UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| SIG SAUER, INC. | ) |  |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) | Civil Action No.:  3:22-cv-00885-JAM |
| v. | ) |  |
|  | ) | September 7, 2022 |
| JEFFREY S. BAGNELL, ESQ., LLC, | ) |  |
| and JEFFREY S. BAGNELL. | ) |  |
|  | ) |  |
| *Defendants.* | ) |  |

_____

**MEMORNANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff SIG Sauer, Inc. ("SIG") filed this lawsuit in March 2022 because, at that time and for several months prior, Defendants made demonstrably false and misleading statements concerning SIG's iconic P320 handgun in a video animation (the "Animation") published on the internet to promote Defendants' law practice.[1]  The Animation misrepresented and visually distorted components of the pistol and made assertions about the mechanics of the P320 that are physically impossible—all in service of the message that the P320 is susceptible of firing without a trigger pull, in an effort to promote Defendants' plaintiff-side firearms liability practice. Before Defendants agreed to take the Animation down pending resolution of this motion, Defendants placed the Animation, among other locations, on the website of defendant Jeffrey S. Bagnell, Esq., LLC (the "Bagnell Firm") and on the YouTube channel of defendant Jeffrey S. Bagnell ("Bagnell").  When viewers left comments questioning the accuracy of the Animation,

_____

[1] Plaintiff filed the case initially in the District of New Hampshire, but that court found that it lacked personal jurisdiction over the Defendants and transferred the case to this Court. Dkt. 38.

Bagnell deleted those comments, thus ensuring that the public would continue to be misled. Defendants are free to represent clients in matters against SIG—and to market their services to potential clients—but they cross a line when they make material misrepresentations of fact in their marketing materials. The Court should issue an order requiring defendants to refrain from republishing the Animation.

## FACTS

SIG manufactures and supplies high-quality firearms to law enforcement, the U.S military, and civilian customers. Declaration of Sean Toner ("Toner Decl.") at ¶ 2. SIG maintains its principal place of business in New Hampshire, where it manufactures firearms and operates an academy to train customers in the safe use of its products. *Id.* The P320 is a striker-fired handgun first produced in 2014 and which, since that time, has been sold to a variety of customers—including the U.S. Army, which has adopted a version of SIG Sauer's P320 as its primary sidearm. *Id.* at ¶ 3. Pulling the trigger of a P320 pistol sets in motion a series of interconnected mechanical steps that disengages the multiple internal safeties and ultimately causes the striker to spring forward and fire a chambered round. *Id.* at ¶¶ 4-7 (describing the series of mechanical steps and the components involved).

Bagnell is a lawyer and principal of the Bagnell Firm. Compl. at ¶ 6. The Bagnell Firm maintains a website at www.bagnell-law.com, on which Bagnell links to press releases and articles regarding his firearms-related personal injury litigation, posts client reviews, and invites clients to contact him about his services. *Id.* at ¶ 7; Declaration of Stephen K. Garvey ("Garvey Decl.") at ¶¶ 2, 6. Prior to its removal pending the resolution of this motion, the Animation appeared on the Bagnell Firm's website on a dedicated page that a consumer could reach by

clicking the "P320 animation" link on the website's main menu.[2]  Compl. at ¶ 16; Garvey Decl.

at ¶ 2.  The Animation appeared at the top of the page, below a banner containing descriptions of

media appearances by Bagnell and press coverage of Bagnell and the Bagnell Firm.  *Id.*; Garvey

Decl. at ¶¶ 2, 6.  The website contained a link to view the Animation on YouTube, where

consumers could leave and respond to comments, and where Bagnell asserted a 2021 copyright

in the Animation.  Compl. at ¶ 16; Garvey Decl. at ¶ 2.

The Animation also appeared on Bagnell's YouTube page, where it was posted on or

about August 28, 2021 and where Bagnell also asserted a 2021 copyright.  Compl. at ¶ 18;

Garvey Decl. at ¶ 3.  In text below the Animation, Bagnell thanked "High Impact in Colorado for

developing this HD animation based on CT scans and microscopic photography" and included

the Bagnell Firm's website address.  According to the view count maintained by YouTube, the

Animation had been viewed on Bagnell's YouTube page over 30,000 times prior to being taken

down.  Compl. at ¶ 18; Garvey Decl. at ¶ 3.

The opening frames of the Animation contain a prominent written message stating that

SIG's P320 has a "mechanism of failure."  *See* Garvey Decl. at Ex. 7 (Animation).  The

Animation then shows images it represents are "based on" a CT scan of a P320.  *Id.* at  0:07.[3]

This conveys the message that what follows is an accurate and exacting representation of the

internal parts of the P320—a message that is false.  The Animation then morphs into fully

animated images purporting to demonstrate the alleged mechanism of failure in action.  *Id.* at

0:11. According to the Animation, "[n]ormal operation requires [a] trigger pull to discharge the

firearm," *Id.* at 2:07, but it is possible for the P320 to have a "defective discharge" with "no

---

[2] *See* https://www.bagnell-law.com/p320-animation
[3] For purposes of citing to the Animation, SIG has included a timestamp reference (minutes:seconds) to identify where in the Animation a particular claim is made.

trigger pull." *Id.* at 2:28.  To support this false narrative, the Animation shows what purport to be images of internal components of the P320.  In reality, though, the images on which the Animation's claims are based are misrepresentations, and the claims themselves are false.

SIG retained Robert "Buzz" Miller, an expert with more than fifteen years of experience in handgun design and manufacturing, to compare the representations in the Animation to an actual P320 firearm.  *See* Declaration of Robert Miller ("Miller Decl.") at ¶¶ 1-7.  Miller found many misrepresentations, distortions or omissions about components of the P320.  *Id.* at ¶¶ 12-43. In addition, Miller observed multiple indications that certain images in the Animation were intentionally manipulated or distorted, *e.g.,* to make surfaces look rounded or deformed rather than smooth and straight, to change the dimensions of components and falsely depict increased space between them, and to have solid parts merge into each other and occupy the same space (a physical impossibility).  *Id., e.g.,* at ¶¶ 30-32.

Disclosures by Defendants in the course of this litigation confirmed Miller's observations regarding intentional manipulation.  Prior to transfer of this case, Bagnell identified in a sworn affidavit the source material for some of the most striking images in the Animation—a sear with a lumpy and malformed surface that, according to text in the Animation, gave rise to a dangerous "rollover condition" that could cause the gun to fire without a trigger pull.



According to Bagnell, the source material for these images consisted of microscopic photographs taken during a March 2021 inspection of two pistols conducted at North Star Imaging in Marlborough, Massachusetts: the Mayes firearm and the Frankenberry firearm. However, photographs from that inspection show that the sears of those two guns look nothing like the sear as depicted in the Animation.  To the contrary, the surfaces were flat, as designed, with no visual evidence of any "inset surface" or "rollover condition."



[Frankenberry]                    [Mayes]

While one of the source material photographs of the *striker foot*—a completely different part—shows a surface that appears at first blush to look lumpy and malformed, the contours in that image were not the part itself, but instead were the result of grease, which Bagnell knew or should have known as he was present for the inspection, and which Bagnell's expert (also present for the inspection) ultimately admitted in an affidavit. Dkt. 25.3 at ¶¶ 4-5.  Once the grease was wiped away, the underlying surface was revealed to be flat with well-formed edges:



*Photographs of Mayes Striker Feet Before And After Cleaning*

Thus, the Animation's depiction of a malformed sear was the result of intentional manipulation. The Animation superimposed the contours of the grease-covered striker foot onto the sear and represented to viewers that the surface of the P320's sear is lumpy and malformed—when those representations are literally false, as Defendants know.

Yet these misrepresentations are just the tip of the iceberg. As described in more detail below and in the Toner Declaration at ¶¶ 13-20 and Miller Declaration at ¶¶ 12-43, the misrepresentations in the Animation, conveyed in images and text, also include:

- Falsely depicting the striker foot as lumpy and deformed (Miller Decl. ¶¶ 18-21)

- Falsely depicting the P320's striker as being able to walk off the sear vertically, which is accomplished by having two solid parts move into each other to occupy the same physical space (*Id.* at ¶¶ 29-33)

- Omitting the current version of the P320 sear, which includes a secondary sear notch, as well as omission of other components of the P320 offered for sale by SIG since 2017 (*Id.* at ¶ 13)

- Falsely depicting "excessive" space between the striker and its housing, including by manipulating images to make parts appear thinner (and gaps wider) than they are (*Id.* at ¶¶ 22-27)

- Falsely omitting the striker foot's downward angle and extension towards the sear. (*Id.* at ¶ 21)

- Falsely depicting the P320's striker safety notch as being shorter than the engagement face of the striker safety lock and omitting the safety notch's forward angle and relief cut at the base of the striker safety notch (*Id.* at ¶¶ 37-40)

- Falsely depicting the physical geometry of the striker safety lock to make it appear loose fitting (*Id.* at ¶¶ 34-35)

- Falsely depicting the physical geometry of the firearm's striker safety lock, including by changing its size and shape (*Id.* at ¶¶ 41-44)

- Falsely depicting the striker safety lock as having rounded edges and a loose fit against the striker (*Id.* at ¶¶ 34-35)

- Falsely presenting the P320 as having a single notch sear, when the P320 has used a two-notch sear since 2017 (*Id.* at ¶ 13)

- Falsely omitting the mechanical disconnector present on the P320 since 2017, as well as other components and safety features (*Id.* at ¶¶ 41-43)

Before it was taken down pending resolution of this motion, the false and misleading Animation created confusion and sowed doubt among gun owners, potential owners, and the wider firearms community.  Indeed, several comments posted on YouTube by viewers of the Animation show that the false message was reaching consumers and causing harm.  One commenter wrote, "*Should I stop carrying my P320?*" Garvey Decl. Ex. 3. Another wrote, "*This is definitely plausible and very well described video [sic] as to what could be the defective issue in Sigs firearms.*"  *Id.* at Ex. 4.  These comments indicate that viewers were being misled into thinking that what is depicted in the Animation might be accurate, when in fact it is literally false.

In addition, Bagnell, or someone on his behalf, actively deleted particular comments.  For example, one commenter wrote, "*I'm going to re-watch it now and look to see if I missed the*

*firing pin safety block aspect.*[4]  *Don't think I did.  Did the earlier models not have one?  And the later models do?*"  *Id.* at Ex. 3.  Another wrote, "*does this reflect the pre-upgrade or post-upgrade [fire control unit]?*"  *Id.* at Ex. 4. In fact, Bagnell, or someone on his behalf, deleted all comments that raised questions about the accuracy of the Animation, while leaving behind a few comments that seem to support the false message.  *Id.* at ¶¶ 4-7.

<strong>ARGUMENT</strong>

To obtain a preliminary injunction, a plaintiff must establish: (1) *either* a likelihood of success on the merits of its case *or* sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied.  *See Timer Warner Cable, Inc. v DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007) (applying standard in Lanham Act false advertising action); *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 442 (D. Conn. 1994) (same); *Brooks v. Consensus Strategies, LLC*, 2007 U.S. Dist. LEXIS 112653, *7 (D. Conn. June 18, 2007) (applying standard in defamation action).  As a result of a recent amendment to the Lanham Act, a plaintiff that demonstrates a likelihood of success on the merits is entitled to a *presumption* of irreparable harm.  *See* 15 U.S.C. § 1116(a) (noting that a plaintiff seeking a preliminary injunction "shall be entitled to a rebuttal presumption of irreparable harm … upon a finding of likelihood of success on the merits for a violation identified in this subsection").  Here, these factors weighs in favor of granting SIG's Renewed Motion for a Preliminary Injunction.

**I.      SIG is likely to succeed on the merits.**

---

[4] Based on context, this reference to a "firing pin safety block" likely refers to the striker (i.e., firing pin) safety, a feature which has been present on the P320 since the firearm was first sold.

SIG has brought two counts against defendants: (1) false advertising under the Lanham Act and (2) defamation. Although SIG need only show that it is likely to succeed on the merits of one of these counts, in fact SIG is likely to prevail on both.

### a.  Lanham Act Claim

To establish false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must demonstrate that: (1) the statement in the challenged commercial advertising is false, (2) the defendant misrepresented an inherent "quality or characteristic" of plaintiff's product, (3) the defendant placed the false or misleading statement in interstate commerce, and (4) the plaintiff has been injured—or, in the case of a motion for preliminary injunction, is likely to be injured—as a result of the misrepresentation, either by direct diversion of sales or a lessening of goodwill associated with its products. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255-56 (2d Cir. 2014) (discussing elements in context of damages claim); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980) (noting that, with respect to a claim for injunctive relief, "[t]he statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising").

Here, SIG can prove each of these elements and is likely to succeed on the merits.

### i.  Commercial Advertising

Courts apply a three-part test to determine whether a representation constitutes "commercial advertising or promotion" under the Lanham Act. They consider whether the representation: (a) constitutes commercial speech, (b) was made with the intent of influencing potential customers to purchase the speaker's goods or services, and (c) are disseminated sufficiently to the relevant purchasing public. *See e.g., Gmurzynska v. Hutton,* 355 F.3d 206,

9

210 (2d Cir. 2004), citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56-58 (2d Cir. 2002).[5] Here, the evidence more than satisfies this test.

As the U.S. Supreme Court has recognized for some time, it is "well established that attorney advertising is commercial speech." *Fla. Bar v. Went for It*, 515 U.S. 618, 623 (1995). Although the advertising at issue in *Went for It* involved direct mail solicitations to victims of accidents or disasters, the modes of attorney advertising since the Supreme Court's decision in that case have expanded in light of advances in technology. Now, of course, attorneys and law firms routinely market their services and expertise on websites and social media platforms, and rely far less on direct mailings and other forms of outmoded communication. Accordingly, many states, including Connecticut and Massachusetts (the two states in which Bagnell is admitted to practice), now recognize that law firm websites constitute attorney advertising. *See* Massachusetts Rule of Professional Conduct 7.2 Comment 3A ("[A] website or home page would generally be considered advertising"); Connecticut Rule of Professional Conduct 7.2(c)(1) and Commentary (permitting lawyers to pay reasonable costs of advertisements, including the cost of domain name registrations). Thus, it is clear that Defendants' website constitutes commercial speech.

That Bagnell posted the Animation on his firm's website demonstrates an intention to use the Animation commercially, *i.e.*, to raise awareness of his expertise as a litigator in gun accident cases, in particular those alleging uncommanded discharges involving the P320, and to attract potential clients. The Bagnell Firm's website places significant emphasis on Bagnell's

---

[5] Following the Supreme Court's decision in *Lexmark Int'l Inc. v. Static Control Components*, 572 U.S. 118, 136 (2014), a plaintiff need not establish the additional element that the parties are in direct competition with each other.

experience in P320 litigation.  When a consumer goes to the website, the Welcome page gives the consumer the option to "enter" or, alternatively, to read Bagnell's opening statement in one of his cases against SIG.  The consumer who clicks "enter" is taken to the home page, which touts Bagnell's inclusion on a list of the Best Lawyers in New England and highlights his work for plaintiffs in cases against SIG.  From the home page, the consumer can navigate to the "client reviews" page, which includes (at the top of the page) a testimonial from a client in litigation against SIG, or to the "cases" or "practice group" pages, both of which highlight Bagnell's experience in cases against SIG.  Inclusion of the Animation on the website, amidst these other overt examples of advertising, underscores that its purpose is to influence potential clients to purchase Defendants' services.

This conclusion is no different because Defendants also published the Animation on YouTube.  To the contrary, this fact only highlights Bagnell's intention to use the Animation as a marketing tool.  Just like Defendants' website, which is accessible to anyone in the world with an internet connection, YouTube is broadly accessible and is commonly used by lawyers and law firms to advertise their services.  *See* Garvey Decl.  Ex. 8-9. In addition, YouTube has an active community of gun owners and enthusiasts and would likely allow reach more viewers than if published on the website alone.  The fact that Bagnell included the firm's website address under the Animation on YouTube underscores that he intended to use it commercially.  By providing the website address, Bagnell provided viewers with all the information they would need to learn about his expertise and contact him about potential legal representation.

ii.  *Falsity*

A Lanham Act plaintiff establishes falsity by proving either that: (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to

11

deceive or confuse customers (i.e., impliedly false). *See Merck Eprova AG*, 760 F.3d at 255-56.

Where an advertising claim is literally false, the court may enjoin the use of the claim without

reference to the advertising's impact on the public. *Id.* (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 600

F.3d 93, 96 (2d Cir. 2010)). Where a claim is impliedly false, the plaintiff must also prove that

consumers were deceived. The plaintiff is entitled to a presumption of consumer deception

where it shows that the defendant "intentionally set out to deceive the public," and that the

defendant's deliberate conduct was of an egregious nature.[6] *Id.* (citing *Johnson & Johnson v.

Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992)).

Depictions of products in animations are no less susceptible to a finding of literal falsity

than claims expressed through words. *See, e.g., Schick Mfg. v. Gillette Co.*, 372 F. Supp. 2d 273,

285-86 (D. Conn. 2005) (finding animation literally false because it exaggerated extent to which

defendant's vibrating razor raised hair up and away from skin prior to shaving); *S.C. Johnson &

Son, Inc. v. Clorox Co.*, 241 F.3d 232, 239 (2d Cir. 2001) (upholding district court's finding that

animation was literally false because it exaggerated extent to which competitor's "Slide Loc"

plastic bag leaked water when filled and held upside down). Indeed, this Court has observed it is

"wrong as a matter of law" to argue that an animation need not be exact, and that "a party may

not distort an inherent quality of its product in either graphics or animation." *Schick Mfg.*, 372 F.

Supp. 2d at 285-86. Here, the Animation is replete with literally false statements.

First, the Animation conveys the literally false message that the firearm depicted is an

accurate representation of the P320 firearm currently being offered for sale by SIG. Both the

---

[6] Once the plaintiff establishes deceptive intent, the burden shifts to the defendant to demonstrate the absence of consumer confusion. *Id.* (citing *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992))

Bagnell Firm website and Bagnell's YouTube channel present the Animation alongside a conspicuous note in which Bagnell asserts a "2021" copyright.  Garvey Decl. at ¶¶ 2-3.  When an individual clicks on the animation, the opening frames specifically mention the "SIG Sauer P320".  Garvey Decl. Ex. 7 at 0:00. The Animation then indicates that it is "based on CT scans" and shows computer-generated animated images of what it claims is a SIG P320.  *Id.* at 0:11.  Considering the Animation in its entirety, a reasonable consumer would be led to believe that the P320 depicted is the actual SIG P320 firearm.  But the P320 depicted in the Animation is <u>not</u> an accurate depiction of any SIG P320, *see* Miller Decl. at ¶¶ 12-43, much less the P320 currently being sold by SIG.

Second, focusing on the critical sear and striker components, the Animation falsely depicts malformed versions of the P320's sear notch and striker foot—depicting the sear as lumpy and uneven, and depicting both the sear and striker foot as having an "inset surface" and purported "rollover condition."  In reality, the surfaces of both parts are flat with straight edges.  *Miller Decl.* at ¶¶ 13-20.  What the Animation portrays as an uneven, lumpy service is just grease.  As discussed above, Bagnell provided photographs of P320 parts to the animator, High Impact LLC, and one of those photographs depicts what appears at first blush to be lumps in the surface of the striker foot, but in fact was just a grease-like substance that had accumulated on the part.  When the grease was wiped away—during an inspection process attended by Bagnell— the part showed a flat and pristine surface with straight edges.  SIG is not aware of any real world P320 striker or sear that looks like those depicted in the Animation, and the conditions purportedly shown are not the product of typical wear or any manufacturing process.  Miller Decl. at ¶¶ 15, 19.  Thus, the Animation's depictions of the sear and striker foot are literally false.

13

Third, the Animation claims that the striker can walk vertically up off the sear.  This representation is false, and the Animation depicting it has been manipulated.  It is impossible for the striker to walk up off the sear as depicted because the striker, striker housing, slide and frame rails are all held at rest biased in their upwardmost position, making it physically impossible for the striker to move upwards as depicted.  Miller Decl. at ¶ 33.  Such movement is only made possible in the Animation by misrepresenting the positioning of these parts, by shrinking the size of some parts to increase the apparent "spaces" between them, and by manipulating the images so that solid parts (the slide and the frame rails) merge into each other and occupy the same space—a physical impossibility.  Miller Decl. at ¶¶ 32-33.

Fourth, the Animation misrepresents the height and geometry of the P320's striker safety notch and striker safety lock.  Miller Decl. at ¶¶ 37-40. It depicts the safety notch as being only half its actual height, omitting both the back angle of the notch and the undercut at the bottom of the notch, and depicts the safety lock as having rounded edges and a "loose fit" against the striker.  Miller Decl. at ¶ 38.  This creates the false impression that the two parts could slip past each other, when in reality the geometry of the two parts has them lightly fitted and locked against each other.

Finally, the Animation depicts the P320 as having a single-notch sear, when the P320 has used a two-notch sear since 2017, and it completely omits the mechanical disconnector and the safety lever design used on the P320 since 2017.  Miller Decl. at ¶¶ 13, 41-43.  These misrepresentations and omissions, individually and taken together, demonstrate that the Animation does not accurately depict any real-world SIG P320.

> iii.  *Misrepresentation of an Inherent Quality or Characteristic of the P320*

The evidence also establishes that Defendants' literally false representations relate to an inherent quality or characteristic of the P320 and are therefore material.  Specifically, the Animation makes numerous misrepresentations about the internal components of SIG's P320— *i.e.*, "inherent characteristics" of the firearm—and it uses those false statements and misrepresentations in service of a message that the P320 is inherently unsafe because of specific alleged flaws in the design and manufacture of the P320.  These are precisely the types of claims that can be expected to impact a consumer's purchasing decision or opinion of SIG.  On this record, there is no doubt that the misrepresentations of fact relate to an inherent quality or characteristic of the P320.

### iv.  Tendency to Deceive Consumers

A plaintiff need not introduce evidence of consumer deception if the advertisement contains literally false representations.  *See Merck Eprova AG*, 760 F.3d at 255-56.  Thus, because the Animation is replete with literally false representations, SIG need not offer evidence of consumer deception.  However, it is clear enough from the comments left by consumers on Bagnell's YouTube page that the Animation is deceptive—and it is clear from Bagnell's systematic deletion of comments that the deception was willful.[7]

For example, in a comment that Bagnell has since deleted, a self-identified SIG customer said: *"I'm going to re-watch it now and look to see if I missed the firing pin safety block aspect. Don't think I did.  Did the earlier models not have one?  And the later models do?"* Garvey Decl. Ex. 3.  The customer then stated that *"if the early models had a firing pin block this video*

---

[7] To be clear, SIG is not required to prove that defendants acted willfully, but the fact that Bagnell has been deleting YouTube comments that question the accuracy of the Animation leaves no doubt as to defendants' state of mind.

15

*is misleading.  Cause if all else fails it will stop the pin."  Id.*  These comments were

subsequently deleted.  *Id.*  As discussed above, the P320 has all along had both a striker safety

notch and safety lock (both misrepresented in the Animation).  In yet another comment that

Bagnell deleted, a user wrote, *"does this reflect the pre-upgrade or post-upgrade FCU?"  Id.* at

Ex. 4.

     *v.  Interstate Commerce*

   The Animation was published on the internet, which constitutes interstate commerce.

*See, e.g. U.S. v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (noting that a web site "is an avenue

of interstate commerce"); *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1180

(D. Or. 2008) (statements made on website were advertisements in interstate commerce).

   **b.  State Law Claim**

   Although SIG need only demonstrate likelihood of success on one claim, the evidence

leaves no doubt that SIG is likely to succeed on the merits of *all* its claims, including its claim

under state law.  The elements of a defamation claim are straightforward—defendants (1)

published a defamatory statement (2) identifying the plaintiff, (3) to a third party, and 4) the

plaintiff's reputation suffered injury as a result. *Spears v. Elder*, 124 Conn. App. 280, 287 (Ct.

App. 2010). A statement is defamatory when it would tend to lower the plaintiff "in the

estimation of the community or to deter third persons from associating with him." *Id.* Where a

defamatory statement "impugns the basic integrity or creditworthiness of a business… injury is

conclusively presumed." *QSP, Inc. v. Aetna Casualty & Surety Co,* 256 Conn. 343, 21 (2001).

Even defamatory statements that do not impugn the basic integrity of a business but nonetheless

"denigrat[e] the quality of the business' goods or services" are actionable as commercial

disparagement, a "species of defamation." *Id.*

Here, SIG has clearly demonstrated a likelihood of success on its defamation claim. Defendants published the Animations on the internet, *i.e.*, to anyone with an internet connection and a computer, tablet, or smart phone. The Animation contains myriad false statements about SIG's product. These false statements are defamatory as they tend to disparage SIG's reputation and goodwill. The character of the statements impugn the basic integrity of SIG as a company by implying that SIG's design and manufacturing practices would result in, for example, the grossly deformed parts depicted (falsely) in the Animation. Finally, the manipulation of the images in the video, the depiction of physically impossible conditions, and Bagnell's systematic deletion of certain YouTube comments, all discussed above, underscores that the false statements in the Animation were not merely "accidental," but that defendants are willfully engaged in an effort to mislead. Thus, there is ample evidence that Defendants failed to exercise reasonable care in ensuring that their statement (the Animation) was accurate.

## II.    Likelihood of irreparable harm.

To obtain a preliminary injunction, the moving party need only demonstrate a *likelihood* of injury[8] to reputation or goodwill. *See Johnson & Johnson*, 631 F.2d at 190 ("The statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising."). Here, the Animation's continued public availability threatens SIG's reputation and goodwill. It conveys the false message that the P320 has internal defects that allow the striker to "walk off" the sear and fire without a trigger pull (which the Animation accomplishes by merging two solid parts into each other, a physical

---

[8] Irreparable harm is "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

impossibility).  It conveys the false message that the P320 contains substandard and poorly-manufactured parts that appear lumpy and malformed rather than flat with straight edges.  It conveys the false message that the P320 lacks certain safety features that would *prevent* an uncommanded discharge of the type alleged in the Animation.  In short, the Animation conveys the message that a consumer should not purchase the P320 and that SIG's design and manufacturing procedures are substandard.

This evidence is more than sufficient for purposes of a preliminary injunction—particularly in light of Congress' recent amendment of the Lanham Act providing for a presumption of irreparable harm where a plaintiff shows a likelihood of success on the merits.  *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."); *see also Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2021 U.S. App. LEXIS 30144, *19, n.8 (9th Cir. Oct. 7, 2021) (post-amendment, holding that false advertising plaintiff can obtain injunctive relief without affirmative proof of irreparable harm).  As discussed above, SIG is likely to succeed on its Lanham Act claim.

Thus, it is defendants' burden to rebut the presumption of irreparable harm, and on these facts, defendants cannot do so.  Defendants published the Animation knowing that it does not accurately depict any version of the P320, much less the version currently on the market.  By intentionally fostering such confusion, defendants sowed doubt among consumers and the firearms community, which risked irreparably harming SIG's brand, reputation, and goodwill.  Moreover, a number of comments—many since deleted—demonstrate that some irreparable harm has likely been experienced already.  One user asked, *"Should I stop carrying my P320?"*

18

Garvey Decl. at Ex. 3.  And in a comment showing that the Animation has the potential to affect

an entire line of SIG products, not just the P320, another asked: *"Was it only the P320 models*

*specifically affected? Or the whole line that shares that FCU … like the M18 etc."  Id.*

**III.    The harm to SIG outweighs any harm that granting the requested injunction would
inflict on defendants.**

To the extent that the Court considers this equitable balancing test as part of its analysis,

the irreparable harm that will affect SIG if the Court does not issue an injunction greatly

outweighs the de minimis effect on defendants if the Court does issue an injunction.  Defendants

may continue to advertise their services; they simply must refrain from publishing the false and

misleading Animation as part of that effort.

**IV.    The public interest will not be adversely affected, but rather would be served by
granting the requested injunction.**

It is in the public interest to remove false advertising from the marketplace. *See Annalee*

*Mobilitee Dolls, Inc. v. Townsend Design Studios, Inc.*, 2003 U.S. Dist. LEXIS 22164, *45 (D.

N.H. Dec. 9, 2003) (finding that the public interest would be served by enjoining the defendants

from engaging in the allegedly misleading advertising).  Thus, an order requiring defendants to

take down the Animation would not adversely affect the public interest.  To the contrary, an

order removing the false advertisement is affirmatively in the public interest.

**V.    SIG has raised sufficiently serious questions going to the merits to make them fair
ground for litigation and has demonstrated a balance of hardships tipping decidedly
in its favor and a likelihood of irreparable harm if the Court denies its motion for
preliminary injunction.**

Though SIG has shown that it is likely to succeed on the merits of its claims, it has also

raised sufficiently serious questions going to the merits of the case and a balance of hardships

warranting issuance of a preliminary injunction. The Second Circuit has recognized that "the

"serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d. Cir. 2010). Consequently, a plaintiff may secure a preliminary injunction if  "the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Nastro v. D'Onofrio*, 263 F.Supp. 2d 446, 460 (D. Conn. 2003).

Here, and as described above, SIG has shown a strong likelihood of success as to both its Lanham Act and state law claims. The balance of hardship tips decidedly in SIG's favor as SIG will suffer irreparable harm to its reputation in the event that the Animation once again becomes publically available. In contrast, issuance of a preliminary injunction will not harm the Defendants as they will remain free to advertise their services and to bring litigation against SIG, they simply cannot do so using the false and misleading Animation. As a result, the "serious questions" test also favors the issuance of a preliminary injunction.

## CONCLUSION

For the forgoing reasons, SIG Sauer respectfully requests that this court grant its motion for a preliminary injunction and order the Bagnell defendants to cease and refrain from publishing the Animation to the public in any form, on any platform, on the internet or in any other media, or in any other way outside of the context of litigation.

Dated:  September 7, 2022

Respectfully submitted,

SIG Sauer, Inc.

By its attorneys,

*/s/ James R. Smart*
James R. Smart (ct20982)
McElroy, Deutsch, Mulvaney & Carpenter,
LLP
30 Jelliff Lane
Southport, CT 06890
Telephone: 203-319-4039
Fascimile: 203-259-0251
jsmart@mcmc-law.com

Jeffrey I.D. Lewis (ct13599)
Foley Hoag, LLP
1301 Avenue of the Americas, 25th Floor
New York, New York 10019
Telephone:  212-812-0400
Facsimile:  212-812-0399
jidlewis@foleyhoag.com

Anthony D. Mirenda (*pro hac pending*)
K. Neil Austin (*pro hac pending*)
Stephen K. Garvey (*pro hac pending*)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone:  617-832-1000
Facsimile:  617-832-7000
amirenda@foleyhoag.com
naustin@foleyhoag.com
sgarvey@foleyhoag.com

## <u>CERTIFICATE OF SERVICE</u>

I, James R. Smart, hereby certify that on September 7, 2022 I caused a true and correct

copy of this document to be served on the following via the methods of service indicated below:


*Via the CM/ECF system and first class mail*

**Lorraine D. Belostock**
Todd and Weld LLP
One Federal Street
Boston, MA 02110

**Giles Bissonette**
**Henrey Klementowicz**
American Civil Liberties Union of New Hampshire
18 Low Ave.
Concord, NH 03301

**Brian Matthew Hauss**
**Laura Moraff**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

**Dan Barrett**
American Civil Liberties Union of Connecticut
765 Asylum Ave., 1st Floor
Hartford, CT 06105

22

*Via first class mail*

**Joseph M. Cacace**
**Howard M. Cooper**
Todd and Weld LLP
One Federal Street
Boston, MA 02110

<u>*/s/ James R. Smart*</u>
James R. Smart