UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
SIG SAUER, INC.,                :   No. 3:22CV885(JAM)
                                :
            Plaintiff           :
                                :
        v.                      :
                                :
JEFFREY S. BAGNELL, ESQ., LLC,  :
and JEFFREY S. BAGNELL,         :
                                :   New Haven, Connecticut
            Defendants          :   March 10, 2023
                                :
- - - - - - - - - - - - - - - - x


<u>MOTION HEARING</u>

B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            FOLEY HOAG LLP
                255 Seaport Blvd.
                Boston, Massachusetts 02210-2600
            BY:  ANTHONY MIRENDA, ESQ.

            McELROY DEUTSCH MULVANEY & CARPENTER LLP
                30 Jelliff Lane
                Southport, Connecticut 06890-1436
            BY:  JAMES ROSS SMART, ESQ.

    FOR THE DEFENDANT:

            JEFFREY S. BAGNELL, ESQ., LLC
                55 Post Road West, Suite 200
                Westport, Connecticut 06880
            BY:  JEFFREY S. BAGNELL, ESQ.


                        Diana Huntington, RDR, CRR
                        Official Court Reporter

1                           **2:04 P.M.**

2                   THE COURT:  We're here today for arguments on

3      motions in SIG Sauer v. Bagnell.

4                   Appearance of counsel, please, for SIG Sauer.

5                   MR. MIRENDA:  Good afternoon, Your Honor.

6      Anthony Mirenda from Foley Hoag representing SIG Sauer and

7      third-party defendant Ron Cohen.

8                   MR. SMART:  Good afternoon, Your Honor.  James

9      Smart representing the same parties.

10                  THE COURT:  Good afternoon.

11                  Mr. Bagnell.

12                  MR. BAGNELL:  Your Honor, Jeff Bagnell, pro se,

13     for the defendants.

14                  THE COURT:  All right.  So I guess, Mr. Mirenda,

15     these are your motions, if you'd like to proceed.

16                  MR. MIRENDA:  Yes.  Thank you, Your Honor.

17     Should I --

18                  THE COURT:  If you don't mind, that would be

19     great.

20                  I'll just ask you at the outset, is it your view

21     that Connecticut law governs here?

22                  MR. MIRENDA:  I'm sorry, Your Honor?

23                  THE COURT:  Is it your view that Connecticut law

24     governs with respect to the common law claims, the

25     defamation?

1           MR. MIRENDA:  Yes, Your Honor, it is.

2           THE COURT:  All right.

3           MR. MIRENDA:  So, Your Honor, we're here on two

4    motions.  The first is SIG Sauer's motion to dismiss the

5    three counterclaims asserted against it.  And the second

6    is third-party defendant Ron Cohen's motion to dismiss the

7    one claim that's asserted against him.

8           With respect to the SIG Sauer motion, I'll take

9    that first.

10          THE COURT:  Sure.  And one of them has already

11   agreed to be dismissed, right, the intentional

12   interference?

13          MR. MIRENDA:  Yes.  Count Three has been waived,

14   I guess I would say, from the plaintiff in their

15   opposition.  So it's really only the two.

16          THE COURT:  Two defamation and the CUTPA, at

17   least as to SIG Sauer.

18          MR. MIRENDA:  Exactly.  The Connecticut trade

19   practices claim.

20          Basically, Your Honor, there are four reasons

21   why both of those claims should be dismissed.

22          First, is that to the extent that those claims

23   rest on allegations relating to the filing of this

24   lawsuit, the filing of this lawsuit is absolutely

25   privileged by the litigation privilege.  As framed in the

1     complaint, the Connecticut Unfair Trade Practices claim

2     pretty clearly is the complaint there is that the filing

3     of the lawsuit, the timing of the filing of the lawsuit

4     was somehow an unfair practice.  So from that standpoint,

5     the absolute litigation privilege protects --

6           THE COURT:  I take it your argument is really

7     that it protects it at least during the pendency of the

8     litigation, but that you could have a vexatious litigation

9     claim but that has a favorable termination requirement,

10    right?

11          MR. MIRENDA:  That's correct, Your Honor.

12    Rule 11 certainly would be applicable if that were in

13    play.  Vexatious litigation --

14          THE COURT:  Sure.  That's premature.  Okay.

15    All right.

16          MR. MIRENDA:  The second reason -- and these

17    reasons really go to the extent that the complaint is

18    viewed as addressing -- as directed at the press release

19    that was issued at the time the lawsuit was filed.  To the

20    extent that the claims are addressing the press release,

21    there are really kind of three interrelated reasons why

22    the claims should be dismissed.  First, the press release

23    is not a defamatory statement because it is accurate.  It

24    is accurate in that it accurately describes --

25         THE COURT:  Can I stop you for a second?  I have

1  to say I was confused by the argument, basically what I

2  call your truth argument.

3          MR. MIRENDA:  Yes.

4          THE COURT:  To the extent that you're saying

5  that, well, it's accurate in that the underlying

6  allegations are true, that seems to me to be something I

7  can't resolve at this point in time.  But if you're saying

8  it's accurate to the extent that it accurately reports

9  basically statements that would otherwise be protected by

10  the litigation privilege, then you're not really claiming

11  truth as a defense, right, but you're claiming the

12  coverage of the fair report privilege, right?

13          MR. MIRENDA:  I would say, Your Honor, those two

14  arguments are related but there is a distinction between

15  them.

16          The first argument, the truth aspect of it, is

17  that this Court can assess whether or not the two

18  sentences from the press release that Mr. Bagnell focuses

19  on in his complaint, whether those two sentences

20  accurately describe the lawsuit, the contents of the

21  lawsuit and SIG's belief.  If they do, if those statements

22  accurately describe the lawsuit, then they are true and

23  therefore they are not defamatory.

24          THE COURT:  But that's because of the fair

25  report privilege, right?

1    MR. MIRENDA:  I would say, actually, no,

2  Your Honor.  My distinction there is that if it accurately

3  describes the proceeding, then it is true.  If it --

4  independently of that, there is a fair report privilege

5  which also protects.  So it's true so therefore not a

6  defamatory statement.

7    THE COURT:  Maybe I'm still puzzled a little bit

8  about that, about what situation your truth argument would

9  apply when the fair report privilege does not.  Is there

10  any daylight there between the two?

11    MR. MIRENDA:  It may be, Your Honor -- as we

12  stand here, I can't imagine one, so it may be that the two

13  arguments essentially are coextensive.

14    THE COURT:  And then if you say, well, it's true

15  in terms of what SIG Sauer believes, I think Mr. Bagnell's

16  point is they actually don't believe this, they're just

17  basically in bad faith making these claims about me but

18  they don't actually believe it.  That would be disputed,

19  right?  If you want to say, well, it's accurate in terms

20  of what SIG Sauer believes, well, we don't know yet what

21  SIG Sauer believes.

22    MR. MIRENDA:  Well, Your Honor, I guess I would

23  say there is no -- there's no plausible allegations in the

24  complaint, factual matter in the complaint that would call

25  SIG's belief in the merits of its litigation -- for

1  example, SIG Sauer believes that it will prevail.  That is

2  both opinion --

3          THE COURT:  Right, we haven't talked about that

4  yet.

5          MR. MIRENDA:  -- which is a separate doctrine,

6  we haven't talked about that yet, but is also a

7  description of SIG's belief.  And there's no kind of

8  plausibly alleged factual underpinning.

9          THE COURT:  Okay, great.  Do you have the press

10  release in front of you?  I have it in front of me.

11          MR. MIRENDA:  I do, Your Honor.  Yes.

12          THE COURT:  So I tried to look at the press

13  release and essentially do a side-by-side with the first

14  version of the complaint, of course, not the later version

15  because the later version was after the press release,

16  right?

17          MR. MIRENDA:  Correct.

18          THE COURT:  It looks to me that there are parts

19  where I can see your argument that SIG Sauer believes

20  these misrepresentations are willful in nature, I get

21  that.  You're going to say that's an opinion.  It's a

22  little harder for me on the rest of the statement because

23  it states that "to ensure that Mr. Bagnell is not allowed

24  to continue deceiving the public about the safety of the

25  P320."  It strikes me that that's a statement of fact,

1  right, I would say, right?  If in fact he is deceiving the

2  public about the safety of the P320, is that just opinion?

3          MR. MIRENDA:  Your Honor, the statement is that

4  SIG is taking action with the filing of the complaint to

5  ensure that that doesn't happen.  And so it is a

6  description of the remedy being sought by SIG Sauer in the

7  complaint.  The equitable remedy that SIG Sauer is seeking

8  is an injunction finding those statements that we've

9  challenged false and prohibiting him from continuing to

10  use those deceptive statements as part of his advertising

11  campaign.

12          THE COURT:  And then it goes on in the next

13  clause, it says "and use such deceptions in an attempt to

14  generate business for his legal practice."  So how is

15  that -- how is that protected, that statement?

16          MR. MIRENDA:  That, again, is the remedy that

17  SIG is seeking here.  SIG's affirmative claim in this case

18  is a Lanham Act claim that challenges these false

19  statements used in advertising.  So that description, the

20  attempt to generate business, is a reference to the

21  advertising purpose.

22          THE COURT:  Okay.  All right.

23          MR. MIRENDA:  And then the last sentence is --

24          THE COURT:  No, I got that.

25          MR. MIRENDA:  Okay.

1          And so, in any event, Your Honor, from SIG's

2    perspective, that statement is a description of the remedy

3    that SIG is seeking by the litigation, the injunctive

4    remedy to order him not to make those statements, not to

5    be able to use them in advertising.  That's our core point

6    there.

7          THE COURT:  I see.  Okay.

8          MR. MIRENDA:  I would add that on the fair

9    report privilege aspect that we've been talking about, the

10    case that I would point the Court to -- well, I guess

11    maybe I should make two points.

12          First, there's a significant argument that the

13    fair report privilege should be limited only to

14    traditional media.  And I think that the Second

15    Restatement Section 611 that is cited in the Connecticut

16    Supreme Court case I think makes clear that privilege is

17    not limited to traditional media but is available to

18    anyone who speaks on, like SIG did here, a lawsuit that's

19    filed.  That's sort of the first point.

20          The --

21          THE COURT:  And the malice point, I wonder if

22    you might address that.

23          MR. MIRENDA:  Yes, Your Honor.

24          Again, I think that simply adding malice to --

25    the word "malice" to the complaint is not the kind of

1  allegation that sufficiently rises to the plausibility

2  standard.  The Court has an obligation to assess the

3  privilege claim at a motion to dismiss.  And so defamation

4  claims like this do have a heightened pleading standard

5  because the privilege is there to protect not only

6  ultimate liability but also the need even to defend the

7  case.  It's like many privileges where there really does

8  need to be a searching inquiry at this point that the --

9  that the allegations provide sufficient basis, not simply

10  use the language of the rule.

11          THE COURT:  Maybe let's step back for a moment.

12          Do you agree that there is essentially, I think

13  as Mr. Bagnell is arguing, a malice exception to the fair

14  report privilege?

15          MR. MIRENDA:  I don't know that any court in

16  Connecticut has adopted it, Your Honor.  I know that

17  Mr. Bagnell has argued it.  I could not find a case where

18  a court in Connecticut has adopted this sort of malice

19  exception.  And again, I would go back to, as a threshold

20  matter, so long as the report is substantially accurate,

21  then we don't get to malice.  We don't even get to malice.

22  If the report is substantially accurate, it's protected by

23  the privilege and there's no question of malice.  It's

24  only if the report is inaccurate.

25          THE COURT:  So I guess maybe your argument is

1   there's not a malice exception to the fair report

2   privilege, the fair report privilege applies regardless of

3   malice.

4          MR. MIRENDA:  Again, so long as --

5          THE COURT:  So long as it's a fair report.

6          MR. MIRENDA:  -- it's a fair report.

7          THE COURT:  Right.  Obviously, if it doesn't

8   qualify as a fair report, the privilege doesn't apply in

9   the first place, we don't need to think about malice,

10  right?

11         MR. MIRENDA:  Correct, Your Honor.  Correct.

12         THE COURT:  When you think about something like

13  the fair report privilege, you think of the classic sort

14  of media source, the *New York Times* reporting on the fact

15  that a lawsuit has been filed.  You can understand the

16  reason for the privilege to apply in that context because

17  you have basically a reporter who's just trying to get the

18  news out.  A lot harder, although not unprecedented, of

19  course, to envision that the reporter is acting with

20  malice.  We know the *New York Times* has had some issues

21  there.  It strikes me maybe the considerations are a bit

22  different when the, quote, reporter is actually the

23  litigant, right, that's filing the lawsuit, making all

24  these, you know, very clearly adverse allegations against

25  somebody.  They can do it.  They've got the litigation

1  privilege, okay.  But then they kind of sweep in and say,

2  okay, we're going to use our resources to publish broadly

3  the fact that we're filing this lawsuit.  And it made me

4  wonder a bit about the applicability if it does apply of a

5  finding of malice in that context, because the incentives

6  seem to me to be quite different.  But I'm not sure if I

7  fully understand that.

8         MR. MIRENDA:  Yes, Your Honor.  I guess I would

9  say that -- well, two things.  One, I think the

10  Alzheimer's Association case is pretty instructive here

11  because there the reports that were at issue were by the

12  association and it was to their donors, it was broadly

13  disseminated to donors.  It wasn't even about a litigation

14  that they filed; it was about their own investigation.

15  And there it was a Southern District of New York case but

16  the court did not grapple with malice once the court

17  concluded that the description was substantially accurate

18  to what the investigation had done.  So I'd say that there

19  are few cases in this area that press on this particular

20  point, but that's one that I think comes close and is not

21  even a report about litigation; it's a report about

22  investigations and sent to the donors.

23         THE COURT:  I see.  Okay.

24         MR. MIRENDA:  And in that case the court also

25  noted that the communication to the donors included not

1    only a report about the investigation but it included a

2    report about what the association was doing, what actions

3    it took, what steps it took.  And in that sense it's like

4    the report here of, you know, SIG filing the lawsuit in

5    order to obtain the injunctive relief.  I think on those

6    facts, it's close.

7              I think the other piece that we haven't yet

8    talked about is to the extent that what's contained in the

9    challenged statements is opinion, and that is a statement

10   of SIG's belief.  Again, there's no malice assessment in

11   evaluating that.  If it's a statement of opinion, then it

12   is not a defamatory statement and therefore not

13   actionable.

14             THE COURT:  So if I go out on the street and put

15   a sandwich board up about my neighbor who I have a beef

16   against "I believe my neighbor engaged in," you know,

17   robbed three banks and, who knows, molested five children

18   yesterday, you'd say as long as I say "I believe," right,

19   the fact that it's "I believe that he robbed three banks

20   and molested five children yesterday," the rest of that is

21   just opinion.  Is that kind of your argument?

22             MR. MIRENDA:  My argument is that the Court is

23   obliged to look at the context of the statement.  And for

24   a reasonable person looking at that statement would

25   understand it to be a statement of opinion, then the

1  courts say --

2          THE COURT:  But it's an opinion about facts,

3  right?  It's not like "I believe my neighbor is a dirty

4  rotten scoundrel."  Well, then you know that's just an

5  opinion you could see would be classically protected.

6  It's when you couch the term "I believe" but then what

7  follows are specific what would otherwise be facts.

8          Let me change the hypo on you.  Suppose on the

9  sandwich board I don't say I believe, okay, but I say

10  "Yesterday my neighbor robbed three banks and molested

11  five children."  Protected or is that just opinion?

12          MR. MIRENDA:  Absent context which would change

13  the assessment, that would not be protected.  That would

14  be a statement.

15          THE COURT:  So now let's leave the hypothetical

16  world and we go and look at what the real world says.

17  You're saying here that Mr. Bagnell is deceiving the

18  public about the safety of the P320 and he's doing it to

19  generate business for his legal practice.  That sounds

20  pretty factual to me.

21          MR. MIRENDA:  Well, it's --

22          THE COURT:  Even though couched with "we

23  believe."

24          MR. MIRENDA:  I think the difference,

25  Your Honor, is that it's not all of the specific facts

1    that are alleged.  So, for example, the complaint

2    identifies very specific misrepresentations in the

3    animation.  Those not only were alleged but there's

4    support in the record, affidavit support from an expert

5    who analyzed the animation.  So there's substantial

6    information before the Court as to the foundation for that

7    belief, for the belief.  So even if SIG had gone on the

8    public square and read the complaint, read all of the

9    allegations in the complaint, there I would say that's

10   still expressing an opinion based on the information

11   that's in the complaint and based on the expert's

12   testimony.  That's detailed.  Here, the statement that's

13   in the press release refers to legal action and then

14   provides a generalization.  Which is not the kind of

15   specific identifiable, you know, person X molested three

16   children in Your Honor's hypothetical but more the general

17   SIG believes that we're attempting to essentially

18   vindicate our rights.

19            THE COURT:  I see.  Okay.

20            So I don't know if you have more to say on SIG's

21   or if you want to turn to Mr. Cohen.

22            MR. MIRENDA:  I think the -- I'll turn to

23   Mr. Cohen.

24            I think here there are sort of two levels to the

25   motion to dismiss.  The first sort of on the substance,

1  Mr. Cohen is alleged to have aided and abetted SIG.  In

2  the complaint there are -- other than the legal

3  boilerplate statement of the claim at the end, there are

4  only two paragraphs that discuss Mr. Cohen at all.  Most

5  of them discuss the situation in Germany that's got

6  absolutely nothing to do with the claim here.

7       The only kind of potentially relevant

8  allegations in the complaint are: (1) his status,

9  Mr. Cohen is the CEO; and (2) the allegation on

10  information and belief that Mr. Cohen authorized the

11  lawsuit.  That's what's in the complaint.

12       Authorizing the lawsuit cannot, as a matter of

13  law, be a wrongful act that would support an aiding and

14  abetting claim because authorizing a lawsuit is protected

15  by the litigation privilege.

16       THE COURT:  And there's nothing about his role

17  in authorizing a press release about the lawsuit.

18       MR. MIRENDA:  Well, so there's nothing in the

19  complaint that alleges that.

20       THE COURT:  In the complaint, right.

21       MR. MIRENDA:  But assuming that that allegation,

22  we consider it, again, there's no -- well, both, again,

23  because the underlying actions by SIG, for the reasons

24  that I was arguing earlier, are protected it's not an

25  unauthorized action, that's number one.  Number two, it's,

1   of course, wholly speculative that he personally

2   authorized the press release.  But I think that's not --

3   sort of neither here nor there.

4           THE COURT:  Well, you say it's wholly

5   speculative.  There's not even an allegation about it,

6   right?

7           MR. MIRENDA:  Exactly.  There's nothing in the

8   complaint about it.  We're inventing that based on the

9   opposition papers.  The only allegation in the complaint

10  is that he authorized the lawsuit, period.  And that

11  allegation was made on information and belief, and there's

12  no assertion as to the nature of the information or the

13  basis of the belief or anything that would provide any

14  substance to that.  But even if we take that at face

15  value, authorizing the lawsuit is completely protected.

16          The second big issue here, though, is personal

17  jurisdiction.

18          THE COURT:  Can I ask you, I thought there was

19  another issue that you also were flagging, basically the

20  application of the intracorporate conspiracy doctrine as

21  applied to aiding and abetting.

22          MR. MIRENDA:  Yes, Your Honor.  We argued that

23  in our brief.  It's -- again, the allegation is Mr. Cohen

24  authorized the lawsuit.  The lawsuit was filed by SIG, the

25  corporation.  He's the CEO of the corporation.  Simply by

1   virtue of his status as a CEO, that isn't sufficient to

2   impute personal liability to him.  And the fact that the

3   company could only act through its agents, there is kind

4   of considerable body of law around the country that

5   employees of a corporation can't conspire with a

6   corporation.

7           THE COURT:  I get that.  Now on to personal

8   jurisdiction.

9           MR. MIRENDA:  Personal jurisdiction I think is

10  fairly straightforward.

11          First, there is absolutely zero in the

12  complaint, not a single allegation that touches on

13  personal jurisdiction in any way.  The Bagnell parties

14  have the burden to demonstrate the existence of personal

15  jurisdiction and to do so in their pleading.  They didn't

16  do it.  They didn't even attempt to do it.

17          In the opposition papers -- well, maybe I'll say

18  one more word on that.  There's no allegation that he's a

19  resident of Connecticut, nor could there be; he's not.

20  There's no allegation that he personally engaged in the

21  acts in Connecticut.  There's no allegations at all that

22  would support personal jurisdiction.

23          In the opposition papers there is the argument

24  that Mr. Cohen, by virtue of his employment at SIG,

25  quote/unquote, derives substantial revenue from

1  Connecticut.  And I would say that, quite simply,

2  Your Honor, that can't be the rule.  Of course, every

3  person who has a job and who relies on their income from

4  that job, you know, derives substantial personal income

5  from their job.  That's by definition almost.  The idea

6  that every Microsoft employee is subject to personal

7  jurisdiction in Connecticut because Microsoft sells a lot

8  of software here, it just simply can't be the rule.

9  There's no case that holds that that's the rule.  And it

10  wouldn't make sense.

11          Unless the Court has -- I want to address any

12  questions you might have.

13          THE COURT:  I haven't asked enough?

14          MR. MIRENDA:  Well, on personal jurisdiction --

15          THE COURT:  No, I don't have other questions.

16  Thank you very much.  Appreciate it.

17          MR. MIRENDA:  Thank you, Your Honor.

18          THE COURT:  Mr. Bagnell.

19          And I just wanted to clarify, Mr. Bagnell, I

20  know you said you're representing pro se yourself, but

21  you're also representing your law firm, right?

22          MR. BAGNELL:  Correct.

23          THE COURT:  So in that capacity you're not

24  pro se, you're counsel to the law firm, as it were.

25          MR. BAGNELL:  Correct, Your Honor.

1    THE COURT:  Okay, great.

2    MR. BAGNELL:  Thank you, Your Honor.

3    I really don't have a lot to add to my papers in

4    opposition, Your Honor.  I will say on the topics you just

5    discussed with Mr. Mirenda, I find it hard to believe that

6    Mr. Mirenda's excellent firm ever signed off on that press

7    release.  My belief is that SIG issued that unilaterally

8    and Mr. Mirenda was probably not very happy about it.

9    If SIG had issued a press release saying

10   Mr. Bagnell's wrong, he's off in left field, his experts

11   are wrong, you know, I would not have made a counterclaim,

12   Your Honor.  But after 30 years to be called a liar

13   nationally when I've seen what this gun has done to people

14   is unacceptable to me and it's caused me great harm, my

15   reputation, Your Honor.  Again, this was -- you can put "I

16   believe" in front of any number of horrible statements

17   about a person and then say, well, that's my accurate

18   opinion, that's my true opinion.  That's not the legal

19   standard, Your Honor, especially not under Rule 12.  I

20   won't belabor the Rule 12 standard, Your Honor.

21   Obviously, everything is supposed to be resolved or

22   construed in my favor at this point.

23   THE COURT:  Can I stop you for -- just so I

24   understand, because it wasn't quite as clear to me.  Your

25   defamation counterclaim is based -- you reference the

1   press release, in general, but I take it it's specific to

2   I think I'll call it the paragraph we were referring to,

3   there's a single paragraph there which I could read it out

4   loud, but it's the one that starts "SIG Sauer believes"

5   and then it goes on.  When I'm looking at what you believe

6   is defamatory, I only look at that paragraph, right?

7              MR. BAGNELL:  That's correct, Your Honor.  Yes,

8   it's that paragraph.

9              THE COURT:  Are you saying that every single

10  statement within that paragraph is defamatory?  I don't

11  know if you have the press release in front of you.  I

12  don't want to make you -- take your time.

13             MR. BAGNELL:  Okay.

14             THE COURT:  You see the paragraph there?

15             MR. BAGNELL:  Yes, Your Honor.

16             THE COURT:  So, look, I'll take maybe the

17  hardest question for you.  The last sentence, "SIG SAUER

18  is confident that it will prevail on the merits of this

19  case," that's pretty classically kind of opinion, right?

20             MR. BAGNELL:  Classic, Your Honor.  I have no

21  problem with that if they had left it at that.

22             THE COURT:  Tell me, where should I focus, then,

23  in terms of what's the defamation?

24             MR. BAGNELL:  The defamation, Your Honor, is

25  after "believes that these misrepresentations are willful

1   in nature and is taking action, with the filing of this

2   complaint, to ensure that Mr. Bagnell is not allowed to

3   continue deceiving the public about the safety of the P320

4   and use such deceptions in an attempt to generate business

5   for his legal practice."  That's well beyond the sort of

6   fair report privilege that Your Honor referenced in terms

7   of a *New York Times* reporter.  That's well beyond a

8   statement of opinion.  Any reasonable person reading that

9   would conclude that I am lying and I'm deceiving the

10  country, essentially, about the safety of this gun.  It's

11  very hard for me, Your Honor, to read that in any kind of

12  a neutral fashion.  That is just an opinion.  I think they

13  stepped well over the boundary.

14          Given that this is my profession, my position,

15  Your Honor, is that falls into the liable per se category

16  where you're attributing dishonesty to a lawyer.

17          THE COURT:  To the extent that they file a

18  lawsuit saying exactly that, if they just cut and paste

19  that, I guess you'd agree that litigation privilege would

20  bar you from bringing a defamation claim?

21          MR. BAGNELL:  Sure, yeah.  If they had limited

22  it to that.  Again, I'm sure Mr. Mirenda -- I'd be stunned

23  if his firm green-lighted this press release.

24          THE COURT:  I'm not going to get into sort of

25  the backstory there.

1          So if they could say exactly that in a lawsuit,

2    and if we look at it seems to me the two parts of this

3    paragraph that are biggest concern to you, number one, the

4    statement "to ensure that Mr. Bagnell is not allowed to

5    continue deceiving the public about the safety of the

6    P320," it strikes me that that is basically the statement

7    of the relief they're requesting.  They're seeking

8    injunctive relief, right?  I mean, they're saying in the

9    lawsuit that they believe -- I know you hotly disagree

10   with it -- but they believe that you are deceiving the

11   public and the animation is a deception to the public

12   about the safety of the P320.  And then when they say that

13   they're trying to stop you from continuing to do that,

14   that's basically a statement of the relief.  So it does

15   seem to me to track the lawsuit, right?

16          MR. BAGNELL:  I don't think those statements

17   actually appear in the lawsuit, Your Honor.  I don't think

18   they do.  I'd have to double-check that.

19          THE COURT:  I think that they say, if I'm

20   recalling the lawsuit --

21          MR. BAGNELL:  They talk about the animation,

22   Your Honor.

23          THE COURT:  -- it says you acted willfully,

24   right?

25          MR. BAGNELL:  Yes.

1          THE COURT:  It says that the statements were

2     willful.  I know you don't agree with it.  I'm not

3     accepting it as true, of course.  I'm just saying what

4     they say in the protected litigation privilege lawsuit is

5     that you acted wilfully.  And then they do seem to seek a

6     permanent injunction, I guess I'm looking at page 17 of

7     the initial complaint, so that strikes me -- their

8     preliminary injunction as well, page 16 -- so it strikes

9     me that that tracks the lawsuit.

10          MR. BAGNELL:  It may, Your Honor.  I'd have to

11     go back.  But the fact, obviously, is that it's an

12     extrajudicial statement that was made to the public when

13     they went outside the protection of the judicial

14     privilege.

15          THE COURT:  But I thought we agreed that you

16     could have an extrajudicial statement that is made to the

17     public as long as it tracks -- and maybe we don't agree on

18     this; tell me if we don't -- as long as it tracks what the

19     lawsuit is saying.

20          MR. BAGNELL:  I didn't find any case law saying

21     that, Your Honor, as long as it tracks the substance of a

22     lawsuit it's okay.  I just focused more on the defamation

23     case law.  This obviously would tend to lower my

24     reputation in the community.

25          THE COURT:  As does the lawsuit, right?  I mean,

the lawsuit does that too.  But that's why we have a
litigation privilege.  We also have a fair report
privilege.  So that's what I'm struggling with.  I'm not
challenging your argument that this is lowering your
reputation.

MR. BAGNELL:  The difference, Your Honor, is
that this statement got picked up.  It was spread to these
sort of -- I'll refrain from using any adjectives -- from
these gun publications.  It's very, very clear reading the
comments that, first of all, these people probably
wouldn't have known about the lawsuit if the press release
had not happened.  Reading the statement about me, there's
innumerable comments calling me dishonest, I've doctored
evidence, I've altered evidence.  I think one said I
should be disbarred.

Also, Your Honor, the second clause here "using
such deceptions in an attempt to generate business for his
legal practice," I've been overwhelmed by these cases,
Your Honor.  I've had so many that I've had to form
partnerships with attorneys all over the country.  That is
basically calling me an ambulance chaser, I'm using
falsehood to drum up bad cases.  That's not the kind of
lawyer I am.  So it's very hard for me to say that kind
of -- that gets a pass because it tracks what's in the
complaint.

1          THE COURT:  It does track, right, because it's a

2    false advertising, a Lanham Act false advertising count,

3    right?

4          MR. BAGNELL:  Right.  But I don't think they say

5    in the complaint that I'm doing it to gin up business for

6    my practice.  It's just so obviously disparaging.

7          THE COURT:  False advertising, that's why you

8    have false advertising, right, to gin up business on the

9    basis of a false representation, right?

10          MR. BAGNELL:  I suppose, Your Honor.  But I know

11    that's not what I was doing.  I was not doing that.  I've

12    had any number of people say to me, including my first

13    lawyers who I could not afford over time, that this is a

14    defamatory statement.  So I think if SIG had not done the

15    statement, we might not have been standing here today.

16    But they did.

17          THE COURT:  I get that.  Okay.

18          So the CUTPA claim -- I don't know if you have

19    more to say on the defamation.  I wanted to ask about the

20    CUTPA claim.

21          So it strikes me that the CUTPA claim, it's not

22    really specific in the way that you've pled it.  I'm

23    looking at I believe paragraph, really, 128.  You say, "By

24    reason of the foregoing" -- I don't know if you have it in

25    front of you.  Do you want to grab it?

1    MR. BAGNELL:  Okay, I have it.

2    THE COURT:  So I wanted to make sure I'm

3  understanding basically the predicate for the CUTPA claim.

4  It strikes me that there's two possible predicates: one is

5  the filing of a lawsuit itself by SIG Sauer against you

6  and your firm; and the second would be the issuance of the

7  press release.

8    MR. BAGNELL:  And the selective targeting of my

9  firm, Your Honor.  I do go into detail that I was

10  selectively targeted by SIG and the Philadelphia firm that

11  had posted this to YouTube before me was given a pass.

12  And I alleged that that was to interfere with my trial

13  preparation in the *Guay* matter, which it did.

14    The suit, Your Honor, you may recall, was filed

15  on the same day that Judge McCafferty gave us a trial date

16  in the *Guay* case.  It was three months before trial, it

17  was in the heavy trial preparation period.  I had to spend

18  hundreds of hours talking to my boss and lawyers,

19  traveling up there trying to get them to understand how a

20  gun works.  And it interfered with my trial preparation.

21    THE COURT:  When you say "it," you mean the

22  filing of the lawsuit?

23    MR. BAGNELL:  The filing of the lawsuit.

24    So the timing of it and selectively targeting

25  me, Your Honor, I can't think of any reason why SIG would

1  give a large firm a pass when their posting had 80,000

2  views on YouTube, almost three times as mine apparently

3  did, and just sue me.  Well, I think the answer is pretty

4  clear, Your Honor.  I had a trial coming up.  And it was

5  what you might call sort of a marquee trial.  If SIG loses

6  that trial, all the other dominoes fall.  The jury hung,

7  Your Honor, after three days, basically.  They got an

8  *Allen* charge, then they came back for SIG.  But Judge

9  McCafferty in her opinion came out and found that the gun

10  fired in the holster.  So I can live with it, Your Honor.

11       The selective targeting of me is part of my

12  CUTPA claim.  The press release, yes, also.  But I do go

13  into detail about that.  And I think that falls into the

14  category of ascertainable loss and deception or corrupt

15  business practice, if that answers the question.

16       THE COURT:  Does the litigation privilege apply

17  to a CUTPA claim?

18       MR. BAGNELL:  In this context, I don't think it

19  does, Your Honor.  You know, to take it to maybe a point

20  of absurdity, if ten other firms had published this months

21  before me and I'm the only person with a trial coming up

22  and I'm the only one who is sued, I think the lawsuit can

23  proceed but the fact of the timing has to be considered

24  under all the circumstances that this is an attempt to

25  manipulate the judicial system, to have the judge, the

1   presiding judge prejudge the merits, draw negative

2   inferences about me right before trial.  So I do go into

3   detail about that and the reputational harm to me,

4   Your Honor.  The ascertainable law standard under CUTPA is

5   pretty broad, as I read it.  It's loss; it's not economic

6   damage.

7           THE COURT:  You know, I'm not sure the other

8   side is contesting that part of your CUTPA claim, but

9   maybe they are if I missed it.  I think that their

10  arguments are different.  I think that they're really

11  looking at the application of the litigation privilege, to

12  the fair report privilege to the extent the CUTPA claim is

13  predicated on the press release.

14          MR. BAGNELL:  I'll leave it to the Court,

15  Your Honor.  I don't claim to be an expert in the area.  I

16  addressed these points in my briefs as best as I could.

17  And I lost my -- I don't know if that answered your

18  question, Your Honor.

19          THE COURT:  Yes.  I don't have other

20  questions -- actually, I was going to ask you the same

21  question I started off with Mr. Mirenda.

22          I take it, do you agree Connecticut law governs

23  your -- it governs the CUTPA claim, it has to.  But does

24  it govern your defamation claim and your aiding and

25  abetting claim?

1    MR. BAGNELL:  I have to say it does, Your Honor.

2  And I cited Connecticut law.

3    THE COURT:  I just wanted to make sure there

4  wasn't an argument that somehow New Hampshire law applies

5  or somewhere else applies.

6    MR. BAGNELL:  That's right, we were in

7  New Hampshire.

8    THE COURT:  The lawsuit was filed in

9  New Hampshire.

10    MR. BAGNELL:  The geographic location of the

11  filing of the lawsuit.  As I say in my brief, I think it

12  was relatively clear that the court there had no personal

13  jurisdiction over me.  But it was filed there and it just

14  so happened that I had not one, but two cases pending

15  there.  And it ends up with the judge that presided over

16  my trial.  So -- and Judge McCafferty pretty expeditiously

17  dispatched the case and sent it here.  So all of that I

18  think is not covered by the litigation privilege.  To some

19  extent, Your Honor, I don't know if there's really case

20  law on it.  It's kind of a unique situation.

21    THE COURT:  It is kind of an interesting fact

22  pattern here.  I haven't seen this kind of fact pattern

23  before.

24    So I don't know if -- unless you have more to

25  say about the SIG Sauer counterclaims.  What about

1  Mr. Cohen?  You know, I was basically -- as far as I can
2  tell, usually the intracorporate conspiracy doctrine would
3  bar this kind of claim.  I know that's not something that
4  gets a lot of attention in your briefing.  Is there
5  something I'm overlooking?
6          MR. BAGNELL:  Maybe not, Your Honor.  I think
7  when I was looking at it, I was just focusing on aiding
8  and abetting and that I had no question that he authorized
9  the lawsuit against me.  And I did the research on aiding
10 and abetting; I did not go into the intracorporate
11 doctrine.  Maybe that does bar it.  But, you know,
12 candidly, Your Honor, I was stuck in the Dallas airport
13 when I was writing that brief.  That polar bomb came down
14 in December.
15         THE COURT:  Yes, I remember that.
16         MR. BAGNELL:  Very limited access.  I thought --
17 I read the CUTPA case law.  It said there's a long body of
18 federal precedent saying that corporate officers can be
19 held accountable.  I read that and I said, okay, that
20 sounds like he can individually be held liable.  It's in
21 my brief on it.  So that was my basis upon further
22 research for maintaining the position that he should be
23 named individually.  And I know it's not in the complaint,
24 Your Honor, but I think I put in my brief that discovery
25 topic would be:  Did he authorize this press release

1   against me?  Who wrote it?  I assume he didn't write it,

2   but did he review it.  Did he make any edits to it?  I'll

3   defer to the Court.  It may be that that doctrine bars it.

4           THE COURT:  How about personal jurisdiction?

5   How is it that the Court has personal jurisdiction over

6   him?

7           MR. BAGNELL:  I looked at the long-arm statute,

8   Your Honor.  I thought he satisfied the third subsection,

9   commits a tortious act outside the state.  That would be

10  authorizing the lawsuit, perhaps drafting or authorizing

11  the press release against me or aiding and abetting SIG in

12  those actions, causing injury to a person within

13  Connecticut if such person regularly does or solicits

14  business or -- moving to the relevant clause, "or derives

15  substantial revenue from goods used or consumed or

16  services rendered."  I have no doubt Mr. Cohen derived

17  substantial revenue from the SIG weapons that are sold in

18  Connecticut.  Probably -- well, I don't know how much, but

19  I'm sure Connecticut buys a healthy number of SIG Sauer

20  products, probably well into the millions of dollars every

21  year, it goes in to the company and then it goes in to his

22  salary.  That was my basis, Your Honor.

23          THE COURT:  I take it, then -- it's a pretty big

24  company.  I take it, then, basically anybody who has got a

25  decent salary from a company like SIG Sauer would

1  basically be subject to jurisdiction under the same

2  principle?

3          MR. BAGNELL:  Right, Your Honor.  Candidly, that

4  would mean that they would be subject to jurisdiction in

5  all 50 states which probably is not correct.

6          I had a hard time reading that the aiding and

7  abetting cause of action was kind of a phantom cause of

8  action.  I said this must mean something.  I don't know

9  right now what the perfect set of facts is to make that

10  work in the setting of a corporate officer, but maybe it

11  does not.  It was pled in good faith.

12          THE COURT:  Sure.  I was looking -- I don't know

13  if there's law -- and maybe I've overlooked it, I

14  apologize if I have -- that essentially imputes for

15  purposes of this tortious act outside of the state and

16  looking at whether somebody has obtained substantial

17  revenue, whether you look at the revenue received from the

18  third party, right, the company, as distinct from kind of

19  directly.  Maybe you'd look at a sole proprietorship and

20  say it's direct in that sense.

21          MR. BAGNELL:  Right.

22          THE COURT:  Anything else?

23          MR. BAGNELL:  No, Your Honor.

24          THE COURT:  Thank you, sir.

25          Mr. Mirenda, anything else you want to follow up

1  on?

2  　　　　　MR. MIRENDA:  Just one point, Your Honor.

3  　　　　　You asked a question about Connecticut law and

4  the privilege applying to a CUTPA claim.  And the case I

5  would point you to is the *Deutsche Bank v. Vik* case.

6  　　　　　THE COURT:  That's been granted cert by the

7  Connecticut Supreme Court; is that right?

8  　　　　　MR. MIRENDA:  I believe so, yes, Your Honor.  So

9  it is on appeal.  But that's the statement.  And it's

10  collecting a whole bunch of cases that recognizes the

11  applicability of the privilege in that context.

12  　　　　　THE COURT:  Assuming Connecticut law applies.

13  　　　　　MR. MIRENDA:  Yes.

14  　　　　　THE COURT:  Thank you very much.

15  　　　　　MR. MIRENDA:  Thank you, Your Honor.

16  　　　　　THE COURT:  I appreciate the parties' arguments

17  here, you've given me a lot to think about.  I'm going to

18  hold the motion under advisement at this time.  And I'll

19  try to rule as soon as I can on it.

20  　　　　　Is there anything else you want to take up at

21  this point?

22  　　　　　MR. MIRENDA:  Just briefly, Your Honor, the

23  status conference aspect of today.

24  　　　　　THE COURT:  Okay.

25  　　　　　MR. MIRENDA:  Just with respect to discovery,

1    the parties are moving along.  The close of discovery

2    is -- close of all discovery is the end of May, May 31.  I

3    wanted to flag that there is an interim deadline that the

4    Court adopted that the parties had submitted of March 24

5    for the close of fact discovery.

6             There's a third-party, High Impact, the company

7    that created the animation for Mr. Bagnell.  Their

8    deposition is noticed for the week of the 20th.  They've

9    asked for some more time to prepare.  From my standpoint,

10   I have no problem accommodating them, but I didn't want to

11   go beyond the 24th without checking.

12             THE COURT:  What's Mr. Bagnell position on that?

13             MR. BAGNELL:  I have no objection to an

14   extension, Your Honor.  I will be moving to quash that

15   subpoena on work product privilege grounds, so we'll have

16   to take that up at some point also.

17             THE COURT:  All right.  Maybe you could file

18   that motion to quash soon.

19             MR. BAGNELL:  I will.

20             THE COURT:  And I'll probably have a magistrate

21   judge look at that issue.

22             So I will extend the discovery, though, insofar

23   as to deposition of that -- you said the name of the

24   nonparty?

25             MR. MIRENDA:  It's a company called High Impact

1  based in Colorado.  They created the animation for

2  Mr. Bagnell.

3           THE COURT:  So it would be my intent, especially

4  if the Court needs to resolve a motion to quash, that I

5  would extend the discovery to allow for that.

6           MR. MIRENDA:  Again, as I was suggesting,

7  because we have a May 31 end of discovery, there is

8  flexibility in there, and we don't have any issue with

9  that, Your Honor.

10          THE COURT:  Good.

11          Maybe, Mr. Bagnell, could you file that motion

12  to quash in the next seven days?

13          MR. BAGNELL:  I can.

14          THE COURT:  You won't be in Dallas?

15          MR. BAGNELL:  No, I won't be in Dallas.

16          THE COURT:  If you file that in seven days, then

17  any opposition to the motion to quash seven days after

18  that, that would be great.

19          MR. MIRENDA:  Certainly, Your Honor.

20          THE COURT:  Or if any other party wants to weigh

21  in on that motion to quash, they're welcome to do that.

22  We'll put that on the docket as well.

23          And are there other things status

24  conference-wise we should be talking about?

25          MR. MIRENDA:  I don't have anything else,

1  Your Honor.  We're moving along.

2          MR. BAGNELL:  The only thing I wanted to

3  mention, Your Honor, I don't know if the Court has a copy

4  of the animation at issue.  I know it has a lot of still

5  frames.  But I have the animation on a flash drive which

6  Tony has it also.

7          MR. MIRENDA:  We actually filed a flash drive

8  with the complaint.

9          MR. BAGNELL:  So the Court already has it.

10  All right.

11          THE COURT:  So we've got that.  At this point in

12  time I don't think I need to do a careful review of the

13  animation.  There may be a point in time when I do.  It

14  strikes me that's not in play right now.

15          MR. BAGNELL:  Not now.  I just wasn't sure.

16          THE COURT:  And I know that there was an

17  agreement not to have the animation stay on the firm

18  website.

19          MR. MIRENDA:  That's correct.  And that's

20  continuing.

21          THE COURT:  Great.  Anything else?

22          MR. BAGNELL:  No, Your Honor.

23          THE COURT:  Thank you all.  I hope you have a

24  good weekend.  Stand in recess.

25              (Proceedings adjourned at 2:55 p.m.)

C E R T I F I C A T E

RE: SIG SAUER, INC. v. JEFFREY S. BAGNELL, ESQ., LLC,
ET AL., No. 3:22CV885(JAM)

      I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 37 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____/s/_____

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180