

N<sup>th</sup>-Level, LLC
219 Enterprise Drive
Elizabethtown, KY 42701
270.307.9996
dereklw@nth-level.com

The Next Level in Engineering

---

**Thomas Ahern v. SIG Sauer, Inc.,**
**Expert Report – Incident and Firearm Analysis**
Prepared by:  Derek Watkins
Date:  01/03/2024

---



Figure 1.1: Subject SIG Sauer P320, 9mm (SN: 58C278540)

## 1.    Introduction & Incident Background

This report is with respect to the matter of Thomas Ahern v SIG Sauer, Inc.  According to the allegations of the Complaint, on May 19, 2019, Lieutenant Thomas Ahern, of the City of Cambridge Police Department, allegedly experienced a discharge of his SIG Sauer P320 pistol without the trigger being pulled.  At the time of the incident, Officer Ahern was standing in a stationary SWAT vehicle, with six other officers.  The SWAT vehicle was parked in a SWAT staging area at the Harvard Square MayFair event.  Officer Ahern was reportedly

manipulating his pistol and Safariland Level 3 flashlight compatible holster in an effort to familiarize himself with the retention mechanism in the holster, which he did not use often. . After having difficulty re-seating his pistol in the holster, Officer Ahern removed his pistol from the holster completely and held it in front of his body. The discharge allegedly occurred as he was looking down into his empty holster while holding his pistol in front of his body. The discharged bullet did not penetrate any of the persons in the vehicle and was found inside the gear bag of the other officer located immediately to Officer Ahern's left at the time of the discharge. None of the other officers in the vehicle witnessed the discharge of Officer Ahern's pistol.

The plaintiff's firearm consultants have opined the subject pistol is defective and said defect(s) caused Mr. Ahern to be injured. To date, none of the plaintiff's experts have provided any analytical or empirical test data substantiating their opined defect(s). More specifically, during the singular exam of the subject pistol, the firearms consultants attending the exam on behalf of the plaintiff (Mr. Villani & Mr. Hicks) were unsuccessful in demonstrating any defective behavior in the pistol. Mr. Villani and Mr. Hicks did observe me physically testing their theories of defect with the subject pistol and observed the subject pistol pass each and every test.

Mr. Tertin, the third consultant for the plaintiff, did not attend the exam and has never examined the pistol, yet has also rendered an opinion of defect. This case marks the first known time Mr. Tertin has been brought in to work with Mr. Villani and Mr. Hicks. This is of interest because Mr. Villani and Mr. Hicks have opined the SIG P320 can discharge absent a trigger pull, while Mr. Tertin has repeatedly testified that the SIG P320 will not discharge unless the trigger is pulled. The conclusions of Mr. Tertin's report never once suggests a SIG P320 is capable of discharging absent a trigger pull. The reports for the plaintiff's consultants lack consensus as to how the incident shooting occurred. In fact, none of the reports from the plaintiff's consultants attempt to explain exactly what caused Mr. Ahern's pistol to discharge.

In short, the plaintiff's consultants have reached conclusions of defect without any analytical or empirical proof and have made claims that defy the laws of physics. As a result of their non-scientific approach to exams of P320 pistols, Mr. Villani has failed four Daubert

exams[1], Mr. Hicks has failed three Daubert exams[2], and Mr. Tertin has failed two Daubert exams[3].

## 2. Summary of Findings

The subject pistol was examined by two of the consultants for the plaintiff (Mr. Villani and Mr. Hicks) and me (expert for SIG Sauer) on October 13, 2022, at North Star Imaging's lab in Marlborough, MA.  The pistol and its mechanical components were examined via CT scan, digital photography, force measurements and physical testing.  The pistol was memorialized non-destructively via CT scan before being physically inspected and tested. Throughout the inspection no evidence of manufacturing or design defect was observed. The pistol passed all the physical function tests to which it was subjected.  See Figure 2.1. The tests marked with an "*" were added to the function testing to address specific allegations of defect previously made by Mr. Villani and Mr. Hicks.

The examination of the subject SIG Sauer P320 revealed the pistol was fully functional. Despite being subjected to the full battery of function testing, the pistol was never made to discharge absent a trigger pull.  It should be noted that during the exam I asked Mr. Villani and Mr. Hicks if they wished to directly test any of their claims of defect to demonstrate the pistol discharging absent a trigger pull and they declined.  At no time did Mr. Villani or Mr. Hicks demonstrate during the examination, even when specifically prompted to do so, how any of their claimed design or manufacturing defects could cause the pistol to discharge without a trigger pull.

---

[1] **Thomas Frankenberry & Sansani Frankenberry vs. SIG Sauer, Inc**.; United States District Court for the District of South Carolina Florence Division; Case No. 4:19-cv-02990-JD; Order Date 02/04/22 (complete preclusion).
**Stephen Mayes vs. SIG Sauer, Inc.**; United States District Court Western District of Kentucky Bowling Green Division; Case No. 1:19-cv-00146-GNS-HBB; Order Date 03/30/23 (complete preclusion).
**Brittany Hilton vs. SIG Sauer, Inc**.; Unites States District Court for the Eastern District of Texas Beaumont Division; Case No. 1:21-cv-00441-MJT; Order Date 06/08/23 (complete preclusion).
**Jimmy S.C. Jinn vs. SIG Sauer, Inc.**; United State District Court Southern District of New York; Case No. 1:20-cv-01122-PGG-RWL; Order Date 09/13/23 (complete preclusion).
[2] **Stephen Mayes vs. SIG Sauer, Inc.**; United States District Court Western District of Kentucky Bowling Green Division; Case No. 1:19-cv-00146-GNS-HBB; Order Date 03/30/23 (complete preclusion).
**Brittany Hilton vs. SIG Sauer, Inc**.; Unites States District Court for the Eastern District of Texas Beaumont Division; Case No. 1:21-cv-00441-MJT; Order Date 06/08/23 (complete preclusion).
**Jimmy S.C. Jinn vs. SIG Sauer, Inc.**; United State District Court Southern District of New York; Case No. 1:20-cv-01122-PGG-RWL; Order Date 09/13/23 (complete preclusion).
[3] **John Tyler Herman vs. SIG Sauer, Inc.**; United States District Court for the Western District of Oklahoma; Case No. 5:21-cv-01038-R; Order Date 09/08/23 (complete preclusion).
**Robert Lang vs. SIG Sauer, Inc**.; United States District Court for the Northern District of Georgia Atlanta Division; Case No. 1:21-cv-04196-ELR; Order Date 09/28/23 (partial preclusion).

| CT & 2D Radiograph | Pass | Fail |
|---|---|---|
| Sear to Striker Pin Engagement | ✓ | |
| Striker Safety Lock to Safety Lever Clearance | ✓ | |
| Striker Safety Lock to Striker Pin Engagement | ✓ | |
| Trigger Bar Spring Integrity | ✓ | |
| Sear Springs Integrity | ✓ | |
| **Function Testing** | **Pass** | **Fail** |
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Block Function | ✓ | |
| *Dynamic Striker Block Function (Ramp) | ✓ | |
| *Safety Lever Return Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |

Figure 2.1: Summary of the Function Tests Performed on the Subject SIG Sauer P320 Pistol.

The fire control unit was removed from the pistol and visually examined during the inspection. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then pull the trigger. No physical or empirical evidence was observed that suggested the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Officer Ahern's testimony.

The plaintiff's "expert" reports from Mr. Villani and Mr. Hicks make multiple incorrect statements that pre-existing design and manufacturing defects were present in the subject P320 pistol when it discharged. However, neither Mr. Villani nor Mr. Hicks have provided any proof of defective behavior in the subject pistol. The event or chain of events that caused the incident discharge has not been established – or even attempted to be established – by Mr. Villani or Mr. Hicks. Mr. Villani and Mr. Hicks have dismissed the possibility that the trigger of the subject pistol was actuated through improper handling of the subject pistol without any empirical data, analytical analysis or adherence to the

scientific method, leading multiple federal courts to preclude both Mr. Hicks and Mr. Villani's opinions as unreliable under Daubert (see page 2 of this report).

Mr. Tertin, the newest consultant for the plaintiff, has issued an opinion of defect without even examining the subject pistol. Per Mr. Tertin's report, the subject pistol is defective because it does not have a manual safety. Yet, one of the most prolific pistols not equipped with a manual safety and widely employed by law enforcement is a Glock, a pistol Mr. Tertin considers "safe". However, Glock pistols, also experience claims of unintended discharge, as evidenced in the 1990's by a Washington DC police department which had over 120 claims of their officers experiencing unintended discharges with Glock pistols. Additionally, A study in Los Angeles County showed officers claiming unintended discharges with their Beretta 92 pistols, a true double action semiautomatic pistol equipped with manual and passive safeties. Mr. Tertin's opinions of defect are without foundation, as he does not know how the subject pistol discharged and the past 100 years of law enforcement employing firearms has repeatedly shown no firearm can prevent unsafe/negligent handling.

All physical testing of the subject pistol failed to produce a discharge absent a trigger pull. The pistol could be made to fire only when it was cocked and the trigger was pulled. There is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated. It is my demonstrable opinion that the physical condition of the subject P320 pistol, memorialized in the CT scan, 2D radiographs, physical testing, photographs, and microscope analysis dictates the root cause of the incident shooting was the trigger of the subject pistol was actuated, causing the pistol to discharge.

Prior to the October 2022 exam, the subject pistol was examined by the Boston Police Department and SIG Sauer. Neither inspection found the subject pistol defective.

Officer Ahern's testimony and claim that the pistol spontaneously discharged is in direct violation of the first law of Newtonian Physics: "An object will remain at rest or in a uniform state of motion unless that state is changed by an external force." Neither the physical

condition of the pistol, nor the laws of physics support Mr. Ahern's claim of an uncommanded discharge.

### 3.) Brief Overview of the SIG Sauer P320



Figure 3.1:  Select Components of the SIG Sauer P320

The SIG Sauer P320 is a semi-automatic striker fired pistol manufactured by SIG Sauer, Inc. The P320 was first introduced to the US market in 2014 and is an evolution of the SIG Sauer P250 platform.  The uniqueness of the P320 is that it employs a short displacement trigger system housed in a modular fire control unit (FCU).  See Figure 3.1.  The use of a modular FCU allows a single fire control system to be used in generic grip modules, enabling the user to configure the pistol to their needs.  Currently, SIG Sauer manufactures over 16 different models of the P320, including a customer configurable line.  The modularity of the P320 is one of the features that allowed a variant of the P320 to win the US Army's

solicitation for a new sidearm in 2017, making a custom version of the P320 the standard issued sidearm of the US Army in the form of the M17 (full size) and M18 (compact).



Figure 3.2:  Component Displacement Due to a Trigger Pull

The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market.  Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911 and its clones.  The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985.  Due to the fundamental differences between hammer fired and striker fired pistols, it has only been in the past couple of

decades that striker fired pistols with short displacement triggers have become readily available in the civilian firearms market.

The short displacement trigger, the modular fire control unit and the user configurable grip modules, combined with the P320's excellent reliability and performance, have made the P320 the platform of choice among multiple branches of the military and law enforcement agencies, and the pistol of choice for many consumers.  In the seven-plus years the SIG Sauer P320 has been in production, it has risen to be a market leader.

4.    Inspection and Testing of the Subject Pistol

On October 13, 2022 the subject P320 pistol was examined at North Star Imaging's lab in Marlborough, MA.   The condition of the pistol was assessed non-destructively with photography, computed tomography (CT), 2D x-rays (digital radiography), function-testing and physical measurements.   The North Star Imaging's CT equipment is similar to the CT equipment used in hospitals, only many times more powerful.   The CT scans serve to memorialize the condition of the fire control unit's components and their relationship to one another prior to any functioning testing or disassembly of the pistol.   After the CT and x-ray analyses were completed, the pistol was evaluated with respect to its condition and functionality.   The entirety of the physical examination was video recorded.

The pistol was found to be in good condition and fully functional.   No signs of overt damage or alteration were observed.   The pistol passed all function tests and discharged only with a contemporaneous and full actuation of the trigger.   Mr. Villani and Mr. Hicks, consultants for the plaintiff, were present for the inspection.   However, at no point during the exam did Mr. Villani or Mr. Hicks directly test for any of their opined defects in the subject pistol.   Throughout the exam Mr. Villani was only observed to take photos.   Mr. Hicks was observed to cycle the slide and pull the trigger of the pistol twice, with zero failures observed.

When the function testing and measurements of the pistol were completed, the pistol was field stripped (partially disassembled) and examined at the component level.   The pistol and its components were in a clean condition, with no overt signs of component alteration or damage observed.   After the pistol was reassembled, the function tests were repeated to confirm the functionality of the pistol had not been affected by the exam.   From start to finish the examination took approximately four hours.

4.1.    <u>External Inspection of the Pistol</u>

The pistol was initially verified to be unloaded and clear of ammunition.   No overt signs of alteration or damage were observed.   Initial external photographs of the pistol were taken before the pistol was placed in the CT machine.   While the pistol was being scanned, the incident shell was examined.

4.2.    <u>CT and 2D Radiography Review</u>

The pistol was placed in the CT scanner without being function tested beyond verifying it was fully unloaded.  The purpose of the CT scan was to nondestructively memorialize the pistol's components and examine the fire control unit for signs of adjustment, abuse, and broken or improperly manufactured parts.  Examination of the CT scan can also determine if any foreign material was interfering with the pistol's function.  The pistol was scanned with the slide closed, the action cocked, and an empty magazine loaded into the grip. Scanning the pistol in the fully cocked condition enables the interaction of the pistol's internal components to be examined as they would have been configured immediately prior to the incident discharge.





Figure 4.2.1:  CT Scan Image of the Subject P320's Striker Pin to Sear Engagement

The CT scan confirmed the pistol contained a post upgrade fire control unit and did not contain aftermarket parts.  Figure 4.2.1 shows a CT image slice through the approximate

center of the pistol's fire control unit.  The engagement between the sear and the striker pin was measured to be approximately 0.039 inches using the CT software provided by North Star Imaging.  My measurement of engagement differs from Mr. Hicks because Mr. Hicks close to take his measurement along the side of the striker, where the corner radii are largest and the engagement appears minimized.  My measurement was taken more through the center of the striker, a more accurate representation of the engagement.  The subject pistol's engagement was 100% of maximum, with the striker pin's engagement surface in a complete overlapping condition with the sear's mating engagement surface. SIG Sauer specifies a minimum engagement of 0.021 inches (0.526 mm) for the P320.  The measured 0.044 inches is well above the SIG standard.  The CT scan confirms the striker pin to sear engagement of the subject pistol was not causally related to the incident shooting.



Figure 4.2.2:  CT Image of the Sear's Rotation Engagement Stop

The subject pistol contains a post upgrade sear, which is designed to maximize the engagement between the striker pin and the sear to 100% of the available engagement and is self-compensating for dimensional tolerances.  When the striker engages the sear, the sear rotates in a clockwise manner, increasing the engagement between the striker

and the sear until the bottom of the striker contacts the rotation stop surface of the sear. Because the sear's rotation is stopped by the striker, the sear adaptively rotates to the striker and negates any tolerance stack that may exist between the sear assembly and the striker assembly, ensuring 100% engagement.  When the pistol is not cocked, the sear is rotated into a fully upward condition by the sear springs.  When the sear's upward rotation is not limited by its engagement with the striker pin, its upward rotation is stopped by its contact with the safety lever's pivot pin.  Figure 4.2.2. clearly shows no contact between the sear and the safety lever pivot pin, which means the sear has bottomed out on the striker pin and the engagement between the striker pin and the sear is at its maximum. Any assertion or implication made by Mr. Hicks or Mr. Villani that the engagement between the subject striker and the sear is less than 100% is false.  The sear physically cannot cover/engage more of the striker's engagement surface.

Mr. Hicks has asserted in his report that vibrations experienced by a SIG P320 during normal usage may cause the striker to become disengaged from the sear and discharge the pistol.  Beside this scenario requiring a compound failure of both the sear to striker engagement and the striker safety lock systems, the sear's engagement is controlled by the striker, which means the sear moves up and down in unison with any striker movement that may occur.  Mr. Hicks' claim of vibrational sensitivity is false and has been repeatedly proven so through large spectrum vibration testing.



Figure 4.2.3:  CT Image of the Striker safety lock Sitting in the Striker Pin's Channel

The CT also showed the striker safety lock was well seated in the striker pin's mating channel and was properly aligned to block the striker pin from completing a full stroke if

somehow the striker pin was released before the striker safety lock was rotated up and out of position by the safety lever. See Figure 4.2.3. The CT scan confirms the striker safety lock was not causally related to the incident shooting.



Figure 4.2.4: Villani's False Claim of a Clearance Cut Acting as a Ramp

In the past Mr. Villani has stated in his reports that the striker safety lock channel in the striker pin contains an angled surface that would cause the safety lock to rise out of

position during use and defeat the blocking feature of the striker safety lock.  This assertion by Mr. Villani has been repeatedly proven false.  Interestingly, this is the first report where Mr. Villani has abandoned this claim.  The CT image shown in Figures 4.2.3 and 4.2.4 clearly show no such angled surface/ramp exists.  Even though Mr. Villani has now abandoned this claim of defect, I believe it is important to show how the consultants for the plaintiff will make claims of defect with no physical foundation.  Image A of Figure 4.2.4 is taken from a previous report of Mr. Villani and the red zig-zag line is claimed to depict the "ramp" that will enable the striker lock to "jump" the striker's blocking surface during an uncommanded release of the striker and allow the striker to bypass the striker lock and discharge the firearm (the second failure of the compound failure needed to produce an uncommanded discharge in a SIG P320 pistol).

The edge of the surface Mr. Villani identifies with his red zig-zag line is actually a clearance surface and does not interact with the striker lock.  See Figure 4.2.4.  Image C of Figure 4.2.4 shows the area of interest on the striker pin's body.  While the red arrows point to Mr. Villani's fictitious ramp, images D and E of Figure 4.2.4 clearly show the identified surface radially slopes down and away from the surface the striker lock rides on and prevents the edge of the striker from interacting with the striker lock by creating a clearance.  It is a physical impossibility for the clearance surface identified by Mr. Villani to act as a ramp.  More importantly, in every physical examination, Mr. Villani physically had the subject striker pin and striker lock in his hands and could see the identified red zig-zag surface is a simple change in diameter and could not impart a "jumping" force to the striker lock.  Mr. Villani had also witnessed me repeatedly dynamically testing the striker lock system and saw his opined defect proven false.



Figure 4.2.5:  CT Image of the Trigger Bar Spring to Magazine Gap

In the past Mr. Villani had mentioned contact between the trigger bar spring and the pistol's magazine as a defect.  The CT clearly shows the trigger bar spring of the subject P320 does not contact the magazine.  See Figure 4.2.5.

The sear springs in the subject pistol were also examined via the CT scan.  See Figure 4.2.6. The scan showed the springs were properly aligned in their respective guide channels and were providing a restoration force to the sear in an unimpeded manner.   The CT scan confirmed the sear springs were not causally related to the incident shooting.



Figure 4.2.6:  CT Image of the Sear Springs in their Respective Channels in the Sear Housing

Mr. Villani and Mr. Hicks have also been critical of the striker pin's retention and positioning in SIG P320 pistols, asserting gaps exist around the striker pin that will allow the striker pin to rotate and translate excessively.  This is a false assertion.  As discussed earlier, the engagement between the sear and the striker is set by the striker.  Put simply, if the striker moves the engagement is maintained until the trigger is pulled.  Figure 4.2.7 is of two images taken from Mr. Hicks' report in which he depicts the side gaps of the striker pin (yellow circles). At this point it should be noted that while Mr. Hicks is a mechanical engineer, he has never designed a firearm, nor a firearm component.  Mr. Hicks' professional experience with firearms is limited to taking measurements and performing basic tests, both of which he did not perform at the inspection of the subject pistol.  While clearance gaps do exist in the subject pistol's design, the striker pin's rotation is well restrained by the striker housing.  Clearances are a necessity in firearm design, as they are essential for the management of field debris.



Figure 4.2.7:  Mr. Hick's Claimed Excessive Gaps

It is a physical impossibility for simple rotation of the striker pin and/or striker lock to allow the striker lock to fail.  Figure 4.2.7 shows the rotation of the striker pin is well restrained by the striker housing and the striker housing is well restrained within the pistol's slide. Interestingly, Mr. Hicks and Mr. Villani are quick to point out clearance gaps and call them excessive, but Mr. Hicks nor Mr. Villani have ever defined an acceptable gap or identified any standard by which a gap can be measured as acceptable or excessive.  If the gaps of any machine were to be eliminated and no rotation between the parts was permitted, the assembly could become sensitive to debris or improper lubricants.  The CT clearly shows

Mr. Hicks' and Mr. Villani's claim of the striker to be capable of being excessively rotated or create an unsafe condition to be false.

Furthermore, the absence of excessive striker pin rotation is clearly demonstrable without the use of CT. Simply removing the slide from the pistol and manually placing a side load on the striker pin shows the striker pin's movement/rotation to the right or left is consistent with other commercially available semiautomatic pistols, such as Glock, Smith & Wesson, Walther, and Canik to name a few. Mr. Villani and Mr. Hicks have never simply applied a side load to the striker of a SIG P320 pistol to attempt to show it excessively rotates as they opine, nor can they because the design prevents it. Mr. Villani and Mr. Hicks had ample opportuinty to test their striker rotational defect claim during the examination of the subject pistol and chose not to. I did side load the striker during the examination and its axial rotation was negligible at best, as it is in Glock, Smith & Wesson, Walther, and Canik pistols, to name a few. Mr. Villani and Mr. Hicks repeatedly claim the SIG P320 pistol is defective without any analytical or empirical proof. Mr. Villani's behavior is somewhat understandable as he is completely unqualified to provide expert opinions with respect to firearm design and manufacturing. Taking an armorer's course does not qualify a person as a firearms expert. While being deposed Mr. Villani has admitted he did not even know what the scientific method is. To be clear, Mr. Villani does not know the basic process by which all scientifically sound opinions are rendered. Mr. Hicks, on the other hand, is an engineer and should know how to render a scientifically sound opinion, yet he has failed to substantiate any of his opinions of defect alleged against the SIG Sauer P320 with a single performance test.

In fact, it appears Mr. Hicks may be guilty of dissinformation. Figure 11 from Mr. Hicks' report shows a gap between the top of the striker and the striker housing and claims this gap will allow the striker to move vertically. See Figure 4.2.8.A. The vertical gap Mr. Hicks shows is a false representation of potential movement because the CT image Mr. Hicks has chosen to use is placed after the striker pin's diameter is reduced. The reality is the top of the striker pin is in contact with the striker housing and it is impossible for the striker to move vertically relative to the striker housing. See Figure 4.2.8.B.

 

Figure 4.2.8:  CT Image of the Sear Springs in their Respective Channels in the Sear Housing

In previous reports and in testimony, Mr. Hicks and Mr. Villani have stated excessive gaps exist between the slide of the pistol and the rails of its fire control unit, and these gaps will allow the striker to move excessively vertically relative to the sear and allow the SIG P320 to discharge absent a trigger pull.  However, Mr. Hicks and Mr. Villani do not account for the ability of the sear to move and maintain full engagement with the striker; and the CT scan of the subject pistol shows this opined defect to be false.  The CT scan shows the slide is biased upward and is pressing against the rails (yellow arrows in Figure 4.2.9) and the slide cannot go any higher relative to the fire control unit.  Further examination of the CT also shows the striker and striker housing are also biased upward against the slide. The blue arrows shown in Figure 4.2.9 show the striker pin is biased upward agains the striker housing, while the red arrows show the striker housing is biased upward against the slide. The vertical biasing of the pistol's slide components is not by chance.  When the striker engages the sear, a clockwise moment is induced in the striker (shooter's right side view). This moment causes the striker to attempt to rise, pushing the striker up into the striker housing, the striker housing into the slide and the slide up against the rails of the fire control unit.  This biasing upward of the striker combined with the rotation of the sear means that every time the pistol is cycled the engagement between the sear and the striker is maximized and all of the upward gaps between the sear, striker, striker housing and slide are removed. This means the engagement between the striker and sear is maximized and it is a physical impossibility for the striker to ride up and over the sear without the sear being physically rotated down.






Figure 4.2.9:  CT Images of Mr. Ahern's SIG Sauer P320 Pistol and Internal Component Biasing

Any claim or suggestion that relative motion between the slide and the fire control unit of the subject pistol could produce an uncommanded discharge is false and has never been analytically or physically demonstrated.  Although Mr. Hicks and Mr. Villani have been

adament in the past that this excessive vertical motion defect exists in the SIG P320, neither consultant has taken any steps to substantiate their claim.  Each time the slide of a P320 pistol is cycled, all of the upward gaps between the striker assembly's components and the slide are biased out of the system.  Therefore, the upward biasing of the pistol's slide assembly and its components, combined with the rotation of the sear upward to maximize its engagement with the striker pin, makes it a physical impossibility for the striker to rise above the engaged sear.



Figure 4.2.10:  CT Image of the Safety Lever and Striker Lock System

Mr. Hicks is critical of the lack of a safety lever return spring in the subject pistol, claiming the removal of the spring in the post upgrade pistol allows the safety lever to contact and

possibly displace and disable the striker safety lock absent a trigger pull.  Mr. Hicks' statements with respect to the removal of the safety lever spring clearly demonstrates an ignorance of the functionality of the safety lever in the post upgrade pistols.  Figure 4.2.10 shows how the safety lever functions in the post upgrade pistols.  The post upgrade safety levers are equipped with a "v" notch that the trigger bar engages.  As the trigger is pulled and the trigger bar is displaced forward, the trigger bar causes the rotation of the safety lever up and into contact with the striker safety lock.  As the trigger is released, the trigger bar rotates the safety lever downward and out of contact with the striker safety lock.  The motion of the trigger bar positions the safety lever, eliminating the need for a dedicated spring to rotate it downward and out of contact with the striker safety lock.  During the exam of the pistol I lifted and released the safety lever multiple times.  Each time I released the safety lever, the trigger bar snapped the safety lever back down.  Mr. Hicks' claim suggestion that the removal of the safety lever spring can lead to an uncommanded discharge is false and has never been analytically or physically demonstrated possible. The dedicated safety lever spring was removed because the design of the upgraded fire controls changed the interaction between the trigger bar and the safety lever, eliminating the need for a dedicated safety lever return spring.

Furthermore, it is disingenuous for Mr. Hicks to claim a dedicated spring is necessary to control the positioning of the safety lever.  Figure 4.2.10 shows the striker lock is biased downward by the striker lock spring.  The striker lock spring is strong enough to reset the striker safety lock and the safety lever (if ever needed).  Pistols like the series 80, M1911 pistols have successfully employed this type of springless safety lever design for the past 40 years.  Almost every major firearms pistol manufacturer has produced a variant of the 1911 pistol.  Mr. Hicks's omission that the striker safety lock's spring must be overcome before the striker safety can displace the striker safety lock misrepresents the functionality of the striker block/lock system.  Mr. Hicks's representation that when the pistol is in a muzzle down orientation or the upside down orientation, the safety lever can deactivate the striker block/lock system by a non trigger pull induced contact between the safety lever and the striker safety lock is false.  Both the trigger bar and the striker safety lock spring actively prevent this from occurring.

Mr. Hicks challenged the dimensional quality of several of the component features in the subject pistol. Mr. Hicks did not provide for the source of his measurements in his report, nor did he provide any type of qualification for the accuracy of his "measurements". For example, Mr. Hicks reports the width of the rails to be 21.67 mm (under the SIG drawing specification). See Figure 4.2.11.A. It appears Mr. Hicks does not understands that this dimension is physically machined to width on each frame, which is a fact that can be verified by simply looking at the frame or the CT. See Figure 4.2.11.C. Measurements via the CT software showed the rail width to be 21.726 mm and within specification. See Figure 4.2.11.B. Therefore, based on my review of Mr. Hicks's measurement, any and all measurements presented in his report must be viewed as false until proven correct.







Figure 4.2.11:  Mr. Hicks Improper Representation of Dimensions in the Subject Pistol

Mr. Villani falsely claims the engagement surface of the striker pin has excess material, because SIG employs metal injection molding (MIM) without secondary machining operations to fabricate many of its components.  Mr. Hicks does not support Mr. Villani's claim of excess material, but does claim the use of MIM does promote "excessive variability".  True to form, neither Mr. Villani nor Mr. Hicks provide any measurements or test data that suggests the claimed extra material or variability is present in the subject pistol and causally related to an uncommanded discharge.  In Section 5 of this report I explain in detail the physics present in the subject pistol that would prevent an uncommanded discharge even if said excess material was present in the striker or sear.  In Figure 4.2.12, I show how much physical deformation of the subject striker pin's engagement surface would be necessary for an uncommanded discharge to be even theoretically possible.  Image A of Figure 4.2.12 clearly shows the claimed excess material on the striker's engagement surface is not present, as no gap exists between the striker and sear, which means the striker and sear are in perfect surface to surface contact (no excess material present).  Image B shows the angle of the sear's engagement surface is approximately 110 degrees relative to the center of the sear's pivot.  This means more than 20 degrees of material would need to be removed from the striker pin's engagement surface before the striker pin could theoretically start to depress the sear absent a trigger pull.  The red triangle shown in image C of Figure 2.4.12 approximates how much material would need to be removed from the striker pin.  Therefore, the claimed excess material or excessive variability Mr. Villani and Mr. Hicks say is present on the engagement surface of the striker pin has no adverse effect on the performace of the subject SIG P320 pistol, as the engagement surface of the subject striker pin looks nothing like the theoretical defective striker pin shown in image C of Figure 4.2.12.







Figure 4.2.12:  Striker Pin Deformation Required for the Striker to Override the Sear







Figure 4.2.13:  Striker Pin Deformation Required for the Striker Lock to Override the Striker

Similar overt deformation would also be necessary for the striker lock to override the striker pin and allow an uncommanded discharge to occur. Image A of Figue 4.2.13 shows the striker impacting the striker lock creates a clockwise moment about the striker lock's pivot and urges the striker lock to rotate down and into a locking condition with the striker. Image B of Figure 4.2.13 shows the locking surface of the striker pin would need to be at an approximate angle of 110 degrees relative to the bottom of the striker lock before the striker lock could start to be lifted up and over the striker pin via contact with the striker pin. This means the locking surface of the striker pin would need to be backcut to an angle of approximately 30 degrees before it could theoretically lift the striker lock up and out of the locking position. The red polygon shown in image C of Figure 4.2.13 shows the minimum theoretical amount of material that would need to be removed from the striker pin to lift the striker lock out of position. Because the subject striker pin's locking surface looks nothing like the theoretical deformation required for the striker lock to fail, Mr. Villani and Mr. Hick's claim that the subject striker lock can "jump" the striker during an uncommanded discharge can be dismissed.



Figure 4.2.14: Top-Down CT Image of the Striker to Sear Engagement

In Mr. Hicks' report he claims the striker can induce a side biasing force on the sear, due to a lateral offset. This is a false assertion. Figure 4.2.14 shows the orientation of the striker as it engages the sear. The striker is located within the width of the sear's pivot. This means that the contact force vector between the sear and the striker is transferred witin the body of the sear to the sear pivot pin at a perpendicular angle to the axis of the sear pivot pin, and as long as the contact force vector lies with the contact area between the sear and sear pivot (at a perpendicular angle) no side to side moment can be generated. Practically stated, most people have had the childhood experience of stacking blocks. If a large cube shaped block is placed on a table and a smaller cube shaped lock is placed on top of the larger block, the smaller block can be placed anywhere on top of the larger block and the larger block will not tip over as long as the perimeter of the smaller block stays within the perimter of the larger block. With respect to Figure 4.2.14, the striker is the smaller block and the sear is the larger block. As long as the striker stays within the side-to-side limits established by the width of the sear at its pivot, the striker will not bias the sear to a side. The image Mr. Hicks uses in his report does not show the relationship between the striker and the sear's pivot, hiding the relationship between the striker and the sear's pivot.

Analysis of the subject pistol's CT scan showed no propensity for the subject P320 to discharge absent a trigger pull. None of the fire control's components were observed to be overtly altered or damaged. The motions and interactions between the components were found to be within factory specifications. No evidence was observed that would support any of Mr. Villani's or Mr. Hicks's assertions of defect, nor have Mr. Villani or Mr. Hicks demonstrated any of their opined defects analytically or empirically.

4.3.  <u>Physical Testing of the Pistol</u>

After the CT scan was completed, the pistol was function tested.  The purpose of function testing is to verify the components of the pistol are interacting properly and determine if any claimed defects can be substantiated.  Figure 4.3.1 documents each function test that was performed.  The function tests were performed a minimum of five times before any disassembly of the pistol was performed.  The slide gap test was performed at the end of the exam.  The pistol passed all the function tests performed.  When directly asked, Mr. Villani and Mr. Hicks declined to perform function tests that would directly test any of their previous claims of defect.

| Function Testing | Pass | Fail |
|---|---|---|
| Magazine Catch | ✔ | |
| Slide Catch | ✔ | |
| Magazine Release | ✔ | |
| Slide Release | ✔ | |
| Trigger Function | ✔ | |
| Disconnector Function | ✔ | |
| Firing Pin/Striker Pin Function | ✔ | |
| Striker Block Function | ✔ | |
| *Striker Block "Ramp" | ✔ | |
| *Dynamic Striker Block Function | ✔ | |
| *Safety Lever Return Function | ✔ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✔ | |

Figure 4.3.1:  Summary of the Function Tests Performed on the P320 Pistol.

Four new tests were added to the standard function tests (noted with an "*" in Figure 4.3.1) to directly test the far-fetched allegations of defect made by Mr. Villani and Mr. Hicks.  Mr. Villani has previously made the allegation that the striker contained a ramped surface which could make the striker safety lock "jump" out of position and allow the pistol to discharge absent a trigger pull.  Mr. Villani has also alleged the striker pin has excessive rotation from side to side which can defeat the striker block/lock safety system.  To test these allegations, the functionality of the striker block was tested via the standard method taught in the SIG armorer's course, and then via a dynamic test.  The dynamic striker block tests consisted of removing the slide assembly from the pistol and placing a dummy round of ammunition into the chamber of the pistol.  The dummy round contained a primer pocket filled with modeling clay.  The striker was then fully retracted and released multiple

times.  If the striker safety lock ever failed to block the motion of the striker, the failure would be record with a firing pin impression in the clay.  This test was designed to directly test Mr. Villani's allegation of a ramp defect.  The testing proved the striker does not contain a "ramp", the mating surfaces of the striker and striker safety lock do not contain "rollover", and side loading of the striker does not defeat the striker block/lock system of the subject P320.  The only way the pistol's striker could be made to leave a firing pin indent in the clay of the dummy round was to depress the striker safety lock and release the striker from the cocked position, as the pistol was designed and intended to function.  See Figure 4.3.2.



Clay Primer Before Test



Striker Safety Lock Not Depressed
(No Discharge)



Striker Safety Lock Depressed
(Discharge)

Figure 4.3.2:  Striker Block Function Testing Results with Dummy Ammunition Containing Clay Primers

The test results shown in Figure 4.3.2 conclusively show the striker lock system of the subject pistol functions properly.  Interestingly, Mr. Villani claims his training as an armorer qualifies him as a firearm expert.  Yet, Mr. Villani is critical of my techniques for testing the striker lock system of the subject pistol in his report, even when one of the techniques used to test the functionality of the striker block came directly from the SIG armorer's handbook for the P320.  The simple act of running a test for a defect does not acknowledge or in any way validate existence of the defect.  The existence of a defect is only acknowledged or verified by repeatable validating test results.  The physical testing of the subject pistol specifically disproved the unsubstantiated and untested conclusion postulated by Mr. Villani.

The slide gap test was also added to the function testing regiment in direct response to the allegations that relative motion between the slide and the fire control can cause an uncommanded discharge.  This allegation has previously been proven to be false from a design standpoint via analytical analysis (regain torque vector analysis of the sear) and empirical testing (vibration testing of pistols in different carry orientations).  The slide gap test was run at the end of the exam and consisted of cocking the pistol, and then pulling the slide away from the fire control unit and pressing it back down on the fire control unit.  One pull and one push constitute one cycle of the test.  This test is a direct evaluation of Mr. Hicks claim of excessive motion exists between the striker and sear.  The subject pistol was tested a minimum of 100 times with no failures, disproving the allegations.  Mr. Hicks attempted no such examination of his claim of defect.

NRA hanging weights were employed to measure the force required to pull the pistol's trigger and discharge the firearm.  Six trigger pull forces were measured with an average trigger pull force of 6.225 pounds.  See Figure 4.3.3.  The measured trigger pulls are well above the Sporting Arms and Ammunition Manufacturer's Institute's (SAAMI) recommended 3lb minimum

| Trigger Pull Measurements (pounds) | |
|---|---|
| No Discharge | Discharge |
| 6.00 | 6.25 |
| 6.25 | 6.50 |
| 6.25 | 6.50 |
| 6.00 | 6.25 |
| 6.00 | 6.25 |

Figure 4.3.3: Trigger Pull Force Measurements

During the function testing and throughout the examination, the pistol could only be made to discharge when the pistol was cocked and the trigger was fully pulled.  The pistol never discharged absent a trigger pull or behaved in any way that would substantiate any of Mr. Villani's or Mr. Hicks' assertions of defect.

## 4.4.  Disassembly and Inspection

When the function testing and trigger pull measurements had been completed, the fire control unit was removed from the pistol and visually inspected.  The components were

relatively clean, but a significant amount of oil was present.  See Figure 4.4.1.  No overt signs of fire control component damage or alteration were observed.



Figure 4.4.1:  Subject Fire Control Unit

The subject sear was manually depressed multiple times to verify it was moving freely and the sear springs were returning the sear with force.  The sear was proven to be functioning properly.  The sear had a light film of what appeared to be grease on its engagement surface.  No signs of damage or alteration were observed. See Figure 4.4.2.



Figure 4.4.2:  Subject Sear's Engagement Surface

Mr. Villani and Mr. Hicks have previously asserted in their reports against SIG P320 pistols that the burnished top edge of the sear is evidence that the sear is improperly formed.  Mr. Villani has used the term "rollover" – which is a self-fabricated term and is not used in

product design or manufacturing – to characterize his fabricated "defect". The observed burnishing is a product of the tooling and the motion of the sear against the engagement surface of the striker pin as the trigger is pulled. This is explained in detail in Section 5 of this report.

SIG Sauer designed the fire control of the P320 to use as-cast MIM (metal injection molded) parts. Mr. Villani and Mr. Hicks are critical of the surfaces of the parts and compare them to machined parts. Neither Mr. Hicks nor Mr. Villani have ever provided a quantitative (measurement) value for the claimed excess material, nor an analysis or demonstration of how the claimed excess material would yield an uncommanded discharge. The CT scan (discussed in detail above) clearly shows clean surface-to-surface contact between the striker and the sear. If excess material was present in the subject pistol, the CT scan would clearly show it.



Figure 4.4.3: Subject Striker Pin's Engagement Surface

Figure 4.4.3 shows no signs of defects in the striker pin and the radii present on the edges of the striker pin are per the design and do not constitute a defect, as was proven by the function testing. The burnishing present on the lower edge of the striker pin's engagement surface is due to said edge sliding against the striker as the trigger is pulled. Correspondingly, the top edge of the sear's engagement surface is burnished as it slides against the striker pin when the trigger is pulled.



Figure 4.4.4: The Subject Striker Assembly in the Full Blocked Condition

Removing the striker assembly from the pistol showed no signs of alteration or damage. When the striker assembly is removed, the striker safety lock engages the striker pin, placing the striker pin in the blocked condition. Figure 4.4.4 shows the striker safety lock is not only blocking the striker pin but is also pulled down to the fully engaged position. This physical evidence completely contradicts the claim of the striker safety lock defect made by Mr. Villani and Mr. Hicks.



Figure 4.4.5:  The Striker Safety Lock Fully Engaged by the Striker Pin

As discussed earlier, the striker safety lock rotates on a pivot.  See Figure 4.4.4.  If the striker pin were to be theoretically released without a trigger pull, the striker pin would impact the striker safety lock above the striker safety lock's pivot, which would induce a clockwise moment about the pivot and causes the striker safety lock to rotate downward.  Therefore, the harder the striker presses on the striker safety lock, the harder the striker safety lock is held in position to block/lock the striker pin.  The radius on the top edge of the striker pin's engagement with the striker safety lock doesn't interact with the striker safety lock. See Figure 4.4.5.  The radiused edge on the striker pin was also empirically proven to have no adverse effect on the functionality of the striker safety lock during the striker block function testing discussed in Section 4.3.

Lastly, in the past Mr. Villani has asserted the contact marks between the striker safety spring and the striker housing are evidence of a defect.  The P320 design uses the striker housing to not only locate the striker safety spring, but also to align and guide it with

respect to the striker safety lock.  Because the contact between the striker safety spring and the striker housing is a function of the housing acting as a spring guide, the contact occurs by design and is not a defect.  It was easy to see the minimal nature of the contact marks, directly refuting the statements that the striker safety spring was dragging against the housing and could cause the striker safety lock to seize.  See Figure 4.4.4.

When the inspection of the pistol's internal components was completed, the pistol was reassembled and function tested again to verify the function of the firearm had not changed due to its disassembly or reassembly.  The pistol once again passed all the function tests and was proven to discharge only when the striker pin was cocked and the trigger was pulled.

4.5.    <u>Incident Shell</u>

Examination of the incident shell revealed no signs of extraction and ejection under pressure.  When a shell is extracted under pressure after discharge, the firing pin typically elongates the primer indent as the barrel unlocks from the frame.  An ejector indent is also typically imprinted in the case head as the slide reaches the end of its opening cycle.  The absence of these marks indicates the motion of the slide was inhibited at the time of discharge.  See Figure 4.5.1.



Figure 4.5.1:  Incident Shell

5. **Employing Science and the Scientific Method in Forensics**

The Merriam-Webster dictionary defines the meaning of the word forensic as an argumentative exercise. Generally, the point of the argumentative exercise is to identify the root cause of an issue. To facilitate a conclusionary end to a forensic exercise, facts and rules based in science are traditionally employed. Whereas,

> "Science is a rigorous, systematic endeavor that builds and organizes knowledge in the form of testable explanations and predictions about the world. Modern science is typically divided into three major branches: the natural sciences (e.g., physics, chemistry, and biology), which study the physical world; the social sciences (e.g., economics, psychology, and sociology), which study individuals and societies; and the formal sciences (e.g., logic, mathematics, and theoretical computer science), which study formal systems, governed by axioms and rules. There is disagreement whether the formal sciences are science disciplines, because they do not rely on empirical evidence."[4]

Applied sciences are disciplines that use scientific knowledge for practical purposes, such as in engineering, medicine and even forensics. The most used tool in the practical toolbox of science is the scientific method:

> "the scientific method is an empirical method for acquiring knowledge that has characterized the development of science since at least the 17th century (with notable practitioners in previous centuries; see the article history of scientific method for additional detail.) It involves careful observation, applying rigorous skepticism about what is observed, given that cognitive assumptions can distort how one interprets the observation. It involves formulating hypotheses, via induction, based on such observations; the testability of hypotheses, experimental and the measurement-based statistical testing of deductions drawn from the hypotheses; and refinement (or elimination) of the hypotheses based on the experimental findings. These are principles of the scientific method, as distinguished from a definitive series of steps applicable to all scientific enterprises."[5]

Although the exact procedures employed by the scientific method vary from one field of inquiry to another (not all questions are created equally) the underlying process of the scientific method is frequently the same from one field to another. The process in the scientific method involves making conjectures (hypothetical explanations), deriving predictions from the hypotheses as logical consequences, and then carrying out experiments or empirical observations based on those predictions. However, the foundation of the scientific method is said hypotheses and experimentation is bound by physics, and excludes the inexplicable, such as "magic" and divine intervention, as plausible

---

[4] Science, (2023, December, 27). In Wikipedia. https://en.wikipedia.org/wiki/Science
[5] Scientific Method, (2023, December, 20). In Wikipedia. https://en.wikipedia.org/wiki/Scientific_method

explanations.  Additionally, the results of real-world physical testing cannot be dismissed or ignored because it does not agree with a hypothesis.

A hypothesis is a conjecture, based on knowledge obtained while seeking answers to the question.  The hypothesis might be very specific, or it might be broad.  But, by its very nature, a hypothesis cannot be considered fact until conclusively proven.  Scientists test hypotheses by conducting experiments or studies.  A scientific hypothesis must be falsifiable, implying that it is possible to identify a possible outcome of an experiment or observation that conflicts with predictions deduced from the hypothesis; otherwise, the hypothesis cannot be meaningfully tested.  The data derived via empirical testing is the cornerstone upon which all disciplines of engineering are built.

| CT & 2D Radiograph | Pass | Fail |
|---|---|---|
| Sear to Striker Pin Engagement | ✓ | |
| Striker Safety Lock to Safety Lever Clearance | ✓ | |
| Striker Safety Lock to Striker Pin Engagement | ✓ | |
| Trigger Bar Spring Integrity | ✓ | |
| Sear Springs Integrity | ✓ | |
| **Function Testing** | **Pass** | **Fail** |
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Block Function | ✓ | |
| *Dynamic Striker Block Function (Ramp) | ✓ | |
| *Safety Lever Return Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |

Figure 5.1:  Summary of the Analysis and Tests Performed on the Subject SIG Sauer P320 Pistol.

With respect to Officer Ahern's claim the subject pistol discharged absent a trigger pull, the non-destructive CT scan, the 2D X-rays, the physical testing and the physical measurements were all performed under the hypothesis that the subject P320 pistol contained a defect and was capable of discharging in a manner consistent with Officer Ahern's claim.  However, each analysis and physical test performed on the subject pistol

falsified the hypothesis of defect, yielding a conclusion of discharge via trigger pull. See Figure 5.1.

Mr. Villani, Mr. Hicks and Mr. Tertin have all taken issue the fact that the striker and sear of the subject pistol are fabricated from metal injection molding (MIM) without secondary machining being performed on the mating/engagement surfaces of each part. What Mr. Villani, Mr. Hicks and Mr. Tertin do not appear to understand is the performance of a SIG Sauer P320 pistol's engagement would not be adversely affected by the center surfaces of the sear or striker being recessed relative to the surrounding edges even if they were in that condition – which they are not.

What follows here is an example of employing the scientific method via analytical analysis verified with empirical testing to falsify the hypothesis that the engagement surfaces of the P320 pistol require secondary machining to function properly, the unverified claim made by the consultants for the plaintiff. The sear of the P320 rotates on a pivot. When the trigger is being pulled and the sear is being rotated downward to release the striker, the engagement surface of the sear rotates in a circular fashion. Therefore, by definition, it is impossible for the sear to maintain full surface to surface contact with a striker during rotation. Full surface to surface contact/engagement between the striker and sear is not required in the P320 or any other firearm that I am aware of. The only thing that is truly required is for the engagement contact stresses to be non-yielding, and the contact force vector to not produce a discharge moment about the sear. By design, the engagement between the striker and the sear of the P320 does not produce yield stresses or induce a discharge moment/torque about the sear. When the P320's striker engages the sear, the engagement promotes the sear to rise to full engagement, even with the center engagement surfaces recessed.

To better illustrate the engagement physics of the P320, I modeled a striker and sear with center engagement surfaces that have been recessed 0.015 inches relative to the radiused edges. See Figure 5.2. These altered versions of the striker and sear represent an extreme recess condition in the engagement surfaces (an extreme version of Mr. Villani's claimed defect). Figure 5.3 shows that when the recessed striker engages the recessed sear, the fact that the striker is significantly narrower than the sear dictates the edges of the striker's

engagement interface mate with the top edge of the sear's engagement interface.  See Figure 5.3B and Figure 5.3C.  The fact that the center surfaces of the engagement interfaces of the striker and sear do not touch has no effect of the contact force vector created by the engagement.  The side edges of the striker's engagement interface set up the same angle of contact that would exist if the center material was present.



Striker with Recessed Center Engagement Surface.



Sear with Recessed Center Engagement Surface

**Figure 5.2:  Models of Striker and Sear with Extreme Recessed Engagement Surface Centers**

Because the contact angle between the striker and sear is unchanged, the contact force vector creates the same clockwise moment/torque about the sear's pivot, promoting the sear to rise and stay in the cocked position.  See Figure 5.3.A.  Having sears and strikers with recessed center engagement interfaces does nothing to promote a SIG Sauer P320 pistol to discharge absent a trigger pull.  Mathematically, the modified engagement shown in Figure 5.3 is identical to the factory engagement of the P320 pistol.  Therefore, the performance must be identical between the two systems.  Tellingly, neither Mr. Villani nor Mr. Hicks have even attempted to demonstrate or replicate how any center recess or exterior excess of material can cause or contribute to a loss of engagement in an actual P320 pistol.  That is because if any such condition exists in a P320, it is so minimal that it has no appreciable effect.



Figure 5.3:  P320 Engagement with Center Recessed Engagement Surfaces

As the trigger of a P320 is pulled, the sear is forced to rotate counterclockwise and disengage the striker.  This causes the top edge of the sear's engagement interface to trace a circle relative to the pivot pin of the sear.  This means that only the top edge of the sear's engagement interface contacts the striker throughout the discharge process.  This is why the top edge of the sear on the subject pistol is burnished/bright.  See Figure 5.5.  The edge burnishing is a function of the rotation of the sear against the striker and is designed, expected and appropriate.



**Figure 5.4:  P320 Sear Rotation and Disengagement**

Figure 5.4 also shows that throughout the rotation of the sear during a trigger pull, the engagement induced contact torque about the sear's pivot remains positive:

$$T_A > T_B > T_C$$

This means the sear is continuously in a regain condition due to the sear's contact with the striker.  It is a common mistake for people unskilled in the art of firearms design to think

the sear springs are what holds the sear in engagement with the striker. Well-designed fire controls/trigger mechanisms, such as the P320, shape the contact force between the striker and sear to induce a regain moment about the sear that will cause the sear to return to full engagement with the striker if the pressure is removed from the trigger before the firearm has discharged. After the initial engagement is made, the sear springs only serve to enhance the regain torque about the sear, they are not its singular source.



Figure 5.5: P320 Sears and Strikers Equipped with Recessed Engagement Interfaces are Equivalent to the Factory Parts

This simple proof utilizing basic physics, dynamics and mathematics conclusively shows that recessing the center of the engagement interfaces of the sear and/or striker does not affect the magnitude or direction of the contact force, nor the resulting moment/torque about the sear. See Figure 5.5. Therefore, the theoretical lack of contact between the center areas of a P320 pistol's engagement interfaces would have no adverse effect on the performance of the sear or striker even if it existed in the subject pistol – which it does not. To verify the analytical analysis is accurate, the sear springs of an exemplar P320 were removed and the pistol was then cocked. To be clear, the only force that was keeping the striker in contact with the sear was the contact force generated by the striker onto the

sear.  The sear was then pushed down in the same fashion as shown in Figure 5.4.  When the engagement was minimized to the point it represented Figure 5.4.D, the downward force was removed from the sear.  With the downward force removed, the regain moment/torque applied to the sear via the striker's contact force rotated the sear back up and into full engagement with the striker, verifying the analytical analysis was correct.

Therefore, Mr. Villani's claim of excess material around the engagement surfaces contributes to uncommanded discharges in SIG Sauer P320 pistols was proven false via the scientific method.  The condition of the engagement interfaces of the subject striker and sear did not contribute to or cause Officer Ahern's discharge.

It is more perplexing that Mr. Hicks, who is an engineer, did not conduct such a basic analysis before supporting and adopting Mr. Villani's false assertions.  Mr. Hicks makes the following false statement in his report: "Throughout this investigation, the scientific method was utilized as described in Chapter 4 of the National Fire Protection Association (NFPA) "Guide for Fire & Explosion Investigations.…  The testing can be physical, experimental, or by calculation. In developing any opinion, it is necessary to eliminate other possible explanations for a given set of data or observations. This can take the form of elimination or reduced likelihood as compared to more likely opinions, with reasonable engineering certainty. It is a fallacy to suggest that all testing of hypotheses must be physical, particularly when the testing required is not practical or reasonable."  What Mr. Hicks omits from his report is the National Fire Protection Association **never** states it is acceptable to discount the results of the physical testing that proves the pistol does not discharge absent a trigger pull.  Mr. Hicks is an engineer, yet he has failed to provide the simplest of free body diagrams or cite a single principle of physics that would support his hypothesis of defect.  Due to the lack of a single test verifying a P320 is capable of discharging in a manner consistent with Officer Ahern's testimony, no evidence exists that Mr. Hicks reached a single conclusion by following the scientific method.

6.   Clarifying Manual Safeties vs. Passive Safeties in Firearms

The inclusion of Mr. Tertin in this case as a consultant for the plaintiff has complicated the plaintiff's claim that the subject pistol discharged absent a trigger pull, because Mr. Tertin has repeatedly testified a trigger pull is required for a P320 to discharge.  Mr. Tertin has

further complicated the issue by redefining and reclassifying the types of safeties used in firearms.  Therefore, in section I will do my best to remove his veil of confusion.  The purpose of a firearm is to provide a focused manner in which to propel a projectile or group of projectiles in a direction at a commanded time.  Since the 1200s, when the first firearms were invented, controlling when the firearm discharged was of paramount importance.  In those initial designs, the firearms had two manual safeties: 1) don't load the firearm until you are ready to discharge the gun; and 2) don't light the fuse until you are ready to discharge the gun.  The second manual safety instruction evolved into "don't cock the firearm until you are ready to discharge the gun", as fuses gave way to flint locks, which gave way to percussion caps, which gave way to primed case ammunition.

Just as the method by which firearms discharge has evolved, so has the inclusion and design of their safety mechanisms.  Today, firearm safeties have been split into two fundamental types, the manual safety and the passive safety.  These two types of safeties are defined as follows:

> Manual firearm safety – a mechanism or manipulation that when consciously engaged renders a condition termed "safe", and said engagement renders the firearm inert by disabling a component or subsystem of the firearms fire control/trigger mechanism. Deliberate manual manipulation of the firearm and/or its component(s) (safety selector) is required to toggle the fire control between a "On/Safe" condition and "Off/Fire" condition.  Once the firearm has been placed in the "On/Safe" condition or the "Off/Fire" condition the firearm will stay in said condition without the aid of interaction with the operator until the firearm is manually manipulated to the alternate condition.  Examples of manual safeties include but are not limited to: controlling the cocked/uncocked condition of the firearm; quarter cock notches; half cock notches; decockers; placing the safety selector in the "On/Safe" position; and controlling the loading status of the firearm.

> Passive firearm safety – a mechanism termed a "safety" that is passively engaged and disengaged through the operator's normal interaction with the firearm and requires no deliberate manual manipulation.  When a passive safety is engaged it renders the firearm inert and/or prevents the firearm from discharging by disabling a component or subsystem of the firearms fire control/trigger mechanism.  Passive safeties are typically engaged via springs which automatically engage the safety in the "On/Safe" position when the operator disengages from the firearm.  As the operator of the firearm steps through the sequence to discharge the firearm, the passive safeties are toggled from the "On/Safe" position to the "Off/Fire" position threw the operators actions.  When the operator ceases to manipulate the firearm (puts away or holsters the firearm) the passive safeties should automatically toggle back to the "On/Safe" condition.  Examples of passive safeties include but are not limited to: trigger blade safeties, grip safeties, firing

pin/striker block safeties, magazine disconnect safeties, hammer block safeties and transfer bar safeties.

Keeping the firearm unloaded until ready to use it is the most basic manual safety inherent in all firearms. If a live round of ammunition is not loaded into the chamber of the firearm, the firearm cannot be discharged. While carrying a firearm without a round of ammunition in the chamber is technically a form of a manual safety, it is not what many people would initially describe as a manual safety. But those same people cannot dispute that keeping a firearm unloaded is the most effective way to prevent an accidental discharge. For example, firearm competitions require all firearms to be fully unloaded at all times unless the operator(s) is competing. However, for the sake of clarity, I will refer to manual safeties such as thumb safety selectors, decockers, quarter cock notches, lever safeties and the like as "traditional manual safeties".

Over the years various police and military agencies have adopted the policy that firearms are not to be carried with a round in the chamber. For the better part of the 20th century, carrying a firearm with an empty chamber was the standard for military, police, and civilians[6]. In the firearms community, the most well-known organization that promotes this method of carry is probably Mossad (the intelligence agency of Israel), and this philosophy of carrying a firearm without a round of ammunition in the chamber of a firearm is commonly called the "Israeli carry" method. However, the "Israeli carry" method predates Israel and was initially popularized by W. E. Fairbairn, a close quarters combat specialist, who wrote the book, *Shooting to Live with the One-Hand Gun*. Today, the empty chamber carry method has become controversial among many in the U.S. shooting community, with some shooters not only insisting a firearm should be carried in the loaded condition, but also the firearm may not be equipped with a traditional manual safety. This philosophy theorizes that minimizing the number of steps it takes to draw, aim and fire a weapon minimizes the opportunity to forget steps that may compromise a shooter in a high threat situation.

---

[6] Grobman, Ron (December 7, 2022). *Everyday Carry Chronicles: The Truth About 'Israeli Carry'*. https://www.thetruthaboutguns.com/truth-israeli-carry/

This controversy about how a firearm should be carried is a perfect example of the diversity that exists in the philosophy of use (POU) of firearms. Mr. Tertin has previously suggested that the trigger used in the SIG Sauer P320 is unreasonably dangerous and should be replaced with a longer displacement trigger equipped with a tabbed safety, such as the one found in a Glock. This accusation is false and is completely without foundation. In December of 2015, the Office of Inspector General County of Los Angeles issued the report, *Assessing the Rise in Unintended Discharges Following the Sheriff's Department's Conversion to a New Handgun* [7] , describing an increase in unintended discharges experienced by Los Angeles Sheriff's Department (LASD) officers when they switched their standard issue sidearm.

The LASD was transitioning from a hammer fired, double action/single action Beretta 92FS pistol with a manual thumb safety to a striker fired pistol equipped with a long displacement trigger and no manual thumb safety, a Smith & Wesson M&P 9. The transition period evaluated in the report was from 2012 to 2015. During the transition period, the number of unintended discharges experienced with the Beretta declined while the number of unintended discharges experienced with the Smith and Wesson increased. See Figure 6.1. Statistically, it is expected for data distributions to shift within two populations when one population is decreased in size as the other population is increased in size, but the documented increase in Smith and Wesson pistols related to unintentional discharges substantially outpaced the associated decrease in the Beretta pistol population. Anytime a new product is introduced to users, an acclimation period is expected as the plan for change intersect with the reality of change. Ultimately, the Inspector General's report opined a lack of training significantly contributed to the increase in unintended discharges. In other words, the planned level of officer training with the new firearms did not meet the amount of training that reality ultimately deemed necessary.

---

[7] Katz, Walter W. (2015, December). *Assessing the Rise in Unintended Discharges Following the Sheriff's Department's Conversion to a New Handgun*. Office of Inspector General County of Los Angeles

| Firearm Make & Model | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Beretta 92 | 3 | 4 | 1 | 1 |
| Smith & Wesson M&P 9 | 0 | 8 | 28 | 14 |

Figure 6.1:  LASD Unintended Discharges per Firearm Type

With respect to the opinion rendered by Mr. Tertin that the SIG Sauer P320 is defective due to its trigger displacement and a longer displacement trigger with a trigger safety would be less likely to experience unintended discharges, the Inspector General's report is direct evidence to the contrary.  Per the report, the Smith & Wesson M&P 9 pistols evaluated employed a 6.5-pound trigger pull on average.  My evaluation of a 2014 M&P 9 showed it had a trigger discharge displacement of approximately 0.299 inches (measured at the point where the finger applies force to the trigger), which is equivalent to a Glock 19's trigger discharge displacement that measured approximately 0.292 inches.  Both the Glock and the Smith & Wesson employ a trigger safety tab.  The experience of the LASD conclusively proves use of a longer displacement trigger does not prevent unintended discharges due to a trigger pull and neither does a hinged trigger safety.

Another compelling fact in the debate about manual safeties vs passive safeties vs short displacement triggers vs long displacement triggers is the LASD employed Beretta 92FS equipped with a manual thumb safety that also acts as a decocker, and every year unintended discharges were still recorded.  To be clear, when the manual thumb safety on a Beretta 92FS is engaged, the trigger is rendered inoperable, the hammer is decocked and fully down, and a physical block is placed between the hammer and the firing pin.  The only way to render a Beretta 92FS more inert would be to unload it, but the LASD was still experiencing unintended discharges with the Beretta every year.

The LASD experienced a total of 13 unintended discharges in 2012.  Of those 13 discharges, seven of the firearms were identified with enough detail to determine if they were or were not equipped with a manual safety switch.  Six of the seven firearms that experienced an unintentional discharge were equipped with a manual safety switch.  The seventh firearm, a Glock 27, had only a passive trigger safety externally.  These multiple instances of unintentional discharges illustrate the existence of a manual thumb safety, a trigger safety and/or a longer trigger displacement will not stop a firearm from discharging when said firearm is loaded, and the trigger is pulled when the manual safety is not employed.  This

is not to say the Beretta 92, Smith & Wesson M&P or Glock pistols are unsafe firearms, they are safe, and I own and shoot each of them. The reality is no safety system has ever been implemented on a firearm that can prevent the firearm from discharging when human error circumvents the safety system(s).

Trigger design has been actively evolving for the last 800 years and each approach has pros and cons. Some of the differences are measurable, while others are subjective, but physics and mathematics dictate no feature is without cost. Some have asserted that a trigger equipped with a safety blade is less likely to experience an unintentional discharge due to side loading, meaning that if the trigger is loaded on the sides such that the safety blade is not disengaged from the frame and the trigger cannot be moved. If this highly improbable scenario is to be accepted as true, then it must also be accepted as true that an operator could improperly attempt to pull the trigger in a crisis and not disengage the safety blade, causing the firearm not to fire when it is most needed. Mathematically you can't have one scenario without the other because everything has a cost. Mr. Tertin does not address this scenario because he knows the act of adding a trigger safety to a firearm also adds a safety vulnerability. Trigger safeties were designed and implemented to allow pistols to pass abuse testing, such as drop testing, where no object is contacting the trigger. They were not designed to make it more difficult for a user to pull the trigger with his finger.

The safety mechanisms and trigger mechanisms employed by various firearms are as varied as the philosophy of use that dictated their design and use in the field. No one pistol is right for all users in all circumstances. The SIG P320's fire control is set apart from the other striker fired pistols, which incorporate trigger safeties, because the SIG P320 incorporates a balanced trigger mechanism and does not need a trigger safety to pass standard industry abuse tests, such as drop testing. Glock and the other striker-based pistols cited in by Mr. Tertin need a trigger safety to pass abuse tests (i.e., drop tests), because they do not employ a balanced trigger mechanism. The main purpose of a trigger safety is to prevent a discharge during abuse, such as drops and impacts.



Figure 6.2:  Passive Safety Systems of a Glock Pistol

Mr. Tertin has previously opined that given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its relatively crisp and short trigger, it was reasonably foreseeable to SIG Sauer that without an external manual safety the SIG P320 was at an increased risk of an unintentional discharge compared to other striker fired handguns.  A trigger safety is not an external manual safety.  Glock, the firearms manufacturer that first popularized the use of a trigger safety in the 1980s and has arguably manufactured and sold more tabbed trigger pistols than any other firearms manufacturer in history, correctly defines its tabbed trigger safeties as "passive safeties," not manual safeties.  In fact, Glock pistols employ three passive safeties, the trigger safety, the firing pin safety and the drop safety.  See Figure 5.2.  Glock states on page 11 of its Gen 4 Glock Armorer's Manual that, "GLOCK pistols do not feature a conventional manual safety lever; however, they are equipped with the revolutionary, fully automatic safety system consisting of three passive, independent, mechanical safety devices that collectively form the "Safe Action" system".  Contrary to Mr. Tertin's opinion, a trigger safety is not a manual safety and the SIG P320 doesn't include a trigger safety because it doesn't need one to pass abuse standards.

Mr. Tertin either does not understand the purpose of a trigger safety, or he is purposefully omitting the true purpose of a trigger safety from his reports.  All the pistols I am aware of that employ a trigger safety do so because they utilize an unbalanced trigger and trigger bar assembly.  Unbalanced trigger assemblies, when not compensated for, can be

potentially drop sensitive. Adding a trigger safety to an unbalanced trigger safety mechanically compensates for the potential of inertially inducing trigger motion due to impacts (unintentional discharges). Alternatively, pistols like the SIG Sauer P320 employ a balanced trigger assembly that is designed to be impact insensitive without the need for a trigger safety mechanism. Therefore, adding a trigger safety to a P320 pistol would not serve to enhance the robustness of the pistol, but rather only add another potential reliability failure point and diminish reliability. Adding unnecessary parts and/or mechanism to designs is a practice looked down on by competent engineers.

Passive safety systems do nothing to prevent a firearm from being discharged if the pistol is being actuated through a normal and expected manner, i.e., properly gripping a loaded pistol and pulling the trigger should cause the pistol to discharge. Only manual safeties have the ability to override the proper input to a pistol and prevent it from discharging. When the manual safety of a pistol is engaged in the "On/Safe" position, properly gripping a loaded pistol and pulling the trigger should not yield a discharge. In fact, SAAMI (Sporting Arms and Ammunition Manufacturer's Institute) tests the manual safety of a firearm by suspending a 40-pound weight from the trigger while the safety selector is in the "On/Safe" position. If a trigger safety was considered a manual safety, all pistols employing only a trigger safety as its "manual safety" would fail the test because the 40-pound weight would actuate the tabbed trigger in every test. Contrary to Mr. Tertin's opinion, tabbed triggers are passive, not manual.

The National Institute of Justice (NIJ) defines active safeties in firearms as user activated safety devices. Grip safeties, tabbed trigger safeties and striker block safeties are deactivated by the user and activated automatically via springs when the user ceases handling the firearm. For example, the NIJ drop criteria requires that passive safeties that are "automatically applied by the pistol" when a firearm is dropped from the hand are not required to have their passive safeties defeated, while the manual safety selectors must be placed in the "Off/Fire" position. The NIJ defines a grip safety as a "passive safety device that requires an applied force on the grip before the pistol can be fired". During NIJ drop testing, a pistol equipped with a grip safety is not required to have the grip safety actuator depressed/defeated.

Mr. Tertin has also opined that if SIG Sauer integrated an external manual safety into the design of the SIG P320 it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the handgun. To date, Mr. Tertin has cited no justification or support for this claim. To assert that the addition of a manual safety will not adversely affect the utility of a handgun is simply reckless and a false statement. Nor does it account for consumer choice or philosophy of use. The context in which a firearm is being deployed and by whom it is being used matters. Practice does not make perfect; it only reduces the potential for mistakes. Stress can hugely affect the way people perform tasks for which they have been trained. Most people in my experience have been speaking a single primary language for most of their lives, yet it is still common for people to use the wrong word, misspeak under normal everyday conditions, develop a stutter, or even lose the ability to speak in a crisis. It is easy to see that practicing speaking for a lifetime has not made people immune from verbal mistakes. But comparatively, the mistake of leaving the occasional word out of a sentence and the mistake of forgetting to disengage a manual safety on a firearm in a crisis can yield catastrophically different results. It is for this reason many organizations have mandated their pistols cannot be equipped with a manual safety. Glock and other striker fired pistols, such as the SIG Sauer P320 have variants that do not employ manual safeties to satisfy the corresponding philosophy of use. However, the P320 and other striker fired pistols do offer variants that employ a manual safety to satisfy opposing philosophies of use. If a user wants a manual safety on their pistol, they can acquire a pistol – including a P320 variant – equipped with a manual safety. In physics and science there is a cost to everything, and one size does not fit all, but the simple option of carrying the pistol without a round of ammunition in the chamber always remains.



Figure 6.3:  Trigger Actuation Caused by Pushing the Holster Against a Finger on the Trigger

I have been working as a firearms expert in the product liability field for over 13 years and the majority of accidental discharge cases I work involve firearms equipped with manual safeties.  Manual safeties only work if they are engaged. If a firearm is in proper working condition, loaded, the trigger is pulled and the corresponding safeties (passive or manual) are disengaged, the pistol will discharge, just as it did when Officer Ahern accidentally caused the trigger to be pulled and the pistol to discharge.  Figure 6.3 shows an example of how a pistol can be inadvertently discharged because the pistol is fully loaded, the striker is in a cocked condition and the operator's finger is on the trigger as the pistol is being inserted into the holster.  Because the finger is between the trigger and the holster, the act of pushing the pistol into the holster causes the holster to push against the finger, which in turn pushes against the trigger until the pistol discharges.



Note: In the original photo the strap is black in color. The strap has been highlighted red to help clarify its position through the trigger guard.

Figure 6.4:  Actuation of a Trigger Equipped with a Safety, Caused by a foreign Object in the Holster

Figure 6.4 shows how a law enforcement officer managed to shoot himself in the hand while inserting his pistol into his off-duty holster when a tactical belt strap (highlighted in red) was caught between the trigger and the holster. The incident pistol was equipped with a trigger safety. The shooting took place at the officer's desk as he was transitioning off duty.  Because the shooting took place in the station, the response was immediate, and the incident scene was very well documented with photos.  I was asked to evaluate the pistol and verify its functionality.  Like Officer Ahern, the officer who shot himself was claiming the pistol discharged absent a trigger pull.  After the functionality of the pistol was verified, I was shown the incident scene photos and a detailed photo of the incident pistol inserted into the incident holster with a tactical strap in the trigger guard was present.  I then recreated and demonstrated how the shooting occurred, given the incident photos. It was concluded and proven the pistol discharged due to a trigger pull and the incident officer's claim was dropped.

In times of stress, what people perceive and remember is not always a good representation of reality.  The subject P320 pistol is not defective if it is unequipped with a manual safety

or a passive safety (such as a trigger safety) beyond the striker block safety and sear-to-striker engagement. The philosophy of use SIG Sauer's customers employ and which products they choose to purchase is beyond SIG Sauer's control. What firearm a customer chooses to employ to protect themselves or their family is not for SIG Sauer (or plaintiff's consultants) to dictate. The subject SIG Sauer P320 pistol is not defective because the subject variant of the pistol is tailored for customers whose philosophy of use excludes manual safeties.

7.    Clarifying Trigger Actions and the Physics of a Trigger Pull

The first commercially available repeating pistol was the revolver, which started to become common place in the latter half of the 1800s. These first revolvers were single action only, meaning the operator had to physically cock the pistol (pull back the hammer) before the revolver could be discharged by pulling the trigger. Simply pulling the trigger on a single action only firearm does nothing if the firearm is not already cocked. A few decades later the double action/single action revolver was invented. Double action revolvers were capable of cocking and releasing the hammer by simply pulling the trigger. In a firearm equipped with a double action trigger, each time the operator pulls the trigger the firearm is taken from a fully uncocked state to the fully cocked state and then discharged. The double action eliminated the need for the operator to manually cock the firearm (pull the hammer back) before pulling the trigger. Because the act of pulling the trigger in a double action is doing more work (cocking the hammer and releasing the hammer) than in a single action only trigger (releasing the hammer), the trigger pull of a double action is typically longer and heavier than in a single action firearm. Firearms equipped with double action/single action triggers allow the operator to manually cock the hammer (single action) or cock the firearm by simply pulling the trigger. Double action/single action revolvers replaced the single action only revolvers in popularity because they allow the operator to discharge the firearm as fast as they can pull the trigger.

Magazine fed semi-auto pistols started to become commercially available in the early 1900s, with the Colt 1911 becoming one of the first commercially successful variant. These early magazine-fed semi-auto firearms were single action only because the energy released by discharging the firearm was partially harnessed to cock the firearm for the next

shot.  As long as the firearm started in the cocked and loaded condition, the requirement for a double action trigger was not needed.  In the latter half of the 1900s, double action/single action magazine-fed semi-auto pistols became commercially available and popular among law enforcement and military.  In 1985 the Beretta M9 (double action/single action magazine-fed semi-auto pistol) was adopted by the US military to replace the M1911, a single action only magazine fed semi-auto pistol. Because philosophies behind firearm use are constantly evolving, law enforcement agencies and militaries eventually started to transition away from double action/single action semi-auto pistols to single action only semi-auto pistols.  In 2017, the US military adopted the SIG Sauer M17 and M18 (P320 variants) to replace the Beretta M9 pistols.

Recently in firearm product liability litigation, plaintiffs have been claiming that shorter displacement single action triggers, such as used in the M1911, M17, M18 and P320 are defective.  Specifically, plaintiffs claim the Glock style trigger is a better trigger, less prone to unintended discharges, because it employs a longer displacement trigger equipped with a trigger safety.  As discussed in the previous section, the report Assessing the Rise in Unintended Discharges Following the Sheriff's Department's Conversion to a New Handgun by the Office of Inspector General County of Los Angeles completely disproves this claim and in this section of the report I will explain the physics and biomechanics that support the Inspector General's findings by evaluating the triggers of the Smith & Wesson M&P 9, Glock 19 Gen 4 and the SIG Sauer P320.

Before we begin, the action of a Glock trigger needs to be clarified.  Glock triggers are neither truly single action nor double action.  When the slide of a Glock is cycled, it becomes partially cocked (not fully cocked like a single action).  When the trigger is pulled, the act of pulling the trigger completes the cocking action and then discharges the chambered round of ammunition.  If for some reason the chambered round does not discharge when the trigger is pulled (hard primer), pulling the trigger a second time will do nothing because the trigger will be dead, just as a true single action pistol would be under the same circumstances.  If the Glock was a true double action pistol, pulling the trigger a second time would re-cock the firing mechanism and a discharge would be attempted a second time.  Because a Glock's trigger mechanism is neither a true single action nor a true double action, it is most accurately called a one and a half action, having the limitations of

a single action with the increased trigger displacement required to discharge the firearm required by a double action trigger. This is not to say the Glock trigger is good or bad, it is just unique in the firearms industry. When Glocks pistols were introduced to the firearms market in the early 1980s, no other pistols had a trigger mechanism like them. Interestingly, during the first 10 years of the Washington DC Police Department's adoption of Glock 9mm pistols, they accumulated a record of 120 accidental discharges with the Glocks. As was found in LA County with the Smith & Wesson pistols, a lack of training was the root cause for the increase in accidental shootings among the officers. History appears to repeat itself.



Figure 6.1:  SIG P320 Mounted in a Dvorak

To aid in comparing and contrasting the trigger mechanism of a SIG Sauer P320 pistols to other magazine-fed single action striker fired pistols, a Dvorak TriggerScan fixture was employed. When the pistol is mounted in the Dvorak, the fixture pulls the trigger and measures the force vs displacement of the trigger. Dvorak fixtures are capable of very precise measurements and are commonly used in trigger mechanism design.



Figure 6.2:  Trigger Scans for Glock, S&W and SIG Sauer Pistols

To better understand the characteristics of pistol trigger pulls, a Glock 19 Gen 4, a Smith & Wesson M&P 9 (gen 1) and a SIG Sauer P320 (post upgrade with a curved trigger) were evaluated in the Dvorak.  For consistency and a fair comparison between the trigger mechanisms, the trigger probe contacted and pulled each trigger in the middle of the trigger's bow (per Sporting Arms and Ammunition Manufacturers Institute standards). Figure 6.2 shows a side-by-side comparison of the resulting trigger scans.  The Smith & Wesson M&P 9 had the lightest trigger pull, 4.8 pounds, because it was the pro/competition version of the M&P 9, meaning it had a lighter trigger pull spring set in it. I did not have access to a standard law enforcement model of the M&P 9, which reportedly has a 6.5 pound trigger pull spring kit in it.  The Glock and SIG pistol had very similar trigger pull weights at 5.9 and 6.3 pounds respectively.  See Figure 6.3.

|  | SIG P320 | Glock 19 | Smith & Wesson M&P 9 |
|---|---|---|---|
| Trigger Pull (lb) | ≈ 5.9 | ≈ 6.3 | ≈ 4.8 |
| Trigger Displacement at Discharge (in) | ≈ 0.180 | ≈ 0.292 | ≈ 0.299 |
| Trigger Safety Disengagement Force (lb) | N/A | ≈ 0.90 | ≈ 0.90 |
| Trigger Safety Disengagement Displacement (in) | N/A | ≈ 0.04 | ≈ 0.08 |

Figure 6.3:  Trigger Pull Data

The claim has been made that long displacement triggers have less propensity to experience unintentional discharges than short displacement triggers. The M&P 9 has a longer trigger displacement curve than the Glock, yet the Los Angeles County Sheriff's Department has documented multiple unintended discharges with the M&P 9, empirical field data that large trigger displacements will not prevent unintended discharges when the trigger is pulled. The M&P 9, like the Glock, is also equipped with a trigger safety, yet unintended discharges still occurred. The empirical field data confirms that a trigger safety will not prevent unintended discharges when the trigger is pulled.

The debate among shooters about long trigger displacement versus short trigger displacement has nothing to do with safety and everything to do with being able to hit what you are shooting at. The SIG Sauer P320 takes approximately 38% less trigger displacement to discharge than the Glock 19 Gen 4. It is difficult for the human body to pull the trigger of a firearm in a straight line. Pulling the trigger with a slight bias to the left on the trigger will cause the shots to spread left of the target. Pulling the trigger with a slight bias to the right will cause the shots to spread right of the target. The argument is, the shorter the displacement of the trigger, the less opportunity there is to bias the trigger left or right. The performance of Glock triggers is hotly debated among firearms enthusiasts, with Glocks having one of the largest, if not the largest, number of available after market replacement triggers of any firearm today. To be fair though, Glock is one of the most popular pistols ever put into production. Does the large number of available after-market triggers for Glocks mean short displacement triggers are better than long displacement triggers? Not necessarily. No method is singularly better than the other. Short and long displacement triggers are equally functional approaches to controlling the discharge of a firearm. For some operators a short displacement trigger will serve them best and for others a long displacement trigger will serve them best, while for many either system will serve equally well. This goes back to customer choice and philosophy of use.

Biomechanically, the human body is not equipped with encoders or transducers to provide a sense of displacement when pushing on an object. Our bodies are equipped with muscles which pull our skeleton through various positions. In the field of trigger design, it has been shown that as long as the finger has to exert a continually increasing, and steadily increasing force on a trigger to move it, the perception of displacement is minimized by

the operator.  When a trigger is being pulled, the operator can easily distinguish bumps and dwells in the force required to displace the trigger.  Looking at the trigger displacement curves in Figure 6.2, the SIG Sauer and Smith and Wesson trigger curves have a relatively steady buildup in force until approximately 2 pounds and then the force required to further displace the trigger starts to climb significantly, but in a very consistent manner, with the discharge occurring at a peak in the pull force.  The smoother the force increases to a peak before the break/discharge, the crisper the perceived trigger pull.  The Glock trigger displacement curve has four distinct sections of pull, with a dwell/plateau before the break/discharge.  This plateau before the discharge is the biggest contributor to why some people dislike the Glock trigger and don't think it is crisp.  For others, the Glock trigger is perfectly good.  The issue is not if the trigger's displacement is long or short, the issue is given the 27 bones in the human hand that are connected by 30 muscles and the operator's ability to control the contraction of the muscles and not bias the trigger right or left and possibly causing a missed shot.

The M&P 9 is a perfect example of a hybrid between long and short displacement triggers, as it has the displacement characteristics of a long displacement trigger but has the break/discharge characteristics of a short displacement trigger.  Mechanically, the operator feels the initial displacement of the trigger until the trigger displacement force starts to rise quickly at the 0.24 inch mark.  After that point the trigger displacement becomes minimally perceptible and operator perceives the ultimate break of the trigger (discharge) as crisp and controlled, just as it does in the SIG Sauer P320.

The reality is Glock, Smith & Wesson and SIG Sauer all take very different approaches to the design of their trigger mechanisms, but in the end, all meet the same functional requirements and safety requirements.  The Glock 19 Gen 4, Smith & Wesson M&P 9 and the SIG Sauer P320 are all safe, reliable, and accurate pistols.  I personally own and am equally comfortable shooting each of these pistols, but the undeniable fact remains that when competing against each other, the US Army chose the SIG Sauer P320 as its standard issue sidearm in 2017.

8.   False and Improper Statements Made by Mr. Tertin

Mr. Tertin is the third firearm consultant for the plaintiff.  Mr. Tertin's education and experience is in the field of gunsmithing.  It should be known Mr. Tertin has previously testified he doesn't fully write the reports that bear his name.  When questioned he has had difficulty recalling what portions he is responsible for, stating "there was so much back and forth".  To the best of my knowledge Mr. Tertin is not a mechanical engineer, or an engineer of any type.  Mr. Tertin has reportedly never examined the subject pistol.  Therefore, it is interesting that Mr. Tertin states that all of his opinions, "are held to a reasonable degree of engineering and gunsmithing certainty."  It is unknown to myself (a degreed engineer) how someone who has never examined the subject firearm and lacks an engineering education can render engineering opinions with any certainty.



Figure 8.1:  SIG P320 Primary and Secondary Sear Notches

The author(s) of Mr. Tertin's report claim the secondary sear notch of a SIG Sauer P320 is defective.  This is a false statement and the methodology Mr. Tertin used to "demonstrate" the claim is deeply flawed.  The secondary sear notch is a feature cut into the sear that acts as a backup to the primary sear and has the function of catching the striker and prevent a discharge if the primary sear notch breaks or the striker becomes disengaged from the primary sear under heavy impact/abuse.  See Figure 8.1.  The secondary sear notch is a

redundant safety feature to the striker lock. Because the secondary sear notch is not a separate part, but rather a feature formed into the sear it does not add cost from a monetarily or reliability standpoint. The functionality of the secondary sear notch with respect to the breakage of the primary sear notch is straight forward and easy enough for most people to visualize. However, Mr. Tertin evidently has no understanding of how the secondary striker notch is intended to function under heavy impact/abuse. In a theoretical heavy impact/abuse scenario, it has been theorized enough energy may be imparted to the striker and sear to compromise the engagement. See Figure 8.2.A. The sear is equipped with springs that serve to restore the sear to the cocked position (rotate the primary and secondary sear notches up). After the sear has rotated downward and compromised the engagement under heavy impact, the sear should begin to translate forward while the sear springs work to rotate the sear back upward. As the striker clears the primary sear notch, the sear springs can rotate the secondary sear notch into position to catch the forward moving striker. See Figure 8.2.B.



Figure 8.2: Functionality of the Secondary Sear Notches Under Heavy Impact

Figure 8.2.B also shows the secondary sear notch is a redundant safety to the striker lock (purple part), as the striker lock is still in the down position and blocking the striker from fully translating forward and discharging the pistol.



**A**

**Tertin Holds the Trigger in a Partially Pulled Condition with a Spacer**



**B**

**Tertin Presses the Sear Down with a Rod**



**C**

**Tertin Holds the Secondary Sear Notch Down as the Pistol Discharges**

Figure 8.3:  Steps Taken in Tertin's Secondary Sear Notch Test

Per a video of testing of an exemplar P320 pistol, Mr. Tertin did not test the secondary sear notch in any manner consistent with its design or purpose.  Mr. Tertin first cut the back off the rear slide cap of the pistol to gain access to the sear.  Mr. Tertin then placed a spacer in the trigger guard to hold the trigger in a pulled position that deactivated the striker

safety lock but not rotate the sear downward.  See Figure 8.3.A.  Tertin then used a steel punch/rod to depress the sear and release the striker while the striker lock was held in the deactivated condition by the spacer he placed in the trigger guard to keep the trigger pulled.  See Figure 8.3.B.  Because Mr. Tertin manually depressed the sear with a steel punch/rod, the secondary sear notch was held down and was unable to rise and catch the striker and the pistol discharged.  See Figure 8.3.C.  What Mr. Tertin did was not test the secondary sear notch, but rather simulate a trigger pull and place all of the components of the fire control in the position they would be in when the trigger of a SIG P320 is fully pulled.  Using Mr. Tertin's test principals and methods, the passive safeties of every single firearm ever made can be defeated and the firearm made to discharge "absent a trigger pull", using Tertin's definition.  Therefore, Mr. Tertin has identified every firearm ever made capable of discharging absent a trigger pull and defective.

Per Mr. Tertin's test standards, even the Magnum Research BFR (a revolver) he claims to have designed is defective.  Simply cocking the revolver and then pressing on the engagement with a steel punch/rod will defeat the passive safety transfer bar and discharge the revolver "without a trigger pull", as claimed by Mr. Terin.  The step of adding a spacer in the trigger guard to hold the trigger in a partially pulled condition, as Mr. Tertin did with the P320, is not required with the Magnum Research BFR.

The author(s) of Mr. Tertin's report use testimony from Mr. Toner (lead designer of the SIG P320) about the purpose of the secondary sear notch in an attempt to justify Mr. Tertin's flawed testing.  Mr. Toner testified that the "intercept notch was installed or designed so that if the sear moves out of position without the trigger being pulled, the intercept notch would come back up and catch the striker so you won't have a fire.  It's a secondary sear notch is what we call it."  What the author(s) of Mr. Tertin's report fail to provide is the context of "discharging absent a trigger pull".  I have met and discussed the SIG P320 with Mr. Toner on multiple occasions, including the entire Guay vs. SIG Sauer trial in which a jury unanimously found the subject P320 pistol did not discharge absent a trigger pull.  Mr. Toner never designed the secondary sear notch to prevent a discharge if the back of the slide cap was cut off, a spacer was placed in the trigger guard to hold the trigger in a partially pulled condition (defeating the striker lock), and a steel punch/rod was then

inserted into the fire control for the purpose of depressing the sear and discharging the pistol.

Mr. Tertin is not an engineer and has no formal education in the fields of physics, statics, dynamics and kinematics.  Therefore, it is understandable that Mr. Tertin does not know the principals on which the secondary sear notch functions.  But, Mr. Toner specifically testified the intercept notch was designed to "come back up and catch the striker so you won't have a fire", which Mr. Tertin's test specifically prevents by holding the sear down with a steel punch/pin.



Figure 8.4:  Engagement of a Magnum Research BFR

The author(s) of Mr. Tertin's report were also critical of the 0.041 inches of engagement between the striker and sear Mr. Tertin measured on his exemplar P320.  Stating the measure engagement was lacking and could be disengaged via "vibration, jostling, or contact with another P320".  Mr. Tertin has presented no testing with respect to "vibration, jostling, or contact with another P320".   The author(s) criticisms of the measured engagement are contradictory because the minimum engagement for a Glock pistol, a pistol the author(s) repeatedly praise, has a minimum specified engagement of two-thirds the cruciform/sear's height, which is approximately 0.032 inches and less than the

engagement measured on the exemplar P320.  Mr. Tertin has not examined the subject pistol.

However, the apparent contradictions/double standards do not stop with the Glock pistols. Examining an exemplar Magnum Research BFR, reportedly designed by Mr. Tertin, yielded a measured engagement less than 0.012 inches, which is less than 29% of the 0.041 inch engagment the author(s) were critical of in the exemplar P320.  See Figure 8.4. Interestingly, the author(s) of Mr. Tertin's report never state or define an acceptable range of engagement.

The author(s) of Mr. Tertin's report state that Mr. Tertin has been made aware of "close to 100 other incidents of the P320 discharging when the user believes they did not touch or pull the trigger."  The author(s) fail to define what percentages of false claims is expected when the exposure is greater than 2 million units.  Is a false claim rate of 0.005% expected (given not a single claim has been duplicated)?  The author(s) also fail to reconcile Mr. Tertin's apparent disappointment in the claimed SIG P320 failure rate with the 120 plus accidental discharges (1988-1998) claimed to have been experienced by the Washing D.C. police [8] department when they adopted Glock 9mm pistols.  Theoretically, If the department had 10,000 Glock pistols, those Glocks were experiencing claimed failures 200 times more often than the SIG P320.  The author(s) of Mr. Tertin's report are very pro Glock and mention Glock pistols at least 12 times in the report, but fail to reconcile Mr. Tertin's condemnation of the SIG P320 with his praise of the Glock pistols.

To be clear, I am in no way criticizing the design or functionality of Glock pistols as the result of the investigation into the claimed accidental discharges was operator error and not defective design.  I am simply pointing out the discrepancies not addressed by the author(s) of in the report that bears Mr. Terin's name.

The author(s) of Mr. Tertin's report claim the SIG Sauer P320 is unique because it is the only single action striker fired pistol that does not have an external safety.  This is not true, Kahr Arms makes single action striker fired pistols that do not have external safeties. Despite the efforts of the author(s) of Mr. Tertin's report, pistols made by Kahr Arms and

---

[8] Armed and Unready, (1998, November 18). Washington Post, Jeff Leen and Sari Horwitz

Glock are false double action pistols.  With respect to the operator, these pistols function as single action pistols, with all the limitations of single action pistols.  When the trigger is pulled on a true double action pistol, the striker is cocked and then released.  Repeatedly pulling the trigger on a true double action pistol will repeatedly cock the striker and then release the striker, for as long as the operator can pull the trigger.  Kahr Arms and Glock pistols do not behave in this manner.  If you pull the trigger on an empty and cocked Kahr Arms pistol or Glock pistol the striker will be released, but the trigger cannot be pulled again.  A true double action pistol will allow the striker to be cocked and released with each actuation of the trigger, even if the pistol is unloaded.  Smith and Wesson, Walther, Canik and Taurus all make true double action striker fired pistols.

The author(s) of Mr. Tertin's report go as far as to say Mr. Toner's (designer of the SIG P320) description of how the sear and striker of the P320 function is incorrect.  The author(s) of Mr. Tertin's report falsely state the "trigger-pull does cause a negligible amount of rearward movement in the striker, but that is due to the rearward angulation of the sear".  The fact is there exists no effective angulation.  The sear retracts the striker when the trigger is pulled because the sear rotates about a pivot and swings through an arc when the trigger is pulled.  No angle exists on the sear that causes the striker to retract.  The top edge of the sear's engagement swings through an arc that moves the top engagement edge of the sear back and down when the trigger is pull.  That motion of the engagement edge is what retracts the striker, not any angled surface.  The author(s) improper reference to an angulation on the sear indicates a fundamental ignorance of the mechanics of machine design.

Mr. Tertin also opines the P320 is unreasonably dangerous and defectively designed because the combination of its short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated.  SIG Sauer had and has P320 pistols equipped with a manual thumb safety in its production line.  The Cambridge Police Department could have purchased P320 pistols equipped with manual thumb safeties.  The Cambridge Police Department exercised their right to choose a firearm that coincided with their philosophy of use with respect to their officers expeditiously deploying a firearm in a manner that is safe and effective at protecting the lives of the public they serve and the officers they employ.

Additionally, all SIG Sauer P320 pistols sold on the civilian market in Massachusetts are equipped with manual thumb safeties.  Massachusetts law has an exemption that allows law enforcement to choose their firearms and are not required employ a manual thumb safety.  Therefore, Massachusetts law does not condone Mr. Tertin's opinion that Officer Ahern's SIG Sauer P320 is defective because it does not contain a manual thumb safety.

In summary the author(s) of Mr. Tertin's report have declared the subject SIG Sauer P320 defective without examining the subject pistol, determining if a mechanical defect exists or determining via what method the subject trigger was pulled/actuated.

9.   **Review of Case Materials**

In the preparation of this report I have reviewed the following materials:

- Complaint;
- Subject Pistol;
- Exemplar Pistols;
- North Star Imaging Exam Materials;
- Report - Mr. Villani;
- Report - Mr. Hicks;
- Report – Mr. Tertin
- Report – Mr. Reitz;
- Law Enforcement Reports;
- SIG Sauer Initial Pistol Examination Report
- SIG Sauer's Response to Interrogatories;
- Mr. Ahern's Response to Interrogatories;
- Deposition – Mr. Ahern;
- Deposition – Mr. Lamonical;
- Deposition – Mr. Taylor;
- Deposition – Mr. Mushilin;
- Deposition – Mr. Kervick;
- Deposition – Mr. Toner;
- Deposition – Mr. Meyer; and
- Produced technical data package – SIG P320.

Exhibits which I may use to explain or support the opinions expressed at trial include the afore-mentioned materials along with exemplar pistols, exemplar ammunition, cutaways, computer simulations, videos and other demonstrative exhibits.

Attached are a copy of my resume, a listing of my testimony for the last four years, and expert fee schedule.

## 10. Conclusions

Based on my education, training, and experience in product design and firearm design, manufacture and function, my review and study of the information provided regarding the circumstances of the shooting, and my inspection and testing of the subject pistol and exemplar pistols, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

- The subject P320 pistol discharged at the time of the occurrence because the trigger was pulled or otherwise depressed;

- The subject P320 pistol will not discharge after being loaded and cocked without an external stimulus inducing motion of the trigger;

- The subject P320 pistol will not discharge in the absence of a pulling, depression or motion of the trigger;

- The subject P320 pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol;

- No design or manufacturing defects exist in the condition and functionality of the subject P320 pistol that would cause the pistol to discharge absent a trigger pull;

- The subject P320 pistol is safe in design and manufacture for its intended and reasonably foreseeable uses;

- In its condition at the time of the shooting, the subject P320 pistol did not possess any defective or unreasonably dangerous conditions;

- All post-incident attempts to cause the subject P320 pistol to fire absent a trigger pull have failed;

- The discharge of the subject P320 pistol was caused by Mr. Ahern's failure to follow safe gun handling practices, including failure to control the direction of the muzzle and causing the trigger to be pulled or depressed;

- Mr. Ahern's actions described above caused the shooting;

- Mr. Villani and Mr. Hicks have not demonstrated a single one of their claimed "defect" in the subject pistol because no such "defects" exists; and

- Mr. Tertin has not demonstrated a single claimed "defect" in the subject pistol because he has never examined the subject pistol and no such "defects" exists.

I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.


Date: 01-03-2024

This report was prepared and authored by:

Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.