Page 86

1 clean it?
2    A    It is more just keeping the appearance of
3 your vehicle clean, but as far as what you can and
4 can't have in your vehicle, no, other than you
5 obviously need your computer when you're in your
6 vehicle, and the tools to perform your job that
7 they give you. But there's no regulations as far
8 as you can't have this, you can't have that, you
9 have to have this in there. It's...
10    Q    And was it dark when you left your home
11 that morning?
12    A    Yes.
13    Q    And what was the overall elapsed time for
14 you from leaving your home till you arrived at the
15 academy?
16    A    Maybe an hour and 15 minutes, hour and 30
17 minutes, somewhere in that time frame.
18    Q    Do you recall the weather?
19    A    Weather where? My home or...
20    Q    That you drove through that morning.
21    A    When I left my home, we were getting rain
22 and had sleet that day. After I came over the
23 mountain, it was not raining on this side of the
24 mountain any longer. The roads were somewhat wet,
25 but it wasn't currently raining on this side.

Page 87

1    Q    Okay. And when you arrived at the
2 academy, was the surface dry there?
3    A    I don't recall.
4    Q    Do you recall an approximate temperature
5 during the time you went from home to the academy?
6    A    I would assume it was somewhere around
7 the freezing point because I do know I had to
8 scrape ice off of the windshield of my cruiser.
9    Q    When did you do that?
10    A    When I got to the station that morning.
11    Q    Did you make any other stops that morning
12 other than Dunkin' Donuts and your station -- the
13 station?
14    A    No. And you're referring to the station
15 where I picked up my vehicle, correct?
16    Q    Correct. Are you permitted to smoke in
17 your cruiser?
18    A    No.
19    Q    And what was your smoking habit in
20 February of 2018 before your accident?
21    A    Light smoker. Mostly I'd average around,
22 like, a pack a week, maybe.
23    Q    And if you felt like a smoke when you
24 were on patrol, would you stop and get out of the
25 car?

Page 88

1    A    Yes. I'd typically find a side street
2 where I'm not visible to the public and would
3 smoke outside of my cruiser.
4    Q    What time did you arrive at the academy?
5    A    Somewhere between 6:40, 6:45. I don't
6 remember exactly when I arrived there.
7    Q    Okay. And how full was the parking lot
8 in the area where you were parking?
9    A    Not very full.
10    Q    How many officers were enrolled in the
11 general instruction class that you were taking?
12    A    I believe there was either 22 or 23 of
13 us.
14    Q    And did you back into your parking space?
15    A    Yes.
16    Q    Is that a habit of yours or is it law
17 enforcement practice or do you just like to?
18    A    No. We typically back our cruisers in.
19 It's more of a habit when I'm in my cruiser that I
20 would back in. Not something I do with a personal
21 vehicle, but I do with my cruiser.
22    Q    And why do you do that?
23    A    It's become habit when I'm in my cruiser
24 for -- if a call comes out, and -- it's much
25 quicker to get in your vehicle to pull straight

Page 89

1 out to respond verse [sic] having to try and back
2 out and...
3    Q    And did you have a particular parking
4 space that you used regularly there?
5    A    No.
6    Q    When you pulled in, did you -- and backed
7 into the space, did you pop the trunk at some
8 point?
9    A    Yes.
10    Q    And had you put the car into park by the
11 time you popped the trunk?
12    A    Yes.
13    Q    Was the motor still running when you
14 popped the trunk?
15    A    Yes.
16    Q    Was the -- your cruiser was a Dodge
17 Charger, right?
18    A    Correct.
19    Q    Do you remember the model year?
20    A    2016.
21    Q    How would you characterize the smoothness
22 of the engine? Did it have -- was it a quiet
23 ride? Noisy ride? Souped-up?
24    A    Quiet. Typical car.
25    Q    And did it run efficiently, in your

23 (Pages 86 - 89)

Page 90

1 experience?
2   A   Yes. I had never had any issues.
3   Q   Okay. And was there any heavy equipment
4 around the parking lot when you pulled in?
5   A   Heavy equipment around the parking lot?
6   Q   Like, construction equipment or snow
7 plows or, you know, big trucks.
8   A   Not that I recall seeing, no.
9   Q   Okay. Just cars?
10  A   Yeah.
11  Q   And aside from any heavy equipment, did
12 you sense any type of vibration or ground movement
13 that you could feel in your car?
14  A   (Shakes head negatively.)
15  Q   No shockwaves?
16  A   Like an earthquake? Is that what you're
17 asking me?
18  Q   Anything like that, that, you know,
19 disturbed the surface or disturbed your car at
20 all?
21  A   I'm not sure where you're trying to go
22 with that, but, I mean, as far as -- if there was
23 an earthquake or something that morning that was
24 shaking the ground, no.
25  Q   Okay. So you don't recall any shocks or

Page 91

1 vibrations as you were sitting in your car?
2   A   No. There was no atomic bombs going off
3 next to me.
4   Q   The car ran smoothly and nothing rocked
5 the car, correct?
6   A   Other than pulling into a spot and the
7 typical rock of when you put it in park.
8   Q   What did you have to do to pop the trunk?
9 Where was the switch for that?
10  A   On the left side of my steering wheel,
11 there was a button.
12  Q   As you pulled in, what was your intention
13 with respect to storing your weapon?
14  A   To store it in my trunk prior to entering
15 the academy.
16  Q   And how did you have the weapon
17 positioned on your person as you pulled it?
18  A   On my hip.
19  Q   What was it attached to?
20  A   My belt.
21  Q   Was it attached only to the belt or was
22 it also inside your trousers?
23  A   My belt.
24  Q   And why -- you did not intend to bring
25 the weapon into the academy, correct?

Page 92

1   A   I'm not permitted to bring a live firearm
2 into the academy.
3   Q   Okay. What are the circumstances under
4 which you would be permitted to bring a live
5 firearm into the academy?
6   A   Academy staff.
7   Q   If you were in full uniform, would you be
8 allowed to bring the weapon into the academy?
9   A   I'm not entirely sure on that. I've
10 never gone to the academy in full uniform. I've
11 only attended classes, and I've been in civilian
12 attire. So I've always stored my weapon.
13  Q   And how many times had you been there
14 previously for classes?
15  A   Aside from the six months I spent there
16 for the academy, four to six classes of in-service
17 that I had taken there. I don't recall exactly
18 how many times I'd been there since.
19  Q   Were the classes typically a week?
20  A   No. They all vary. It depends on what
21 class it is.
22  Q   Okay. And was it always your practice to
23 store your weapon in the trunk of your car?
24  A   Yes.
25  Q   Were you aware that there were lock boxes

Page 93

1 available inside the academy for storing your
2 weapons?
3   A   No.
4   Q   You were not aware?
5   A   No. I'll add to that that I was not
6 aware at the time that there was lock boxes, and I
7 have since learned that there are six lock boxes
8 available at the academy.
9   Q   How did you learn that?
10  A   In discussion with other deputies that
11 also do not use the lock boxes because there is a
12 limited number. So I inquired as to what the
13 number of boxes at the academy there were and was
14 told there's around six.
15  Q   Who told you that?
16  A   I don't recall. It was deputies within
17 the sheriff's office that I had talked to. I
18 don't remember exactly who it was that told me how
19 many there were.
20      MR. KELLY: Could you show the witness
21 Exhibit 4, please.
22 BY MR. KELLY:
23  Q   I apologize for the quality of this copy.
24 It's kind of, I think, how it came to us within
25 the last couple of days. But could you take a

Page 94

1 look at the top page of Exhibit 4, please?
2    A    Sure.
3    Q    Under the firearms.
4    A    Yeah.
5    Q    Have you ever seen this particular
6 information sheet before?
7    A    It doesn't look familiar.  I may have
8 seen it.  It may have been part of our academy
9 training, but I don't -- the form doesn't look
10 familiar to me.
11    Q    If you look under the section marked
12 firearms, does it advise of the availability of
13 lock boxes?
14    A    Yes.
15    Q    Do you know where the in-service office
16 room 102 is at the academy?
17    A    Not without walking into the academy and
18 looking for the room number.
19    Q    Okay.  Could you turn to the second and
20 third pages of the exhibit, please.
21    A    Uh-huh.
22    Q    Do those appear to be lock boxes?
23    A    I would assume.  I don't know.  I've
24 never seen them.  So I could not tell you if
25 they're mailboxes or if they're lock boxes.

Page 95

1    Q    Okay.  Do you see key fobs hanging out of
2 the locks there?
3    A    Yeah, some of them.
4    Q    Has any other deputy ever told you that
5 they used the lock boxes at the academy?
6    A    No.
7    Q    Okay.  Thank you.
8         After you pulled into the parking space
9 and popped the trunk, what was your -- what next
10 steps were you contemplating?  What were you going
11 to do next?
12    A    Pop my trunk so that I could secure my
13 weapon in the trunk.
14    Q    Okay.  And what was the plan with regard
15 to securing the weapon?  How were you going to get
16 the weapon from you to the trunk?
17    A    Walk it.
18    Q    Were you going to remove it from your
19 belt?
20    A    Obviously.
21    Q    Okay.  And is that something you had ever
22 done before?
23    A    Yes.
24    Q    Had you ever done it before with this
25 particular belt and this particular holster and

Page 96

1 this particular weapon?
2    A    Yes.
3    Q    About how many times?
4    A    I can't give you a number.
5    Q    Would you say more than ten times?
6    A    That might be fair to say.  It might be a
7 lot more than that.  I'm not -- like I said, I
8 can't give you a number.  I don't count how many
9 times I remove my gun.
10    Q    Do you recall how many times you had
11 removed your gun from this particular belt and
12 stored it in your trunk as opposed to your other
13 clothing?
14         MR. BAGNELL:  Object to the form.
15         THE WITNESS:  Like I said, I don't keep
16 track of when I remove my weapon or my holstered
17 weapon.  It's something that depends on where I'm
18 going and what I'm doing and, if I need to secure
19 it, how I need to secure it.  I don't keep track
20 of it.
21 BY MR. KELLY:
22    Q    Okay.  Well, was it a fairly regular
23 occurrence for you to remove this holster and
24 weapon from this particular belt and store it in
25 the trunk of your cruiser?

Page 97

1    A    If I was doing an in-service training and
2 I was in that type of attire, then, yes, it would
3 have been.
4    Q    Okay.  And were you in that type of
5 attire on other occasions when you would remove
6 the holster and weapon from your belt and store it
7 in the trunk?
8    A    I don't know.  I don't keep track of what
9 clothing I wear to in-service.  I am allowed to
10 wear civilian clothing, so whatever I feel like
11 putting on that day is what I put on.  The holster
12 and the belt, it would need to be removed, but
13 what I had on when I did that, it would vary.
14 So -- but it's always the same weapon and it's
15 always the same holster.
16    Q    Is it always the same belt?
17    A    No.  There's times where I've used a
18 leather belt depending on what the circumstances
19 are.
20    Q    Okay.  On the day before, you had worn
21 jeans to the class, right?
22    A    Maybe.
23    Q    Do you recall what belt you wore the day
24 before?
25    A    I believe it was the same belt.

25 (Pages 94 - 97)

Page 98

1  Q  Okay.  Same for Monday?
2  A  I don't recall what I had on Monday.
3  Q  Okay.  Had you ever encountered any
4  difficulty removing this holster and weapon from
5  the belt that you were wearing at the time you
6  were injured?
7  A  That holster is difficult to remove from
8  any belt, because there's a tight fit for it to
9  stay in place when it's on your belt.  So removing
10 it is difficult, which it's intended to be, so
11 that the retention -- it stays on your belt.  If
12 you ever draw your weapon, you don't want your
13 holster to come with it when you draw your weapon.
14 Q  And you were fully aware of that before
15 the day of your accident, correct?
16 A  Aware of?
17 Q  The fact that it was difficult to remove
18 this holster and weapon from this particular belt?
19    MR. BAGNELL:  Object to the form.
20    THE WITNESS:  Yeah.  Otherwise, I would
21 never use it.  If I drew my weapon and the holster
22 came with it, I wouldn't -- that would defeat the
23 purpose of everything.
24 BY MR. KELLY:
25 Q  Okay.  As you sat in your cruiser and

Page 99

1  began to remove the holster and weapon from the
2  belt, were you able to see the holster and weapon?
3  A  Yes.
4  Q  Could you show us how you were able to
5  see the holster and weapon?
6  A  It's on my hip, and I moved it slightly
7  towards the front to have a better visual of the
8  first tooth on the paddle holster.
9  Q  So you moved it forward intentionally so
10 that you could see it?
11 A  Yeah.  Because otherwise, it's on my
12 actual hip.  So I'm -- you know, on the side of my
13 hip.  So by moving it slightly forward, then the
14 front part of the holster is more in my direct
15 visual line for me to see that tooth.
16 Q  And what did you have to do to manipulate
17 the holster off of your belt?
18 A  Move the belt through the teeth.
19 Q  This is from Exhibit previously marked
20 Bruns 2 for identification.  And you may recall
21 what we did was mark the exhibit and then refer to
22 Bates numbers for the individual photographs.  I
23 just want to show you one of those photographs,
24 and that is photograph number 622 from Bruns 2,
25 and ask if you can point out to me the teeth that

Page 100

1  you're referring to.
2  A  They're not visible on this.
3  Q  Okay.  Are their locations visible?
4  A  They would be on the inside of this loop
5  here, but you can't see the actual teeth in this
6  photo.
7  Q  Are there indentations that match where
8  the teeth go?
9  A  I would assume that that's where they
10 are, but without actually seeing the other side of
11 it and being able to line them up, then I
12 wouldn't -- wouldn't know.  I've never looked at
13 the back side of the holster in conjunction with
14 where the teeth line up with those indentations.
15 Q  Okay.  I'll take it back.  Thank you.
16    When had you last loaded the weapon?
17 A  Loaded it is -- you have to be a little
18 bit more detail --
19 Q  Sure.  Okay.  When had you last inserted
20 a magazine and placed a round in the chamber?
21 A  My weapon's always stored that way.  So
22 probably the -- when I was at the range about two
23 weeks prior to this.
24 Q  Okay.  And was there a round in the
25 chamber at the time that you were injured?

Page 101

1  A  Absolutely.
2  Q  And you were aware of that?
3  A  Absolutely.  I'm trained to keep a round
4  in the chamber.
5  Q  Okay.  Why do you keep a round in the
6  chamber?
7  A  So that I don't have to waste time
8  racking the slide to chamber a round if I'm in a
9  situation where I'm engaged in gunfire with
10 somebody.
11 Q  Were you using two hands to try to remove
12 the holster and weapon from the belt?
13 A  I had one hand on the holster and one
14 hand on the belt.
15 Q  Okay.  One hand entirely on the belt and
16 one hand entirely on the holster as opposed to
17 having a little bit of each component in your
18 hand?
19 A  Yeah.  One hand on my belt, one hand on
20 my holster.
21 Q  Okay.  Where on the belt -- which hand
22 was on the belt?
23 A  My left.
24 Q  Okay.  And where on the belt was it?
25 A  On my belt right next to my holster.

26 (Pages 98 - 101)

Veritext Legal Solutions

800-227-8440                                                    973-410-4040

1  Q   Okay.  How close to the holster was your
2 left hand as you went into this maneuver?
3   A   Right next to it, possibly touching the
4 side of my finger.
5   Q   And what part of the holster was your
6 left hand right next to?
7   A   I guess what would be considered the top
8 of the weapon as it sits in the holster.
9   Q   And with your left hand -- was your left
10 hand touching the weapon at all?
11   A   No.
12   Q   Was your right hand touching the weapon
13 at all?
14   A   No.
15   Q   What was your right hand touching?
16   A   My right hand was around the biggest
17 portion of the holster.
18   Q   You mean the top portion of the holster?
19   A   I'm not sure what you're referring to as
20 the top verse [sic] me saying the meat of the
21 holster.
22   Q   Okay.  Okay.  The widest part of the
23 holster?
24   A   The largest chunk of the holster.
25   Q   Okay.  I'm going to show you the holster

1 that's been damaged.  It's in Bruns 2, Bates
2 number 621.  Can you point out to me the part of
3 the holster that your right hand was touching?
4   A   It would have been this area.
5   Q   Down at the muzzle, correct?
6   A   Around this area.  Yes.
7   Q   Are you pointing with two fingers?
8   A   Well, my entire hand was wrapped around
9 this portion of the holster.  So --
10   Q   Okay.
11   A   -- yes, somewhere in location was where
12 my hand was.
13   Q   Okay.
14      MR. KELLY:  Can you zero in on that?
15      THE WITNESS:  Should I hold it up?
16 BY MR. KELLY:
17   Q   Yes, please.  Could you demonstrate to
18 the videographer what you were doing with your
19 hand?
20   A   On paper?
21   Q   Yes.  Just as you did before.
22      MR. BAGNELL:  I object to the form.
23      But you can try.
24      THE WITNESS:  As far as this holster is
25 concerned --

1      MR. BAGNELL:  This is a piece of paper.
2 This is a photo of a holster.
3      MR. KELLY:  Objection noted.
4 BY MR. KELLY:
5   Q   You can proceed.
6   A   The only part of this that you would have
7 seen would have been my thumb here.  My other
8 fingers were around --
9   Q   Okay.
10   A   -- the back side of it.  So --
11   Q   Okay.
12   A   -- as it sits on my waist, it would have
13 been wrapped around.
14   Q   Thank you.  And so your thumb was around
15 the bottom of the Sig Sauer name, correct?
16   A   Sure.  That's a...
17   Q   And the rest of your fingers on your
18 right hand were wrapped around the underside of
19 the holster, correct?
20   A   The back side not the underside.
21   Q   Back side, yes.  Thank you.
22      And can you describe for me the action
23 that you were taking to try to separate the
24 holster from the belt?  Were you pulling it?
25 Wiggling it?  Jiggling it?  Moving it from side to

1 side?
2   A   Little of all of those.
3   Q   I'm just giving you examples.  I'd rather
4 hear it from you.
5   A   With the holster, had to -- once it was
6 rotated, it was forward slightly to where I could
7 see the teeth.  This hand had ahold of my belt.
8 The holster was rotated back so that I could see
9 that first tooth, and I was, like I said, trying
10 to fish the belt over that first alligator
11 teeth -- tooth.  And in that, you're having to
12 kind of hold the holster away from the back side
13 of where the teeth are to create enough of a gap
14 for a belt to go through it.  So it was kind of an
15 all in one rotating it backwards and creating the
16 space.
17      So it was, like I said, pretty much all
18 the things you said.  It was moving it, rotating
19 it, jiggling it, jostling it, getting to that
20 point where there was enough space to get the belt
21 over that first tooth.
22   Q   Okay.  And this is something you had done
23 on prior occasions, correct?
24   A   As I already said, yes.
25   Q   Was it any more difficult to do it that

27 (Pages 102 - 105)

1 day than it had been on prior occasions?
2    A   No.
3    Q   How long would it usually take you to
4 accomplish that maneuver?
5    A   A few seconds at the most.
6    Q   Had you ever been advised by any deputy
7 or officer of the sheriff's office that -- of any
8 preference that you should get out of the car,
9 stand up and remove the holster and weapon from
10 the belt that way rather than do it seated in your
11 cruiser?
12    A   No.  It's a personal preference of
13 everybody to do it whatever is comfortable for
14 them.  It's...
15    Q   Comfortable and safe?
16    A   Correct.
17    Q   Do you have any sense of the lapse of
18 time between you when you started to try to
19 maneuver the holster off the belt and when the gun
20 fired?
21    A   Split second.  Seconds.  I'm not entirely
22 sure.  It was not long after I started to maneuver
23 everything that I assumed that it fired.  I never
24 heard it fire.  So I...
25    Q   Do you have any explanation of why you

1 never heard it fire?
2    A   Other than, you know, the -- no, I would
3 only be guessing as to why it is.  So I'm going to
4 say no, I don't.
5    Q   Okay.  Wouldn't you expect to hear it
6 fire?
7    A   You would think, but typically, firing a
8 weapon, I have ear protection in because I'm at
9 the range.  I've never been in a situation where
10 I've been in an enclosed space where a weapon has
11 fired.  So...
12    Q   How did you become aware that the weapon
13 had fired?
14    A   The smell.
15    Q   What was the smell?  Gunpowder smell?
16    A   Gunpowder, blood, burning.  It was
17 several smells.  I don't -- I can't tell you
18 exactly what the smell was.  It was just a very
19 distinct smell, and since I was still looking in
20 that area, then it was fairly easy to tell quickly
21 that I had been hit.
22    Q   When did you start to feel pain?
23    A   I don't remember a whole lot of when --
24 if it was excruciating pain, if it was numb until
25 somebody touched it.  I don't recall exactly when

1 it set into my brain the pain.
2    Q   And you -- strike that.
3        What did you do after you realized that
4 the weapon had fired?
5    A   My first reaction was to -- when I saw my
6 leg, was to check the type of bleeding that I was
7 having.  Once I did that, I was looking to see who
8 was around me to get attention for help.
9    Q   And what did you see or who?
10    A   I saw a couple of heads in vehicles, so
11 that's when I opened my door and activated the
12 siren on my -- by hitting my horn and trying to
13 get attention from people.
14    Q   And you were able to get attention from
15 people, correct?
16    A   Correct.
17    Q   And what did you observe about the
18 attention you were getting from people?  How many
19 people and what did they do?
20    A   From what I recall, there was the person
21 that was sitting in the vehicle to my left, who I
22 spoke to first.  The other people, I don't
23 remember at what point they came over.  I just
24 remember the three people that were closest to me
25 in my vehicle.

1    Q   Okay.  And who were those three?
2    A   My passenger's seat was a sergeant from
3 Purcellville, Ryan Vasconi.  And the two people on
4 my driver's side was a female with dark hair that
5 I now know as Officer DeLage.  And there was the
6 male that was kneeling on the pavement inside my
7 driver's door that I now know as Travis -- Officer
8 Travis Willis.
9    Q   And whether others were around or not,
10 those are the three that you recall, correct?
11    A   Correct.
12    Q   After you realized that the weapon had
13 fired, did you look down at the weapon?
14    A   Look down at the weapon?
15    Q   Did you look at the weapon?
16    A   My eyes never actually left that area,
17 because I was looking the entire time, trying to
18 remove my belt.  So once I realized I was shot, my
19 reaction was to first look at the wound.  I didn't
20 turn my attention to the weapon until after I had
21 gotten attention from somebody to come render aid.
22    Q   At any point while you were manipulating
23 the holster, weapon and belt, did you realize that
24 the muzzle of the weapon was pointed at your right
25 leg?

28 (Pages 106 - 109)

1      MR. BAGNELL:  Object to the form.
2      You can answer.
3      THE WITNESS:  Not something that I was,
4  oh, look.  It wasn't something that I thought
5  anything of at the time.
6  BY MR. KELLY:
7      Q   Well, do you agree that in order for
8  you -- for the weapon have to have discharged into
9  your right leg, it had to have been pointed at
10 your right leg at some point?
11     A   Yes.
12     Q   And the way that it became pointed at
13 your right leg was through the manipulations that
14 you were doing with the holster and the belt,
15 correct?
16     A   With the holster, correct.
17     Q   In other words, you put it in that
18 position, didn't you?
19     A   I don't know what other position it could
20 have been in, but...
21     Q   At some point, did you take the weapon
22 out of the holster and put it on the passenger's
23 seat?
24     A   Yes.
25     Q   Okay.  And up until that moment, is it

1  your testimony that the weapon was never out of
2  the holster?
3      A   Yes.
4      Q   So as far as you're concerned, the weapon
5  was never out of the holster, correct?
6      A   Hundred percent that weapon never came
7  out of its holster.
8      Q   Okay.  And did you say to anyone --
9  immediately following the accident, did you say,
10 quote, I don't know how the gun got out of the
11 holster, close quote?
12     A   No.
13     Q   You never said that?
14     A   I don't recall ever saying that.  I don't
15 know why I would have said that because it never
16 came out of its holster.
17     Q   Okay.  You have sat here this week and
18 listened to the testimony of Officer DeLage and
19 Officer Bietsch, correct?
20     A   Correct.
21     Q   And you've heard both of them say that
22 you reported at the time, I don't know how the gun
23 got out of the holster.
24     You heard that, right?
25     A   Yes.

1      Q   Are they mistaken in their recollection,
2  both of them?
3      A   Possibly.
4      Q   Well, do you believe they're mistaken in
5  their recollection?
6      A   Yes.
7      Q   Did the gun get out of the holster at any
8  time before you intentionally removed it and put
9  it on the passenger's seat?
10     A   Not at all.
11     Q   And how do you know that?
12     A   Because I was physically looking at my
13 holster and weapon while trying to remove it from
14 my belt.
15     Q   Do you recall the weapon moving in any
16 direction from within the holster while you were
17 trying to remove the holster from your belt?
18     A   No.
19     Q   Is it your recollection that the weapon
20 stayed snug in the holster throughout that series
21 of trying to remove the holster?
22     A   Yes.
23     Q   Do you know whether a round was found to
24 be in the chamber of your weapon after you were
25 shot?

1      A   At what time are you referring to?  Now?
2  Then?
3      Q   Then.  Immediately after.
4      A   No.  I -- no, I told somebody where my
5  weapon was located.  Beyond that, at that time, I
6  didn't know what they did with it.  I knew they
7  set it on my floorboard of my passenger's side,
8  but as far as the condition of it when they saw
9  it, I don't know in that situation right then and
10 there.
11     Q   Okay.  Did anyone ever advise you that a
12 round was found to be in the chamber after the
13 weapon was recovered from the passenger's seat?
14     A   Again, still in that same time while
15 we're all sitting in the car?
16     Q   Yes.
17     A   I don't believe anybody told me that, no.
18 I don't recall.
19     Q   After that immediate time frame, did
20 someone ever tell you that there had been a round
21 found in the chamber?
22     A   I've learned since the incident that
23 there was.
24     Q   Okay.  And how did you learn that?
25     A   Through the detectives that I've spoke

29 (Pages 110 - 113)

Page 114

1  to.
2  Q    And what is the significance of a round
3  being found in the chamber after it discharged
4  into you?
5  A    That the weapon cycled and pulled another
6  round from my magazine.
7  Q    Based upon your experience with this
8  weapon and this holster, do you believe you could
9  have accessed the trigger if the weapon was fully
10  seated in the holster?
11  A    No.
12  Q    You could not?
13  A    No.
14  Q    Then you agree that you could not have
15  pulled the trigger while the weapon was fully
16  seated in the holster, correct?
17  A    Absolutely.  There's no way I could have
18  touched that trigger to pull it.
19  Q    Okay.  So if the weapon discharged as a
20  result of a trigger pull, it would have to be
21  because the weapon was partially removed from the
22  holster, correct?
23       MR. BAGNELL:  Object to the form.
24       THE WITNESS:  I guess you could assume
25  that it was partially out or it was fully out for

Page 115

1  somebody to be able to access the trigger, but my
2  weapon never left my holster.  So I know there was
3  no way for me to have access to the trigger.
4  BY MR. KELLY:
5  Q    Okay.  And this is not something that you
6  assume or believe.  You're telling me that you
7  know you never touched the trigger because you had
8  your eye on the weapon in the holster the whole
9  time, right?
10  A    Absolutely.
11  Q    What is your recollection of the care
12  that you received in the parking lot?  What do you
13  remember about that?
14  A    I remember the gentleman in my
15  passenger -- or in my driver's door attempting to
16  apply a tourniquet, and the Purcellville officer
17  in my passenger's seat holding my right hand,
18  talking to me, and the female with the dark hair
19  from George Mason holding my left hand, both of
20  them talking to me while the other male officer
21  was applying the tourniquet to my leg.
22  Q    Do you recall seeing Officer Bietsch from
23  the George Mason University police force who was
24  here yesterday?  Do you remember her from the
25  parking lot?

Page 116

1  A    No, not at all.
2  Q    Do you recall answering any questions
3  from someone who was making a 911 call for you?
4  A    I know I answered a couple of questions,
5  but I don't know who exactly was asking those
6  questions.  I just know people were relaying or
7  asking questions and I was answering.
8  Q    Okay.  And one of the questions you were
9  asked was your age, correct?
10  A    Yes.
11  Q    And you said 37, correct?
12  A    Correct.
13  Q    Was that the correct answer?
14  A    Yes.
15  Q    Do you remember what other information
16  you provided to the 911 caller?
17  A    I gave them the address to the academy.
18  Q    Anything else?
19  A    Not that I recall.  As I said, before, I
20  don't know who or what they were asking the
21  information for.  I just know people were asking
22  me questions and I was relaying information that I
23  knew and would be able to give them.
24  Q    Okay.  But they heard you correctly when
25  you said your age and when you said the address of

Page 117

1  the academy, correct?
2  A    I gave them the address for the academy
3  twice because they had it wrong the first time.
4  Q    Who had it wrong?
5  A    The female that was next to me.  When she
6  said it the first time after I told her the
7  address, she had numbers flipped, and I said it
8  again to her.
9  Q    At some point, did you come to the belief
10  that the weapon had discharged as a result of an
11  equipment malfunction?
12  A    At some time since the incident in the
13  past nine, ten months?
14  Q    Anytime from 7:00 a.m. on February 7th,
15  2018.
16  A    Yeah, I guess that would be fair to say,
17  that it was a faulty weapon.  And that made the
18  most sense to me because I know I never touched my
19  weapon.
20  Q    At some point, did you believe that the
21  cause was a faulty holster?
22  A    At the beginning, it was not clear on
23  what any of the issues were.  It was very limited
24  information that I was receiving from detectives.
25  I didn't know the condition of any of my gear

30 (Pages 114 - 117)

Page 118

1  after the incident. So I was going based off of
2  what I was being told that they had seen. And
3  these were also things that I was coming to
4  understand while I was still hospitalized.
5    Q   At some point, did you form the belief
6  that the accidental discharge had been the result
7  of a faulty holster?
8    A   That was one of my assumptions.
9    Q   What was the basis for your assumption?
10   A   That it was something -- faulty
11 equipment. I believe I stated I don't know if it
12 was my faulty holster, weapon, belt. I wasn't
13 sure what it was, but there was something
14 equipment-wise that was faulty.
15   Q   Was there a particular fault of the
16 holster that you had in mind when you said that?
17      MR. BAGNELL: I just want to put an
18 objection on the record to the extent it calls for
19 expert testimony, which we will be disclosing.
20      You can answer.
21      THE WITNESS: Can you read it back to me?
22      (The reporter read the record as
23 requested.)
24      THE WITNESS: No. Again, I was stating a
25 broad statement as far as equipment, whether it

Page 119

1  was the holster, the weapon, any equipment. There
2  was no one thing in particular that stood out that
3  led me to believe one thing over another at that
4  time while I was still in the hospital.
5  BY MR. KELLY:
6    Q   Okay.
7      MR. KELLY: Could you show the witness
8  Vadnais 2, please?
9  BY MR. KELLY:
10   Q   You have Vadnais 2 in front you, don't
11 you, Ms. Vadnais?
12   A   Yes.
13   Q   Does that picture look familiar to you?
14   A   Yes.
15   Q   What is it?
16   A   It's a picture of my left hand.
17   Q   Okay. And there are some marks on the --
18 at the base of your index finger there, correct?
19   A   Correct.
20   Q   Do you know how those marks got there?
21   A   No. When this photo was taken, I did not
22 know. It was just something additional that I had
23 noticed was not there previously.
24   Q   Have you since developed a belief as to
25 what -- how those marks got there?

Page 120

1    A   I believe they're burn marks from a
2  muzzle flash.
3    Q   Okay. And what was the relative position
4  of your left hand and the muzzle when that
5  occurred?
6    A   That knuckle would have been closer down
7  towards the bottom of the holster where the muzzle
8  flash would have come from.
9    Q   Okay. Does it indicate to you that your
10 left hand was touching the holster?
11   A   No. It just tells me that my hand was
12 in -- was relatively close to the holster or the
13 bottom of the holster.
14   Q   And I'm going to show you again Bates
15 number 621 from Bruns 2 and ask if it's your
16 belief that the round was discharged from the
17 weapon through the muzzle that's on the far left
18 side of the picture?
19      MR. BAGNELL: Object to the form.
20 There's no muzzle in the picture. There's a
21 holster in the picture.
22 BY MR. KELLY:
23   Q   Okay. The muzzle portion of the holster.
24      MR. BAGNELL: Same objection. It's a
25 holster, not a gun.

Page 121

1      THE WITNESS: The flash would have come
2  out from the bottom of the holster.
3  BY MR. KELLY:
4    Q   Okay. Thank you. Thanks for clearing
5  that up. Jeff and I couldn't do it.
6      And that flash is what you believe caused
7  those marks on Vadnais 2, correct?
8    A   Yes.
9    Q   Going back to your training, do you
10 recall whether any aspect of the training that you
11 received throughout the time that you were trained
12 at the Loudoun County Sheriff's Office, did any
13 aspect of that training address what you were
14 doing in the car that day, removing your weapon?
15   A   You already asked me that and I said no.
16   Q   Do you believe that any action of yours
17 contributed to the discharge of the gun?
18   A   No.
19   Q   At some point, did you conclude that it
20 was the fault of the weapon?
21   A   Once I learned that the weapon is
22 defective and -- then, yes, absolutely.
23   Q   Okay. And when did you arrive at that
24 conclusion?
25   A   It's been an ongoing process since the

Page 122

1 incident.
2    Q    Okay. When did you first arrive at that
3 conclusion?
4    A    I can't give you a date. Month, two
5 months, three months, four months after the
6 accident. I'm not entirely sure.
7        MR. KELLY: Do you have Number 9?
8 BY MR. KELLY:
9    Q    Have you had a chance to look at
10 Vadnais 9, Ms. Vadnais?
11    A    I'm familiar with the letter.
12    Q    Okay. At some point, did you retain an
13 attorney named Michael Kernbach?
14    A    Kernbach?
15    Q    Kernbach.
16    A    Yes.
17    Q    Okay. When did you retain him?
18    A    It may have been the date of this letter,
19 the 21st.
20    Q    And did you physically meet with
21 Mr. Kernbach on or before February 21st?
22    A    I don't recall the date that I met with
23 him, but, yes, when I was released from the
24 hospital, I did meet with him.
25    Q    Okay. Your first physical meeting with

Page 123

1 him was after you were released from the hospital
2 or before?
3    A    After I was released.
4    Q    Okay. Did you speak with him over the
5 phone before February 21st, 2018? I'm not asking
6 for the content of any conversations.
7    A    I believe maybe a day or two prior to me
8 being released I may have spoke to him on the
9 phone, but I don't recall exactly when the first
10 time that we spoke.
11    Q    Subsequent to February 21st, 2018, did
12 you also meet with Detective Bush to discuss this
13 incident?
14    A    Yes.
15    Q    Was that after you first spoke with
16 Mr. Kernbach?
17    A    I don't remember.
18        MR. KELLY: V-3, please.
19 BY MR. KELLY:
20    Q    And have you had a chance to look at
21 Vadnais 3, Ms. Vadnais? Take your time, I'm sorry
22 to interrupt.
23    A    Okay.
24    Q    And I'll represent to you that this was
25 retrieved from the internal affairs file that we

Page 124

1 received in the last couple of days. Was the
2 content of V-3, or Vadnais 3, authored by you?
3    A    It may have been a combination of me and
4 my husband and the okay for the content by my
5 attorney.
6    Q    Was your -- when you say your attorney,
7 was that Mr. Kernbach or Mr. Bagnell or somebody
8 else?
9    A    In regards to this exhibit, it was
10 Kernbach, I believe.
11    Q    Okay. And if I'm reading -- is this a
12 Facebook or -- I'm not too hip to the social
13 media. It is a tweet or --
14    A    It's Facebook.
15    Q    Facebook? Indicates that you made that
16 entry on February 17th, correct?
17    A    That's what's typed in there. When it
18 was actually posted, I don't know because that
19 date is not on the post.
20    Q    But it certainly reflects what you were
21 thinking on February 17th, right?
22    A    Yeah, as of -- because it says, as of
23 today. So I would assume, yes. But I don't
24 recall everything from this situation because I
25 was still in the hospital at this time.

Page 125

1    Q    Well, is there anything in Vadnais 3 that
2 you want to take back or that's inaccurate?
3    A    I don't know. I don't see anything that
4 jumps out at me. I wouldn't. I don't know.
5    Q    Okay. What was the fault in the
6 equipment that caused your gun to fire from inside
7 the holster?
8        MR. BAGNELL: Objection to the extent it
9 calls for expert testimony.
10        You can answer.
11        THE WITNESS: Again, it was faulty
12 equipment as a broad statement, referring to
13 anything, because I don't know what had caused the
14 accident in the first place. So it was a broad
15 statement, once again, to any equipment, whether
16 that's the holster, the weapon, whatever it was,
17 there was something equipment-wise that caused
18 this injury, to make sure that my family and
19 friends knew that this was not something that was
20 done on my part.
21 BY MR. KELLY:
22    Q    Okay. So is it fair to say that it had
23 to be the fault of either the holster or the
24 weapon because you knew it was not your fault?
25    A    That's what I just said.

32 (Pages 122 - 125)

Page 126

1  Q  You did meet with Detective Bush a couple
2 of weeks after the accident, right?
3  A  No.
4  Q  No?
5  A  After the accident?
6  Q  Yes.
7  A  He came to the hospital that one time.
8  Q  Right.
9  A  That's the only time I've met with him.
10  Q  Okay.  Did he come to the hospital once
11 or twice?
12  A  Once.
13  Q  You recall once?  Did Detective Bush
14 attribute your accident to any fault in the
15 holster or the weapon?
16  A  He didn't give me any straightforward
17 answer.  From him is where I had first -- from
18 what I remember, getting the understanding of that
19 there was something equipment-wise that was
20 faulty.  But he didn't have a clear answer for me
21 as to what that was.
22  I don't remember our entire conversation
23 that took place that day.  Again, I was still in
24 the hospital when that conversation took place and
25 still taking quite a bit of narcotics for the pain

Page 127

1 while I was in the hospital.  So my recollection
2 of that conversation is not very clear.
3  Q  Okay.  Did you also meet with Sergeant
4 Berger at your home?
5  A  Yes.
6  Q  And did Sergeant Berger, when you met
7 with him, attribute your accident to any fault of
8 the holster or the weapon?
9  A  He did not give any conclusions of what
10 he assumed had happened.
11  Q  Do you recall being in the room here when
12 Deputy Salamida testified?
13  A  A very small portion of his deposition I
14 was in here for.
15  Q  Okay.  Did you hear him say that he
16 attributed the accident to operator error?
17  A  No.  I was not in here for that part.
18  Q  Okay.  Have you read his deposition?
19  A  No.  I don't have copies of them.
20  Q  Have you reviewed the internal affairs
21 report that was produced to the lawyers in the
22 last couple of days?
23  A  No.
24  Q  Has anyone made you familiar with the
25 conclusions that were reached in the internal

Page 128

1 affairs report?
2  A  Only what Sergeant Berger had said here,
3 but I had not received or been told by anyone
4 within my department of what that conclusion is.
5  Q  Did anyone communicate to you the
6 conclusion that Sergeant Berger reached that you
7 had failed to properly control your weapon?
8  A  The only person I've heard that from was
9 Sergeant Berger.  Again, I have not had anybody
10 from my department come to me with any conclusion
11 of the IA.
12  Q  Okay.  And not to belabor the obvious,
13 but you're quite certain you didn't pull the
14 trigger and that nobody else pulled the trigger,
15 correct?
16  A  I'm a hundred percent positive that
17 trigger was never pulled.
18  Q  Okay.  Which can only mean that the
19 weapon discharged without the trigger being
20 pulled, correct?
21  A  Correct.
22  Q  And do you have a belief as to what the
23 fault was in the weapon that caused the weapon to
24 discharge without the trigger being pulled?
25  A  When?  As of now, do I have a belief?

Page 129

1  Q  Yes.
2  A  Or then at the accident?
3  Q  Now.
4  A  Now, yes.
5  Q  What is that?
6  A  That there's a defect in the weapon that
7 caused it to fire.
8  Q  Okay.  What's the defect?
9  A  I'm not a firearms expert.  I have not
10 seen my weapon since that day, so I cannot tell
11 you what the defect is in my weapon.
12  Q  I want to show you a few more exhibits
13 and then we'll probably be at the end of a tape,
14 or a disk, and we'll move in another direction
15 which won't be terribly longer.  Okay?  Just to
16 let you know.
17  MR. KELLY:  Could you show Ms. Vadnais
18 Vadnais 1, please.
19 BY MR. KELLY:
20  Q  Could you just take a moment to flip
21 through it, please?
22  A  This is a long document.  Do you want me
23 to go through the entire thing or --
24  Q  I just wanted you to --
25  A  -- do you have particular --

33 (Pages 126 - 129)

Page 130

1  Q   -- flip through it for familiarity
2  purposes.
3  A   Okay.
4  Q   Have you seen it before?
5  A   This actual document?  No, but I vaguely
6  remember the questions and needing to provide
7  answers for them.
8  Q   Okay.  And you can see on pages 1 and 2
9  in particular where you apparently provided some
10  content to those answers, right?
11  A   Correct.
12  Q   Could you look at about two-thirds,
13  three-quarters of the way down on page 2 --
14  A   Okay.
15  Q   -- where you're quoted as saying, I don't
16  know what happened, I never touched my gun,
17  immediately after the accident.
18     Do you see that?
19  A   Yep.
20  Q   Okay.  Do you recall saying that
21  immediately after the accident?
22  A   I don't know if it was immediately after
23  the accident, but I know I had said that several
24  times.
25  Q   Okay.  You said it while you were still

Page 131

1  in your car at the scene of the accident, correct?
2  A   Yes.
3  Q   Okay.  You have sat through the
4  depositions of pretty much everybody we could find
5  who was present at the scene, correct?
6  A   Correct.
7  Q   Did you hear anyone say that they heard
8  you say that?
9  A   The one person I directly addressed,
10  which was Lieutenant Buckman, has the closest
11  recollection of what I remember saying and what he
12  remembers me saying --
13  Q   Okay.
14  A   -- as well as Officer Willis who was the
15  one pretty much in my lap applying a tourniquet to
16  my leg.
17  Q   Where was Lieutenant Buckman when he
18  heard you say what you say you said?
19  A   When I first saw him and spoke to him
20  directly by name, he was standing directly behind
21  Officer Willis and Officer DeLage at my driver's
22  side door.
23  Q   Okay.  Did you just remember that now?
24  A   Remember what just now?
25  Q   That Lieutenant Buckman was standing

Page 132

1  there?  Because I don't think you mentioned him
2  before.
3     MR. BAGNELL:  Object to the form.
4     THE WITNESS:  No.  I've -- remember
5  Lieutenant Buckman as being the first person on
6  scene from my department that I recognized.
7     MR. KELLY:  Could you show the witness
8  Vadnais 5, 6 and 7, please.
9  BY MR. KELLY:
10  Q   Ms. Vadnais, could you please familiarize
11  yourself with those three documents.
12  A   Okay.
13  Q   Those are copies of range safety rules
14  that were signed by you on December 1st, 2016,
15  June 20th, 2017, and February 27th, 8th or
16  March 1st and 2nd of 2017, correct?
17  A   Uh-huh.
18  Q   And in each of those documents, you
19  acknowledge your awareness of the cardinal rules
20  of firearms safety, correct?
21  A   Yes, the range safety rules.  Yes.
22  Q   Okay.  And specifically with regard to
23  rule number 2 -- and I'll read it -- "Keep all
24  firearms pointed in a safe direction and never
25  point a weapon at anything you are not prepared to

Page 133

1  shoot."
2     Did I read that correctly?
3  A   Yeah.
4  Q   And do you agree that you violated that
5  rule by having your weapon pointed at your right
6  leg at the moment that you were injured?
7     MR. BAGNELL:  Object to the form.
8     THE WITNESS:  Absolutely not.  My weapon
9  was holstered.
10  BY MR. KELLY:
11  Q   That's why you believe that the weapon
12  wasn't pointed at your leg, because it was
13  holstered?
14  A   That's why I believe I didn't violate the
15  rule, because my weapon was holstered.
16     MR. KELLY:  Vadnais 8, please.
17  BY MR. KELLY:
18  Q   Could you familiarize yourself with that
19  document, please.
20  A   Okay.
21     MR. BAGNELL:  Marcie, can I look at it?
22  BY MR. KELLY:
23  Q   Vadnais 8 purports to be a lesson plan
24  cover sheet for 2016 firearms training, doesn't
25  it?

34 (Pages 130 - 133)

Page 134

1    A    Yes.
2    Q    Have you ever seen it before?
3    A    No.
4    Q    Was it typical for the sheriff's office
5    to distribute a lesson plan to people who are
6    qualifying on a weapon?
7    A    No. A lesson plan is for the
8    instructor -- a guide for the instructor to follow
9    while teaching a class. It's not given to
10    students.
11        MR. KELLY: Vadnais 10, please.
12    BY MR. KELLY:
13    Q    Could you take a look at Vadnais 10,
14    please? And I'm really just asking if that's
15    the -- a copy of the owner's manual that you
16    received when you received your P320.
17    A    No. This is not.
18    Q    It's not the owner's manual?
19    A    No. I received a small booklet within
20    my -- the case that the weapon came in. It
21    absolutely is not this extensive or thick by any
22    means.
23    Q    Okay. Did the -- what you received in
24    the box say that it was an owner's manual?
25    A    It may have.

Page 135

1    Q    Or a user's manual?
2    A    Something along those lines. I just know
3    it's a smaller booklet.
4    Q    I'm going to show you from Bruns 2 what
5    we have Bates stamped LCSO 695. And could you
6    tell me -- first of all, does that appear to be a
7    picture of the internal compartment of your car --
8    A    Yes.
9    Q    -- your cruiser? Okay. Can you describe
10    for me the equipment that's in the picture?
11    A    My light and siren box, my radio and
12    microphones and my seat belt clip.
13    Q    And where is that all located?
14    A    Basically center console.
15    Q    Okay. I will now show you from Bruns 2
16    Bates number 657, and ask if that's a picture of
17    the cruiser that you were using when you were
18    injured.
19    A    Yes.
20        MR. KELLY: Off the record.
21        THE VIDEOGRAPHER: The time is 2:02 p.m.
22    This completes media unit number 2. We are now
23    off the record.
24        (Whereupon, a short recess was taken.)
25        THE VIDEOGRAPHER: The time is 2:34 p.m.

Page 136

1    This begins media unit number 3. We are now on
2    the record.
3        Please proceed, Counsel.
4    BY MR. KELLY:
5    Q    Okay. Ms. Vadnais, I have one more
6    picture and then we'll go where I said we were
7    going to go. I just want to show you from Bruns 2
8    number 666. Just take a look at it, please.
9    A    Okay.
10    Q    Does that appear to be interior of your
11    cruiser?
12    A    Yes.
13    Q    Can you tell me what is shown in the
14    picture, please? It's driver's side, right?
15    A    Yep. So starting from the top left of
16    the picture would be my -- a bracelet, a necklace,
17    extra set of handcuffs, my light, spotlight
18    handle, over to the steering wheel, my MDT, as in
19    Tom. Connected to that is my electronic ticket
20    printer. Below my MDT is my center console with
21    my light box and siren box, radio, my seat, seat
22    belt, and -- that's about all I can make out from
23    the picture.
24        It looks like there's something across my
25    seat, but the picture is too dark for me to say

Page 137

1    exactly what that is.
2    Q    Like a seat belt, maybe?
3    A    I couldn't tell you.
4    Q    Okay. That's fine. Thank you.
5        Now, back to the day of the accident.
6    You were taken by ambulance to a hospital, right?
7    A    Correct.
8    Q    Do you consciously recall being taken
9    from the scene?
10    A    I remember being taken out of my vehicle
11    and put in the back of an ambulance.
12    Q    Physically, what were you feeling at the
13    time?
14    A    Extreme pain like I've never felt before.
15    Q    Obviously, it started in your leg. Was
16    it -- was the pain limited to your leg? Was it
17    all over?
18    A    There were so much pain that I can't
19    pinpoint exactly where the majority of the pain
20    was coming from. I could assume that it was from
21    my leg, but my entire body was in so much shock
22    from the trauma and the pain that it was radiating
23    throughout my entire body.
24    Q    Okay. And mentally, were you fully
25    conscious?

35 (Pages 134 - 137)

1  A   Yes.
2  Q   Were you able to converse with the EMTs?
3  A   From what I recall.
4  Q   And were pain killers administered at
5  some point?
6  A   I remember them saying something on the
7  ambulance about making a call to the hospital to
8  get authorization for another dose of whatever
9  they had given me, because the medicine had not
10 worked at that point. I don't know what it was
11 that they gave me or how much. I just know that
12 whatever they gave me was not controlling the pain
13 at all and they were calling the hospital to see
14 if they could be authorized to give me additional.
15 Q   Okay. Were you still conscious when you
16 got to the hospital?
17 A   Through the doors of the hospital, the
18 last memory I have is seeing several doctors,
19 nurses, who -- you know, medical -- the hospital
20 staff right inside the second set of sliding doors
21 where the ambulance came in. But beyond that
22 point, before I actually got to them, I don't
23 remember anything after that point.
24 Q   Okay. So you blanked out at some point,
25 correct?

1  A   Yeah.
2  Q   And when you woke up, where were you?
3  A   The next conscious memory that I have is
4  being loaded into my husband's vehicle to be
5  transported to the second hospital.
6  Q   Your husband drove you to the second
7  hospital?
8  A   Yeah.
9  Q   Do you know, in terms of passage of time,
10 when that was?
11 A   I now know that it was eight days after
12 the accident.
13 Q   So are you -- do I understand correctly
14 that you don't really have a conscious
15 recollection of those eight days?
16 A   In those eight days, I remember little
17 blips of things that I saw, but not any type of
18 conversation. I mean, there's some people that I
19 thought I remembered seeing and there was other
20 people that I don't remember seeing at all.
21     My husband pretty much never left the
22 hospital. I think I have one slight memory of
23 actually seeing him in the hospital room. They
24 had me on so much pain medication that entire time
25 I don't -- I was pretty much out. I would come in

1  and out, from what I was told.
2  Q   Okay. And when your husband drove you
3  to -- did you say a rehab place?
4  A   The second hospital, which is the rehab
5  center.
6  Q   What was your pain level at that point?
7  A   Still very high, 10. Couldn't move
8  myself. Had to have assistance moving my leg.
9  Was still being moved around in a wheelchair.
10 Couldn't take myself to the bathroom.
11 Q   And do you think you were in the first
12 hospital for about ten days? Is that right?
13 A   Eight, ten days, somewhere in that time
14 frame. I don't --
15 Q   And which hospital was that?
16 A   Reston trauma unit.
17 Q   Okay. And what was the name of the
18 second hospital?
19 A   Winchester Rehabilitation Center.
20 Q   Did you undergo surgery at Reston trauma
21 center?
22 A   Yes.
23 Q   And was that immediate, as far as you
24 know now?
25 A   I know it was that same morning, but I

1  don't know how quickly after I arrived at the
2  hospital.
3  Q   Okay. Do you have a recollection of the
4  surgery?
5  A   No.
6  Q   And what treatment did you receive at the
7  second hospital?
8  A   Continued with pain management and about
9  three hours a day of physical therapy, trying to
10 get some function in my leg back. I was not able
11 to lift my leg on my own at all without
12 assistance. I was in a -- still being moved
13 around with a wheelchair, had no bend in my knee.
14     My entire leg was just a -- something
15 that I had absolutely no control over. I could
16 not control anything in that leg without somebody
17 or, you know, me having a tool from the hospital
18 to physically move my leg with that tool.
19 Q   So you couldn't move it independently?
20 A   Absolutely not.
21 Q   How long were you in the second hospital?
22 A   Somewhere between, again, seven and ten
23 days.
24 Q   And did you have surgery in the second
25 hospital?

36 (Pages 138 - 141)

Page 142

```
1    A    No.  That was just the rehab facility.
2    Q    Where did you go from there?
3    A    From there is where I was released to go
4  home.
5    Q    Okay.  And about when was that?
6    A    End of February.
7    Q    And what was your status when you were
8  released to go home in terms of your pain and your
9  ability to care for yourself?
10   A    Still had extreme amount of pain, still
11 taking a lot of pain medicine, and needed somebody
12 with me pretty much 24 hours to assist me with
13 getting around.
14       I still could not use the bathroom by
15 myself because I had no bend in my leg at the hip
16 or the knee.  So I had to have assistance with
17 somebody holding my leg flat, as I have to have it
18 sitting here, for me to be able to even sit down
19 to use the restroom.
20       I could not shower by myself for fairly
21 good amount of time.  I couldn't stand in the
22 shower and support myself.  So I had to be able to
23 have somebody there that could assist me with, you
24 know, taking a shower, using the restroom, you
25 know.
```

Page 143

```
1        I couldn't get anything for myself to eat
2  because I wasn't mobile enough to be able to make
3  my way around a kitchen and fix myself something
4  to eat.  So I had to depend on my husband and my
5  children to constantly be with me and waiting on
6  me hand and foot while I was on the couch with
7  pain medicine and the heat and ice and stuff on my
8  leg.
9    Q    Did you have a home care giver --
10   A    No.
11   Q    -- an outside person to come in and help
12 you out?
13   A    No, because I had the resources to be
14 able to -- and felt more comfortable with my
15 family.  I didn't feel comfortable with a stranger
16 helping me shower or use the restroom or being
17 around my children, somebody that I don't know in
18 my home.
19   Q    Okay.  For how long did you keep taking
20 pain killers?
21   A    After I was released from the hospital
22 the first time, possibly two or three months after
23 that initial surgery.  And we went to other ways
24 to try and manage the pain, because every doctor
25 obviously is concerned with prescription
```

Page 144

```
1  medication dependency.  So they try to get you off
2  of it as quickly as possible.
3        I had a very hard time with that because
4  I can't take other types of over-the-counter pain
5  medication to help with the pain.  So I was pretty
6  much left with nothing and just had to, you know,
7  deal with it day to day and the pain, because
8  there was nothing that I could take to help with
9  it once stopped taking narcotics.
10   Q    Why can't you take over-the-counter pain
11 medication?
12   A    I can't take Tylenol because my liver
13 enzymes were elevated, which they contribute to
14 possibly -- you know, Tylenol can cause that.  So
15 they told me not to take Tylenol unless it's
16 something that I absolutely have to.  Motrin or
17 ibuprofen, something along those lines, actually,
18 it's -- basically, it stunts the regrowth of bone,
19 so they don't want me taking Motrin since I'm --
20 have a hole in my femur that we're waiting for
21 bone to regenerate to close that hole.
22   Q    Did you have to have a second surgery?
23   A    Yes.
24   Q    When was that?
25   A    August.
```

Page 145

```
1    Q    Okay.  And why was that?
2    A    Because my leg was not healing
3  appropriately and they felt that going in and
4  doing a bone graft from my pelvis would maybe help
5  get it to start healing and regenerating bone a
6  little quicker.
7    Q    Is that the hole you were just talking
8  about a moment ago?
9    A    No.  They will not go in, unless it's an
10 emergency, to fix the home or gap that's in my
11 femur on the left side of the rod that's in my
12 leg.  Because it's so close to my femoral artery,
13 they don't -- they try not to mess with that part
14 of your body unless it's an emergency situation.
15       So the only portions that were fixed in
16 the second surgery, besides all the hardware being
17 taken out and replaced, was the bone graft pulled
18 all the shattered pieces of bone that were kind of
19 floating around in my thigh closer to the rod
20 and -- in hopes that that would kind of get it to
21 finally start to heal back together.
22   Q    How did it develop that you needed to
23 have the second surgery?  Were you just too slow
24 in recovering?
25       MR. BAGNELL:  Object to the form.
```

37 (Pages 142 - 145)

Page 146

1    You can answer.
2    THE WITNESS: I went to my normal
3  follow-up appointment with the surgeon, and every
4  time before I go they have me get x-rays. He
5  wasn't happy with what he saw on the x-rays and
6  scheduled surgery the following week.
7  BY MR. KELLY:
8    Q    What's the name of the surgeon?
9    A    That was Dr. Kennedy.
10   Q    Where is he located?
11   A    Reston.
12   Q    What is your understanding of the
13  prognosis for the recovery of your leg?
14   MR. BAGNELL: Object to the form to the
15  extent it calls for expert medical testimony,
16  expert medical knowledge which my client doesn't
17  possess, obviously.
18   You can try to answer.
19   THE WITNESS: It is a day-by-day
20  struggle, and I wait till my follow-up
21  appointments with my surgeon to give me updates as
22  to what they see and where they see things going.
23   At this point, they're not even
24  projecting any type of a, you know, outcome.
25  They're doing the same thing that I am, is, well,

Page 147

1  we'll just have to see what it looks like at your
2  next appointment.
3    Still contemplating possibly a third
4  surgery, but we won't know that until they give
5  the second surgery a little bit more time to see
6  if it's even going to take like they hope it
7  would.
8  BY MR. KELLY:
9    Q    What would be the third surgery?
10   A    They did not go into detail of what that
11  was. I'm sure it's something to where they would
12  see on the x-ray at that time what they felt
13  needed to be done.
14   Q    Have your doctors given you any forecast
15  about your ability to return full-time to work at
16  the sheriff's office?
17   A    No.
18   Q    Do you have any personal expectations of
19  what you're going to be able to do?
20   A    At the very beginning, I had hopes of
21  what I would be able to go back to being able to
22  do, but things have not gone as you hope, coming
23  out of something like that, that they will. You
24  think in your head, you know, like, all right,
25  going to heal. And it's just not healing.

Page 148

1    I still struggle at this point to go up
2  and down a flight of stairs without having to
3  physically pull myself using a railing. To walk
4  across the room is still very difficult. I can't
5  can support my weight solely on that leg. I have
6  to depend primarily on my left leg to pull my
7  weight.
8    I can't walk straight. I have a
9  significant limp from this leg and not being able
10  to support all of my weight on that leg, and the
11  pain that's associated when I do put weight on
12  that leg. The pain -- I can't sleep between the
13  pain that I constantly have and never being able
14  to get comfortable, the anxiety, the stress, the
15  nightmares, the -- waking up and smelling my leg
16  from that morning. I'm lucky if I get two, three
17  hours of sleep per night, combined. Tried from
18  doctors -- taking, you know, things for sleep. It
19  doesn't help. My mind never shuts off. I play
20  this over in my head constantly.
21   Q    Are you receiving any psychiatric or
22  emotional therapy, psychological, anything like
23  that?
24   A    No. The last time I went to the doctor,
25  I talked to her about all this, and she made the

Page 149

1  suggestion that I talk to my primary care doctor,
2  who I'm not exactly comfortable talking to about
3  stuff like that other than, like, a common cold or
4  something along those lines.
5    So I am working with my department -- my
6  HR department in finding a different -- if it's a
7  primary care doctor or a psychologist that works
8  with our department and somebody that I can go and
9  talk to and go that route.
10   Q    How would you characterize your level of
11  pain on a daily basis these days, on a 1 to 10?
12   A    On a good day, it could be a 3, 4,
13  somewhere in there, on the scale of the 1 to 10.
14  On a bad day, I can be anywhere from a 7 to a 10.
15  It all just depends on what my level of activity
16  is or the day prior, if, you know, if I'm up
17  moving around too much, then it's obviously going
18  to be more severe in the amount of pain verse
19  [sic] if I'm able to just be down on a couch. You
20  know, I still do ice on my leg, constantly
21  massaging my leg.
22   Q    Would you like to take a break?
23   A    I'm good. Go ahead.
24   Q    Have you engaged in any occupational
25  therapy to try to recover your basic skills,

38 (Pages 146 - 149)

Page 150

1 activities of daily living-type things?
2     MR. BAGNELL:  Object to the form.
3     You can answer.
4     THE WITNESS:  When I was at the rehab
5 center, they worked with me on, you know, the
6 basic things of be able to, like, fold a towel or,
7 you know, something along those lines, or -- it
8 was not extensive.  It was more of safe ways,
9 giving my limited [sic] with my leg, the safest
10 ways to -- you know, for me to be able to shower,
11 the safest ways for me to make it up and down
12 stairs with the limited mobility had and still
13 have with my leg.
14 BY MR. KELLY:
15   Q   Are there any -- what were your
16 recreational pursuits before you were injured?
17   A   Activities with my kids.  You mean, like
18 hobby-type --
19   Q   Yes?
20   A   -- outside of work?  My kids' sports,
21 photography, more -- like nature-type photography.
22 I don't with particularly care for taking photos
23 of people.  Working with dogs.
24   Q   Dogs.
25   A   Just -- those are pretty much my hobbies.

Page 151

1 They're my -- working with the dogs and dog
2 training, the rescue.  I worked with a rescue,
3 took in a lot of foster animals, worked with those
4 dogs to be able -- and turn around and provide
5 them a home, you know, with somebody.  Obviously,
6 can't do that now, because I can't work with dogs
7 and feel confident of what I'm doing with my
8 limited mobility that the dog that I'm turning
9 over to a family is going to be at its best.  So
10 I've had to stop fostering.  My dogs, I am not
11 able to do training with them.  My kids have had
12 to take over training with the dogs that we, you
13 know, already have.
14     Photography, I don't -- can't do any of
15 that, because that would consist of, you know,
16 hiking or, you know, walking through a muddy field
17 or something, and there's -- I can't walk on
18 uneven ground.
19   Q   How many dogs do you have, personal ones?
20   A   Four.
21   Q   How about -- were there any athletic
22 pursuits that you would engage in before your
23 injury that you can't engage in anymore?
24   A   Working out.  It's not something I can do
25 right now.  There's not a lot that -- other than

Page 152

1 just, you know, arms.  There's not much that you
2 can do for back, abs, legs, anything when I have
3 such limited mobility with my leg.
4     Other than that, it was pretty much my
5 daughter's softball and not being able to partake
6 in that anymore.  My son with his baseball and
7 BMX.  Can't do that anymore.
8   Q   You can go watch, right?  You just
9 can't -- you can't go watch?
10   A   Softball?  I can't walk from parking lots
11 to where the fields are because it's across grassy
12 or dirt paths, and I can't walk on uneven ground.
13 I tried it once, and it was the worst day of pain,
14 and we were -- you know, had only taken one
15 vehicle.  So it -- I did not go back for the
16 tournament the next day because of that, and I
17 have not been able to go to a tournament since
18 then.
19     BMX, it's same thing.  It's on a dirt
20 track.  It's uneven rocky ground --
21   Q   Right.
22   A   -- around the track.  So those are things
23 that -- I get sent pictures that my husband takes
24 when he's there.
25     My kids in the marching band.  I can't

Page 153

1 walk those two, three, however many blocks you're
2 going to end up having to park away from the
3 parade route to where the parade is going to take
4 place to watch my kids march in a band because I
5 can't walk that distance.
6   Q   What about before your accident, any
7 personal athletic pursuits, like golf or tennis or
8 bowling or --
9   A   I would golf, but mostly just
10 tournaments, not really the type just to, on a
11 Saturday, go golfing.
12   Q   You mean tournaments like you're a good
13 golfer?  Competitive?
14   A   I don't know if I'd call myself good, but
15 it was fun and would enjoy -- I always played with
16 the same people on a team from the sheriff's
17 office.  So it's something that we enjoyed doing.
18 And we would play in, like, the sheriff's office
19 golf tournament, the Project Lifesaver golf
20 tournament --
21   Q   I see.
22   A   -- things like that that we were doing to
23 raise money for something.
24     Heros -- Homes for Heros was another one
25 that we played in.

39 (Pages 150 - 153)

Page 154

1    Q   How is your relationship with your
2  husband doing?
3    A   Stressful. He's pretty much had to take
4  on everything, plus me.  He works a full-time job
5  and still has to do the laundry, he still has to
6  do the grocery shopping, go take the kids
7  everywhere that they need to go because I'm not
8  able to do those things.
9        So it's put a lot of stress on him and he
10  gets frustrated, but not frustrated at me -- but
11  frustrated because he sees how frustrated I'm
12  getting because I can't sleep and I am frustrated
13  because I can't help more.  And, you know, he
14  knows I'm doing what I can.  So he gets frustrated
15  to see me frustrated, which is just a vicious
16  circle.
17    Q   Has your physical relationship been
18  affected?
19    A   Yeah.
20    Q   Yes.
21    A   Extremely.
22    Q   Okay.  Could you just elaborate on that
23  in about one sentence?
24    A   Physical contact is almost impossible for
25  us.

Page 155

1    Q   Okay.  Has there been any economic impact
2  on your family as a result of this accident?
3    A   Yeah.  My pay is pretty much my -- the
4  base salary.  It's not what my paychecks are
5  normally.  So what I'm used to my paychecks being
6  every two weeks is not what they are anymore.
7    Q   Is that -- what's the difference?
8    A   I don't have any of the overtime.
9  Trainings that I would do would also be overtime.
10  Because I worked nights, I was paid an additional
11  amount because I worked nights, and I don't have
12  that any longer.  I don't have holiday pay,
13  which -- you know, not something everybody in
14  their typical jobs expects, but in my job, because
15  I work all holidays, then it's one of those
16  benefits to our job that, when you do work on a
17  holiday, you know, it's that little bit of extra
18  that helps.  And the -- like I said, the extra I
19  got paid for working nights was something that we
20  were accustomed to.  I'd pretty much been on
21  nights my entire career with the sheriff's office.
22        Court dates were -- typically, twice a
23  month we had court dates; typically, about four
24  hours -- as long as nothing went over, were
25  additional, you know, overtime.  Because I'm part

Page 156

1  of Project Lifesaver and search and rescue, all
2  the call-outs that they have, unless I was working
3  and was told I was not allowed to go, I would
4  respond to a search and rescue call-out, or
5  Project Lifesaver especially, since I was part of
6  the management team for Project Lifesaver and
7  managing the adult clients, as well as our
8  auxiliary units who help with our battery changes.
9        So if a Project Lifesaver client, you
10  know, went missing, I would drop everything and go
11  in for that.  I have assisted other agencies with
12  search and rescues.  And all of that has impacted
13  the funds that come in my household.
14    Q   You had a lot of earned extras that are
15  not available anymore, right?
16    A   Yeah, a lot.
17    Q   Okay.  Now, you were recently cleared to
18  return to desk duty part-time, right, four
19  hours --
20    A   Correct.  This week is --
21    Q   -- a day?
22    A   -- the day I started.
23    Q   Is there a plan to build upon that?
24    A   No.  As of right now, the plan is let's
25  just see what four hours and if you can handle it.

Page 157

1    Q   Okay.  So we haven't talked about the
2  next step yet?
3    A   No.  She still -- at the appointment, she
4  said, we're going to try four hours, but we're
5  going to put on here that it's temporary and it's
6  a trial basis.  So if we decide you're not ready
7  to handle that four hours, we're able to pull you
8  back out of work.
9    Q   Okay.  What's the name of this person who
10  let you go back to work?
11    A   It's the doctor that I saw the last time,
12  Dr. White.  I almost forgot her name.
13    Q   First name?
14    A   I don't recall.
15    Q   Location?
16    A   It's Reston also.
17    Q   Okay.
18    A   They're all at the same office.
19    Q   Those are all the questions I have,
20  Ms. Vadnais.  Thanks very much.
21        (Discussion held off the record.)
22        MR. BAGNELL:  We can go off the record
23  for a second.
24        THE VIDEOGRAPHER:  The time is 3:10 p.m.
25  We're going off the record.

40 (Pages 154 - 157)

Page 158

1     (Discussion held off the record.)
2     (Vadnais Deposition Exhibit Numbers 11
3  through 15 were marked for identification.)
4     THE VIDEOGRAPHER:  The time is 3:16 p.m.
5  We're back on the record.
6     Please proceed, Counsel.
7     EXAMINATION BY COUNSEL FOR PLAINTIFF
8  BY MR. BAGNELL:
9     Q   Marcie, Mr. Kelly asked you a lot of
10  questions about the cardinal rules of firearms
11  safety.  Do you recall that?
12    A   Yes.
13    Q   And I just want to read those into the
14  record.  This is Exhibit 5, under range safety
15  rules.  "1, treat all firearms as though they are
16  loaded.  2, keep all firearms pointed in a safe
17  direction and never point a weapon at anything you
18  are not prepared to shoot.  3, keep your finger
19  off the trigger and outside the trigger guard
20  unless you are on target and prepared to use
21  lethal force.  4, be sure of your target and
22  what's in the target's foreground and background."
23    Are you familiar with those rules?
24    A   Yes.
25    Q   Have you heard them many times over your

Page 159

1  career?
2     A   Yes.
3     Q   You're unable to recite them from memory;
4  is that correct?
5     A   Correct.
6     Q   Attorney Kelly asked you a lot of
7  questions about what happened that February 7th
8  morning with your holstered P320.  And I want to
9  ask you if I heard you correctly that, in your
10  view, you did not violate any of the cardinal
11  rules that morning; is that correct.
12    A   Yes.
13    Q   Why?
14    A   Because my weapon was holstered.
15    Q   In your opinion, do the cardinal rules of
16  firearms safety apply to holstered firearms?
17    A   No.
18    Q   What do they apply to?
19    A   A naked gun.
20    Q   A deployed weapon; is that fair to say?
21    A   Yes.
22    Q   All right.  I want to show you what's
23  Exhibit 11 to your deposition.  For the record,
24  this is a two-page exhibit, a photograph starting
25  on page 1, and continuing on to page 2 because of

Page 160

1  the printer.  On the second page, you see the Sig
2  Sauer trademark; is that correct?
3     A   Yes.
4     Q   Can you read what it states there?
5     A   It says, Sig Sauer, and then,
6  @mrs_truexodus is ready for anything with the
7  Rattler and the P365.
8     Q   And what's the P365, to your knowledge?
9     A   I don't have any knowledge of that
10  weapon, other than it's a pistol.
11    Q   Do you see a pistol on that women's body
12  in that photograph?
13    A   Yes.
14    Q   Where is it?
15    A   Inside her waist band.
16    Q   Is it in a holster?
17    A   Yes.
18    Q   Where is the muzzle of the weapon inside
19  the holster pointing?
20    A   Straight --
21    MR. KELLY:  Object to the form.
22    THE WITNESS:  Straight down at her --
23  towards her hip and thigh.
24  BY MR. BAGNELL:
25    Q   If that weapon discharged, would it hit

Page 161

1  her body, in your opinion?
2     MR. KELLY:  Object to the form.
3     THE WITNESS:  From this image and the way
4  that it appears to be pointing, absolutely.
5  BY MR. BAGNELL:
6     Q   And this is a Sig Sauer marketing
7  material; is that correct?
8     A   Yes.  Their label is on it.
9     Q   Where is it from originally, if page 1
10  makes that clear?
11    A   From Facebook.
12    Q   The Sig Sauer of -- Facebook site, to
13  your believing?
14    A   I assume so.
15    Q   Let me show you Exhibit 12.
16    A   Okay.
17    Q   Take a look at that.  Also a two-page
18  document.
19    A   Uh-huh.
20    Q   What do you see there in that exhibit?
21    A   A female with a pistol drawn and it looks
22  her handbag in her left hand.
23    Q   On page 2, do you also see the Sig Sauer
24  trademark under her photograph?
25    A   Yes.

41 (Pages 158 - 161)

Page 162

1    Q   Can you read into the record what it
2  states?
3    A   It says, What's your favorite concealed
4  carry pistol and why?
5    Q   Can you describe what you see on page 1
6  in the photograph?
7        MR. KELLY:  Object to the form.
8        THE WITNESS:  With taking into context
9  the statement that's made with the post, I would
10  assume that she's drawing her pistol from her
11  purse.
12  BY MR. BAGNELL:
13    Q   All right.  What direction is the pistol
14  pointing in?
15    A   By shadow, it looks like pointing
16  directly at her hand.
17    Q   All right.  Do you consider that a
18  violation of the cardinal rules of gun safety?
19        MR. KELLY:  Object to the form.
20        THE WITNESS:  That, absolutely.
21  BY MR. BAGNELL:
22    Q   And that's a Sig Sauer Facebook post, to
23  your knowledge?
24    A   Yes.
25    Q   And the weapon in that case is

Page 163

1  unholstered; am I right?
2    A   Correct.
3    Q   I'll show you 13 to your deposition.  For
4  the record, this is also a two-page exhibit.  Can
5  you describe what you see on these two pages?
6    A   This one shows the lower portion of a
7  person with a weapon drawn and a holster inside
8  the waistband at the front of their pants.
9    Q   Would you call that an appendix carry
10  holster?
11    A   Yes.
12    Q   All right.  Now, where would that woman
13  be inserting the gun into that holster?
14    A   Straight down at her groin.
15    Q   Where -- once that weapon is holstered,
16  where is it pointing in the holster?
17        MR. KELLY:  Object to the form.
18        THE WITNESS:  Her pelvis and her groin
19  area.
20  BY MR. BAGNELL:
21    Q   If that weapon were holstered inside that
22  appendix carry holster, would you consider that a
23  violation of the cardinal rules of gun safety?
24        MR. KELLY:  Object to the form.
25        THE WITNESS:  If it was inside the

Page 164

1  holster?
2  BY MR. BAGNELL:
3    Q   Inside.
4    A   No.
5    Q   Why is that?
6    A   Because a holster's purpose is to
7  transport and carry a weapon safely.
8    Q   Now, if she were pointing that pistol
9  deployed from the holster, a naked gun so to
10  speak, at her pelvis outside of the holster, would
11  you consider that a violation of cardinal rules?
12    A   Yes.
13    Q   And page 2, do we again see the Sig Sauer
14  trademark?
15    A   Yes.
16    Q   Can you read into the record what it
17  says?
18    A   The Sig Sauer symbol.  And then it says,
19  No days off.  When did you decide to carry and
20  what made you choose to do so?
21    Q   And all three images I've showed you so
22  far, are these images of women?
23    A   This one, I'm not sure.  I'm assuming by
24  the body type that it's a female.  But --
25    Q   The other two, the first two?

Page 165

1    A   The first two are females, yes.
2    Q   Okay.  Exhibit 14, just take a look at
3  that.  Have you reviewed it?
4    A   Yes.
5    Q   Can you describe what you see in this
6  two-page exhibit?
7    A   Appears to be a female with a holstered
8  weapon inside her waistband, just to one side of
9  the small of her back.  I'm not sure which side of
10  her that is.
11    Q   Do you recognize the source of this
12  picture?  Social media?
13    A   Yeah.
14    Q   Where is it from?
15    A   This appears to be from Instagram.
16    Q   Do you see Sig Sauer's trademark on
17  page 1?
18    A   Yes.  The post is made by Sig Sauer, Inc.
19    Q   On what you would assume is their
20  Instagram site?
21    A   Correct.
22    Q   All right.  The holstered firearm -- and
23  you kind of have to put the two pages together
24  because of how it printed -- you said it was in
25  the small of her back.  Can you see which

42 (Pages 162 - 165)

Page 166

1  direction the weapon is pointing in the small of
2  her back?
3      A    The indentation in her jeans makes it
4  appear the pistol is pointed backwards, behind
5  her.
6      Q    So that if it went off in its holster and
7  someone was standing behind her, might it strike
8  them, the bullet?
9      A    Yes.
10     Q    Do you consider this weapon in its
11 holster in the small of her back to be a violation
12 of the cardinal rules of gun safety?
13         MR. KELLY:  Object to the form.
14         THE WITNESS:  No.  Because, again, it's
15 in a holster.  So a holster is meant to secure a
16 weapon.
17 BY MR. BAGNELL:
18     Q    Is it safe to say that, based on your
19 experience as a law enforcement officer, that Sig
20 Sauer itself thinks it's no violation, since
21 they're posting it on social media?
22         MR. KELLY:  Object to the form.
23         THE WITNESS:  Yes.  They appear to be
24 advertising it, so...
25 BY MR. BAGNELL:

Page 167

1      Q    This also is a picture of a young woman,
2  correct?
3      A    Correct.
4      Q    Can you read what's on page 2, the
5  Instagram post text?
6      A    It's made by Sig Sauer, Inc., and it
7  says, Sig Sauer, with #p224, #9mm.  One of the
8  most underrated Sig pistols.  Perfect for #edc,
9  even if you're tiny, thanks to @spdstress, check
10 her out.
11     Q    edc, do you know what that stands for?
12     A    I don't know what that hashtag is.
13     Q    15.
14         MR. BAGNELL:  Bob, this you have in your
15 e-mail.
16 BY MR. BAGNELL:
17     Q    Exhibit 15.  Marcie, please take a look
18 at that photo.
19     A    Okay.
20     Q    Can you make out the make of the pistol
21 in that photograph?
22     A    It's -- not with it in its holster.
23     Q    You can't say?
24     A    No.
25     Q    Do you consider the way this weapon is

Page 168

1  holstered to be a violation of the cardinal rules?
2          MR. KELLY:  Object to the form.
3          THE WITNESS:  No.  Again, it's in its
4  holster, so it's meant to keep it safe.
5  BY MR. BAGNELL:
6      Q    And how is it safe in -- why is it safe
7  in a holster?
8      A    A weapon -- in its holster, you don't
9  have access to the trigger for the weapon to fire.
10 And so the purpose of the holster is to secure
11 everything from having access to those points.
12     Q    In your career as a law enforcement
13 officer, Marcie, is it fair to say that your
14 assumption was that a holstered firearm would not
15 go off without a trigger pull?
16     A    Absolutely.
17     Q    This gentleman in this picture, which I
18 think -- we can prove this up later, but I think
19 it is a Sig Sauer marketing piece -- where is the
20 end of the holster pointing in that photograph?
21         MR. KELLY:  Object to the form.
22         THE WITNESS:  It appears to be pointed at
23 his hip, upper thigh area.
24 BY MR. BAGNELL:
25     Q    Is there, in fact, any way you could

Page 169

1  carry a holstered pistol, Marcie, without it
2  pointing in the direction at some point that could
3  impact or harm a person or property?
4          MR. KELLY:  Object to the form.
5          THE WITNESS:  Not that I can come up with
6  off the top of my head.  Pretty much anywhere you
7  are, if a firearm is in its holster and intended
8  to be kept pointed in a safe direction, there's no
9  safe direction for you to be in that case.
10 There's always going to be something below you,
11 above you, next to you, around you.
12 BY MR. BAGNELL:
13     Q    There's a ricochet risk I assume, also?
14     A    Absolutely.
15         MR. KELLY:  Object to the form.
16 BY MR. BAGNELL:
17     Q    If you're on the second floor of a house,
18 for example, wooden floors, and your holstered gun
19 is pointing downward, is there a risk it could
20 penetrate the floor if it went off by itself?
21         MR. KELLY:  Object to the form.
22 BY MR. BAGNELL:
23     Q    And it could strike someone down below?
24     A    I would assume so, yes.
25     Q    Did anyone ever tell you at Loudoun

43 (Pages 166 - 169)

1 County that you need to carry your gun around in a
2 small safe in case it ever went off by itself?
3    A   No.
4    Q   The last photograph which -- this will be
5 electronic -- this will be Exhibit 16.
6        MR. BAGNELL:  I'm going to show this to
7 the reporter.
8 BY MR. BAGNELL:
9    Q   All right.  I'm showing you --
10       MR. KELLY:  I just have to object to the
11 format of presentation here.  Note that for the
12 record, please.
13       MR. BAGNELL:  Noted.
14 BY MR. BAGNELL:
15    Q   Exhibit 16, Marcie, is an iPhone
16 photograph -- or a photograph contained on an
17 iPhone of a gentleman wearing a Sig Sauer shirt.
18 Do you see the Sig logo on his back?
19    A   Yes.
20    Q   And do you see the holster on his -- the
21 right side of his body?
22    A   Yes.
23    Q   All right.  Is that holster -- based on
24 your viewing, if that gun were to discharge in its
25 holster, would it strike his right leg?

1    A   Yes.
2    Q   The morning of February 7th, am I
3 recalling your testimony correctly that it was
4 dark?
5    A   Yes.
6    Q   And you had to scrape -- did you say you
7 had to scrape ice off your windshield?
8    A   Yes.
9    Q   It was February?
10    A   Yes.
11    Q   Had there been precipitation?
12    A   Yes.
13    Q   Is it possible that there was ice at or
14 around your car?
15       MR. KELLY:  Object to the form.
16       THE WITNESS:  It would be assumed.  My
17 children were called out of school for icy roads
18 that day.
19 BY MR. BAGNELL:
20    Q   And had it precipitated that night or
21 that morning, or was it precipitating?  Snowing?
22 Icy rain?
23       MR. KELLY:  Where?
24 BY MR. BAGNELL:
25    Q   Start at your house that morning.

1        MR. KELLY:  Object to the form.
2        THE WITNESS:  From the way he's standing
3 right there, if it was to go off, it would travel
4 down his -- the outside of his leg.
5 BY MR. BAGNELL:
6    Q   Do you think that --
7    A   Possibly striking around his knee region.
8    Q   Do you think that gentleman is violating
9 the cardinal rules of gun safety?
10       MR. KELLY:  Object to the form.
11       THE WITNESS:  His firearm is holstered in
12 this image, so I would say absolutely not.
13 BY MR. BAGNELL:
14    Q   Mr. Kelly asked you some questions about
15 the occasional cigarette breaks you would take,
16 Marcie.  Do you recall that?
17    A   Yes.
18    Q   And I believe you said that you would
19 find a secondary road or somewhere to pull over
20 and have a cigarette?
21    A   Yeah.  Out of the view of public.
22    Q   Is that a violation of any department
23 policy?
24    A   No.
25    Q   Would smoking in the car be a violation?

1    A   When I left my house, it was on and off
2 rain, sleet.  Roads were wet.  When I came over
3 the mountain, it hadn't been raining on me
4 anymore, on my commute in.  But like I said, I had
5 stopped at my vehicle to switch over to my
6 cruiser, and had to scrape ice off my windshield
7 prior to continuing on from the station to the
8 academy.  So I would assume the weather that I had
9 gotten in -- was getting at my house had come
10 through this same area.
11    Q   We had a couple of people in the academy
12 parking lot who said it was dark that morning?
13    A   Yes, it was still very early.
14    Q   It was about 6:00 -- 6:50; is that
15 correct?  Do you remember?
16    A   Between 6:40, 6:45.  So prior to 7:00.
17    Q   And some photographs show footprints
18 behind your vehicle that we've looked at over the
19 course of these 16 depositions.  Do you recall
20 those footprints?
21    A   I remember seeing something.
22    Q   Were those your footprints?
23    A   No.
24    Q   Do you know whose they were?
25    A   No.

44 (Pages 170 - 173)

3133c4cd2cbceebc

Page 174

1      MR. BAGNELL: Two-minute break, Bob.
2  That might be all I have.
3      THE VIDEOGRAPHER: The time is 3:33 p.m.
4  We are going off the record.
5      (Whereupon, a short recess was taken.)
6      THE VIDEOGRAPHER: The time is 3:38 p.m.
7  We are back on the record.
8      Please proceed, Counsel.
9      MR. BAGNELL: Thank you.
10 BY MR. BAGNELL:
11   Q   Marcie, Attorney Kelly asked you some
12 questions about the -- sort of the forward-looking
13 or prognosis of your injury. I just want to make
14 it clear for the record, if it isn't already, I
15 assume you're not a medical doctor?
16   A   No.
17   Q   You're not a surgeon?
18   A   No, not even close.
19   Q   Are you a radiologist?
20   A   No.
21   Q   Do you know what the prognosis is at this
22 point?
23   A   No.
24     MR. BAGNELL: That's all I have.
25     MR. KELLY: No questions.

Page 175

1      THE VIDEOGRAPHER: The time is 3:39 p.m.
2  This concludes today's testimony given by Deputy
3  Marcie Vadnais. We are now off the record.
4      (Vadnais Deposition Exhibit Number 16 was
5  marked for identification.)
6      (Whereupon, at 3:39 p.m., the deposition
7  of MARCIE D. VADNAIS was concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 176

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Denise M. Brunet, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was sworn by me; that
6  the testimony of said witness was taken by me
7  stenographically and thereafter reduced to print
8  by means of computer-assisted transcription by me
9  to the best of my ability; that I am neither
10 counsel for, related to, nor employed by any of
11 the parties to this litigation and have no
12 interest, financial or otherwise, in the outcome
13 of this matter.
14
15     Denise M. Brunet
       Denise M. Brunet
16     Notary Public in and for
17     The Commonwealth of Virginia
18
19 My commission expires:
20 October 31, 2020
21 Notary Registration No. 119330
22
23
24
25

45 (Pages 174 - 176)