UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____
                                 :

SIG SAUER, INC.,                 :       CIVIL ACTION NO.:

                                   :       1:22CV-78 (LBM)

     Plaintiff,            :

                                   :

v.                               :

                                 :

JEFFREY S. BAGNELL, ESQ., LLC,   :
and JEFFREY S. BAGNELL,      :

                                 :

     Defendants.          :

                                 :
_____

## AFFIDAVIT OF JEFFREY S. BAGNELL

I, Jeffrey S. Bagnell, hereby depose and state as follows:

## MY BACKGROUND

1.     I am an attorney based in Westport, Connecticut, where I operate my law practice. I am licensed to practice in the State of Connecticut and the Commonwealth of Massachusetts.

2.     I am a graduate of the College of the Holy Cross (1988) and Boston College Law School (1992).  I am a member in good standing of the following state and federal courts:

- o  State of Massachusetts (December 15, 1992);
- o  State of Connecticut (May 21, 1993);
- o  United States District Court, District of Connecticut (June 5, 1998);
- o  United States District Court, Southern and Eastern Districts of New York (August 10th and September 9th, 1998);
- o  United States Court of Appeals for the Second Circuit (September 12, 2000); and
- o  United States Supreme Court (April 4, 2002).

3.     I have received peer-reviewed honors over the course of my almost 30-year career, including recognition in Best Lawyers for the last five years and recognition as one of the

top 50 lawyers in Connecticut.  I have received no professional discipline.  I have litigated and

tried cases in state and federal courts, and before arbitration panels.

4.      Over the years, my law practice has included firearms product liability, sexual

abuse, Title IX, civil rights, defamation, trademark, employment litigation and counseling,

executive compensation, business litigation, and insurance coverage disputes. Most of my law

practice has involved a public interest or civil rights component.

5.      Since about 2017, I have served as lead counsel and co-counsel in about 15

lawsuits, primarily representing federal and local law enforcement agents, seeking damages

against Sig Sauer, Inc. (SIG) across the country for injuries caused by the Sig Sauer P320 semi-

automatic pistol discharging without the trigger being pulled (referred to as an "un-commanded

discharge").  I understand that there are about two million P320s in circulation, many with law

enforcement officers.

6.      During the past five years, I have become a well-known critic of safety risks

associated with the P320. I have appeared on Good Morning America, Nightline, CNN, and

other media outlets at their request to warn of the potential danger that the P320 poses of firing

without a trigger pull, including incidents resulting in serious injury and sometimes death and

often involving litigation. There is intense media and public interest in these incidents and the

litigation that ensues, especially since this has been a recurring problem, because the un-

commanded discharge of a firearm is a serious, life-threatening public safety issue.

7.      I am a gun owner and licensed to carry firearms in the State of Connecticut.  I was

previously licensed to carry in Massachusetts in 2017.  I support the Second Amendment to the

United States Constitution.  I also support gun safety and firearms that are well made and safe.

8.      Two of the cases that I am handling are currently pending before this Court. *See*

*Guay v. Sig Sauer, Inc.*, 1:20-cv-00736-LM (D.N.H.); *Schneider v. Sig Sauer, Inc.*, 1:20-cv-01190-LM (D.N.H.). The *Guay* case was scheduled for a July 2022 jury trial on March 2, 2022, the very same day that SIG sued me and my firm in this action.

9.      I do not reside, nor do I own any property, in the State of New Hampshire. My law firm has no office in New Hampshire. I am not licensed to practice in the State of New Hampshire, though I have been admitted *pro hac vice* in two cases currently pending before this court.

10.     Like most attorneys and law firms in the internet age, I maintain a website that informs viewers about my background and representative cases and successes. *See* https://www.bagnell-law.com/  As I understand it, my firm's website is available to anyone, anywhere.  It is not directed at any particular geographic location. It is not directed at the State of New Hampshire.

11.     My firm's website includes a home page, a page about the P320, a page describing various honors I have received, a page with client reviews, a list of representative cases, a description of my practice areas, a news page, and a contact page. To the best of my knowledge, the contact page on my website has resulted in no new cases.  Instead, cases have been and are referred to me by other attorneys by word of mouth or potential clients who have contacted me directly, and not through my website.

12.     As most of my clients are individuals and unable to afford hourly fees, I typically accept cases on a contingency basis so that their legal rights may be enforced, and the public interest vindicated in open courts through the constitutional right to a jury trial.

13.     In 2015 and 2016, I received significant training on the use of semi-automatic handguns from a gunsmith and veteran of the Afghanistan conflict.  This training, along with my

professional experience and reputation as a civil litigator, resulted in one of the first, if not the first, P320 cases being referred to me.

### *OFFICER VINCENT SHEPERIS v. SIG SAUER, INC.*, 2017; INCIDENT AND LAWSUIT CAUSES SIG TO MAKE DESIGN CHANGE

14.     I brought one of the first cases against SIG for a defective discharge of a P320 in the United States District Court for the District of Connecticut in August 2017, *Vincent Sheperis v. Sig Sauer, Inc.,* 3:17-cv-01318 (JCH).  Officer Sheperis was and is a member of the Stamford, Connecticut Special Response Team, formerly known as "SWAT" or Special Weapons and Tactics.  His holstered P320 discharged when the holstered weapon dropped approximately three feet to the ground and then fired, shooting him in his left knee causing substantial physical injury and trauma.  Had the bullet followed a different trajectory, Officer Sheperis could easily have lost his life.

15.     The same day I filed the *Sheperis* suit, SIG stated in a press release that several conditions, including "shock, vibration, [and] heavy or repeated drops" could make the internal safety of the P320 fail.  **Exhibit 1.**  Just four days later, SIG announced what it termed a "voluntary upgrade" of the original commercial version of the P320.  **Exhibit 2.**  At the same time, SIG informed owners on its website that the original P320 was still safe and did not need to be returned.

16.     Around that same time, SIG also posted a video on its website about the upgrade (the video has since been removed), stating that numerous changes would be made to the original P320 if the owner sent it back.  One of the changes "had nothing to do with drop safety," as SIG employee Phil Strader stated in the video.  In other words, it was clear that SIG knew that the internal safety mechanism in the P320 could fail from "shock" or "vibration" even without "heavy or repeated drops."

17.     In the *Sheperis* Complaint's Prayer for Relief, I asked the Court in August 2017 to order SIG to issue a mandatory recall of the P320.  Nevertheless, SIG has refused to issue a recall of the weapon from the date of that lawsuit to the present.

18.     SIG settled the *Sheperis* lawsuit in June 2018 after a mediation conference with the Honorable Thomas P. Smith in Hartford, Connecticut.  The terms of that settlement are confidential.

19.     The *Sheperis* lawsuit resulted in significant publicity, which I did not solicit.  I was interviewed by Connecticut's local legal newspaper and the local News 12 television station regarding the gun firing on its own.  Given that a lethal product was at issue, I stated during that interview that I viewed the matter as a "serious public safety issue," which I still do. The video of this interview may be viewed at https://www.bagnell-law.com/video-media.  The video of this interview has been on my website since August 2017.

20.     Since the *Sheperis* suit, I have appeared on Good Morning America, Nightline, CNN, and many other national and local media outlets around the country to warn of the danger that the P320 poses of firing without a trigger pull, including incidents resulting in serious injury and sometimes death and often involving litigation.

### *DEPUTY SHERIFF MARCIE VADNAIS v. SIG SAUER, INC.*, 2018

21.     During the *Sheperis* suit, I was contacted by the sister of another law enforcement agent, Deputy Sheriff Marcie Vadnais of the Loudoun County, Virginia Sheriff's Department.

22.     In February 2018, her holstered, original version P320 discharged without a trigger pull as she jostled the holster to remove it from her belt.  The bullet impacted her right femur causing a comminuted fracture.  X-rays showed that her femur had been severed in half with shards of bone fragments and substantial shrapnel left in her right leg as seen here:



23.     Surgeons were forced to hollow out her bone marrow to insert a titanium rod down through the remaining portions of her femur.  The rod was screwed into Vadnais' right pelvis and knee to keep it in place.  Without the rod, her right leg would have collapsed in on itself upon any weight bearing.

24.     In April 2018, two months after Vadnais was shot, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320.  SIG Sauer, however, did not recall the weapon.

25.     I agreed to represent Deputy Sheriff Vadnais and filed suit against SIG in the Eastern District of Virginia in May 2018, *Vadnais v. Sig Sauer, Inc.* (1:18-cv-00540) (LMB).

26.     The Loudoun County Sheriff's Office had asked SIG in 2017 to change out their existing supply of original P320s with the redesigned or so-called "upgraded" version on a priority basis.  SIG complied, but Vadnais' P320 was not changed out in time before it shot her.

27.     SIG settled the *Vadnais* case on the second day of a jury trial in late May 2019. Its summary judgment and *Daubert* motions were denied from the bench.  The terms of that settlement are confidential.

28.     Computer tomography (CT) images of the Vadnais P320 revealed a manufacturing defect, i.e., crossed sear springs that were incorrectly installed at SIG's New Hampshire facility.

29.     Three other Loudon County deputy sheriffs subsequently experienced similar un-commanded discharges of their P320s, which by that point were all re-designed or "upgraded" P320s, demonstrating that even after the re-design or "upgrade," certain P320s were still experiencing un-commanded discharges.

30.     During and after the *Sheperis* and *Vadnais* cases, I received frequent calls or emails from P320 owners, mainly law enforcement agents, who stated that their guns had fired without the trigger being pulled.

## OTHER INCIDENTS OF P320 UN-COMMANDED DISCHARGES

31.     Through my work on the *Sheperis* and *Vadnais* cases, as well as direct contact

from law enforcement officers, civilians, and lawyers around the country, I became aware of many other incidents of the P320 discharging without the trigger being pulled. In fact, I am aware of over 70 reported incidents of the P320 discharging without a trigger pull (in both its original and redesigned form, with at least as many occurring with redesigned guns)—sometimes even while holstered—resulting in serious injury in several cases. A representative list of some of those incidents is as follows:

    i.     In May 2018, civilian Gunter Walker of Oklahoma reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand;

    ii.    In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward.  One round grazed the officer's arm; the other blew through his patrol car's driver side door;

    iii.    In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room.

    iv.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Morrow, Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf;

    v.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded in Georgia, causing severe tunneling wounds to his right leg;

    vi.    In May 2019, Cambridge, Massachusetts Lt. Commander Thomas Ahern's P320 fired un-commanded inside a SWAT van near Harvard Square;

    vii.    On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the police department of Somerville, Massachusetts, hitting him in his leg and causing substantial injuries;

    viii.    On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg;

    ix.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while holstered, nearly hitting a bystander in the subway;

x.      On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg;

xi.     On October 10, 2019, Cambridge, Massachusetts Officer Jacques Desrosiers's P320 discharged un-commanded.  The round caused life-changing injuries to Officer Desrosiers;

xii.    On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski in New Jersey, striking him beneath his lower back as he was un-holstering the weapon;

xiii.   On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the police department in Manteca, California, as he was preparing for work. The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door. The entire event was eye witnessed and reduced to writing by Gardette's partner (**Exhibit 3**);

xiv.    On December 2, 2019, a P320 fired un-commanded while in the possession of Cambridge Police Department Detective David Albert, as he was in the process of putting on his duty belt in Cambridge, Massachusetts;

xv.     In January 2020, a fully holstered P320 fired un-commanded on an Army veteran, Tanner Larson, in Utah, penetrating his leg and impacting his femur bone;

xvi.    On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, Robert Northrop, causing catastrophic bone damage to his lower left leg;

xvii.   In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg.  This incident was the third un-commanded discharge experienced by Pasco County officers since 2019;

xviii.  On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury;

xix.    On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement agent at a firing range in Maryland, striking him in the leg and causing serious injury.  The weapon discharged when the ICE agent placed his hand on the grip to the draw gun;

xx.     On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm.

9

xxi.    On November 9, 2020, a P320 fired un-commanded on Officer Jerry Wyche of the Tampa Police Department while he was sitting in his patrol car.  His partner in the passenger seat witnessed the weapon fire without Wyche doing anything to make it fire;

xxii.   In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh;

xxiii.  On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas.  The bullet entered millimeters away from her vagina and exited her bottom, leaving inoperable shrapnel near and around her sciatic nerve;

xxiv.   In January 2021, a P320 again fired un-commanded on an undercover officer in Milwaukee, Wisconsin as he stood to get out of the car.  The discharge is captured on parking lot surveillance video.  Both the officer's hands were full;

xxv.    On May 12, 2021, a P320 fired un-commanded on a second Homeland Security Investigations ("HSI") agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled.  The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula;

xxvi.   On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh;

xxvii.  In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs causing significant injuries;

xxviii. In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

xxix.   On June 22, 2001, a P320 fired un-commanded on an HSI agent in Tameling, Guam;

xxx.    On or about August 4, 2021, a P320 fired un-commanded on an ICE agent transporting a prisoner to Saint Clare County Jail in Detroit, Michigan.  This incident was captured on video.  A still photo of the moment of discharge shows that the agent's finger was entirely outside the holstered P320 when it fired.  Black gunpowder mist can be seen exiting the bottom of the holster over his khaki duty pants:



32.    Between April 2020 and October 2021, I provided at least $75,000 in *pro bono*

advice and services regarding a fatality involving a P320 in Tampa, Florida in March 2020.  I was contacted by the Tampa, Florida's public defender's officer in April 2021 to provide assistance on a P320 case that involved the death of a 15-year-old, Bradly Hulett.  I was informed that the public defender's office would retain me.  However, the 15-year-old defendant, named Christopher Bevan, ultimately obtained private counsel and I nonetheless spent a substantial amount of time providing advice and knowledge about the P320 and its history to the boy's attorney, his family, and ultimately the District Attorney's office itself, including a copy of the Animation at issue.  After reviewing the information I supplied, and having the P320 at issue inspected and photographed, the District Attorney dismissed the homicide charges against the defendant. Photographs of the gun at issue showed the same excess material present on critical internal components of the weapon's fire control unit.

https://www.fox13news.com/news/prosecutor-attorney-allege-defect-in-gun-model-involved-in-bradley-huletts-death

33.     I am aware of many additional P320 discharges such as these and they continue to happen. For example, an un-commanded discharge of a P320 took place on March 28, 2022 involving a Houston, Texas police officer. Another un-commanded discharge of a P320 occurred on April 6, 2022 involving a police officer in Somerville, Massachusetts.  Both of these incidents were captured on video and *post-date the lawsuit SIG has brought against me* for allegedly "deceiving" the public about the safety of the P320. *See*

https://www.wcvb.com/article/somerville-police-officer-injured-when-weapon-unintentionally-discharges/39661504

34.     In my opinion all these incidents, which include multiple videos and eyewitness statements, support a good faith belief that the P320 represents a serious law enforcement and

public safety issue, which the public needs to be made aware of to avoid injury and/or loss of life.

35.     At least five un-commanded discharges of the P320 have been captured on video. I attach for the Court's review hyperlinks to videos of four of these incidents (the fifth has been subpoenaed from the Laredo, Texas police department):  Roscommon Michigan (February 2016); Philadelphia's Suburban Station (August 2019); a Milwaukee Police Department parking lot (January 2021); and Saint Clare Prison in Detroit, Michigan (August 2021).  All but the Roscommon incident involved re-designed or "upgraded" P320s.

36.     *Roscommon, Michigan February 2016*.  From 6:00 minute mark on:

https://vimeo.com/geomatrixproductions/review/327346849/4f8af65fc0

(password:  richardson320). **Exhibit 4**.[1]

SIG claims that the officer's "seat belt buckle" somehow dove into the officer's holster and pulled the trigger in this case.  However, the video clearly shows in several frames that the seatbelt is in place and fully retracted.  In addition, a reflection of the officer standing stunned outside his patrol car shows his holstered P320 has nothing attached to it.  The officer himself states in the video that the seatbelt did not make his gun fire and notes that the casing did not eject.

37.     *Southeastern Pennsylvania Transportation Authority (SEPTA) officer Suburban Station, Philadelphia August 2019*.  The incident occurs as soon as video begins.  At 2:20 to 2:40 mark the officer expressly states that the gun is still holstered.

https://www.dropbox.com/s/rp5kmsth6xp0zcb/SEPTA000083.AVI?dl=0

**Exhibit 5**.

---

[1] This video and the others referenced below will be conventionally filed in accordance with the Court's Local Rules.

38.     *Undercover Milwaukee officer in police department parking lot, Milwaukee, Wisconsin January 2021*. Discharge is around 1:20 mark.  Note that the officer's hands are full.  The gun launches out of the holster as he exits the car.  The gun hits the side of his car and goes up in the air and then falls to the ground.

https://www.dropbox.com/s/xdrs8gzkwgy222k/clip0001.avi?dl=0

**Exhibit 6**.

39.     *Saint Clare Prison, Detroit, Michigan August 2021*.  The discharge occurs early in the video.

https://www.dropbox.com/s/qv4iszuuyety5dl/2021septclip0243.avi?dl=0

**Exhibit 7**.

## THE P320 HIGH IMPACT ANIMATION

40.     In 2020, in anticipation of upcoming trials, I retained a company called High Impact, which specializes in forensic animations, to create a demonstrative to be used at trial to depict my theory, based upon the expert opinions of Peter Villani and Timothy Hicks, P.E., about how an un-commanded discharge of the P320 can occur.

41.     During a mediation I attended with counsel for SIG in the *Vadnais* case a few months before the May 2019 trial, I saw that SIG had developed an animation of the P320 and how they claim that it works on the inside.  SIG also developed an animation of my client, Deputy Sheriff Vadnais, and how she allegedly appeared and moved inside her patrol car on the morning she was shot in February 2018.  Both these animations were crude and misleading in several ways, but I realized that a well-made animation could be effective.

42.     In July 2020, I contacted High Impact in Colorado to develop a animation of how the P320 works and looks on the inside.  High Impact had experience with firearms and had

previously done an animation of another manufacturer's striker-fired nine-millimeter pistol, contrary to SIG's claim in its press release after it filed this lawsuit.

43.     High Impact's prior animation, of a Taurus brand[2] nine-millimeter pistol, can be viewed here:

https://www.highimpact.com/exhibits/animated-gun-defects

44.     I was impressed with High Impact's national reputation in the field, and in particular, that the firm had prior experience animating another striker-fired, nine-millimeter pistol.

45.     In the context of the Animation, it is important to understand that a striker-fired pistol differs substantially from the traditional hammer-fired pistol that most Americans are familiar with.  It has no external hammer to be moved back.  Rather, it has an internal "striker" that is held back under constant spring pressure very much like a bow and arrow or crossbow.  This internal condition is very different from a hammer-fired design.  Once the slide on a striker-fired gun is moved or "racked" forcibly backward, the weapon is fully-cocked and in what is known as "condition 0."  The only component holding the striker back is the weapon's "sear." In the illustrative image of a typical striker-fired pistol that appears on the next page, the striker, in red, is held back by the face of the sear, in blue.

---

[2] As part of a legal settlement, Taurus recalled one million of its Millennium brand striker-fired guns in 2015.  Mr. Miller states in his Affidavit that he formerly worked there from 2015 to 2017 as part of its product development team.  Miller Aff., ¶ 4.  Taurus also paid a $38 million class action settlement regarding defects in its Rossi brand and other handguns.    https://topclassactions.com/lawsuit-settlements/lawsuit-news/taurus-drop-fire-gun-defect-class-action-settles-38m/ https://www.al.com/news/birmingham/2015/07/taurus_agrees_to_voluntary_rec.html



46.     My purpose in working with High Impact was to develop an *animation* of a

defective P320 based on CT scan imaging and up-close photographs; it was not to insert a

miniature camera inside a P320 to record an actual cycling of the weapon.  To my knowledge,

there are no video cameras tiny enough for this purpose, and in any case the detonation and

cycling of the gun would destroy such a camera.  It would also present substantial danger to

those present.

47.     I have been present at three inspections of numerous P320s, both the original and

re-designed (a/k/a "upgraded") versions while representing clients or consulting other attorneys

concerning at least 20 discharge incidents involving P320 guns.  The first inspection was in

Belcamp, Maryland on December 7, 2018, and was attended by me, my expert Chuck Powell,

SIG's lawyer Robert Kelly, SIG's expert Michael Knox, and personnel at the imaging facility.

The second inspection, described in more detail below, took place in March 2021 at the North

Star Imaging facility in Marlborough, Massachusetts. The third inspection was in January 2022,

also at Marlborough, Massachusetts, and was attended by me, my expert Peter Villani, attorneys

Daniel Ceisler and Robert Zimmerman (co-counsel with me on several P320 cases), SIG's expert Derek Watkins, SIG's lawyer Kristen Dennison, and a North Star employee.

48.     During these inspections, each P320 was put inside a large imaging machine that over the course of two hours took CT scan images of the gun.

49.     The March 2021 inspection at the North Star Imaging facility in Marlborough, Massachusetts took place pursuant to a joint inspection protocol agreed upon among counsel for SIG and counsel for plaintiffs and involved several exemplar guns and the guns in four pending cases: (1) *Guay v. Sig Sauer, Inc.*, 1:20-cv-00736-LM (D.N.H.) (pre-"upgrade" P320); (2) *Mayes v. Sig Sauer, Inc.*, 2020mc00105 (E.D. Pa.) (post-"upgrade" P320); (3) *Frankenberry v. SIG Sauer, Inc.*, 19-cv-02990 (D.S.C.) (pre-"upgrade" P320); and (4) the gun from the Frank J. Kneski incident (listed above) involving an un-commanded discharge (pre-"upgrade" P320).

50.     I attended the inspection in March 2021 at North Star Imaging along with my experts Peter Villani and Timothy M. Hicks, P.E. In attendance for SIG was their counsel B. Keith Gibson, Sean Toner from SIG, and their retained expert Derek Watkins.

51.     The guns were placed as shown in the photograph that appears on the next page from the North Star Imaging facility in Marlborough, Massachusetts for CT imaging:



52.     Contrary to the affidavit of Mr. Miller, those inspections, which included lengthy and expensive computer tomography (CT) imaging of the P320s at issue, as well as up-close photographs taken by Watkins, one of *SIG's own experts*, have all shown **substantial manufacturing defects** in the form of **excess material left on the surface areas of critical parts in the P320 fire control unit**; specifically, the **sear face**, **striker foot face**, and **safety lock tab**.

53.     This excess material, which SIG should have machined off to increase surface contact area (particularly between the sear face and striker foot face) to prevent un-commanded discharges, can be seen in the photographs shown below, which show high-resolution up-close photos taken in March 2021 by one of SIG's own experts, Derek Watkins.

54.     As noted, I was personally present at the Marlborough imaging facility when the images shown below were taken by Mr. Watkins in March 2021.  Watkins brought with him a portable digital microscope that projected high-resolution close-up photographs of the internal parts of the P320 onto his Apple laptop in view of those present. Only Watkins controlled the digital microscope. I and my experts had to view the images that Watkins was capturing with his digital microscope as they were displayed on his laptop. My retained expert, Timothy M. Hicks, P.E., had to take cell phone photographs as the images were displayed to capture what was being seen using Mr. Watkins's digital microscope. The photos shown below were taken by my retained expert, Timothy M. Hicks, P.E. while SIG's expert, Derek Watkins displayed on his laptop the images taken using his digital microscope.

55.     The first photo (below) was taken by Mr. Hicks as SIG's expert, Derek Watkins, displayed the image on his laptop using a digital microscope. The photograph therefore shows the image being displayed on Mr. Watkins's laptop. The photo shows a striker foot face with excess molding material present from one of the four guns that were examined in March 2021 at North Star in Marlborough (i.e., one of the guns from the *Guay*, *Mayes*, *Frankenberry*, or Kneski cases). An examination of Mr. Watkins's records of the images that he captured that day should allow identification of the particular gun being imaged. This photograph was provided to High Impact to make the Animation.



56.     The second photo (which appears on the next page) was also taken by Mr. Hicks as SIG's expert, Derek Watkins, displayed the image on his laptop using a digital microscope. This photograph also shows the image being displayed on Watkins's laptop. The photo shows a striker foot face from one of the four guns that were examined in March 2021 at North Star in Marlborough (i.e., one of the guns from the *Guay*, *Mayes*, *Frankenberry*, or Kneski cases). An examination of Mr. Watkins's records of the images that he captured that day should allow identification of the particular gun being imaged. The photo of the striker foot face on that gun shows excess material around its entire perimeter as can be seen below. This photograph was also provided to High Impact to make the Animation.



57.     A third photo (below) taken by Watkins at the inspection in Marlborough in 2021, which he included in a later report in the *Mayes* case, and which shows a sear face with excess material around its perimeter is shown below:



58.     Upon seeing the excess material on these parts at the Marlborough inspection facility, and in particular the photo of the striker foot face shown in the second photo above, Watkins audibly gasped and dropped his head to his chest.  His inspection then stopped while he

left the room to confer with SIG representatives.

59.     Upon returning to the same facility nine months later, in January 2022, to inspect four additional P320s alleged to have discharged without trigger pulls, Watkins changed his inspection methodology and refrained from taking *any* up-close photographs of the surfaces of these internal parts, in an apparent attempt to avoid making a record of the obvious defects that his prior imaging had revealed.

60.     To make the Animation, I sent to High Impact the first two photographs shown above, and additional up-close photographs of P320 components (including the sear and striker foot), as well as CT scan images of an original pre-upgrade P320 from the *Schneider v. Sig Sauer, Inc.*, 1:20-cv-01190-LM (D.N.H.) case.  The CT images were taken at North Star Imaging's facility in Minnesota on May 4, 2020 for Schneider's Attorney Scott Reisch and his expert William Munsell.  High Impact used those CT scan images to create the structure of the weapon for the Animation, and the photographs (including those taken by SIG's own expert, Watkins) to develop the depiction of the rollover condition and mechanism of failure in the Animation of the P320 over the course of approximately one year between July 2020 and August 2021.

61.     The result was an Animation that depicted a defective pre-"upgrade" P320 firing without a trigger pull and illustrated my theory, based upon expert opinion, as to the mechanism of failure that was causing un-commanded discharges of defective P320s. *See* **Exhibit 8**.

62.     It is important to note that the Animation depicts a pre-"upgrade" P320. That is why the gun in the Animation lacks certain aspects of the "upgraded" P320, which SIG points out in its papers. That is a red herring, though, because the Animation shows a pre-"upgrade" P320. That said, the same mechanism of failure exists in both the pre-"upgrade" and post-

"upgrade" gun.

63.     An un-commanded discharge cannot occur unless the safety apparatus in the pistol is defeated. The Animation was intended to show the mechanism that I believe, based upon expert opinions, was and is causing un-commanded discharges of the SIG P320.

64.     Ultimately, it is SIG's and its subcontractor's poor manufacturing practices and SIG's lax quality control that is causing sloppily finished components, which are key to the gun's safety mechanisms, to malfunction.

65.     The title on the opening screen of the Animation reads: "*SIG Sauer P320 Striker-Fired Handgun, **Mechanism of Failure***." **Exhibit 8** at 0:01. That title clearly communicates that the Animation is demonstrating how the P320 fails when it fails. It does not state that all P320s fail or are defective.



66.     The Animation then displays "CT Data" to inform the viewer that the animation is based, in part, upon CT data.



67.     The Animation then depicts some of the key internal and external components of

the P320 firearm.





68.     Starting at about 1:05, the Animation illustrates how the gun fires under normal conditions with a trigger pull.



69.     The Animation then shows the key internal components that are part of the "mechanism of failure" depicted in the Animation.



















70.    Starting at 2:00, the Animation explains: "Normal operation requires trigger pull to discharge the firearm." The Animation then depicts normal operation with a trigger pull.



71.    Starting at about 2:20, the Animation starts the depiction of a "Defective Discharge – No Trigger Pull." Again, this contrast between "normal operation" and "defective

discharge" makes clear that the Animation is asserting that *some* P320s have discharged without a trigger pull, but *not* that *all* P320s experience defective discharges.



72.     The Animation then depicts what I believe to be the "mechanism of failure," meaning *how* the P320 discharges without a trigger pull.

73.     First, at 2:32 the Animation depicts an inset surface and rollover condition on the sear face, as seen in the photographs taken by SIG's own expert and shown above. Those surfaces are highlighted in color in the Animation to show where they occur, with the rollover condition appearing in red and the inset surface appearing in blue.



74.    The Animation then shows the same condition on the face of the striker foot.



75.    The Animation then explains that "[s]udden or gradual vibration can make the

STRIKER FOOT walk off the SEAR," leading to an un-commanded discharge, which is what

SIG acknowledged could happen in its August 3, 2017 press release issued the same day I filed the *Sheperis* lawsuit.



76.     The Animation then states that "[t]he defective SIG P320 inadvertently discharges."



77.    The Animation explains that "[t]he manufacturing defect is known as ROLLOVER"; "[t]he rounded edges allow the STRIKER FOOT to slip off the SEAR." That phenomenon is depicted at 3:12 of the Animation.



78.    The Animation states at 3:20 that "[u]nder normal operation a trigger pull is required to discharge a firearm."



79.     The Animation then illustrates the existence of "[e]xcessive space between [the]

STRIKER FOOT and STRIKER HOUSING."



80.     CT scan images in the Affidavit of Peter Villani show that the Animation depicted

this condition, which results in the safety lock tab not tightly fitting against the striker body.

37

81.     The Animation also depicts "[e]xcessive space between the STRIKER FOOT and STRIKER HOUSING," which "allows the STRIKER PIN to rotate."



Excessive space between the **STRIKER FOOT** and **STRIKER HOUSING** allows the **STRIKER PIN** to rotate

82.     Further, the Animation explains that "[t]he LOOSE FIT and ROLLOVER on the SAFETY LOCK and striker pin's SAFETY STOPPER contribute to the failure" because "[t]he safety slips, allowing the striker pin to pass and the SIG P320 inadvertently discharges."





83.     The Animation then briefly depicts the "striker safety edge" and "safety lock" in a single image, but the Animation does not focus on the striker safety edge in any detail, nor does it depict any manufacturing defects on the striker safety edge (though it can suffer from the same

rollover condition that the other components experience).



84.    The Animation then states again, as SIG has acknowledged, that "[s]udden impact

or gradual vibration allows the striker foot to walk off the sear."



85.    The Animation then illustrates at 4:44 that "[v]ertical play between the slide and frame further compromises the striker sear connection by raising the striker foot when the slide moves vertically."



86.    The Animation ends by displaying SIG's own August 4, 2017 press release.



87.     The Animation shows that the SIG P320 is capable of firing without a trigger pull and depicts what I understand, based on the opinions of firearms and engineering experts, to be the mechanism of failure that causes the P320 to fire without a trigger pull.

88.     The Animation was not intended to be an exact drawing to scale or a blueprint of the gun. It was intended to be a demonstrative exhibit to be used at trial to show how the manufacturing defects can affect the performance of the safety mechanisms.

89.     After the Animation was completed, in August 2021, I uploaded it to my YouTube channel and then to my firm's website because I believed I had an obligation to warn the public about the danger that this weapon posed.

90.     That was the reason why I posted the High Impact animation on my YouTube channel and my firm's website:  to alert the public to a life-threatening safety issue with a product that can be deadly if it malfunctions.  I viewed it as serving the public interest without compensation.  The postings did not seek new business nor did they result in new business to me. At the time, I already had more P320 cases than I could handle.  The volume had required me to form work partnerships with numerous lawyers around the country.

91.     As shown in SIG's own moving papers, my YouTube channel where I posted the Animation had *no* advertising or promotional aspects. The YouTube channel simply noted that I owned the copyright to the Animation and included the URL, but *not* a link, to my firm's website. (Doc. No. 3-7)

92.     SIG contends that I "selectively" deleted comments on the Animation while it was posted on my YouTube channel.  That is false.  I set my YouTube settings to withhold all comments, as I did not wish to engage in any internet debates about the matter.  When comments poured in despite my settings command, on at least three occasions I deleted all comments,

positive and negative, and then reset the channel to withhold all comments.  Ultimately, I did not

have time to constantly monitor comments.  As I recall, the last few comments on the Animation

contained some that were positive to SIG.  I did not agree with them but did not delete them.

93.     Also shown in SIG's own moving papers is that the P320 page on my firm's

website where I posted the Animation had *no* advertising or promotional aspects to it. The page

simply had the Animation on it with the following message on the bottom: "Thanks to High

Impact in Colorado for developing this animation based on CT scan images and microscopic

photography." There was no information on that page about my practice or my legal services.

(Doc. No. 3-6)

94.     The main purpose of posting the Animation to my YouTube channel and my

website was to alert the public to a significant, life-threatening public safety issue.

95.     Despite years of courteous relations between SIG's counsel and my office in

many P320 cases, SIG's lawyers in this case never reached out to me with any concerns about

the Animation. They never sent a letter. They never sent an email or called to protest it. The first

I heard from SIG about this lawsuit was when they sued me, after they filed this lawsuit on

March 2, 2022—the same day that the *Guay* case was set down for trial in July 2022.  By that

time the Animation had already been posted for at least six months.

## REBUTTAL OF MR. MILLER'S CLAIMS REGARDING THE P320 ANIMATION

96.     The Animation clearly depicts the original version of the P320. Throughout his

Affidavit, however, Mr. Miller complains that the Animation of the original version of the P320

that High Impact created is somehow "misleading" - - because it is not an animation of the re-

designed, or upgraded, version of the P320.  This improper mixing of "apples and oranges"

undermines the credibility of his entire Affidavit.

97.     The original and re-designed P320s are two different products, a fact which SIG constantly proclaims.  Neither I nor High Impact had an obligation to incur the expense of creating animations of both versions of the P320.

98.     Approximately 400,000-500,000 original versions of the P320 are in circulation today.  Any owner of a P320 viewing the animation would know it is the original P320 because of its external appearance, i.e., the heavy or fat trigger that is on the original model but not the re-designed model.

99.     The clear difference between the two, based on this feature alone, can be seen here:





**The new trigger is 35% lighter, according to the company.**

100.    In addition, the serial number of the P320 shown in the animation further confirms that it is an original version.  This can be confirmed simply by entering the serial number on SIG's website.

101.    Finally, the sear in the animation is not double-notched, which further confirms

that it is of an original P320.

102.     Miller simply ignores these facts and acts as though it was misleading to do an

animation of the original P320 which, as noted, is in possession of hundreds of thousands of

people in the United States and has never been recalled.  All his criticisms and complaints that

the Animation does not depict the "current" P320 should therefore be rejected.  They are two

different products, though the mechanism of failure is the same in each.

103.     For example, the following close-up images taken from the November 15, 2021

expert report of Timothy M. Hicks, P.E. in the *Jinn* case (*see* Ex. 1 to Hicks Aff.) show excess

metal on the sear and striker faces of a post-"upgrade" P320 fired un-commanded on Jimmy S.C.

Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York,

resulting in permanent nerve damage to his leg.



Figure 4 - Close ups of sear step (left), and striker foot (right)

104.     Further, Miller's statement that the Animation "does not accurately depict the sear

used in the post-upgrade P320" (Miller Aff., ¶ 13) is another attempt to confuse the Court.  The

High Impact Animation is clearly of an original P320, a fact of which Miller is well aware.

105.     Miller is attempting to confuse the issues and deceive the Court by suggesting that

they are one and the same.  The Animation is a rendering of a defective, original-version P320.

It does not claim to be an Animation of the re-designed or "upgraded" later version of the P320.

106.     Further, Miller's complaints that the Animation "inaccurately" shows excess material on the sear and striker foot surfaces are absurd.

107.     The (i) Watkins photographs, *supra;* (ii) additional photos obtained during other inspections of P320s claimed to have discharged on their own; and (iii) the zoomed-out photos in Miller's *own Affidavit, all* show substantial surface irregularities that serve to dangerously reduce surface contact between the spring-charged striker foot and sear face connection:



Image 1, Perez[3] P320, Tampa, Florida. My expert Peter Villani took this photograph in connection with his examination of the gun involved in the Bevan/Hulett incident described in Paragraph 36 above. A criminal prosecution was brought against Mr. Bevan and Mr. Villani was retained as an expert by defense counsel. Mr. Villani took this photograph of the gun involved in that incident and included it in his report. As explained above, the homicide charges were dismissed.

---

[3] Perez is the name of the Tampa police officer who owned the P320 involved in this incident.



Image 2, Miller photograph from Affidavit.  Clear excess material on right, lower and outer edges.  White lines appear to have been superimposed on the image to disguise the defect.



Image 3, close-up of photo of Watkins digital microscope image from Marlborough, MA inspection site, discussed above.



Image 4, Miller photograph from Affidavit, page 10.  Excess material ignored by Miller and pointed out with solid red arrow.  Protruding material is also clearly visible on right side of sear face.



Image 5. This is a photograph taken during the Marlborough inspection in March 2021 that Timothy M. Hicks, P.E. used in his report in the *Mayes* case.  This photo shows protruding excess material clearly visible on the lower horizontal edge and left and upper edges.

108.    These photographs, individually and together, demonstrate beyond any question that the Animation displays, even if not perfectly, the excess material on the surface faces of the critical safety connection between the striker foot and sear.

109.    Moreover, computer tomography images of P320s taken at the Marlborough facility also show that the Animation displays that the striker foot rests slightly above the sear face, again contrary to what Miller claims on page 14 of his Affidavit, as shown in this image of the gun from the *Frankenberry* case as well as others:



110.    Miller continues his erroneous demand that the images in the Animation must

correspond *exactly* to the precise measurements of a physical P320 when he moves to the subject

of the striker's housing.  Miller Aff., pp. 14-16.  While conceding that "some of the Animation

dimensions were similar to the dimensions of the actual P320 components," Miller then claims

that others were not perfectly accurate and then concludes (with no apparent basis) that the

images in the *animation* must have been "manipulated."  Aff., p. 15.  Here, again, Miller mixes

apples and oranges.  The animation is *based on* actual images of the P320; the *animation frames*

*themselves*, however, are *not actual images of the P320*.  They are *renderings* of those images,

which required High Impact to approximate, as closely as possible, the actual gun.  Miller's

complaint, in short, is that the Animation could be more accurate or should replicate the actual

gun to a degree of perfect replication, which is not the purpose of an *animation*.

111.    On the subject of manipulation of images, as noted, it appears that it is Miller

himself who manipulated and/or altered a photograph of an actual P320's striker foot on page 13

of his Affidavit.  The three white lines placed over the right edge of the sear, which clearly bears

the same signs of excess material as all the other actual photographs, give every indication of

having been superimposed there to disguise the defect. Similarly, the sear "surface" photo on page 10 bears a black outline that suggests the image may have been sharpened using graphic editing software like Adobe Photoshop, and the striker safety photo on page 21, also appears to have been manipulated or altered to make the parts look better than they do in reality (see next page):







112.    Mr. Miller complains further that High Impact's Animation of a defective original

P320 does not contain a mechanical disconnector.  Aff., p. 24.  The latter device, however, is

only present on the re-designed "post-upgrade" version of the P320.  This complaint is therefore irrelevant because the Animation does not depict a re-designed "post-upgrade" P320.  Further, the Animation admittedly does not contain every single part contained in the P320, nor does Sig's own YouTube animation of the P320.[4] That was never the purpose of the Animation.

113.    The remainder of Miller's Affidavit variously complains that the Animation does "not represent the actual geometry" of other parts in the P320.  An animation is not required to perfectly present the exact geometry of an original P320.  It is an *animation*, a *depiction*, a *rendering*, as previously stated.

114.    Miller's claim that the Animation's depiction of the striker foot walking off the sear as "physically impossible" is contradicted both by the enormous number of real-life examples of such discharges without a trigger pull (which can only occur because the spring-charged striker foot, defaced as it is with dangerous surface irregularities, is walking off the similarly defective surface of the sear), and the expert affidavits submitted on my behalf.   Using Miller here, SIG is attempting to try the case before the Court and short-circuit the jury trial with this Court in the *Guay* matter scheduled for July 2022.

115.    The Animation, in short, portrays the function of an original P320 and how inertial impacts to the weapon can cause a catastrophic failure of the product.  SIG itself has stated that mere "vibration" can make the gun fail.  In view of that fact, Miller's claim that it is "physically impossible" for the P320 to fail in the manner depicted in the Animation is not credible.

### SEAN TONER'S AFFIDAVIT CONTAINS INACCURATE IMAGES OF A PRE-UPGRADED P320

116.    Sean Toner, the designer of the P320, submits a very brief Affidavit in connection

---

[4] *See* https://www.youtube.com/watch?v=8jg3p9HXHXg.

with SIG's preliminary injunction motion.  Mr. Toner simply recites how a P320 should function and includes some basic artistic renderings of the internal parts of the P320, which are far less accurate than those in the Animation.  For example, Toner's drawings display sear springs that simply float in thin air.  He also compounds Miller's error by presenting an "upgraded" P320 rather than the original.   He also omits the safety lock spring, which Mr. Miller complains about regarding the High Impact Animation.

## HARM TO ME AND MY PRACTICE

117.    I believe this lawsuit was designed to silence and intimidate and burden me with substantial costs to interfere with my nationwide advocacy on behalf of victims of the P320. SIG's press release stating that this lawsuit is intended "to ensure that [I am] not allowed to continue deceiving the public about the safety of the P320" is false and defamatory.  It falsely states that I am deceiving the public. **Exhibit 9**.[5]

118.    I have not deceived anyone.  I am informing the law enforcement community and general public of what I perceive in good faith to be a serious and life-threatening safety problem, which *just last week* nearly took the life of a Somerville, Massachusetts officer as she walked to her patrol car with her hands full.  It is SIG that is seeking to deceive the public, at the cost of peoples' safety and lives, to preserve their lucrative contract with the U.S. Army worth over $500 million and sales of the P320 to law enforcement agencies around the country, and to avoid the tens of millions of dollars a mandatory recall of the gun would cost.

119.    If the injunction that SIG requests is entered, it will interfere with my ability to respond to SIG's false and defamatory press release about me and it will ensure that fewer

---

[5] SIG's March 3, 2022 Press Release is available at https://www.thefirearmblog.com/blog/2022/03/08/sig-sauer-lawsuit-p320/, and https://www.thetruthaboutguns.com/sig-sauer-sues-attorney-jeffrey-bagnell-for-allegedly-false-and-defamatory-statements-about-the-p320s-safety/.

people are informed about the defects in the P320 and that more people are therefore injured or killed. The injunction that SIG requests would prevent me from displaying the Animation to explain what I was intending to show.

120. Further, as this Court knows, I am very busy preparing for trial and responding to *Daubert* motions in the *Guay* case. I am also responding to a summary judgment in another case against SIG, and addressing various other litigation-related tasks in cases against SIG that require my attention. SIG knows that this lawsuit will divert my attention and energy from litigating those cases to defend against this lawsuit. What is more, this lawsuit is undoubtedly intended to cause me to have to testify in my own defense and to reveal attorney work product, including mental impressions, that could not be discovered by SIG in the *Guay* case or any of other cases that I am handling against SIG. I believe it is precisely for these reasons that SIG filed this lawsuit.

Signed under the pains and penalties of perjury this 15th day of April, 2022:

*/s/ Jeffrey S. Bagnell*
Jeffrey S. Bagnell, Esq.