UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SIG SAUER, INC.,<br><br>        Plaintiff<br><br>       v.<br><br>JEFFREY S. BAGNELL, ESQ., LLC,<br>and JEFFREY S. BAGNELL<br><br>        Defendants and Counter-<br>        Plaintiffs,<br><br>       v.<br><br>SIG SAUER, INC.,<br>RON J. COHEN, Individually,<br><br>        Counter-Defendants. | CIVIL ACTION NO. 1:22-cv-00078(JAM) |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

## INTRODUCTION

1.    Denied.

       Sig's implications that the Animation is anything other than a computer rendering of the P320 is misleading. It is not a video and does not claim to be. There are no cameras small enough to place inside the fire control unit of a P320 and film the exact dimensions of the internal parts. Sig's own animations of the P320 are also merely artistic renderings of the internal components and do not show their exact dimensions and in some cases show certain parts floating in the air attached to nothing. Courts have recognized that an animation "need not be exact in every detail" even if sought to be used as a demonstrative exhibit. *Clark v. Cantrell*, 529 S.E.2d 528, 537 (S.C. 2000) (animations admissible if authentic, relevant, fair and

1

accurate representation of evidence, and probative value not substantially outweighed by danger of unfair prejudice); *see Insight Tech., Inc. v. SureFire, LLC*, No. CIV. 04-CV-74-JD, 2007 WL 3244092, at *3 (D.N.H. Nov. 1, 2007). The Animation at issue was just admitted as a demonstrative exhibit in *Guay v. Sig Sauer, Inc*. matter, tried to a jury in July 2022 in the District of New Hampshire, after which the court found that the plaintiff's P320 discharged without a trigger pull.

2.      Denied.

2a.     Denied.

2b.     Denied.

2c.     Denied.

2d.     Denied that defendants had any obligation to make a second animation on the redesigned or "upgraded" P320,[1] which continues to fire without a trigger pull and injure officers and civilians as recently as September 10, 2022 in Milwaukee, Wisconsin. The latter incident post-dates the transfer of this suit from New Hampshire and is the third time P320s in that department, as is the case with other departments nationwide, fired without a trigger pull. Upon information and belief, all three incidents were captured on video.

https://www.jsonline.com/story/news/2022/09/30/union-president-says-milwaukee-police-have-no-trust-service-weapon/8137308001/

3.      Denied. The photograph supplied to High Impact was taken by one of Sig's experts, Derek Watkins. Regardless of the presence of grease, the surface faces of the striker foot and sear of numerous P320s before and after cleaning all exhibit raised, excess metal material that reduces the surface contact area between them. The parts are simply being dropped into the fire control unit "raw" or unfinished as specified in detail in the original Bagnell and Villani

---

[1]      The first Animation cost just under $30,000.

affidavits. (Ex. 1, Ex. 2). In Sig's own August 4, 2017 press release on the P320, displayed in the Animation, it states that vibration can make that unstable connection fail.

4.      Denied. Defendants repeatedly set the comment controls to "no comments," however comments still came through. Eventually, deleting them all became time-consuming and the remaining comments included some that were favorable to Sig. Denied that it has caused any "confusion" in the market. Denied that defendants have precise knowledge how many times the animation was viewed. The animation was published to alert law enforcement and the public to an ongoing serious safety issue with this weapon. A major Philadelphia firm published a version of the animation on YouTube approximately two months before defendants, and it had more than twice as many views (80,000 upon information and belief). Yet Sig chose to sue only Bagnell, without any warning or notice, in retaliation for bringing the first and many other P320 cases around the country. It omitted the Philadelphia firm from the action entirely.

## PARTIES

5.      Admitted it is based in New Hampshire. The remainder of the allegations are denied.

6.      Admitted.

7.      Admitted with the qualification that the cases involving the P320 are product liability cases properly speaking.

## JURISDICTION AND VENUE

8.      Admitted.

9.      Admitted.

10.      Admitted.

## FACTS

11.      Admitted.

12.     Admitted that this is now the P320 is supposed to function.

13.     Admitted that Sig has manufactured the P320 since 2014, if not earlier.  Admitted that

Sig announced a "voluntary upgrade" program in August 2017, after several officers and

civilians were shot without the trigger being pulled.  The remainder of the allegations are denied.

14.     Denied.  The inclusion of a secondary sear notch pursuant to the VUP had the capacity to

produce a "dead trigger" result in which the gun would not fire as designed.  The secondary

notch also concedes that the connection between the striker foot face and initial sear face can

fail.

15.     Admitted.

16.     Admitted.  Denied that comments were enabled.  Comments were set to "no comments"

several times as noted.

17.     Denied.  I published the Animation to alert law enforcement and the public to

a serious safety issue, just as the Philadelphia firm did two months before.  Admitted that I

maintain a website that discusses representative cases in many different areas of the law, as does

counsel for Sig.

18.     Admitted.

19.     Without sufficient information to admit or deny.

20.     Admitted.  The Animation also includes a press release authored by Sig, confirming that

inertial impacts as slight as "vibration" can make the P320's safety mechanism fail.  The

Animation therefore does nothing more than illustrate a catastrophic malfunction which Sig itself

has acknowledged can happen.

21.     Denied.  The Animation is a rendering.  No statement is made that it exactly conforms to

how the internal parts of the P320 appear in real life.

22.     Admitted.

23.     Admitted.

24.     Denied.

25.     Denied.  Sig's own press release states that the original P320 is susceptible to firing without a trigger pull.  The Animation therefore depicts a failure that Sig itself has acknowledged is possible.

26.     Denied.  The surfaces are not uniform as shown in detail in the Bagnell and Villani affidavits filed in opposition to Sig's motion for a preliminary injunction.

27.     Admitted that there is grease present; denied that the surface is "uniform".  It obviously shows raised excess material around the horizontal and vertical perimeters of the striker foot.

28.     The response to allegation 27 is incorporated by reference.

29.     Denied.

30.     Denied.

31.     Denied.  Sig itself stated in August 2017 that precisely such an event could happen, which was the foundation for the announcement of its "voluntary upgrade program."

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.  The Animation is of an original version P320.

43.     Denied that defendants had any obligation to create a second animation of the "upgraded" P320, which also continues to fire without trigger pulls around the country.

44.     Denied.

45.     Denied.

46.     Denied.  Defendants' intention was to alert law enforcement and civilians to the serious public safety issue presented by the original P320, as he has done since 2017 on his website.  The sheer volume of defective discharges of the P320 on law enforcement and civilians all over the country speaks for itself.  See Ex. 1, Bagnell Affidavit.  It would be immoral and unconscionable to maintain silence about these events while more and more people are shot.  Sig itself has failed to issue a single safety warning or recall of the P320 in eight years despite have done so for other of its products that had the potential for malfunctioning.

## **COUNT ONE**

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Admitted.

52.     Denied.

## **COUNT TWO**

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are in whole or in part untimely.

### SECOND AFFIRMATIVE DEFENSE

Connecticut's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute—Conn. Gen. Stat. § 52- 196a, effective January 1, 2018—protects parties from frivolous lawsuits such as the instant action aimed at curtailing the exercise of federal and state constitutional protected rights.  Under the statute, a "[m]atter of public concern" means an issue related to (A) *health or safety*, (B) environmental, economic or community well-being, (C) the government, zoning and other regulatory matters, (D) a public official or public figure, or (E) an *audiovisual work*.  The "[r]ight of free speech" means communicating, or conduct furthering communication, in a public forum on a matter of public concern.  (emphasis added).

### THIRD AFFIRMATIVE DEFENSE

It is a fact that the P320 has discharged without a trigger pull across the country.  The Bagnell defendants' statements regarding this fact are therefore true and an absolute defense to Sig's defamation and other claims.

### FOURTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by the doctrine of unclean hands.

## COUNTERCLAIMS AGAINST SIG SAUER, INC.

## FACTS

1.      I am an attorney based in Westport, Connecticut, where I operate my law practice.
I am licensed to practice in the State of Connecticut and the Commonwealth of Massachusetts.

2.      I am a graduate of the College of the Holy Cross (1988) and Boston College Law
School (1992).  I am a member in good standing of the following state and federal courts:

- o  State of Massachusetts (December 15, 1992);
- o  State of Connecticut (May 21, 1993);
- o  United States District Court, District of Connecticut (June 5, 1998);
- o  United States District Court, Southern and Eastern Districts of New York (August 10th and September 9th, 1998);
- o  United States Court of Appeals for the Second Circuit (September 12, 2000); and
- o  United States Supreme Court (April 4, 2002).

3.      I have received peer-reviewed honors over the course of my almost 30-year
career, including recognition in Best Lawyers for the last five years and recognition as one of the
top 50 lawyers in Connecticut.  I have received no professional discipline.  I have litigated and
tried cases in state and federal courts and before arbitration panels.

4.      Over the years, my law practice has included firearms product liability, sexual
abuse, Title IX, civil rights, defamation, trademark, employment litigation and counseling,
executive compensation, business litigation, and insurance coverage disputes. Most of my law
practice has involved a public interest or civil rights component.

5.      Since about 2017, I have served as lead counsel and co-counsel in about 15
lawsuits, primarily representing federal and local law enforcement agents, seeking damages
against Sig Sauer, Inc. (Sig or SIG) across the country for injuries caused by the Sig Sauer P320

semiautomatic pistol discharging without the trigger being pulled (referred to as an "un-commanded discharge").  I understand that there are at least one million P320s in circulation, many in the possession of law enforcement officers.

6.        During the past six years, I have become a well-known critic of safety risks associated with the P320. I have appeared on Good Morning America, Nightline, CNN, and other media outlets at their request to warn of the potential danger that the P320 poses of firing without a trigger pull, including incidents resulting in serious injury and sometimes death. There is intense media and public interest in these incidents and the litigation that ensues, especially since this has been a recurring problem, because the un-commanded discharge of a firearm is a serious, life-threatening public safety issue.

7.        I am a gun owner and licensed to carry firearms in the State of Connecticut.  I was previously licensed to carry in Massachusetts in 2017.  I support the Second Amendment to the United States Constitution.  I also support gun safety and firearms that are well made and safe.

8.        Two of the P320 cases that I was handling were currently pending before the New Hampshire District Court when Sig sued me on March 2, 2022, the very same day the *Guay* case was assigned a trial date. *See Guay v. Sig Sauer, Inc.*, 1:20-cv-00736-LM (D.N.H.); *Schneider v. Sig Sauer, Inc.*, 1:20-cv01190-LM (D.N.H.). The *Guay* case was tried in July 2022 shortly after the court there transferred this case to the District of Connecticut for lack of personal jurisdiction, and the Animation was admitted as a demonstrative exhibit.

9.        At great expense I retained the Boston firm of Todd & Weld to represent me during what was the trial preparation period for the *Guay* matter.  I estimate that I was required to spend approximately 250 hours conferring with my attorneys, explaining the inner workings of a semi-automatic striker-fired pistol, securing expert witnesses for affidavits, discussing the background of the P320 pistol, reviewing Sig's filings, as well as making numerous trips to

Boston for in-person meetings, all of which distracted my attention and energies during the Guay trial preparation period. I contend that Sig's management did this maliciously and on purpose to manipulate the civil justice system in its favor, denigrate me before the New Hampshire federal bench, invite the presiding Judge to pre-judge the merits, and interfere with my representation of my client shortly before trial. That case was resolved (transferred to Connecticut) only days before the start of trial in New Hampshire. It was relatively obvious that the New Hampshire court did not have personal jurisdiction over me, yet Sig filed there anyway, knowing that I had two pending P320 cases there and no anti-SLAPP statute as Connecticut does. Sig also knew that the lawsuit would impose an enormous pre-trial burden on me.

10. Like most attorneys and law firms in the internet age, I maintain a website that informs viewers about my background and representative cases and successes. *See* https://www.bagnell-law.com

11. My firm's website includes a home page, a page about the P320, a page describing various honors I have received, a page with client reviews, a list of representative cases, a description of my practice areas, a news page, and a contact page. The Contact page on my website has resulted in no new cases since I began my practice. Instead, cases have been and are referred to me by other attorneys by word of mouth, or potential clients who have contacted me directly, and not through my website. The landing page featured an image of the P320 taken from a CNN article, entitled "Trigger Warning," from 2018 throughout 2022. Sig never protested it.

12. As most of my clients are individuals and unable to afford hourly fees as corporations like Sig are, I typically accept cases on a contingency basis so that their legal rights

may be enforced, and the public interest in open courts protected through the constitutional right to a jury trial.

13.     In 2015 and 2016, I received significant instruction on the use of semi-automatic handguns from a gunsmith and veteran of the Afghanistan conflict.  This training and the people I met during it resulted in one of the first, if not the first, P320 cases being referred to me, *Sheperis v. Sig Sauer, Inc*., 3:17-cv-01318 (D. Conn.) (JCH).

### *SHEPERIS v. SIG SAUER, INC.* 2017; ### LAWSUIT CAUSES SIG TO MAKE DESIGN CHANGE

14.     I sued Sig in the United States District Court for the District of Connecticut in August 2017 in the *Sheperis* matter.  Officer Sheperis was and is a member of the Stamford, Connecticut Special Response Team, formerly known as "SWAT" or Special Weapons and Tactics.  His holstered P320 discharged when it fell approximately three feet to the ground, shooting him in his left knee causing substantial physical injury and trauma.  Had the bullet followed a different trajectory, Officer Sheperis could easily have been killed.

15.     The same day I filed the *Sheperis* suit, Sig stated in a press release that several conditions, including "shock, vibration, heavy or repeated drops" could make the internal safety of the P320 fail.  Ex. 3.  Just four days later, Sig announced what it termed a "voluntary upgrade" of the original commercial version of the P320.  Ex. 4**.**  At the same time, Sig informed owners on its website that the original P320 was still "safe" in its existing configuration and did not need to be returned.

16.     The August 4, 2017 release was an admission and made it clear that Sig knew then, if not much earlier, that shock, vibration, heavy or repeated drops could make the internal safety mechanism in the P320 fail.  This constituted a major embarrassment for Sig as it had just been awarded a $580 million contract with the Department of Defense to supply the armed

forces with the P320. The Army demanded that Sig made extensive changes to the fire control unit and subassemblies within it, and add a manual external thumb safety, but Sig did not make any of those changes for the version in the hands of American law enforcement and civilians.

16.     In the *Sheperis* Prayer for Relief, I asked the Court to order Sig to issue a mandatory recall of the P320. Sig has refused to issue a recall of the weapon from the date of that lawsuit to the present. Sig settled *Sheperis* in June 2018 after a mediation conference with the Honorable Thomas P. Smith in Hartford, Connecticut. The terms of that settlement are confidential.

17.     The *Sheperis* lawsuit resulted in significant publicity that I never solicited. I was interviewed by Connecticut's legal newspaper, the Connecticut Law Tribune, and the local News 12 television station regarding the gun firing without a trigger pull. Given that a lethal product was at issue, I stated during the News 12 interview that I viewed the matter as a "serious public safety issue" which I do. The video of this interview, which shows images of the P320, may be viewed at https://www.bagnell-law.com/video-media It has been posted on my website since August 2017 and resulted in no protests from Sig at any time.

18.     Since the *Sheperis* suit, I have made brief appearances on Good Morning America, Nightline, CNN, Boston Channel 5, and other media outlets to warn of the danger that the P320 poses.

### *DEPUTY SHERIFF MARCIE VADNAIS v. SIG SAUER, INC.*, 2018

19.     During the *Sheperis* suit, the sister of another law enforcement agent, Deputy Sheriff Marcie Vadnais of the Loudoun County, Virginia Sheriff's Department, called me.

20.     In February 2018, her sister Marcie's holstered, original version P320 discharged without a trigger pull as she jostled the holster to remove it from her belt insider her patrol car.[2] The bullet impacted her right femur causing a catastrophic, comminuted fracture.  X-rays showed that her femur had been severed in half with shards of bone fragments and substantial shrapnel left in her right leg as seen here:

(next page)

---

[2]     This was precisely the allegation in *Guay v. Sig Sauer, Inc.*. i.e., that Guay's holstered P320 discharged as he was jostling it to remove it from his belt in January 2020 and shot him in his right thigh.  In a decision issues six weeks after the divided jury rendered a verdict, the court found that his gun discharged fully seated in his holster exactly as he testified:

> The court found Guay credible in every respect.  Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged.  With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it.  Moreover, as expert testimony revealed, the P320 had a 6.7 pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure.  The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in the holster.  In short, the court found Guay's testimony about the gunshot, how it occurred, and his resulting injuries consistent and believable.

Docket No. 108, p. 5.



21.     Surgeons were forced to hollow out her bone marrow to insert a titanium rod down through the remaining portions of her femur.  The rod was screwed into her right pelvis and knee to keep it in place.  Without the rod, her right leg would have collapsed in on itself upon any weight bearing.  Vadnais ended up requiring four general anesthesia surgeries to

14

attempt to repair the damage to her right leg.  For some time, her expert neurologist was concerned that it would have to be amputated due to the extreme amount of bone loss the bullet from the P320 caused.

22.     In April 2018, two months after Vadnais was shot, Sig issued a second "voluntary upgrade" notice to all users or owners of the P320 via email.  Sig, however, still did not recall the weapon or issue a safety warning about it as it had done for other of its products including the Predator rifle.

23.     I agreed to represent Deputy Vadnais and filed suit against Sig in the Eastern District of Virginia in May 2018, *Vadnais v. Sig Sauer, Inc.* (1:18-cv-00540) (LMB).

24.     The Loudoun County Sheriff's Office had asked SIG in 2017 to change out their existing supply of original P320s with the redesigned or so-called "upgraded" version on a priority basis.  Sig complied, but Vadnais' P320 was not changed out in time before it shot her.

25.     Sig settled the *Vadnais* case on the second day of a jury trial in late May 2019.  Its summary judgment and *Daubert* motions were denied from the bench.  The terms of that settlement are confidential.

26.     Computer tomography images of the Vadnais P320 revealed a manufacturing defect, i.e., crossed sear springs that were incorrectly installed at Sig's New Hampshire facility.

27.     Three other Loudon County deputy sheriffs later experienced similar un-commanded discharges of their P320s. By that point, all had been all re-designed or "upgraded" demonstrating that even after the so-called upgrade, certain P320s were still firing without trigger pulls.

28. During and after the *Sheperis* and *Vadnais* cases, I received frequent calls or emails from P320 owners, mainly law enforcement agents, who stated that their guns had fired without the trigger being pulled.

## OTHER INCIDENTS OF P320 UN-COMMANDED DISCHARGES

29. Through my work on the *Sheperis* and *Vadnais* cases, as well as direct contact from law enforcement officers, civilians, and lawyers around the country, I became aware of many other incidents of the P320 discharging without the trigger being pulled. To date I am aware of over 70 reported incidents of the P320 discharging without a trigger pull (in both its original and redesigned form, with at least as many occurring with redesigned guns)—sometimes even while holstered—resulting in serious injury in several cases. I believe the actual number of incidents to be much higher, well over 100.

A representative list of some of those incidents is as follows:

i. In May 2018, civilian Gunter Walker of Oklahoma reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand;

ii. In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver side door;

iii. In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room.

iv. In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Morrow, Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf;

v. In December 2018, civilian Robert Lang's P320 fired on him un-commanded in Georgia, causing severe tunneling wounds to his right leg;

vi. In May 2019, Cambridge, Massachusetts Lt. Commander Thomas Ahern's P320 fired un-commanded inside a SWAT van near Harvard Square;

vii.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the police department of Somerville, Massachusetts, hitting him in his leg and causing substantial injuries;

viii.    On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in near loss of his leg and permanent nerve damage to his leg;

ix.     In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while holstered, nearly hitting a bystander in the subway;

x.     On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg;

xi.     On October 10, 2019, Cambridge, Massachusetts Officer Jacques Desrosiers's P320 discharged un-commanded.  The round caused life-changing injuries to Officer Desrosiers;

xii.    On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski in New Jersey, striking him beneath his lower back as he was un-holstering the weapon;

xiii.   On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the police department in Manteca, California, as he was preparing for work.  The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door. The entire event was eye witnessed and reduced to writing by Gardette's partner (Ex. 5);

xiv.   On December 2, 2019, a P320 fired un-commanded while in the possession of Cambridge Police Department Detective David Albert, as he was in the process of putting on his duty belt in Cambridge, Massachusetts;

xv.    In January 2020, a fully holstered P320 fired un-commanded on an Army veteran, Tanner Larson, in Utah, penetrating his leg and impacting his femur bone;

xvi.   On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, Robert Northrop, causing catastrophic bone damage to his lower left leg;

xvii.   In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg.  This incident was the third uncommanded discharge experienced by Pasco County officers since 2019;

xviii.    On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury;

xix.    On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement agent at a firing range in Maryland, striking him in the leg and causing serious injury. The weapon discharged when the ICE agent placed his hand on the grip to the draw gun;

xx.    On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm.

xxi.    On November 9, 2020, a P320 fired un-commanded on Officer Jerry Wyche of the Tampa Police Department while he was sitting in his patrol car. His partner in the passenger seat witnessed the weapon fire without Wyche doing anything to make it fire;

xxii.    In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee. The bullet resulted in a tunnel wound to her right thigh;

xxiii.    On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas. The bullet entered millimeters away from her bottom, leaving inoperable shrapnel near and around her sciatic nerve;

xxiv.    In January 2021, a P320 again fired un-commanded on an undercover officer in Milwaukee, Wisconsin as he stood to get out of the car. The discharge is captured on parking lot surveillance video. Both the officer's hands were full;

xxv.    On May 12, 2021, a P320 fired un-commanded on a second Homeland Security Investigations ("HSI") agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled. The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula;

xxvi.    On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh;

xxvii.    In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs causing significant injuries;

xxviii.    In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

xxix.   On June 22, 2001, a P320 fired un-commanded on an HSI agent in Tameling, Guam;

xxx.   On or about August 4, 2021, a P320 fired un-commanded on an ICE agent transporting a prisoner to Saint Clare County Jail in Detroit, Michigan. This incident was captured on video. A still photo of the moment of discharge shows that the agent's finger was entirely outside the holstered P320 when it fired. Black gunpowder mist can be seen exiting the bottom of the holster over his khaki duty pants:

[next page]



xxxi.   In February 2022, a P320 fired un-commanded as a Honesdale Pennsylvania
        police officer was getting out of his vehicle.  This incident was captured on high
        resolution video and shows that his hands were nowhere near the holstered gun
        when it discharged and miraculously missed his leg on the way to the pavement;

xxxii.  In April 2022, a P320 fired un-commanded as a Somerville, Massachusetts officer
        walked to her patrol car with her hands full. The bullet impacted her thigh leaving
        a massive contusion;

xxxiii. On September 10, 2022, a P320 fired un-commanded while in the holster of a
        Milwaukee police officer.  The bullet stuck his partner in the knee and caused
        substantial injury.

30.     In another P320 case, I provided at least $75,000 in *pro bono* advice and services

regarding a fatality involving a P320 in Tampa, Florida in March 2020. The 15-year-old

defendant, named Christopher Bevan, obtained private counsel and I spent substantial time

providing advice and knowledge about the P320 and its history to the boy's attorney, his family,

and ultimately the District Attorney's office, including a copy of the Animation at issue.  After

reviewing the information I supplied, and having the P320 at issue inspected and photographed

by an armorer on the P320, the District Attorney halted prosecution of the homicide charge.

Photographs of the gun at issue showed the same excess material present on critical internal

components of the weapon's fire control unit.

https://www.wtsp.com/article/news/local/wrongful-death-lawsuit-gun-manufacturer-bradley-
hulett/67-711b6704-61fb-4cbe-964c-e2aedf22113f

31.     I am aware of other P320 discharges such as these and they continue to happen.

For example, another un-commanded discharge of a P320 occurred on April 6, 2022 involving a

police officer in Somerville, Massachusetts.  In September 2022, a holstered P320 fired un-

commanded and hit a Milwaukee officer in the knee. The latter two incidents were captured on

video and post-date the lawsuit SIG has brought against me for allegedly deceiving the public

about the safety of the P320. https://www.wcvb.com/article/somerville-police-officer-injured-when-weapon-unintentionallydischarges/39661504

32.     All these incidents, which include multiple videos and eyewitness statements and severe injuries, support a good faith belief that the P320 represents a serious law enforcement and public safety issue, which the public needs to be made aware of to avoid injury and/or loss of life.

33.     At least nine un-commanded discharges of the P320 have been captured on video. One, in Manteca, California was eye-witnessed by an officer.  I attach for the Court's review hyperlinks to videos of six of these incidents:  Roscommon Michigan (February 2016); Philadelphia's Suburban Station (August 2019); a Milwaukee Police Department parking lot (January 2021); Rose Casino, Louisiana (December 2021), Saint Clare Prison in Detroit, Michigan (August 2021), and Honesdale, Pennsylvania (February 2022). All but the Roscommon incident involved re-designed or "upgraded" P320s.

34.     *Roscommon, Michigan February 2016.*  From 6:00 minute mark on:

https://vimeo.com/geomatrixproductions/review/327346849/4f8af65fc0

(password:  richardson320).[3]

SIG claims that the officer's seatbelt buckle somehow dove into the officer's holster and pulled the trigger in this case.  However, the video clearly shows in several frames that the seatbelt is in place and fully retracted.  In addition, a reflection of the officer standing stunned outside his patrol car shows his holstered P320 has nothing attached to it.  The officer himself states in the video that the seatbelt did not make his gun fire.

---

[3]     This video and the others referenced below will be conventionally filed in accordance with the Court's Local Rules.



35.      *Southeastern Pennsylvania Transportation Authority (SEPTA) officer Suburban Station, Philadelphia August 2019*.  The incident occurs as soon as video begins.  At 2:20 to 2:40 mark the officer expressly states that the gun is still holstered.

   https://www.dropbox.com/s/rp5kmsth6xp0zcb/SEPTA000083.AVI?dl=0

36.      *Undercover Milwaukee officer in police department parking lot, Milwaukee, Wisconsin January 2021*. Discharge is around 1:20 mark.  Note that the officer's hands are full.  The gun launches out of the holster as he exits the car.  The gun hits the side of his car and goes up in the air and then falls to the ground.

   https://www.dropbox.com/s/xdrs8gzkwgy222k/clip0001.avi?dl=0

37.      *Saint Clare Prison, Detroit, Michigan August 2021*.  The discharge occurs early in the video.  Agent's finger is clearly outside the holster when gun fires.

https://www.dropbox.com/s/qv4iszuuyety5dl/2021septclip0243.avi?dl=0

40.     *Rose Casino, Louisiana.  Casino December 2021.*

The casino camera shows an off-duty ICE agent moving to a gaming table with her P320 in a purse.  As she approaches and stops at the table, the gun discharges inside her purse.

https://smb.filevineapp.com/s/ef09Fujjnvajg3XonsAWsSHAuUKPNhpSMAuzaVWjhun pwFArcpofjvMF/folder/59054527

41.     *Honesdale, Pennsylvania, February 2022.*

The surveillance camera shows a holstered P320 discharging as the officer exits his vehicle.  His hands are not near the holstered P320:

https://smb.filevineapp.com/s/ef09Fujjnvajg3XonsAWsSHAuUKPNhpSMAuzaVWjhun pwFArcpofjvMF/folder/59054527

## THE  HIGH IMPACT ANIMATION

42.     In 2020, in anticipation of upcoming trials, I retained a Colorado company named High Impact, which specializes in forensic animations, to create a demonstrative show how an un-commanded discharge of the P320 can occur.

43.     During a mediation I attended with counsel for Sig in the *Vadnais* case a few months before the May 2019 trial, I saw that Sig had developed an animation of the P320 and how they claim that it works on the inside.  Sig also developed an animation of my client, Deputy Marcie Vadnais, and how she allegedly appeared and moved inside her patrol car on the morning she was shot in February 2018.

44.     High Impact had experience with firearms and had previously done an animation of another manufacturer's striker-fired nine-millimeter pistol,[4] contrary to Sig's claim in its March 2022 press release about this lawsuit.

---

[4]     As part of a legal settlement, Taurus recalled one million of its Millennium brand striker-fired guns in 2015.  Mr. Miller states in his Affidavit that he formerly worked there from 2015 to 2017 as part of its product

45.     The animation High Impact developed shows that a striker-fired pistol differs substantially from the traditional hammer-fired pistol that most Americans are familiar with.  It has no external hammer to be moved back.  Rather, it has an internal "striker" that is held back under constant spring pressure very much like a bow and arrow or crossbow.  This internal condition is very different from a hammer-fired design.  Once the slide on a striker fired gun is moved or "racked" forcibly backward, the weapon is fully cocked and in what is known as "condition 0".  The only component holding the striker back is the weapon's sear."  In the illustrative image of a typical striker-fired pistol that appears on the next page, the striker, in red, is held back by the face of the sear in blue:

[next page]

---

development team.  Miller Aff., ¶ 4.  Taurus also paid a $38 million class action settlement regarding defects in its Rossi brand and other handguns.



46.     My purpose in working with High Impact was to develop an *animation* of a defective P320 based on CT scan imaging and up-close photographs; it was not to insert a miniature camera inside a P320 to record an actual cycling of the weapon.  To my knowledge, there are no video cameras tiny enough for this purpose, and in any case the detonation and cycling of the gun would destroy it.  It would also present substantial danger to those present.

47.     I have been present at three inspections of numerous P320s, both the original and re-designed (a/k/a "upgraded") versions while representing clients or consulting other attorneys concerning at least 20 discharge incidents involving P320 guns.  The first inspection was in Belcamp, Maryland on December 7, 2018, and was attended by me, my expert Chuck Powell, Sig's lawyer Robert Kelly, Sig's expert Michael Knox, and personnel at the imaging facility. The second inspection, described in more detail below, took place in March 2021 at the North Star Imaging facility in Marlborough, Massachusetts. The third inspection was in January 2022, also at Marlborough, Massachusetts, and was attended by me, my expert Peter Villani, attorneys Daniel Ceisler and Robert Zimmerman (co-counsel with me on several P320 cases), Sig's expert Derek Watkins, Sig's lawyer Kristen Dennison, and a North Star employee.

48.     During these inspections, each P320 was put inside a large imaging machine that over the course of two hours took CT scan images of the gun.

49.     The March 2021 inspection at the North Star Imaging facility in Marlborough, Massachusetts took place pursuant to a joint inspection protocol agreed upon among counsel for Sig and counsel for plaintiffs and involved several exemplar guns and the guns in four pending cases: (1) *Guay v. Sig Sauer, Inc.*, 1:20-cv-00736-LM (D.N.H.) (pre-"upgrade" P320); (2) *Mayes v. Sig Sauer, Inc.*, 2020mc00105 (E.D. Pa.) (post-"upgrade" P320); (3) *Frankenberry v. SIG Sauer, Inc.*, 19-cv-02990 (D.S.C.) (pre-"upgrade" P320); and (4) the gun from the Frank J. Kneski incident (listed above) involving an un-commanded discharge (pre-"upgrade" P320).

50.     I attended the inspection in March 2021 at North Star Imaging along with my experts Peter Villani and Timothy M. Hicks, P.E. In attendance for SIG was their counsel B. Keith Gibson, Esq., Sean Toner from Sig, and their retained expert Derek Watkins.

51.     The guns were placed as shown in the photograph that appears on the next page from the North Star Imaging facility in Marlborough, Massachusetts for CT imaging:



52.     Contrary to the affidavit of Mr. Miller, those inspections, which included lengthy

and expensive computer tomography (CT) imaging of the P320s at issue, as well as up-close

photographs taken by Watkins, one of Sig's own experts, have all shown substantial

manufacturing defects in the form of excess material left on the surface areas of critical parts in

the P320 fire control unit; specifically, the sear face, striker foot face, and safety lock tab.

53.     This excess material, which Sig should have machined off to increase surface contact area (particularly between the sear face and striker foot face) to prevent un-commanded discharges, can be seen in the photographs shown below, which show high-resolution up-close photos taken in March 2021 by one of Sig's experts, Derek Watkins.

54.     As noted, I was personally present at the Marlborough imaging facility when the images shown below were taken by Mr. Watkins in March 2021.  Watkins brought with him a portable digital microscope that projected high-resolution close-up photographs of the internal parts of the P320 onto his Apple laptop in view of those present.

55.     Only Watkins controlled the digital microscope. I and my experts had to view the images that Watkins was capturing with his digital microscope as they were displayed on his laptop. My retained expert, Timothy M. Hicks, P.E., had to take cell phone photographs as the images were displayed to capture what was being seen using Mr. Watkins's digital microscope. The photos shown below were taken by my retained expert, Timothy M. Hicks, P.E., while Watkins displayed on his laptop the images taken using his digital microscope.

56.     The first photo (below) was taken by Hicks as Watkins displayed the image on his laptop using a digital microscope. The photograph therefore shows the image being displayed on Watkins's laptop. The photo shows a striker foot face with excess molding material present from one of the four guns that were examined in March 2021 at North Star in Marlborough (i.e., one of the guns from the *Guay*, *Mayes*, *Frankenberry*, or Kneski cases). An examination of Watkins's records of the images that he captured that day should allow identification of the particular gun being imaged. This photograph was provided to High Impact to make the Animation.

29



57.     The second photo (which appears on the next page) was also taken by Hicks as

Watkins displayed the image on his laptop using a digital microscope. This photograph also

shows the image being displayed on Watkins's laptop. The photo shows a striker foot face from

one of the four guns that were examined in March 2021 at North Star in Marlborough (i.e., one

of the guns from the *Guay*, *Mayes*, *Frankenberry*, or Kneski cases).  The photo of the striker foot

face on that gun shows excess material around its entire perimeter as can be seen below. This

photograph was also provided to High Impact to make the Animation.



58.     A third photo (below) taken by Watkins at the inspection in Marlborough in 2021, which he included in a later report in the *Mayes* case, and which shows a sear face with excess material around its perimeter is shown below:



59.     Upon seeing the excess material on these parts at the Marlborough inspection facility, and in particular the photo of the striker foot face shown in the second photo above, Watkins audibly gasped and dropped his head to his chest.  His inspection then stopped while he

left the room to confer with Sig representatives.

60.     Upon returning to the same facility nine months later, in January 2022, to inspect four additional P320s alleged to have discharged without trigger pulls, Watkins changed his inspection methodology and refrained from taking *any* up-close photographs of the surfaces of these internal parts, in an apparent attempt to avoid making a record of the obvious defects that his prior imaging had revealed.

61.     To make the Animation, I believe I sent High Impact the first two photographs shown above, and additional up-close photographs of P320 components (including the sear and striker foot), as well as CT scan images of an original pre-upgrade P320 from the *Schneider v. Sig Sauer, Inc.*, 1:20-cv-01190-LM (D.N.H.) case or the *Vadnais v. Sig* case.  It was quite some time ago.  The CT images were taken at North Star Imaging's facility in Minnesota on May 4, 2020for Schneider's Attorney Scott Reisch and his expert William Munsell.

62.     High Impact used those CT scan images to create the structure of the weapon for the Animation, and the photographs (including those taken by Watkins) to develop the depiction of the rollover condition and mechanism of failure in the Animation of the P320 over the course of approximately one year between July 2020 and August 2021.

63.     The result was an Animation that depicted a defective pre-"upgrade" P320 firing without a trigger pull and illustrated the mechanism of failure that was causing un-commanded discharges of defective P320s based on Sig's own statements and expert analysis, as well as many real world replications of the failure.

64.     The Animation depicts a pre-"upgrade" P320.  That is why lacks certain aspects of the "upgraded" P320, which Sig points out in its papers.  It is a different product with a similar design and name.  That said, the same mechanism of failure exists in both the pre-upgrade and post-upgrade gun.

65.　An un-commanded discharge cannot occur unless the safety apparatus in the pistol is defeated. The Animation was intended to show how it fails.

66.　Ultimately, it is Sig's and its subcontractor's poor manufacturing practices and Sig's lax quality control and failure to do any secondary machining on these parts that is causing it to malfunction.

67.　The title on the opening screen of the Animation reads: "*SIG Sauer P320 Striker-Fired Handgun, Mechanism of Failure.*"



68.　The Animation then displays "CT Data" to inform the viewer that the animation is based in part upon CT data.



69.     The Animation then depicts some of the key internal and external components of the P320 firearm.





70.     Starting at about 1:05, the Animation illustrates how the gun fires under normal conditions with a trigger pull.



71.     The Animation then shows the key internal components that are part of the

mechanism of failure depicted in the Animation.



















72.     Starting at 2:00, the Animation explains: "Normal operation requires trigger pull to discharge the firearm." The Animation then depicts normal operation with a trigger pull.



73.     Starting at about 2:20, the Animation starts the depiction of a "Defective

Discharge – No Trigger Pull." Again, this contrast between "normal operation" and "defective discharge" makes clear that the Animation is asserting that some P320s can and have discharged without a trigger pull, but not that all have.



Defective Discharge - No Trigger Pull

74.     The Animation then depicts what experts believe to be the mechanism of failure, meaning how the P320 discharges without a trigger pull.

75.     First, at 2:32 the Animation depicts an inset surface and rollover condition on the sear face, as seen in the photographs taken by Sig' expert and shown above. Those surfaces are highlighted in color in the Animation to show where they occur, with the rollover condition appearing in red and the inset surface appearing in blue.



76.    The Animation then shows the same condition on the face of the striker foot.



77.    The Animation then explains that "[s]udden or gradual vibration can make the

STRIKER FOOT walk off the SEAR," leading to an un-commanded discharge, which is what

Sig acknowledged could happen in its August 4, 2017 press release issued the same day I filed the *Sheperis* lawsuit.



78.     The Animation then states that "[t]he defective SIG P320 inadvertently discharges."



79.     The Animation explains that "[t]he manufacturing defect is known as ROLLOVER"; "[t]he rounded edges allow the STRIKER FOOT to slip off the SEAR." That phenomenon is depicted at 3:12 of the Animation.



80.     The Animation states at 3:20 that "[u]nder normal operation a trigger pull is required to discharge a firearm."



81.     The Animation then illustrates the existence of "[e]xcessive space between [the] STRIKER FOOT and STRIKER HOUSING."



82.     CT scan images in the Affidavit of Peter Villani show that the Animation depicted this condition, which results in the safety lock tab not tightly fitting against the striker body.

83.     The Animation also depicts "[e]xcessive space between the STRIKER FOOT and STRIKER HOUSING," which "allows the STRIKER PIN to rotate."



84.     Further, the Animation explains that "[t]he LOOSE FIT and ROLLOVER on the SAFETY LOCK and striker pin's SAFETY STOPPER contribute to the failure" because "[t]he safety slips, allowing the striker pin to pass and the SIG P320 inadvertently discharges."





85.     The Animation then briefly depicts the "striker safety edge" and "safety lock" in a

single image, but the Animation does not focus on the striker safety edge in any detail, nor does

it depict any manufacturing defects on the striker safety edge (though it can suffer from the same

rollover condition that the other components experience).



86.     The Animation then states again, as SIG has acknowledged, that "[s]udden impact or gradual vibration allows the striker foot to walk off the sear."



87. The Animation then illustrates at 4:44 that "[v]ertical play between the slide and frame further compromises the striker sear connection by raising the striker foot when the slide moves vertically."



88. The Animation ends by displaying Sig's August 4, 2017 press release, which expressly states that vibration can make the P320's internal safety fail, exactly as depicted in the Animation. If Sig contends that this press release was inaccurate, it could have issued a clarification years ago. It never did.



89.     The Animation shows that the SIG P320 is capable of firing without a trigger pull and depicts the mechanism of failure that can cause the P320 to fire without a trigger pull.

90.     The Animation was not intended to be an exact drawing to scale or a blueprint of the gun.  It was intended to be a demonstrative exhibit to be used at trial to show how the manufacturing defects can affect the performance of the safety mechanisms.

91.     After the Animation was completed, in August 2021, I uploaded it to YouTube and my firm's website because I believed I have an obligation to warn the public about the danger that this weapon poses.  Despite the cases I had brought, and other lawyers had brought regarding the P320 malfunctioning catastrophically, Sig and its agents continued to deny the safety risk, and/or outright accuse the victims around the country of either lying or being totally incompetent.

92.     This was the reason why I posted the High Impact animation on YouTube and my firm's website:  to alert the public to a life-threatening safety issue with a product that can be

deadly if it malfunctions. I viewed it as serving the public interest and saving lives and preventing severe injuries to law enforcement and civilians including, potentially, children. The SEPTA discharge in Philadelphia, for example, could have easily struck any number of innocent people, young or old, in that subway station. It narrowly missed a female bystander. The postings did not seek new business, nor did they result in new business. I already had more P320 cases than I could handle and was forced to refer many out to other firms. The sheer volume required me to form work partnerships with many lawyers and law firms around the country.

93.    As shown in Sig's moving papers, the YouTube channel where I posted the Animation had no advertising or promotional aspects. It simply noted that I owned the copyright to the Animation and included the URL, but not a link, to my firm's website.

94.    Also shown in Sig's moving papers is that the P320 page on my firm's website where I posted the Animation had no advertising or promotional aspects to it. The page simply had the Animation on it with the following message on the bottom: "Thanks to High Impact in Colorado for developing this animation based on CT scan images and microscopic photography." There was no information on that page about my practice or my legal services.

95.    Despite years of courteous relations between Sig's counsel and my office in many P320 cases, Sig's lawyers in this case never conveyed any concerns about the Animation. They never emailed or called to protest it. No letter was ever sent warning of litigation, as is almost invariably the case before civil litigation is filed. The first I heard about this lawsuit was when Sig sued me on March 2, 2022—the same day that the *Guay* case was set for trial in July 2022. By that time the Animation had already been posted for at least six months and Sig had said nothing.

96.    The Animation clearly depicts the original version of the P320.

97.     The original and re-designed P320s are two different products, a fact which SIG constantly proclaims.  Neither I nor High Impact had an obligation to incur the expense of creating animations of both versions of the P320.

98.     Approximately 400,000-500,000 original versions of the P320 are in circulation today.  Any owner of a P320 viewing the animation would know it is the original P320 because of its external appearance, i.e., the heavy or fat trigger that is on the original model but not the re-designed model.

99.     The clear difference between the two, based on this feature alone, can be seen here:





The new trigger is 35% lighter, according to the company.

100. In addition, the serial number of the P320 shown in the animation further confirms that it is an original version. This can be confirmed simply by entering the serial number on Sig's website.

101. Finally, the sear in the animation is not double-notched, which further confirms that it is of an original P320.

102. Sig simply ignores these facts and acts as though it was misleading to do an animation of the original P320 which, as noted, is in possession of hundreds of thousands of people in the United States and has never been recalled.

103.    For example, the following close-up images taken from the November 15, 2021 expert report of Timothy M. Hicks, P.E. in the *Jinn* case show excess metal on the sear and striker faces of a post-"upgrade" P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.



*Figure 4 - Close ups of sear step (left), and striker foot (right)*

104.    Sig's complaints that the Animation "inaccurately" shows excess material on the sear and striker foot surfaces are absurd.

105.    The (i) Watkins photographs, *supra;* (ii) additional photos obtained during other inspections of P320s claimed to have discharged on their own; and (iii) the zoomed-out photos in Sig's experts *own Affidavit in this case*, *all* show substantial surface irregularities that serve to dangerously reduce surface contact between the spring-charged striker foot and sear face connection:



Image 1, Perez[5] P320, Tampa, Florida. My expert Peter Villani took this photograph in connection with his examination of the gun involved in the Bevan/Hulett incident described in Paragraph 36 above. A criminal prosecution was brought against Mr. Bevan and Mr. Villani was retained as an expert by defense counsel. Mr. Villani took this photograph of the gun involved in that incident and included it in his report. As explained above, the homicide charges were dismissed.

---

[5]       Perez is the name of the Tampa police officer who owned the P320 involved in this incident.



Image 2, Miller photograph from Affidavit. Clear excess material on right, lower and outer edges. White lines appear to have been superimposed on the image to disguise the defect.



Image 3, close-up of photo of Watkins digital microscope image from Marlborough, MA inspection site, discussed above.



Image 4, Miller photograph from Affidavit, page 10. Excess material ignored by Miller and pointed out with solid red arrow. Protruding material is also clearly visible on right side of sear face.



Image 5. This is a photograph taken during the Marlborough inspection in March 2021 that Timothy M. Hicks, P.E. used in his report in the *Mayes* case. This photo shows protruding excess material clearly visible on the lower horizontal edge and left and upper edges.

106. These photographs, individually and together, demonstrate beyond any question that the Animation displays, even if not perfectly, the excess material on the surface faces of the critical safety connection between the striker foot and sear.

107. Moreover, computer tomography images of P320s taken at the Marlborough facility also show that the Animation displays that the striker foot rests slightly above the sear face, again contrary to what Sig's expert claims on page 14 of his Affidavit, as shown in this image of the gun from the *Frankenberry* case as well as others:



108.     While conceding that "some of the Animation dimensions were similar to the dimensions of the actual P320 components," Sig complains that others were not perfectly accurate and then concludes (with no apparent basis) that the images in the *animation* must have been "manipulated." Miller Aff., p. 15. Here, again, Sig is mixing apples and oranges. The animation is *based on* actual images of the P320; the *animation frames themselves*, however, are *not actual images of the P320*. They are *renderings* of those images, which required High Impact to approximate, as closely as possible, the actual gun. Sig's complaint, in short, is that the Animation could be more accurate, or should replicate the actual gun to a degree of perfect replication, but that is not the purpose of an *animation*.

109.     On the subject of manipulation of images, as noted, it appears that it is Sig's expert who manipulated and/or altered a photograph of an actual P320's striker foot on page 13 of his Affidavit. The three white lines placed over the right edge of the sear, which clearly bears the same signs of excess material as all the other actual photographs, give every indication of having been superimposed there to disguise the defect. Similarly, the sear "surface" photo on

page 10 bears a black outline that suggests the image may have been sharpened using graphic editing software like Adobe Photoshop, and the striker safety photo on page 21, also appears to have been manipulated or altered to make the parts look better than they do in reality (see next page):







110.    Mr. Miller complains further that High Impact's Animation of a defective original

P320 does not contain a mechanical disconnector.  Aff., p. 24.  The latter device, however, is

only present on the re-designed "post-upgrade" version of the P320. This complaint is therefore irrelevant because the Animation does not depict a re-designed "post-upgrade" P320. Further, the Animation admittedly does not contain every single part contained in the P320, nor does Sig's own YouTube animation of the P320.[6] That was never the purpose of the Animation.

110. Sig's claim that the Animation's depiction of the striker foot walking off the sear as "physically impossible" is contradicted both by the enormous number of real-life examples of such discharges without a trigger pull and the expert affidavits submitted on my behalf. Using Miller's affidavit before the New Hampshire court, SIG was attempting to pre-try the Guay case before that court in advance of the jury trial in July 2022.

111. The Animation, in short, portrays the function of an original P320 and how inertial impacts to the weapon can cause a catastrophic failure of the product. SIG itself has stated that mere "vibration" can make the gun fail. In view of that fact, Sig's ongoing claim that it is "physically impossible" for the P320 to fail in the manner depicted in the Animation is not credible.

## HARM TO MY PRACTICE

112. I believe this lawsuit was designed to slander, silence, intimidate and burden me with substantial legal fees and costs to interfere with my nationwide advocacy on behalf of victims of the P320 and with my trial preparation in the *Guay* matter. It was designed to destroy my reputation and legal practice in retaliation for bringing the first P320 case and daring to bring others since then. It is, further, retaliation for having one of my wounded clients appear on Good Moring America and Nightline in August 2021 which allowed a large part of the country to hear about this serious problem.

---

[6] *See https://www.youtube.com/watch?v=8jg3p9HXHXg*

113.    SIG's press release in March 2022 stating that this lawsuit is intended "to ensure that [I am] not allowed to continue deceiving the public about the safety of the P320" is false.[7]  It is also absurd given how many federal and state law enforcement agents and civilians all over the country have been injured by this gun:

> SIG SAUER believes that these misrepresentations are willful in nature and is taking action, with the filing of this complaint, to ensure that **Mr. Bagnell is not allowed to continue deceiving the public about the safety of the P320 and use such deceptions in an attempt to generate business for his legal practice.** SIG SAUER is confident that it will prevail on the merits of this case.

(emphasis added).

114.    Sig's press release accuses me of intentional dishonesty regarding the P320, despite settling two cases with my office and a class action suit alleging that the P320 can fire out of battery.  No legal privilege attaches to this malicious statement.  The release, further, was re-published by several other gun media and business news outlets, and the comments to these articles variously accuse me of "altering" evidence, calling for my disbarment, and "misrepresenting" evidence.  Sig has therefore defamed me in my trade and business, i.e., the law, and accused me nationally of conduct irreconcilable with it:  lying to the public, and by extension the Court, about the well-known safety problems with the P320.  It has acted with malice though I am not required to show malice as a private figure.  Nor am I required to show aeconomic damages though I have incurred them.

---

[7] SIG's March 3, 2022 Press Release is available at https://www.thetruthaboutguns.com/sig-sauer-sues-attorney-jeffrey-bagnell-for-allegedly-false-and-defamatory-statements-about-the-p320s-safety/ and https://www.thefirearmblog.com/blog/2022/03/08/sig-sauer-lawsuit-p320/.

115. Sig's allegations of deception against me are indeed interesting given that its CEO, Ron J. Cohen, plead guilty in 2019 in Germany to charges of knowingly violating that country's export control laws regarding shipment of firearms, making false statements, and falsifying documents under oath. https://www.npr.org/2019/02/25/696690043/ceo-of-u-s-gun-maker-faces-jail-in-germany  In that case, which involved the shipment of 40,000 Sig firearms from Germany to the USA and then to Colombia, Cohen was alleged to have "covered up the shipment's final destination by submitting false paperwork, known as end-use certificates, to German export officials, stating that the weapons were bound solely for the United States." Upon information and belief, it is this individual who authorized the lawsuit accusing me of dishonesty.

116. I have told the truth about the P320.  I have not deceived anyone or submitted any false paperwork, as Sig's CEO did.  I have received countless thanks from federal and state law enforcement agents who no longer carry the P320 or who now carry it unchambered, as does the weapon's own designer.  I have informed the law enforcement community and public of what I perceive in good faith to be a serious and life-threatening safety problem, which just last month nearly took the life of a Milwaukee, Wisconsin police officer.

117. I have seen first-hand the horrible injuries inflicted on clients and others by this weapon and had to calm one officer in post-operative agony whose leg stood to be amputated.  I have no doubt my advocacy on behalf of victims of the P320 over the last six years has saved lives and prevented severe injuries. It is Sig that is seeking to deceive the public at the cost of peoples' safety to make money.  And to preserve their contract with the Department of Defense worth over $500 million and sales of the P320 to law enforcement agencies around the country. If the product at issue were a Boeing airplane and had this many catastrophic failures, it would have been taken out of service years ago.

118.    Its level of malice is also shown by its selective targeting of my practice for this lawsuit while declining to engage a major Philadelphia firm, Saltz Mongeluzzi & Bendesky with the resources to fight back on equal terms over the exact same issues.

119.    If the injunction that SIG requests is entered, it will interfere with my ability to respond to SIG's false and defamatory press release about me and it will ensure that fewer people are informed about the defects in the P320, and that more people are therefore injured or killed.

120.    Sig knew that this lawsuit would divert my attention and energy from litigating those cases to defend against this lawsuit. It was also undoubtedly intended to cause me to have to testify in my own defense and to reveal attorney work product, including mental impressions, that could not be discovered by Sig in the *Guay* case or any of other cases that I am currently handling against SIG.

## COUNT ONE

## DEFAMATION/LIBEL PER SE

## (Against plaintiff Sig Sauer, Inc.)

121.    Defendants incorporate by reference paragraphs 1 through 125.

122.    Sig's statements in its March 2022 press release were false.

123.    Sig made these statements willfully and/or recklessly.

124.    Sig's defamatory statements were published or communicated to third parties around the country.

125.    Sig's defamatory statements identified the individual Bagnell party by name.

126.    The defamatory statements allege improper conduct and lack of integrity in his profession thereby constituting defamation *per se*.

## COUNT TWO

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

### (Against plaintiff Sig Sauer, Inc.)

127.    Paragraphs 1 through 120 are incorporated by reference.

128.    By reason of the foregoing acts, defendant Sig Sauer is liable to defendants for engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Conn. Gen. Stat. § 42-110b.

129.    Plaintiff's violation of CUTPA has been the direct and proximate cause of substantial economic and non-economic damages to defendants, including legal fees, costs, harm to reputation, anxiety, sleeplessness, and other emotional distress.

## COUNT THREE

## INTERFERENCE WITH CONTRACT

### (Against Plaintiff Sig Sauer, Inc.)

130.    Paragraphs 1 through 129 are incorporated by reference.

131.    The Bagnell parties have valid retainer agreements in place with numerous victims of the P320 around the country.  These include with the following individuals:  Kyle Guay, Jimmy S.C. Jinn, Howard Northrup, Brittany I. Hilton, Keith Slatowski, Tyler Herman, Stephen Mayes, Thomas Ahern, among others.

132.    Sig knows of all these contractual relations through correspondence and/or litigation against it.

133.    Sig has intentionally tried to interfere with the performance of these contracts by burdening Bagnell with this litigation, which attempts to destroy his reputation and punish him with exorbitant legal fees and costs, by falsely accusing him of deceiving the public about the

P320.

134.     Sig's actions have been the direct and proximate cause of economic and non-economic injury to the Bagnell parties.

### COUNT FOUR

### AIDING AND ABETTING

(Against counter-defendant Ron J. Cohen)

135.     Paragraphs 1 through 134 are incorporated by reference.

136.     Counter-defendant Cohen knowingly conspired with, assisted, aided and abetted counter-defendant Sig Sauer, Inc. in inflicting illegal harm upon the Bagnell parties, damaging their reputations, interfering with their representation of wounded clientS, and violating the Connecticut Unfair Trade Practices Act and defaming the Bagnell parties.

137.     Cohen's illegal conduct has been the direct and proximate cause of substantial economic and non-economic damages to defendants, including legal fees, costs, harm to reputation, anxiety, sleeplessness, and other emotional distress.

## **PRAYER FOR RELIEF**

Wherefore, the Bagnell parties request the following relief:

1.      Compensatory and punitive money damages in an amount not less than $25

million for malicious defamation, intentional interference with the *Guay v. Sig* trial, and

violation of the Connecticut Unfair Trade Practices Act;

2.      Costs and attorneys' fees;

3.      That Sig be ordered to issue an unambiguous, public safety warning about the

P320's capacity to fire without a trigger pull;

4.      That Sig issue a retraction - - in as public a manner as its March 2022 press
release was issued - - of its claim that the Bagnell parties have deceived the public regarding the
P320 or any other matter; and

5.      Any other relief the Court deems appropriate.

Respectfully submitted,

JEFFREY S. BAGNELL, ESQ., LLC, and
JEFFREY S. BAGNELL,


*/s/ Jeffrey S. Bagnell*
Jeffrey S. Bagnell
Federal Bar No. CT18983
55 Post Road West
Suite 200
Westport, Connecticut 06880
(203) 984 8820
jeff@bagnell-law.com


Dated: October 27, 2022

## **CERTIFICATE OF SERVICE**

      I, JEFFREY S. BAGNELL, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                  */s/ Jeffrey S. Bagnell*
                                  Jeffrey S. Bagnell

Dated:   October 27, 2022