UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


```
- - - - - - - - - - - - - - - x
                              :
SIG SAUER, INC.,              :  No. 3:22CV885(JAM)
                              :
             Plaintiff        :
                              :
         v.                   :
                              :
JEFFREY S. BAGNELL, ESQ., LLC, :
and JEFFREY S. BAGNELL,       :
                              :  New Haven, Connecticut
             Defendants       :  February 21, 2024
                              :
- - - - - - - - - - - - - - - x
```


HEARING ON MOTION FOR PERMANENT INJUNCTION

VOLUME I


B E F O R E:


THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

```
1    A P P E A R A N C E S:

2
          FOR SIG SAUER, INC.:
3
                  FOLEY HOAG LLP
4                       255 Seaport Blvd.
                        Boston, Massachusetts 02210-2600
5                 BY:  ANTHONY MIRENDA, ESQ.
                        E. JACQUELINE CHAVEZ, ESQ.
6
                  McELROY DEUTSCH MULVANEY & CARPENTER LLP
7                       30 Jelliff Lane
                        Southport, Connecticut 06890-1436
8                 BY:  JAMES ROSS SMART, ESQ.

9
          FOR JEFFREY S. BAGNELL, ESQ., LLC, AND
10        JEFFREY S. BAGNELL:

11                JEFFREY S. BAGNELL, ESQ., LLC
                        55 Post Road West, Suite 200
12                      Westport, Connecticut 06880
                  BY:  JEFFREY S. BAGNELL, ESQ.
13
                  ATTORNEY JOHN W. MADIGAN III, PLLP
14                      30 Old King's Highway South, Suite 215
                        Darien, Connecticut 06820
15                BY:  JOHN W. MADIGAN III, ESQ.

16

17

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3    PLAINTIFF'S
     WITNESS                DIRECT    CROSS    REDIRECT    RECROSS
4
     NICK MAGUIRE
5      (Exhibit 133 played)    7

6    JEFFREY BAGNELL
       (Exhibit 134 played)   13
7
     SEAN TONER
8      By Mr. Mirenda          17
       By Mr. Bagnell                  97
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **10:04 A.M.**

2              THE COURT:  We're here today for a hearing on

3    injunction in the matter of SIG Sauer v. Bagnell.

4              Appearance of counsel for plaintiff.

5              MR. MIRENDA:  Good morning, Your Honor.  Anthony

6    Mirenda from Foley Hoag for plaintiff SIG Sauer.

7              THE COURT:  Good morning.

8              MS. CHAVEZ:  Good morning.  Jackie Chavez from

9    Foley Hoag for SIG.

10             THE COURT:  Good morning.

11             MR. SMART:  Good morning, Your Honor.  James

12   Smart for SIG Sauer.

13             THE COURT:  Good morning to you as well.

14             And for Mr. Bagnell.

15             MR. MADIGAN:  Attorney John Madigan for Bagnell

16   and Bagnell LLC, Your Honor.

17             MR. BAGNELL:  Your Honor, Jeff Bagnell for the

18   same defendants.

19             THE COURT:  And good morning to you.

20             It looks like we're all set to start hearing

21   evidence on the injunction hearing.  Is there anything we

22   need to take up before we hear from the first witness?

23             MR. MIRENDA:  Not from SIG Sauer, Your Honor.

24             MR. MADIGAN:  Not from the defendant either.

25             THE COURT:  Would you like to call your first

1    witness?

2              MR. MIRENDA:  Yes, Your Honor.

3              We are going to be presenting four witnesses

4    today.  The first witness will be Mr. Nick Maguire from

5    High Impact which is the firm that created the animation.

6    He's appearing via deposition.  They're based in Colorado,

7    I believe he resides in Florida.  So we would play his

8    Rule 30(b)(6) deposition as the first witness.

9              THE COURT:  And how long will it be?

10             MR. MIRENDA:  It's about one hour video time.

11   And there are a number of exhibits, including the very

12   first exhibit would be the animation, which we'll play.

13             THE COURT:  Sure.  That's fine.

14             Mr. Bagnell, I saw you about to get up.  Did you

15   have something you wanted to add?

16             MR. BAGNELL:  Yes, Your Honor.  My understanding

17   is that was not a 30(b)(6) deposition but a third-party

18   deposition, to the extend it matters.  When I heard

19   30(b)(6), High Impact is not a party, so -- I could be

20   wrong on that.

21             THE COURT:  Do you know?  Well, does it make a

22   difference?

23             MR. MIRENDA:  I don't believe it makes a

24   difference.  It was noticed as a Rule 30(b)(6) deposition

25   of High Impact.

```
 1              THE COURT:  Sounds good.
 2              Oh, I should have mentioned as well on
 3   scheduling, first of all, my apologies for the last-minute
 4   stuff.  I'm undergoing cancer treatment right now.  Some
 5   of it is time sensitive.  I feel fine today, I'm glad to
 6   say.  I'll be wearing a mask for part of the proceedings
 7   today.  It's just that when the doctors tell me I need to
 8   show up on a particular date for something, I have to do
 9   that.  There is a higher authority than me.
10              MR. MIRENDA:  Certainly understandable,
11   Your Honor.
12              MR. BAGNELL:  Understand, Your Honor.
13              THE COURT:  My apologies.  I know we've gone
14   back and forth.  It looks like Friday I won't be here
15   again because of a doctor issue.  I think we've
16   rescheduled a third day for next Tuesday.  So if there's
17   some other change, obviously I'll let you know right away
18   if something happens on the medical front.
19              Let's hear from our first witness, if you'd like
20   to proceed.
21              MR. MIRENDA:  All right, Your Honor.  I would
22   call Nick Maguire as 30(b)(6) representative designee of
23   High Impact.
24              THE COURT:  Okay.
25              MR. MIRENDA:  Your Honor, Mr. Gibson is here on
```

1    the side running the technology.  So if there's any

2    questions of that, we can rely on him.

3              THE COURT:  Great.  Thank you.

4                   (Plaintiff's Exhibit 133 played.)

5              MR. MIRENDA:  Your Honor, at this point I'd like

6    to pause the deposition video and play the entirety of

7    Exhibit 1, which is the animation.  I'd offer it in

8    evidence as well.  It's a 5 minute and I believe 19 second

9    animation, so that's the run time.

10             THE COURT:  Okay.  Absent an objection,

11   Exhibit 1, full exhibit.

12             MR. BAGNELL:  No objection.

13                   (Plaintiff's Exhibit 1 admitted in

14                    evidence.)

15                   (Plaintiff's Exhibit 1 played.)

16             MR. MIRENDA:  Thank you, Your Honor.  That was

17   the entirety of Exhibit 1.  We'll obviously be coming back

18   to that a fair bit during the course of the day with the

19   various witnesses.

20             Now we can pick back up with Mr. Maguire's

21   testimony.

22             THE COURT:  Sounds good.

23                   (Plaintiff's Exhibit 133 played.)

24             MR. MIRENDA:  A moment of housekeeping,

25   Your Honor.  At this point I'd like to offer Exhibits 102

1   and 103, which were the two file trees.

2             THE COURT:  Any objection?

3             MR. BAGNELL:  No objection.

4             THE COURT:  Full exhibits.

5                  (Plaintiff's Exhibits 102 and 103 admitted

6                  in evidence.)

7             MR. MIRENDA:  I offer Exhibits 2, 3, and 4,

8   which were the three CT scan X, Y, and Z slices.

9             MR. BAGNELL:  No objection.

10            THE COURT:  Full exhibits.

11                 (Plaintiff's Exhibits 2, 3, and 4 admitted

12                 in evidence.)

13            MR. MIRENDA:  And I'd like to offer Exhibits 5,

14  6, 7, 8, 10, 11, 12, and 13, which were each of the

15  animation videos and the excerpted stills.

16            THE COURT:  Okay.  Any objection?

17            MR. BAGNELL:  No objection.

18            THE COURT:  Full exhibits.

19                 (Plaintiff's Exhibits 5, 6, 7, 8, 10, 11,

20                 12, and 13 admitted in evidence.)

21            MR. MIRENDA:  Thank you, Your Honor.

22            Now we can resume.

23                 (Plaintiff's Exhibit 133 played.)

24            MR. MIRENDA:  If we could just pause right

25  there.

 1              Again, Your Honor, for housekeeping, I'd like to

 2     offer Exhibits 17, 18, 19, which are emails that the

 3     witness described, and Exhibits 9, 14, and 15, which are

 4     the images in evidence here.

 5              THE COURT:  Any objection?

 6              MR. BAGNELL:  No objection, Your Honor.

 7              THE COURT:  Full exhibits.

 8                   (Plaintiff's Exhibits 9, 14, 15, 17, 18,

 9                    and 19 admitted in evidence.)

10              MR. MIRENDA:  Thank you, Your Honor.

11              We can continue.

12                   (Plaintiff's Exhibit 133 played.)

13              MR. MIRENDA:  Your Honor, I'd like to offer

14     Exhibits 22 and 23, which were those last two emails.

15              THE COURT:  Any objection?

16              MR. BAGNELL:  No objection.

17              THE COURT:  Full exhibits.

18                   (Plaintiff's Exhibits 22 and 23 admitted in

19                    evidence.)

20              MR. MIRENDA:  Thank you, Your Honor.

21              This concludes the deposition testimony of

22     Mr. Maguire.

23              THE COURT:  All right.

24              MR. BAGNELL:  If I could be heard, Your Honor.

25              THE COURT:  Mr. Bagnell.

```
 1            MR. BAGNELL:  Just for the sake of a complete
 2    record, Your Honor, I'd like to ask that Mr. Mirenda offer
 3    the full Maguire transcript into the record pursuant to
 4    Rule 32(a)(6), if I have that correct, including my
 5    examination.
 6            THE COURT:  Okay.  Do you have an objection to
 7    that?
 8            MR. MIRENDA:  Mr. Bagnell's examination, at
 9    least the bulk of it, is not relevant to the proceeding
10    today, Your Honor.  It's not discussing the animation;
11    it's discussing other things.  I wouldn't offer it.  It's
12    not relevant to the Lanham Act case we have here.
13            THE COURT:  So you're not offering it.
14            I guess, Mr. Bagnell, when you present your
15    case, you can renew the offer if you'd like.
16            MR. BAGNELL:  Okay, Your Honor.
17            THE COURT:  And I'll take it up then.
18            MR. BAGNELL:  Thank you, Your Honor.
19            MR. MIRENDA:  Thank you, Your Honor.
20            THE COURT:  Anything else here before our next
21    witness?
22            MR. MIRENDA:  No, Your Honor.  That would
23    conclude High Impact's testimony.
24            THE COURT:  We've gone, I guess, about an hour
25    and a half.  Is now a good time for a brief recess?
```

```
 1              MR. BAGNELL:  Yes, Your Honor, I think so.

 2              MR. MIRENDA:  Yes, Your Honor.

 3              THE COURT:  Why don't we take a 15-minute

 4    recess.

 5              I'm not sure in terms of schedule for today.  Do

 6    you have a preference in terms of how you'd like to do

 7    this?

 8              MR. MIRENDA:  Your Honor, the next witness that

 9    we would present is another set of deposition excerpts.

10    It's actually from Mr. Bagnell's deposition, so it's

11    offered as party admissions.  That, again, is about an

12    hour of testimony.  And so I think we take the break now,

13    then we'd have that maybe fit in, and then there would be

14    a time for another break.  Then I would turn to the

15    witnesses that we have in person with Sean Toner as the

16    next witness.

17              THE COURT:  Why don't we take a 15-minute break,

18    then.  Then we'll have the next segment.  At that point

19    we'll probably take a 30-minute break for folks to get

20    lunch, and then we can resume.  Does that make sense?

21              MR. BAGNELL:  Yes.

22              MR. MIRENDA:  Certainly, Your Honor.

23              THE COURT:  See you in fifteen.

24              (Whereupon, a recess followed.)

25              THE COURT:  Please be seated.
```

 1          Shall we start with our next witness and/or

 2   exhibits?

 3          MR. MIRENDA:  Yes.  Thank you, Your Honor.

 4          One housekeeping detail.  During the break we

 5   discussed actually submitting the electronic file of the

 6   Maguire deposition video that was played as an exhibit.

 7   So we've marked it as Plaintiff's Exhibit 133 and offer

 8   that.

 9          THE COURT:  Any objection?

10          MR. BAGNELL:  No objection.

11          THE COURT:  Full exhibit.

12               (Plaintiff's Exhibit 133 admitted in

13                evidence.)

14          THE COURT:  Please proceed.

15          MS. CHAVEZ:  Your Honor, we'll now be playing

16   another video.  This will be segments from the deposition

17   of Mr. Jeffrey Bagnell both in his personal capacity and

18   as corporate representative in the 30(b)(6) deposition of

19   Jeffrey Bagnell, Esq., LLC.  The designations for this

20   deposition were attached as Exhibit C to plaintiff's

21   memorandum of law in support of permanent injunction.

22          THE COURT:  All right.

23          MS. CHAVEZ:  The first segment we'll be hearing

24   about Mr. Bagnell's background, the Bagnell website, and

25   the public's interactions with the animation.

```
 1              THE COURT:  Okay.
 2                   (Plaintiff's Exhibit 134 played.)
 3              MS. CHAVEZ:  Your Honor, at this point we'd like
 4   to introduce Exhibits 29, 59, and 60, which were those
 5   images of the Bagnell website.
 6              THE COURT:  Any objection to those three
 7   exhibits?
 8              MR. BAGNELL:  Just so I understand, Your Honor,
 9   those are images that have been just shown?
10              MS. CHAVEZ:  Yes.
11              MR. BAGNELL:  No objection.
12              THE COURT:  Full exhibits.
13                   (Plaintiff's Exhibits 29, 59, and 60
14                    admitted in evidence.)
15                   (Plaintiff's Exhibit 134 played.)
16              MS. CHAVEZ:  Your Honor, I'd like to introduce
17   Exhibits 30, 31, 32, and 33, those YouTube comments that
18   we viewed.
19              THE COURT:  I'm sorry, 30 --
20              MS. CHAVEZ:  -- 31, 32, and 33.
21              THE COURT:  Any objection?
22              MR. BAGNELL:  No objection.
23              THE COURT:  Full exhibits.
24                   (Plaintiff's Exhibits 30, 31, 32, and 33
25                    admitted in evidence.)
```

1          MS. CHAVEZ:  In this next section of the video

2     we're going to be hearing about a photo of a P320

3     component that Mr. Bagnell shared with High Impact.

4          THE COURT:  Okay.

5               (Plaintiff's Exhibit 134 played.)

6          MS. CHAVEZ:  Your Honor, I'd like to introduce

7     Exhibit 39, which is that image of the Mayes striker foot.

8          MR. BAGNELL:  No objection.

9          THE COURT:  Okay.  Full exhibit.

10               (Plaintiff's Exhibit 39 admitted in

11                evidence.)

12          MS. CHAVEZ:  In the final segment of the video

13     we'll be hearing a bit more about the data on the number

14     of times the animation was viewed on YouTube and on the

15     Bagnell website as well as some information on the Bagnell

16     website relating to a P320 case.

17          THE COURT:  Just to be clear, Exhibit 39 is just

18     that photograph?

19          MS. CHAVEZ:  Correct.

20          THE COURT:  But you're not introducing

21     Exhibit 38, which is the supplemental affidavit?

22          MS. CHAVEZ:  Correct.

23          THE COURT:  Okay.

24               (Plaintiff's Exhibit 134 played.)

25          MS. CHAVEZ:  Your Honor, at this point I'd like

1    to introduce Exhibits 50, 51, and 52.

2              THE COURT:  Any objection?

3              MR. BAGNELL:  Are these what's already been

4    shown?

5              MS. CHAVEZ:  Yes.

6              MR. BAGNELL:  No objection.

7              THE COURT:  Full exhibits.

8                   (Plaintiff's Exhibits 50, 51, and 52

9                    admitted in evidence.)

10             MS. CHAVEZ:  We'd also like to introduce

11   Exhibit 134, which is the video we just played for the

12   Court.

13             THE COURT:  That number one more time, I'm

14   sorry?

15             MS. CHAVEZ:  134.

16             THE COURT:  Any objection to the video?

17             MR. BAGNELL:  No objection.

18             THE COURT:  Okay.

19                   (Plaintiff's Exhibit 134 admitted in

20                    evidence.)

21             MS. CHAVEZ:  Thank you.  This concludes

22   Mr. Bagnell's testimony.

23             THE COURT:  All right.

24             So I think then at this point we'll take our

25   30-minute -- is 30 minutes enough for folks to grab a

1    sandwich, bag of chips, whatever, to make it through the

2    afternoon?

3            MR. BAGNELL:  Yes, Your Honor.

4            MR. MIRENDA:  Whatever is comfortable for the

5    team there, Your Honor.

6            THE COURT:  So we'll take a 30-minute break.

7    Let's resume at 1:30, if that's okay.  See you here at

8    1:30.  Thank you.

9                (Whereupon, a recess followed.)

10            THE COURT:  Would plaintiff like to call the

11   next witness?

12            MR. MIRENDA:  Good afternoon, Your Honor.

13            We call Mr. Sean Toner.

14            THE COURT:  Come on up, Mr. Toner.

15            MR. MIRENDA:  Your Honor, would you prefer I

16   stay here?

17            THE COURT:  If you don't mind, that would be --

18   actually, come on up to the lectern.  You'll have a better

19   view of your witness.

20            Mr. Toner, welcome, sir.  If you don't mind

21   remain standing for the oath.

22            THE CLERK:  Please raise your right hand.

23

24

25

```
 1                       SEAN TONER,
 2           called as a witness, having been first duly
 3           sworn, was examined and testified as follows:
 4
 5              THE CLERK:  Please state your name and spell
 6    your last name.
 7              THE WITNESS:  Sean Toner, T-O-N-E-R.
 8              THE CLERK:  Give us your city and state of
 9    employment.
10              THE WITNESS:  Exeter, New Hampshire.
11              THE COURT:  Please be seated, sir.
12              Please proceed.
13
14                     DIRECT EXAMINATION
15    BY MR. MIRENDA:
16    Q.   Good afternoon, Mr. Toner.
17    A.   Good afternoon.
18    Q.   Where do you work?
19    A.   At SIG Sauer.
20    Q.   What is SIG Sauer?
21    A.   SIG Sauer is a firearms manufacturer.  We supply
22    firearms to a variety of industries, including law
23    enforcement, the civilian market, and the military.
24    Q.   And what kinds of firearms does SIG Sauer supply to
25    those various markets?
```

1  A.   We have a pretty broad product line.  We have a very

2  broad pistol product line as well as rifles.  We also go

3  into other accessories such as optics.  We have

4  ammunition.  We have a pretty broad range of products.

5  Q.   In terms of the military market, what kinds of

6  products does SIG supply to the U.S. military?

7  A.   For the U.S. military, we were awarded the MHS

8  contract which is the M17 and M18 pistols.  We're also

9  involved with the new rifle contract that we're working

10  on.

11  Q.   And you mentioned pistols, SIG's product line

12  regarding pistols.  Could you describe that product line

13  or product lines?

14  A.   So there's several models that we produce.

15  Originally, back in the '80s and '90s, we were producing

16  what we call the classic line which is our 226 and 229

17  products, primarily.  Now we've moved into the more modern

18  pistols which is our striker line which would be primarily

19  the P320 and the P365.

20  Q.   How long has SIG been providing quality firearms to

21  the various markets that you've been describing?

22  A.   SIG started in the 1800s doing non-firearms work, but

23  they've evolved over the years.  They've been providing

24  firearms for probably about a hundred years at this point.

25  Q.   And how long have you been working at SIG Sauer?

1    A.    I started in SIG in November of 2012.

2    Q.    Where are SIG's operations located?

3    A.    We have a pretty -- a lot of different locations.   In

4    New Hampshire, we have the headquarters, which is in

5    Newington, New Hampshire.   We have an R and D facility,

6    which is where I work, which is in Exeter.   We have

7    training facilities in Epping as well as Florida.   We have

8    ammunition in Arkansas, electrooptics in Oregon, and

9    various other locations in New Hampshire as well that

10   support the effort.

11   Q.    Okay.   Let's focus in on what you do at SIG.

12         First of all, can you describe your career at SIG,

13   the various positions you've held and the responsibilities

14   that you had in those various roles?

15   A.    Yes.

16         When I first started in 2012, I was a senior design

17   engineer.   So I was part of a team that was developing

18   pistol products, primarily.   That lasted for approximately

19   four years or so.

20         And then I evolved or promoted into a team lead

21   position.   And we were working -- or I was working on the

22   Suppressor product line at that time for about a year.

23         And then in spring of 2017 I became the 320 product

24   family team lead.

25   Q.    First you said you were a senior design engineer.

1    What does a senior design engineer do at SIG?

2    A.    So a senior level engineer typically will work on

3    concepts of new products, assist other engineers or

4    drafters in doing their work or checking their work.

5    We'll do analysis.  We'll get involved in testing and

6    things of that nature.

7    Q.    Are you an engineer by training?

8    A.    Yes.

9    Q.    You said that in 2017 you became team lead on the

10   P320 line; is that right?

11   A.    Correct.

12   Q.    Could you describe generally what the P320 line is?

13   A.    So the P320 product family is our number two seller

14   as far as the pistol line is concerned.  There's a variety

15   of different variations of the P320 pistol that we sell.

16   So the team lead is basically working on new product

17   developments and launches for that product line.

18   Q.    You said there are several different variations.  Can

19   you just describe the range of differences?  What's

20   different about the different variations?

21   A.    So it's mostly involved with size.  So the slide

22   length, essentially.  So there's what I would call small,

23   medium, large, essentially.  So you'd have a smaller

24   shorter slide, you'd have a medium length slide, and then

25   the larger handguns.  So it's all surrounding the form

1    factor of the weapon, primarily.

2    Q.    Now, as team lead for the P320 family, could you get

3    into a little bit more detail about what your various

4    responsibilities included?

5    A.    So essentially I have a team of engineers that work

6    for me.  So I have five to six engineers that work on our

7    team.  And I help drive the team to the goals of the

8    company.  When product management has different models

9    they want to launch, they give us the parameters of what

10   those models should be, and I help oversee the design work

11   and the new product launch.

12   Q.    Could you describe basically the design and

13   development process at SIG, just how it works?

14   A.    Sure.

15         So the initial -- if it's a new product, you'd have

16   initial concept designs, you may have two or three

17   different concepts of how to solve a problem or a design

18   that we want to launch.  And then we develop prototypes of

19   those concepts, we basically narrow it down to a concept

20   that we think we want to move forward with.  And from

21   there, we would roll into creating production components

22   or production representative components, we'd move into

23   doing additional testing to ensure that the product is

24   meeting the specifications that we would like the product

25   to achieve.  And from there, assuming that we get past all

1    those hurdles, we would move into a production environment

2    where we're actually spending the investment to create the

3    product that we would sell on the market.

4    Q.    In the first phase that you described, the initial

5    design, how big of a team was involved in the P320 and

6    what did they do?

7    A.    From what I recall, we had about four to five people

8    working on it at that point.

9    Q.    And what did they do?

10   A.    So different people had different roles.  So we had

11   people that were just doing drafting; in other words,

12   creating the drawings that would be used for

13   manufacturing.  We had other people doing spring

14   calculations, things of that nature, right down to

15   designing the individual components as well.

16   Q.    What's involved in that next phase, the developing

17   production representative components?

18   A.    So, depending on how you're going to make the

19   components in production, you either try to mimic that

20   exactly and copy that technology or you may do things like

21   machine parts and later on there might be a molded part,

22   that sort of thing.  So in that secondary phase, you're

23   creating a prototype that's production-like or

24   production-representative but it might not be the exact

25   parts that we go to production in.

1    Q.    Are you involved in looking at the methods of

2    manufacture for the different components at that time?

3    A.    Yes.

4    Q.    Describe that very briefly.  What's involved in that

5    part of the work you're doing?

6    A.    So, depending on the component, component's shape,

7    and depending on how the component is used, you might pick

8    different ways of creating those components or

9    manufacturing them.  In other words, if it's a simple

10   round cylindrical part, it might be just a machine part

11   that's turned on a lathe or on a milling machine, that

12   sort of thing, where some of the complex components that

13   are in the handgun are more akin to using molding

14   processes where you can get unique geometry that you

15   wouldn't be able to do traditionally with a

16   machine-cutting type of operation.

17   Q.    And then you mentioned testing as part of the

18   development process?

19   A.    Yes.

20   Q.    Can you describe that in a little bit more detail,

21   what's involved there?

22   A.    So we do thorough testing.  It's everything from

23   making sure the gun works as designed from a reliability

24   standpoint, meaning that every time a user would pull the

25   trigger, the gun would fire, to endurance where we make

1  sure the components are durable enough to last a very high

2  round count without failure.  We also do environmental

3  testing, which is like hot and cold testing, sand and dust

4  testing, rain, submergence testing, abuse of handling

5  testing which can include drop testing as well as ensuring

6  that the barrel can contain the pressure of the round when

7  you fire it.

8  Q.    You used the phrase "high round count."  What is

9  that?

10  A.    So basically you have like an expected life of the

11  weapon.  So when we test, we would test to that expected

12  life plus some.  So when we do endurance, we test a very

13  high round count to make sure that the parts will last.

14  Q.    By "high round count," you mean firing the gun --

15  A.    Thousands and thousands of times, yes.

16  Q.    Are there -- well, again, if you could describe

17  generally, what are the standards that you utilized in the

18  development and testing of the P320?

19  A.    So there are a few standards that we rely upon or

20  that we adhere to.  SAAMI is one of them.

21  Q.    What is SAAMI?

22  A.    Sporting Arms and Ammunition Manufacturers'

23  Institute.  It's essentially a board of people that are in

24  the industry, so multiple manufacturers that come up with

25  standards that the gun should adhere to.

1  Q.   Is that a standard that's applicable in the

2  United States?

3  A.   Yes.

4  Q.   Are there other standards that you use to test the

5  P320 at various times?

6  A.   Yes.  There's also a NATO standard, N-A-T-O, that has

7  some of the similar specifications that are just a little

8  bit different based on what they want it to do.

9  Q.   NATO, that's the European organization?

10 A.   Yes.

11 Q.   You said that you worked at SIG's R and D facility.

12 A.   Yes.

13 Q.   Can you describe what that facility is and who all

14 works there?

15 A.   The R and D facility is research and development.  So

16 that's where all the design teams work.  We have several

17 different design teams, depending on what the product line

18 is.  So there's a couple of different pistol design teams,

19 there's rifle design teams, machine gun, suppressor design

20 teams.  We're all in one building so that we can work

21 together in that environment.

22 Q.   And based on your experience at SIG, what role does

23 the research and development process that you've just

24 described play in SIG's reputation and brand image?

25 A.   So SIG spends a lot of time and energy and investment

1    into the R and D facility between all the testing that we

2    do and all the equipment that we have to measure and

3    verify that our designs are meeting the specifications

4    that we want to produce to the public.  So it's a very

5    cohesive precision engineering intensive environment.

6    Q.    How does that relate to how the SIG brand is

7    portrayed to the public?

8    A.    So it shows our commitment to quality and the

9    precision engineering of our components and of our

10   firearms to ensure that we put out a reliable product.

11   Q.    Now let's turn to the P320 product, specifically.

12         I guess, first, if you could tell us in some detail

13   what your personal involvement is and has been over the

14   years with the P320 product line?

15   A.    So when I first started, the P320 didn't really

16   exist.  They had some concepts of striker-fired polymer

17   weapons, but they weren't very far along.  So I was tasked

18   to come up with some different concepts of what the P320

19   would be.

20         So from there it evolved into, yes, this is a real

21   product, we're going to make this product and it's going

22   to be our first striker-fired weapon that we offer in our

23   product line.

24   Q.    If we could put up Plaintiff's Exhibit 63 and blow

25   that up a bit.

1          Mr. Toner, what's Exhibit 63?

2    A.   That is a P320 model full-size firearm.

3    Q.   And you mentioned there were different variations of

4    the P320.  This is the full-size?

5    A.   Correct.

6    Q.   And what makes this different from the other

7    variations?

8    A.   So the slide length on this particular weapon has a

9    barrel in it that's 4.7 inches long.  So that just defines

10   the overall length of the handgun.

11   Q.   There are other versions that have a shorter barrel

12   length?

13   A.   Yes, as well as longer.

14   Q.   You said that this was a striker-fired pistol?

15   A.   Yes.

16   Q.   Can you explain what a striker-fired pistol is?

17   A.   So.

18              THE COURT:  Can I ask, are you offering

19   Exhibit 63?

20              MR. MIRENDA:  Yes, Your Honor.

21              THE COURT:  Any objection?

22              MR. BAGNELL:  Objection, Your Honor, to the

23   extent it's offered as an example of the original version

24   P320, which it is not.  It is not the P320 portrayed in

25   the animation Exhibit 1.  This is the post redesigned

```
 1    version of the P320 with a lighter trigger compared to the

 2    original version.

 3              THE COURT:  Okay.  So I think that goes more to

 4    weight and not admissibility.  I'll overrule the objection

 5    but of course you'll be free to cross-examine on that.

 6    Full exhibit, 63.

 7                   (Plaintiff's Exhibit 63 admitted in

 8                   evidence.)

 9    BY MR. MIRENDA:

10    Q.   So, Mr. Toner, could you describe how a striker-fired

11    pistol works?

12    A.   So essentially there's a striker pin that's in the

13    slide assembly.  And that has a compression spring that is

14    attached to it.  So that when the slide reciprocates and

15    closes, energizes that striker spring and compresses it so

16    that the striker pin is ready to fire when the slide is

17    closed.

18    Q.   How is a striker-fired pistol different from other

19    kinds of pistols?

20    A.   So the other -- another type of pistol is a

21    hammer-fired pistol in which a hammer is a metallic

22    component that's in a pistol that is rotated to the rear

23    and then released forward against a firing pin that would

24    hit the cartridge that's in the barrel to fire the weapon.

25    So the striker has an internal component that's energized
```

 1    and released rather than having a rotating hammer that

 2    would hit a firing pin.

 3    Q.    Why don't we show you Plaintiff's Exhibit 64.  Let's

 4    take a look at that and maybe you can explain in a little

 5    bit more detail how the components work.

 6          So, first, do you recognize Exhibit 64?

 7    A.    Yes.

 8    Q.    What is it?

 9    A.    So this is a computer-generated assembly of the 320

10    components with some of the components removed so that you

11    can see just the components that we're highlighting here,

12    so we commonly call a cutaway because it's easier to

13    describe.  So it's basically remove some components so you

14    can see the other ones that are there.

15    Q.    You said it was computer-generated.  What do you mean

16    by that?

17    A.    So the models that you see in red, blue, green, and

18    gray, they're all computer-generated, so using a CAD

19    software, computer-aided drafting and design.  That's

20    what's used to create the shape of these components.

21    Q.    Are you familiar with using computer-aided design

22    software and cutaway models like this?

23    A.    Yes.

24    Q.    So starting at the right-hand side of Exhibit 64 --

25                THE COURT:  Can I ask, do you want to offer this

1    as an exhibit at this time?

2              MR. MIRENDA:  Yes, Your Honor.

3              THE COURT:  The usual practice is if you're

4    going to question a witness about a document or an

5    exhibit, you should lay the foundation, then offer it,

6    okay, and then we'll see if there's an objection, and then

7    the document can be a full exhibit.

8              MR. MIRENDA:  Sure, Your Honor.  I'd offer it.

9              THE COURT:  Any objection?

10             MR. BAGNELL:  No, Your Honor.

11             THE COURT:  Full Exhibit, 64.

12                  (Plaintiff's Exhibit 64 admitted in

13                  evidence.)

14   BY MR. MIRENDA:

15   Q.   Mr. Toner, starting at the right-hand side of

16   Exhibit 64 and going from right to left, could you explain

17   what each of the components is and how it works?  We'll

18   take them one at a time.

19   A.   Would you like me to just hit the colored components

20   or everything from the right to the left?

21   Q.   Start with the component that's labeled "trigger."

22   A.   So the red component is labeled "trigger."  That is

23   the trigger for the P320.

24        Attached to that and to the left of that is the blue

25   component, it's kind of a long-shaped component, L-shaped

1    component, that's the trigger bar.

2    Q.    How does the trigger interact with the trigger bar?

3    A.    So at the very top of the trigger where there's kind

4    of an oval shape or a vertical geometry, there's the blue

5    portion of the trigger bar is behind that.  And what you

6    can't see is that there's a post on the red trigger flag

7    is what I call that going into the pivot circle or the

8    pivot hole of the trigger bar.

9    Q.    And how do those two components interact?

10   A.    So when you rotate the trigger or press it to the

11   rear, to the left in this orientation, it pulls the

12   trigger bar, which is blue, to the right.

13   Q.    Now, moving along the trigger bar, what's the next

14   component in that assembly?

15   A.    So the next component that is labeled as "captive

16   safety lever" which is in red.

17   Q.    And below the captive safety lever is there another

18   component there that's not labeled?

19   A.    So there's the gray torsion spring that you see

20   that's attached to the trigger bar.  That's the trigger

21   bar spring.

22   Q.    What does the trigger bar spring do?

23   A.    The trigger bar spring essentially puts force on the

24   trigger bar to bias it to the rearward position of the

25   gun.

```
 1   Q.    And what do you mean by biasing it to the rear?
 2   A.    So its home position is a rearward position in the
 3   gun.  So as you pull the trigger forward, you're pulling
 4   against the force of that spring which wants to pull the
 5   trigger bar in the opposite direction.
 6   Q.    Above the blue trigger bar there, you mentioned the
 7   captive safety lever?
 8   A.    Correct.
 9   Q.    What is that?
10   A.    The safety lever is the component that disables or
11   lifts the striker safety lock out of its home position
12   which is shown just above it in green.
13   Q.    And what makes the captive safety lever captive?
14   A.    So it's a little bit hard to tell in this picture,
15   but there's two legs that go down from the -- at the
16   bottom of the safety lever that straddle a portion of the
17   trigger bar which I call the trigger bar leg that's going
18   into the screen.  So it's basically straddling that
19   component and limiting the distance that it can rotate.
20   Q.    And so when the trigger is depressed and the trigger
21   bar moves forward, moves to the right, what happens to the
22   captive safety lever?
23   A.    So the captive safety lever would rotate
24   counterclockwise in this orientation.
25   Q.    And what's the function of that captive safety lever
```

1    rotating counterclockwise?

2    A.    So when you pull the trigger and the trigger bar goes

3    forward and that captive safety lever rotates

4    counterclockwise, it lifts the green piece above it which

5    is the striker safety lock up.

6    Q.    Let's take a look at Exhibit 65.

7         Do you recognize Exhibit 65?

8    A.    Yes.

9    Q.    What is this?

10   A.    So it's a very similar computer-generated assembly as

11   to what we were just looking at except for it's not a

12   straight-on view, it's more of a rotated view so you can

13   see three dimensions.

14              MR. MIRENDA:  I'd offer Exhibit 65, Your Honor.

15              THE COURT:  Any objection?

16              MR. BAGNELL:  No.

17              THE COURT:  Full exhibit.

18                   (Plaintiff's Exhibit 65 admitted in

19                   evidence.)

20   BY MR. MIRENDA:

21   Q.    So, again, taking a look at the captive safety lever

22   in this image, what component does it interact with and

23   how does it interact with that part?

24   A.    So in this image it's directly above the captive

25   safety lever such that when the captive safety lever

```
 1    rotates, it lifts and rotates around its pivot point.
 2    Q.    And what's the pivot point of the captive safety
 3    lever?
 4    A.    So it's a little bit difficult to see in this, but if
 5    you look to kind of the left side of that green piece
 6    where it necks down to a smaller shape, there's a round --
 7    Q.    I'm sorry, Mr. Toner.  The pivot point of the captive
 8    safety lever, the red piece.
 9    A.    Oh, I'm sorry.  I apologize.
10    Q.    I might have misspoken.
11    A.    It's okay.
12          You can see the gray cylindric shape that has kind of
13    a circle in the very center of it, that's the safety lever
14    pin.  That's where it pivots around.
15    Q.    Now, you said the captive safety lever rotates
16    counterclockwise when the trigger bar is pulled forward by
17    pulling the trigger?
18    A.    Yes.
19    Q.    What does that rotation do to the striker safety
20    lock?
21    A.    So that lifts the striker safety lock up.
22    Q.    And how does that striker safety lock interact with
23    the other components around it?
24    A.    So the striker safety lock is in the striker
25    assembly.  So it resides in the striker housing.  So the
```

1    striker safety -- the intent of it is so when you lift it

2    up and release the striker, it's allowed to fire.

3    Q.   And what is the striker assembly in this depiction?

4    Where is it?

5    A.   So it's kind of at the top of the image.  So there's

6    several components there that are above the CAD image of

7    the 9-millimeter cartridge.  So it's the green piece

8    that's labeled "striker safety lock," the striker housing,

9    the striker spring, the striker cups, and then you can

10   faintly see the front of the striker pin but it's not

11   completely clear in this view.

12   Q.   Let me put up Exhibit 72.

13        Do you recognize Exhibit 72?

14   A.   Yes.

15   Q.   What is Exhibit 72?

16   A.   So that is a striker assembly from a P320.  It's not

17   the entire -- it's not the entire view of it.  This

18   picture has been cropped.

19   Q.   Is this a photograph?

20   A.   Yes.

21             MR. MIRENDA:  Let me offer Exhibit 72.

22             THE COURT:  Is this from a current version of

23   the P320, can you clarify?  Or a past version?

24             THE WITNESS:  I believe that's the current

25   version.

1              THE COURT:  Okay.  Any objection?

2              MR. BAGNELL:  No objection, Your Honor.

3              THE COURT:  Full Exhibit, 72.

4                  (Plaintiff's Exhibit 72 admitted in

5                  evidence.)

6    BY MR. MIRENDA:

7    Q.   Mr. Toner, looking at this photograph, can you

8    identify the various components of the striker assembly?

9    A.   Yes.

10   Q.   What's where?

11   A.   Okay.  Working from right to left, you'll see in kind

12   of the inside, that's the striker pin.  So it's the one

13   that kind of has some rectangular shapes to it and some

14   circles that are metallic.  Around that striker pin is the

15   striker spring.  So you can see kind of the coiled spring

16   that is present.

17   Q.   And that's the coiled spring on the right-hand side

18   of the photo?

19   A.   Correct.

20        The coiled spring bottoms out against the striker

21   housing, which is kind of that barrel-shaped component

22   that kind of takes up most of the rear end of the striker

23   assembly.

24        The component labeled with the red arrow is the

25   safety lock spring which has the leg that is down to

1    the -- that goes down to the right that is touching the

2    striker safety lock.

3        And at the very bottom of the photo you can see the

4    striker pin foot which is shown just below the striker

5    safety lock.

6    Q.   And what's the function of that striker safety lock

7    spring?

8    A.   So the function of the striker safety lock spring is

9    to keep it in the down position and always against the

10   shelf that is on the striker pin that it normally rests

11   against.

12            MR. MIRENDA:  With the Court's permission,

13   Your Honor, I would approach Mr. Toner with examples of

14   these physical parts.

15            THE COURT:  Okay.

16            MR. MIRENDA:  So he can, as a demonstration,

17   show the Court what they look like in reality.

18            THE WITNESS:  Thank you.

19   BY MR. MIRENDA:

20   Q.   Mr. Toner, in front of you I brought up a magnetic

21   block that has a couple of components on it.

22   A.   Yes.

23   Q.   Could you demonstrate for the Court what is the first

24   component, the one immediately to your left?

25   A.   So the first component immediately to my left is the

1   320 sear.  It's this component here (indicating).

2   Q.   What's the next component?

3   A.   The next component over would be a striker pin.  So

4   it's this pin-like component here that has the striker

5   foot that's down below the main body of the part.

6   Q.   And on that striker pin you mentioned a shelf?

7   A.   Yes.

8   Q.   Would you point that out?

9   A.   So, as part of the barrel shape or the cylindrical

10  shape of the striker pin, there's a cutout that has a flat

11  shelf.  That's this portion right here (indicating).

12  Q.   Are there any other aspects of that shelf that are

13  noteworthy?

14  A.   So the only other thing that would be noteworthy is

15  the striker safety notch which is kind of towards the back

16  of that shelf which is a vertical or backward-angled wall

17  that's right about here (indicating).  It's very hard to

18  see.  It's kind of a small part.

19  Q.   Take a look at the third component in that

20  demonstrative.  What is that?

21  A.   This is the striker housing.  So this is the housing

22  that the striker pin rides within.  So it's got a hole in

23  it that the striker pin rides in and out when it's

24  reciprocating.

25  Q.   If you could demonstrate, how would the striker pin

1    and the striker housing interact with each other?

2    A.   So, in the assembly, they go into each other through

3    that hole.  So when it's in the gun, with the slide motion

4    it will be going in and out of that cylinder like that

5    (indicating).

6    Q.   And then what's that fourth component on the block

7    there?

8    A.   So the fourth component is the striker safety lock,

9    which is a small sheet metal piece.  So you'll see it's

10   got, in general, kind of looks a little bit like an L

11   shape to it.  But then in the third dimension it's got a

12   tab that kind of goes away from you if you're looking at

13   it from the side.

14   Q.   How does that striker safety lock tab relate to the

15   striker and the housing that you were just showing?  How

16   do those parts fit together?

17   A.   It resides on the housing as its pivot point, as I

18   was describing before.  So it resides on the striker

19   housing here (indicating).  And then it interacts with the

20   striker pin when it's all together as an assembly as well.

21   So it will ride against that shelf or that striker safety

22   lock tab.

23   Q.   Where does the tab sit in relation to that shelf?

24   A.   Right on top of it.  It's always in contact with that

25   unless you pull the trigger, and that's what gets lifted

1    up.

2    Q.    Looking back at Exhibit 72, you've discussed the

3    striker, the striker housing, and the striker safety arm.

4    The striker safety spring, how does that relate to the

5    three components you were just demonstrating?

6    A.    So that sits on the side of the striker housing.

7    You'll see there's a circular shape that's kind of in the

8    center of the striker safety lock spring.  That basically

9    just keeps it in place.  And then the bottom leg of the

10   striker safety lock spring pushes down on the striker

11   safety lock just below that arrow.  And the top leg of it

12   is grounded on the striker housing.  And that's what gives

13   it spring tension.

14   Q.    What's the purpose of that spring tension?

15   A.    To keep that striker safety lock tab that kind of

16   goes away from you when you're looking at it from the side

17   down against the shelf that is on the side of the striker

18   pin.

19   Q.    Let me show you what's been marked as Plaintiff's

20   Exhibit 128.

21         Do you recognize Exhibit 128?

22   A.    Yes.

23   Q.    What is it?

24   A.    This is a CT image of a P320.

25              MR. MIRENDA:  I'd offer Exhibit 128.

```
 1                  THE COURT:  Any objection?
 2                  MR. BAGNELL:  No objection.
 3                  THE COURT:  Full exhibit.
 4                     (Plaintiff's Exhibit 128 admitted in
 5                     evidence.)
 6   BY MR. MIRENDA:
 7   Q.    Mr. Toner, you said this was a CT scan image of a
 8   P320.  Can you explain what you mean by that?
 9   A.    So the CT scan process, you can think of it very
10   similar to what humans go through when they get CAT
11   scanned.  It's a series of x-ray images that are generated
12   by moving the x-ray scanner up and down on the part, or
13   the gun, in this manner.  It takes a series of those
14   slices and then stitches them together into a 3D model.
15   Q.    What's the orientation of this particular CT scan
16   image?
17   A.    So this would be as if the user was holding the gun,
18   it would be coming from the right-hand side.
19   Q.    So the muzzle of the gun is off to the right and the
20   back of the gun is off to the left in this image?
21   A.    Correct.
22   Q.    And you said that the CT scan takes slices.  What
23   slice is this?
24   A.    So it's a little bit hard to tell what depth it would
25   be into the gun, but it's not quite the center, like right
```

1    down the center of the gun, it's more towards the

2    right-hand side.

3    Q.    And what components do you see inside that red

4    rectangle?

5    A.    So the -- I see the striker pin.

6         I also see the striker safety lock tab that we were

7    talking about that goes into the screen.

8         And the striker safety notch, which is labeled Roman

9    Numeral I.

10        And again, the Roman Numeral II is pointing at that

11   striker safety lock tab.

12   Q.    Is this a slice basically down and laterally through

13   the striker?

14   A.    Yes.  It's going down the length of the gun.

15   Q.    So this is sort of a half or a third of the striker

16   kind of sliced down the middle?

17   A.    Yes.

18   Q.    And that safety lock tab that's sitting there on the

19   shelf, how does that function in the P320?

20   A.    So the point of the safety lock tab is to prevent the

21   striker pin from going forward.  So the striker safety

22   notch, which is Roman Numeral I, would interact with that

23   feature or that portion of the striker safety lock to

24   prevent the striker pin from moving forward.

25   Q.    What do you mean by that?  How would the striker

1    safety notch interact with the tab?

2    A.    So if you can imagine the striker pin moving to the

3    right, eventually you get to a point where that striker

4    safety notch which is labeled Roman Numeral I would hit

5    the striker safety lock tab which is labeled Roman

6    Numeral II.

7    Q.    And if it did that, what would the result be?

8    A.    It would prevent the striker pin from moving forward.

9            THE COURT:  I guess it would help me if maybe

10   you explained a little bit more here.  I'm trying to

11   figure out how the part that's depicted Number I could

12   actually meet Number II.  It looks like it's a solid piece

13   itself.  Do you mind trying to explain that again?

14   BY MR. MIRENDA:

15   Q.    Mr. Toner, again, maybe even use the demonstrative of

16   the striker and the safety tab, and explain how those two

17   parts would interact in this scenario.

18   A.    So, as I said before, the parts are not fixed.  They

19   move within each other.

20        So the striker pin, when it's energized in the cocked

21   position, if you will, it's towards the rear.  When you

22   release the striker, it goes forward.

23        So the point of the striker safety lock is that when

24   it's in the down position and the trigger has not been

25   pulled, it arrests the striker pin from being able to go

1  forward.  So it will hit that notch because that Roman

2  Numeral II, that piece is not a solid part of the striker

3  pin.  That's actually another component, the striker

4  safety lock.  It's just that tab that you're seeing is a

5  section of that.

6          THE COURT:  All right.  So despite the fact when

7  I look at this image, it looks like that part I and part

8  II are actually part of the same piece, that's not so?

9          THE WITNESS:  Correct.  They're two different

10  components.

11  BY MR. MIRENDA:

12  Q.  As one of the demonstratives in front of you, do you

13  have the striker safety lock to show the tab for the

14  Court?

15  A.  Yes.

16      I'm not sure if you're going to be able to see it.

17  It's that 90-degree bend that's going that way

18  (indicating).

19          THE COURT:  I see.

20          THE WITNESS:  That's the rectangular piece that

21  you're seeing in the CAT scan, as if you took a knife and

22  sliced it vertically through here.

23          THE COURT:  Okay.

24  BY MR. MIRENDA:

25  Q.  Does that tab sit on the shelf and ride on it so that

```
 1    the striker would slide along and catch on that tab if it
 2    had been released?
 3    A.    Yes.
 4              MR. MIRENDA:  Your Honor, did we --
 5              THE COURT:  Please proceed.
 6              MR. MIRENDA:  Thank you.
 7    BY MR. MIRENDA:
 8    Q.    Let's take a look at Exhibit 66.
 9          Do you recognize this, Mr. Toner?
10    A.    Yes.
11    Q.    And what is this?
12    A.    So that is the same generated or same
13    computer-generated assembly that we were looking at
14    before, just from a different angle.  So it's the opposite
15    side.
16    Q.    So it's flipped around 180 degrees so the orientation
17    of the gun is the reverse of what we've just been looking
18    at?
19    A.    Correct.  Before we were looking more from the right
20    side of the gun.  This is looking from the left.
21    Q.    If you, I guess, look at the top of this image,
22    there's a part labeled "Striker pin."  What's that?
23    A.    Yes.  That's the striker pin that rides in the
24    striker housing.
25    Q.    That's the component you were just describing to the
```

1    Court and using that demonstrative?

2    A.    Correct.

3    Q.    And to the right-hand side of this image, there's an

4    area labeled "'Foot' of the striker pin."  What's that?

5    A.    That is the foot of the striker pin which interacts

6    with the sear which is on the bottom side of the gun or

7    the frame side of the gun.

8    Q.    Could you use that demonstrative again to show the

9    Court where the foot is in the striker pin.

10    A.    That's this bottom portion here (indicating).  This

11    portion here that hangs down.

12              THE COURT:  Thank you.

13    BY MR. MIRENDA:

14    Q.    You said that the foot of the striker pin interacts

15    with the sear?

16    A.    Correct.

17    Q.    So what's the sear?

18    A.    So the sear is the green piece that's shown in this

19    CAD assembly.  And the purpose of that is to catch the

20    striker foot when the gun, the slide closes.  And that's

21    what helps energize the striker pin.

22    Q.    What do you mean by that?

23    A.    So when the slide is closing, the striker foot will

24    hit the sear and the sear face that it's interacting with

25    and essentially stay still as the rest of the slide is

1    closing, and that's what energizes the striker spring

2    which is the coiled spring that we spoke of before.

3    Q.    In this image that coiled spring is energized, it's

4    at the top center of the exhibit?

5    A.    Yes, it's below the words "Striker pin," you can see

6    kind of the round representation of the spring.

7    Q.    The gray coiled spring there?

8    A.    Yes.

9    Q.    Now, how does the -- well, you're talking about the

10   sear and its interaction with the striker foot.  Are there

11   other parts of the sear that you haven't yet described?

12   A.    Yes.  So if you look down the left-hand side, you'll

13   see there's a leg that kind of goes down and to the right

14   of that green piece.  That's the sear leg.  That's what

15   the trigger bar interacts with.  And you see the sear

16   springs that are kind of just below the striker foot.

17   Those are the compression springs that are the sear

18   springs.

19   Q.    What's the function of those two compression springs

20   on the right?

21   A.    Those are the springs that provide force in that area

22   of the sear to keep it in the up position.

23   Q.    And you said that the leg of the sear interacts with

24   the trigger bar.  How does that work?

25   A.    So the leg of the sear interacts with the trigger bar

1    in that when you rotate the trigger and pull the trigger

2    bar forward, the trigger bar hits that leg and rotates the

3    sear counterclockwise in this view to release the striker

4    when you want to fire it.

5    Q.    And how does the trigger -- how does depressing the

6    trigger cause that to happen?

7    A.    Because the trigger and trigger bar connected with

8    the post and pivot hole of those two components, when you

9    pull the trigger or rotate it to the rear, the trigger bar

10   goes forward and hits that leg and embarks rotation on the

11   sear.

12   Q.    What's the consequence of that clockwise rotation to

13   the sear?

14   A.    It would release the striker.  So the foot of the

15   striker would go past the sear.

16   Q.    And what does that rotation do to those two springs

17   on the right-hand side?

18   A.    It would make them shorter and compress them.

19   Q.    It would compress those springs?

20   A.    Yes.

21   Q.    And what happens when the trigger is released and the

22   trigger bar moves back to its rest position?

23   A.    The sear would rotate counterclockwise in this view

24   back to its home position which is in the up position.

25   Q.    How does it interact with the striker foot at that

```
 1   point?
 2   A.   So as the slide -- after you fire the weapon, the
 3   slide retracts to the rear, it reciprocates to the rear.
 4   Then it goes back forward again under recoil spring
 5   tension.  So as it's coming back forward, the striker foot
 6   is caught by the sear face that it's interacting with in
 7   this view and holds it there so it can compress the
 8   spring.
 9            THE COURT:  So when the trigger is pulled, the
10   sear rotates you said counterclockwise?
11            THE WITNESS:  Clockwise in this view.
12            THE COURT:  It goes clockwise.  How is it able
13   to do that without -- and when it does that, it pushes
14   against the foot?
15            THE WITNESS:  The foot of the sear, yes.  So it
16   will essentially, if you imagine this is the foot of the
17   sear, the trigger bar is coming forward, it does this
18   (indicating) and it rotates that whole component.
19            THE COURT:  So the sear rotating clockwise
20   pushes the foot of the striker pin?
21            THE WITNESS:  So, it's probably easier if I use
22   the parts.
23            THE COURT:  It's a little harder for everybody
24   to see.  They're so small, you're holding them in your
25   hand.  Can you show it on the diagram?  It seems like it
```

```
 1    should be clear on the diagram.  What exactly moves?
 2              THE WITNESS:  I can't.  I don't have like a
 3    pointer.
 4              THE COURT:  Pardon?
 5              THE WITNESS:  I don't have a pointer so that
 6    everybody can see.
 7              THE COURT:  Well, you can describe.  We can see
 8    where the sear meets the foot of the striker pin.  What
 9    happens then?
10              THE WITNESS:  Okay, I'll try.
11              So below, you can see there's kind of a gray
12    larger cylindrical shape that's a pin that the safety
13    lever is rotating around.  Just below that you'll see a
14    blue portion of the trigger bar.  So that is the trigger
15    bar leg that is 90 degrees to the trigger bar face.  So
16    that's sticking out from the trigger bar.  And that, as
17    the trigger bar is moving forward, will hit the bottom
18    portion of the sear leg which is hidden behind that pin
19    slightly.  So when that trigger bar leg hits the sear
20    leg -- that's all one continuous piece, it's one
21    component -- so when it continues to go forward, it's
22    going to rotate around the sear pivot pin which is that
23    smaller pin up and to the left of the pin I described
24    before.
25              THE COURT:  All right.  Thank you.
```

1           MR. MIRENDA:  Your Honor, if I could approach.

2    We've got a printed copy of Exhibit 66 he could draw on if

3    that might make this easier to convey.

4           THE COURT:  Why don't you do that.

5    BY MR. MIRENDA:

6    Q.   Mr. Toner, if you could use that physical copy of

7    Exhibit 66 and indicate for the Court, draw on that

8    document what the directions are and how the sear moves

9    when the trigger bar is pulled forward.

10          MR. MIRENDA:  I don't know if there's a document

11   camera that's there.

12          THE COURT:  Right to the right.  We'll activate

13   it so Mr. Bagnell can see what's going on.

14          MR. MIRENDA:  Show it on the monitor.

15          THE WITNESS:  This pen is not cooperating.

16          THE COURT:  We'll get another pen for you.

17          THE WITNESS:  Maybe another sheet of paper?

18   It's that thing when you're trying to draw on it and it

19   dies on it.

20          THE COURT:  You can come up to the document

21   camera.  Then that way Mr. Bagnell can see everything

22   that's going on.

23          MR. BAGNELL:  I'm sorry, Your Honor?

24          THE COURT:  This witness is testifying using

25   tiny microscopic pieces that I can't imagine you can see.

1              MR. BAGNELL:  No, I can't.

2              THE COURT:  So I think it's helpful if you can

3    see it if the witness can show the motion on the document

4    camera now so, Mr. Bagnell, you can see what the witness

5    is talking about, that I can see a little better too.

6              MR. MIRENDA:  Is that good?

7              THE COURT:  Yes.  Go ahead and explain it.  Use

8    the microphone.

9              THE WITNESS:  I'm sorry?

10             THE COURT:  Use the microphone so our court

11   reporter can hear you.

12             THE WITNESS:  So what I was describing was the

13   sear and trigger bar interact with each other kind of

14   behind this pin.  You can't see it clearly in this view,

15   but this blue piece that's kind of here goes forward and

16   hits the sear leg which is hanging down in this

17   orientation.  And when that happens, it rotates around

18   this pivot point here.  This is the sear pivot point.  And

19   that makes the right side of the sear rotate also in a

20   downward position or a downward motion.  When that

21   happens, the striker foot will release from this

22   interaction here, which is the sear and striker interface,

23   and allow the striker pin to go forward.

24             THE COURT:  And the striker pin goes forward

25   because of the spring?

1            THE WITNESS:  Correct.  The striker pin goes

2    forward because of this striker spring.

3            THE COURT:  All right.  That's helpful.  You

4    might want to mark that as 66A.

5            MR. MIRENDA:  Exhibit 66A.

6            THE COURT:  Yes.

7                (Plaintiff's Exhibit 66A admitted in

8                evidence.)

9    BY MR. MIRENDA:

10   Q.   If we could put up Exhibit 71.

11        Mr. Toner, taking a look at Exhibit 71, what is this?

12   A.   That is a magnified photo of the striker foot and the

13   front of the striker foot where the striker foot faces.

14            MR. MIRENDA:  I offer Exhibit 71.

15            THE COURT:  Any objection?

16            MR. BAGNELL:  We object, Your Honor.  We believe

17   this photo has been manipulated.

18            THE COURT:  Okay.  Why don't you ask him if it's

19   a genuine version or has it been manipulated.

20   BY MR. MIRENDA:

21   Q.   Mr. Toner, taking a look at this photograph, is this

22   a genuine photo or has it been manipulated in any way?

23   A.   It looks like it's a real photo to me.

24            THE COURT:  So did you take it yourself, sir,

25   the photo?

1            THE WITNESS:  I did not.

2            THE COURT:  Does it appear, as far as you know,

3     to be a true and accurate representation of what a striker

4     foot looks like?

5            THE WITNESS:  Yes.

6            THE COURT:  I'll overrule the objection, but

7     subject of course to cross-examination if you believe it's

8     been manipulated in some manner.  71, full exhibit.

9                  (Plaintiff's Exhibit 71 admitted in

10                  evidence.)

11    BY MR. MIRENDA:

12    Q.   Mr. Toner, looking at the striker foot face, the

13    right-hand side of this photograph, could you describe

14    what you see there based on your experience with the P320s

15    over the years you've been working on the program?

16    A.   I can see the kind of the face of the striker foot

17    kind of going down away from the front face down into the

18    screen.  I can also see the corner of the bottom of the

19    striker foot and top as well as along the arc of the

20    geometry of the shape.  That's about it.

21    Q.   Could you describe the manufacturing process for the

22    striker foot that's depicted here?  How is it made?

23    A.   So the striker pin and striker foot, for that matter,

24    is made using the MIM, M-I-M, process.  What that is, it's

25    very similar to plastic manufacturing and molding in that

1    you have a mold that is a cavity of the shape that you

2    want to make the part, and you inject metallic powder at a

3    very high pressure into the mold and that creates the net

4    shape of the component that you want to manufacture.

5    Q.    Is the mold all one piece?

6    A.    No.  It's got two halves.  Two metallic halves so it

7    will open and close.

8    Q.    On this striker and the strikers that are used in the

9    P320, where is that MIM mold dividing line?

10   A.    So it's on the right-hand, kind of the right middle

11   part of the image that we're looking at.  You can see

12   there's kind of a line that kind of goes up and then at an

13   arc up from like 6:00 to 3:00.  That looks to be the mold

14   parting line.

15   Q.    What you're describing is the right-hand -- from this

16   view, the right-hand side of the striker foot?

17   A.    If you look at the striker face, it's the right-hand

18   side of the face going up and along the striker foot.

19   Q.    Okay.  And in the P320 striker, the two parts of that

20   mold, how do they fit together?

21   A.    Can you repeat the question?

22   Q.    Yes.  For the P320 striker, how do the two components

23   of the mold fit together?  Where is the parting line and

24   how do they fit together?

25   A.    So it's a little difficult to describe it.  It might

 1    be easier if I draw on another piece of paper, if that is

 2    allowable.

 3              THE COURT:  It's up to your attorney.

 4              MR. MIRENDA:  Yes, we'll get a copy of

 5    Exhibit 71.  And, Your Honor, with the Court's permission,

 6    I'd ask him to come down.

 7              THE COURT:  Go on down to the overhead camera.

 8    BY MR. MIRENDA:

 9    Q.   If you can use the microphone and describe to the

10    Court how the mold fits together on that part.

11    A.   So essentially the two halves come together along

12    this line (indicating) and then down the part.  So

13    essentially this whole face here is free of any mold

14    parting lines.

15    Q.   And is the mold -- the two halves of the mold offset

16    from each other?

17    A.   Let me -- it's hard to see in this image.  There's a

18    slight offset.  This surface here is down below its parent

19    surface which is right adjacent to it.

20    Q.   What about the front face of the striker foot, is the

21    mold again offset there?

22    A.   Yes.  Very similarly, it's offset in this region here

23    (indicating) that's kind of highlighted or some kind of

24    reflection.

25    Q.   And what's the result of the mold being offset in

1    that way?

2    A.    So by having it offset in that manner, none of the

3    components that interact with those faces would touch each

4    other.  So you would want the -- the surfaces that you

5    want to touch together will.

6    Q.    And in this instance, what are the surfaces that you

7    want to fit together well?  Could you explain that to the

8    Court?

9    A.    Essentially, this whole front face is involved with

10    interacting with the sear.

11    Q.    So what's the consequence of the mold being offset in

12    the way you've described?

13    A.    It ensures that that front face is flat and uniform

14    and not -- has no imperfections.

15    Q.    So the right-hand side is pushed back behind the face

16    of the --

17              MR. BAGNELL:  Objection, leading.

18              THE COURT:  That's okay.  What's the question?

19    BY MR. MIRENDA:

20    Q.    The question was that the right-hand side is pushed

21    back or recessed behind the face of the striker foot; is

22    that right?

23    A.    Yes.  This whole vertical wall and this geometry here

24    is offset or pushed back slightly.

25    Q.    Thank you.

1          The manufacturing process that you just described,

2   has that been the process for manufacturing strikers for

3   the P320 for as long as it's been in production?

4   A.   Yes.  That was always the manufacturing method.

5   Q.   So that was used both pre-2017 and post-2017?

6   A.   Correct.

7   Q.   Let's take a look at Exhibit 69.

8          Do you recognize Exhibit 69?  What's this?

9   A.   That is a sear for a 320.

10             MR. MIRENDA:  I'd offer Exhibit 69.

11             MR. BAGNELL:  No objection.

12             THE COURT:  Full exhibit.

13                  (Plaintiff's Exhibit 69 admitted in

14                  evidence.)

15   BY MR. MIRENDA:

16   Q.   Now, could you describe to the Court what you observe

17   in Exhibit 69 about the sear?

18   A.   It's a typical sear that I've seen over the years.

19   It's got shiny metallic coating which is electroless

20   nickel coating.  It's got the sear spring posts that are

21   to the right of the image or at the right-hand side of the

22   image.  It's showing the sear face that the striker foot

23   would interact with as well as the undercut in the corner

24   of the part.

25   Q.   The sear spring posts, are those the two stubs on the

1    right-hand side?

2    A.    Yes.  They're cylindrical shapes that retain the sear

3    springs for assembly.

4    Q.    And is the sear face that's depicted here, is that

5    typical, in your experience, of the sears used in the

6    P320?

7    A.    Yes.  That's very typical of what I've seen in the

8    past.

9    Q.    And how is the sear made?  What's the manufacturing

10    process there?

11    A.    That's using the MIM process.

12    Q.    So similar to the MIM process you described for the

13    striker?

14    A.    Yes.  It's a different shape.  The process is the

15    same.

16    Q.    And are these parts mass-produced?

17    A.    Yes.

18    Q.    I'd like to show you Exhibit Number 70.

19          Do you recognize Exhibit 70?

20    A.    Yes.  That's also a sear for a 320.

21    Q.    And the face of the sear that you see here, is that

22    typical of sears, in your experience, for P320?

23    A.    Yes, it's very typical.

24    Q.    And is this -- well, what is this sear?  When was

25    this -- when has this sear been used on a P320?

```
 1   A.    So this is a picture of a sear that we use as part of

 2   the voluntary upgrade.  It would have been post-2017.

 3   Q.    And Exhibit 69, what we were looking at a few moments

 4   ago, what was that sear?

 5   A.    Can we put that back on the screen?

 6   Q.    Put Exhibit 69 back up.

 7   A.    So that would have been a pre-2017 model or version

 8   of it.

 9   Q.    And specifically with regard to the sear face, is

10   that the area that interacts with the striker foot?

11   A.    Yes.

12   Q.    Whether it's Exhibit 69, the sear in Exhibit 69 or

13   the sear in Exhibit 70, is the function of the sear face

14   interacting with the striker foot similar?

15   A.    Yes.  They work exactly the same.

16              THE COURT:  Would you like to offer Exhibit 70?

17              MR. MIRENDA:  Yes, Your Honor.

18              THE COURT:  Any objection to 70?

19              MR. BAGNELL:  Yes, Your Honor.  On the same

20   basis as -- which 70 are we talking about, PX?

21              MR. MIRENDA:  PX70.

22              MR. BAGNELL:  Yes, Your Honor, on two bases.

23              One would be relevance.  I think the witness has

24   just testified that the image on the right is a sear that

25   has a secondary notch added after the 2017 redesign.  That
```

1    is not the gun at issue in the animation.

2              And on the image on the left side, we contend

3    it's not an authentic photo and that it's been manipulated

4    with the addition of black lines.

5              THE COURT:  Okay.

6              Sir, as far as you know, are both of these

7    photos true and accurate depictions of the post-2017 sear?

8              THE WITNESS:  Yes.

9              THE COURT:  So I'll overrule the objection, but

10   of course you're welcome to cross-examine on that.

11   Exhibit 70, full Exhibit.

12                   (Plaintiff's Exhibit 70 admitted in

13                    evidence.)

14   BY MR. MIRENDA:

15   Q.   Last in this sequence, would you take a look at

16   Exhibit 132.

17        Do you recognize Exhibit 132?  What is this?

18   A.   That is a CT scan image of a P320.

19   Q.   What's the orientation of this CT scan?

20   A.   So it's looking from the rear of the gun.  And it's a

21   cross-sectional slice at some depth from the rear, I can't

22   tell exactly how deep it is.

23   Q.   Could you describe for the Court the components of

24   the P320 that are shown in this CT scan slice with

25   particular focus on the areas in the red circles?

 1              THE COURT:  Can I just ask you, do you want to

 2    offer this exhibit?

 3              MR. MIRENDA:  Yes, Your Honor.  I offer

 4    Exhibit 132.

 5              THE COURT:  Any objection to 132?

 6              MR. BAGNELL:  No objection.

 7              THE COURT:  Full exhibit.

 8                  (Plaintiff's Exhibit 132 admitted in

 9                  evidence.)

10              THE WITNESS:  I'm sorry, can you repeat the

11    question?

12    BY MR. MIRENDA:

13    Q.   Yes.  Could you describe for the Court the components

14    that are shown in this CT scan with particular focus on

15    the areas in the red circles?

16    A.   So the components that are shown in the red circles,

17    you can see there's metallic components that are what I

18    would call hockey stick shaped, for lack of a better term.

19    Those would be the receiver rails.  The receiver rails are

20    interacting with or at least in the same similar space as

21    the slide channels, receiver rail channels.

22    Q.   Let's take this slow, step by step.  So the first

23    thing you talked about was the receiver rails?

24    A.   Yes.

25    Q.   So where are they in this CT scan?

 1   A.   So the tops of them are in the red circles.  Then you

 2   can see them if you follow that shape vertically down,

 3   that is the rest of the receiver metallic part.  So the

 4   rails themselves are really just in those red circles.

 5               MR. MIRENDA:  Your Honor, if I could ask

 6   Mr. Toner to come down to the document camera to be able

 7   to point that out, make that a little more clear.

 8               THE COURT:  Okay.

 9   BY MR. MIRENDA:

10   Q.   Mr. Toner, could you indicate to the Court where the

11   frame rails are and the slide channel and describe how

12   those two parts interact?

13   A.   So the frame or the receiver rails are here

14   (indicating) on both sides.  And the slide channel that

15   the slide rides over the rails is here (indicating).  So

16   it's the C shape that involves those rail pieces.

17        As the slide -- as you fire the gun, the slide

18   reciprocates, it rides along those rails, and that's what

19   guides the slide to be in the right position as the gun is

20   functioning.

21   Q.   You can go back to your seat.

22        Mr. Toner, what material are the frame rails made of?

23   A.   Stainless steel.

24   Q.   What about the slide channel that the frame rails

25   ride in, what material is the slide channel made of?

```
 1   A.    So the slide is also made out of stainless steel.

 2   Q.    So those are two stainless steel parts, one riding in

 3   the other?

 4   A.    Correct.

 5          MR. MIRENDA:  Your Honor, I would offer

 6   Exhibit 132A as the document that Mr. Toner drew on.

 7          THE COURT:  Any objection?

 8          MR. BAGNELL:  No objection.

 9          THE COURT:  Full exhibit.

10              (Plaintiff's Exhibit 132A admitted in

11               evidence.)

12   BY MR. MIRENDA:

13   Q.    Mr. Toner, we're going to turn to a new subject now.

14          At some point did you come to learn about the

15   existence of an animation on the internet that was

16   supposedly showing the inner workings of the P320?

17   A.    Yes.

18   Q.    How is it that you came to learn of that?

19   A.    I believe it was SIG legal counsel pointed it out to

20   me.

21   Q.    When was that?

22   A.    It would have been the fall of 2021.

23   Q.    After it was pointed out to you, without getting into

24   any conversations you had with SIG legal counsel, what did

25   you do?
```

1   A.   So I reviewed it.  I went on the website.  I looked

2   at it a handful of times.  And then I offered my opinion

3   as to what I thought about it.

4   Q.   Again, without getting into any discussions you had

5   with SIG legal counsel, what were your initial reactions

6   to viewing the animation the number of times that you did?

7   A.   That there were some inaccuracies.

8   Q.   Let's go through it.

9        I'd like to show you what's been admitted as

10  Exhibit 1, which is the animation.  And let's advance the

11  animation to time 2 minutes and 26 seconds in.  And let's

12  play through 2 minutes and 31 seconds in.

13                  (Plaintiff's Exhibit 1 played.)

14  Q.   Mr. Toner, did you observe that in the animation that

15  you looked at on Mr. Bagnell's website?

16  A.   Yes.

17  Q.   What was your conclusion upon observing this?

18  A.   That the condition of the sear face was not an

19  accurate depiction of what the part actually looks like.

20  Q.   Let's take a look at Exhibit 69.  If we can put

21  Exhibit 69 up side by side with this portion of Exhibit 1.

22       In what ways did you observe the animation's

23  depiction of the sear face different from what a sear face

24  looks like in a real P320?

25  A.   So on the animation face it is depicted as very lumpy

1    or wavy, not very uniform.  And it also shows that the

2    blue portion is not at the same -- not on the same plane

3    as the rest of that feature.  So it depicts it as not good

4    quality.

5    Q.    When you say "not on the same plane," what do you

6    mean by that?

7    A.    So essentially the blue shaded area of this image is

8    implying that that surface is inset or deeper into the

9    part than the red perimeter.

10   Q.    In all your years working with the P320, have you

11   ever seen any sear face that looked like what the

12   animation depicts the sear face to look like?

13   A.    No, I have not.

14   Q.    Let's go back to Exhibit 1, take a look at the

15   animation at 2 minutes and 39 seconds.

16         What's this?

17   A.    So that is the bottom of the striker pin, the striker

18   foot area.

19   Q.    And is this what you observed in the animation when

20   you looked at it on Mr. Bagnell's website?

21   A.    Yes.

22   Q.    Could you put up Exhibit 117.

23         Taking a look at Exhibit 117, is that a side-by-side

24   comparison of what you saw in the animation and the

25   striker foot photograph that we were looking at a few

1   moments ago?

2   A.   Yes, it is.

3              MR. MIRENDA:  I'd offer Exhibit 117.

4              MR. BAGNELL:  No objection.

5              THE COURT:  All right.  Full exhibit.

6                  (Plaintiff's Exhibit 117 admitted in

7                  evidence.)

8   BY MR. MIRENDA:

9   Q.   Based on your observations, does the striker foot in

10  the animation look like the striker on the right-hand side

11  here, the photograph of the striker?

12  A.   No, it does not.

13  Q.   Could you describe how it's different?

14  A.   So the geometry of the striker foot on the left is

15  very different in that it's very what I would call short,

16  where on the right-hand side the striker foot in reality

17  is a little bit elongated.  On the left-hand image of the

18  animation there is shaded areas that are showing an inset

19  surface on a rollover condition which would indicate that

20  those two surfaces are not in the same plane -- in other

21  words, they're offset from each other -- where on the

22  actual component that plane is very flat and uniform.

23  Q.   And in all your years working on the P320 have you

24  ever seen a striker foot that looks like what the

25  animation depicted?

1    A.    No, I have not.

2    Q.    Let's take a look at Exhibit 1, the animation, at 4

3    minutes, 11 seconds in.

4         Do you recognize this as a part of the animation that

5    you observed on Mr. Bagnell's website?

6    A.    Yes.

7    Q.    If I could put up Exhibit 74.

8         Taking a look at Exhibit 74, what is Exhibit 74?

9    A.    So that is an image from the animation of the rear of

10   the striker pin with other components kind of silhouetted

11   in there as well.

12            MR. MIRENDA:  I'd offer Exhibit 74.

13            MR. BAGNELL:  No objection.

14            THE COURT:  Full exhibit, 74.

15                (Plaintiff's Exhibit 74 admitted in

16                evidence.)

17   BY MR. MIRENDA:

18   Q.    Looking in the red box, what is that focusing in on?

19   A.    That would be the striker pin safety notch.

20   Q.    And is the image on the right-hand side of this, is

21   that a blown-up version of the image that appears in the

22   animation?

23   A.    Yes, it appears to be.

24   Q.    So that focuses in on that striker safety notch area?

25   A.    Yes.

1   Q.   Let's take a look at Exhibit 123.

2        What is Exhibit 123?

3   A.   So the image in the red box on the left appears to be

4   taken from the animation.  And the image that's on the

5   right is a photograph of an actual striker safety pin

6   safety notch.

7            MR. MIRENDA:  I offer Exhibit 123.

8            MR. BAGNELL:  No objection.

9            THE COURT:  123, full exhibit.

10               (Plaintiff's Exhibit 123 admitted in

11               evidence.)

12  BY MR. MIRENDA:

13  Q.   Does the image of the striker safety notch in the

14  animation, based on your experience, look at all like what

15  a striker safety notch is on a real striker?

16  A.   No, it is not.

17  Q.   How is it different?

18  A.   So the animation image shows the wall of the striker

19  safety notch to be vertical to a little bit forward.  It

20  also has an arc at the bottom of that wall that interacts

21  with the horizontal plane of the shelf of the striker pin

22  with a radius in that corner or an arc.  Whereas the

23  actual striker safety pin safety notch -- striker pin

24  safety notch, excuse me, has a 90-degree wall plus it's

25  actually a little bit backwards and it has a large

```
 1    undercut in the corner of it that blends into the
 2    horizontal shelf that's on the striker pin.
 3    Q.   What's the significance of those differences?
 4    A.   So part of the reason why it's undercut like that is
 5    so it can act like a catch.  So if you have the tab of the
 6    striker safety lock, it would sort of catch that area and
 7    contain it in the event that the two parts interacted with
 8    each other.
 9    Q.   As it's depicted in the animation, does that
10    depiction accurately represent the way the striker safety
11    notch functions?
12    A.   No, it does not.
13    Q.   Why not?
14    A.   Because it has that feature of that undercut is
15    completely omitted and it's showing the angle of that
16    vertical wall to be inaccurate.  It's not vertical.  It's
17    actually a little bit canted forward.
18    Q.   In all your years working on the P320, have you ever
19    seen a striker safety notch that looks like the one that
20    appears in the animation?
21    A.   No, I have not.
22             THE COURT:  May I ask, you asked the witness a
23    number of times "in all your years of working on this,"
24    but it wasn't clear to me the witness is familiar with
25    weapons that have been used.  He's talked a lot about the
```

1    manufacturing process and what it looks like when it's

2    been manufactured.  It would help me if I knew from the

3    witness whether the comparison he's drawing is not simply

4    to what the part looks like when it's new but when it's

5    actually been fired and used perhaps hundreds or even you

6    said thousands of times during its life.

7    BY MR. MIRENDA:

8    Q.    Mr. Toner, could you describe to the Court your

9    experience with P320 not only in that design and

10   development and initial manufacture stage but over the

11   course of their life?

12   A.    Sorry, can you say that question one more time?

13   Q.    Sure.  Could you describe for the Court your

14   experience over the years that you've been working on the

15   P320 program, your experience with P320s not only at their

16   initial manufacture point but also over their useful life?

17   A.    Yeah.  So as I was describing before, as we're

18   developing products and we're testing them and we're

19   running them through the stress tests, essentially, we do

20   high-round tests.  We shoot upwards of 20,000 rounds.  We

21   look at the parts when we're done just to make sure

22   there's nothing happening that we don't expect.  So part

23   of that is observing, you know, the sear face, the striker

24   foot face, features like this that are on the gun, the

25   striker safety notch.  We do take a look at those items to

```
 1    make sure nothing is unusual.
 2              THE COURT:  All right.  Thank you.
 3    BY MR. MIRENDA:
 4    Q.   And is that, in part, the experience you were basing
 5    your answers on?
 6    A.   Yes.
 7    Q.   Let's move to Exhibit 1, the animation, at 3:37.
 8         Do you recognize this from the animation?
 9    A.   Yes, I do.
10    Q.   So what is this depicting?
11    A.   So that is a rear view of the striker pin and striker
12    housing as well as the sear -- or the striker foot and the
13    sear face that it interacts with.
14    Q.   Let's start at the bottom here at the sear face that
15    is shown in the animation.  What did you observe about the
16    sear face in this portion of the animation?
17    A.   That it was very lumpy and bumpy and not uniform.
18    Q.   In your experience, does the sear face -- have you
19    ever seen a sear face that looks like that?
20    A.   No.
21    Q.   Now, moving up, the leg that's in the middle there,
22    what is that?
23    A.   That's the striker foot.
24    Q.   And up at the top of that leg, the rounded component
25    that's attached to the leg with the L-shape cutout in it,
```

1    what's that?

2    A.   That's the cylindrical portion of the striker pin.

3    Q.   When you observed this portion of the animation, did

4    you have any conclusions about its accuracy?

5    A.   Yes.

6    Q.   What did you observe?

7    A.   I think the biggest thing I observed beyond the sear

8    face that was very abnormal was the excessive gap that was

9    depicted in this view.  So both vertically along the sides

10   of the striker foot and also around the circumference of

11   the striker pin cylindrical portion there is a very large

12   gap that is not accurate.

13   Q.   Let me show you what's been marked as Exhibit 111.

14        Do you recognize Exhibit 111?

15   A.   Yes.

16   Q.   What is Exhibit 111?

17   A.   That's a CT scan image of the P320.

18   Q.   What's the orientation of this CT scan?

19   A.   It would be looking from the rear down towards the

20   front of the gun.

21             MR. MIRENDA:  I'd offer Exhibit 111.

22             MR. BAGNELL:  No objection.

23             THE COURT:  Full exhibit.

24                  (Plaintiff's Exhibit 111 admitted in

25                   evidence.)

1    BY MR. MIRENDA:

2    Q.    Is the striker pin and striker pin housing shown in

3    this CT scan?

4    A.    Yes, it is.

5    Q.    If we could put the animation at 3:37 side by side

6    with Exhibit 111.

7          Does the animation accurately depict the space around

8    the striker pin inside its housing?

9    A.    No, it does not.

10   Q.    Can you explain why or how?

11   A.    So if you look at the CT scan image, particularly the

12   area that is blown up, it's the rectangle on the right, it

13   shows the striker pin cylindrical portion actually

14   touching the upper cylindrical portion of the striker

15   housing.  And on the animation it shows a very large gap

16   in that area that is not accurate.

17   Q.    In a real P320 how is it that the striker pin is up

18   against the top of the housing in the way that you see on

19   the CT scan?

20   A.    So when the slide is closed and the striker pin is

21   engaged with the sear face, it's putting upward pressure

22   on the striker pin such that that body would always be

23   pushed up to the limit of travel against the striker

24   housing.

25   Q.    And what's the significance of the animation

1    depicting additional space around the striker inside its

2    housing?

3    A.    So the way that's depicted, it could be more

4    plausible that the striker foot could move up vertically.

5    Q.    And why is that?

6    A.    Because of the gap that's between the striker pin and

7    the striker housing.

8    Q.    And in your experience with P320s from 2014 forward,

9    have you ever seen a P320 striker and housing assembly

10   with that much space between the striker and its housing?

11   A.    No, I have not.

12   Q.    It's not designed that way, is it?

13   A.    It's not.  There's not enough of clearance there.

14   That's not how the parts are designed.

15              THE COURT:  I'll tell you, I'm just looking at

16   PX111.  I'm looking at the red box on the left, the small

17   red box.  It appears that the striker foot is still

18   recessed inside the housing.  I want it to be clear from

19   the witness where the striker foot is shown on PX111.

20              THE WITNESS:  So the striker foot, it's not the

21   complete foot because of the shape of it.  It comes down

22   and it has an arc.  So where they cut the CT slice, we're

23   missing some of that shape.

24              THE COURT:  That might be helpful to point out

25   if a photograph is actually missing something.  It's

1    important.  Maybe you have the witness again show on the

2    screen, if you can, what it is that PX111 is missing.

3    BY MR. MIRENDA:

4    Q.   Mr. Toner, PX111, that's a CT scan slice; is that

5    right?

6    A.   Correct.

7    Q.   Why don't we have you come down to the document

8    camera.  And if you could explain to the Court what the

9    fact that this is a CT scan slice does for the perspective

10   that you're seeing in terms of the leg and foot of the

11   striker.

12   A.   So because it's a slice of unknown depth into and out

13   of the page, we're only --

14           THE COURT:  I can't see it on the screen

15   picture.  Slide it over, please.

16           THE WITNESS:  Sorry.

17           Because it's a CT image and where it was sliced

18   in the gun, the depth of it I'm not sure where it was

19   sliced, but because of that you're not seeing the whole

20   striker foot coming down; it's only giving a portion of

21   it.  Because when you look at the shape of the striker

22   pin, it looks roughly like this and then it comes down.

23           THE COURT:  So you're drawing which I can't see.

24           THE WITNESS:  I'm sorry.

25           Basically looks something like this and then the

1    foot is down the bottom.  So it's conceivable this may

2    have been sliced through this area, so you're not seeing

3    this portion that's getting truncated.  There's a portion

4    of the striker foot there, it's just not the whole thing.

5              THE COURT:  I just don't have an understanding,

6    then, of what the witness's testimony is in terms of how

7    far the striker foot is coming down.  I think that's

8    relevant to the excess space claim.

9    BY MR. MIRENDA:

10   Q.   Mr. Toner, how about if you get the actual striker

11   that you were looking at, the real striker that you were

12   looking at.  We can put it on the document camera and

13   maybe you could show the Court what you mean by where the

14   CT slice is taken.

15   A.   So the geometry of the striker pin is such that it

16   comes down, there's some material in here and it kind of

17   arcs backwards.  So if you took a knife and sliced through

18   that front portion, you're not going to get the bottom of

19   this area of the hook; you're only going to see what's

20   interacting with the striker housing and not the whole

21   thing.

22   Q.   So if this image had been a CT slice that was a

23   little bit further forward on the striker --

24   A.   Or the opposite, yeah, it's hard to tell.

25   Q.   -- or further back on the striker, you'd see a

1    different length of the foot?

2    A.    Yes.    Correct.

3            THE COURT:    I get that.    I still don't have a

4    picture, from the witness's testimony, if there is such a

5    claim about if we could indeed see the striker foot on

6    this Exhibit Number 111 how far down would it extend,

7    would it be the same as shown on the animation.    That

8    seems to me to be what I'm trying to understand.

9            MR. MIRENDA:    The length of the striker foot

10    down to the bottom -- I'm sorry, the length of the striker

11    leg down to where the foot is?

12            THE COURT:    I think so.    It seems to me that

13    that's what you're trying to say.    You're trying to say

14    there's a difference between what the striker -- how far

15    the striker foot actually comes down.    Maybe that's not

16    what you're trying to say.    If that's not what you're

17    trying to say, and I'm sorry if I'm missing the major

18    point here, but you've shown me a photograph that seems to

19    me to be missing vital information.    And now the witness

20    is explaining what the information would be if there had

21    been a better CT scan taken.    We would actually be able to

22    see the striker foot as ostensibly shown on the

23    side-by-side and the animation.    So I'm trying to

24    understand then if we had a good photograph, a good CT

25    photograph, what would it show?

```
 1            MR. MIRENDA:  I understand, Your Honor.  Let me
 2   ask the witness some other questions because I think I was
 3   not going for that issue.
 4            If you can go back up.
 5            Let's put the side-by-side back up again.
 6   BY MR. MIRENDA:
 7   Q.   So let's start, Mr. Toner, with the striker body, the
 8   cylindrical body of the striker that has the L-shape
 9   cutout --
10   A.   Okay.
11   Q.   -- and its fit into the striker housing.
12   A.   Yes.
13   Q.   Putting aside where the striker foot comes down,
14   could you describe for the Court the difference between
15   the space around the striker body and the striker housing
16   looking at the animation on the one side and looking at
17   the CT scan on the other, just focusing on the striker
18   body and the striker housing.
19   A.   Yes.
20        So if you look at the animation depiction, there's a
21   pretty uniform space around that entire cylindrical body
22   and it's quite large.
23        If you look at the CT scan, you'll see that it's not
24   a uniform annular space around that cylindrical body and
25   the striker pin is actually in contact with the striker
```

 1 | housing at, say, the 10:00 to 12:00 position, roughly.  So
 2 | it shows that it's not an accurate depiction of it.
 3 | Q.   So the comparison that you're making here, Mr. Toner,
 4 | is not about where the foot sits but, rather, how much
 5 | space there is around the striker body inside its housing?
 6 |         MR. BAGNELL:  Objection, leading.
 7 |         THE COURT:  No, I'll allow it.
 8 |         THE WITNESS:  That's correct.  So there's much
 9 | more of a gap on the animation.
10 | BY MR. MIRENDA:
11 | Q.   Okay.  And you have -- maybe you can come back to the
12 | document camera with the two components.
13 |     You have a striker housing and a striker body?
14 | A.   Yes.
15 | Q.   Perhaps you could show us what that fit looks like
16 | and what it is you're describing in the difference between
17 | what you see in the CT scan and what you see in the
18 | animation.
19 | A.   So in the actual parts you can see that the gap is
20 | not large and uniform as it's shown in the animation.
21 | It's touching the top and it's a small gap where it is not
22 | touching.
23 |         THE COURT:  Thank you.
24 | BY MR. MIRENDA:
25 | Q.   And then going back to Exhibit 111 -- actually, if we

1    could go to Exhibit 132.

2        Mr. Toner, do you recognize Exhibit 132?

3  A.   Yes.

4            MR. MIRENDA:  I'd offer Exhibit 132.

5            MR. BAGNELL:  No objection.

6            THE COURT:  Full exhibit.

7                (Plaintiff's Exhibit 132 admitted in

8                evidence.)

9  BY MR. MIRENDA:

10  Q.   Focusing on the components inside the red circles,

11  you described these earlier for the Court; is that right?

12  A.   Yes.

13  Q.   And what are they and what are they made of?

14  A.   So the hockey stick shaped components are the frame

15  rails, and those are made out of stainless steel.  And the

16  upper portion that's kind of the U-shaped portion is the

17  slide and it has the slide channels, and the slide is made

18  out of stainless steel.

19  Q.   And based on your experience working with the P320,

20  have you ever seen any example where the frame rails move

21  down through the slide channel, those two stainless steel

22  parts move through each other?

23  A.   No.  They're solid parts, so that would be very

24  difficult.

25  Q.   Very difficult?

1    A.    It would be impossible.

2    Q.    They're two solid steel parts?

3    A.    Correct.  They're solid components.

4    Q.    Let me move to another topic.

5          In March of 2021 did you attend a joint firearms

6    inspection at North Star Imaging in Marlborough,

7    Massachusetts?

8    A.    Yes, I did.

9    Q.    What's North Star Imaging?

10   A.    North Star Imaging is a company that offers CT

11   scanning services to their customers.

12   Q.    And what was the purpose of this joint firearms

13   inspection that you attended?

14   A.    The point was for SIG's expert, Mr. Watkins, to

15   perform inspections and to do the CT scanning on pistols

16   that were involved with litigations.

17   Q.    Who was present for this examination?

18   A.    So there was North Star Imaging personnel there; I

19   was there; SIG counsel was there; Mr. Watkins was there,

20   who was SIG's expert; Mr. Bagnell was there and he also

21   had a couple of his experts, Mr. Villani and Mr. Hicks.

22   Q.    I'd like you to focus on one particular firearm that

23   was examined during that inspection, the so-called Mayes

24   firearm.

25   A.    Okay.

1    Q.    Were you present for the inspection of the Mayes

2    firearm?

3    A.    Yes.

4    Q.    And who else was present for that particular

5    inspection?

6    A.    Mr. Watkins was there, SIG's legal counsel,

7    Mr. Bagnell, as well as his experts Mr. Villani and

8    Mr. Hicks.

9    Q.    Could you describe the process of that inspection?

10   A.    Yes.

11         So, essentially, we would put the weapons that we

12   wanted to look at into the CT imaging machinery or -- yes,

13   machinery.  The North Star Imaging personnel would run the

14   CT scan, so they would actually run the equipment to

15   actually do the scans.  Then the weapons would be removed

16   from the equipment.  And basic safety check/function check

17   would be done on the guns to make sure that the gun was

18   operating as expected per the expectations.

19         From there, we would go in and take the gun apart,

20   take the slide assembly apart, take the frame assembly

21   apart to see if we could see any broken parts, any

22   abnormal wear, things of that nature.

23   Q.    And specifically who performed the disassembly part

24   of that inspection?

25   A.    Mr. Watkins did.

1   Q.   And who observed that disassembly?

2   A.   So I was observing as well as Mr. Villani and

3   Mr. Hicks were also in the room as well as Mr. Bagnell.

4   Q.   Okay.  I'd like to ask you to take a look at

5   Exhibit 76.

6        Do you recognize the two photographs that are in

7   Exhibit 76?

8   A.   Yes.

9   Q.   Are these photographs that were taken during that

10  visual inspection at North Star Imaging in 2021 of the

11  Mayes firearm?

12  A.   I believe so.

13            MR. MIRENDA:  I'd offer Exhibit 76.

14            MR. BAGNELL:  No objection.

15            THE COURT:  Full exhibit.

16                 (Plaintiff's Exhibit 76 admitted in

17                 evidence.)

18  BY MR. MIRENDA:

19  Q.   First, focusing on the photograph on the left, what

20  is that?

21  A.   So that is the bottom of the striker foot looking

22  basically at the striker foot face.

23  Q.   And this is of the Mayes firearm?

24  A.   Yes.

25  Q.   Looking in the red circle, what did you observe

1    during this inspection of the Mayes firearm?

2    A.    There was a buildup of debris.  I don't really --

3    can't say for certain what the debris was, but it was

4    definitely some kind of foreign substance in combination

5    with some kind of lubrication that the customer was likely

6    using.

7    Q.    You said in combination with lubrication.  What do

8    you mean by that?

9    A.    Like oil and things of that nature, or grease.  It

10   could be one or the other.

11   Q.    Are oil or grease used as lubricants for firearms?

12   A.    Yes, very commonly.

13   Q.    What is the photograph on the right?

14   A.    So the photograph on the right is of the same striker

15   foot, roughly the same angle with that debris removed.

16   Q.    Were you there when both of these photos were taken?

17   A.    Yes.

18   Q.    Did you see how the substance or the debris was

19   removed from the photograph of the striker on the left to

20   the photograph of the striker on the right?

21   A.    I believe he used a Q-tip.

22   Q.    Who?

23   A.    Mr. Watkins.

24   Q.    And what did he do?

25   A.    So he ran a Q-tip along that top edge to see if that

1    material was indeed debris or if it was actually part of

2    the striker foot.

3    Q.    And what happened?

4    A.    It came off.  It was removed.

5    Q.    I'd like you to take a look at Exhibit 78.

6          Do you recognize Exhibit 78?

7    A.    Yes.  It's a P320 sear.

8    Q.    Again, is the photograph on the left, do you

9    recognize that as the Mayes sear photograph taken during

10   the same inspection?

11   A.    Yes.

12   Q.    And what about the photograph on the right, what do

13   you recognize that to be?

14   A.    That's the same component, it just has the sear face

15   cleaned off.

16   Q.    Who cleaned it off?

17   A.    Would have been Mr. Watkins.

18   Q.    How did he do that?

19   A.    With a Q-tip.

20   Q.    So what did Mr. Watkins do, exactly?

21   A.    Just took a Q-tip and ran along that face to see if

22   the debris was loose.

23   Q.    And what happened when he did that?

24   A.    It cleaned off.

25   Q.    Was Mr. Bagnell in the room when Mr. Watkins cleaned

1  off the striker foot in Exhibit 76 and the sear face in

2  Exhibit 78?

3        MR. BAGNELL:  Objection, Your Honor.  It's

4  argumentative.  Whether I was in the room or not --

5        THE COURT:  No, that's a fact question.

6        I take it there's no objection to 78 or 76?

7        MR. BAGNELL:  There's no objection.

8        THE COURT:  They're full exhibits.

9            (Plaintiff's Exhibits 76 and 78 admitted in

10              evidence.)

11        THE COURT:  And I overrule the objection to

12  whether you were present in the room.

13        THE WITNESS:  Yes, I believe he was.

14  BY MR. MIRENDA:

15  Q.   What about Mr. Villani?  Was Mr. Villani present?

16  A.   Yes, I believe he was.

17        THE COURT:  When you reach a logical stopping

18  point, we'll take a recess.

19        MR. MIRENDA:  Yes, Your Honor.

20        THE COURT:  Now?

21        MR. MIRENDA:  Now would be fine.

22        THE COURT:  We'll take a 15-minute recess.

23  Thank you.

24            (Whereupon, a recess followed.)

25        THE COURT:  Please be seated.

1          It looks like we'll probably go to 5:00 p.m. if

2     that's okay with everybody.  Everybody good with that?

3     Okay.  And then start again tomorrow.

4          If you'd like to proceed.

5          MR. MIRENDA:  Thank you, Your Honor.

6     BY MR. MIRENDA:

7     Q.   So, Mr. Toner, just before we broke we were looking

8     at a number of different parts of the animation and your

9     observations of them when you reviewed the animation in

10    the fall of 2021.

11    A.   Yes.

12    Q.   After reviewing the animation on Mr. Bagnell's

13    website and making the observations you made, did you have

14    any concerns about how the animation was depicting the

15    internal components of the SIG Sauer P320?

16    A.   Yes, I did.

17    Q.   What were those concerns?

18    A.   My concerns were that the quality of the parts and

19    the depiction of the looseness of the fit creates a

20    depiction that is not accurate to what the gun can

21    actually do.  So it damages the reputation of the company.

22    Q.   And in what way, in your experience, were the

23    depictions in the animation harmful?

24    A.   Because showing that the striker foot can move

25    vertically and slip off the sear and also with the striker

1    safety lock getting kind of bumped up and out of the way

2    and allowing the striker pin to go forward, it's showing

3    that it can fire in a manner that's not reality.

4    Q.    Those depictions, how does that affect SIG's

5    reputation and brand?

6    A.    We have a reputation to manufacture reliable,

7    durable, and quality firearms that are precision

8    engineered that we supply to law enforcement and the

9    military.  So this depiction damages that brand.

10   Q.    Earlier you talked about, described some of the

11   testing that SIG puts the P320 through.  Could you

12   describe that testing in more detail?

13   A.    So there's a variety of tests we do, we conduct on

14   the weapons when we launch products from reliability to

15   durability.  We do environmental testing which is, you

16   know, hot, cold.  We put it in sand and dust to ensure

17   that the weapon will fire under those adverse conditions.

18   We also do abusive testing.  We've done vibration testing

19   in the past where we actually put the weapon in a box and

20   shake it very vigorously and very extreme to see if the

21   gun would fire, and it did not.  We've also done

22   third-party testing to the same vein of vibration testing

23   where we would put several guns into a vibration fixture

24   and shake them very vigorously and extremely to see if it

25   would fire, and it does not.

1  Q.   Could you describe maybe in a little bit more detail

2  what testing looks like and how it works?

3  A.   So I don't know all the details, but I can give you

4  an overview of it.

5      Essentially, you mount the pistols on a table that

6  vibrates.  So essentially you can input frequencies of

7  vibration and the table will shake and pitch and move, and

8  the gun is attach to that on a fixture.  And what that

9  does is tell you whether the gun and the internal safety

10 features, whether the gun would fire or not under those

11 very extreme conditions.

12 Q.   Does the P320 get put through that kind of vibration

13 testing?

14 A.   Yes.  It's not a regular occurrence, but we have done

15 it on two occasions at this point.

16 Q.   If you could describe those occasions, what was

17 involved in those two sets of testing?

18 A.   So there were two separate tests.

19     We did it very early on before we submit the guns to

20 the modular handgun system program.  That was more of what

21 I described before where we put it in a box, it's called

22 loose cargo test.  But it's the same type of shaker table,

23 it's just a different fixture.

24     And then in the fall of 2021 we also had a

25 third-party company do the vibration tests which was a

1    little bit more scientific in that they did a series of

2    frequencies so that you're getting a full gamut of

3    vibrations that are possible or plausible so that you can

4    see if the gun is going to perform under those conditions.

5    Q.    You mentioned loose cargo test.  Can you describe

6    what that is?

7    A.    Yeah.  That is -- it's part of the Army testing

8    protocol.  Essentially, it's supposed to mimic if the gun

9    was loose, like in the back of a Humvee or in the back of

10   a pickup or some kind of Army vehicle, and it basically

11   bounces around and is on the shaker table as well, but

12   it's enclosed in a wooden box so that it bounces around

13   and rattles around in the box to determine whether it

14   would fire or not.

15   Q.    And you also described environmental testing?

16   A.    Yes.

17   Q.    Can you describe that in a little more detail?

18   A.    So there's several tests.  The most common ones we do

19   are hot and cold, so we do at extreme temperatures, like

20   150 degrees Fahrenheit down to minus 50 degrees Fahrenheit

21   for the cold.

22         We also do rain testing.  So we'll put the gun in a

23   fixture that has a very high intensity rain event, and we

24   fire the weapon in that condition to see if it will

25   perform in extreme environments.

1          Sand and dust testing is where it's in a chamber

2     where there's sand and dust blowing around in the chamber

3     with the weapon itself.  And then you see if it will fire

4     after that is complete.

5          Mud testing is similar.  You drag it through some mud

6     and then you pull it out and see if it will fire.

7          Those sort of tests are the environmentals.

8     Q.   You also mentioned high-round testing.  I think you

9     described that earlier.

10    A.   Yes.

11    Q.   What was that?

12    A.   We'll take a gun or a platform and we'll do

13    high-round count testing.  So we'll literally sit there

14    and fire large amounts of ammo through the gun.

15    Generally, it will be the type of ammo that is more higher

16    impulse so it's a little stronger than the average ammo

17    that our customers would use just to see the durability of

18    the components to understand how the gun would perform at

19    that extended life.

20    Q.   Are you familiar with how the P320 performs on those

21    testing?

22    A.   Yes.

23    Q.   How did the P320 perform in that testing?

24    A.   Our reliability and our durability are very good.

25    We're above and beyond what I would consider a lot of the

1    other guns in the industry.

2        Environmentals, all pistols perform very similar as

3    far as a lot of those tests are concerned.  We're about

4    average in that regard.

5        But, yes, we perform well in most of those tests.

6    Q.   And in particular, has the U.S. Army tested the P320?

7    A.   Yes, it has.

8    Q.   And describe that testing and what the results of

9    that testing are.

10   A.   So as part of the U.S. Army testing and our success

11   in that program, the weapons had to go through what is

12   called PVT testing.  That's product verification testing.

13   Essentially, they have a large testing protocol:

14   reliability, durability, the environmentals, abusive

15   handling.  They run the gun through all of those tests to

16   ensure that when they put the gun in the hands of the

17   soldier that it's something that they would want to field.

18   Q.   You mentioned abusive handling.  I don't think we've

19   heard about that kind of testing before.  What's that kind

20   of testing?

21   A.   That's testing that we would do that could damage the

22   gun when you're testing it.  So drop testing as well as

23   high pressure testing.  So essentially testing whether the

24   barrel will contain the pressures that are involved when

25   you fire the weapon.

 1    Q.    And what is that testing designed to test?

 2    A.    So the barrel testing is essentially testing the

 3    integrity of the metal that is used for the barrel and the

 4    geometry and the design of the barrel.

 5          And then drop testing is to ensure that the gun won't

 6    go off during abusive handling in a drop.

 7    Q.    Are you familiar with how the SIG P320 performed in

 8    that testing?

 9    A.    Are you talking about the Army testing?

10    Q.    The Army testing, yes.

11    A.    So there's a couple of different levels of testing

12    that we did.  There was very early testing and then there

13    was later testing.

14          In the very early testing of the MHS testing, we were

15    notified of a dop fire.  And we made changes to the gun to

16    address that.

17    Q.    And after SIG made changes to the gun to address that

18    particular scenario, did the Army continue to test the

19    firearm?

20    A.    Yes.  So after we were notified of that, we went to

21    work to address the issue.  We made changes to the design

22    and gave them more guns to test.  And they tested those

23    guns, and it passed.

24    Q.    Describe what was the nature of the issue that the

25    Army detected?

1   A.   So during drop testing, they were testing at a angle

2   that I wasn't aware of prior to submitting the guns and

3   also they had the manual safety in the off position which

4   was not normal protocol, and they had a drop fire.

5   Q.   What was the cause?  What was determined to be the

6   cause of that drop fire?

7   A.   So what we observed was that when the gun was being

8   dropped, the trigger, through its inertia, was rotating

9   itself.  So essentially the trigger was pulling itself as

10  a cause of the impact when the gun hit the ground.

11  Q.   And did SIG address that issue?

12  A.   Yes.

13  Q.   How did SIG address that issue?

14  A.   So we went through a design effort to reduce the mass

15  of the components.  So, in other words, make them lighter.

16  So we went through and reduced the mass so that that

17  effect of inertia during the drop testing would not be

18  negative.

19            THE COURT:  Is there a time frame?  We're

20  talking very broad time frames.  Can you ask the witness

21  if he knows approximate years when any of this is

22  happening?

23            MR. MIRENDA:  Yes, certainly.

24  BY MR. MIRENDA:

25  Q.   Mr. Toner, again, the year that this occurred?

1  A.   So this would have been early 2017.  So we had a

2  start-of-work meeting with the Army after we were awarded

3  the contract.  That's when I was notified about their test

4  results.

5  Q.   And you said SIG addressed the issue by reducing the

6  mass of some of the components.  What was the consequence

7  of reducing the mass of those components?

8  A.   So by reducing the mass of the components, doing the

9  drop testing, the trigger would not pull itself.  So, in

10  other words, it wouldn't have that inertial effect where

11  it wanted to rotate.

12  Q.   And I guess to be clear, is the scenario you're

13  describing that the Army detected and that SIG addressed

14  where inertia was pulling the trigger, is that the

15  scenario that's depicted in the animation?

16  A.   I'm sorry, can you ask the question one more time?

17  Q.   Is the scenario where inertia was pulling the

18  trigger, where there was a trigger pull caused by inertia

19  that the Army detected and SIG addressed, is that what is

20  being shown in the animation?

21       THE COURT:  Hold on a second.  Objection?

22       MR. BAGNELL:  Objection to the predicate.  It's

23  a statement, not a question, Your Honor.  I heard a

24  statement there that I think was not a question.

25       THE COURT:  I think it got to a question

```
1   ultimately.  I'll allow the question.

2               THE WITNESS:  I'm sorry, can you do it one more

3   time?

4               THE COURT:  Is your question, basically, is the

5   animation showing something about being dropped?

6   BY MR. MIRENDA:

7   Q.  Is the animation showing the scenario that you just

8   described, that the Army detected and that SIG addressed,

9   is that what the animation is showing?

10  A.  No, it is not.

11              MR. MIRENDA:  I have no further questions,

12  Your Honor.

13              THE COURT:  Cross-examination.

14

15                      CROSS-EXAMINATION

16  BY MR. BAGNELL:

17  Q.  Mr. Toner, good afternoon.

18  A.  Good afternoon.

19  Q.  This is not the first time we've been in court

20  together, is it?

21  A.  No, sir.

22  Q.  Or at a deposition.

23      I want to make sure I understand your testimony,

24  Mr. Toner.  I think you testified in response to

25  Mr. Mirenda's questions that you were with the P320
```

 1   concept from the beginning, correct?

 2   A.   That's correct.

 3   Q.   Were you the original designer of the P320?

 4   A.   Yes.  So I was part of a team that was the design

 5   team.  But, yes, I was with it from the beginning.

 6   Q.   Was there preproduction testing done on the P320?

 7   A.   Yes.

 8   Q.   What kinds?

 9   A.   So some of the testing that I described.  We did

10   reliability, durability, drop testing, we did

11   environmentals.  All of the things that I was describing

12   earlier.

13   Q.   What you didn't note is that a P320 drop fired at SIG

14   Sauer's own in-house testing facility in December 2013,

15   correct?

16   A.   I'm not aware of what you're referring to.

17   Q.   You're not aware of that.  We'll come back to that

18   later.

19        And the P320 was put into commerce in January of

20   2024; is that correct?

21   A.   I'm sorry?  What was the date?

22   Q.   January, I'm sorry, 2014?

23   A.   Yes, it was -- I don't know if it was January, but it

24   was definitely early that year.

25   Q.   All right.  Mr. Mirenda asked you some questions

1    about the fall of 2021 when I think you said SIG's legal

2    department came to you and asked to look at the animation

3    on my site or the YouTube site; is that correct?

4    A.    Yes.

5    Q.    Did they ask you to review the Saltz Mongeluzzi

6    posting of the animation about six weeks before my

7    posting?

8              MR. MIRENDA:  Objection, Your Honor.

9              THE COURT:  What's the objection?

10             MR. MIRENDA:  Would be privileged, legal

11   department asking him to do something.

12             THE COURT:  Well, you already asked him.  You

13   elicited what the legal department had done.  You can ask

14   him -- maybe you can ask the question in terms of did he

15   look at the animation on another firm's website without

16   going into the content of anything legal told him.

17   BY MR. BAGNELL:

18   Q.    Did you look at the website of Saltz Mongeluzzi in

19   the fall of 2021, Mr. Toner?

20   A.    No, I did not.

21   Q.    Why not?

22   A.    I wasn't aware that it was on their site.

23   Q.    No one in your whole company told you that Saltz

24   Mongeluzzi, a large Philadelphia firm, had posted this

25   animation two months before I did?

1   A.   I was not aware of that.

2   Q.   No one?

3   A.   No one.

4   Q.   The Army testing that Mr. Mirenda asked you about,

5   Mr. Toner, I think you conceded that there was a drop fire

6   of an original version P320, correct?

7   A.   It was the M17 version of the 320, yes.

8   Q.   Which had a manual thumb safety?

9   A.   Correct.

10  Q.   No tab trigger safety, but a thumb safety?

11  A.   Correct.

12  Q.   All right.  Are you aware -- did you review the

13  testing results from the Army for the M17?

14  A.   I didn't review the testing results.  It was a

15  meeting with the Army, people from the Army that told me

16  what happened.

17  Q.   Did they tell you that there are, in fact, over 200

18  malfunctions of the P320 prototype in 2016 testing?

19  A.   I know there was a lot of malfunctions that they

20  wanted us to address, but I don't know the exact number.

21  Q.   Other than the drop fire, what were the other

22  malfunctions they told you about?

23  A.   They had some basic malfunctions because they were

24  using a test fixture to test the gun which was giving --

25  the way the gun was being held, it was a little bit

 1    unusual.  It wasn't the way a person would hold it.  We

 2    had some what we call live ejects.  So you're firing the

 3    weapon and then all of a sudden a bullet cartridge that

 4    hadn't been fired would eject out of the gun.  That was

 5    the main thing that I remember.  We had some other

 6    environmental-type failures but it wasn't anything super

 7    significant.

 8    Q.    So you had a drop fire, correct?

 9    A.    Yes.

10    Q.    How many?

11    A.    To my knowledge, it was one test.  I don't know the

12    details on that end.

13    Q.    Failure to eject spent casings?

14    A.    Not fail to eject; it was ejecting live rounds.

15    Q.    Ejecting live rounds.

16          Failure to fire ball ammunition; is that correct?

17    A.    I'm sorry?

18    Q.    Failure to fire ball ammunition?

19    A.    Yes, they had some of those.

20    Q.    And failure to fire, period, correct?

21    A.    Yes.

22    Q.    Okay.  And I think you testified in response to

23    Mr. Mirenda that SIG went out and did something to fix the

24    gun; is that correct?

25    A.    Yes.

1   Q.   I want to show you Defendants' Exhibit 8 for

2   identification.

3              MR. BAGNELL:  I'll put it up on the ELMO,

4   Your Honor, if that's okay.

5              THE COURT:  Sure.

6   BY MR. BAGNELL:

7   Q.   This is Defendants' Exhibit 8 titled Engineering

8   Change Proposal dated May 10, 2017.  Title of change:

9   XM17/XM18 lightweight components.  Class of ECP:  Minor.

10  Priority: Urgent.  ECP type: Preliminary.

11      Do you recognize this document, Mr. Toner?

12  A.   Yes.

13  Q.   In fact, your name is at the bottom of it; is that

14  right?

15  A.   Yes.

16  Q.   I'm trying to -- there it is.  Name:  Sean Toner.

17  Right there.  Okay.

18             MR. BAGNELL:  Your Honor, I would move this in

19  as a full exhibit.

20             THE COURT:  Any objection?

21             MR. MIRENDA:  No objection.

22             THE COURT:  Okay.  Full exhibit, Defendants'

23  Exhibit 8.

24                 (Defendants' Exhibit 8 admitted in

25                  evidence.)

```
 1   BY MR. BAGNELL:
 2   Q.   Mr. Mirenda asked you was a drop fire represented in
 3   the animation that's Exhibit 1.  You reviewed the text in
 4   the animation, correct, Mr. Toner?
 5   A.   I'm sorry, the what?
 6   Q.   You reviewed the text in the animation --
 7   A.   Yes.
 8   Q.   -- underneath?
 9   A.   Yes.
10   Q.   One of those text statements in the animation was
11   that sudden impact can make the gun fail, correct?
12   A.   I believe it said something along the line, yes.
13   Q.   You would agree with me that a drop fire is a sudden
14   impact to the ground, correct?
15   A.   Yes.
16   Q.   All right.  I want to take you through some of these
17   changes.  Again, this is May of 2017.  SIG has just won
18   the Army contract, correct?
19   A.   It was in January of 2017.
20   Q.   Okay.  Well, four months before.
21        And that was a $580 million contract; am I correct?
22   A.   Something like that.  I don't know the exact number.
23   Q.   Generally denominated in that price range?
24   A.   Yes.
25   Q.   Okay.  So is this -- is this the Army asking you to
```

1    change out the receiver subassembly for the M17 and the

2    M18?  We'll start there.  The receiver subassembly?

3    A.    Yes.

4    Q.    The receiver subassembly, general officer?

5    A.    Yes.

6    Q.    The sear group subassembly?

7    A.    Yes.

8    Q.    They want a trigger, LW?

9    A.    Correct.

10   Q.    I assume that means lightweight?

11   A.    Yes.

12   Q.    They want a sear, lightweight?

13   A.    Yes.

14   Q.    A striker subassembly?

15   A.    Yes.

16   Q.    A pin striker, lightweight; is that correct?

17   A.    Correct.

18   Q.    So that's a lot more than just asking for a lighter

19   weight trigger, correct?

20   A.    Not really.  Because the way the structure of the

21   drawings worked is that if you change the assembly or if

22   you change the component, you also have to rev up the

23   assembly.  They're tied together.

24   Q.    So you're saying that all of those, what, seven or

25   eight, it's really just one item, the trigger; is that

```
 1    your testimony?
 2    A.    It's the trigger, the sear, and the striker assembly
 3    is what we changed.
 4    Q.    The receiver is not the trigger, correct?
 5    A.    Those components are used in the receiver assembly,
 6    and that's why you have to rev both components.
 7    Q.    What is a receiver, Mr. Toner?
 8    A.    That's the metal chassis, the serialized component
 9    that's part of the 350.
10    Q.    Basically the frame of the gun?
11    A.    Yes.
12    Q.    So it's not the trigger?
13    A.    So the receiver assembly contains the trigger.
14    Q.    I understand that.  But the receiver is basically the
15    frame of the gun on which the striker rests, correct?
16    A.    Correct -- not the striker, no.  Can you say that
17    again?
18    Q.    You have the receiver, the frame?
19    A.    Yes.
20    Q.    And what's on top of that?
21    A.    The slide assembly.
22    Q.    The slide assembly, that was my mistake.  Sorry about
23    that.
24          All right.  These changes made to the military
25    version of the P320 -- before I ask that, is the M17 and
```

1    the M18 the Army denomination of the P320?

2    A.    It is the Army denomination of the MHS handgun.

3    Q.    It's a P320 gun, correct?

4    A.    It's based on the P320, yes.

5    Q.    M, I assume, stands for military?

6    A.    I'm sorry?

7    Q.    M, I assume, stands for military?

8    A.    I don't know the answer to that question.  Possibly.

9    Q.    17 and 18, do you know what that stands for?

10   A.    Those are their number designations that they gave to

11   those two weapons.

12   Q.    All right.  These changes that the Army required SIG

13   to make on an urgent basis, were any of these changes made

14   to the commercial version of the P320 in the hands of law

15   enforcement and civilians?

16   A.    Yes.  Eventually, we did change those guns.

17   Q.    Were they made at the time this ECP was issued?

18   A.    Not in May, no.

19   Q.    Okay.  When were they allegedly made?  Let's go

20   through this.  When were they allegedly made to the

21   commercial version of the P320 in the hands of law

22   enforcement and civilians?

23   A.    We implemented the changes during the voluntary

24   upgrade.

25   Q.    All right.  Did you mandatorily recall the weapon?

1    A.    Excuse me?

2    Q.    Did you mandatorily recall the P320, the commercial

3    version?

4    A.    No, SIG Sauer did not.

5    Q.    So SIG Sauer did not actually make these changes to

6    every commercial P320 out there, correct?

7    A.    Not until the voluntary upgrade.

8    Q.    Let me ask it again, Mr. Toner.  You announced a

9    voluntary upgrade program, correct?

10   A.    Yes.

11   Q.    When was that?

12   A.    It would have been August of 2017.

13   Q.    That was not a mandatory recall of the P320, though,

14   correct?

15   A.    Correct.

16   Q.    And under the terms of the voluntary upgrade program,

17   am I correct that SIG said if you want to send your P320

18   in for enhancements, you can but it's safe as is; is that

19   correct?

20   A.    Correct.

21   Q.    Okay.  Out of the approximately half million P320s in

22   circulation at that point, Mr. Toner, do you know the

23   actual percentage that were returned for this so-called

24   upgrade program?

25   A.    I don't have exact numbers for you, but I believe to

1  date we're somewhere in the 300,000 range.

2  Q.    300,000?

3  A.    I don't know the exact numbers, but that's what I've

4  heard.

5  Q.    We'll come back to that.

6       You work for SIG Sauer, as Mr. Mirenda pointed out,

7  correct?

8  A.    Yes.

9  Q.    You're a salaried employee?

10 A.    Yes.

11 Q.    How many times, Mr. Toner, including today, have you

12 been called to testify in cases alleging that a P320

13 malfunctioned and fired without a trigger pull from 2014

14 to the present time?

15 A.    When you say "testify," are you talking about

16 depositions or trials?

17 Q.    Depositions and trials.

18 A.    Depositions, I think I'm probably around a dozen.

19 Trials I've been through, this is the second one.  And I

20 also did some patent work depositions as well, but that's

21 separate.

22 Q.    How many of the alleged over 200 now P320

23 malfunctions in the real world have you investigated

24 personally?

25 A.    So primarily it would be the ones that I would be

 1  involved with litigation on.

 2  Q.   Did you ever go beyond your case-specific incident

 3  and say, hey, I'd like to go out and talk to some of these

 4  other people who say they've been shot by this gun?

 5  A.   On occasion if a gun was returned, I would get my

 6  eyes on it.  But it wasn't a regular basis.  We have other

 7  people that have that task to investigate the guns.

 8  Q.   How many SIG Sauers are in circulation now,

 9  Mr. Toner?

10  A.   Roughly two and a half million.

11  Q.   How do you know that?

12  A.   Based on what I've heard from sales.  It's not a

13  solid number.

14  Q.   Is that domestic or international?

15  A.   That would be U.S. and Canada.

16  Q.   Does the P320 go elsewhere?

17  A.   Yes.

18  Q.   All over the world?

19  A.   Yes.

20  Q.   Do you know what the total overall number is of

21  what's out there?

22  A.   I do not have that information.

23  Q.   How many alleged uncommanded discharges of the P320,

24  Mr. Toner, are you aware of since it was put into

25  production?

1    A.    Primarily, just the ones that I've been involved with

2    litigation on.  And I don't have a total number for you.

3    I don't have that number in my head.

4    Q.    Has anyone ever told you it's over 200 now known

5    incidents by plaintiff's counsel?

6    A.    I haven't had anybody tell me that number, no.

7    Q.    SIG keeps track of these events, though, correct?

8    A.    I don't know the answer to that.

9    Q.    Your Oracle system, your RMA Oracle system?

10   A.    Yes.

11   Q.    Are you familiar with it?

12   A.    I've never done anything with it.  It's a customer

13   service role; it's not an engineering role.

14   Q.    But you're the designer, Mr. Toner, correct, of the

15   gun?

16   A.    Yes.

17   Q.    Does it peak your interest to go to customer service

18   and say, hey, how many times have we had reports of this

19   gun catastrophically malfunctioning and shooting people?

20   A.    It peaks my interest.  Like I said, we have other

21   people investigating that from the customer service side

22   and our gunsmiths.  So I get involved in it when people

23   ask me to get involved.

24   Q.    Anything beyond that?  Have you done anything else

25   more proactive than getting involved when you're asked to

1   get involved?

2   A.   I mean, I've reviewed the results of the vibration

3   studies.  I've reviewed, you know, testing that we've done

4   over time.  So, yes, in some regards, yes.

5   Q.   When you say the vibration testing, are you talking

6   about the Dayton Brown testing done in October 2021?

7   A.   We've done it twice with Dayton Brown, once in 2015

8   and once in 2021.

9   Q.   Oh, you did it in 2015?

10  A.   Yes.

11  Q.   Because that was never produced to me after years of

12  litigation and discovery.

13       What was the result of the 2015 Dayton Brown testing?

14  A.   So that was what I was describing earlier, the loose

15  cargo testing that we did prior to submitting guns to the

16  Army for their contract.

17  Q.   How many guns were tested in 2015?

18  A.   I don't know that number off the top of my head.

19  Q.   There were ten in 2021, correct?

20  A.   I believe so, yes.

21  Q.   And those were handpicked brand new guns from

22  headquarters, correct?

23  A.   There were pulled from inventory is what I

24  understood.

25  Q.   Well, the testimony in *Guay* way was that they were

1  brand new picked by headquarters.

2  A.   Correct, they were --

3          MR. MIRENDA:  Objection.

4          THE COURT:  What's the objection?

5          MR. MIRENDA:  The representation of counsel.

6          THE COURT:  Just so you know, to the extent,

7  Mr. Bagnell, if you're representing anything, it's fine if

8  you want to formulate a question.  I'm not assuming the

9  truth of anything unless the witness says it's true or

10  unless you prove it otherwise.

11          MR. BAGNELL:  I only said it, Your Honor,

12  because Mr. Toner was present at the trial and testified.

13  But I'll move on.

14          THE COURT:  Okay.

15  BY MR. BAGNELL:

16  Q.   You don't know how many guns were tested in 2015?

17  A.   No, I don't have that information.

18  Q.   And your testimony is that that unknown number of

19  guns passed with flying colors in 2015?

20  A.   Yes.  It passed the test.

21  Q.   Did you do any drop testing?

22  A.   Yes.

23  Q.   Okay.  Any drop fires in 2015?

24  A.   No, not that I'm aware of.

25  Q.   But the Army had one in April 2016?

1    A.    Correct.

2    Q.    And you don't recall one in December of 2013 --

3    A.    Excuse me.  So I don't know if it was April of 2016.

4    I don't know if that date is accurate.

5    Q.    The Army, generally 2016, you're testifying there was

6    one drop fire?

7    A.    Yes.  They informed us of that.

8    Q.    And despite being the designer of the weapon, I think

9    your testimony is that you're not aware of a December 2013

10   drop fire at SIG's own headquarters?

11   A.    I am not aware of what you're referring to.

12   Q.    You're not aware of it?

13   A.    No.

14   Q.    Any other drop fires of the P320, the commercial

15   version now that you're aware of, Mr. Toner?

16   A.    Not at the present time, no.

17   Q.    Were you involved in the *Sheperis v. SIG Sauer* case,

18   Mr. Toner?

19   A.    No.

20   Q.    You never heard anything about it?

21   A.    I've heard the name, but I wasn't involved with it.

22   Q.    As the designer of the weapon, Mr. Toner, when there

23   is a lawsuit, are you brought in to discuss what's

24   happened?

25   A.    It depends on what the situation is.  Not all the

1    time, no.

2    Q.   Does it concern you that there's over 200 -- I should

3    say over 100 plaintiffs in the United States right now

4    alleging that their P320 fired without a trigger pull?

5    A.   I mean, it's an interesting data point.  I don't know

6    how it's happening.  I've not been able to recreate it.

7    So I don't know how to -- it doesn't concern me because I

8    know the design is good and I stand behind it.  So it

9    doesn't concern me in that regard.

10   Q.   It doesn't concern you at all?

11   A.   Like I said, it's interesting that it keeps

12   happening, but with all the testing we do, we cannot

13   recreate it.

14   Q.   Have you seen the videos of this gun discharging

15   without a trigger pull?

16   A.   I've seen a couple videos of the gun going off, but I

17   can't tell whether the trigger was pulled or not.

18   Q.   Have you seen the Roscommon video, Mr. Toner?

19   A.   I believe so, yes.

20         MR. BAGNELL:  I'd like to play that, Your Honor,

21   if that's acceptable to the Court.

22         MR. MIRENDA:  I'm going to object, Your Honor,

23   just because it's not only beyond the scope but it's not

24   relevant to the animation.  There's no connection to the

25   animation.

1          THE COURT:  Is there a connection?  It seems to

2     me -- I didn't understand this trial to be about overall

3     the issues of any particular case of a misfire in a

4     particular case.  I thought this trial was really just

5     about the animation.

6          MR. BAGNELL:  I agree, Your Honor.  Actually, I

7     objected when Mr. Mirenda seemed to go beyond that in my

8     deposition.  But I believe I heard testimony where the

9     message to the Court was that this was not possible.  When

10    I heard that, Your Honor, I thought, okay, that's a

11    foundation to bring in some of these events to ask

12    Mr. Toner about it.  And then I plan on moving to the

13    animation and the animation images and the actual

14    photographs.

15         THE COURT:  So I guess the question I have,

16    Mr. Mirenda, it seems like you could have, but you didn't

17    stick with the animation.  You kind of ended the testimony

18    of the witness having the witness talk about overall his

19    view of the reliability, durability, all the testing that

20    you do, stuff that frankly you didn't need to do if all

21    you wanted to do was to show that the animation was false.

22    Unless I'm missing something.  It seems like you decided

23    to essentially do a full-throated defense of the safety of

24    the weapon in a way that's not related to the animation.

25    And then you decided to go into all the Army stuff.  So it

1    does seem to me kind of you opened the door.  I'm not sure

2    why you opened it, but it seemed like you opened the door

3    to it.  So I'm having a harder time precluding Mr. Bagnell

4    from doing that.

5              MR. MIRENDA:  Your Honor, I would say that the

6    line that I would try to maintain is the other litigations

7    with other theories that aren't what's depicted in the

8    animation don't bear on -- don't bear on the claim.  And

9    what Mr. Toner testified to as just the general testing

10   that the firearm is put through, I didn't object to

11   Mr. Bagnell asking questions about testing and testing

12   methods and things like that.  When we get into specific

13   other cases that don't relate to the animation, I think

14   that's the line that I would stand on.

15             THE COURT:  But they're instances in which, at

16   least according to Mr. Bagnell, the firearm failed, right?

17   And you tried to bring out, well, the witness is saying

18   the firearm is doing great on testing.  In other words,

19   it's not failing.  So the fact that these instances come

20   up in the context of other cases seems to me to be pretty

21   aligned with the subject matter that you decided to bring

22   up.  I'm not sure why you brought it up, but you decided

23   to bring it in here.

24             So let me ask, Mr. Bagnell, what are you going

25   to do?  You're just going to show one?

1          MR. BAGNELL:  One, Your Honor.  So about three

2   minutes long.

3          THE COURT:  About three minutes long.

4          You'll ask a question or two about it, but

5   you're not going into other cases?

6          MR. BAGNELL:  No.  Because then I want to go

7   into the animation itself.

8          THE COURT:  I'll allow this.  I think the door

9   has been opened on the issue so I'll allow the video from

10  this other instance to be shown.

11         MR. BAGNELL:  Your Honor, I'm going to move this

12  to the relevant parts.

13         THE COURT:  Can I get an exhibit number?

14         MR. BAGNELL:  Yes.  This is -- I have a

15  placeholder for this.  Let me pause this.

16         THE COURT:  I'll need an exhibit number, a

17  formal offer.  I know there will be an objection.  I'm

18  overruling that objection provided the witness -- have you

19  seen this video before, sir?

20         THE WITNESS:  I have.

21         THE COURT:  I'm overruling the objection.

22         Let's get an exhibit number so it's officially

23  part of the record.

24         MR. BAGNELL:  It is Exhibit 20 for

25  identification.

```
 1              THE COURT:  You're offering it?

 2              MR. BAGNELL:  Yes.

 3              THE COURT:  So Defendants' Exhibit 20, full

 4   exhibit.

 5                   (Defendants' Exhibit 20 admitted in

 6                    evidence.)

 7              MR. MIRENDA:  For the record, Your Honor, I

 8   object.

 9              THE COURT:  I have you on the record for that.

10   And I'm overruling it on the ground that you opened the

11   door.

12              MR. MIRENDA:  Understood.

13   BY MR. BAGNELL:

14   Q.   Mr. Toner, I want to play part of this video of the

15   February, I believe, 4th, 2016, discharge of a P320 in a

16   state trooper's holster during a snowstorm.

17                   (Defendants' Exhibit 20 played.)

18              MR. BAGNELL:  Your Honor, there's one final

19   interaction where one of the officers said you should go

20   get a beer.  That's essentially the clip I wanted to show.

21              THE COURT:  Thank you.

22   BY MR. BAGNELL:

23   Q.   Mr. Toner, did you see this at the time that it

24   happened?

25   A.   I don't recall when I saw it, but I have seen the
```

1    video.

2    Q.    I want to go back to the animation now, Mr. Toner, as

3    I said.  I want to show you Exhibit 2 which appears in the

4    animation.  Defendants' Exhibit 2 for identification,

5    Your Honor.

6         This is a SIG Sauer press release dated August 4,

7    2017, Newington, New Hampshire.  I want to direct your

8    attention -- first of all, do you know Jordan Hunter,

9    Mr. Toner?

10   A.    He used to be an employee at SIG Sauer.

11   Q.    Okay.  Did you know him?

12   A.    Not personally, no.

13   Q.    Did you have any input into this release that he's

14   the PR contact for?

15   A.    No, I did not.

16   Q.    Okay.  I want to bring your attention down to --

17   well, first of all, it says: "In response to social media

18   rumors questioning the safety of the P320 pistol, a

19   variant of which was selected by the U.S. Government as

20   the U.S. Army's" --

21            THE COURT:  Can I stop you?  I don't know that

22   you've made an offer.

23            MR. BAGNELL:  I'm sorry.

24            THE COURT:  That's just the usual rule that we

25   have in the court --

1           MR. BAGNELL:  I forgot, Your Honor.

2           THE COURT:  -- for attorneys to offer the

3    exhibit before reading it.

4           MR. BAGNELL:  I offer it as a full exhibit,

5    statement of a party opponent.

6           THE COURT:  Any objection?

7           MR. MIRENDA:  No objection, Your Honor.

8           THE COURT:  Full exhibit, Defendants' Exhibit 2.

9               (Defendants' Exhibit 2 admitted in

10              evidence.)

11   BY MR. BAGNELL:

12   Q.   Mr. Toner, again, first paragraph:  "In response to

13   social media rumors questioning the safety of the P320

14   pistol, a variant of which was selected by the U.S.

15   government as the U.S. Army's Modular Handgun System (MHS)

16   SIG Sauer, Inc. has full confidence in the reliability,

17   durability, and safety of its striker-fired handgun

18   platform.  There have been zero (0) recorded drop-related

19   P320 incidents in the U.S. commercial market, with

20   hundreds of thousand of guns delivered to date."

21       Did you write that, Mr. Toner?

22   A.   No, I did not.

23   Q.   Do you know who did?

24   A.   No, I do not.

25   Q.   That statement is inaccurate, correct?

1    A.    No, I believe it is accurate.

2    Q.    Why do you believe it's accurate?

3    A.    Because at that time I was not aware of any drop fire

4    incidents.

5    Q.    Did you do any further investigation to determine

6    whether that was an accurate statement or not?

7    A.    I don't recall at that time what I did, no.

8    Q.    The incident in January of 2017 with SWAT Officer

9    Sheperis in Stamford, were you aware of that at the time?

10   A.    Like I said before, I heard of the name but I wasn't

11   involved with any investigations.

12   Q.    Did you ever investigate it at all?

13   A.    No.

14   Q.    The Army drop incident, I think you said you were

15   aware of that in 2016?

16   A.    I was aware of it in January, February of 2017.

17   Q.    Okay.  And the drop fire in December 2013, your

18   testimony is that you were not aware of it; is that

19   correct?

20   A.    I'm not aware of what you're referring to.

21   Q.    All right.  The third paragraph:  "All SIG SAUER

22   pistols incorporate effective mechanical safeties to

23   ensure they only fire when the trigger is pressed.

24   However, like any mechanical device, exposure to acute

25   conditions (e.g. shock, vibration, heavy or repeated

  1   drops) may have a negative effect on the safety mechanisms

  2   and cause them to not work as designed.  This language is

  3   common to owner's manuals of major handgun manufacturers."

  4        Did you write that paragraph?

  5   A.   No, I did not.

  6   Q.   In fact, this language that vibration can make the

  7   gunfire without a trigger pull, that's not common to other

  8   manufacturer's manuals, correct?

  9             MR. MIRENDA:  Objection to the

 10   mischaracterization of the document, Your Honor.

 11             THE COURT:  The document speaks for itself.

 12             THE WITNESS:  I'm not aware of what other

 13   manufacturers have in their manuals.

 14   BY MR. BAGNELL:

 15   Q.   Have you ever looked at them?

 16   A.   Not that I recall.

 17   Q.   Smith & Wesson?

 18   A.   Not that I recall.

 19   Q.   Heckler & Koch?

 20   A.   No.

 21   Q.   Beretta?

 22   A.   I have not.

 23   Q.   You have not looked at any to see if vibration is in

 24   there as something that can make your gun fire without

 25   trigger pull?

1   A.   I have not looked.

2   Q.   Okay.  Mr. Mirenda asked you questions about the

3   inspection that we did in Marlborough in March of 2021,

4   Mr. Toner.  Do you remember that?

5   A.   Yes.

6   Q.   And you and I were there, correct?

7   A.   Correct.

8   Q.   Mr. Watkins?

9   A.   Yes.

10  Q.   Mr. Villani, Mr. Hicks, Mr. Gibson, and NSI

11  personnel, I think; is that right?

12  A.   That's what I recall, yes.

13  Q.   Okay.  You recall that at a certain point Mr. Watkins

14  was taking digital microscope photos of the actual parts

15  of the P320s inspected that day?

16  A.   Yes.

17  Q.   And he was bringing those photos up on his laptop,

18  correct?

19  A.   I don't know if it was a laptop or not, but it was

20  some type of digital microscope that had a screen.

21  Q.   And these were up-close high-resolution photographs

22  of what the parts actually looked like in real life; is

23  that fair to say?

24  A.   Yes.

25  Q.   Okay.  And when -- let me bring this up, Your Honor.

 1      This would be a photograph in Exhibit 10, Your Honor,
 2   Defendants' Exhibit 10 for identification.
 3      Okay.  Do you remember seeing that photo, Mr. Toner,
 4   in Marlborough?
 5   A.  We looked at a lot of photos that day.  If it was
 6   taken that day, then I'm sure I looked at it.
 7   Q.  Do you recall, was that Mr. Watkins' laptop there?
 8   Do you see that with his hand?
 9   A.   It likely is.  I can't say for certain whether it's
10   his or not, but if you represent that...
11   Q.  Do you recall that when Mr. Watkins brought up -- let
12   me ask you first:  Are you contending that the surface
13   face of that striker foot is uniform?
14   A.   Yes.
15   Q.  Do you see the raised metal material all around the
16   perimeters of it?
17   A.  I see the difference in contrast in lighting.  But
18   it's not raised.  It's actually just going around a
19   corner.  It's not raised up.
20   Q.  That's your contention, that there's no raised metal
21   material there?
22   A.   Correct.
23   Q.  Do you know what the term "secondarily machining"
24   means, Mr. Toner?
25   A.  I would need some context, but I'm sure I can offer

1    my opinion.

2    Q.    Well, you're an engineer; am I right?

3    A.    Correct.

4    Q.    You work with metal injected mold products; is that

5    correct?

6    A.    Yes.

7    Q.    Do you know what secondary machining is?

8    A.    It could mean a variety of things.  Some people when

9    they do MIM parts, they leave material on and then they

10   machine it off.  So somebody may call that secondary

11   machining, but I would need some context.

12   Q.    I'm not making up the term.  You've heard it before,

13   correct?

14   A.    Yes.

15   Q.    Secondary machining?

16   A.    Sure.

17   Q.    Is it fair to say that means making the surface face

18   of a MIM part smooth?

19   A.    It could mean a lot of things.  It could be drilling

20   a hole.  It could be putting in a final feature of a

21   product that has nothing to do with specifically a flat

22   face.

23   Q.    Did SIG try to machine the surface faces of its FCU

24   component parts like the striker foot?  Does SIG try to

25   machine them smooth or grind them smooth?

1   A.   No, we do not.

2   Q.   Why not?

3   A.   Because it's not necessary.

4   Q.   On what basis is it not necessary?

5   A.   Because the parts are designed such that they're flat

6   and smooth without having the need to do any postoperative

7   machining.

8   Q.   You're saying you get these parts from a

9   subcontractor in India --

10  A.   Correct.

11  Q.   -- who says we leave secondary machining to the end

12  user, you're saying they all come to SIG perfectly smooth

13  and machined?

14  A.   They come as molded from the manufacturer, and we do

15  not touch them when they come to SIG.

16  Q.   So you're admitting that SIG does no secondary

17  machining to the surface faces of these parts, correct?

18  A.   For the 320 components that we're discussing, we do

19  not do secondary machining.

20  Q.   I want to show you some surface faces that have been

21  secondarily machined, Mr. Toner.

22       MR. BAGNELL:  Your Honor, I'm not going to

23  offer, I think it's already in evidence.  I'll offer it

24  probably tomorrow, Your Honor.

25       THE COURT:  Defendants' Exhibit 10?

1          MR. BAGNELL:  Yeah, it's Defense Exhibit 10.  To

2    be candid, Your Honor, I don't remember which exhibit

3    number of the plaintiff it was or if it was.  But I just

4    wanted to show that to him for identification at the

5    moment.

6          THE COURT:  Okay.  So it's I.D. only.

7          MR. BAGNELL:  I.D. only at this point, yes,

8    please.

9    BY MR. BAGNELL:

10   Q.   This is an image also from Defendants' Exhibit 10 for

11   identification.

12        Mr. Toner, this is an image of a Windham Weaponry

13   model AR-15 rifle sear face.  The notation notes that it's

14   finished properly with no excess molding material present.

15        Does that look secondarily machined to you?

16        MR. MIRENDA:  Your Honor, I guess I am going to

17   object to the text here.

18        THE COURT:  The text of the --

19        MR. MIRENDA:  The text on this exhibit is not

20   anything that Mr. Toner wrote or has anything to do with.

21   I believe it's from an affidavit from another witness that

22   would be here soon.

23        THE COURT:  I don't know that it's actually been

24   offered.  It might be premature to object to the text if

25   it hasn't been offered as an exhibit.

```
 1              MR. MIRENDA:  Mr. Bagnell just read it.

 2              MR. BAGNELL:  I'll ask it another way,

 3   Your Honor.

 4              THE COURT:  Okay.

 5   BY MR. BAGNELL:

 6   Q.   You hold yourself out as a weapons expert, Mr. Toner,

 7   correct?

 8   A.   Specifically on 320 design and the firearm, yes.

 9   Q.   You know rifles as well?

10   A.   Not very much.

11   Q.   SIG makes rifles?

12   A.   Yes.

13   Q.   Regardless, is it fair to say that you're familiar

14   with the internal components of firearms?

15   A.   To a certain extent, yes.

16   Q.   Does that surface face look anything like the other

17   surface faces of the P320s that you've been shown today?

18   A.   It's very different, but that doesn't mean that --

19   I'm not sure what you mean by that.

20   Q.   It looks smooth, doesn't it?

21   A.   It is smooth, yes.

22   Q.   It looks polished?

23   A.   It looks like there's been some kind of machining

24   operation on it, yes.

25   Q.   Do you see any raised metal bumps around there?
```

1  A.   It's hard to tell.  It's not as zoomed in or

2  magnified as what we were looking at before.  You can't

3  really tell.  I can see machining lines.

4  Q.   Can you explain that?  Machining lines, what are

5  those?

6          MR. MIRENDA:  Your Honor, I object.  The

7  photograph isn't in evidence.

8          THE COURT:  It's not in evidence.  Do you want

9  to try to offer it?  I don't know that the witness has

10  testified he's familiar with this.  I have to say I don't

11  know what this firearm is.  Is it even made by SIG?  You

12  haven't laid a foundation in any way to explain.

13          MR. BAGNELL:  Well, just that he holds himself

14  out as a gun expert, Your Honor.  That was the basis.  And

15  he knows about secondarily machining.  And I think his

16  testimony is that this looks like it was milled or

17  secondarily machined.  But I'll move on.

18          THE COURT:  Okay.

19  BY MR. BAGNELL:

20  Q.   I want to go back to Marlborough, Mr. Toner, when

21  Mr. Watkins was bringing up these photographs.

22      By the way, do you know why Mr. Watkins is not here

23  as a witness?  Why is he not here, do you know?

24  A.   I am not privy to that information.

25  Q.   He took the photos, correct?

1  A.   Yes.

2  Q.   Do you recall his reaction when he brought those

3  micro photographs up on his laptop?

4  A.   No, I do not.

5  Q.   Do you remember he dropped his head to his chest?

6  A.   No, I don't remember that at all.

7  Q.   And then he made a loud sigh?

8  A.   I don't remember that.

9  Q.   And then you all went out in the hallway and huddled

10  with SIG's lawyers, do you remember that happening?

11  A.   We took multiple breaks during that investigation,

12  that inspection.  We went out and did that more than once.

13  So I'm not sure what you're referring to.

14  Q.   Do you remember SIG's lawyer came back in after that

15  exodus of everyone from the room and said, "Hey, Jeff, do

16  you want to settle all these cases now?"

17  A.   I was not in the room when I happened.

18  Q.   You were in the room, though.  We were there in the

19  same room, correct?  That was your testimony, we were all

20  in the room.

21  A.   I was not present when that statement was made or I

22  didn't hear it, so...

23       THE COURT:  Is there an objection?  Trying to

24  get into like settlement communications?

25       MR. MIRENDA:  Object.  Again, it has nothing to

1    do with the animation, Your Honor.  It doesn't have

2    anything to do with the inspection.  Settlement

3    discussions, to the extent that that even occurred --

4         THE COURT:  I think it's fine, Mr. Bagnell, if

5    you want to get into what happened concerning aspects of

6    the firearm.  But if you want to get into legal counsel

7    saying we should settle all the cases, that seems far --

8         MR. BAGNELL:  It was more of an excited

9    utterance, Your Honor.  It was not at legitimate

10   settlement communication.  But I understand.

11        THE COURT:  Well, it wasn't so much a hearsay

12   concern be that I had for excited utterance.  It was

13   mostly a relevance concern in terms of what a lawyer said.

14   Let's move on to another subject, although you're welcome

15   to talk about the Marlborough meeting but not into

16   lawyers' statements about whether we should settle

17   casings.

18        MR. BAGNELL:  Understood.

19   BY MR. BAGNELL:

20   Q.   The image that Mr. Mirenda -- and I don't have the

21   exhibit offhand, but where I think your testimony was that

22   there's debris of some type built up on the striker foot

23   face.  Do you recall that?

24   A.   Yes.

25   Q.   In one of your earlier reports, Mr. Toner, I think

1    you said you couldn't define exactly what it was.  I think

2    you said there appears to be a grease-like substance.  Is

3    there any reason why you can't specifically say what you

4    think it is or what it is?

5    A.   I mean, without doing any kind of chemical analysis

6    on the debris itself, I'm not sure how I could say

7    100 percent positively what it is.

8    Q.   All right.  I want to show you those photos again.

9    Bear with me, please.  Sorry, Your Honor.

10        Okay, Mr. Toner, you've seen this image before today,

11   correct?

12   A.   I believe so, yes.

13   Q.   And, Your Honor, this is an image in Defendants'

14   Exhibit 26.  I think I know that the plaintiffs have

15   already marked it.  I don't remember the number, however.

16            THE COURT:  I believe it was Plaintiff's

17   Exhibit 76.

18            MR. BAGNELL:  76.

19            THE COURT:  Am I right about that?  I'll ask

20   plaintiffs.  It's the striker foot of the so-called Mayes

21   firearm.

22            MR. BAGNELL:  Yes.

23            MR. MIRENDA:  Exhibit 75 was the standalone.

24   And Exhibit 76 is the side-by-side, Your Honor.

25            THE COURT:  Okay.  Is there agreement what we're

1        looking at on the screen is Exhibit 75?

2                MR. MIRENDA:  It's a different image of the same

3        surface, Your Honor.  It's a different photo of the same

4        surface, as best I can tell.

5                THE COURT:  Okay.

6                MR. MIRENDA:  It's not the same photo as in

7        Exhibit 75.

8                THE COURT:  I think, Mr. Bagnell, you'll have to

9        introduce and go through the whole rigmarole here unless

10       you want to take the same photo that was shown by the

11       plaintiff.

12               MR. BAGNELL:  Organizationally, Your Honor, I'm

13       sorry, I can't.  I'm happy to offer Exhibit 26.  For the

14       record, it is my answer to the lawsuit.

15               MR. MIRENDA:  I'm going to object, Your Honor,

16       to the offer of the entire answer.

17               MR. BAGNELL:  I'll limit it to the offer of this

18       photograph in the answer.

19               THE COURT:  Do you have an objection to just

20       that photograph?

21               MR. MIRENDA:  If it were a standalone exhibit

22       just this photograph, I would have no objection.

23               THE COURT:  Do you recognize this photo, sir?

24               THE WITNESS:  I mean, it looks very similar to

25       the other photo that we have of the striker foot face, but

1    I don't know if it's the exact same one or not.

2              THE COURT:  I don't know that I have a witness

3    who can authenticate the photo, then.  You'll have your

4    own case.

5              MR. BAGNELL:  I'll bring up Defendants' 76,

6    Your Honor, I think I can.  I'll bring up the plaintiff's

7    exhibit.

8              I'm going to try to bring up plaintiff's full

9    Exhibit 76.  That's not the right one.

10             MR. MIRENDA:  Your Honor, we found it to help

11   Mr. Bagnell.  It's in Plaintiff's Exhibit 15.  Page 2 of

12   Exhibit 15 was admitted during High Impact.

13             MR. BAGNELL:  I'm going to move on, Your Honor,

14   to save the Court time.  We're having technical problems.

15             THE COURT:  Okay.

16   BY MR. BAGNELL:

17   Q.   Mr. Toner, I know on direct you looked at the Mayes

18   sear face, correct?

19   A.   Yes.

20   Q.   There was testimony -- your testimony is that there

21   was some kind of debris, it might have been grease, it

22   could have been oil.  Anything else it could have been?

23   A.   So, oftentimes when you're using a weapon or you're

24   firing a weapon, there's unburnt powder that accumulates

25   on various areas of a gun.  That could be part of what it

1    is.

2    Q.   I want to play you Exhibit 1, Plaintiff's Exhibit 1,

3    to get to the frames where the animation depicts that

4    photo in combination with other data.

5         This is Exhibit 1, again, which we've all seen.  I

6    want to move this forward to the frames at issue.  Okay.

7    Get a pause on that.

8         All right.  Pause this.

9         Okay.  You see that, Mr. Toner?

10   A.   Yes.

11   Q.   This is a frame in Exhibit 1, plaintiff's exhibit.

12        What we contend is the rollover condition or excess

13   metal is indicated as red, showing red in that animation

14   image, correct?

15   A.   Yes.

16   Q.   And you understand that this is an animation image,

17   that this is not a real photograph, correct?

18   A.   Correct.  It's an animation.

19   Q.   And in the animation that Mr. Mirenda asked you

20   about, I think this was made by SIG, not everything about

21   that animation corresponds to the P320 how it looks in

22   real life, correct?

23             MR. MIRENDA:  Objection.

24             THE COURT:  What's --

25             MR. MIRENDA:  Again, foundation.

1          THE COURT:  I'll let the witness answer what he

2    knows.

3          THE WITNESS:  So the models that were used in

4    that animation were the actual CAD models that are used in

5    the manufacture of the components.

6    BY MR. BAGNELL:

7    Q.   No, I'm talking about the multicolored video

8    simulation of how the P320 cycles, remember talking about

9    that?

10   A.   Yes.

11   Q.   And the sear springs are floating in mid-air, they're

12   not attached to anything, remember that?

13   A.   They're attached to the sear, but yes.

14   Q.   At the bottom they're floating in air, they're not

15   attached to those nodules that they fit into; do you

16   remember that?

17   A.   So they're floating in air because the parts were

18   hidden so you can see them.

19   Q.   So that's not how it looks in real life, correct?

20   A.   Correct.  There's metal that surrounds that, a

21   housing that they ride within.

22   Q.   Which is all I'm saying, Mr. Toner.  They don't float

23   in thin air in reality, but that was the animation that

24   your company put together to illustrate the functionality

25   of the gun because none of us can get inside this thing

1    and see how it detonates, correct, and how it moves,

2    correct?

3    A.    Correct.  You hide certain components so you can see

4    other ones behind them.

5    Q.    Correct me if I'm wrong, Mr. Toner, but is there any

6    camera small enough to get into the FCU of a P320 and make

7    a video of the gun cycling?

8    A.    There is high-speed technology with x-ray that is out

9    there.  But we don't have that.

10    Q.    Not with x-rays.  I'm talking about an actual real

11    life video camera, is there any one small enough that can

12    get into a P320 to film what happens when the trigger is

13    pulled or not pulled?

14    A.    Not that I'm aware of.

15    Q.    I'm just asking.  I'm not, either.  This is why we

16    have animations.

17          In any event, going back to the rollover condition,

18    it's illustrated in the animation in red.  Now, under the

19    red you'll see that there's a whitish line underneath the

20    red; do you see that?

21    A.    I'm sorry, I don't understand what you mean by

22    "underneath the red."

23    Q.    Underneath the top horizontal edge there is a light

24    white bluish line, correct?

25    A.    It disappeared off my screen.

1        So ask that again, please.

2   Q.   You see that?  It's a different color from what we

3   contend is the inset surface, correct?

4   A.   Yes.  It's a lighter shade of blue.

5   Q.   In fact, it corresponds to the debris field or string

6   that we've talked about today for quite some time,

7   correct?

8   A.   I can't testify to what that was corresponding to

9   from the animater's point of view.

10  Q.   From the animater's point of view.  But you agree,

11  though, that it's a different blue, it's a whitish string

12  underneath what we contend is the raised surface, correct?

13  A.   It is a lighter color blue in that area, yes.

14  Q.   The molding process that Mr. Mirenda asked you some

15  questions about, I think at some point, Mr. Toner, you

16  talked about your knowledge of molding process or molding

17  processes; is that correct?

18  A.   Yes.

19  Q.   I think you said there's metal powder that's injected

20  into a mold; is that correct?

21  A.   Correct.

22  Q.   And that's done with plastics also?

23  A.   No.  Plastics uses a plastic pellet that is heated up

24  and turned into a molten plastic and then injected into

25  the mold.

```
 1   Q.   Let's stick with mold injected metal.  Am I correct
 2   there is a mold, for example, a sear; is that correct?
 3   A.   Yes.
 4   Q.   And something gets shoved into that, metal powder
 5   gets shoved into that mold?
 6   A.   Yes.
 7   Q.   And it comes out cold or cool at some point?
 8   A.   So it comes out -- it's in a warm state, but it comes
 9   out of the mold, yes.
10   Q.   And it cools?
11   A.   Yes.
12   Q.   Does that cause things like shrinkage?
13   A.   Not exactly.  There's another operation that the
14   parts go through after its molded, and that's called
15   centering.  That is when the part actually shrinks down to
16   the size that it ultimately is.
17   Q.   Okay.  When these parts come out of these molds -- by
18   the way, where is this done?  Where are these parts made?
19   A.   It depends on what part you're talking about.  The
20   majority of them are made in India.
21   Q.   Okay.  Is SIG overseeing their production or is the
22   third-party contractor doing this?
23   A.   They work with us, but we are not overseeing their
24   production at all.  We're inspecting parts when they come
25   in the building.
```

1   Q.   When those parts come out of the molds, Mr. Toner, is

2   it sometimes the case that there's excess metal left on

3   the surface or there are rough spots after these parts

4   cool and come out of the mold?

5   A.   I don't have knowledge of that.

6   Q.   I don't have much more, Mr. Toner.

7        Just to go back to the point you just made, am I

8   correct that when this metal material goes into these

9   molds, it goes in hot?

10  A.   So -- no.  It's a powder substance that goes into the

11  mold at very high pressure.  So it's not warm going into

12  the mold.

13  Q.   Okay.

14  A.   It's put in the high pressure, so it's like a powder

15  form at that point.

16  Q.   But to make it a solid, there's got to be some heat,

17  correct?

18  A.   Right.  It goes into the mold, it compacts it to a

19  certain extent, and it's called the green state.  When it

20  comes out in the green state, it goes into a centering

21  oven.  That's when it's heated to a high temperature and

22  it shrinks down and becomes a solid metal.

23  Q.   It cools, correct?

24  A.   Well, it's heated up to very high temperature first

25  and then it cools.

1    Q.    Cools down.

2         Just one more question.  I want to show you

3    Plaintiff's -- I'm sorry, Defendants' Exhibit 5,

4    Mr. Toner.  This is SIG Sauer's United States patent

5    application, publication date April 11, 2019.  The file

6    date, Mr. Toner, October 10, 2018, correct?

7    A.    Yes, it appears so.

8    Q.    That was about a year after what SIG calls the

9    voluntary upgrade program, correct?

10   A.    Roughly, yes.

11   Q.    You're listed as an inventor on this patent

12   application; is that correct?

13   A.    That is correct.

14   Q.    Second name down?

15   A.    Yes.

16   Q.    All right.  I want to read the abstract of this

17   patent into the record.

18              THE COURT:  Would you like to offer it?

19              MR. BAGNELL:  Yes, Your Honor.

20              THE COURT:  Any objection to Defense 5?

21              MR. MIRENDA:  Objection, relevance grounds,

22   Your Honor.

23              THE COURT:  How is this relevant to your claim?

24              MR. BAGNELL:  It's relevant to the animation

25   because here is SIG in their own words stating that not

1    only vibration can make this gun fail but it's stating

2    that an impulse can make the striker foot and the sear

3    dislocate, which is why they had to add in the new version

4    a secondary backup sear face.  I think it's highly

5    relevant to what the animation depicts.

6           THE COURT:  I'll overrule it.  Of course, if

7    you'd like to, Mr. Mirenda, you can argue later on why

8    it's not significant.

9           Please proceed.

10          MR. BAGNELL:  Thank you, Your Honor.

11   BY MR. BAGNELL:

12   Q.   The abstract, Mr. Toner:  "A handgun sear has a sear

13   body extending between the proximal end portion to a

14   distal end portion.  The sear defines a first engagement

15   surface adjacent the proximal end portion and a second

16   engagement surface position distally of the first

17   engagement surface.  The sear can pivot about the distal

18   end portion between a cocked position and a displaced

19   position.  The second engagement surface can be used to

20   arrest forward movement of the striker in the event of an

21   impulse that causes the striker to disengage from the

22   first engagement surface.  The sear may be incorporated

23   into a fire control assembly of a semiautomatic handgun or

24   other firearm."

25          Did you write that language, Mr. Toner?

 1  A.   No, I did not.

 2  Q.   Is this the secondary sear notch component that went

 3  into P320s after the voluntary upgrade program?

 4  A.   Yes, it was.

 5  Q.   The original version did not have a secondary notch,

 6  correct?

 7  A.   Correct.

 8  Q.   And the animation does not depict a secondary notch,

 9  correct?

10  A.   That's correct.

11          MR. BAGNELL:  I have no more questions,

12  Your Honor.

13          THE COURT:  All right.

14          Redirect?

15          MR. MIRENDA:  No questions, Your Honor.

16          THE COURT:  Sir, you can step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  It looks like we're getting close to

19  5:00 p.m.  We'll probably wrap it up for the day.

20          What are we looking at for tomorrow, then?  Do

21  we have Mr. Miller?

22          MR. MIRENDA:  Mr. Miller, yes, from SIG.  The

23  only witness for tomorrow from us would be Mr. Miller.

24          THE COURT:  And then you'll be resting?

25          MR. MIRENDA:  Then we'd rest.

 1                THE COURT:  Okay.

 2                And then will you be prepared, Mr. Bagnell, I

 3  trust tomorrow --

 4                MR. BAGNELL:  Yes.

 5                THE COURT:  -- to move forward.

 6                Let me just take a look here.  Hold on a second.

 7                So in terms of the witnesses, Mr. Bagnell, will

 8  you be testifying yourself?

 9                MR. BAGNELL:  I do plan, Your Honor.  Not too

10  long, but I planned on it.

11                THE COURT:  So Mr. Madigan will be presenting

12  your testimony?

13                MR. MADIGAN:  Yes.

14                THE COURT:  Then will Mr. Villani also be

15  testifying?

16                MR. BAGNELL:  Yes, Your Honor.

17                THE COURT:  Will those be your first two

18  witnesses?

19                MR. BAGNELL:  First two.  And I don't think I'll

20  have many more, Your Honor, given how we ultimately

21  narrowed everything.

22                THE COURT:  I saw kind of a frighteningly long

23  list.

24                MR. BAGNELL:  Just in case.  Impeachment, maybe.

25  No, those people are not going to be called.

1           THE COURT:  We've got like a deputy sheriff from

2   West Virginia, a SWAT officer, SWAT commander, detective.

3   Is there anybody else on your list besides you and

4   Mr. Villani you're going to be calling?

5           MR. BAGNELL:  Maybe SIG.  I may introduce their

6   30(b)(6) depositions, sections of their depositions,

7   Your Honor.

8           THE COURT:  Do you have specific parts of it?

9           MR. BAGNELL:  I can get that to you tomorrow,

10  Your Honor.

11          THE COURT:  Well, mostly I just want to make

12  sure that SIG is aware of what you intend.

13          MR. MIRENDA:  I would say, Your Honor, there was

14  no deposition of SIG in this case.  So I imagine

15  Mr. Bagnell is talking about a deposition in some other

16  case.  I'd be questioning the relevance of it just on its

17  face, but I'd have to look at it.

18          MR. BAGNELL:  That's correct, Your Honor.  It's

19  from a different case.  It would still be admissible.  We

20  argued this issue once -- not Mr. Mirenda and I.  I may

21  not, Your Honor.  I want to look at it some more.  There's

22  not testimony about the animation itself, but I thought

23  there was -- for example, Mr. Toner's admission here that

24  they do no secondary machining.  That's already on the

25  record now.  There's little bits like that that I thought

1    were relevant.

2              THE COURT:  I'll tell you what.  Maybe you'll

3    take a look at it.  And then if you decide you want to try

4    to offer the deposition testimony, if you just let

5    Mr. Mirenda know what you intend to do, and then see if

6    there's going to be an objection.  If there is, of course,

7    I'll try to resolve it.  But if it's a lengthy deposition,

8    it will take me a little bit of time to get through it.

9              MR. BAGNELL:  It would be no more than pages,

10   Your Honor.  Not the whole thing.

11             THE COURT:  All right.  Sounds good.

12             And I was trying to think about other issues

13   that are kind of at play in the case.  It looks like the

14   parties have a difference about whether the Lanham Act

15   even applies in the case.  It sounds like that's raised,

16   Mr. Bagnell, you're saying that you're not a competitor in

17   some sense, direct or indirect, of SIG and therefore that

18   the Lanham Act does not apply at all.

19             MR. BAGNELL:  That's my understanding,

20   Your Honor.  I'm not a Lanham Act expert.  But that is my

21   understanding.  I am not in any kind of competition with

22   SIG.  From my view, this was posted as a public safety

23   service.  And nothing was said about it for quite some

24   time.  More as a consumer advocate.  And I don't think the

25   Lanham Act reaches consumer advocacy.  So, yes, that's

 1    correct, Your Honor.

 2            THE COURT:  I mean, I don't know -- I know that

 3    SIG's memorandum says it applies here.  But I don't --

 4    it's kind of the issue that I would sort have expected to

 5    be raised earlier on before a trial, you known, because it

 6    would be sort of, you know -- it's a straight-up legal

 7    issue it strikes me on facts that are probably not

 8    disputed.  It didn't seem to me that SIG is saying that

 9    Mr. Bagnell is somehow competing directly or indirectly

10    with SIG.  Maybe you are, Mr. Mirenda.

11            MR. MIRENDA:  No, Your Honor.  I think

12    post-*Lexmark* there is no requirement under the Lanham Act

13    for there to be either direct or indirect competition.

14    What has to be alleged is that it's commercial -- that

15    it's advertising, which we believe we have proven based on

16    Mr. Bagnell's deposition testimony, and that the harm is a

17    harm to SIG in commerce.  So the potential harm would be

18    reputational harm to the brand if the animation were to be

19    able to be used and the specific misrepresentations about

20    inherent characteristics that are internal to the firearm

21    are allowed to be published.  We're happy to provide you

22    with additional briefing on that.  There are a number of

23    case the post-*Lexmark* that I think make that distinction.

24            THE COURT:  I probably will need it.  It strikes

25    me I probably have to decide the issue, although it might

1   have been better raised a long time before we decided to

2   have a fact trial.  But I guess if you have a response to

3   the issue, it would be helpful to get.

4           MR. MIRENDA:  Yes, Your Honor.  I don't know

5   what Your Honor's plans are in terms of once the evidence

6   is closed if you're looking for post-hearing briefing.

7           THE COURT:  I would probably want that.

8           MR. MIRENDA:  We could incorporate it into that.

9   Whatever Your Honor thinks is the most efficient.

10          THE COURT:  I usually kind of let the parties,

11  if you can agree on a briefing schedule, I'm happy to do

12  that after the hearing is over, given that you probably

13  have other cases and other matters as well, which is fine.

14  And then we can have an orderly process for doing that.

15          I also wanted to ask about SIG Sauer's relief

16  that they're requesting in the case.  Because it sounded

17  to me like there was at least perhaps some confusion or

18  disagreement, maybe not confusion.  But I take it

19  SIG Sauer's looking solely to prevent the posting of this

20  animation on Mr. Bagnell's law firm website and/or on

21  YouTube with a connection to his law practice?

22          MR. MIRENDA:  That's correct, Your Honor.  Well,

23  I think the distinction that we were making is that we're

24  not seeking to affect Mr. Bagnell's ability to make

25  whatever argument he wants to make in some other case or

1    litigate some other case.  Those issues would be tied up

2    with the facts of those cases and be supervised by the

3    courts in those cases.  We're not looking to interfere

4    with that.  What we are looking to prevent is Mr. Bagnell

5    from making the specific misrepresentations in the

6    animation in any other public forum, whether it's

7    advertising on his website or in some other forum.  It's

8    the factual misrepresentations about the characteristics

9    of the parts that we are looking to prevent.

10           THE COURT:  I see.  So to be clear, you're

11   not -- if he files another lawsuit, you're not trying to

12   stop him from using the animation in another lawsuit?

13           MR. MIRENDA:  No, Your Honor.  That would be the

14   province of that court and discovery and if the factual

15   circumstances presented in that other case.  We're not

16   looking to try to stop that.

17           THE COURT:  So what if, though, he simply wanted

18   to post the animation on YouTube or Vimeo or some other

19   public website without any kind of link to his law firm?

20   In other words, without the law firm advertising nexus.

21   Would that still be within --

22           MR. MIRENDA:  That would be within the scope of

23   the prohibition that we're asking for, Your Honor, yes.

24           THE COURT:  And so --

25           MR. MIRENDA:  That would be, in our view, the

1    appropriate remedy for the Lanham Act violation that has

2    occurred, is to prevent that from being disseminated to

3    the public.  What the Lanham Act is attempting to prevent

4    the public being fooled by false statements and where they

5    are literally false and they're about inherent

6    characteristics that are subject to being proved true or

7    false.  It's not an opinion.  We're not arguing about

8    opinion here.  We're arguing, does the sear look like

9    this?  Is the distance between this part and that part

10   accurate?  Does this part merge into that part?  I think

11   those are the specific misrepresentations that we're

12   seeking to preclude with an exception for, obviously,

13   litigation where he may be able to litigate, and that

14   would be the subject of the province of those other

15   courts.

16           THE COURT:  I see.

17           So if any member of the public decided to create

18   this animation, you would say that the Lanham Act would

19   apply?

20           MR. MIRENDA:  So, again, the Lanham Act applies

21   because Mr. Bagnell used the animation in advertising.

22           THE COURT:  But hold on a second.  You're

23   seeking prospective injunctive relief.  You're not seeking

24   money damages for what he did yesterday or many years ago.

25   So if I enter an injunction, doesn't the injunction have

1  to be limited to the use of the video for purposes of

2  commercial advertising?

3          MR. MIRENDA:  I don't believe so, Your Honor.

4  The limitation would be on Mr. Bagnell and his firm.  That

5  is, they couldn't use it.

6          THE COURT:  So I'm looking at your own

7  memorandum, your trial memorandum.  One of the elements is

8  that it states that the representation in the challenged

9  commercial advertising is false.  It strikes me that an

10 inherent part of your Lanham Act claim -- because that's

11 the only one left -- is that it has to be a part of

12 commercial advertising which would separate it, I take it,

13 from some member of the public decides to just post this

14 animation.  You don't like it, you think it's untrue, but

15 I'm not sure if there's a remedy under the Lanham Act.

16         MR. MIRENDA:  For that other random person in

17 the public, there may not be a remedy under the

18 Lanham Act.

19         THE COURT:  Okay.

20         MR. MIRENDA:  But here, because Mr. Bagnell

21 published it as advertising, there is a remedy under the

22 Lanham Act.  And that remedy should be scoped to the

23 defendants: Mr. Bagnell and his firm.  If some third

24 person not in league with Mr. Bagnell, not aided by

25 Mr. Bagnell, not connected to Mr. Bagnell, some third

1    person were to find an animation like this and publish it,

2    that future event might not come within the Lanham Act.

3    It might well be defamation, there might be other claims

4    that SIG could claim.  But that future event at least

5    under the circumstances wouldn't necessarily be.  Here,

6    though, because we have Mr. Bagnell having used it as

7    advertising, that's what is the trigger for the Lanham Act

8    claim.

9              THE COURT:  No pun intended, sure.

10             Okay.  I think I get your argument there.  I

11   still have some questions, I have to say, about that.

12             MR. BAGNELL:  Your Honor --

13             THE COURT:  But maybe this is something I can

14   think about and I can hear more from you at a later time

15   about.

16             Did you have something, Mr. Bagnell?

17             MR. BAGNELL:  Yes, just briefly, Your Honor.

18             I don't think this has been commercial

19   advertising.  It's commercial speech.  The animation does

20   not advertise my legal services in any way.  I continue to

21   object to the characterization that there are

22   misrepresentations in the animation.  This was based on

23   CAT scan imagery, the defendants' own microphotographs of

24   the actual parts.

25             THE COURT:  I get that.  I get all that argument

1    there.  And I'm not certainly purporting to decide any of

2    that.  I haven't even heard the rest of the evidence.  But

3    my question mostly to Mr. Mirenda was whether the scope of

4    relief sought was to prohibit you categorically as a

5    citizen, as an interested citizen, from posting this on

6    YouTube or some website like that, publicly available

7    website, if it's not linked at all to advertising for your

8    law firm.  What I've seen so far, it had your law firm, it

9    has a link, those sorts of things.  It was on your website

10   itself.

11          So that's what I'm trying to figure out in terms

12   of what the relief requested is.  But please don't

13   misunderstand my questions about relief to be suggesting

14   I've even decided anything about the merits.  I'm just

15   trying to figure out ultimately what's going to be in

16   play.

17          MR. BAGNELL:  I just thought it was a public

18   safety issue, Your Honor.

19          THE COURT:  All right.  Well, I think we're set.

20   We might be able to wrap up tomorrow, then, it sounds

21   like.  Decent chance, right?  Mr. Miller, Mr. Bagnell, and

22   Mr. Villani, I don't know how much --

23          MR. BAGNELL:  I'll try.

24          THE COURT:  There's a possibility we'll get

25   through tomorrow.  But if need be, we'll go into the

1    following week.

2            All right.  Anything else?

3            MR. BAGNELL:  Not for the defense.

4            THE COURT:  Thank you all for coming in.  See

5    you tomorrow morning.

6                (Proceedings adjourned at 5:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                     C E R T I F I C A T E

4

5       RE: SIG SAUER, INC. v. JEFFREY S. BAGNELL, ESQ., LLC,
                    ET AL., No. 3:22CV885(JAM)

6

7               I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 154 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                          _____/s/_____

18                       DIANA HUNTINGTON, RDR, CRR
                            Official Court Reporter
19                       United States District Court
                         141 Church Street, Room 147
20                       New Haven, Connecticut 06510
                             (860) 463-3180
21

22

23

24

25