UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
SIG SAUER, INC.,                :  No. 3:22CV885(JAM)
                                :
              Plaintiff         :
                                :
         v.                     :
                                :
JEFFREY S. BAGNELL, ESQ., LLC,  :
and JEFFREY S. BAGNELL,         :
                                :  New Haven, Connecticut
              Defendants        :  February 22, 2024
                                :
- - - - - - - - - - - - - - - - x
```

HEARING ON MOTION FOR PERMANENT INJUNCTION

VOLUME II

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

1    A P P E A R A N C E S:

2

        FOR SIG SAUER, INC.:
3

                FOLEY HOAG LLP
4                    255 Seaport Blvd.
                     Boston, Massachusetts 02210-2600
5               BY:  ANTHONY MIRENDA, ESQ.
                     E. JACQUELINE CHAVEZ, ESQ.
6

                McELROY DEUTSCH MULVANEY & CARPENTER LLP
7                    30 Jelliff Lane
                     Southport, Connecticut 06890-1436
8               BY:  JAMES ROSS SMART, ESQ.

9

        FOR JEFFREY S. BAGNELL, ESQ., LLC, AND
10      JEFFREY S. BAGNELL:

11              JEFFREY S. BAGNELL, ESQ., LLC
                     55 Post Road West, Suite 200
12                   Westport, Connecticut 06880
                BY:  JEFFREY S. BAGNELL, ESQ.
13

                ATTORNEY JOHN W. MADIGAN III, PLLP
14                   30 Old King's Highway South, Suite 215
                     Darien, Connecticut 06820
15              BY:  JOHN W. MADIGAN III, ESQ.

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

PLAINTIFF'S
WITNESS

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT MILLER | | | | |
| By Mr. Mirenda | 160 | | | |
| By Mr. Bagnell | | 247 | | |
| By Mr. Mirenda | | | 295 | |
| By Mr. Bagnell | | | | 298 |

DEFENDANTS'
WITNESS

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER VILLANI | | | | |
| By Mr. Bagnell | 300 | | | |
| By Mr. Smart | | 445 | | |
| By Mr. Bagnell | | | 341 | |
| JEFFREY BAGNELL | | | | |
| By Mr. Madigan | 343 | | | |

1                        **10:02 A.M.**

2              THE COURT:  We're here for second day of trial

3    proceedings in the matter of SIG Sauer v. Bagnell.

4              Appearance of counsel, please, for the

5    plaintiff.

6              MR. MIRENDA:  Good morning, Your Honor.  Anthony

7    Mirenda, Foley Hoag, for the plaintiff.

8              THE COURT:  Good morning.

9              MS. CHAVEZ:  Good morning.  Jackie Chavez for

10   the plaintiff.

11             THE COURT:  Good morning.

12             MR. SMART:  Good morning, Your Honor.  James

13   Smart for SIG Sauer.

14             THE COURT:  Good morning.

15             MR. MADIGAN:  Good morning, Your Honor.  John

16   Madigan for Bagnell and Bagnell firm.

17             MR. BAGNELL:  Your Honor, Jeff Bagnell for

18   defendants.

19             THE COURT:  Good morning.

20             So are we all set to go with our next witness?

21             MR. MIRENDA:  Yes, Your Honor.

22             THE COURT:  Mr. Mirenda, if you'd like to

23   proceed.

24             MR. MIRENDA:  Yes, Your Honor.

25             I would call Mr. Miller.

1        THE COURT:  Okay.  Come on up, sir.  If you

2  don't mind remaining standing and we'll swear you in.

3  Just stand right over by the chair.

4        THE CLERK:  Please raise your right hand.

5

6                ROBERT MILLER,

7     called as a witness, having been first duly

8      sworn, was examined and testified as follows:

9

10        THE CLERK:  Please state your name and spell

11  your last name.

12        THE WITNESS:  Robert Miller, M-I-L-L-E-R.

13        THE CLERK:  And give us your city and state of

14  employment.

15        THE WITNESS:  City would be Sterling, Virginia.

16        THE COURT:  Please proceed.

17

18             DIRECT EXAMINATION

19  BY MR. MIRENDA:

20  Q.  Good morning, Mr. Miller.  Where do you work?

21  A.  I work for Sync Development Solutions.

22  Q.  What is Sync Development Solutions?

23  A.  Sync Development Solutions is an engineering

24  consulting firm that I started back in 2017.  So the type

25  of work that we do would be product development consulting

1  primarily for the firearms industry.

2  Q.   And what does that involve?

3  A.   So that involves -- originally it started as just

4  design work itself.  So just modeling and working with

5  engineering teams to help them develop their products or

6  resolve any potential issues they may bring about.

7  Q.   What kinds of product were you involved in the design

8  of?

9  A.   Primarily firearms.  Specifically pistols, revolvers,

10  and a little bit of work on rifles.

11  Q.   And what else?

12  A.   So, you know, at some point as we design products, we

13  go from design to hardware.  So I developed the

14  capabilities to actually, you know, build the hardware and

15  create prototypes.  So now I do quite a bit of prototype

16  work through CNC machining for components of these

17  firearms.  And now I'm able to also offer small production

18  runs of parts as well.

19     So when we talk about prototypes, we're talking about

20  limited quantities.  Production would be upwards of 500 to

21  1,000 parts a month would be typical volume for me.

22  Q.   And what else do you do at Sync Development

23  Solutions?

24  A.   Can you clarify?

25  Q.   Other aspects of your work.

1  A.   Aspects, yeah, consulting for -- a couple of my

2  clients have been on the business development side of

3  things.  So for vendors to the firearms industry, you

4  know, have worked with a couple vendors to identify

5  opportunities where they may be able to offer their

6  services in a different way or to develop their services

7  specifically for the firearms industry.  One of those

8  clients specifically was a MIM supplier for the firearms

9  industry.

10  Q.   Mr. Miller, could you take a look at what's been

11  marked as Exhibit 80?

12  A.   Uh-huh.

13  Q.   Do you recognize this?

14  A.   I recognize this to be a CV.

15  Q.   Whose CV is it?

16  A.   I'm sorry, this is my CV.

17  Q.   Does it accurately describe your background and

18  experience?

19  A.   Yes.

20          MR. MIRENDA:  Your Honor, I'd offer it.

21          THE COURT:  Any objection?

22          MR. BAGNELL:  No objection, Your Honor.

23          THE COURT:  Full exhibit.

24              (Plaintiff's Exhibit 80 admitted in

25               evidence.)

BY MR. MIRENDA:

Q.   Could you describe your educational background?

A.   My undergrad was from University of South Carolina back in '04, I believe.  My master's -- excuse me, the undergrad was in engineering, mechanical engineering.  My master's degree is a master's in business administration also from University of South Carolina.

Q.   Could you please describe your professional background in the firearms industry?

A.   So I started in the firearms industry in I believe it was 2006 with FN America.  I was hired in as a design engineer I.  And I spent eight years with FN America. Through that time I went from design engineer I, II, and III, and then also transitioned into product management. All of that experience was specific to the pistol products that FN America produced.

Q.   What is FN America and what products do they produce?

A.   FN America is a manufacturer of small arms globally, actually.  Predominantly known for machine guns, I think, for the military products.  When I started they were wanting to expand their commercial product offerings, and pistols was certainly an aspect they were getting into for that.

Q.   Can you describe your own work at FN America, your role and responsibilities during the time you were there?

1  A.   Sure.  My work was pretty broad.  Obviously, any of

2  us who have spent significant time with a company usually

3  gets to get into a lot of things, hopefully.

4      Some of my work included quality assurance aspects

5  and roles.  So any time there were issues or

6  nonconformances with incoming product, and this was more

7  specific to during the development stage of product, not

8  necessarily -- while I did this also for production

9  products, that would not be the bulk of the work.  The

10 bulk of the work would be during the development stage of

11 products in the industrialization stage.  But effectively

12 identifying nonconformances both with internal suppliers,

13 external suppliers, dispositioning those nonconformances,

14 working with the suppliers to fix any issues that were

15 found or outstanding.  Through that work, I ended up

16 becoming kind of the lead technical role for working with

17 our entire supply base for a pistol program.

18     Other aspects include I was heavily involved in

19 pretty much all of the major qualification testing that we

20 did for our pistols.  So, you know, just major milestone

21 testing.  So at different stages of the product

22 development, we would subject the products to a variety of

23 tests and a certain test protocol.  Early on it may take

24 the form of one set of expectations that we had to meet.

25 Later on, certainly as we get into production, then you've

1  got to demonstrate your ability to meet whatever

2  requirements we had laid out for the product.  So those

3  requirements were typically guided by industry standards

4  such as SAAMI, NATO, military contracts.  It just all

5  depended on what the product was being developed for.

6  Q.   As part of your role, you mentioned that you were

7  involved in working with suppliers.  Are you familiar with

8  metal injection molding suppliers?  Did you work with

9  them?

10  A.   Yes, I am.  So, again, I worked with a variety of

11  suppliers, so that included metal injection molding,

12  plastic injection molding, sheet metal stamping, CNC

13  machining.  But, yes, so I'm very experienced with all of

14  these types of manufacturing methods, and I have been to a

15  variety of suppliers in all of these manufacturing

16  methods, again worked closely at, you know, creating

17  products with those suppliers effectively.

18  Q.   You've been talking about your time at FN America.

19  What did you do after that?

20  A.   So after FN, I took a job with Taurus Manufacturing

21  down in Miami, Florida.  Taurus is another small arms

22  manufacturer, their parent company is based in Brazil.  So

23  in Miami initially they were doing a good bit of importing

24  Brazilian products.  And then they did some manufacturing

25  in Miami as well for products that didn't meet the

1  qualifications to be imported.  One of the things -- what

2  I was hired on to do down there was effectively they were

3  establishing a new product development team for product

4  development in Miami.  So I was one of the early members

5  of that team, essentially.

6        So my role there was, again, product development,

7  strategic sourcing, developing the supply base for

8  manufacturing, you know, more of these products in the

9  U.S. market.  But it was also working with our Brazilian

10  counterparts to elevate their -- you know, their testing

11  role, their methodologies for products acceptance, that

12  type of thing.  But predominantly new product focused.

13  Q.    How many years did you work for Taurus Firearms?

14  A.    I was with Taurus I want to say maybe just over two

15  years.

16  Q.    And then what did you do after Taurus?

17  A.    Then after Taurus I started Sync Development

18  Solutions.  I believe that was 2017.

19  Q.    And you've been at Sync Development ever since?

20  A.    Yes, sir.

21  Q.    Could you describe just generally your experience

22  with assembly, examination, and evaluation of

23  striker-fired pistols?

24  A.    Sure.

25        So, you know, at FN we had a striker platform that we

1 developed from the ground up. Most of my experience with

2 that was in not necessarily the design phase of it but

3 more of the industrialization phase.

4     So to draw a little distinction there, first you

5 create this design and then you build this design, test

6 this design, and ultimately develop this design so that it

7 meets your standards, right? Nothing ever works the first

8 time. So there's some evolution to the product. So my

9 part was in that evolution aspect. That's where we build

10 it, we break it. You build these samples, you put them

11 through the variety of tests, and you continue to evolve.

12 You see what happens during the testing, you create action

13 plans to address any shortcomings that you may find, and

14 rinse and repeat until you've got a, pardon my pun, but a

15 bulletproof product that meets all of the expectations

16 that you've got outlaid for it.

17 Q. Can you describe your experience with scanning and 3D

18 modeling of striker-fired pistols and their components?

19 A. Sure.

20     We would use any methods that were available to us

21 to -- that would help us to understand, you know,

22 essentially what's going on when you're trying to resolve

23 any of these issues effectively. So a lot of that would

24 end up relying on three-dimensional scans of components,

25 discreet components, so that we can, you know, overlay

1  that with the intended geometry of the CAD model and you

2  can see where the physical part does not match the actual

3  part.  So that was one method of, you know, the

4  three-dimensional scanning I think you're referring to.

5      Additionally, we would use things like high-speed

6  video to watch and see what happens during the firing

7  event.  You know, high speed kind of helps, obviously,

8  slow things down so you can see this is moving here, this

9  is moving there.  You know, we used a variety of

10  inspection equipment to inspect parts, inspect features,

11  microscopes to analyze or to monitor parts throughout the

12  life of the parts.  So if we're looking at certain wear

13  characteristics, what does it look like after so many

14  rounds as opposed to what does it look like when it's

15  brand new.  Heavily relied on microscopes for that type of

16  thing.

17  Q.  Thank you, Mr. Miller.

18      MR. MIRENDA:  We'd offer Mr. Miller as an expert

19  per Rule 702, Your Honor.

20      THE COURT:  Okay.  Any objection?

21      MR. BAGNELL:  I would take no position on that,

22  Your Honor.

23      THE COURT:  I'll allow it.

24  BY MR. MIRENDA:

25  Q.  Mr. Miller, what was your scope of work in this case?

1    A.    So my scope of work for this case was to analyze this

2    animation and how it accurately or inaccurately depicts

3    the SIG P320.

4    Q.    What did you review in order to carry out that scope

5    of work?

6    A.    So to review it, obviously we start with the

7    animation.  But in addition to the animation, it was also

8    made available to me a couple of firearms from SIG, couple

9    of P320 firearms from SIG.  So I had a pre-upgrade P320

10    firearm from SIG to review, a post-upgrade P320 SIG from

11    SIG to review.  I also had what they call a cutaway gun

12    that was a post-upgrade cutaway version.

13        What the cutaway is is it's usually a demonstrative

14    used so that you can see the physical interworkings of the

15    part.  So throughout the models, there are features

16    removed from the gun so that you can see how certain

17    features are interacting with one another.  Additionally,

18    I had a couple of I want to say a couple iterations of the

19    striker that I reviewed and maybe a couple additional

20    examples of the sear that I reviewed.

21        A common -- or with that, specifically with the pre-

22    and post-upgrade versions of the P320 that I reviewed, I

23    also received CT scan data of those guns.  So the

24    animation is looking at CT scan data.  I also had CT scan

25    data of physical products so I could compare the CT scan

1  data to the physical products, and then I could obviously

2  compare that to the animation as well.

3  Q.  Did you review affidavits or declarations from

4  Mr. Villani, Mr. Hicks, Mr. Bagnell that were filed in

5  this case?

6  A.  There were a couple affidavits that I did review in

7  this case from Mr. Villani, Mr. Hicks, yes.

8  Q.  And did you review other materials that were

9  developed during the discovery phase of the case?

10  A.  Yes.  Later on during the discovery phase, material

11  from the High Impact deposition was made available to me

12  and some of that discovery material was made available to

13  me as well that was associated with High Impact.  So I was

14  able to review that.  I was able to review Mr. Bagnell's

15  deposition as well.

16  Q.  Were you able to review the High Impact deposition

17  transcript?

18  A.  Yes, sir.

19  Q.  Among the materials from High Impact, was there CT

20  scan data?

21  A.  There was.  There was CT scan data.  I believe there

22  was one CT scan data file in that material.

23  Q.  And were there also versions of the animation in the

24  High Impact materials that you reviewed?

25  A.  Yes.  There was a series, I believe, that may have

1  been 1 through 6 or something to that effect, but there

2  was a series of what appeared to be the evolution of the

3  creation of the animation that I did review as well.

4  Q.   Other than your work in connection with this case,

5  have you done any other work for SIG Sauer?

6  A.   I have not.

7  Q.   In general, could you describe your methodology for

8  how you approached this project?

9  A.   Sure.

10      So start with the animation.  Obviously, reviewed the

11  animation.  And then compared the animation to the

12  physical samples that I had for comparison as well as

13  compared the animation to the CT scan data that I had

14  available.  And I also did some inspection of a couple of

15  components, you know, as we got into some of the details

16  of the animation but there was some inspection that I did

17  as well.

18  Q.   Did you have any initial reactions from your early

19  review of the animation itself?

20  A.   I can remember initially being surprised at how the

21  animation was depicting the sear face.  I can remember

22  specifically being surprised by that.  And then, you know,

23  kind of as you get into the details of the animation just

24  certainly thinking that this did not seem to be a -- the

25  initial response was it did not seem to be an accurate

1  depiction.

2  Q.    What was it about your initial observation of the

3  sear face in the animation that stood out to you?

4  A.    The appearance of it.  It had this distorted

5  appearance that just didn't seem like anything I was used

6  to seeing or anything I had seen in the past, you know,

7  with my experience with either MIM components or firearm

8  components in general.

9  Q.    After this initial review of the animation, what

10 other steps did you take to carry out the project?

11 A.    So after that initial review, then I started just,

12 you know, kind of going section by section looking at

13 what's being shown in the animation, looking at the

14 physical components, specifically relying on that initial

15 review first to say, okay, well, here's where things look

16 different, here's where things look different, so forth

17 and so on.

18        After that, then I started looking at how the

19 physical components are represented in the CT scan data to

20 see how is that data kind of representing the physical,

21 essentially.  Just to see, you know, hey, is the data

22 showing anything different than what the physical

23 components show.  And then I was able to say, you know,

24 okay, is it possible that there's something in the CT scan

25 data the way it's representing here since the animation,

1    you know, I think very early on says it's derived from CT

2    scan data, was there something in that derivation that

3    could have led to the appearances that we found in the

4    animation.

5    Q.    Let's go through section by section.

6    A.    Sure.

7    Q.    I'd like to start with Exhibit 1, this was admitted

8    yesterday.  This is the animation.

9          First, Mr. Miller, is this the animation that you

10   reviewed?

11   A.    It appears so.

12   Q.    Let's go to 2 minutes and 31 seconds into the

13   animation.

14         Do you recognize this?

15   A.    I do.

16   Q.    And what is it?

17   A.    So this is a close-up three-dimensional view showing

18   the sear face.  The sear face that I'm referring to would

19   be this highlighted area that's outlined in red with the

20   blue through the middle.  And it's purporting a rollover

21   condition and an inset surface on the sear face.

22   Q.    Is this image from the animation?

23   A.    Yes.

24   Q.    Can you take a look at what's been marked for

25   identification as Exhibit 84?

1   A.    Uh-huh.

2   Q.    Do you recognize this?

3   A.    Yes.

4   Q.    What is this?

5   A.    This is just a screenshot from the animation that we

6   were just looking at.

7                MR. MIRENDA:  We'd offer Exhibit 84, Your Honor.

8                THE COURT:  Any objection?

9                MR. BAGNELL:  No objection.

10               THE COURT:  Full exhibit.

11                    (Plaintiff's Exhibit 84 admitted in

12                    evidence.)

13  BY MR. MIRENDA:

14  Q.    Let's go to 2 minutes and 39 seconds into the

15  animation, Exhibit 1.

16        Do you see this?

17  A.    I do.

18  Q.    And what do you recognize this to be?

19  A.    So this is a -- so this is the animation showing the

20  striker foot and the highlighted face of the striker foot.

21  And that is the face that interacts with the sear face.

22  Q.    Could you take a look at what was marked for

23  identification as Exhibit 89?

24  A.    Uh-huh.

25  Q.    Do you recognize that?

1    A.    Yes.

2    Q.    And what is this?

3    A.    That's a screenshot of the animation we were just

4    looking at.

5              MR. MIRENDA:  We'd offer Exhibit 89.

6              THE COURT:  Any objection?

7              MR. BAGNELL:  No, Your Honor.

8              THE COURT:  Full exhibit.

9                   (Plaintiff's Exhibit 89 admitted in

10                   evidence.)

11   BY MR. MIRENDA:

12   Q.    Are the surfaces that you observed in these two

13   frames of the animation, are they depicted in other parts

14   of the animation as well?

15   A.    To my recollection, they're depicted throughout the

16   animation.

17   Q.    We could go back to Exhibit 1, the animation, at 1

18   minute and 13 seconds.  If we could zoom in on the upper

19   right-hand quadrant of that part of the animation.

20         Do you recognize this?

21   A.    I do.

22   Q.    What is it?

23   A.    So this is a view of the animation.  It's got some

24   features either hidden or shown as transparent.  But I

25   think the intent here is to show the firing mechanism of

1  the animation.

2  Q.   And is the sear visible in this image?

3  A.   Yes, it is.

4  Q.   And could you describe how it appears in this image

5  in the animation?

6  A.   So in this image, you see in that upper right

7  quadrant the two -- the two round features would be

8  considered pins.  And the sear kind of wraps around the

9  upper left pin, if you will, and wraps around to the right

10  and extends towards the striker.  That striker foot is the

11  feature that is extending downward to meet that sear face.

12  Q.   Could you take a look at what's marked for

13  identification as Exhibit 85.

14  A.   Yes.

15  Q.   We can blow that up.

16      Do you recognize this?

17  A.   I do.

18  Q.   What is this?

19  A.   So this is kind of a cropped-in version from the

20  image we were just looking at.  So this red box is

21  outlining, generally outlining the sear.  So that sear

22  component kind of starts at the bottom left of that box,

23  it goes up around that pin on the upper left portion of

24  the box, and then wraps around to the right.  The red

25  arrow is pointing at the sear face, if you will, which is

1    kind of one of the key characteristics of the animation.

2              MR. MIRENDA:  I would offer Exhibit 85.

3              MR. BAGNELL:  No objection.

4              THE COURT:  Full exhibit.

5                   (Plaintiff's Exhibit 85 admitted in

6                   evidence.)

7    BY MR. MIRENDA:

8    Q.   Mr. Miller, do you observe in Exhibit 85 the

9    characteristics of the sear face that you were describing

10   earlier in the animation?

11   A.   Yes.  From the image we were looking at earlier, you

12   can see where that -- you know, where the red arrow is

13   pointing, it's grainy in this image, certainly, but you

14   can vaguely make out kind of a waviness to that vertical

15   face.  So instead of having a flat vertical face, you can

16   make out a contour to that vertical face.

17   Q.   And now again let's go back to Exhibit 1 and move to

18   a different spot in the animation to 2 minutes and 24

19   seconds.  If you could play from 2 minutes, 24 seconds the

20   next four or five seconds of the animation just to get a

21   look at the visual.

22        Mr. Miller, do you recognize this sequence from the

23   animation?

24   A.   I do.

25   Q.   What was it depicting?

1  A.    So that sequence is starting from the right side of

2  the firearm, again highlighting the internal firing

3  mechanism.  It's basically showing a view as it pans

4  around the rear of the gun over to now the left side of

5  the firearm.  But ultimately the viewpoint is focused in

6  on that sear face and the inner face between the sear and

7  the striker foot.

8  Q.    Could you take a look at what's been marked for

9  identification as Exhibit 86.  We can blow that up.

10  A.    Uh-huh.

11  Q.    Do you recognize Exhibit 86 as one of the frames of

12  the animation that we were just playing?

13  A.    Yes.

14          MR. MIRENDA:  Offer Exhibit 86, Your Honor.

15          THE COURT:  Objection?

16          MR. BAGNELL:  Your Honor, it's very blurry.  I

17  object on that basis.

18          THE COURT:  Well, I think I can make it out well

19  enough.  I think it's okay.  So Exhibit 86, full exhibit.

20              (Plaintiff's Exhibit 86 admitted in

21               evidence.)

22  BY MR. MIRENDA:

23  Q.    Mr. Miller, what features of the animation's

24  depiction of the sear face are visible in Exhibit 86?

25  A.    So on this exhibit, you know, essentially where that

1  red arrow is pointing is pointing to this deformed face of

2  the sear that the animation is kind of depicting

3  throughout this entire sequence, but this is just kind of

4  showing that it's depicted in this scenario as being

5  deformed as well.

6  Q.  I'd ask you to take a look at what's been marked for

7  identification as Exhibit 87.  Again, if we could blow

8  that up.

9      Do you recognize that?

10 A.  I do.

11 Q.  Is that another frame of the animation from the

12 sequence that we just played a few moments ago?

13 A.  Yes, it is.

14         MR. MIRENDA:  We'd offer Exhibit 87, Your Honor.

15         THE COURT:  Any objection?

16         MR. BAGNELL:  No objection.

17         THE COURT:  Full exhibit.

18             (Plaintiff's Exhibit 87 admitted in

19             evidence.)

20 BY MR. MIRENDA:

21 Q.  Mr. Miller, is the surface that you've been

22 describing, is that depicted in the animation in this

23 frame as well?

24 A.  Yes, it is, as indicated by that red arrow.

25 Q.  So Mr. Miller, what steps did you take as part of

1    your evaluation of this aspect of the animation?

2    A.    Sure.

3         So the first thing I did was I looked at the physical

4    components to see if this was an accurate representation

5    of that sear face or if this was not an accurate

6    representation of the sear face.

7    Q.    And what techniques did you employ to look at those

8    physical components?

9    A.    I was using a microscope.  First eyeballs, then

10   microscope.

11   Q.    Did you do anything else with regard to evaluating

12   the accuracy of these frames in the animation?

13   A.    Yes.  After reviewing with the microscope, then I

14   attempted to measure the flatness of the sear face.

15   Q.    How did you go about measuring the flatness of the

16   sear face?

17   A.    So I took a what's called a drop indicator --

18   Q.    Could you explain what is a drop indicator?

19   A.    So it's a measuring device that effectively has a

20   probe that moves in and out of this measuring device.  And

21   the device is measuring how accurately that -- you know,

22   how far that probe moves.  So the resolution -- to give

23   you an example, the resolution of this drop indicator that

24   I was using measures down to a .0001-inch increment.  So

25   that's 1 ten thousandth of an inch increment that the

1   device measures.

2       So, effectively, I was able to orient the sear face

3   to be flat within relationship to the indicator.  And then

4   use the indicator to come down and touch on various spots

5   along the sear face and effectively say, okay, my highest

6   point is -- or, you know, zero on your highest point and

7   measure to your lowest point and see what that total

8   variation is, right?  And so the total variation that I

9   was able to measure was .0005 inches.  So 5 ten

10  thousandths of an inch.

11  Q.   So from the lowest measurable point on the physical

12  components that you were measuring to the highest physical

13  point on the components you were measuring?

14  A.   On that surface.  On that surface, yes.

15  Q.   And that difference, as you said, was what?

16  A.   .0005 inches.

17  Q.   And is that difference -- what is depicted in the

18  animation?

19  A.   The animation visibly appears to depict a much larger

20  variance than that.

21  Q.   And did you come to any conclusion based on your use

22  of the drop indicator measuring the surfaces of the

23  physical components that you were evaluating?

24  A.   So I came to the conclusion that the actual

25  components were indeed flat and uniform and not like what

1    is depicted in the animation.

2    Q.    Now --

3              THE COURT:  I'll have to say I'm a little

4    unclear exactly what sear face was used.  I will have you

5    ask the questions.  I'll say I'm not quite clear -- and

6    I'm sorry if I missed it -- sear face from which weapon,

7    which model?  Pre-upgrade?  Post-upgrade?  If there's more

8    information about that.

9              MR. MIRENDA:  Sure, Your Honor.

10             THE COURT:  Was it more than one?

11   BY MR. MIRENDA:

12   Q.    Mr. Miller, can you describe which components you

13   measured in this way and what they were from?

14   A.    Yes.  So, ultimately, I measured both the pre-upgrade

15   version of the P320 that I had as well as the post-upgrade

16   version of the P320 that I had.  You know, I focused on

17   the pre-upgrade version because the pre-upgrade version

18   was what was depicted in the animation.  But I measured

19   both of those components and both were within the 5 ten

20   thousandths of an inch difference.

21   Q.    In addition to this examination using the drop

22   indicator and your visual examination, did you do anything

23   else to evaluate the accuracy of these images in the

24   animation?

25   A.    Yes.  So then I went to the CT scan data to see how

1    the CT scan data -- to see if you could pick up any

2    characteristics from the CT scan data that may indicate

3    that the CT scan data may be distorting this, you know,

4    distorting the actual physical components or not.  And

5    eventually once it became available, I was able to do that

6    with the CT scan data that we found in the High Impact

7    discovery that the animation was, you know, reported to be

8    derived from.  So, ultimately, I was able to look at a

9    variety of CT scan data sets to see if any of them

10   exhibited any condition that looked like what was found in

11   the animation.

12   Q.   Okay.  And, Mr. Miller, you said that you actually

13   did a visual comparison of the actual components, the sear

14   components that you reviewed as compared to the animation?

15   A.   Uh-huh.

16   Q.   What equipment did you use, in addition to your own

17   eyes, to make that visual comparison?

18   A.   I used that microscope that I've got sitting up over

19   there (indicating).

20   Q.   Let's take a look at Exhibit 117 which was admitted

21   yesterday.

22        Mr. Miller, do you recognize Exhibit 117?

23   A.   I do.

24   Q.   What is the image on the left of Exhibit 117?

25   A.   The image on the left is a screenshot from the

1  animation.

2  Q.   And what's the image on the right?

3  A.   The image on the right is an image that I took of

4  the -- I believe this is the pre-upgrade P320 striker

5  foot.

6  Q.   And you took that photograph?

7  A.   I did.

8  Q.   And how was it that you took that photograph?  What

9  did you use to take that photograph?

10  A.   So the microscope has a camera sitting on top that

11  allows me to take an image of whatever the stereo

12  microscope is seeing.

13         MR. MIRENDA:  With the Court's permission, I'd

14  like to ask Mr. Miller to go to the microscope that he set

15  up.  It's over in the corner there because of the cabling

16  in order to get it connected up with the monitor system so

17  that everybody can see what he's doing.

18         THE COURT:  That sounds fine.

19         MR. MIRENDA:  There is a microphone over there

20  as well so he can speak from there.

21         THE COURT:  Great.

22  BY MR. MIRENDA:

23  Q.   Mr. Miller, are you set up there at the microscope?

24  A.   Sure.

25         MR. MIRENDA:  Can you hear?

1          If you hold the microphone up.

2          THE WITNESS:  Is this better?

3          THE COURT:  Yes, thank you.

4   BY MR. MIRENDA:

5   Q.   So, Mr. Miller, can you describe how you went about

6   visually examining the components and how you used that

7   microscope?

8   A.   Yes.

9          So the microscope has a light source to it.  We've

10  got a camera up here that basically turns off one of these

11  view ports.  So, effectively, this goes to a program where

12  you can take a snapshot of what the microscope is seeing

13  or what this camera is seeing in the microscope.

14         And then, you know, you work essentially to -- I know

15  this is a little clunky here -- but you can essentially

16  use this to roll around, look at the surfaces or whatever

17  characteristics it is that you're looking for.  And then

18  you can try to hold that orientation like this right here.

19  Hold that orientation, get as much of an in-focus picture

20  as you can, and then take a snapshot of that image.

21         And the reason why I say as much as you can with the

22  focus, so obviously as you move your focal plane in and

23  out, the camera is limited to the focus range that it has.

24  So when you're trying to get a three-dimensional

25  viewpoint, so like you can see -- I don't have a pointer.

1  You can see in this area here that I'm pointing to, where

2  that's -- sorry, let me let the lighting catch up.  Where

3  that's a little out of focus compared to where we're at

4  down here.  So there's a little bit of a leeway that it

5  takes to kind of orient the object that you're trying to

6  take a picture of.

7  Q.   Now, can you describe what it is we're looking at

8  here in the microscope?

9  A.   Sure.  We should be looking at a pretty close image

10  to what we were just seeing as the image in the exhibit.

11  But this is -- this should be -- can everybody see the

12  same thing?  This should be a view of the face of the

13  striker foot.  This is the pre-upgrade striker that I had

14  available for review, one of the pre-upgrade strikers that

15  I had available for review.  So we're seeing

16  specifically -- we're looking at this face right through

17  here (indicating).  That's the face that interfaces with

18  the sear.

19       Now, I think we're at about 7X magnification.  And

20  then we can -- we can zoom in from there as well to get a

21  little closer for comfort.  There we go.

22       As you can tell in some of these -- you know, when

23  we're working with the microscope, the lighting conditions

24  have an effect on how the image appears.  So you can see

25  right now there are highlights around these corners and

1  whatnot.  As we -- this is going to be bad to do it in

2  this aspect, but as you move the part around, you can see

3  how those highlights and shadows also move around.  Sorry

4  for fumbling.  Yeah.  So is everybody following along?

5  Q.    So in that orientation, what is it that you observe

6  first about the striker foot face and then about what

7  appears in this image of the right-hand side of the

8  striker foot as it moves to the back of the striker foot?

9  A.    So what did I do with my little pointer guy?

10        So the face is the majority of that surface, right?

11  That's what we're calling the face.  And that's the face

12  that actually makes contact with the sear.

13        And then as we get to this feature right through

14  there, that little highlight feature, as we get to that

15  feature, essentially that's -- I would estimate that to be

16  a radius to transition from this face to the actual

17  striker face.

18        Now, you notice this little line coming down.  As we

19  come down the curvature through here, come down through

20  that curvature, then it wraps around this face as well.

21  That's a parting line.

22        What I mean by parting line is in the manufacturing

23  process, the MIM process where this is produced, you've

24  got a mold.  So a mold would basically be two blocks of

25  metal, to simplify things.  You've got a cavity in that

1  mold.  This mold comes together, closes off, and then the

2  metal is injected into that mold, right?  So that line

3  that you see wrapping around in this image, the right side

4  of that image, that line is what's considered the parting

5  line, where those two molds come together, okay.

6      Now -- and I'm speculating here, but because of the

7  placement of that parting line, the intent was to have a

8  radius transition between the right-side face --

9  Q.   Mr. Miller, I don't want you to speculate here.  What

10  do you observe about the position of the parting line and

11  where that portion is with respect to the sear face that

12  interacts with the striker?

13  A.   Sure.

14  Q.   The striker face that interacts with the sear.

15  A.   So the intent here is to have a rounded surface, a

16  radius between this flat face and these faces, these

17  vertical faces, right?  So to create that radius, this

18  geometry has to be in one side of the mold separate from

19  this geometry that's in the other half of the mold, if you

20  follow along.

21      So in the molding process, just like everything else,

22  there's a little bit of a tolerance in where these two

23  halves comes together.  So to account for that tolerance,

24  to account for any type of misalignments, then this radius

25  right here (indicating) is pulled back.  So in this view,

1   it's pulled away from the picture, right?  So pulled into

2   the picture, if I'm describing that correctly.  And the

3   intent there would be so that any misalignment towards us

4   would actually interfere with the sear.  But that

5   misalignment is intentionally pushed back so you don't

6   have any interference with the sear.  So it's by design.

7   Q.   So that radius edge on the right-hand side is behind

8   the functional face of the striker foot?

9   A.   Correct.

10  Q.   It does not protrude in front of the functional face

11  of the striker foot?

12  A.   We could probably take a look at that, but yes.

13  Q.   Mr. Miller, while you're there, I'd like to put up

14  Exhibit 69 which was admitted yesterday.

15  A.   Okay.

16  Q.   Do you recognize Exhibit 69?

17  A.   I do.  These are images that I took of the

18  pre-upgrade sear that I had for review.

19  Q.   And how did you take these images?  Same way?

20  A.   Same way.

21  Q.   So could you describe for the Court using the

22  pre-upgrade sear and the microscope, could you demonstrate

23  for the Court how it is that you took these images and

24  what appears here?  We can go back to the camera.

25       I'm sorry, you said this was a pre-upgrade sear?

1    A.    Correct.

2          So, again, we're at about 7 times magnification here.

3    So this is the pre-upgrade sear that I had for review.

4    This is showing that side view of that sear.

5          So as we rotate that sear around -- this gets a

6    little tricky.

7          So this is just trying to create a three-dimensional

8    view of that sear face.  You can kind of see how lighting

9    plays a role when you take these images.

10   Q.    In what way does lighting affect the images or the

11   microscope's light there?

12   A.    So depending on how the light reflects back off of

13   the part, whether that light is reflecting back into the

14   camera or not, that's creating the highlights and shadows

15   along the edges and the contours of the part.

16   Q.    Looking at the right-hand -- again, from this view,

17   the right-hand side of the sear, can you describe for the

18   Court the interaction or the interface between the

19   right-hand side and the sear face, the functional face of

20   the sear?  What is it that you see?

21   A.    Are you focused in on this area right here?

22   Q.    Yes.  What is it that you see along that whole side

23   edge there?

24   A.    So this shadow that you -- are you referring to the

25   shadow and the highlight?

1  Q.  Yes.

2  A.  Okay, so this is just a vertical -- a vertical

3  highlight showing here.  And back here, as it goes away

4  from the camera.  And this is just a shadow of the right

5  side of the sear.

6      Even when I move around, it still, you know -- those

7  highlights just dance a little bit depending how the light

8  comes into play.

9  Q.  And if you rotate that a little bit, do those shadows

10  and highlights change?

11  A.  Yes.

12  Q.  Because of the lighting?

13  A.  Yes.

14      There we go.  I'll keep my finger there and hold it.

15      You can see here where that entire face looks like

16  it's a highlight.

17  Q.  And earlier when you were looking at the striker

18  foot, you described the MIM molding process and the

19  parting line and the radius created as part of that.  Do

20  you see a similar feature here?

21  A.  So this geometry is a little more difficult or a

22  little more complicated, I should say, than what we see in

23  the striker.  Let me zoom down here a little bit.

24      So you see this vertical line coming through here.

25  So this would be considered one of the parting lines.

1    I believe there appears to be potentially another

2  parting line along this edge.  I'd have to look at that

3  closer, but that appears to be another parting line.

4    Again, depending on -- so the mold opens and closes,

5  right?  These two mold halves move laterally.  When you're

6  trying to get certain other geometry features, such as

7  these features down here, these spring retention features,

8  the round features are what I'm looking at.  When you're

9  trying to get that but you're trying to basically open and

10  close in and out in this direction (indicating) -- I don't

11  know if you follow me or not -- but effectively you may

12  have to add what they call action to the mold in some

13  cases to be able to get the functional surfaces that

14  you're looking for.

15  Q.  And in that microscopic examination, looking at the

16  functional surface of the sear face as it relates to the

17  sides of the sear --

18  A.  Uh-huh.

19  Q.  -- is there any difference or offset between the

20  functional surface of the sear and the rest of the side

21  body of the sear?

22  A.  Not that I can see.  That surface appears to be flat

23  and uniform.

24  Q.  So there's no protrusion forward of the sear face?

25  A.  No, sir.

1  Q.   Mr. Miller, I'd ask you to take a look at Exhibit

2  Number 70, which was also admitted yesterday.

3      Do you recognize Exhibit 70?

4  A.   I do.   These are images that I took of a post-upgrade

5  P320 sear.

6  Q.   Do you have a post-upgrade sear that you could

7  demonstrate in the microscope?

8  A.   Yes.

9      MR. BAGNELL:  Objection, Your Honor, relevance.

10  This is a post-upgrade gun.

11      THE COURT:  I'm still going to allow it.  I

12  understand the concern, but I'll allow the testimony.

13  BY MR. MIRENDA:

14  Q.   Mr. Miller, if you could just describe what it is you

15  did and what you observed with regard to the functional

16  face of the post-upgrade sear?

17  A.   Sure.  So very similar process.

18      And just to kind of orient everybody, the face that

19  I'm attempting to point to in here is this vertical face.

20  And so this vertical face would be the sear face that's in

21  question.  So that's the face that we're focused on.  But

22  again, viewing this through the microscope, through the

23  various angles, you know, again, it appears to be flat and

24  uniform.

25  Q.   Are there any portions of that functional surface of

1  the sear face in this post-upgrade sear that protrude

2  forward of that functional surface?

3  A.    Not that I can find.

4  Q.    Thank you, Mr. Miller.  I think that's where we can

5  stop with the microscope and you can go back to the

6  witness stand.

7        You said that after you did your visual examination

8  and microscopic examination you then looked at CT scan

9  data?

10  A.    That's correct.

11  Q.    And did you examine CT scan data provided by

12  High Impact?

13  A.    I did, eventually, yes.

14  Q.    Could you take a look at Exhibit 88.

15        So do you recognize Exhibit 88?

16  A.    I do.

17  Q.    What is that?

18  A.    So this is a section of the CT scan data that was

19  provided by High Impact looking specifically at the

20  connection between -- or the interface between the sear

21  and the striker foot.

22  Q.    And this is in the Schneider CT scan provided by

23  High Impact?

24  A.    Yes, sir.

25            MR. MIRENDA:  Offer Exhibit 88, Your Honor.

1          THE COURT:  Any objection?

2          MR. BAGNELL:  It's very blurry, Your Honor.  I

3    don't recognize it.  So I'll take no position.

4          THE COURT:  Let me ask, is this from the -- what

5    would be the source?

6          MR. MIRENDA:  It's Exhibits 2, 3, and 4 which

7    were admitted.

8          THE COURT:  The X, Y, Z?

9          MR. MIRENDA:  X, Y, Z axes, yes.  This is -- I'm

10   not good with my math, Your Honor.  I don't know whether

11   this is X, Y, or Z.  But it's one of those orientations.

12         THE COURT:  Is that right, Mr. Miller, it's

13   taken from one of those orientations of the CT scan data

14   from the Schneider firearm?

15         THE WITNESS:  Yes.

16         THE COURT:  I'll allow it.  Full exhibit, 88.

17         MR. MIRENDA:  88, Your Honor, yes.

18              (Plaintiff's Exhibit 88 admitted in

19              evidence.)

20   BY MR. MIRENDA:

21   Q.   And what do you observe in this CT scan slice from

22   the Schneider firearm?

23   A.   Here what I'm observing is, you know, clearly the --

24   you don't get a great distinction between the sear and the

25   striker where they're contacting.

1  Q.    And why is that?

2  A.    And so that -- what I've noticed with working with

3  the CT scan data is that the software, whenever there is

4  contact, the software or the scan does not provide great

5  delineation between one component and the next, presumably

6  because of similar materials.  So that's why this kind of

7  appears to be, you know, one continuous component in this

8  image, effectively.  But what I took from this is more of

9  the proportional features of the striker leg as it extends

10 down to meet where the sear face is.  And so that's kind of

11 of more of what I was looking at when I was, you know,

12 focused in on this image.

13 Q.    Could you take a look at Exhibit 91.

14 A.    Uh-huh.

15 Q.    Do you recognize Exhibit 91?

16 A.    I do.

17 Q.    What is this?

18 A.    So this is more of a three-dimensional view that I

19 took in the CT scan data from Schneider.

20        So, again, I'm using that data to view various

21 cross-sections of the firearm.  And I'm looking around in

22 that data to see, is there -- you know, how is the sear

23 face shown in the data?  So the previous image we just

24 looked at where it's slicing through both components, we

25 can't really tell anything about, you know, the

1  characteristics of the sear face in that image.  In this

2  image, however, we can see that we're not sliced through

3  the two components, the sear and the striker, but instead

4  we're sliced through the sear but maybe just before we

5  start slicing through the striker.  And so what we can see

6  is more of a uniform appearance shown by the -- or a

7  uniform appearance of that sear face.  That's where the

8  red arrows are pointing towards.  But we see that more

9  uniform appearance appear in the CT scan data.

10  Q.   And you're talking about uniform appearance of what

11  feature?

12  A.   I'm sorry, the sear face.  Uniform appearance of the

13  sear face.

14  Q.   And did you take the screenshots that appear in

15  Exhibit 91?

16  A.   I did.

17        MR. MIRENDA:  I'd offer Exhibit 91, Your Honor.

18        THE COURT:  Any objection?

19        MR. BAGNELL:  Yes.  I object, Your Honor, to the

20  extent that this is being offered as a photograph of the

21  actual P320.  I think the testimony is that this is a CAT

22  scan image which the witness just said does not have

23  sufficient resolution to show surface faces.

24        THE COURT:  I gather, sir, that this is a

25  screenshot from the CT scan?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  But there's actually two images

3    here, two different angles?

4          THE WITNESS:  Yes.

5          THE COURT:  And it's derived, again, from the

6    Schneider CT scan --

7          THE WITNESS:  Yes.

8          THE COURT:  -- that was given to High Impact?

9          THE WITNESS:  Correct.

10          THE COURT:  So I'm satisfied that it has enough

11    clarity in terms of what's being looked at.  There's an

12    inference to be drawn in terms of exactly what it shows,

13    but I'm satisfied for admissibility purposes it certainly

14    is relevant and is allowable.  Full exhibit, 91.

15                    (Plaintiff's Exhibit 91 admitted in

16                      evidence.)

17          THE COURT:  I'll just ask, there's been

18    testimony about something having a uniform appearance.  I

19    don't know what that means.  If you could clarify.

20    BY MR. MIRENDA:

21    Q.   Mr. Miller, at various points you've described

22    surfaces you were observing as having a uniform

23    appearance.  What do you mean by that?

24    A.   Sure.  So uniform as in a flat, you know,

25    distortion-free surface, essentially.

1  Q.   In addition to reviewing the Schneider CT scan data

2  that was provided by High Impact, did you review other

3  materials from High Impact?

4  A.   I did.

5  Q.   In particular, did you review various iterations or

6  drafts of the animation?

7  A.   Yes.

8  Q.   And did you review the deposition testimony from

9  High Impact as well?

10 A.   Yes.

11 Q.   What was your purpose in reviewing those iterations

12 of the animation and the High Impact deposition testimony?

13 A.   So my purpose in viewing those was to see how the

14 animation evolved over time, effectively, to see, okay,

15 you know, the early versions of that animation or the

16 early proofs from High Impact, you know, they portrayed

17 features in one way that was not necessarily portrayed by

18 the time that the animation was finalized.  So I was

19 looking at that development cycle.

20 Q.   Let me ask you to take a look at Exhibit 9, which was

21 admitted yesterday.

22      Do you recognize -- this is the first page of

23 Exhibit 9.  I'm going to ask you about other pages as

24 well.  Do you recognize Exhibit 9?

25 A.   Yes.

1  Q.    What is it?

2  A.    It appears to be a string to an image, a

3  ScanToMesh_001_WM.png.

4  Q.    Is this one of the materials you reviewed from that

5  file?

6  A.    Yes, I believe so.

7  Q.    Take a look at page 2 of Exhibit 9.

8  A.    Uh-huh.

9  Q.    So do you recognize this?

10  A.    Uh-huh.

11  Q.    What is this and where does it come from?

12  A.    So this comes from the High Impact data.  I believe

13  this is depicting an overlay, essentially, of

14  High Impact's model.  You know, a model that they have

15  created to create the animation.  As I understand it,

16  High Impact created a model and used that model to render

17  the graphics from that model to create the animation.  My

18  understanding of this image is that this image is an

19  overlay between that model, which is the green mesh in

20  appearance or trying to show the green mesh or green wire

21  frame and superimposed on top of the CT scan data so that

22  you can see kind of -- essentially get a visual

23  representation of how the model that was created by

24  High Impact corresponds to the CT scan data that the model

25  was created from.

1  Q.    And focusing on the sear face, the functional surface

2  of the sear, what were you able to observe from looking at

3  this wire frame provided by High Impact?

4  A.    So this wire frame has uniform boxes, essentially,

5  right?  So that wire frame is depicting that face as being

6  flat.

7       Just to draw a comparison, if you look at some other

8  areas of the wire frame, you may notice where that wire

9  frame is either pushing or pulling or kind of, you know,

10  particularly if you look towards -- if you come down the

11  horizontal ledge of the sear that's just below the sear

12  face and you come towards the back of the sear where it's

13  just above the springs, you can see how that wire frame

14  has contours as it wraps around that contoured geometry,

15  right?  I know we're just -- I'm talking about this just

16  now, I'm using that as an example to say where there's

17  curvature, you see that curvature in the wire frame.  But

18  the wire frame shown on top of the sear face is, again,

19  straight lines, linear.  So no curvature to that wire

20  frame.

21  Q.    What's the significance of there being no curvature

22  to the wire frame that's overlaid on the sear case?

23          MR. BAGNELL:  Your Honor, I object.  This is a

24  CAT scan image, it's not an actual photograph of any of

25  the P320s at issue.

1          THE COURT:  I think you're just trying to use it

2    to show that, based upon High Impact's data from their own

3    data, the representation that High Impact made, according

4    to the expert, sear face is flat and not -- it does not

5    have distortions in it.  I think it's fair testimony.

6          Am I missing something, Mr. Bagnell?

7          MR. BAGNELL:  Yes, Your Honor.  The witness has

8    conceded there's not sufficient resolution on a CAT scan

9    much like an x-ray to actually see the surface face as you

10   would with a human eye.  So I think it's misleading the

11   Court.  That's the basis of my objection.

12         THE COURT:  I'm going to overrule the objection.

13   I think that there's -- nothing's perfect in the world,

14   but I think that there's enough for the witness to draw at

15   least a conclusion.  And, of course, it could be subject

16   to cross-examination, if you'd like.  It's overruled.

17         You may proceed, sir.

18         MR. MIRENDA:  Thank you, Your Honor.  I'm about

19   to move to something else.  I'm not sure in terms of the

20   Court as far as the breaks and timing this morning.

21         THE COURT:  Well, I think we've only been going

22   a little over an hour.  I think we're okay unless our

23   court reporter wants a break.

24         We're going to take a break.  Okay.  All right.

25   We'll see you in 15 minutes or so, whenever our court

1   reporter would like to proceed.

2          MR. MIRENDA:  Thank you, Your Honor.

3              (Whereupon, a recess followed.)

4          THE COURT:  You may continue.

5          MR. MIRENDA:  Thank you, Your Honor.

6   BY MR. MIRENDA:

7   Q.   Mr. Miller, now I'd like to show you what was

8   admitted yesterday as Exhibit 15.

9        Do you recognize this?

10  A.   Yes.

11  Q.   Is this another item that came from the High Impact

12  materials that you reviewed?

13  A.   Yes, it is.

14  Q.   Could you take a look at page 2 of Exhibit 15,

15  please.

16  A.   Uh-huh.

17  Q.   And what is this?

18  A.   So, as I understand, this is an image of a striker

19  foot that was provided to High Impact.

20  Q.   And do you have any understanding as to what the

21  surface appearance in this image is a result of?

22  A.   My understanding is that there was a subsequent image

23  that showed kind of a before and after view of this same

24  component before wiping it and after wiping that face to

25  remove any kind of foreign object debris from that face.

1  And so, yeah, this is the image of before removing that

2  debris.

3  Q.  Let's take a look at what was admitted yesterday as

4  Exhibit 76.

5      What is this?

6  A.  So this is another image of those same striker feet

7  side by side or striker foot side by side.  The left,

8  again, before wiping; the right, after wiping to remove

9  debris.

10  Q.  And in your review of the animation did you see a

11  surface that looked like the pre-wiping, the left-hand

12  side image in Exhibit 76?

13  A.  So in the animation, it appears as though the sear

14  face or the characteristics of this pre-wiping image were

15  applied to the sear face.

16  Q.  I'd like to ask you to take a look at what's marked

17  Exhibit 92 for identification.  There are three images in

18  Exhibit 92.  Let's start from the left.

19      What's the image on the left, the left-hand side of

20  Exhibit 92?

21  A.  So the image on the left is that same image from two

22  exhibits ago.

23  Q.  From Exhibit 15?

24  A.  Yes.

25  Q.  And now moving to the middle image, what is the

1  middle image?

2  A.   So the middle image is that same image rotated

3  180 degrees.

4  Q.   Can you describe what the orientation of that -- what

5  component is that and what's its orientation?

6  A.   This is, again, showing the striker foot.  So the

7  image of that foot has been rotated 180 degrees.  Along

8  the top of the area that's in focus, that's actually the

9  bottom of the striker foot.  Then as you move down, you're

10  actually moving up in the gun, if that makes sense.

11  Q.   And then moving to the right-hand side of Exhibit 92,

12  what's that image?

13  A.   So that is an image from the animation showing the

14  sear face.

15          MR. MIRENDA:  Your Honor, I'd offer Exhibit 92.

16          THE COURT:  Any objection?

17          MR. BAGNELL:  Object, Your Honor, to the extent

18  the striker face is turned upside down and not as it sits

19  in the gun.  I don't understand that.

20          THE COURT:  So why does that matter if the sear

21  face is upside down?  It seems to me it's just shown so

22  there can be, I think, a comparison suggesting that the

23  image that's in the middle is similar to the image that's

24  shown on the animation on the far right.

25          MR. BAGNELL:  Okay.  Withdrawn.

1    THE COURT:  Full exhibit, 92.

2              (Plaintiff's Exhibit 92 admitted in

3              evidence.)

4   BY MR. MIRENDA:

5   Q.   Mr. Miller, can you describe to the Court how you

6   compared these images and what your conclusion was?

7   A.   So the characteristics of that debris that we see on

8   the -- in the photographs, both the left and the middle

9   images here, the appearance of that debris seem to have

10  been applied across the surface of the sear in the

11  animation.  So those lumpy characteristics that we see in

12  the photograph appear to be some of the characteristics

13  that form the lumpy distorted features that we're seeing

14  in the animation on the sear face.

15  Q.   And I think you may have mentioned this already, but

16  the photographs, the left-hand two images in Exhibit 92,

17  those are of a striker foot face; is that right?

18  A.   That is correct.

19  Q.   And the surface in the animation that that was

20  applied to, what surface was that?

21  A.   That's the sear face.

22  Q.   Those are two different components?

23  A.   Correct.

24  Q.   I believe you testified earlier that you reviewed the

25  various affidavits and declarations submitted in this case

1  on Mr. Bagnell's behalf by Mr. Villani, Mr. Hicks.  In

2  your review of all of those materials, other than the

3  image that's shown here on the left-hand side of

4  Exhibit 92, did you see any other photograph of either a

5  striker foot face or a sear face that looks like the

6  animation's depiction of the sear face on the right-hand

7  side of Exhibit 92?

8  A.   I did not.

9  Q.   And taking now together all of the work that you did

10 that you've described, did you come to any conclusions

11 about how the sear face and the striker foot are depicted

12 in the animation?

13 A.   Yes.  So I came to the conclusion that the animation

14 falsely depicts the SIG P320 sear face and striker foot.

15 Q.   In addition to evaluating the sear and striker faces,

16 did you analyze any other aspects of the animation?

17 A.   Yes.  There were other aspects of the animation that

18 I analyzed as well.

19 Q.   So I'd like to go to Exhibit 1 at 4 minutes, 11

20 seconds.  Exhibit 1 is the animation that was admitted

21 yesterday.

22     Do you recognize this?

23 A.   I do.

24 Q.   What is it?

25 A.   So this is in the animation depicting the striker

1  safety as it sits on top of the striker.

2  Q.  I ask you to take a look at Exhibit 74, which was

3  admitted yesterday.

4  A.  Uh-huh.

5  Q.  Do you recognize this?

6  A.  I do.

7  Q.  And what is this?

8  A.  So this is a screenshot that I took from the

9  animation.  And then I'm focused on the smaller rectangle

10  on the left, right?  And so then I copied this image and

11  cropped in and blew it up to what is in the rectangle on

12  the right.  So just to orient everybody, we are looking at

13  the striker notch, the safety notch of the striker.

14  Q.  And is this how the striker safety notch is depicted

15  in the animation?

16  A.  Yes.  This is the animation's depiction of that

17  feature.

18  Q.  What's the function of the striker safety notch in

19  the real P320?

20  A.  So the function is if, for whatever reason, the

21  striker were to disengage from the sear inadvertently

22  without a trigger pull, the safety notch is there to

23  basically prevent forward motion of the striker once it

24  makes contact with the striker safety.

25  Q.  Take a look at Exhibit 123 that was admitted

1  yesterday.  This is a side-by-side.

2      Do you recognize this?

3  A.   I do.

4  Q.   What is the image on the left?

5  A.   So the image on the left is the same image we were

6  just looking at in the previous exhibit.

7  Q.   That is from the animation?

8  A.   From the animation.

9  Q.   And that is of the striker safety notch?

10  A.   Yes.

11  Q.   And what is the image on the right?

12  A.   The image on the right is a photograph that I took of

13  an actual P320 striker safety notch.

14  Q.   Did you evaluate the animation's depiction of the

15  striker safe any notch in comparison to an actual P320

16  striker?

17  A.   Yes.  So there's a couple of things that jump out

18  immediately with this.

19      The safety notch that's depicted, the geometry is

20  obviously different than what is in the photograph here,

21  right?  So the geometry in the animation is different from

22  the actual components.  And the geometry specifically that

23  I'm talking about is as you look at the vertical wall of

24  the actual component, that vertical wall is at a slight

25  angle.  And then there is a notch relief area, that

1  semicircle kind of to undercut, prevent, basically, a

2  radius from being formed between the vertical surface and

3  the horizontal surface of that safety notch.

4  Q.   I'm sorry, you're describing the actual P320 striker

5  safety notch?

6  A.   Yes, I'm attempting to describe the actual component

7  that we see in this image.

8       So that undercut is omitted in the animation.

9  Q.   And what's the significance of those omissions and

10 differences?  Is there a significance?

11 A.   Yes.

12      So I think if we were to take a look at a few

13 exhibits ago when we were looking at the animation,

14 there's some text there that's essentially claiming that

15 the safety notch is prone to having the safety slip over

16 it.  And so I'm kind of drawing into this conclusion that

17 one of the elements that the animation depicts is that

18 there is essentially a little bit of a slight radius

19 between that horizontal surface and that vertical surface.

20 In actuality, if that radius were to exist, then the

21 function of that radius would be to allow that safety

22 component to potentially move in an upwards motion

23 whenever those two features impact.

24      So in the actual components, that radius has been

25 eliminated and replaced with this undercut feature to

1    eliminate any potential for that to happen.

2    Q.   Could you take a look at Exhibit 125.

3         What is Exhibit 125?  Do you recognize it?

4    A.   I do.  So Exhibit 125 is at this point I'm honing in

5    or looking closer at the physical representation of the

6    geometry in the animation versus actual components.

7    Q.   Before we get to your comparison, did you take these

8    photos and create this image?

9    A.   Yes, I did.

10             MR. MIRENDA:  I'd offer Exhibit 125.

11             THE COURT:  Any objection?

12             MR. BAGNELL:  No objection.

13             THE COURT:  Full exhibit.

14                 (Plaintiff's Exhibit 125 admitted in

15                 evidence.)

16   BY MR. MIRENDA:

17   Q.   Mr. Miller, can you describe for the Court what you

18   did in your analysis to compare the actual P320 striker

19   safety notch that appears on the right-hand side of

20   Exhibit 125 and the animation's depiction that is on the

21   left-hand side?

22   A.   Sure.

23        So in the animation, the height of the notch appears

24   to be much smaller than the height of the notch in the

25   actual components.  And so here what I was trying to do to

1  approximate what that height difference might be between

2  the animation and the real components is I took and I

3  applied a red line across -- in the image on the right

4  there's a red line across the stop of the safety notch,

5  horizontal red line, see that?  So I'm using that to scale

6  that image to the same distance in the animation, right?

7  So you can vaguely, in the image on the left, you can see

8  also a red line horizontal along the top of that notch.

9  So I'm using that to scale these two images to make sure

10  approximately we're comparing apples to apples here.

11  Q.   What was the purpose of adjusting the scale so the

12  scale is the same in the two images?

13  A.   So that the proportions in the photograph are

14  matching the proportions in the animation and vice versa.

15       And then next I'm attempting to align the safety

16  notch with the animation.  And I'm using that blue line,

17  the horizontal blue line that extends across both images,

18  right, and that's the base of the safety notch.  That's

19  the surface that the safety is actually riding on in

20  actuality, okay?

21       And then the yellow line is the top of the safety

22  notch in the animation extended across into the actual

23  components.

24       So we've scaled the image, we've got an

25  approximate -- you know, we've got the actual component

1  sized correctly to be able to look at the comparison of

2  the size in the photograph versus the animation, and now

3  we're seeing that the actual component has a much taller

4  safety notch than what is shown in the animation.

5  Q.    And in addition to the height of the actual component

6  as compared to the height as depicted in the animation,

7  are there other differences that you observed as between

8  the actual P320 striker safety notch and how it's depicted

9  in the animation?  You already talked about the undercut.

10  A.    I've talked with the undercut.  I've talked about the

11  vertical surface and how the vertical surface in the

12  actual component appears to be angled forward or angled to

13  the right in these images, whereas it appears to be more

14  the 90-degree, if not back angle, on the image on the

15  left.

16  Q.    And what's the significance?  Have you come to any

17  conclusions, based on your analysis, as to the

18  significance of the differences between what you see in

19  the actual P320 safety notch and how the animation depicts

20  it?

21  A.    So the animation appears to have distorted all of

22  this geometry to be able to create this claim that the

23  notch is prone to bypassing, essentially.  And what I mean

24  by bypassing, for the safety to actually ride over the

25  notch and for the notch to not function as intended.

1    THE COURT:  And I wonder, it wasn't quite clear

2  to me, if you can clarify -- I'm sorry if I missed it, but

3  the actual image that's taken on the right side, is that

4  from a pre-upgrade or a post-upgrade?

5  BY MR. MIRENDA:

6  Q.   Mr. Miller, the image that you're comparing to --

7  A.   This would have been from a pre-upgrade P320.

8    THE COURT:  Thank you.

9  BY MR. MIRENDA:

10  Q.   In your review that you described earlier of the

11  materials submitted on Mr. Bagnell's behalf from

12  Mr. Villani and Mr. Hicks in this case, did you observe

13  any images or photographs where the striker safety notch

14  appeared as it's depicted in the animation?

15  A.   I did not.

16  Q.   Mr. Miller, I'd like you to take a look at

17  Exhibit 129.

18    Do you recognize this?

19  A.   I do.

20  Q.   And what is this?

21  A.   So the image on the top is an image taken from the

22  animation, screenshot taken from the animation.

23    The image on the bottom is an image that I took from

24  the Schneider CT scan data showing basically a section

25  through the striker pin, but that section is through the

1    safety surface or the safety notch surface as well.  So

2    you see Roman Numeral I is pointing towards the safety

3    notch of the Schneider CT scan file.  Roman Numeral II is

4    pointing towards the actual safety lock from the Schneider

5    CT scan.

6    Q.    And I know we've had a number of discussions about

7    the CT scan slices and what they depict.  Can you describe

8    this particular CT scan slice that you took a screenshot

9    of and what it's depicting and how it's oriented in the --

10   the two-dimensional slice is oriented in a

11   three-dimensional firearm?

12   A.    Yeah.

13        So the slice would be, if you're holding the gun and

14   the gun is pointing away from you, the slice would be

15   taken right of center line, right, from the barrel to the

16   rear of the gun.  And that slice is cutting through

17   specifically what's in the box, cutting through the

18   striker pin and the housing such that we can see the

19   safety geometry of the striker pin and the striker safety.

20        So there's a portion of the striker safety that

21   actually sits on top of that shelf in the striker.  I

22   think you may have seen that yesterday.  But it sits on

23   top of the shelf in the striker.  So this is cutting

24   through the portion that sits on top of the shelf, if that

25   makes sense.

1  Q.   Mr. Miller, I know we've got the microscope.  I don't

2  know whether it would be -- whether you would be able to

3  visualize, using the actual striker and actual striker

4  safety, or whether you wouldn't be able to do that because

5  the moving of the parts.  Is it possible to show it?

6  A.   Let's try.

7  Q.   Once you've got that set up there, if you could

8  describe for the Court what it is it's showing.

9  A.   Okay.  So here we're seeing a view of the striker

10 from the right side of the gun similar to the view that

11 the section is moving through, right?  So the section is

12 actually, you know, moving through -- let me try it from

13 this direction.  Try this direction.

14      All right.  So this wall right here, so between this

15 wall -- I realize this is blurry, but between this wall

16 and this wall is where that section is taking place.  So

17 on the right side of the striker cutting down through.  So

18 we get a section of the striker notch, specifically.  And

19 then bring this into focus.  This is a --

20 Q.   What's the component you're now moving into the field

21 of vision?

22 A.   So this is the safety, all right?  So this safety --

23 excuse me.

24      This safety sits kind of like so in the gun, all

25 right?  So the section through the safety is actually a

1  section in and out in this -- in and out vertically
2  through this safety notch.  Are we all oriented correctly?
3  Q.   So in terms of the CT scan, the slice of the striker
4  safety is sort of sliced through that top tab?
5  A.   Through that top tab, yes.
6  Q.   And then how do those two -- I don't know if you can
7  demonstrate, given the microscope.  How do those two parts
8  interact with each other?  How does the safety tab and the
9  safety notch interact?
10 A.   So in that condition, the striker would move forward
11 in the picture or in the image, but the striker would move
12 forward until there is contact like this between these two
13 parts.  So where that notch catches that tab in this
14 orientation.
15 Q.   And that tab would slide along that shelf?
16 A.   Yes.
17 Q.   I guess the tab is fixed.  So the shelf would slide
18 under the tab?
19 A.   Beneath the tab.  And then you have impact right
20 there (indicating).  Correct.
21 Q.   I think that's fine, Mr. Miller.  You can go back.
22     I guess I should ask, Mr. Miller, that block that the
23 parts are sitting on in the microscope, that's magnetized,
24 is it?
25 A.   It is.

1  Q.   What was the impact of that being magnetized?

2  A.   It makes me fumble the parts a lot more, yeah.

3  Q.   So, again, we were looking at Exhibit 129.  You said

4  the top image was from the animation.  The bottom image,

5  is that an image that you took?

6  A.   Yes.  That bottom image is an image that I took from

7  the CT scan data from Schneider.

8              MR. MIRENDA:  Your Honor, I'd offer 129.

9              THE COURT:  Any objection?

10              MR. BAGNELL:  No objection.

11              THE COURT:  Full exhibit, 129.

12                   (Plaintiff's Exhibit 129 admitted in

13                    evidence.)

14  BY MR. MIRENDA:

15  Q.   Mr. Miller I'd like you to take a look at one more

16  exhibit, Exhibit 127.

17       Do you recognize this exhibit?

18  A.   I do.

19  Q.   First, do you recognize the image on the top?

20  A.   Yes.  The top image is an image taken from the

21  animation.

22  Q.   And what's the image on the bottom of Exhibit 127?

23  A.   The image on the bottom is an image that I took of

24  the pre-upgrade, this would essentially be considered the

25  striker assembly.  So this is multiple components of the

1   striker assembled together.  You can see kind of

2   starting -- you know, starting in the front of the image,

3   you can see the striker safety, right?

4   Q.   What's the shape of the striker safety, just so we

5   can tell on this?

6   A.   Kind of an L shape.  Maybe, you know, extends

7   horizontally across the bottom and then it's got a

8   protrusion vertically kind of to the center of the striker

9   assembly.

10  Q.   Okay.  What's above that in the photograph?

11  A.   Above that in the photograph is the safety spring.

12  So that's a spring that applies a downward force on the

13  striker lock to keep that striker lock riding on top of

14  the shelf of the striker that we were just looking at

15  under the microscope.

16  Q.   And I'm sorry, this is a photograph you took?

17  A.   Yes, it is.

18        MR. MIRENDA:  Your Honor, I'd offer Exhibit 127.

19        THE COURT:  Any objection?

20        MR. BAGNELL:  No objection.

21        THE COURT:  Full exhibit.

22            (Plaintiff's Exhibit 127 admitted in

23             evidence.)

24  BY MR. MIRENDA:

25  Q.   So you were describing the components that appear in

1  the photograph.

2  A.    Yes.

3  Q.    You described the striker safety.  You described the

4  safety spring.  What's next?

5  A.    So next would be kind of the large cylindrical

6  component which would be the striker housing that we see.

7  So that houses the striker.  And so the striker rides

8  inside the housing.  And you see the striker extending to

9  the right kind of behind this coiled spring which would be

10  the striker spring.  But you can kind of see those in the

11  right side of the image.

12  Q.    And in this photograph can you see where the striker

13  leg extends downward where the foot would be if it were --

14  if the photograph wasn't cropped?

15  A.    It's cropped off but you can just barely make out the

16  striker leg, yes, at the bottom center of this extending

17  down behind the safety.

18  Q.    Based on your examination of the actual components of

19  the P320 depicted here on Exhibit 127, did you come to any

20  conclusions about how those components and that safety

21  mechanism are depicted in the animation?

22  A.    So, specifically, here we see that the spring and

23  some of the features of the housing that retain the safety

24  and the spring are omitted in the animation.  Additionally

25  to that, we've been able to see that the notch of the

1  striker, the safety notch in the striker is falsely

2  depicted in the animation.  And then we can also see the

3  features of the -- if we go back to the previous exhibit,

4  you see that the features of the -- yeah, correct.  So at

5  Roman Numeral II you can see the features of the striker

6  safety that actually engage with the safety notch.  Those

7  features also appear to be falsely depicted in the

8  animation.

9  Q.    The exhibit you're referring to now is Exhibit 129?

10 A.    Yes, Exhibit 129.

11 Q.    The sum total of all of those observations, what

12 conclusion did you come to regarding how the -- regarding

13 the significance of how the animation difference from the

14 real P320?

15 A.    So the animation right here you can see the safety

16 slips allowing the striker pin to pass and the Sig P320

17 inadvertently discharges.  All of the depictions in the

18 animation that would lead the viewer to see how it could

19 pass have all been falsely depicted.  So the round

20 features on the safety notch -- excuse me, the round

21 features on the safety, the smaller safety notch working

22 together would lead the viewer to assume that the safety

23 pin can pass or the striker can pass the safety.  But in

24 actuality, you know, the actual components as well as the

25 CT scan data show that those are false depictions.

1  Q.  What about the omission of the spring?

2  A.  It shows that the animation is not depicting the

3  entire picture.  You know, not depicting all of the

4  components.

5  Q.  And what's the role that that spring plays in the way

6  the safety system operates?

7  A.  So that spring keeps a vertical downward force on the

8  safety to keep that safety engaged unless the trigger has

9  been pulled.

10  Q.  In your review of the materials submitted on

11  Mr. Bagnell's behalf from Mr. Villani and Mr. Hicks, did

12  you see any photograph or any other image that shows the

13  striker safety mechanism in the way that it is depicted in

14  the animation?

15  A.  I did not.

16  Q.  All right, Mr. Miller, I'm going to turn to the next

17  topic.  Let's take a look at Exhibit 1, the animation, and

18  go to 3 minutes, 37 seconds.

19      Do you recognize this?

20  A.  I do.

21  Q.  What's this?

22  A.  So this is the image or the animation bringing up

23  this notion of excessive space between the striker foot

24  and the striker housing.

25  Q.  Did you take any steps to evaluate the space in an

1    actual P320 around the striker body between it and its

2    housing to compare it to the way the animation depicts it?

3    A.    Yes, I did.

4    Q.    So could you walk the Court through the methodology

5    that you employed to make that analysis?

6    A.    Sure.

7          So first I did a visual comparison with the actual

8    striker and striker housing for both pre- and post-upgrade

9    P320s, but that fitment of the striker into the striker

10   housing to see how that feels and fits to see if I could

11   observe any kind of what I would consider to be excessive

12   space or excessive gaps or excessive movement even between

13   those two components.  I also did that in the assembled

14   state when that is in the gun, right?  So to see if there

15   was any difference between how it feels outside of the gun

16   versus when it's inside the gun, meaning housed inside the

17   slide.

18   Q.    Did you do that for both pre- and post-upgrade

19   versions?

20   A.    I did that for pre and post.  That was to give me

21   kind of a feel of the fitment.

22         Next I wanted to try to quantify the fitment.  So I

23   actually took measurements of both the internal diameter

24   of the housing and the external diameter of the pin to

25   see, you know, what the difference was between those two

1  dimensions to see if that was in line with what I would

2  expect it to be.

3      I believe I would have to refer to my report.  So I

4  don't want to get that dimension wrong.  But I remember

5  including whatever that difference was in my report.

6  Q.   Okay.  We'll take a look at that in a moment.

7  A.   Okay.

8      Moving on from there, then I did that same, you know,

9  same concept for the leg where the striker leg rides in

10 the channel of the housing.  So when this image that's

11 slightly highlighted in red here but essentially the --

12 you know, the width between where that leg rides in the

13 housing versus the overall width of the leg itself, what

14 was the difference in those two dimensions, again, to see

15 is this something I would expect or is this something that

16 is excessive or, you know, larger than what I would expect

17 for the parts to be.  And I found that to be within --

18 well within what I expected those parts to be.  Again, I

19 will refer to the report as to what those numbers are.

20 Q.   We'll come back to the quantification in a moment.

21     Did you do anything in addition to the measurements

22 and quantification?

23 A.   Yes.  So outside of the measurements, I also looked

24 at how these components are represented in the CT scans to

25 see if there's anything that we can take from the CT scans

1   and observe from the CT scans to see, again, does the CT

2   scan represent something different than what the actual

3   components are representing.

4   Q.  I'd like to ask you to take a look at what's been

5   marked as Exhibit 116.

6       Do you recognize this?

7   A.  Yes, I do.

8   Q.  And what's the image on the left?

9   A.  So the image on the left is a section from the

10   Schneider CT scan that I took, again, where I am focused

11   specifically on the fitment of the striker into the

12   housing.  That's what all these red arrows are pointing at

13   is essentially where I'm looking at the gaps between the

14   two components.

15   Q.  And what's the image on the right in Exhibit 116?

16   A.  The image on the right appears to be 337 of the

17   animation.

18          MR. MIRENDA:  I'd offer Exhibit 116.

19          MR. BAGNELL:  No objection.

20          THE COURT:  Full exhibit.

21            (Plaintiff's Exhibit 116 admitted in

22            evidence.)

23   BY MR. MIRENDA:

24   Q.  Now, Mr. Miller, with the Court's permission, I'd

25   like to ask you to -- we'll put Exhibit 110 back up on the

1    screen.

2         What is Exhibit 110?

3    A.   So this is, again, 3:37 of the animation.

4              MR. MIRENDA:  I'd offer Exhibit 110, Your Honor.

5              THE COURT:  Any objection?

6              MR. BAGNELL:  No objection.

7              THE COURT:  Full exhibit.

8                   (Plaintiff's Exhibit 110 admitted in

9                   evidence.)

10             MR. MIRENDA:  With the Court's permission, I'd

11   like Mr. Miller to come to that document camera and use a

12   paper printout of Exhibit 110 because he can indicate to

13   the Court where he took his measurements and what those

14   measurements were.

15             THE COURT:  Certainly.

16             MR. MIRENDA:  Also, Mr. Miller referenced his

17   report.  We're not offering the report in evidence,

18   Your Honor, but he said that the measurement numbers were

19   in the report.  With your permission, I'll give him a copy

20   of his report so he can refer to that.

21             THE COURT:  Of course.

22             MR. MIRENDA:  I'll step back here so he can have

23   the space here.

24   BY MR. MIRENDA:

25   Q.   Mr. Miller, looking at the printed copy of

1  Exhibit 110, can you describe for the Court the steps you

2  took in order to quantify the space that's depicted in the

3  animation around the striker inside its housing?

4  A.   Sure.

5       So to try to quantify what the animation depicts that

6  space to be so that I could compare that to actual

7  components, the first step is I took this image and

8  imported it into my CAD software so that I could draw on

9  top of the image.

10      And so in CAD I was able to draw -- excuse my

11  terrible drawing skills here -- I was able to draw an

12  outline of the housing.  So that's what we would consider

13  the OD of the housing.

14  Q.   OD stands for what?

15  A.   Outside diameter.

16      And this would be considered the inside diameter of

17  the housing.

18      My tracing skills in CAD are much better than they

19  are in an awkward position here.  All right.

20      So we've got the OD.

21      We've got here the inside diameter, ID, of the

22  housing.

23      And then we've got this width here that we'll call

24  the -- you know, the width of the housing, essentially.

25  The housing channel essentially is this width, right?

1      And then next we're able to trace, again, the same

2  thing in CAD we're able to trace these edges for the width

3  of the striker leg as well as the OD of the striker pin.

4      So similar to what we did with the striker notch, now

5  we need to create a reference to say what is this -- you

6  know, what dimensions are we looking at?  How do we get

7  the same dimensions or how do we correlate dimensions

8  between the image and between the actual components?

9  Q.   Is that the process of bringing them to scale?

10 A.   Yes.

11 Q.   Setting the two at the same scale?

12 A.   Yes.  Yes, it is.

13 Q.   So what did you do?

14 A.   So what I did was I took this outside dimension of

15 the housing and applied -- you know, I measured a physical

16 housing and applied that dimension to my sketch, right, to

17 this diameter that I created in the sketch.  And then that

18 gives me basically all of the other dimensions that I look

19 at in the sketch are now scaled to that dimension, okay.

20     To verify that, I looked at other dimensions in the

21 sketch.  And I found that this width was the same as what

22 it should be when I -- when I measure the actual

23 components, this width was measuring to be the same in the

24 sketch.  Now I've got two points of reference to say that

25 I'm looking at apples to apples for the comparison.

1    What I found was when I looked at specifically the

2  inside diameter of the housing to the outside diameter of

3  the pin, right, so I believe the outside diameter of the

4  pin was correct.  The inside diameter of the housing had

5  been increased from actual components.  Okay.

6    So this gap here that I'm looking at, I'm trying to

7  quantify what this gap is.  In the actual components, I

8  believe I measured that gap to be three thousandths total.

9  So when you take the inside diameter of the housing and

10  subtract the outside diameter of the pin, you get three

11  thousandths in actual components.

12         THE COURT:  Three one thousandths of an inch?

13         THE WITNESS:  .0003, yes, sir.

14         THE COURT:  Of an inch?

15         THE WITNESS:  Three thousandths of an inch.

16  BY MR. MIRENDA:

17  Q.   Could you write that on this copy of Exhibit 110,

18  that the actual -- what that is?

19  A.   I'm trying to do that actual.

20    In the animation -- let me find this in my report.

21    When I took the measurement from the animation --

22  page 20.  So that same gap in the animation measured 33

23  thousandths, so .033.

24  Q.   Mr. Miller, can you explain to the Court the

25  significance of the difference that you observed between

1  the space you measured in the animation versus the space

2  you measured in the actual component?

3  A.    Yes.

4        So the animation depicts what I would consider a

5  significantly larger gap than what the actual components

6  depict.  So the animation is saying this excessive space,

7  and they're using this as a claim to say that the striker

8  pin is free to move, right, not necessarily -- maybe free

9  to move is the wrong way to put it.  They're saying this

10 excessive space is one of the causes for the failure mode

11 that the animation is ultimately trying to explain.  In

12 reality, that excessive space is created by the animation

13 and not found in the actual components.

14       Now, additionally --

15 Q.    How different is the space?  How much difference is

16 there?  How much extra gap is there in the animation than

17 you measured in the actual components?

18 A.    I think that would be 11 times, approximately.

19       So -- and again, using this same method, we're able

20 to look at what the gap is between the foot and the

21 channel of the housing.  And so foot to channel of the

22 actual components, I had a set of pre-upgrade and

23 post-upgrade that I was looking at.  One of those measured

24 to be .004 inches.  And one of those measured .005 inches

25 in clearance.  And in the animation I believe I determined

1  that gap to be .016 inches.

2  Q.   So comparing the pre-upgrade measurement with the

3  actual components to the animation, how much of a

4  difference was there?

5  A.   So approximately four times larger gap in the

6  animation compared to actual.

7  Q.   Now, does there need to be some clearance between the

8  striker body and the housing in which it rides?

9  A.   Yes.  So that clearance, number one, you've got to

10  have some amount of clearance to allow for the tolerances

11  of the part.  And number two, you've got to have some

12  amount of clearance so that that part always slides.  You

13  don't want to have so much clearance that it allows the

14  part to not be properly located, but you've got to have

15  enough clearance to allow for it to freely move.

16  Q.   Mr. Miller, is there any other quantification that

17  you haven't yet described to do here?  Otherwise, I could

18  ask you to go back up to the seat.

19  A.   Not that I recall.

20       MR. MIRENDA:  Your Honor, I'd offer the marked

21  version that Mr. Miller just wrote on as Exhibit 110A.

22       THE COURT:  Any objection to 110A?

23       MR. BAGNELL:  Objection, Your Honor.

24       THE COURT:  I'm sorry, there is an objection?

25       MR. BAGNELL:  Yeah.  Unreliable.

1           THE COURT:  Do you want to elaborate on that?

2           MR. BAGNELL:  Your Honor, he's sort of

3    guestimating it with hand-drawn notations on top of an

4    animation image which does not purport to be a video of

5    the gun.  So, to me, it's comparing apples and oranges.

6           THE COURT:  I see.

7           I think that the witness has testified about his

8    measurements.  He's testified about some numerical

9    precision.  He's tried to make a comparison between the

10   actual measurements he took and tried to demonstrate so

11   that the Court could understand what the measurements were

12   that he took based on the animation's view as shown in

13   Exhibit 110 at 3:37 of the animation.  So I'm satisfied

14   that there's a basis for the testimony there.  It may be

15   subject to impeachment, cross-examination, I'll allow

16   that, of course.  But I'm satisfied that it's enough to be

17   admissible and it certainly is helpful to the Court to

18   have those notations made by the witness as a means of at

19   least explaining the conclusions that he's drawn.  Whether

20   those conclusions are convincing, I don't know.  I haven't

21   heard the cross-examination yet.

22           Exhibit 110A is a full exhibit.

23                 (Plaintiff's Exhibit 110A admitted in

24                  evidence.)

25           MR. MIRENDA:  Thank you, Your Honor.

1  BY MR. MIRENDA:

2  Q.  Mr. Miller, in your review of the materials submitted

3  on Mr. Bagnell's behalf, various declarations and

4  affidavits, did you see any photographs or scans or other

5  images that depicted the space between the striker pin and

6  its housing in the way that it was shown in the animation?

7  A.  I did not see anything.

8  Q.  Now, in addition to the various aspects that you've

9  already described, did you analyze another aspect of the

10  animation?

11  A.  I did.

12  Q.  Let's take a look back at Exhibit 1.  This is the

13  animation.  And if we go to 4 minutes, 55 seconds.

14     Oh, I'm sorry, 4 minutes, 44 seconds.  My mistake.

15     So at 4 minutes, 44 seconds in the animation, do you

16  recognize this?

17  A.  I do.

18  Q.  What is it?

19  A.  So this is the animation claiming that vertical play

20  between the slide and frame further compromises the

21  striker sear connection by raising the striker foot when

22  the slide moves vertically.

23  Q.  And let's just start with orientation.  What is the

24  slide?

25  A.  So the slide is the metal component that houses

1  pretty much the upper half of the gun, if you will, and

2  reciprocates forward and back.

3  Q.   And what is the frame?

4  A.   The frame houses the lower half of the components.

5  That would be what the operator holds.

6  Q.   And now if we could play the animation from this

7  point, 4 minutes, 44 seconds, through 4 minutes, 57

8  seconds.

9       What, if anything, did you do to analyze and evaluate

10  this sequence in the animation?

11  A.   Well, what I found interesting about this sequence is

12  it's showing the slide vertically moving away from the

13  frame, okay?  So I'm --

14  Q.   You say "vertically moving away."  What do you mean

15  by that?

16  A.   So the frame in this sequence appears to remain

17  stationary and the slide appears to move vertically and

18  all components associated with the slide --

19  Q.   For me, vertically is up?

20  A.   Up, yes.  Vertically upward away from the frame.

21  Q.   So you observed that.  What did you do, if anything,

22  to evaluate that?

23  A.   So to evaluate that, first I started with the

24  physical components.  So the gun in the full assembly, all

25  the components assembled into the gun.  And physically

1  felt that vertical movement to see if there was any

2  inconsistency with what I would expect that vertical

3  movement to feel like.

4  Q.   What did you find?

5  A.   I found it to be consistent with what I would expect.

6  Q.   What did you do next?

7  A.   So next, then I started looking at the actual

8  interface that controls that movement, if you will.  So

9  the slide to the rails is where that movement is

10  effectively controlled.  So the fitment of the rails

11  within the slide channel is what controls and limits that

12  vertical movement up and down.

13  Q.   If we could take a look at Exhibit 132.  This was

14  admitted yesterday.

15       This was admitted yesterday.  Do you recognize

16  Exhibit 132?

17  A.   Yes, I do.

18  Q.   And what is it?

19  A.   So this is CT scan data showing a cross section

20  horizontally through the gun, I guess we would call it at

21  the rear of the gun so that we're able to see specifically

22  the interface between the rails and the slide channels.

23  Q.   And what's depicted in the CT scan slice inside those

24  two red circles?

25  A.   Inside those two red circles are the portions of the

1    rail that actually interface with the slide channel.  So

2    on the left side it comes up vertically and kind of hangs

3    out to the left, tab out to the left to connect with the

4    slide.  And on the right side comes up vertically, hangs

5    out to the right to connect with the slide channel on that

6    side.

7    Q.   What's the frame made out of?

8    A.   The frame is made out of polymer.  These rails are

9    made out of steel.

10   Q.   I asked you about the wrong part.  What are the rails

11   made out of?

12   A.   The rails are made out of some form of steel.

13   Q.   Steel.

14   A.   Yes.

15   Q.   What about the slide channel in which the rails sit,

16   what material is that made out of?

17   A.   Steel.

18   Q.   So let's go to Exhibit 95.

19        Do you recognize Exhibit 95?

20   A.   I do.

21   Q.   What is Exhibit 95?

22   A.   So Exhibit 95 is a screenshot from the animation that

23   I took.

24   Q.   So you took this image?

25   A.   I did.

1          MR. MIRENDA:  Your Honor, I offer Exhibit 95.

2          THE COURT:  Do you know where on the animation,

3    what point of the animation?

4          THE WITNESS:  I believe it was within that

5    sequence we were just looking at.

6          THE COURT:  The sequence from 4:44?

7          THE WITNESS:  4:44 to 4:57, within that

8    sequence.

9          THE COURT:  Any objection to Exhibit 95?

10         MR. BAGNELL:  No objection.

11         THE COURT:  Full exhibit.

12              (Plaintiff's Exhibit 95 admitted in

13              evidence.)

14   BY MR. MIRENDA:

15   Q.   Mr. Miller, what's shown in Exhibit 95?  What did you

16   do as part of your analysis?

17   A.   So as part of my analysis, my eyes are focused on the

18   red circle, which I added the red circle to this image.

19   The red circle is what I'm focused on.  It is difficult to

20   see, but you can make out essentially the rail channel and

21   the rail in this image.

22        Now, to make it appear like it did, I did adjust the

23   brightness and contrast of this image because in the

24   animation it's very dark.  The image would appear very

25   dark taken straight from the animation.  So here I

1   adjusted the brightness and the contrast to give better

2   clarity as far as to what I'm looking at in this image in

3   that red circle, specifically.

4   Q.   Did that adjustment of the brightness and contrast,

5   did that change the dimensions of the parts or the

6   location of the parts or anything else about how they are

7   depicted in the animation?

8           MR. BAGNELL:   Your Honor, I do have an objection

9   given that the witness has stated that he manipulated this

10  animation image.   So I object on that basis.   It was not a

11  screenshot of an actual frame in the animation.

12          THE COURT:   Okay.   Well, the evidence is already

13  in.   So I'm allowing it subject to the witness's statement

14  that the contrast has been altered.

15          Please proceed.

16  BY MR. MIRENDA:

17  Q.   Mr. Miller, what was your purpose for adjusting the

18  contrast and the brightness?

19  A.   So my purpose was because I wanted to get a better

20  look at the details specifically in that red circle.

21  Q.   And what details were you looking at?

22  A.   So the dark lines in the red circle, it appears to be

23  the frame rail actually shown maybe transparently, but

24  with some sort of outline left in the animation or in the

25  rendering, but essentially you make out the geometry of

1  the frame rail as well as the geometry of the slide

2  channel in those dark lines running horizontally and

3  vertically in that red circle.

4  Q.   I'd like you to look at what's been marked as

5  Exhibit 96.

6       Do you recognize Exhibit 96?

7  A.   I do.

8  Q.   What is Exhibit 96?

9  A.   So 96, this is an image that I took, again, looking

10 at that same area in the animation.

11 Q.   Is this from the same time point as the exhibit we

12 were just looking at, Exhibit 95?

13 A.   Yes, it is.

14 Q.   This is one that you created?

15 A.   Yes, it is.

16 Q.   A screenshot that you took?

17 A.   Yes.

18 Q.   And the yellow lines and the red rectangle and the

19 red shading, did you add that?

20 A.   I did.  So the yellow lines --

21 Q.   Before you do that, let me just offer Exhibit 96.

22            THE COURT:  Any objection?

23            MR. BAGNELL:  Objection.  I believe this image

24 has been manipulated also.

25            THE COURT:  I overrule the objection for the

1   same reasons.  It's a full exhibit, 96.

2                    (Plaintiff's Exhibit 96 admitted in

3                    evidence.)

4   BY MR. MIRENDA:

5   Q.   Mr. Miller, can you explain your methodology, what

6   you did in order to analyze the frame -- I'm sorry, the

7   rail interaction with the slide channel as depicted in the

8   animation in this sequence?

9   A.   Sure.

10       So, again, looking at this image, the yellow lines

11  were added to show where in the image the slide channel

12  is.  So those yellow lines are actually laid on top of the

13  darker-colored lines that we saw in the previous exhibit.

14  The red box -- excuse me.  The yellow lines, again, that's

15  depicting the slide channel.

16       The red box was added on top of the dark lines that

17  correspond with where the rail is sitting in that image.

18  Okay.  So the red box is on top of the rail geometry.  And

19  that shaded portion is the interference of the rail with

20  the slide.

21       So in actuality, the way this should look, that red

22  box should be between the yellow lines.  And in the

23  animation, the animation shows the red box to be going

24  through that bottom yellow line, meaning that the

25  animation has pulled that slide up through the rails to

1  show whatever it's trying to show with the sequence.

2  Q.    And in reality, is the slide able to move up through

3  the rail in the way it's depicted here?

4  A.    No, it is not.

5  Q.    And why not?

6  A.    They are two metal components.  So absent of melting

7  them or absent of either of those components breaking, so

8  either the tab breaking off of the rail or the rail

9  channel breaking through, that does not happen.

10  Q.    So, based on your review and analysis of this, did

11  you come to any conclusions about the animation's

12  depiction of how the rail interacts with the slide

13  channel?

14  A.    Yes.

15        So, again, this is showing that the animation is

16  falsely depicting where the slide is allowed to move

17  vertically.  It's falsely depicting that vertical upward

18  movement that the animation is showing.  That's false

19  compared to what can happen with actual components.

20  Q.    What's the significance of that?

21  A.    So it's using the -- the animation is using the

22  vertical motion to claim that that allows the striker foot

23  to walk off of the sear.  And in reality, that vertical

24  motion is not allowed.  So therefore it cannot walk off

25  the sear in that fashion.

1  Q.   And in this image, Exhibit 96, can you see the

2  striker foot and the sear face?

3  A.   Actually, you can, yes.

4  Q.   And so what is the -- first off, where are they?  If

5  you could just describe those for the Court as to where

6  they are.

7  A.   So you can see the sear face below the red shaded

8  portion approximately a third of the way from the left

9  side of the -- or below the left side of the box.  If you

10  come a third of the way towards the left, you see the

11  vertical face of the sear.

12       And just above that vertical face you see -- which is

13  kind of behind the shaded box, but you can see the

14  geometry of the striker foot behind it.

15       And even in this location you can see that although

16  the slide has moved, you know, halfway through the width

17  of the rail, you can still see this is either right at,

18  quote/unquote, release or right where the striker foot

19  would purport to disengage with the sear at that point.

20            MR. MIRENDA:  Your Honor, would it be helpful if

21  we used a paper copy of this and Mr. Miller wrote on it to

22  indicate?

23            THE COURT:  I'll tell you, I think I understand

24  the testimony in terms of where he said the striker foot

25  is and the sear is.  I don't think I need more from that

1   point.

2           MR. MIRENDA:  Thank you, Your Honor.

3   BY MR. MIRENDA:

4   Q.   So Mr. Miller, if you put all of the circumstances

5   together, all of the misrepresentations in the animation

6   that you've discussed, put them all together, what was the

7   impact of all of those as it appears in the animation?

8   A.   So, overall, the animation is claiming this failure

9   mode that, you know, sudden impact or vibration leads to

10  unintentional discharge.  And to get there, the animation

11  is using distortions to the sear face.  The animation is

12  using distortions to the fitment of the striker into the

13  striker housing.  The animation is using the distortions

14  to the safety geometry.  And then the animation is also

15  misrepresenting the physical movement of the slide all

16  working together to create the illusion that this failure

17  mode can happen.

18          And so, you know, when we look at the falsities of

19  how these different features are depicted in the animation

20  and the fact that they are all falsely depicted to create

21  that illusion, then it's my opinion that this animation

22  falsely depicts how the actual product appears and how the

23  actual product is manufactured and how the actual product

24  behaves.

25          MR. MIRENDA:  I have no further questions,

1   Your Honor.

2           THE COURT:  All right.  Thank you.

3           Perhaps, would it make sense to take a recess, a

4   half-hour recess kind of like we did yesterday?  Does that

5   work for you, Mr. Bagnell?  Is that enough time?

6           MR. BAGNELL:  Yes, that's fine.

7           THE COURT:  Great.  All right.  So we'll take a

8   30-minute recess and resume with cross-examination.  Thank

9   you all.

10              (Whereupon, a recess followed.)

11          THE COURT:  Please be seated.

12          So Mr. Bagnell, are you ready for

13  cross-examination?

14          MR. BAGNELL:  Yes, Your Honor.

15          One housekeeping matter?

16          THE COURT:  Sure.

17          MR. BAGNELL:  The demonstrative which SIG may

18  have disclosed to me, I don't know, but we've never seen

19  it.  I'd like to be able to view the demonstrative

20  yesterday.

21          THE COURT:  Which demonstrative?

22          MR. BAGNELL:  The little parts.  There was some

23  kind of silver piece.

24          THE COURT:  You mean the pieces of the --

25          MR. BAGNELL:  The little pieces.

1          THE COURT:  You're certainly welcome to get

2     them.

3          Let me ask, are these the same pieces that were

4     shown by the witness yesterday?

5          MR. MIRENDA:  Yes.  That's all of what's over

6     there, the various components.

7          THE COURT:  I don't think those have been

8     formally offered into evidence, those pieces.  Does it

9     make sense to do that?  I'll leave it up to counsel.

10    We've had a lot of photographs of them, a lot testimony

11    about them.  I'd be fine if you wish to enter them -- or

12    if there's a motion to be made.  I don't know

13    Mr. Bagnell's view.

14         MR. BAGNELL:  I have no objection if they want a

15    full exhibit.  I guess it was marked as a demonstrative.

16    I didn't see that.

17         MR. MIRENDA:  From our perspective, Your Honor,

18    if it would be helpful to the Court in looking at things

19    to have them as full exhibits, we would offer them, of

20    course.  It's really a matter of what would be helpful.

21         THE COURT:  Mr. Bagnell, any objection to that?

22         MR. BAGNELL:  No.

23         THE COURT:  Could you make a record how many

24    pieces do we have there?

25         MR. BAGNELL:  There are four pieces, Your Honor.

1   Striker pin --

2           MR. MIRENDA:  Striker safety arm.

3           MR. BAGNELL:  Pre-upgrade sear.  Striker

4   housing.  And a safety lock tab.

5           THE COURT:  All right.  Do we have an exhibit

6   number we can give that, plaintiff's exhibit number?

7           THE CLERK:  135.

8           THE COURT:  We'll call it Plaintiff's

9   Exhibit 135, those four pieces --

10          MR. MIRENDA:  Those four components.

11          THE COURT:  -- admitted without objection.

12              (Plaintiff's Exhibit 135 admitted in

13               evidence.)

14          THE COURT:  We also have a number of law student

15  interns who are watching.  And I'm just going to ask

16  counsel, are you okay if the interns sit a little bit

17  closer so that they can see better?

18          MR. MIRENDA:  No objection here, Your Honor.

19          THE COURT:  I don't know, folks, if you want to

20  come up and sit in the back of the jury box, perhaps, just

21  so you can kind of -- you won't be in the way of anything,

22  but you'll be able to see the screens if you sit on the

23  back of the jury box.

24              These are students from Yale Law School who have

25  come across the green here to see what happens in the

1  federal court system.  Hopefully, they'll be comfortable

2  sitting there and can see everybody fine, also with the

3  benefit of the screen.

4         Mr. Bagnell, if you'd like to proceed.

5         MR. BAGNELL:  Thank you, Your Honor.

6

7                     CROSS-EXAMINATION

8  BY MR. BAGNELL:

9  Q.   Mr. Miller, you know the difference between an

10 animation and a video, correct?

11 A.   Correct.

12 Q.   Did you say correct?

13 A.   Correct.

14 Q.   And you know the difference between a painting and a

15 person --

16 A.   Correct.

17 Q.   -- correct?

18      You're not contending that the animation at issue

19 here is a videotape, are you?

20 A.   I am not.

21 Q.   Have you seen other animations of weapons in your

22 past experience?

23 A.   I have.

24 Q.   Can you name the brands?

25 A.   I have seen pretty much all the major brands.

1  Certainly SIG, FN, Glock, Smith & Wesson.

2  Q.   And SIG's animation shown yesterday, that didn't show

3  every component as it actually exists in the P320 itself,

4  did it?

5  A.   Can you clarify?

6  Q.   Sure.  The sear springs, for example, they're

7  floating in mid-air in SIG's animation of the cycling of

8  the P320?

9  A.   So I believe the frame was removed so that we could

10  see those components.

11  Q.   But my question is:  The sear springs are effectively

12  hanging in mid-air, correct?

13  A.   I'm not sure that I follow, but sure.

14  Q.   Do you remember the animation?

15  A.   Yes.

16  Q.   All right.  Do you remember that the two components

17  on which the sear springs are seated is not pictured in

18  the animation?

19  A.   Correct.

20  Q.   Okay.  All right.  How much are you being paid here

21  today, Mr. Miller?

22  A.   I believe I'm being paid 350 an hour.

23  Q.   What are your total billings to SIG Sauer to have

24  dissected an animation to date?

25  A.   Somewhere in the neighborhood of 30,000, I believe.

1  Q.   $30,000.  All right.

2       Did I hear you say at the end of your direct

3  testimony, Mr. Miller, that a malfunction of the P320 of

4  the sort depicted in the animation can't happen?  Did you

5  testify to that?

6  A.   I'd have to go back and listen to what I said,

7  specifically.  I think the intent that I was trying to

8  make was that the malfunction that is depicted could not

9  happen as a result of the way that the malfunction was

10 depicted, if that makes sense.

11      So, in other words, the animation is laying out these

12 different criteria to support a malfunction and then

13 saying this is the cause of that malfunction.  And what I

14 am saying is that those depictions of the aspects to the

15 malfunction are falsely depicted.

16 Q.   Let me ask it another way.  Can the SIG P320

17 malfunction?

18 A.   So I have not done any type of evaluation of the

19 safety of the SIG P320.  In other words, I have not

20 conducted an evaluation to evaluate any results of test

21 data that SIG has done or anybody else has done, nor have

22 I personally tested the SIG P320 for how it would perform.

23 Q.   Have you read about the incidents involving alleged

24 uncommanded discharges of the P320?

25 A.   I'm sure I have read and I certainly have an

1  awareness of uncommanded discharges.  I haven't read any

2  of the specific case material or anything like that in

3  association with any type of legal proceeding or anything,

4  just -- but I am aware from public information of these

5  uncommanded discharges.

6  Q.   What public information?

7  A.   I believe the first one I saw was a YouTuber which I

8  believe I want to say back in 2016, 2017 maybe had shown a

9  drop condition where he's -- you know, again, just not in

10  any kind of test environment or anything, he's just

11  dropping the gun in some orientation showing an

12  uncommanded discharge.

13  Q.   After that did you do any investigation into

14  subsequent incidents involving the P320 allegedly

15  discharging without a trigger pull?

16  A.   I have not done any investigation.

17  Q.   None at all?

18  A.   No, sir.

19  Q.   In five years?

20  A.   No, sir.

21  Q.   Does it not interest you?

22  A.   I have not investigated it.

23  Q.   So none of the $30,000 that's been paid to you

24  involved investigating any of these other similar

25  incidents; is that correct?

1  A.   No.  So I was -- as I stated earlier, I was hired to

2  review the animation for its accuracy and how it depicts

3  the various components of the P320.

4  Q.   Are you contending, Mr. Miller, that the striker foot

5  and the sear face cannot disconnect in the original

6  version P320?

7  A.   I have no direct knowledge of that happening outside

8  of some of these videos.

9  Q.   Let me ask it again.  I want to be clear.  I'm simply

10  asking you:  Is it your contention that the striker foot,

11  spring charged striker foot cannot separate from the sear

12  face as depicted in the animation?

13  A.   Again, so I haven't done any type of evaluation to

14  determine that one way or another.  I haven't done any

15  testing to evaluate that.

16  Q.   Are you saying that the depiction of that happening

17  in the animation is in any way false?

18  A.   So the way the animation depicts it is the animation

19  depicts the striker foot moving vertically upward to

20  bypass the sear.  And I would say that that is a false

21  depiction.

22  Q.   And the sear in fact can also move downward, correct?

23  It's held in place by springs, correct?

24  A.   That is correct.  The sear can rotate downward.

25  Q.   I want to play the animation one more time.  The

1    interns might appreciate it.

2              MR. BAGNELL:  It's not coming up on the screen.

3              THE CLERK:  Did you connect it?

4              MR. BAGNELL:  Oh, I'm sorry.  It's connected.

5    It's not playing.

6              There we go.  Okay.  Please take a look at this.

7                   (Plaintiff's Exhibit 1 played.)

8    BY MR. BAGNELL:

9    Q.   Mr. Miller, that animation -- again, that's an

10   animation, correct?

11   A.   Correct.

12   Q.   It's not a video?

13   A.   Correct.

14   Q.   It does not state that it's a video of an actual

15   P320, does it?

16   A.   Correct, it does not.

17   Q.   And in terms of things that are not included in the

18   animation, would that include the muzzle flash from the

19   detonated round?

20   A.   It would not.

21   Q.   That's not in the animation, correct?

22   A.   Correct.

23   Q.   Does that make it inaccurate or misleading?

24   A.   No.

25   Q.   The answer's no?

1   A.    No.

2   Q.    I want to take you back a little bit, Mr. Miller, to

3   your retention in this matter.

4         I'd like to bring up Plaintiff's Exhibit 82.3.

5              MR. MIRENDA:  Your Honor, this was not on our

6   exhibit list.  I'm not sure what document.

7              MR. BAGNELL:  80.2.

8              MR. MIRENDA:  I'm sorry, Exhibit 80, yes.

9              THE COURT:  Is this the CV?

10             MR. MIRENDA:  It looks like it's Mr. Miller's

11  CV.

12             MR. BAGNELL:  Is it 80?

13             MR. MIRENDA:  Exhibit 80 is Mr. Miller's CV.

14             MR. BAGNELL:  80 is coming up as a frame.  I'll

15  ask you from memory.

16             THE COURT:  Take your time.  Do you have a hard

17  copy of it?  You can put it on the ELMO.

18             MR. BAGNELL:  We just exchanged electronically,

19  Your Honor.  Can I have 80?  It's a full exhibit.

20             MR. MIRENDA:  We have a copy, Your Honor.

21             THE COURT:  If you have a copy, and if you put

22  it on the document camera it will show just fine.

23             MR. BAGNELL:  Feedback here.

24  BY MR. BAGNELL:

25  Q.    Can you see that, Mr. Miller?  I've got feedback on

1  my screen.

2  A.   I do see it, but I can't also make out the text.

3  Q.   I don't know what's happening there.

4       THE COURT:  We can reset it.  It will just take

5  a moment, I think.

6            (Pause.)

7       MR. BAGNELL:  We're reset.

8  BY MR. BAGNELL:

9  Q.   This is part of your résumé, or CV, Mr. Miller,

10 correct?

11 A.   Correct.

12 Q.   You state that you have over a million rounds down

13 range; is that correct?

14 A.   That's correct.

15 Q.   A million?

16 A.   Uh-huh.

17 Q.   In what period of time?

18 A.   Beginning 2006 through -- the bulk of that would

19 probably have been conducted prior to 2018.

20 Q.   Any of those rounds with a P320?

21 A.   Some of them.

22 Q.   Do you own a P320?  I think you said you own two; am

23 I right?

24 A.   I have two -- or excuse me, I have three in

25 possession related to the case.  I do not own them.

1   Q.   Who bought them?

2   A.   They were transferred to me from SIG, and they will

3   go back to the SIG at the conclusion of this.

4   Q.   Which models of the P320 did SIG send you?

5   A.   I believe it's -- I mean, they are P320 full size

6   pre-upgrade and post-upgrade.

7   Q.   That's two.  What's the third one?

8   A.   And the third one is a cutaway version that would be

9   post-upgrade.

10   Q.   Were the two full size or working guns, were they

11   brand new?

12   A.   The condition when I first looked at them, I did take

13   notes as to what the condition appeared to be.  They

14   appeared to be relatively new.  In other words, minimal

15   rounds fired, yes.

16   Q.   Were they in the box?

17   A.   Yes, they were in the box.

18   Q.   Not previously owned?

19   A.   Not to my knowledge.

20   Q.   And you would agree, Mr. Miller, that a gun that has,

21   say, 500 or 1,000 rounds through it will accumulate debris

22   inside the fire control unit, correct?

23   A.   Yes, it will.

24   Q.   That's why guns have to be cleaned?

25   A.   Yes.

1  Q.   You say "Foley Hoag approached me regarding a concern

2  their client, Sig Sauer, has with a video posted to

3  YouTube depicting their product, the Sig P320.  After

4  initially reviewing the video, I met with Foley Hoag to

5  voice my concerns with the video and how it portrays the

6  P320."

7       Who approached you from Foley Hoag?

8  A.   I forget the gentleman's name.  I'm trying to think.

9  I forget the gentleman's name.  May I ask Tony or Mr. --

10 Q.   If you don't remember, that's a fine answer.

11 A.   I do not remember the name of the gentleman at the

12 moment.

13 Q.   Was it a lawyer?

14 A.   Yes.

15 Q.   Okay.  You note that it's a video.  That's a

16 misstatement, correct?

17 A.   Okay, so in this context, yes, I would agree with

18 you.  It's referring to this as an animation throughout.

19 Q.   My only point there.

20      Mr. Miller, you said that in your background you

21 worked for Taurus Firearms; is that correct?

22 A.   That is correct.

23 Q.   You started there around 2015?

24 A.   That is correct.

25 Q.   Are you aware of the severe problems they had with

1  their Millennium striker-fired pistol range?

2  A.    I am aware of issues that they had, correct.

3  Q.    Do you know that there was a $39 million class action

4  settlement regarding that striker-fired Taurus handgun?

5  A.    I knew of a class action lawsuit that was on going,

6  yes.

7  Q.    Were you involved in it in any way?

8  A.    So by the time that I started there in 2015, my

9  involvement would have been there was some limited

10  evaluation that I did of certain products and certainly

11  talking with the legal team there.  But I would categorize

12  my involvement as pretty limited.

13  Q.    Did you have any input on the design of any of the

14  Millennium range pistols?

15  A.    No, I did not.

16  Q.    Do you agree that the Millennium or part of the

17  Millennium series included striker-fired pistols, correct?

18  A.    Correct.

19  Q.    Do you have any opinion, having worked at Taurus,

20  whether some of those striker-fired guns were

21  malfunctioning?

22          MR. MIRENDA:  Objection, Your Honor, relevance

23  here.

24          THE COURT:  I'll allow it.

25          THE WITNESS:  Can you restate the question,

1  please?

2  BY MR. BAGNELL:

3  Q.  Based on your experience working at Taurus,

4  Mr. Miller, do you have an opinion whether some of the

5  Millennium striker-fired pistols, handguns had

6  malfunctioned, that had fired without a trigger pull?

7  A.  I don't know that I ever did enough to form an

8  opinion on that.

9  Q.  Did anyone approach you regarding an animation posted

10 by a Philadelphia firm Saltz Mongeluzzi & Bendesky

11 regarding the animation at issue in this case?

12 A.  No.

13 Q.  Did you ever view the posting by that firm?

14 A.  I do recall seeing that posting and I do recall

15 viewing that posting.

16 Q.  Were you retained by any law firm to consult on their

17 posting?

18 A.  I was not.

19 Q.  I want to talk to you about secondary machining,

20 Mr. Miller.  Are you familiar with that term?

21 A.  I am.

22 Q.  Can you explain what that is?

23 A.  So secondary machining, in my experience, would be if

24 you needed to do an additional step or additional process

25 to get the end result that you're looking for from a

1  designing intent perspective.

2  Q.   Does it have a place with mold injected metal parts

3  and components?

4  A.   I think in my -- excuse me.  In my experience with

5  metal injection molded components, secondary machining has

6  been used whenever the required tolerance could not be met

7  by the MIM process.  And it also, in my experience, has

8  been used to remove what are typically considered support

9  features.

10      So, to give you an example of that, if you have a

11  U shape, right, and during the molding process, if you are

12  seeing too much variability in when it shrinks and how the

13  ends of the U kind of move in and out, there may be a

14  secondary feature that you would add as a brace to the

15  molded component, and then you would do a secondary

16  machining process to remove that feature.

17  Q.   What about flashing?  Do you know what the term

18  "flashing" means, Mr. Miller?

19  A.   I'm familiar with flashing.

20  Q.   What's flashing on a mold injected metal part that

21  comes out of the mold?

22  A.   So flashing is where the two mold halves come

23  together and there is some venting that happens at those

24  two halves.  So flashing would be whenever there is

25  material pushed into -- basically pushed into that

1  interface or that crease, if you will.  And so that

2  flashing would be excess material around where the mold

3  comes together.

4  Q.   Would you machine that off?

5  A.   Usually not, in my experience.

6       Now, I can't say that there aren't companies who

7  would do that.  But in my experience, usually that is --

8  where that flashing is located, you try to change the

9  design of your mold so that the flashing isn't on critical

10 faces.

11 Q.   Let's talk about critical faces.  The striker foot

12 surface space, you would agree that's a critical face?

13 A.   It can be, yes.

14 Q.   What if that comes out of that mold with excess

15 metal, are you going to leave it there or machine it off?

16 A.   If it -- can you explain this excess metal?  Are you

17 referring to flashing on that face?

18 Q.   Burring, flashing.  When it comes out of the mold and

19 there's excess metal, it's irregular, it's not smoothed,

20 it's not been machined.  If you observed it either with

21 your naked eye or a microscope, would you, Mr. Miller, say

22 that needs to be polished smooth, machined smooth?

23 A.   That depends.  I wouldn't say that you have to remove

24 it.  It all depends on -- so as you get into evaluating

25 the design, you know, first is does that affect the

1  function or performance of the design would be --

2  Q.   I don't want -- I'm sorry, let me redirect the

3  question a little bit.  I want to talk about -- I'm not

4  talking about the function of the gun right now.  I'm

5  talking about the surface contact between the striker foot

6  face and the sear.

7       And think of two 2x4s, if you would.  You come out of

8  Home Depot, they're going to mate almost perfectly if

9  they've been finished and sawed.  I'm asking you if the

10  sear face and a striker foot comes out with little metal

11  bumps on them so that they are not fully mating, is that a

12  problem, in your estimation?

13  A.   Again, that's -- that all depends on how things

14  function.

15  Q.   All right.  Let me make --

16  A.   If we find that it leads to a problem, then perhaps.

17  But if we find that it doesn't lead to a problem, if it

18  doesn't adversely affect the performance of the product,

19  then it may be fine to leave them there.

20  Q.   Mr. Miller, these guns are made by the thousands, the

21  millions.  Are you saying that every single striker foot

22  face is visually observed?

23  A.   No, I am not.

24  Q.   No.  So if there's a constant surface defect or

25  irregularity like that, shouldn't you machine it smooth to

1  increase surface contact?

2  A.   Again, in my experience, some manufacturers may

3  choose to do so but some manufacturers may choose not to

4  do so.

5  Q.   What would you do?  What would you advise,

6  Mr. Miller, as a gun engineer?

7  A.   I'm trying to think of a time when I have used

8  secondary machining on those surfaces, and I have not.

9  Q.   You saw the AR-15 that was put up here yesterday.

10  That had clearly been grinded smooth, as Mr. Toner said.

11  A.   Can we pull that image up again?

12  Q.   Sure, sure.

13       One moment, please.

14                 (Pause.)

15  BY MR. BAGNELL:

16  Q.   Here it is.

17       You saw this.  You were in court all day yesterday,

18  correct?

19  A.   Yes, sir, I was.

20       As a matter of fact, could you zoom out of that just

21  a hair so I can see the text?

22            THE COURT:  Can I ask, is there an exhibit

23  number on this?

24            MR. BAGNELL:  I'm sorry, Your Honor?

25            THE COURT:  Is there an exhibit number for this

1   particular --

2          MR. BAGNELL:  It's part of Exhibit 10,

3   Your Honor, which I will offer shortly.  It's in

4   Mr. Villani's first affidavit.  And I will offer that

5   shortly because Mr. Miller said he relied on it.  So it's

6   in Exhibit 10.

7          THE COURT:  I see.  Okay.

8          MR. BAGNELL:  I'll offer it after I show him

9   this picture.

10          THE COURT:  All right.

11          MR. MIRENDA:  I would object, Your Honor, when

12   it happens.

13          THE COURT:  Okay.

14          MR. MIRENDA:  We don't need to do that right

15   this moment.

16   BY MR. BAGNELL:

17   Q.   So when I questioned Mr. Toner yesterday, he said

18   there are marks showing that that piece has been machined

19   smooth, correct?

20   A.   I recall that yesterday, yes.

21   Q.   You do recall it, okay.

22          MR. BAGNELL:  Your Honor, I want to offer

23   Defendants' --

24          THE WITNESS:  I'm sorry to jump in --

25          MR. BAGNELL:  I don't have another question.  I

1  don't have another question.

2          THE WITNESS:  Can I make a comment on that?

3          THE COURT:  No.  You'll have redirect.

4          MR. BAGNELL:  Your Honor, Mr. Miller testified

5  several times that he relied on the affidavit,

6  supplemental affidavit of Mr. Villani and the affidavit of

7  Mr. Hicks.  So I would move Exhibits 10, 11, and 30 into

8  evidence as full exhibits.

9          MR. MIRENDA:  Objection, Your Honor.  First of

10  all, that's not what Mr. Miller testified to.  He

11  testified that he reviewed those documents as part of the

12  background material here.  They're affidavits which are

13  plainly hearsay and they contain a tremendous amount of

14  irrelevant material.  We object to all three of them.

15          MR. BAGNELL:  They contain relevant photographs,

16  Your Honor.  Mr. Miller testified clearly on direct that

17  he'd never seen any image of a striker foot face or a sear

18  face that looks like what's in the animation.  And these

19  affidavits disprove that.

20          MR. MIRENDA:  Your Honor, I don't have any

21  objection to individual photographs being shown to

22  Mr. Miller and being offered.  It's the whole body of the

23  affidavit with all of the text that's in there that is

24  both irrelevant and it's all hearsay.

25          THE COURT:  Mr. Bagnell, help me understand

1   that.  If your concern is about one photograph, it looks

2   to me you've shown a single photograph from a single

3   affidavit, how would that justify putting in that whole

4   affidavit as opposed to just a single photograph, much

5   less two more affidavits that you're referring to and that

6   you haven't had the witness authenticate?

7          MR. BAGNELL:  The basis, Your Honor, would be

8   that he reviewed the materials.  This was part of his

9   research into this assignment and his testimony.  He

10  relied -- he read them.  It would be very much like

11  reading a complaint in a lawsuit.  If an expert said they

12  read the complaint, that will go into evidence.  I'm happy

13  with just showing the pictures.  It's not just this

14  picture, but it was on that basis that I offer them as

15  full exhibits.

16         THE COURT:  I guess, are you offering them not

17  for their truth of the matter stated?  In other words,

18  simply to establish what it is that the witness has

19  reviewed?

20         MR. BAGNELL:  That would be what the offer would

21  be, Your Honor, yes.

22         THE COURT:  So, in other words, to the extent,

23  for example, Mr. Villani is saying something in one of

24  those affidavits about what happened or the like -- I

25  haven't looked at this -- you're not offering it for its

1    truth?

2           MR. BAGNELL:  No, I'm not.

3           THE COURT:  So I've seen a single photograph.

4    Let me ask, who are the affidavits of?  They're Villani

5    and who else?

6           MR. BAGNELL:  Mr. Villani and Timothy Hicks.

7    It's Exhibit 30.

8           THE COURT:  I'm looking at your exhibits here.

9           I'm looking at Mr. Hicks', which is Exhibit 30.

10   But I don't know if I have Mr. Villani's there.

11          MR. BAGNELL:  10 and 11.

12          THE COURT:  10 and 11 as well.

13          Okay.  Is there a continuing objection if these

14   are offered not for their truth but for simply the fact

15   that they've been relied on or were reviewed by a witness?

16          MR. MIRENDA:  So Mr. Miller reviewed them.

17          With respect to Exhibit 30, that's Mr. Hicks'

18   affidavit, there's no photographs in that affidavit at

19   all.  So it's all text.  It's all Mr. Hicks' affidavit

20   testimony which should not come in.  And I would suggest

21   there's no reasonable basis for asking Mr. Miller about

22   photographs that he reviewed that aren't in Exhibit 30.

23   Exhibit 30 doesn't have any photographs.

24          THE COURT:  I see.

25          What about 10 and 11?  11 is Mr. Miller's own

1    affidavit.  Are you objecting to that?

2              MR. MIRENDA:  So 11 is Mr. Miller's affidavit.

3    I guess I'm not objecting to that, Your Honor.  If

4    Mr. Bagnell wants to offer Exhibit 11, no objection.

5              MR. BAGNELL:  I meant to offer, Your Honor, both

6    affidavits of Mr. Villani.  Maybe I have the numbers

7    wrong.  Okay, 9 and 10, Your Honor.  Nine and 10 -- my

8    mistake, 9 and 10 are the affidavits of Mr. Villani with

9    photographs.

10             MR. MIRENDA:  So with respect to Exhibits 9 and

11   10, we would have no objection to the photographs being

12   used.  But the admission of all of the rest of the

13   affidavit, it purports to be expert testimony from

14   Mr. Villani.  It's hearsay.  Reports typically aren't

15   admitted.  He's here to testify.  So if there's something

16   Mr. Bagnell wants to have him testify to that's relevant

17   to these proceedings, I would suggest it should come

18   through testimony, not through offering his affidavit.

19             THE COURT:  I get that point, which is why I

20   suggested that maybe I would allow the two affidavits to

21   come in not for their truth but simply for purposes of the

22   reference to any photographs that are in them.  I think

23   Mr. Bagnell agreed with that.  Maybe I misheard that.

24             MR. BAGNELL:  Yes.

25             THE COURT:  So wouldn't that be appropriate?  We

1  could break out our scissors now and try to cut out each

2  photograph, but I don't think that would be a useful

3  exercise.

4         MR. MIRENDA:  Your Honor, as long as the

5  substance in there is not being offered for its truth, I

6  think that's fine.

7         THE COURT:  I will allow the admission of the

8  affidavits of Peter Villani, original affidavit which is

9  Exhibit 9, and supplemental affidavit which is Exhibit 10,

10  but not for their truth but solely for purposes of the

11  photographs that are contained therein in terms of

12  cross-examining the witness, Mr. Miller, about them.

13         MR. BAGNELL:  Okay.

14  BY MR. BAGNELL:

15  Q.   Mr. Miller, I think you testified that you didn't see

16  any surface face of a striker footer, a sear face that

17  looked anything like what's portrayed in the animation,

18  correct?

19  A.   Correct.

20  Q.   I want to show you this photograph from Exhibit 9.

21  And you just testified that you reviewed these affidavits,

22  correct?

23  A.   Correct.

24  Q.   Do you recall looking at this striker foot face from

25  the Perez P320, an officer down in Florida?

1          THE COURT:  Let me just slow you down,

2     Mr. Bagnell.  For our record purposes, our court reporter

3     is taking things down.  If you're going to refer to a

4     specific photograph, we need to know the page number and

5     other identifying information about the photograph.

6     BY MR. BAGNELL:

7     Q.   Mr. Miller, I'm showing you photographs on page 7 of

8     17 of Exhibit 9.  This is the initial or original

9     affidavit of Mr. Villani.  So you see that on the screen

10    there?

11    A.   I do.

12    Q.   The Perez Photograph Number 0028.

13         Do you see that enormous amount of excess metal on

14    that striker foot face, Mr. Miller?

15    A.   I'm not sure what you're referring to.  What I see on

16    the striker face appears to be --

17    Q.   Please focus on my question.  I'm asking:  Do you see

18    it?  And to help, it's circled in red.

19    A.   No, I don't.

20    Q.   You don't see it.

21         Do you see the raised flashing in fact on all of the

22    perimeter edges of that striker foot face?

23    A.   No, I don't.

24    Q.   You do not see the recessed surface that is clearly

25    lower than that raised material; your testimony is that

1  you don't see it?

2  A.   What I see appears in this image to be a highlight of

3  the -- you know, an artifact of the lighting.

4  Q.   We'll get to highlights, Mr. Miller.

5       Are you saying all of these images are highlighted

6  like on that image that Mr. Mirenda asked you questions

7  about?

8  A.   That appears to me to be a highlight.

9  Q.   What's circled on the right?

10 A.   In right appears to be what we were discussing

11 earlier about the bolding characteristic.

12 Q.   The highlighting, you might say, is at the bottom

13 horizontal edge, correct?

14 A.   Yes.   That's highlighting that I'm referring to, yes.

15 Q.   But that's not present on the blob of metal on the

16 right, correct?

17 A.   Correct.

18 Q.   This image Mr. Mirenda showed you I want to ask you

19 questions about.

20 A.   Uh-huh.

21 Q.   This is a picture you took?

22 A.   Correct.

23 Q.   This is one of your P320s?

24 A.   Correct.   Or one of the P320s I have at the moment,

25 yes.

1   Q.   And you assume it's brand new, correct?

2   A.   Brand new to lightly used, correct.

3   Q.   And your testimony now is that these three vertical

4   lines on the right, you're saying that was a lighting

5   effect?

6   A.   Correct.

7   Q.   And those three lines just happen to cover excess

8   metal material; is that correct?

9   A.   Again, this notion of excess metal I'm not familiar

10  with.  I haven't witnessed any excess metal on these

11  components.

12  Q.   Well, I just showed it to you right there.  Are you

13  denying that that's excess metal material?

14  A.   Yeah.

15  Q.   You're denying it, okay.

16  A.   Again, so what I see in this --

17  Q.   There's no question, Mr. Miller.  Mr. Miller, it's

18  question, answer.  There's no question pending.

19       As part of your investigation of the P320 and your

20  assignment to review the animation, did you talk to any

21  alleged victims of the P320?

22  A.   I did not.

23  Q.   Not a single one?

24  A.   No.

25  Q.   Did you talk to Tom Ahern?

1    A.    That name does not ring a bell.

2    Q.    Marcie Vadnais?

3    A.    That name does not ring a bell.

4    Q.    Vincent Sheperis?

5    A.    That name does not ring a bell.

6    Q.    Brittany Hilton?

7    A.    That name does not ring a bell.

8    Q.    HSI Agent Jimmy Jinn?

9    A.    That name does not ring a bell.

10   Q.    ICE Agent Keith Slatowski?

11   A.    Not to my knowledge.

12   Q.    ICE Agent Armendariz?

13   A.    Not to my knowledge.

14   Q.    ICE Agent Amy Hendel?

15   A.    Not to my knowledge.

16   Q.    VA Officer Frank Kneski?

17   A.    Not to my knowledge.

18   Q.    Bradley Hulett?

19   A.    Not to my knowledge.

20   Q.    That was a fatality.  You didn't hear any of the news

21   about it?

22   A.    I believe the question was did I speak to the

23   individual.

24   Q.    Correct.  You're right.  You're right.  You did not

25   speak to him.

1    Kyle Guay?

2  A.    Not that I can recall.

3  Q.    Officer Zach Seldes in Florida?

4  A.    Not to my knowledge.

5  Q.    Officer Robert Northrop in Florida?

6  A.    Not to my knowledge.

7  Q.    Officer Richardson in the Roscommon video?

8  A.    Not to my knowledge.

9  Q.    The officer in Montville, Connecticut, last July?

10  A.    Not to my knowledge.

11  Q.    Robert Lang?

12  A.    Not to my knowledge.

13  Q.    Officer Robert Colwell?

14  A.    Not to my knowledge.

15  Q.    The Canadian Special Forces officer in 2021?

16  A.    Was there a name associated to that individual?

17  Q.    It wasn't revealed.

18  A.    Then I'm not sure that I ever spoke to that

19  individual.

20  Q.    That's fair.  That's fair.

21    So you've talked to none of the alleged victims

22  across the country and in Canada, correct?

23  A.    Again, not that I'm aware of.

24  Q.    Not that you're aware of?

25  A.    Yeah.

1   Q.   Were you aware of their existence when you were doing

2   your reports and your affidavits?

3   A.   No.

4              MR. BAGNELL:  I need a little bit of water,

5   excuse me.

6              THE COURT:  Need some water?  I've got some up

7   here.

8              THE WITNESS:  We just got a fresh one.  I think

9   it's just you and me.

10  BY MR. BAGNELL:

11  Q.   All right.  I want to change gears a little bit,

12  Mr. Miller, and ask you some questions about CAT scans and

13  x-rays.

14       I want to show you Defendants' Exhibit 21 for

15  identification.  This is an x-ray of a human broken arm.

16  You see that?

17  A.   I do.

18              MR. BAGNELL:  Your Honor, I would offer this as

19  a full exhibit.  The Court can take judicial notice that

20  this is an x-ray of a broken human arm, I think.

21              THE COURT:  Any objection?

22              MR. MIRENDA:  Objection, relevance.

23              THE COURT:  Sure.  How will it be relevant to

24  the testimony?

25              MR. BAGNELL:  Your Honor, there's been a lot of

1   testimony here trying to suggest that a CAT scan image

2   allows you to actually see what the surface face would

3   look like.  It does not.  It's too diffuse.  The

4   resolution is not clear enough.  It's the same phenomenon

5   with a x-ray.  So I wanted to elicit some testimony about

6   that, the fact that High Impact not only used CAT scan

7   imaging to build the model but then they got

8   microphotographs to actually see what the surface faces

9   looked like.  That is not apparent in an x-ray and is not

10  apparent in a CAT scan.  So I wanted to make that point

11  and move on.  I don't intend to spend too much time on it.

12          THE COURT:  I'm just wondering why, if nobody

13  has x-rayed the gun here, as opposed to a CT scan, why

14  would an x-ray --

15          MR. BAGNELL:  Well, it's the same technology.

16  It's slightly different, Your Honor.  But I could not find

17  a CAT scan of a human arm.  The general point I was going

18  to make is that you cannot tell what the human arm looks

19  like based on an x-ray or a CAT scan and you certainly

20  cannot see what the surface faces of the broken bones look

21  like from a CAT scan or an x-ray.  You'd have to take a

22  scalpel and get into the arm, photograph it to see what

23  that surface space looks like.  So my line of questioning,

24  Your Honor, is based on prior testimony that seems to

25  suggest that a CAT scan alone is a fair representation of

1  a part, a very small part in this gun.

2          THE COURT:  All right.  I'm going to overrule

3  the objection.  I'll allow Defendants' Exhibit 21.

4                  (Defendants' Exhibit 21 admitted in

5                  evidence.)

6  BY MR. BAGNELL:

7  Q.   Mr. Miller, you see that this arm is broken, correct?

8  A.   Okay.

9  Q.   Do you see the fracture point there?

10 A.   Yes, sir.

11 Q.   All right.  Your human eye cannot accurately see what

12 the surface faces of those broken bones look like,

13 correct?

14 A.   Correct.

15 Q.   You'd have to get a scalpel and cut open the arm and

16 visually look.  You might have to wash away blood, but

17 you'd have to visually look at the actual surface to know

18 exactly what it looks like, correct?

19 A.   I don't know what other methods doctors may use or

20 the medical profession may use to evaluate broken features

21 or certain --

22 Q.   You're right.

23 A.   -- body parts or what have you.

24 Q.   There might be technology to actually insert a camera

25 into that area, correct?

1  A.    There may be.

2  Q.    But that camera would give you the image of what the

3  surface actually looks like in real life, correct?

4  A.    It could, yeah.

5  Q.    For example, an x-ray of me does not show anyone

6  exactly what I look like, correct?

7  A.    No, sir.

8  Q.    You have to have a photograph or put eyes on me,

9  correct?

10  A.    Correct.

11  Q.    I want to go back to your conclusions about the

12  animation, Mr. Miller.  I think you -- when Mr. Mirenda

13  wound up, I think you said it was not -- that it can't

14  happen, that the failure as depicted in the animation I

15  think you said can't happen.  Am I right?

16  A.    I believe so.

17  Q.    Okay.  I want to show you Defendants' Exhibit 4 --

18  sorry, Exhibit 2.  Let me start with Exhibit 5.  This was

19  previously marked a full exhibit.

20      This is a United States patent application filed by

21  SIG Sauer on October 10, 2018.  Do you see that,

22  Mr. Miller?

23  A.    I see it in front of me, yes.

24  Q.    Did you have this in your possession before you wrote

25  your affidavits and your report?

1   A.   I did not.

2   Q.   SIG did not give this to you?

3   A.   They did not.

4   Q.   I'm going to read the abstract language to you.

5        "A handgun sear has a sear body extending between a

6   proximal end portion to a distal end portion.  The sear

7   defines a first engagement surface adjacent the proximal

8   end portion and a second engagement surface positioned

9   distally of the first engagement surface.  The sear can

10  pivot about the distal end portion between a cocked

11  position and a displaced position.  The second engagement

12  surface can be used to arrest forward movement of the

13  striker in the event of an impulse that causes the striker

14  to disengage from the first engagement surface."

15       Did I read that correctly?

16  A.   I believe so.

17  Q.   Would you have liked to have had that information

18  before you wrote your affidavits and your report?

19  A.   I don't think that this language would have changed

20  anything in my report.

21  Q.   It acknowledges that that primary connection can

22  fail, Mr. Miller.  It says it right there, an impulse can

23  make it fail, correct?  I didn't write it.

24  A.   Okay.

25  Q.   Okay.  And I want to show you Exhibit 2.  This is

1  Defendants' Exhibit 2, Mr. Miller.  It's not coming up on

2  my screen.  It's up now.  Okay.

3      This is a press release, Mr. Miller, dated August 4,

4  2017, by SIG Sauer, correct?

5  A.   It appears so.

6  Q.   The third paragraph, Mr. Miller, says, second

7  sentence:  "However, like any mechanical device, exposure

8  to acute conditions (e.g. shock, vibration, heavy or

9  repeated drops) may have a negative effect on the safety

10  mechanisms and cause them to not work as designed."

11      That's what the animation portrays, correct?

12  A.   The animation portrays, I believe, vibration or

13  sudden impact.

14  Q.   Or sudden impact, correct.

15      Did you have this press release?  Did SIG give you

16  this press release before you wrote your affidavits and

17  your report?

18  A.   I don't recall SIG giving me this press release.

19  Q.   And you're aware, Mr. Miller, in your experience as a

20  firearms expert and engineer -- are you an engineer?

21  A.   I am.

22  Q.   You are an engineer.

23      -- that gun manufacturers have issued recalls and

24  safety warnings for guns in the past, correct?

25  A.   Correct.

1  Q.   Can you name some of the manufacturers who have done

2  that?

3  A.   Not off the top of my head.  Taurus.

4  Q.   Taurus?

5  A.   Was that the result of Taurus or --

6  Q.   I think that was part of the class action settlement,

7  there a page with certain --

8  A.   Something to that effect.

9  Q.   Smith & Wesson, the M&P 9 in the Shield?

10  A.   Doesn't ring a bell, specifically.

11  Q.   Here's one from SIG Sauer itself.  This is

12  Defendants' Exhibit 4.  This is a SIG Sauer safety warning

13  and recall notice dated September 15, 2017.

14      For a limited number of rifles in the SIG716, 516,

15  and SIGM400 Predator models, they were built with a

16  two-stage SIG Sauer trigger that may have an improperly

17  heat-treated hammer.  Over time this could result in a

18  trigger malfunction creating a significant safety hazard.

19      I assume you had no involvement with the Predator

20  rifle; is that correct?

21  A.   I did not.

22  Q.   Does this go to show fairly, Mr. Miller, that guns

23  can malfunction and they can have manufacturing defects?

24  A.   They can.

25  Q.   They're not perfect machines, are they?

1  A.   Is anything a perfect machine?

2  Q.   I would agree.  There is no such thing as a perfect

3  machine; do you agree with me?

4  A.   I agree with you.

5           THE COURT:  I take it you're not trying to

6  introduce that press release?

7           MR. BAGNELL:  I meant to offer it, Your Honor,

8  yes.  That's Exhibit 4, we offer that.

9           THE COURT:  Any objection?

10          MR. MIRENDA:  No objection, Your Honor, other

11 than relevance again.

12          THE COURT:  I see.  I'll allow it.  Overruled.

13 It's a full exhibit.

14               (Defendants' Exhibit 4 admitted in

15                evidence.)

16          MR. MADIGAN:  Actually, the press release was

17 Number 2.  Safety warning was Number 4.

18 BY MR. BAGNELL:

19 Q.   I want to show you a second press release regarding

20 the P320, Mr. Miller.  This is dated August 8, 2017.

21      This is four days after the prior press release,

22 correct, August 4th?

23 A.   Okay.

24 Q.   It's entitled "SIG SAUER Issues Voluntary Upgrade of

25 P320 Pistol."  It goes on to say basically "meets

1  requirements for industry" --

2      THE COURT:  Before you read from the document,

3  is it possible to identify an exhibit number?

4      MR. BAGNELL:  That's Exhibit 3, Your Honor.  SIG

5  press release dated August 8, 2017.  And I would offer it

6  as a full exhibit, Your Honor.

7      THE COURT:  And any objection?

8      MR. MIRENDA:  Defendants' Exhibit 3, no,

9  Your Honor.

10     THE COURT:  So Defendants' Exhibit 3, full

11  exhibit.

12          (Defendants' Exhibit 3 admitted in

13           evidence.)

14  BY MR. BAGNELL:

15  Q.   Mr. Miller, again, entitled "SIG SAUER Issues

16  Voluntary Upgrade of P320 Pistol."

17      It then says:  "P320 pistol meets requirements for

18  industry and government safety standards."

19      You would agree with me, Mr. Miller, that there are

20  no U.S. government safety standards for guns, correct?

21  A.   It would be SAAMI offers guidelines.

22  Q.   Guidelines.  Which are not imposed by the federal

23  government, correct?

24  A.   Correct.

25  Q.   Guns, in fact, are the one product that is not

1  subject to consumer safety regulation in the

2  United States, correct?

3  A.   I don't know if it's the only product.

4  Q.   These regulations and safety standards are part of a

5  self-regulatory mechanism, correct?

6  A.   That is my understanding.

7  Q.   Okay.  It goes on to say "performance enhancements

8  optimize safety and reliability."

9       Paragraph three:  "Recent events indicate that

10  dropping the P320 beyond U.S. standard for safety may

11  cause an unintentional discharge."

12       Had you seen this release before you prepared your

13  affidavits?

14  A.   I had seen this release.

15  Q.   You had seen it.  So you were aware of a P320 drop

16  firing, I assume, before you wrote your reports?

17  A.   Yes.

18  Q.   How many times?

19  A.   The only instance that comes to mind that I can

20  recall is from that initial video that I was mentioning

21  earlier.  That's where I initially saw the, I guess,

22  evidence.

23  Q.   All right.  I want to read the fourth paragraph.

24       "As a result of input from law enforcement,

25  government and military customers, SIG has developed a

1  number of enhancements in function, reliability, and

2  overall safety including drop performance."

3      I understand your testimony that you had not seen

4  this -- you said you had seen this before you wrote your

5  affidavits?

6  A.   Yes.

7  Q.   Did you include it in your affidavits in any way,

8  shape, or form?

9  A.   Not that I recall.

10 Q.   That SIG Sauer issued a, quote, voluntary upgrade of

11 this pistol, did that peak your curiosity at all?

12 A.   Can you clarify that question?  Peak my curiosity?

13 Q.   Did it make you curious?

14 A.   I would say I was pretty neutral.

15 Q.   Neutral?

16 A.   Yeah.

17 Q.   Did you see the phrase "overall safety" in there?

18 A.   Overall safety.  I don't see it specifically right

19 now, but I'll take your word that it's in here.  I think

20 you probably just mentioned it.  I'm having trouble

21 finding which paragraph.

22 Q.   So in the space of four days there are two press

23 releases from SIG Sauer notifying the public that there

24 may be some issue with the P320, correct?

25 A.   Okay.

1  Q.   And in fact, on August 4, SIG Sauer was sued in this

2  district regarding a drop fire that hit a Stamford SWAT

3  officer.  Did SIG tell you that?

4  A.   I have no awareness of any of the legal

5  proceedings that are -- excuse me, not awareness, but --

6  Q.   My question though -- I'm sorry.  My question is:

7  Did SIG tell you about that lawsuit?

8  A.   No, not specifically.

9  Q.   Did they tell you about any other lawsuits involving

10 the P320?

11 A.   I know there are ongoing lawsuits or there have been

12 lawsuits.  We didn't discuss any of them outside of this

13 one.

14 Q.   Would it surprise you that there are hundreds of

15 plaintiffs around the country asserting claims regarding

16 the P320, malfunction claims?

17 A.   Would it surprise me is the question?  I really don't

18 have any kind of basis for what that would mean.

19 Q.   Let me ask you a different question.  Does it concern

20 you that there are over a hundred plaintiffs?

21 A.   So I have no knowledge of any of the circumstances

22 with any of those cases.

23 Q.   I know you don't.  I understand, Mr. Miller.  I'm

24 just saying, does it concern you that there are hundreds

25 of claims, most of them law enforcement agents, federal,

1  state, local, asserting that their P320 fired without the

2  trigger being pulled?  Does that concern you?

3  A.    Not specifically.

4  Q.    It does not concern you specifically?

5  A.    Huh-uh.

6  Q.    If you heard a Boeing jet had crashed a hundred

7  times, would that give you concern?

8  A.    Potentially.

9  Q.    But not with a gun?

10  A.    I'm sorry, was that a question?

11  Q.    That was a question.  But not with a gun, question

12  mark?

13  A.    Yeah, at the moment I would just consider that I'm

14  not concerned with what's --

15  Q.    If a gun did have a propensity to fire without a

16  trigger being pulled, Mr. Miller, would you want to be

17  notified of that fact if you owned it?

18  A.    I would want to be aware of that, yes.

19  Q.    Would you ever carry a weapon, a pistol that could

20  fire without the trigger being pulled?  I should say

21  chambered.  Would you ever carry it chambered?

22  A.    I'm sorry, I'm chuckling because I'm getting into the

23  nuances of could it ever happen.  And so there's -- in my

24  mind, we should be putting a limit on that event.  So, in

25  other words, if some forces of nature come in and cause a

1 breakage to happen and then that happens, you know, that's

2 a little bit beyond my control. I don't think that's what

3 your intent is. I'm sorry, I find it out of control there

4 for a second.

5 Q. It's a simpler question. I know you know guns. If

6 you had a striker-fired pistol in your collection -- I'm

7 not now talking about the P320, let's call it Acme

8 striker-fired pistol -- and it was shown that it has the

9 propensity to discharge without a trigger pull and you

10 owned it, would you want the manufacturer or someone else

11 to notify you of that fact?

12 A. I think, from my perspective, I would look more into

13 what that propensity is, right? And so, you know, as I

14 look at this, and I look at this -- I don't want to use

15 the wrong terms here. You know, the SIG P320 has been put

16 through significant testing --

17 Q. Mr. Miller --

18 A. -- significant testing --

19 Q. Mr. Miller, it's question-and-answer format.

20 A. True, but --

21 THE COURT: Hold on. You'll get an opportunity.

22 There will be -- Mr. Mirenda will have an opportunity to

23 ask you further questions.

24 THE WITNESS: I thank you for that

25 clarification.

1   BY MR. BAGNELL:

2   Q.   I'll re-ask it, Mr. Miller.  Please focus on my

3   question.  It's very simple.  I'm saying if you owned a

4   striker-fired pistol and it had been discovered that it

5   had a propensity that it could fire without the trigger

6   being pulled, would you want to be notified of that fact

7   by the manufacturer or someone else?

8   A.   I would want to be notified.

9   Q.   To avoid getting shot, correct?

10  A.   I don't necessarily know that it would be to avoid

11  getting shot, but I would want to be notified of that

12  potential failure.

13  Q.   Well, would you agree that there is a possibility

14  that you could be shot if a striker-fired pistol went off

15  on your waist?

16  A.   Yes.

17  Q.   Foot?  Calf?  Thigh?

18  A.   The calf, leg.

19  Q.   I assume you've never been shot, Mr. Miller?

20  A.   No, sir.

21  Q.   Okay.

22          MR. BAGNELL:  Can I have five minutes,

23  Your Honor?  I don't have a whole lot more.

24          THE COURT:  Sure.  Why don't we take -- why

25  don't we take an afternoon recess, then.  Let me ask, are

1   you thinking just five minutes?

2            MR. BAGNELL:  Five-minute break.  Just five

3   minutes.  If we want to do the afternoon break, that's

4   fine too.

5            THE COURT:  Let's take a ten-minute recess, if

6   we can, make sure you've got enough time, and then we'll

7   resume.  Thank you.

8                 (Whereupon, a recess followed.)

9            THE COURT:  Please be seated.

10           Mr. Bagnell, do you have more?

11           MR. BAGNELL:  A little bit more, Your Honor.

12           THE COURT:  Sure.

13  BY MR. BAGNELL:

14  Q.  Mr. Miller, are you aware where the parts --

15           THE COURT:  The interns may take their seats

16  again, if you'd like.  You're welcome to either way.  Just

17  a moment.

18           Please proceed.

19           MR. BAGNELL:  Thank you, Your Honor.

20  BY MR. BAGNELL:

21  Q.  Mr. Miller, do you know where the parts in the P320

22  come from?

23  A.  Specifically?

24  Q.  Yes.

25  A.  Which parts, specifically?  I think, to just kind

1  of -- if I understand the question --

2  Q.   Let's say the fire control unit components, do you

3  know where they come from?

4  A.   The only supplier that I'm aware of that SIG uses

5  would be a company called INDO-MIM.

6  Q.   In India?

7  A.   I believe they've got locations in the U.S. as well.

8  I don't know if parts are from India or the U.S. location.

9  Q.   Are you aware that the only component of the P320

10  that's made in the United States is the slide?

11  A.   I'm also aware of a magazine supplier, to my

12  knowledge, that's I believe out of Tennessee, if I'm not

13  mistaken.

14  Q.   And the frame of the gun, or the receiver, the

15  composite -- I'm forgetting the word now -- the polymer

16  frame, are you aware that was developed by SIG for a

17  previous hammer-fired gun, the P250?

18  A.   Yes, it did appear that it was deprived from.  I'm

19  not sure if it's the same one or not.  But my recollection

20  of the 250 is that was a derivation.

21  Q.   The P320 was the SIG's first striker-fired pistol,

22  correct?

23  A.   To my knowledge, I guess.

24  Q.   What they did, basically, was drop a striker-fired

25  slide on top of the P250 frame, correct?

1  A.   No.  There would be significant changes to the frame

2  and internal components as well to accommodate that.

3  Q.   Are you saying you're aware that they used the P250

4  frame to build the rest of the striker-fired gun?  I'm

5  trying to understand.

6  A.   I'm saying that the -- my understanding of the

7  evolution of the 320 is that it started with the frame of

8  the 250 -- well, I don't know if it's the frame assembly

9  or whatnot, but the polymer frame of the 250 was also used

10  as the envelope for the 320, if that makes sense.

11  Q.   Are you aware that the CEO of SIG Sauer, Ron Cohen,

12  in a 2017 interview said that he had concerns about

13  striker-fired pistols because of accidental discharges?

14  A.   I'm not aware of that.

15  Q.   Did anyone at SIG give you that information?

16  A.   No.  This is the first time I've heard of that.

17  Q.   I want to show you Exhibit 1, Defendants' Exhibit 1.

18  I believe this is a full exhibit.

19          THE COURT:  I'm not sure we've seen this before.

20  Is it a full exhibit?

21          MR. BAGNELL:  I can't remember now.  I thought

22  it was.  I'll lay a foundation, Your Honor, first.

23          THE COURT:  Okay.

24          MR. BAGNELL:  Maybe I didn't, okay.

25

1    BY MR. BAGNELL:

2    Q.   Mr. Miller, I'm showing you a document entitled "FY17

3    Army Programs, XM17/XM18 Modular Handgun System (MHS)."

4         Am I correct that the XM17 and the XM18 are military

5    nomenclature for the P320?

6    A.   That's my understanding.

7    Q.   Okay.  This document comes from the Director,

8    Operational Test and Evaluation Office which is some kind

9    of federal agency.  Have you heard of that before?

10   A.   I'm sorry, can you repeat the agency?

11   Q.   Director, Operational Test and Evaluation.

12   A.   I don't have an awareness of the agency.

13   Q.   This document is an analysis of testing done to the

14   military version of the P320.  I want to show you -- okay.

15        "Activity.  The Army's Program Executive Office

16   Soldier released the final solicitation for the MHS" --

17             THE COURT:  So usually the practice in court is

18   before you read a document, try to introduce it in

19   evidence.  Are you going to offer it?

20             MR. BAGNELL:  I would.  It's a public record,

21   Your Honor.  It's a record maintained by the office, the

22   federal -- it's a strange title, Your Honor.  It's not an

23   alphabet agency.  Director, comma, Operational Test and

24   Evaluation.  I would offer it as a full exhibit as a

25   public record of the federal government.

1        THE COURT:  I see.

2        Any objection?

3        MR. MIRENDA:  Well, objection both as to

4   foundation and relevance, Your Honor.

5        THE COURT:  Have you seen this document before,

6   sir?

7        THE WITNESS:  This is the first time I've seen

8   this.

9        THE COURT:  First time you've seen it, okay.

10       I'm not sure that the witness can authenticate

11  the record as a public record.  Usually if you have a

12  certified copy of a public record, that would be

13  self-authenticating.  Otherwise, I don't think I can admit

14  it.  But if you want to cross-examine him on the basis of

15  information that you believe is derived from that, you can

16  do that.  That's permissible cross-examination.  I don't

17  think that it's adequate to allow the document to come in

18  as evidence or substantive evidence.

19  BY MR. BAGNELL:

20  Q.   Mr. Miller, this report -- and I'm not going to ask

21  you to read it all -- it details a drop failure of a

22  prototype, a P320 prototype between February 16 --

23  sometime between February 16 and June 22, 201315.  Did SIG

24  make you aware of this drop incident with the Army

25  testing?

1  A.  With a prototype?

2  Q.  Yes.

3  A.  No.

4  Q.  As part of this assignment, did SIG tell you about

5  this?

6  A.  No.

7  Q.  Did SIG tell you about other malfunctions of the

8  prototype with the Army in 2016 during Army testing?

9  A.  No.

10  Q.  Do you have any knowledge of how successful the P320

11  has been in terms of sales, Mr. Miller?

12  A.  I believe we -- you may have touched upon that

13  yesterday with Mr. Toner's testimony.  That's the only

14  knowledge that I would have.

15  Q.  Is what Mr. Toner said?

16  A.  Well, I think you were specifically saying somewhere

17  around -- or maybe Mr. Toner said two and a half

18  million --

19  Q.  Correct.

20  A.  -- P320s.

21  Q.  Do you know how it rates in comparison to sales of

22  other guns in the United States?

23  A.  SIG P320s, specifically, no.  It's one of the top

24  contenders, certainly.

25  Q.  To this day?

1　A.　To my knowledge, yeah.

2　Q.　Finally, Mr. Miller, I want to show you this SIG

3　patent application again.

4　　　Do you see this drawing right here?

5　A.　Yes, sir.

6　Q.　You'll notice in this drawing the sear springs are

7　also floating in air, in effect.  There's an outline of

8　the frame but the actual frame is not pictured, correct?

9　A.　Correct.

10　Q.　You wouldn't say that that schematic is deceptive on

11　that basis, would you?

12　A.　Not on that basis.

13　　　　　MR. BAGNELL:  That's all I have, Your Honor.

14　　　　　THE COURT:  Any redirect?

15　　　　　MR. MIRENDA:  Just very briefly, Your Honor.

16

17　　　　　　　　　　REDIRECT EXAMINATION

18　BY MR. MIRENDA:

19　Q.　I'll use the document camera here to show you a

20　couple of photographs.

21　　　Mr. Miller, during Mr. Bagnell's cross-examination do

22　you recall when he showed you Miller page 13, the

23　photograph that's labeled "Miller pg 13" and the

24　photograph labeled "Perez 0028" that came from page 7 of

25　17 of Defendants' Exhibit 9?

1   A.    Yes, sir.

2   Q.    Can you describe what it is you see?

3         And let's start with the photograph on the right,

4   Perez 0028.  What do you see, and particularly focusing on

5   the area in the red circle?

6   A.    What I see is that transition from the striker face

7   that's kind of the foremost face that we're viewing in

8   this image and that transition as it rolls to what would

9   be the vertical face on the right side of the striker leg.

10  So in red that appears to be a radius transition over to

11  that.  That does not appear to be any protrusion of

12  material coming towards the screen or towards me in the

13  image.

14  Q.    Do you see any raised material coming forward of the

15  sear face in that photograph?

16  A.    The only thing that I do see is I see kind of a, you

17  know, this black -- you know, this black stuff on the sear

18  face.  What that stuff is, I'm guessing to be unburnt

19  powder and/or debris on the sear face.  But nothing in my

20  view that appears to be raised material protruding from

21  that face.  That would be part of the striker itself.

22  Q.    So no raised metal protruding forward of the front

23  face of that sear -- striker?

24  A.    Not that I can see from this perspective in this

25  image.

1    Q.    Looking at the photograph on the left that's labeled

2    "Miller pg 13," do you recognize that photo?

3    A.    Yes.  That's a photo that I took.

4    Q.    Is that -- you testified about that photo earlier.

5    It had been marked as Plaintiff's Exhibit 117, do you

6    recall that?

7    A.    Correct.

8    Q.    And again, focusing on the right-hand side from the

9    viewer's angle of that image, can you describe what you

10   observed looking at that striker foot?

11   A.    Yeah.  So that appears to be the transition and the

12   radiused transition between those two faces.  And the

13   highlight that you see is an artifact of the lighting that

14   was used when that image was taken.

15   Q.    Is that the lighting that you demonstrated when you

16   were at your microscope showing the striker foot?

17   A.    Yes, it is.

18   Q.    I'm going to show you one more photograph that

19   Mr. Bagnell showed you during cross-examination.  This was

20   from page 11 of Defendants' Exhibit 10.

21        Do you see this?

22   A.    I do.

23   Q.    What is it that you observe about the rifle part,

24   AR15 rifle part that's depicted in this photograph?

25   A.    So without examining the component, I cannot confirm

1    that this is a MIM component or not.  Generally speaking,

2    this component would be manufactured using a different

3    method of manufacturing called investment casting.  And it

4    is typical when using investment casting, because it's not

5    able to hold the same tolerances that MIM manufacturing

6    can hold, it would be considered typical to do secondary

7    machine processes on investment cast parts, again, to

8    assure you're achieving the intended dimensional

9    tolerances.

10          MR. MIRENDA:  I have no further questions,

11    Your Honor.

12          THE COURT:  Do you have anything else,

13    Mr. Bagnell?

14          MR. BAGNELL:  Just a couple, Your Honor.

15

16                 RECROSS-EXAMINATION

17    BY MR. BAGNELL:

18    Q.   The secondary machining you just mentioned,

19    Mr. Miller, that's a labor intensive step, isn't it?

20    A.   It is typically a cost additive step.

21    Q.   It's a cost, correct?

22    A.   Yes.

23    Q.   And if you skip it, you're saving money?

24    A.   If you skip it, you are not introducing money, you

25    are not introducing cost.

1      MR. BAGNELL:  That's all I have, Your Honor.

2      THE COURT:  Do you have anything else,

3  Mr. Mirenda?

4      MR. MIRENDA:  No, Your Honor.

5      THE COURT:  Thank you, sir.  You're excused at

6  this time.  Thank you.

7      Any more witnesses?

8      MR. MIRENDA:  That is all from plaintiff,

9  Your Honor.

10     THE COURT:  I guess the case then turns to the

11 defense.

12     Mr. Bagnell, would you like to call your first

13 witness.

14     MR. BAGNELL:  Yes, Your Honor.

15     Peter Villani.

16     THE CLERK:  Please raise your right hand.

17

18                 PETER VILLANI,

19     called as a witness, having been first duly

20     sworn, was examined and testified as follows:

21

22     THE CLERK:  Please state your name and spell

23 your last name.

24     THE WITNESS:  Peter Villani, V-I-L-L-A-N-I.

25     THE CLERK:  Give us your city and state of

1  employment.

2           THE WITNESS:  I work in East Orange, New Jersey.

3           THE COURT:  Welcome, sir.  Please be seated.

4           THE WITNESS:  Hello, Your Honor.

5           THE COURT:  Please proceed.

6           MR. BAGNELL:  Thank you, Your Honor.

7

8                    DIRECT EXAMINATION

9  BY MR. BAGNELL:

10  Q.   Mr. Villani, can you tell the Court a little bit

11  about your background with firearms?

12  A.   Well, first I work for the United States Department

13  of Veterans Affairs.  I've been their senior firearms

14  instructor for the past 22 years.  Prior to that I've been

15  a certified firearms instructor since about 1985.  And

16  then I also retailed in firearms from 1995 to about 1998.

17  Q.   Are you a firearms owner, Mr. Villani?

18  A.   Yes.

19  Q.   Can you talk a little bit about what you own?

20  A.   I didn't hear the last part of that.

21  Q.   What you own.  The microphone, it's hard for me to

22  hear.

23  A.   Well, I own several firearms.

24  Q.   Do you own any SIG Sauer?

25  A.   No.  I carry one at work.  It's a SIG 229 9mm, but

1  it's a hammer-fired gun.

2  Q.   Do you have a SIG P320?

3  A.   No, I do not.

4  Q.   Can you talk to the Court a little bit about your

5  experience with the SIG P320?  And by that, I mean your

6  retention in these products cases, what you've done, and

7  just talk about it, please.

8  A.   I believe it started around 2019.  One of my officers

9  who purchased a P320 as his off-duty firearm, he had an

10  uncommanded discharge in our armory when he was taking it

11  off to arm up with our duty weapon.  And he sustained

12  injury to his buttocks, you know, had it grazed.  And then

13  I was put on the investigation.  Plus, I was the primary

14  evidence custodian at the time.  And the Chief of Police

15  put me in charge of the investigation.  As I had heard

16  previous to that, there were some problems with the 320.

17       So shortly after that, after my investigation, I did

18  what they call an incident report, submitted it to the

19  Chief.  So the officer was cleared of any wrongdoing

20  because he didn't have his finger on the trigger, the gun

21  went off in the holster as he was removing the holster

22  from his waistband.

23       And then I received a call from a firm down in the

24  Carolinas where they had an accidental shooting or

25  uncommanded discharge of a 320.  Then I got involved with

1    that.

2          Then I just branched off from there.  I had a couple

3    of other cases where I examined P320s.  And during the

4    course of that, I became a certified armorer by SIG Sauer

5    in the P320.  I wanted to make sure I understood the

6    workings of the gun even though I understand firearms and

7    I know how to disassemble firearms.  I'm also an armorer

8    for my department.

9          THE COURT:  What's that mean, an armorer?

10          THE WITNESS:  You basically take the firearm

11    apart, you maintain it, you replace the springs, you

12    replace any worn parts over the course of its life.  Any

13    malfunctions that occur while you are on the range, you

14    know, you handle it, anything that needs to be done.  If

15    it's beyond an armorer's capability, it gets sent back to

16    the company.

17          I was also a SIG Sauer armorer in P229 and P239

18    from my department.  I'm also an armorer for AR-15.  And

19    I'm also an armorer for Beretta 92.

20          THE COURT:  Was that for the VA?

21          THE WITNESS:  That's for the VA.  Not the 320.

22    That, I did on my own.

23    BY MR. BAGNELL:

24    Q.   Mr. Villani, I think you talked about inspection of

25    P320s.  Can you tell the Court about the inspection

1  process of subject P320s?  And by that, I mean P320s that

2  have been alleged to have fired without a trigger pull,

3  where the inspection was done and what the process was.

4  A.    The firearms that were in question --

5          MR. SMART:  Your Honor, I guess just relevance.

6  I sense that Counsel is going to be going into a lot of

7  other incidents, cases that are separate cases from this

8  case.  It seems like, you know, it's delving into a trial

9  within a trial multiple times over.

10          MR. BAGNELL:  Your Honor, this is responsive to

11  Mr. Miller's testimony that he never saw any sear faces

12  that looked like what's in the animation.  I'm trying to

13  lay the foundation for Mr. Villani's extensive experience

14  visually inspecting P320 parts.  I'm not going to talk

15  about the merits of the cases, but his experience visually

16  inspecting these small parts over a long period of time,

17  many different P320s.

18          THE COURT:  Are you going to be going kind of

19  case by case by case with him?

20          MR. BAGNELL:  No.  I really just wanted to get

21  to the point where he is able to truthfully testify that

22  he has visually inspected these surface faces many times

23  and it was as a result of that that the animation was

24  constructed.

25          THE COURT:  I see.

1          I'm overruling the objection.

2          You may proceed.

3          THE WITNESS:  Can you repeat the question?

4          MR. BAGNELL:  Sure.

5    BY MR. BAGNELL:

6    Q.   You've been present at inspections of P320s,

7    Mr. Villani, correct?

8    A.   Correct.  At NSI.

9    Q.   What does NSI stand for?

10   A.   That slips my mind.

11   Q.   North Star Imaging?

12   A.   That's right.

13   Q.   Where was this facility?

14   A.   That was up north.

15   Q.   Okay.  Can you tell the Court the process for

16   inspecting P320s at NSI over the last several years of

17   your career?

18   A.   Myself, the other expert Tim Hicks, SIG's expert

19   Derrick Watkins, and Mr. Toner was there a few times.

20        The firearms -- subject firearms and also a couple of

21   exemplar firearms were put into the CT machines.  And then

22   once they came out, then we inspected them.  Mr. Watkins

23   pretty much took the lead on that in the beginning.  We

24   did a safety inspection, make sure that the gun was safe.

25   Then he did -- you know, protocols as far as the operation

1    of the gun, did it work.  He took it apart.  And then we

2    started photographing it.  He did trigger weight tests,

3    function tests.  And then we photographed it individually.

4    Q.   Approximately how many P320s were you personally

5    present to inspect and visually observe?

6    A.   Between ten and twelve.  That's including the

7    exemplars.

8    Q.   Okay.  Do you remember being present with Mr. Watkins

9    in March of 2021, Mr. Villani?

10   A.   Yes.

11   Q.   This is at NSI --

12   A.   Yes.

13   Q.   -- in Marlborough?

14        Can you tell the Court how -- first of all, where

15   were you standing in relation to Mr. Watkins?

16   A.   I was standing right behind him.

17   Q.   And what was he doing?

18   A.   He was sitting down at a table.  He had a laptop in

19   front of him, electronic microscope to his left.  And he

20   was examining the parts to the 320.  He was bringing them

21   up on the screen.  I was standing immediately behind him,

22   and I believe Tim Hicks was to my right standing behind

23   him also.  And then he was just bringing up the different

24   parts.

25        I remember at one point he had asked me, "Is it okay

1  if I can clean this part?"  I said, "Yeah, go ahead."  So

2  then he used a Q-tip and cleaned one of the parts, I

3  believe it was the striker foot that he had cleaned and

4  one of the sears that he had cleaned.

5  Q.  What was his reaction when he brought up those photos

6  in March of 2021?

7  A.  Well, after he cleaned the one part, I think it was

8  the striker foot, when he brought that up, he paused a

9  second.

10  Q.  Brought it up where?

11  A.  He brought it up on his screen.  He enlarged it.  And

12  he looked at it.  And he just gasped.  He went -- (gasp

13  sound) -- and he put his head down into his chest.  And

14  Tim Hicks and I looked at each other.  And we looked at

15  the screen.  And we looked at each other again.  And we're

16  like, oh, okay, we know what we're looking at.

17      Mr. Watkins got up.  He looked at Mr. Gibson, the

18  other SIG attorney.  And I believe Mr. Toner was there.

19  All three of them walked out into the hallway to the front

20  of the facility.

21  Q.  I want to --

22          THE COURT:  Hold on just a second.

23          Is there an objection?

24          MR. SMART:  Yes, relevance.  And we're delving,

25  again, it sounds like --

1    THE COURT:  Are you about to bring out the whole

2    he comes back and the lawyer says --

3    MR. BAGNELL:  No, Your Honor.  This is about the

4    flashing and the excess metal that was present which was

5    in the animation and SIG's expert's reaction to it.

6    THE COURT:  All right.  I'll allow it then.

7    Please proceed.

8    THE WITNESS:  So they were talking out in the

9    hall.  We don't know what was being said.

10    But after they came back, the picture was still

11    on the screen and it was of the cleaned striker foot.  I

12    can't recall exactly what gun it came from, but I believe

13    we had a couple of guns that day.

14    BY MR. BAGNELL:

15    Q.    I want to show you those photos.

16    This is Plaintiff's Exhibit 10 -- I'm sorry,

17    Defendants' Exhibit 10.

18    Is that one of the photos that came up on

19    Mr. Watkins's screen, Mr. Villani?

20    A.    That was one of them.  But the one that he gasped at,

21    that wasn't the photo.  It was another photo that had a

22    larger perimeter of excess material.

23    Q.    Would that be this one?

24    A.    That's the one.

25    Q.    Okay.  What do these -- can you tell the Court what

1  you see on these striker foot faces, Mr. Villani?

2  A.    I see excess molding material around the entire

3  perimeter of the picture on the left.  It's the center of

4  the striker foot is called positive contact surface.  And

5  that is recessed.  The perimeter is raised slightly around

6  the entire perimeter on all four sides.  The picture on

7  the right has excess mold material where the arrows are

8  indicated on the vertical right side and the horizontal

9  bottom side.

10      Now, there is some flashing -- not flashing, I'm

11  sorry -- light exposure making that blurring effect midway

12  to the right side.  That's from lighting.  But from where

13  the tip of the arrow is pointing to the horizontal line,

14  that's excess mold material.

15  Q.    The top vertical edge, Mr. Villani, do you see a

16  shelf of raised material there?

17  A.    Right.  But that part never touches the sear.  It's

18  the bottom part and the sides that touch the sear.

19  Q.    Can you describe how those two parts engage on that

20  subject?

21  A.    The striker foot sits behind the sear.  The sear

22  face -- or the sear face is called the positive contact

23  surface as well.  Both positive contact surfaces are

24  supposed to mate perfectly.  Because of the excess mold

25  material that's on the edges, it keeps the contact

1    surfaces away from each other.  So you only have physical

2    contact with the excess mold material on both parts.

3    Q.    You heard my 2x4 hypothetical?

4    A.    Yes.

5    Q.    Can you tell the Court if that's accurate or not?

6    A.    Yes, it is.

7    Q.    So if you had nails in the surface of those 2x4

8    faces, they would not mate, correct?

9    A.    Correct.

10   Q.    It would be an unstable connection?

11   A.    Right.

12   Q.    Okay.  You went -- I believe you went back -- I want

13   to show you another striker foot face.  This is from

14   Exhibit 10, Defendants' Exhibit 10.

15              THE COURT:  Can I just clarify?  The last two

16   photographs we've seen, are they both from Exhibit 10 as

17   well?

18              MR. BAGNELL:  Yes.  Supplemental affidavit of

19   Peter Villani.

20              THE COURT:  Okay.

21   BY MR. BAGNELL:

22   Q.    Do you see that?

23   A.    Yes.

24   Q.    Can you describe to the Court what that circled

25   material is?

1    A.    Well, that's a striker foot.  That's the -- looking

2    at it, it's the right vertical edge with excess mold

3    material.  Actually, it's a straight line above that lump.

4    That lump is actually the side of the striker foot.  But

5    it's that straight line that's going from top to bottom is

6    the excess mold material and also along the bottom.  And

7    the other left side you could slightly see it going up as

8    well.  So the positive contact surface is slightly

9    recessed compared to those edges.

10   Q.    Is there excess metal material outside the red

11   circled area, Mr. Villani?

12   A.    Yes, along the bottom of the striker foot and up the

13   left side.  That isn't circled.  There is a little bit on

14   the top, but that's insignificant because it doesn't make

15   contact with the sear.

16   Q.    Am I correct you personally inspected this Jinn P320?

17   A.    Yes.

18   Q.    Is that grease or a lubricant of any kind?

19   A.    No, that was cleaned.

20   Q.    Now, have you observed -- as part of your involvement

21   in the P320 cases, Mr. Villani, have you observed a -- let

22   me ask it another way.

23         Can you explain to the Court what secondary machining

24   is?

25   A.    Secondary machining is when you have to apply another

1  procedure to a part before you install it into a machine

2  or whatever, like a gun part.  Like, for example, I

3  repeatedly had stated that the excess mold material should

4  have been removed prior to the installation of that.  As a

5  matter of fact, I even contacted the --

6           MR. SMART:  Objection, Your Honor.

7           THE COURT:  I think we're beyond the question.

8           THE WITNESS:  Okay.

9           THE COURT:  Next question, please.

10  BY MR. BAGNELL:

11  Q.    Did you contact SIG Sauer about that?

12  A.    No.  I spoke to Mr. Gibson about that during some of

13  my -- what do you call it, my hearings that I had with

14  him.

15  Q.    What did you tell him?

16  A.    I told him, I said we wouldn't be talking if SIG had

17  simply installed another process within the --

18           MR. SMART:  Objection, Your Honor.

19           THE COURT:  I'll tell you, I --

20           MR. SMART:  Opinion testimony.

21           THE COURT:  I'm sorry?

22           MR. SMART:  It sounds like opinion testimony.

23           THE COURT:  I actually don't even understand the

24  testimony.  So if you can set a context and a foundation

25  for the testimony, and then I can rule on any objections.

1      MR. BAGNELL:  Sure, Your Honor.

2          In the animation, the parts depicted have not

3  been secondarily machined.  So I'm trying to elicit

4  testimony corroborating that and explaining why that is.

5  So that was the basis of my questioning.  It was related

6  to the animation and secondary machining.

7          THE COURT:  So there's supposedly somebody named

8  a Mr. Gibson.  It's helpful to me, maybe talk about -- ask

9  the witness, who is Mr. Gibson?  What position does he

10  have with the company?  How would Mr. Gibson know?  Those

11  things to lay a context, framing for me to understand what

12  the witness is talking about.

13          MR. BAGNELL:  Sure, Your Honor.

14  BY MR. BAGNELL:

15  Q.   For background, Mr. Villani, who did you speak to

16  about this lack of secondary machining?

17  A.   SIG Sauer's attorney, Mr. Gibson.

18  Q.   And where did this conversation take place?

19  A.   This was when I was being deposed.

20  Q.   And I'm not asking you what he said in response, but

21  what is your contention about the lack of secondary

22  machining on the P320?  What effect does that have?

23  A.   The parts don't properly interact with each other.

24          MR. SMART:  Objection, calling for opinion

25  testimony.  And it sounds like pretty sophisticated

1   material that he's opining about.

2           THE COURT:  Sure.  Isn't he being called, in

3   part, as an expert in the case in terms of his credentials

4   and qualifications?

5           MR. SMART:  Well, he hasn't been offered as an

6   expert, nor designated, nor do we have an expert report

7   from him.  I also don't think he has the qualifications to

8   be an expert.  He's been disqualified in the products

9   cases at least four times because of his lack of

10  qualifications.

11          MR. BAGNELL:  No, that's not accurate,

12  Your Honor.

13          THE COURT:  I see.

14          So is the opinion that I think you're trying to

15  elicit from him is that -- what exactly is it?  Is it that

16  the machine -- that it could be -- that the manufacturing

17  production process leaves excess material?

18          MR. BAGNELL:  Yes.  And SIG is skipping a

19  quality control step, and that is portrayed in the

20  animation.

21          If I could respond, Your Honor.  Mr. Villani has

22  been admitted by a federal judge as an expert in the *Guay*

23  *v. SIG* trial, which was three months after SIG sued me in

24  this case.  He withstood a *Daubert* challenge.  The jury

25  heard his testimony, as Mr. Hicks'.

1    My intention was to offer him as an expert.

2  He's testified he's certified by SIG Sauer itself as an

3  armorer.  So I do think he should be admitted as an

4  expert, given his extensive background specifically with

5  the P320 and firearms in general.

6    THE COURT:  Mr. Smart.

7    MR. SMART:  Yes, Your Honor.  Counsel's

8  referring to the *Guay* case where he was allowed to

9  testify.  That's the one outlier case.  But even there the

10 Court held that he does not have sufficient experience to

11 opine about the mold or casting process and whether a

12 machining process would have prevented the problems he

13 identified, specify holding right from that court that

14 Counsel is relying on.  And that's the only case in which

15 he was allowed to opine as an expert, in part, in a

16 limited fashion.  But in *Hilton*, in *Jinn*, in *Mayes*, and in

17 *Frankenberry* he was disallowed all on the basis of his

18 qualifications.

19   MR. BAGNELL:  That's not accurate, Your Honor.

20   THE COURT:  I see.

21   What I'm going to do is -- frankly, I don't

22 think I have a *Daubert* motion.  I don't think this was

23 litigated previously before me.

24   MR. SMART:  He wasn't designated as an expert.

25   THE COURT:  Well, I think you had a pretty good

1   sense, you knew he was a witness.  You have his

2   affidavits, and you knew he would be testifying in this

3   case.  So what I'm going to do is I'm going to allow the

4   witness to testify here.  I'm not finding that he is an

5   expert, but I'm going to allow the testimony at any rate

6   and I can consider it for the weight it has and to the

7   extent that he's able to substantiate what is his basis

8   for knowing and having an opinion about secondary

9   machining.  I'll consider it for that purpose.  And then,

10  if necessary, at some later time, I can take up the issue

11  of whether he is actually qualified to present the opinion

12  testimony.

13          MR. SMART:  Sure, Your Honor.  Thank you.

14          THE COURT:  Please proceed, sir.

15  BY MR. BAGNELL:

16  Q.  So is it your opinion, Mr. Villani, having inspected

17  many allegedly defective P320s that secondary machining is

18  being skipped?

19  A.  Yes.

20  Q.  Is that portrayed in the animation?

21  A.  Yes.

22  Q.  I want to turn to that.

23          MR. BAGNELL:  For the record, Your Honor, if I

24  could respond to some of my opponent's comments about

25  Mr. Villani.

1          THE COURT:  Okay.

2          MR. BAGNELL:  He was admitted to testify, in

3     part, in *Guay*, that's accurate.  And the jury heard his

4     testimony.

5          There have been a line of recent cases in which

6     federal judges are now saying that this defective

7     discharge must be replicated in a laboratory.  That has

8     not been done.  No one has done it.  No law firm, no

9     laboratory has done that.  Our contention has been,

10    Your Honor, that it's cost prohibitive.  And *Daubert*

11    recognizes that when something is cost prohibitive, it's

12    not necessary.  It was not required in the *Vadnais v.*

13    *SIG Sauer* case in Virginia.  It was not required in *Guay*.

14    It was not required in *Sheperis*.  It's into the case law

15    now, though, in one decision after another, kind of

16    copying the reasoning, we think wrongly.  We think the

17    New Hampshire judge got it right, Judge McCafferty.  But

18    the cost involved, Your Honor, to purchase, say, a

19    thousand P320s, take them into a laboratory, hook them up

20    to robots and have those robots walk on a treadmill for

21    months at a time would be well over a million dollars and

22    well past the financial capacity of any individual

23    plaintiff to do.  So there may have been a

24    case criticizing -- he is not a mechanical engineer, we're

25    not stating that he is.  As the New Hampshire judge said,

1　　he has extensive specialized knowledge in guns and the

2　　P320 in particular.  I just wanted to put that on the

3　　record.

4　　　　　　　　THE COURT:  I see.

5　　　　　　　　MR. SMART:  If Your Honor would be interested, I

6　　have the cases --

7　　　　　　　　MR. BAGNELL:  Now we're litigating the products

8　　cases now?

9　　　　　　　　THE COURT:  I'm really not -- I'm not saying I'm

10　　not interested.  It's just that we're in the middle of a

11　　trial.  I'm trying to hear factual testimony --

12　　　　　　　　MR. SMART:  Understood, Your Honor.

13　　　　　　　　THE COURT:  -- from a witness.  And to the

14　　extent there's going to be a later issue about whether I'm

15　　able to consider it at all because it's not proper expert

16　　testimony, I guess I'm going to take that up later on.

17　　For now I'm going to listen to the witness --

18　　　　　　　　MR. SMART:  Understood, Your Honor.

19　　　　　　　　THE COURT:  -- on the point.

20　　　　　　　　MR. MADIGAN:  Your Honor, for some reason it's

21　　not taking the ethernet cord.

22　　　　　　　　　　(Pause.)

23　　BY MR. BAGNELL:

24　　Q.   Before I play parts of it, were you involved in the

25　　production of this animation by High Impact, Mr. Villani?

1  A.   My part in it was to inform I believe it was Nick

2  Maguire and a couple of his co-workers.  I guess they were

3  the animaters.  They basically wanted from me -- what each

4  part was, they wanted me to explain what the parts were,

5  what they did, what the parts did with each other.  And

6  then they wanted me to explain to them what my reasoning

7  was to what the defect was.

8  Q.   Did you feel qualified to give them that information?

9  A.   I felt I did, yes.

10  Q.   And as you testified, you were certified by SIG as an

11  armorer on the P320?

12  A.   Yes, I was.

13  Q.   What does that mean?

14  A.   Well, SIG Sauer came to a site.  I went to the class,

15  an eight-hour class.  I took a course where there were

16  about 30 other people where they taught me, they actually

17  showed me -- I already knew how the gun disassembled.  I

18  already knew it, but I went there to basically assure

19  myself that I knew what I was talking about.  They taught

20  you how to break the gun down, how to repair it, how to

21  replace the springs, how to put it back together.  At the

22  end of the class I thought, okay, this is what I already

23  knew.

24  Q.   Is it fair to say, Mr. Villani, that you knew all of

25  the parts of the P320?

1  A.    Yes.

2  Q.    Do you know how they interacted with each other?

3  A.    Yes.

4  Q.    About how many phone calls did you have with

5  High Impact over the course of the development of this

6  animation?

7  A.    They were Zoom conferences.  I think maybe if there

8  was one or two phone calls.  I think they were Zoom

9  meetings where Nick -- I remember I saw Nick Maguire was

10 on the line with his two coworkers when they were asking

11 me to explain the parts of the 320.

12 Q.    Is it fair to say it was a process?

13 A.    Yes.

14 Q.    How long -- approximately how long did it take to

15 make the animation?

16 A.    I don't remember how long it was from start to

17 finish.  I just remember there was an initial conversation

18 to explain the parts and what I thought how the gun fired

19 uncommanded.  And then there was some time, it could be a

20 month or so, I don't know what the exact time was when --

21 I don't know who sent me the final animation.  And then

22 when I reviewed it, I said, wow, that's a pretty good

23 depiction of a real gun but in an animation-type setting.

24 Q.    I'm sorry, you said you thought it was a good

25 depiction?  I didn't hear.

1  A.    Yes.

2  Q.    Is it more accurate than SIG's own animation, if you

3  know, Mr. Villani?  Have you seen SIG's own animation of

4  the P320?

5  A.    Yes.

6  Q.    Do you think the High Impact version is more

7  accurate?

8  A.    Yes, I do.

9  Q.    At the same time would you agree that it's not a

10 video of the actual P320?

11 A.    No, it's not.

12 Q.    In your experience with guns, Mr. Villani, is there

13 any way to get inside the fire control unit of a weapon

14 and take a video of what happens when the gun is fired?

15 A.    That's physically impossible.

16 Q.    Why?

17 A.    I don't know of any type of equipment that can

18 actually go in a gun and actually survive a discharge.

19 Q.    It's a controlled explosion; is that fair to say?

20 A.    Correct.

21 Q.    Did you provide any of the CAT scan data to

22 High Impact, Mr. Villani?

23 A.    No.

24 Q.    Did you provide any photographs other than the ones

25 taken by Mr. Watkins?

1    A.   I don't know if they got copies of my photos through
2    you.  I don't know how they got some of them.
3    Q.   Did you send any photos -- well, if you sent any,
4    were there any other photos sent by you other than the
5    Watkins photos?
6    A.   I don't remember sending them any photos personally.
7    If anything, it was sent from my collection of photos, it
8    would be through your firm.
9    Q.   Through me, correct.
10        And Mr. Villani, let me stop the animation right
11   here.  Can you tell what version of the P320 this is just
12   by looking at that?
13   A.   It's a pre-upgrade.
14   Q.   How do you know that?
15   A.   Fatter trigger.
16   Q.   Okay.  Would any knowledgeable gun owner or I should
17   say any knowledgeable gun owner or user know that this was
18   the original version because of the fat trigger?
19   A.   An average gun owner?  It depends on the knowledge of
20   the person owning the gun.  I would say the average person
21   wouldn't know.
22   Q.   Are you aware, Mr. Villani, that SIG added a
23   secondary sear notch?
24   A.   Yes.
25   Q.   As part of the voluntary upgrade program?

1  A.   Yes.

2  Q.   Is there any secondary sear notch portrayed in this

3  animation?

4  A.   No.  There wouldn't be.

5  Q.   Mr. Miller made some comments about impossible things

6  in this animation; namely, one was that the rails and the

7  rail guides are sort of occupying the same space.  Does

8  the animation portray the gun cycling normally?

9  A.   Yes.

10  Q.   Does it show the slide moving back and forth?

11  A.   Yes.

12  Q.   If those parts were welded together, would it move?

13  A.   No.

14  Q.   Let me go a little bit further here.

15       I want to stop there, Mr. Villani.

16       This picture's been shown quite a bit in this case.

17  Can you describe what that frame of the animation is

18  trying to convey to the viewer?

19  A.   That's the sear positive contact surface that would

20  be highlighted in blue.  The red -- it says rollover

21  condition, which is basically excess molding material.

22  Q.   Did you personally observe sear faces that exhibited

23  raised material around the perimeters of the edges --

24  perimeters of the part?

25  A.   Yes, just like in the photos that you showed me

1  before.

2  Q.  Would that include the Perez P320 down in Florida?

3  A.  Yes.

4  Q.  The Jinn P320?

5  A.  Yes.

6  Q.  The Mayes P320?

7  A.  Yes.

8  Q.  Kneski P320?

9  A.  Every single one of them that I've examined had the

10  same thing, just varying degree of height.

11  Q.  Can you say that again?  I didn't hear.

12  A.  Every 320 that I've examined, the sear face, the

13  striker foot face, they all have varying degrees of excess

14  mold material around its perimeter.

15  Q.  There's a white line underneath the horizontal upper

16  edge, Mr. Villani.  I know there's been a lot of talk

17  about maybe it's lubricant, maybe it's some kind of

18  grease.  Is it fair to say that High Impact accounts for

19  that material which would be -- would it be a liquid?

20  A.  It could be oil --

21       MR. SMART:  Objection.  I don't understand the

22  question.

23       THE COURT:  If you can be open-ended instead of

24  leading as well, that would be great.

25

1  BY MR. BAGNELL:

2  Q.   Is it fair to say that High Impact depicts what

3  Mr. Toner contends was a grease-like substance in this

4  highlighted white area?

5          MR. SMART:  That is leading.

6          THE COURT:  The definition of a leading question

7  is when you say "is it fair to say."  So ask a who, what,

8  when.

9  BY MR. BAGNELL:

10 Q.   Do you remember the discussion about a grease-like

11 substance on this face, Mr. Villani?

12 A.   Yes.

13 Q.   Can you describe what that animation frame shows?

14 A.   That could possibly be some type of grease-like

15 substance or oil mixed with some type of gun powder

16 debris.

17 Q.   And that's what the Watkins photo before it was

18 cleaned showed, correct?

19 A.   Correct.

20 Q.   After it was cleaned, did it still show raised excess

21 metal?

22 A.   Yes, it did.

23 Q.   By the way, Mr. Villani, as portrayed in the

24 animation, the sear is fixed.  Is it fixed in the real

25 P320?

1   A.   No.  It travels up and down.

2   Q.   What is it supported by?

3   A.   Two springs in the rear.

4   Q.   Does it have the capacity to move down?

5   A.   Yes.

6   Q.   Mr. Miller made some contentions, I think, that it

7   was basically impossible for there to be any vertical play

8   between the frame and the slide of the P320.  Can you talk

9   about that?

10   A.   There is some amount of play in the slide between the

11   slide rails and the contact points on the fire control

12   unit.  There's four contact points that are supposed to be

13   bent at a 90-degree angle from the fire control unit that

14   made contact with the slide rails.  And the slide has to

15   move to operate.  If it was solid, it wouldn't move.  But

16   the slide does move slightly up and down and it torques

17   left and right also depending on how much the slide rail

18   contact points are bent.  The original design shows a

19   90-degree bend.  None of them I've seen have been

20   90 degrees.  They're all at a slight angle and they're all

21   different.  So every slide on every 320 moves different.

22   Q.   So is it in any way -- well, let me ask another

23   question.

24        Okay.  I'll play a little bit more.

25          MR. SMART:  Your Honor, I think on the last

1    answer, I'd move to strike it for lack of foundation.

2          THE COURT:  There has not been, frankly, a lot

3    of foundation for the answer, but I think it goes to

4    weight more than admissibility at this point.  You'll be

5    free to cross-examine him on the lack of any foundation if

6    you believe there's a lack of foundation.

7    BY MR. BAGNELL:

8    Q.   How many P320s have you personally handled,

9    Mr. Villani?

10   A.   At least a dozen.

11   Q.   Have you manipulated those weapons?

12   A.   Every one of them.

13   Q.   Have you rocked the slide back and forth on top of

14   the frame?

15   A.   Yes, I have.

16   Q.   You did that yourself, correct?

17   A.   Yes.

18   Q.   Did you do that in the New Hampshire trial in front

19   of Judge McCafferty?

20   A.   Yes.

21   Q.   Mr. Villani, there's been criticism by SIG of

22   these -- sorry.  One second.

23        We already discussed the sear face on the left.  But

24   the striker foot face on the right, what is the red

25   conveying in that image, if you know?

1              THE COURT:  I'll just stop.  Because we're

2    making a formal record of the proceeding, it's helpful if

3    you can identify the specific point in Exhibit 1, the

4    animation.  It appears to be at 3 minutes, 16 seconds;

5    does that sound right?

6              MR. BAGNELL:  3:16, yes.

7              THE COURT:  You can proceed with the question.

8    BY MR. BAGNELL:

9    Q.   What is that red area supposed to convey?

10   A.   A higher area than the blue area.

11   Q.   It's not red in real life, is it?

12   A.   No.

13   Q.   And the inset area is not blue?

14   A.   No.

15   Q.   And just going back to your prior testimony, vertical

16   play between the slide and the frame further compromises

17   the striker sear connection by raising the striker foot

18   when the slide moves vertically.  Can you explain what

19   that means, Mr. Villani?

20   A.   The slide has two rails, left and right, and they sit

21   on four contact points that are part of the fire control

22   unit or the receiver.  And the slide moves up and down,

23   left and right, forward and back, depending on the angle

24   of those four contact points.  Those four contact points

25   are supposed to be bent at 90-degree angles based on SIG's

1   own drawings.  Every one that I've examined have never

2   been at a 90-degree angle.  They've always been subtly

3   off.  Which causes each 320 that I've examined to have its

4   slide move to a different amount of upward movement or

5   downward movement or left and right movement.  It's not

6   consistent.

7          MR. BAGNELL:  Your Honor, for the record, that's

8   4:45 of Plaintiff's Exhibit 1.

9   BY MR. BAGNELL:

10  Q.   Is there anything in your -- let me ask another

11  question.

12         THE COURT:  I guess before you do that, the

13  witness is talking about a contact point.  It would help

14  me to understand a little more if the witness can explain

15  what he means by contact points and the four contact

16  points.

17  BY MR. BAGNELL:

18  Q.   Mr. Villani, you mentioned a contact point in your

19  last answer?

20  A.   Yes.

21  Q.   Can you talk about what's being contacted?

22  A.   Okay.  The main -- the registered part of the gun is

23  called a fire control unit.  It's the housing that goes

24  inside the grip module.  The fire control unit has four

25  ears that come up, two in the front and two in the back.

 1   Those ears ride in the channels of a slide.  And that

 2   holds the slide to the gun.  So these contact points are

 3   supposed to be at exact 90-degree angles for the slide to

 4   ride in.  But since this is a stamped part, the fire

 5   control unit housing, they're bent.  They're not totally a

 6   90-degree angle.  They're all bent.  All four of them on

 7   every gun that I've examined.  So that makes a different

 8   contact point.  It's never 90 degrees.  It's one way or

 9   the other.  So that causes the slide to move more than

10   other guns depending on how these contact points are bent.

11            THE COURT:  I see.  Thank you.

12   BY MR. BAGNELL:

13   Q.   Mr. Villani, have you reviewed statements by

14   SIG Sauer itself about the striker sear connection in this

15   gun?

16   A.   I didn't hear part of that.

17   Q.   Mr. Villani, have you reviewed statements by

18   SIG Sauer itself regarding the striker sear connection?

19   A.   Yes.

20   Q.   What have you read?

21   A.   The ones that you had showed earlier to Mr. Miller.

22   Q.   That would be a patent application?

23   A.   Yes.

24   Q.   Did you read the abstract?

25   A.   Yes.

1    Q.    And the press releases?

2    A.    Yes.

3    Q.    Have you ever heard a major gun manufacturer state

4    that vibration can make their gun fire?

5    A.    SIG Sauer did.

6    Q.    Any other manufacturer?

7    A.    Not that I can recall.

8    Q.    Have you ever heard any gun manufacturer in a manual

9    or anyone else state that an impulse can break that

10   connection?

11   A.    No.    Just SIG.

12            MR. BAGNELL:  Excuse me, Your Honor.

13                  (Pause.)

14   BY MR. BAGNELL:

15   Q.    Mr. Villani, I want to ask you some questions about

16   this frame of the animation.  At 3 minutes and -- oh, it's

17   still moving.  3:44, Your Honor.  Okay -- oh, I'm sorry.

18        All right.  Can you describe what that frame depicts

19   in the animation, Mr. Villani?

20   A.    That's the rear of the striker and the striker foot

21   that hangs down below the striker housing.

22   Q.    Have you visually yourself viewed how this actually

23   looks in real life?

24   A.    Yes.

25   Q.    And I assume this is not exactly how it looks in real

1  life; is that correct?

2  A.  No, this is just a depiction of how a real gun would

3  look.

4  Q.  All right.  In your experience handling I think you

5  said twelve P320s yourself and conducting these

6  inspections, what did you observe about the striker foot

7  component?

8  A.  The striker foot pivots.  It could pivot to the left,

9  it could pivot to the right, or it could be centered

10  because there is a slight gap in the striker housing.  So

11  as the slide retracts during a discharge, when the slide

12  goes forward and the striker is re-cocked, that striker

13  foot can either reposition itself on the sear centered,

14  slightly to the left, or slightly to the right.  It all

15  depends on the inertia of the gun and the person who is

16  handling it, it can handle the recoil.  It sits different

17  every time.

18  Q.  Mr. Miller said that there has to be some space so

19  that the part can move, so that the striker can move; is

20  that correct?

21  A.  Oh, sure.  It wouldn't move at all if there were no

22  space.

23  Q.  In your opinion, Mr. Villani, should it be able to

24  rock back and forth?

25  A.  It shouldn't be that loose.

1   Q.  I want to show you a CAT scan image from Mr. Miller's

2   I think report or affidavit.  Page 24.

3       Do you remember seeing this image brought up before,

4   Mr. Villani?

5   A.  Yes.

6           MR. SMART:  I don't believe this is in evidence,

7   Your Honor.

8           THE COURT:  All right.

9           MR. BAGNELL:  I thought it was.

10          THE COURT:  I think there's an image that looks

11   like this that's been in evidence; is that right?

12          MR. BAGNELL:  There's a lot of questions by

13   Your Honor about why the striker foot is not visible on

14   this.

15          THE COURT:  Is it possible for you to actually

16   use the document that's in evidence rather than -- I'm not

17   sure which one that is.

18          MR. SMART:  I think he may be referring to

19   Exhibit 132.

20          MR. BAGNELL:  Your Honor, it's from Buzz

21   Miller's report.  It's Plaintiff's 132, Your Honor.

22          THE COURT:  Okay, great.

23   BY MR. BAGNELL:

24   Q.  I'm showing you a CAT scan image from Plaintiff's

25   132, Mr. Villani.  And you had testified, I think, about

1    slide rails a little bit.  Can you describe -- can you

2    tell the Court what's being pictured there?

3    A.    Sure.  In the red circles are those tabs that I was

4    just discussing, how they're supposed to be at a 90-degree

5    angle but they're subtly off.

6    Q.    And what does that cause?

7    A.    Well, that would change the orientation of the slide.

8    It would allow the slide to move more or less depending on

9    how those tabs are bent.

10   Q.    Are you saying that should be a right angle?

11   A.    Yes.  90-degree, yes.

12   Q.    Did you observe that on drawings provided by

13   SIG Sauer?

14   A.    Yes.

15             MR. BAGNELL:  I don't have much more,

16   Your Honor.  I just want to confer with my cocounsel.

17             THE COURT:  Of course.

18                 (Pause.)

19             MR. BAGNELL:  Your Honor, finally, I'd like to

20   show Mr. Villani the former demonstrative.  I can't

21   remember if it was offered into evidence, the small parts

22   of the gun.

23             THE COURT:  I think it was offered.

24             MR. MIRENDA:  Yes, Your Honor.  The exhibit

25   number is on the outside of the bag.

1          MR. MADIGAN:  I think it's 135, Your Honor.

2          THE COURT:  135.

3    BY MR. BAGNELL:

4    Q.   I want to put this under here.

5          MR. MADIGAN:  For the record, Your Honor, there

6    are two other small parts.

7    BY MR. BAGNELL:

8    Q.   What is that depicting, Mr. Villani, or what is that?

9    It's not a depiction, but what is that?

10   A.   You're showing the rear of the striker inside of the

11   striker housing.

12   Q.   Does it -- can you see that the striker foot can

13   rotate left to right?

14   A.   Can I hold it?  It's moving too much.

15   Q.   Is this the actual size of the parts in a gun?

16   A.   Yes.

17          It does move.  It moves more to the left than it does

18   to the right.

19   Q.   And that's depicted in the animation, correct?

20   A.   Correct.

21          MR. BAGNELL:  I don't have anything else,

22   Your Honor.

23          THE COURT:  All right.

24          Cross-examination.

25          Folks, just for planning purposes, I think we're

1  going to go to 4:45 today after consultation with our

2  court reporter.

3          MR. SMART:  I don't have that much, Your Honor.

4  I should be done fairly quickly.

5          THE COURT:  Okay, whatever.  Just wanted you to

6  know we won't go quite as late as we went yesterday.

7          MR. SMART:  Thank you, Your Honor.

8

9                       CROSS-EXAMINATION

10  BY MR. SMART:

11  Q.   Good afternoon, Mr. Villani.

12  A.   Hi.  How are you?

13  Q.   I'd like to talk about the basis of your opinions.

14  A.   Okay.

15  Q.   As of the time of the publication of the animation in

16  2021, you had not conducted any testing to confirm that

17  any of your claimed defects can actually cause a P320

18  pistol to fire without a pull of the trigger?

19          MR. BAGNELL:  I object, Your Honor.  This is

20  well outside the scope of the remaining Lanham Act claim.

21  We're actually getting into the merits of the product

22  cases with this line of questioning.  I object.

23          THE COURT:  Is there a response to that?

24          MR. SMART:  Yeah.  Well, he's identified a lot

25  of defects.  He had input into the animation.  His defects

1  that he's identified in his testimony are the defects that

2  are depicted in the animation.  The animation is

3  commercial speech.  It's directly relevant to the --

4         THE COURT:  I guess I'm not quite clear on the

5  nature of the objection.  I thought you were offering him

6  to show that there was a basis for him to believe that

7  there's defects that are indeed shown in the animation.

8  So isn't it fair game for him to be asked, well, what

9  testing did you do?  What's your foundation, in other

10  words, for your testimony?

11         MR. BAGNELL:  Well, we introduced, Your Honor,

12  the Roscommon video showing this can happen.  The line of

13  questioning is you haven't done this in a laboratory,

14  therefore the animation is false.  That's not proper,

15  Your Honor.  We've already had two trials of this gun.

16  One settled on the second day.  One went to a full verdict

17  and then later the judge ruled that the gun went off on

18  its own.  We concede, Your Honor, that this has not been

19  replicated in a laboratory primarily because it would cost

20  over a million dollars.  That does not mean it's not

21  happening all over the country.

22         THE COURT:  So I overrule the objection.  It's

23  clearly proper questioning.

24         Go ahead.

25         MR. SMART:  Okay.

1    THE WITNESS:  No, I have not conducted any

2  tests.

3  BY MR. SMART:

4  Q.   And as of that time you had not accomplished a

5  physical demonstration that the defects that you posit can

6  cause a discharge without a pull of the trigger?

7  A.   Can you repeat that?

8  Q.   At the time of the publication of the animation, you

9  had not actually accomplished any physical demonstration

10  that any of the defects individually or all together that

11  you posit can actually cause a P320 to discharge without a

12  pull of the trigger?

13  A.   I conducted no tests.

14  Q.   No tests and no replication of the incidents that you

15  are claiming are happening without trigger pulls?

16  A.   That is correct.

17  Q.   And as of the time of the publication of the

18  animation you were not relying on any articles,

19  publications, or other studies to support your opinions

20  about the alleged defects in the P320, right?

21  A.   Correct.  It was my personal observation of the

22  parts.

23  Q.   Just your personal observation of the parts; is that

24  what you said?

25  A.   And how they interact with each other, correct, or

1  how they're supposed to interact with each other.

2  Q.   For the pre-upgrade P320 to fire without a trigger

3  pull, you needed to have at least two independent safety

4  mechanisms fail, right?

5  A.   Correct.

6  Q.   The striker would need to release from the sear

7  without a trigger pull, right?

8  A.   Correct.

9  Q.   And then the striker safety would need to fail to

10 stop the striker as it begins to move forward, right?

11 A.   Its engagement with the safety lock tab, correct.

12 Q.   So there would have to be both of those defects in

13 order for a discharge without a trigger pull to happen?

14 A.   The release of the striker foot from the sear is the

15 first.  Then the second would be that the safety lock tab

16 would have to fail being stopped by the striker body as it

17 moves forward.

18 Q.   And you hadn't -- you haven't tested that either one

19 of those can happen without a pull of the trigger, right?

20 A.   I have conducted no tests, correct.

21 Q.   And we've heard about you manipulating the firearm.

22 We saw you showing lateral movement this way and that of

23 the slide, purportedly.  As of the time of the publication

24 of the video, you'd never caused the disengagement of the

25 safeties in the process of doing that, right?

1    A.    That is correct.

2    Q.    At the time of the publication of the animation, you

3    had not measured the alleged irregularities in the surface

4    of the sear or the striker foot, correct?

5    A.    Measured what?

6    Q.    The alleged irregularities or uneven surfaces on the

7    sear or the striker foot.

8    A.    You mean the depth of them?

9    Q.    The depth or the height, however you want to look at

10    it, you had not measured the flatness or the lack of

11    flatness, the relief or lack of relief --

12    A.    No.

13    Q.    -- in those surfaces?

14    A.    It was visually obvious there was a height

15    difference.

16    Q.    At that time you were not even aware of how to do

17    such a measurement, correct?

18    A.    I'm not an engineer.  No.

19    Q.    And you couldn't even estimate how much unevenness

20    there was?

21    A.    It would be hard to give you a measurement if I don't

22    measure it.  It's just that it's visually obvious that

23    there is excess material causing a rise on the positive

24    contact surfaces.

25    Q.    So you couldn't even estimate the amount of

1   irregularity you allege to exist there?

2   A.   That's correct.

3   Q.   And also as of the time of the publication of the

4   video, of the animation, you had not done any analytical

5   calculations or engineering or mathematical modeling to

6   establish that the defects that you allege would induce a

7   discharge without a pull of the trigger, correct?

8              MR. BAGNELL:  Objection, Your Honor.  We've

9   already conceded and stated that Mr. Villani is not a

10  mechanical engineer or a mathematician.

11             THE COURT:  I get that.  But I do think it's

12  fair to ask if he'd done tests, if he had done

13  mathematical modeling or the sort.  If you've conceded it,

14  then I don't think you have anything to fear from the

15  question because he'll say no.  But I think it's fair to

16  at least ask the question.

17             THE WITNESS:  No.

18             MR. SMART:  Just a moment, Your Honor.  I may be

19  done.

20             THE COURT:  All right.

21                (Pause.)

22             MR. SMART:  Nothing else, Your Honor.

23             THE COURT:  I see.  Okay.

24             So any redirect, if you'd like?

25             MR. BAGNELL:  Yes, Your Honor.  Just a moment,

1  please, thank you.

2              (Pause.)

3

4              REDIRECT EXAMINATION

5  BY MR. BAGNELL:

6  Q.   Mr. Villani, regardless of whether you made precise

7  measurements of what you described as excess metal, I

8  think you stated that it was visually obvious?

9  A.   Yes.

10  Q.   What did you mean by that?

11  A.   I can see the defects.

12  Q.   With your naked eye?

13  A.   Some.  Some of them under magnification when I

14  photographed them.

15  Q.   And on the subject of replication and testing which

16  has been discussed, have you personally viewed

17  surveillance videos and body cam videos of this gun firing

18  without users pulling the trigger?

19              MR. SMART:  Objection.

20              THE COURT:  Objection?

21              MR. SMART:  I don't see the relevance.  It's not

22  about scientific circumstances.  There could be many, many

23  variables.

24              THE COURT:  I'll allow it.  It's overruled.

25              THE WITNESS:  I've seen a few videos of

1  uncommanded discharges.

2  BY MR. BAGNELL:

3  Q.   What did they show?

4  A.   They showed guns going off in officers' holsters

5  without their hands on the guns.

6          MR. BAGNELL:  Thank you.

7          THE COURT:  Is that it?

8          MR. BAGNELL:  Yes, Your Honor.

9          THE COURT:  Mr. Smart, anything else, sir?

10         MR. SMART:  No, sir.

11         THE COURT:  Thank you for coming in, sir.  You

12 can step down.

13         Next witness, please.

14         MR. MADIGAN:  Your Honor, at this point we're

15 going to have two more witnesses, it will probably take

16 about the morning, another three hours, at most.

17         THE COURT:  Sure.  It looks like we've got

18 almost another hour right now.  Let's go on with the next

19 witness.

20         MR. MADIGAN:  I'd like to call Mr. Bagnell.

21         THE COURT:  Okay, great.

22         THE CLERK:  Please stand and raise your right

23 hand.

24

25

1          JEFFREY BAGNELL,

2          called as a witness, having been first duly

3          sworn, was examined and testified as follows:

4

5          THE CLERK:  Please state your name and spell

6    your last name.

7          THE WITNESS:  Jeff Bagnell, B-A-G-N-E-L-L.

8          THE CLERK:  Give us your city and state of

9    employment.

10         THE WITNESS:  Westport, Connecticut.

11         THE COURT:  Please proceed.

12

13                    REDIRECT EXAMINATION

14   BY MR. MADIGAN:

15   Q.   Good afternoon, Mr. Bagnell.

16   A.   Good afternoon.

17   Q.   Could you just summarize for the Court, I know it's

18   part of the deposition, but summarize your educational

19   background?

20   A.   Sure.  I went to Central Catholic High School in

21   Norwalk.  I went to College of the Holy Cross for

22   undergrad and Boston College Law School.

23   Q.   And when were you admitted in the state of

24   Connecticut and the federal bar?

25   A.   State of Connecticut was May 1993.

1    Q.    And when were you admitted to the federal bar?

2    A.    District of Connecticut I believe 1998, I believe.

3    Q.    And you testified, pursuant to your deposition which

4    is in evidence, that you had certain admissions and

5    credentials.  Is there anything within that list -- you

6    had some hesitancy at the time, the other day you stated a

7    caveat.  Do you have anything that you would like to

8    update?

9    A.    Yes.  I was admitted on an inactive basis to the

10   State Commonwealth of Massachusetts Bar.  And it lapsed --

11   I think it lapsed sometime during COVID.  And I was

12   administratively suspended for not paying the inactive

13   fee.  I was extremely ill at the time.  And some things

14   went by the wayside, and that was one of them.  But while

15   I was a member of the Commonwealth Bar of Massachusetts, I

16   never received any discipline.

17   Q.    And in terms of your career and your affiliations,

18   what firms have you been affiliated with?

19   A.    Sure.  Garrison Levin-Esptein Chimes & Richardson, I

20   worked there over four years in New Haven.  I had my own

21   firm with Scott Lucas and Doug Varga for about eight

22   years.  And I don't know if I'm forgetting.  I was

23   actually in-house counsel at one point in my career for a

24   telecommunications corporation.

25   Q.    And when did you first become involved with the

1  SIG Sauer series of cases?

2  A.    The first one was the SWAT officer in Stanford,

3  Vincent Sheperis.

4  Q.    What date was that?

5  A.    That was January -- his gun fired in its holster

6  January 2017.  And Vin was referred to me by a gunsmith

7  friend of mine.

8  Q.    What were the circumstances surrounding that case?

9        MR. MIRENDA:  Objection, Your Honor.  Getting

10  into the circumstances of these other cases.

11        MR. MADIGAN:  Your Honor, I simply --

12        THE COURT:  Help me, I know he's litigating a

13  lot of these other cases.

14        MR. MADIGAN:  I don't want to get into the

15  merits of each case, but I'd like to at least get some

16  sort of foundation for his familiarity with the type of

17  discharge that has occurred.  I'm not going to go much

18  further than that.

19        THE COURT:  All right.  I'll allow it.  Go

20  ahead.

21        THE WITNESS:  The allegation which, of course, I

22  believe to be true was that Mr. Sheperis was loading SWAT

23  gear into the back of his SUV.  The holstered gun was in

24  his hands along with other material.  That gun slipped, it

25  descended about 3 feet to the ground.  It fired when it

1  hit the ground and the bullet hit him in the knee.  It

2  never left its holster.

3  BY MR. MADIGAN:

4  Q.   Approximately how many cases have you been involved

5  in with regard to misfires of the SIG Sauer?

6  A.   Overall, it would be a very large number.  You know,

7  if you include people having consulted me about these

8  cases around the country, lawyers and other people.

9  Actively serving as counsel or cocounsel or, you know,

10  pro hac'd in, I would estimate 15 to 20.

11  Q.   And with regard to -- which is really the focal point

12  of this trial.  With regard to the video, were you

13  present -- how was that initiated?

14  A.   The animation?

15  Q.   Yes.  Excuse me, the animation.

16  A.   The *Vadnais* case, I was up against a very good firm,

17  Littleton Park.  And they had put together an animation of

18  the P320.  And I saw -- they played it during a settlement

19  conference with a magistrate -- they tried to play it

20  during a settlement conference with a magistrate judge and

21  they also did an animation of what my client was allegedly

22  doing in her patrol car.  And when the case was resolved

23  and I kept getting calls about more and more cases, I said

24  an animation would be an effective demonstrative at trial.

25  And that's when I reached out to High Impact.  High Impact

1  had already done a gun animation.  I think they did one of

2  the Heckler & Koch.  And to me, they seemed like a perfect

3  fit for the task.

4  Q.  Who recommended High Impact?

5  A.  I don't think anyone did.  I think I probably just

6  Googled litigation visuals, something like that.

7  Q.  Could you just review for the Court the creative

8  process or at least the production process of the

9  animation?

10  A.  Sure.

11      My role was somewhat limited.  I supplied CAT scan

12  data from the Schneider gun, although my colleague in

13  Colorado, Scott Reikes, he may have sent that directly to

14  High Impact, I don't recall.  High Impact's in Colorado.

15  But I sort of supervised providing CAT scan data of the

16  Schneider P320.  There was also DICOM images, which I

17  think is CAT scan, of the Vadnais gun that I sent along.

18  And at some point the photographs that Mr. Watkins took in

19  Marlborough, Massachusetts.

20  Q.  As far as the final animation product or the final

21  version of the animation is concerned, was there anything

22  in there that was not taken from actual either parts or a

23  CAT scan?

24  A.  No.  No.  The only thing that was added was SIG's

25  press release at the end.

1   Q.   Could you explain the process behind creating the

2   slides that were shown here today with the sear and the

3   footer, the two surfaces that contact each other?

4   A.   Sure.  That's obviously an extremely critical

5   connection point in a striker-fired gun.

6        In this particular model, it already has a very

7   shallow engagement.  But my understanding is that

8   High Impact first built a model of the gun using CAT scan

9   images.  They then took in the data of how those surface

10  faces really look in reality based on Mr. Watkins'

11  photographs.  And then at the end of about a year they

12  came up with the final proof version of the completed

13  animation.

14  Q.   And in looking at that animation, what is the contact

15  point between the footer and the sear surface?

16  A.   What is the contact point?

17  Q.   Yes.  Is it flush all the way down?  Is it raised?

18  Is it in the middle?

19  A.   Sure.  It's raised.  It does not sit fully down on

20  the sear face.  The striker foot is elevated so that

21  there's the top portion of the striker foot is not in

22  contact with the sear at all.  This is designed by SIG to

23  create a lighter trigger pull.  It requires less force to

24  separate that connection.

25  Q.   So, in other words -- if pardon me if I'm putting

1  words in your mouth; I don't mean to -- the higher the

2  foot is up on the sear face, the less pressure it takes to

3  pull the trigger; is that what you mean?

4  A.    You're moving less material, less matter, yes.

5  Q.    So, in other words, it's a concession to facilitate

6  the pull?

7  A.    Correct.

8  Q.    Now, when that foot is contacting the face and it's

9  up higher, it's obviously -- would it be susceptible to

10  more movement or not?

11  A.    That is my contention, yes.  That vibration that SIG

12  has said, or impulse, can in some of these guns serve to

13  make that connection go to a vanishing point of contact

14  and it fails.  And that can happen over time or it can

15  happen suddenly as in the case of a drop.

16  Q.    So what was the -- when did you first launch or

17  publish this animation?

18  A.    I think it was August of 2021, as I recall.  Yes,

19  August of 2021.

20  Q.    And I believe it was your testimony in the

21  deposition, which is in evidence, that you had some

22  difficulty posting it to your own site?

23  A.    Yes.  I wasn't able to.

24  Q.    And who were you dealing with then when it came to

25  trying to get that published?

1   A.   I think I asked Shawn Kinsey at High Impact how to go

2   about it.

3   Q.   And what was the ultimate solution?

4   A.   I think it was to put the YouTube link on my site,

5   add that link to my site.  I don't -- it's been a long

6   time, but I don't precisely recall.

7   Q.   But it was never actually -- you were never actually

8   able to view it on your site, it was on another platform?

9   A.   Yeah, it was not on my platform.  It was on a YouTube

10   platform, correct.

11   Q.   So all it was on your website, your company website,

12   it was nothing more than just a button or a link to

13   YouTube?

14   A.   Correct.

15   Q.   And on the YouTube site or platform, what was the

16   extent of any reference to you?  Was there any link back

17   to your site?

18   A.   There was a dead link.  I stated my website address,

19   but there was not a clickable link.  And I think I stated

20   a copyright.

21   Q.   So really it was just copyright Jeff Bagnell and your

22   URL?

23   A.   Correct.  My primary purpose with the text was to

24   give kudos to High Impact and to thank them.  I thought

25   they did a fantastic job.

1   Q.   With regard to your website, when did you first

2   create that?

3   A.   It was January of 2017.

4   Q.   And who advised you on that again?  I believe there

5   was some testimony.

6   A.   A place called The Om Office.  And I can't remember

7   the very nice person I worked with, I think her name was

8   Susan.

9   Q.   From 2017 until the time you took down this

10  animation, what -- how much traffic were you getting on

11  your site?

12  A.   Minimal.  Sometimes one or two hits a day or no hits

13  a day.  You know, I think in my video deposition I said

14  the high point or the spike was probably the Good Morning

15  America interview of my client.  I had about -- I think I

16  had 200 in a month.  That breaks down to about seven hits

17  a day.  So it's a lightly trafficked website.

18  Q.   You also gave some testimony that there was a certain

19  amount of views of the animation on YouTube?

20  A.   Correct.

21  Q.   And can you summarize for His Honor how many there

22  were, to the best of your knowledge?  I don't think

23  anybody had a final number.

24  A.   To the best of my knowledge, it was 35 or 37,000.

25  Q.   And that's over approximately a seven-month period?

1  A.   I think pushing seven months, yeah.

2  Q.   So that's maybe only 100-something a day,

3  170-something a day?

4  A.   I think so.

5  Q.   So given the fact that you only have seven visits a

6  day on average to your website and there are some more but

7  not a substantial number on YouTube, safe to say that your

8  site isn't driving traffic to YouTube to view this video?

9  A.   I think that's fair to say.

10  Q.   Have you ever engaged in any social media to promote

11  your site?

12  A.   No.  No, I don't.

13  Q.   Have you ever engaged in Twitter or X or Instagram?

14  A.   No, I have not.  I'm on LinkedIn, that's it.  I'm not

15  on Instagram or X at all.  Instagram, I have a personal

16  account.

17  Q.   Do you use LinkedIn much?

18  A.   I try not to.

19  Q.   Have you ever engaged in any social media to drive

20  traffic to YouTube?

21  A.   No, not that I know of or remember.  I don't think

22  so.

23  Q.   Have you ever used Google Words?

24  A.   Google Works?

25  Q.   I think you answered the question.

1  A.   No, I don't use that.

2  Q.   Have you had any meta tags in your site?

3  A.   No, I don't know what those are.

4  Q.   How often do you visit your own site?

5  A.   I might check the sparse traffic, you know, a couple

6  times a month.

7  Q.   When was the last time you posted something to your

8  site?

9  A.   I posted the decision of Judge McCafferty where she

10  found that my client's gun went off fully seated in the

11  holster early January.  I think I did a press release on

12  that.  I think that's the last item I added to my site.

13  Q.   But since you're not really doing much for yourself,

14  it's safe to say you're not doing something in the gun

15  market in terms of any marketing or advertising?

16  A.   No.  I have no ambitions to sell or distribute guns.

17  Q.   In producing the animation, there were a series -- in

18  the file that was produced, there were a series of

19  subfiles that had v, I think version -- we concluded it

20  was Version 1 through 6 or something like that.  Explain

21  to the Court how those versions actually -- was there a

22  process you went through?  Was it an iterative process?

23  Did you have a lot of input?  A little input?  How did

24  that go?

25  A.   It was iterative, yes.  It took a lot of time.  Even

1  though High Impact had done an animation before, it was a

2  different gun.  So they really had to build it from the

3  ground up although they had the general knowledge of how

4  to do it.  So I think the first iterations were very

5  primitive just based on CAT scans where they're trying to

6  understand how the parts of the P320 all move and

7  interact.  And I would provide more feedback on that.  And

8  then as they took in more data, the versions became more

9  complete until they finally included the real life

10 photography for the final version.  It took about a year.

11 Q.   And the photography as it was incorporated, it was

12 modified to some degree.  Could you explain to the Court

13 how you modified it and why you modified it?

14 A.   The photography?

15 Q.   Yes.

16 A.   Well, the photography is how those surface faces

17 actually look.  The CAT scans did not show how they

18 actually looked.  So they had to take into account the

19 actual appearance of those faces, ultimately.  I don't

20 know if I'm answering your question.

21 Q.   Partially.

22      What did you do to demonstrate that there was a

23 difference in the surface?

24 A.   Oh, with the animation, we asked -- I think we asked

25 that High Impact use sort of a color-coding system.  Of

1    course it doesn't look that way on the gun.  But we wanted

2    to convey the basic true fact that there's raised material

3    around the perimeters of these surface spaces.  So they

4    used red for that.  And they used blue for the inset

5    surface which we think was not being contacted.  They even

6    used a light white to indicate the apparent grease that

7    was on one of Mr. Watkins' photos.

8    Q.   Now, with regard to the impact that this animation

9    may or may not have had on SIG, do you have any way of

10    knowing whether it's impacted their sales or their

11    business?

12    A.   I did ask for it in discovery.  Mr. Mirenda and I

13    agreed to table discovery while the motions on the

14    counterclaims were pending.  So I never got that after the

15    stipulation we reached.  My own research -- and it's in my

16    exhibit book -- indicates that it's had no impact

17    whatsoever.  The P320 is the best-selling striker-fired

18    gun on the market for 2022 and 2023.  So I don't think

19    that it had any harmful impact to SIG.

20    Q.   So sitting here today, is it your contention that the

21    animation is a fair, reasonable depiction of how a gun may

22    misfire?

23    A.   Absolutely.  I think it's very high quality.

24            MR. MADIGAN:  I have no further questions.

25            THE COURT:  Any cross-examination?

1        MR. MIRENDA:  Your Honor, if I may have a

2    moment.  I don't think it will be long if at all.

3                    (Pause.)

4        MR. MIRENDA:  No questions, Your Honor.

5        THE COURT:  Thank you, Mr. Bagnell.

6        MR. BAGNELL:  Thank you, Your Honor.

7        THE COURT:  Would you like to call another

8    witness?

9        MR. MADIGAN:  I have to confer with Mr. Bagnell.

10   We had somebody we had in mind, but we didn't think we

11   were going to have to call him today.

12                    (Pause.)

13       MR. MADIGAN:  We rest, Your Honor.

14       THE COURT:  You rest at this time?

15       MR. BAGNELL:  Yes, we rest.

16       THE COURT:  Is there a rebuttal case?

17       MR. MIRENDA:  Give us one moment, Your Honor,

18   confer with cocounsel.

19                    (Pause.)

20       MR. MIRENDA:  Your Honor, having conferred, no

21   rebuttal case.

22       THE COURT:  Okay, great.  So I guess that

23   concludes the evidence in the case.

24       I know we had talked before about post-hearing

25   briefing.  I don't know if you had had a chance to talk

1   about approximate time frames for --

2           MR. MIRENDA:  I raised it earlier.  We haven't

3   yet had a chance to confer.  I think we could confer right

4   now, Your Honor, and come to a reasonable schedule.  I

5   don't expect it would be very lengthy.

6           THE COURT:  Okay.  So maybe I'll just let you

7   all confer on that and you can file a proposed briefing

8   schedule, is that all right?

9           MR. MIRENDA:  Yes.

10          THE COURT:  Rather than putting you on the spot.

11          MR. BAGNELL:  I think that's fine, Your Honor.

12          MR. MADIGAN:  We agreed that it shouldn't be too

13  long.

14          MR. MIRENDA:  And I guess a bit in part relates

15  to the transcript, we'll talk about generating the

16  transcript, we'll build all that into the schedule.

17          THE COURT:  Please give our court reporter

18  plenty of time.

19          MR. MIRENDA:  Absolutely.

20          THE COURT:  We just finished a trial before

21  this, so that may be first in her line.

22          MR. MIRENDA:  Certainly, Your Honor.

23          THE COURT:  Okay.  That's fine.  So maybe just

24  submit a proposed schedule, that would be great.

25          I want to make sure I'm understanding,

1  especially for the focus of the briefing, it strikes me

2  that the issue here is focused on the basis for the

3  animation and whether there are false statements, indeed

4  there are factual statements, I realize the opinion

5  arguments that are out there for the animation. I know

6  there's been testimony in the case or evidence in the case

7  about the fact that there have been or the alleged fact,

8  certainly by the defense, that there have been uncommanded

9  discharges. I want to make sure I'm understanding,

10  Mr. Bagnell, the significance of that to your ultimate

11  argument in the case.

12          And I'll just give you an example. Suppose you

13  have, you know, a case where a product is malfunctioning,

14  a toaster is exploding or a car is just, you know,

15  crashing in some way. I take it your argument is not

16  simply, well, you could put up a video or an animation, if

17  you want to say, that asserts that, who knows, the brakes

18  of the car are made of cheese if in fact the brakes are

19  made of cheese. And that's a factual matter. It seems to

20  me that I really have to focus on whether on the factual

21  basis for the animation itself and the fact that the car

22  is proverbially driven off the road or, as you contend,

23  you showed us a video from Michigan that there have been

24  uncommanded discharges. That doesn't really go towards

25  showing the basis for the video -- or the animation.

1          MR. BAGNELL:  I understand.

2          THE COURT:  I know you prefer to use the word

3  "animation."  I wanted to make sure I'm not overlooking

4  something about that.

5          MR. BAGNELL:  No, you're not, Your Honor.  I'm

6  not going to make a products argument here.  I think the

7  reason it came into the case is because there was a

8  blanket statement that this was impossible to happen.  And

9  that's why Roscommon came in.

10          THE COURT:  And I let that evidence in.

11          MR. BAGNELL:  As part of the briefing,

12  Your Honor, I don't plan on spending much time on what we

13  call OSI, other similar incidents.

14          THE COURT:  Okay.

15          Did you have anything else, Mr. Mirenda?

16          MR. MIRENDA:  Nothing else, Your Honor.

17          Just the logistics question about those small

18  parts.  We've got them bagged here.  Who should have them

19  and where we should keep them?  Whatever you're

20  comfortable with.

21          THE COURT:  We'll hold on to them as part of the

22  evidence in the case with the Clerk of Court.

23          All right.  I appreciate all of the efforts on

24  both sides.  It looks like we're done and we won't have to

25  get back together next Tuesday as we thought.  I'll look

1    forward to hearing from you with a proposed briefing

2    schedule and we'll go from there.

3              Anything else you want to raise?

4              MR. MIRENDA:  Thank you, Your Honor.

5              MR. BAGNELL:  Thank you, Your Honor.

6              THE COURT:  Thank you all.  Safe travels.

7                   (Proceedings adjourned at 4:31 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    RE: SIG SAUER, INC. v. JEFFREY S. BAGNELL, ESQ., LLC,
                ET AL., No. 3:22CV885(JAM)

5

6            I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 155 through 360 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16              _____/s/_____

17              DIANA HUNTINGTON, RDR, CRR
                   Official Court Reporter
18              United States District Court
                  141 Church Street, Room 147
19              New Haven, Connecticut 06510
                      (860) 463-3180
20

21

22

23

24

25