UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____
                                             )
SIG SAUER, INC.                              )
                                             )
                     *Plaintiff,*            )
                                             )        Civil Action No.:  3:22-cv-00885-JAM
              v.                             )
                                             )        March 25, 2024
JEFFREY S. BAGNELL, ESQ., LLC,               )
and JEFFREY S. BAGNELL.                      )
                                             )
                     *Defendants.*           )
_____)

**<u>PLAINTIFF'S POST-TRIAL OPENING BRIEF</u>**

1

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

FACTS ................................................................................................................................4

    A.  SIG and the P320....................................................................................................4

    B.  Attorney Bagnell and the Bagnell Firm Website .................................................5

    C.  High Impact and the Creation of the Animation..................................................7

    D.  The P320 Animation on Bagnell's Website .......................................................11

    E.  Critical Misrepresentations in the Animation ....................................................14

        i.      False Depiction of the Sear Face and Striker Foot ................................14

        ii.    False Depiction of the Slide's Upward Movement................................17

        iii.   False Depiction of the Striker Safety Notch Geometry and Height......19

        iv.   False Depiction of the Striker Safety Lock............................................20

        v.     False Depiction of the Striker in Its Housing.........................................20

        vi.   Summary of Misrepresentations ............................................................21

ARGUMENT ....................................................................................................................22

  I.     Plaintiff Has Standing to Sue Defendants Under the Lanham Act.................................22

  II.    Defendants' Animation Is False Advertising in Violation of the Lanham Act .............24

        a.    The Animation Is Commercial Advertising................................................25

        b.    The Animation Contains Many Literally False Material Misrepresentations .........29

        c.    The Animation's Material Misrepresentations Are of Inherent Qualities or Characteristics of the P320 ........................................................................31

        d.    The Animation Was Published in Interstate Commerce...........................32

        e.    Impact of Defendants' Deception .............................................................32

  III.   Plaintiff Is Entitled to a Permanent Injunction Against the Animation to Remedy the Lanham Act Violation....................................................................................................33

  IV.   The Most Appropriate Lanham Act Remedy Here Is a Permanent Injunction As Set Forth in Plaintiff's Proposed Order, Attached As Exhibit A, Requiring Defendants to Permanently Refrain from Publishing the Animation ...................................................37

  V.    Issuance of Plaintiff's Narrowed Proposed Injunction Would Not Raise Any First Amendment Concerns.....................................................................................................38

CONCLUSION.................................................................................................................39

## INTRODUCTION

Plaintiff SIG Sauer, Inc. ("SIG") filed this lawsuit in March 2022 because, at that time and for several months prior, Defendants Jeffrey S. Bagnell and Jeffrey S. Bagnell, Esq., LLC (the "Bagnell Firm") made demonstrably false and misleading statements concerning internal components of SIG's iconic P320 handgun in a video animation (the "Animation") published on the Internet to promote Defendants' law practice.  The Animation misrepresented and visually distorted components of the pistol and made assertions about the internal mechanics of the P320 that are physically impossible—changing the physical appearance to make certain parts appear lumpy and deformed, altering the physical dimensions and geometry of other key parts, and depicting two solid steel parts as if they could merge into each other and occupy the same space—all in service of the message that due to these misrepresented internal physical characteristics the P320 is capable of firing without any trigger pull, in an effort to promote Defendants' plaintiff-side firearms product liability practice.  Defendants placed the Animation on the Bagnell Firm website and on Bagnell's YouTube channel.  When some viewers left comments questioning the accuracy of the Animation, Bagnell deleted those comments, thus ensuring that the public would continue to be misled.

Defendants are free to represent clients in matters against SIG—and to market their services to potential clients—but they cross a line when they make material misrepresentations of fact about the inner workings of the P320 in their marketing materials.  Accordingly, the Court should issue a permanent injunction as set forth in Plaintiff's Proposed Order, attached as **Exhibit A**, requiring Defendants, and anyone in active concert or participation with them,[1] to

---

[1] *See* Fed. R. Civ. P. 65(d)(2) (authorizing the Court to enjoin "other persons who are in active concert or participation with" the parties).

permanently refrain from publishing any version of the Animation to the public in any
advertising context, whether on the Bagnell Firm website or in any other form on any other
platform, and whether on the Internet or in any other media.

## FACTS

The Court held a Trial on the factual basis for the permanent injunction sought on
Plaintiff's Lanham Act claim on February 21 and 22, 2024.[2]  Plaintiff presented four witnesses:
(1) High Impact, the technical graphics firm hired by Bagnell to create the Animation; (2) Jeffrey
Bagnell; (3) Sean Toner, a Senior Design Engineer at SIG and the lead engineer on the P320
firearm; and (4) Robert Miller, an expert who testified in detail as to the steps he undertook to
analyze the Animation and the various material misrepresentations found in the Animation.

Defendants presented two witnesses, Peter Villani and Jeffrey Bagnell.  Neither provided
any credible testimony to support the accuracy of the Animation or to refute the overwhelming
evidence, including expert testimony, presented by Plaintiff demonstrating the many material
misrepresentations in the Animation.

The evidence presented at trial supports finding the facts as follows:

**A.  SIG and the P320**

SIG has a long history of designing, developing, and manufacturing firearms, which it
supplies to a variety of customers—including the U.S. military, law enforcement and civilians.
Transcript of Trial held on February 21 and 22, 2024, *see* D.E. # 173 & 174 ("Trial Tr.") (Toner

---

[2] In this brief, SIG cites the trial testimony of the witnesses who testified in person by reference
to the trial transcript (e.g., "Trial Tr. (Toner Testimony) at xx") and the testimony of the
witnesses presented via video deposition, High Impact (Px133) and Bagnell (Px134), by
reference to timestamps from the corresponding video exhibit.  For reference, transcripts of the
depositions of High Impact and Bagnell, which include highlighted text representing Plaintiff's
designations for trial, are available at D.E. # 158 Exs. C & D.

Testimony) at 17:20-23, 19:3-10.  Headquartered in New Hampshire, SIG has extensive

engineering and R&D operations there, along with a training facility, and has manufacturing

operations in other parts of the country as well.  *Id*. at 19:3-10.

SIG's P320 is a striker-fired pistol, in which the pull of the trigger initiates a sequence of

internal components to move, ultimately releasing a compressed spring which generates the force

necessary to drive the striker pin forward to impact the cartridge, causing the gun to fire.  *Id.* at

28:10-29:2.[3]  SIG began development of the P320 approximately a decade ago, and SIG had a

team of five to six engineers involved in designing the P320.  *Id*. at 21:2-11.  The P320 has been

sold to a variety of customers—including the U.S. Army, which adopted a version of SIG

Sauer's P320 as its primary sidearm.  *Id*. at 18:5-10.  Roughly two and a half million SIG P320s

have been sold in the U.S. and Canada.  *Id*. at 109:8-15.  The P320 is among SIG's best-selling

pistols.  *Id*. at 20:12-17.

**B.  Attorney Bagnell and the Bagnell Firm Website**

Bagnell is a lawyer and the individual owner and sole member of the Bagnell Firm.

Plaintiff's Exhibit ("Px") 134 (Bagnell Dep.) at 00:27-00:45, 02:45-02:48.  The Bagnell Firm

maintains a website at www.bagnell-law.com, which Bagnell created in January of 2017.  *Id*. at

11:31-11:42; Trial Tr. (Bagnell Testimony) at 351:1-3; Px059 (2022 Bagnell Law Website

Homepage).  The Bagnell Firm website describes events relating to Bagnell's law practice,

highlights various accolades he has received to "let[] clients know that [he] ha[s] a good record,"

Px134 (Bagnell Dep.) at 17:52-18:47, shares information about his rates, and invites "potential

---

[3] In 2017, SIG implemented a voluntary upgrade program that involved changes to the P320.
*See* Trial Tr. (Toner Testimony) at 59:24-60:8; e.g., compare Px070 (post-upgrade sear) with
Px069 (pre-upgrade sear).  The Animation portrays the pre-upgrade P320.  *See* Trial Tr. (Toner
Testimony) at 143:2-10.

clients" to contact him about his services. *Id*. at 20:58-21:47; Px060 (2022 Bagnell Law Website Contact Page). It also touts Bagnell's inclusion on lists such as "Best Lawyers, Super Lawyers, and Top 50 in Connecticut." Px134 (Bagnell Dep.) at 19:22-19:57. The Bagnell Firm website also includes press releases and articles regarding Bagnell's firearms-related personal injury litigation. *See, e.g.*, Trial Tr. (Bagnell Testimony) at 353:7-12. Bagnell personally maintains his website and is the only person who posts content on it. Px134 (Bagnell Dep.) at 13:50-14:08.

Despite admitting that he uses his website to communicate his experience and qualifications to potential clients and invite them to contact him about his legal services, Bagnell evaded questions about whether his website was "advertising". *See, e.g.*, Px134 (Bagnell Dep.) at 15:30-16:27. For example, when asked whether his website is lawyer advertising, Bagnell responded: "I don't know, Tony. I'm not an ethics—that's not my specialty. … I was simply doing what every other practitioner that I know of does in Connecticut by creating a website." *Id*. Similarly, when asked why he posted his accolades on his website, rather than answering directly Bagnell responded with a rhetorical question: "Why do you post them on yours, Tony?" *Id.* at 18:20-18:40. He ultimately conceded that he registered his website with the Connecticut body governing the practice of law because "he was required to" and that his website is, "in the internet age, it's something everyone -- every lawyer has, and almost every business." *Id*. at 16:59-17:45.

In August of 2021, Defendants first published the Animation on the Bagnell Firm's website. *See* Trial Tr. (Bagnell Testimony) at 349:16-19. In order to publish the Animation on the Bagnell Firm's website, Bagnell first had to publish the Animation to YouTube, which he then linked to his site. *Id*. at 350:3-14. The Animation as it appeared on YouTube also contained a reference guiding viewers to the Bagnell Firm's website at www.bagnell-law.com.

6

*Id*. at 350:15-23.  The Animation was taken down by Bagnell from both YouTube and the Bagnell Firm's website pending resolution of this trial.  *Id*. at 351:9-17.

Now, featured prominently on the Bagnell Firm website is a button entitled "Closing Argument, Guay v. Sig Sauer, Inc," a case against SIG in which Bagnell was plaintiff's attorney. Px134 (Bagnell Dep.) at 59:16-59:27; Px050 (Bagnell Law Website Homepage).  If a viewer clicks that button, they can see what purports to be a transcript of Bagnell's closing argument in that case—a transcript which Bagnell concedes he "edited and abridged."  Px134 (Bagnell Dep.) at 59:42-01:00:04; Px051 (Transcript of Closing Argument).  Bagnell also testified that, at the end of the transcript of his closing argument, he added text stating: "After a full weekend and full day of deliberations on the fifth day, … the jury informed the court that it was hung."  *See* Px134 (Bagnell Dep.) at 01:00:29-01:01:00; Px051 (Closing Argument).  This text includes no further explanation, and no disclosure of the jury's *final* determination in that case: a unanimous verdict in favor of SIG.  *See* Px134 (Bagnell Dep.) at 01:02:26-01:02:35; Px052 (Verdict Form).[4]  This misleading statement provides another example of Bagnell's use of his website in a troubling pattern of taking liberties with the truth to bolster his image to attract potential clients.

### C.  High Impact and the Creation of the Animation

In 2020, Bagnell hired High Impact, a technical graphics studio located in Denver, Colorado, to create the Animation at issue here.  *See* Px133 (High Impact Dep.) at 00:32-00:45; Px134 (Bagnell Dep.) at 05:43-06:01.  Bagnell, working with two individuals whom he identifies as his "experts," Timothy Hicks and Peter Villani, provided the direction to High Impact with

---

[4] Despite Bagnell's evasiveness when questioned about whether this was the final verdict the jury returned in this case, *see, e.g.*, Px134 (Bagnell Dep.) at 01:02:04-01:02:37, Bagnell eventually admitted that Px052 was the verdict form in which the jury returned a verdict unanimously of no liability for SIG.  *Id*.

respect to creating the Animation.  *See* Trial Tr. (Villani Testimony) at 317:24-318:7; *see also* Px133 (High Impact Dep.) at 10:05-10:35; Px134 (Bagnell Dep.) at 09:14-10:37.  Bagnell supplied High Impact with CT scan data from a P320—the "Schneider P320"—as well as microscopic photographs of specific P320 components taken at an inspection of several P320s in Marlborough, Massachusetts.  *See* Px133 (High Impact Dep.) at 12:48-13:49; *see also* Px134 (Bagnell Dep.) at 49:50-52:16; Trial Tr. (Bagnell Testimony) at 347:7-19.  The CT scan data and photographs served as the source material High Impact used to create the Animation.  *See* Px133 (High Impact Dep.) at 14:36-15:27; Px134 (Bagnell Dep.) at 35:34-35:54.

Several High Impact employees worked on the Animation.  *See* Px133 (High Impact Dep.)  at 07:16-07:48 ("The whole creative team had hands on [the Animation] in one way or another.").  However, it was Bagnell and his self-described experts who provided direction in creating the Animation.  *Id*. at 10:04-10:35.  High Impact's process for creating the Animation began with Bagnell providing source material to High Impact.  *Id*. at 10:40-12:22.  Bagnell provided High Impact with CT Scan data for the Schneider P320 which High Impact then used to create an electronic 3D model of the gun.  *Id*. at 13:51-14:30, 15:26-16:27.

High Impact then shared this 3-D model with Bagnell for feedback.  Px018 (Email between High Impact and Bagnell).  Bagnell then raised "concerns" as to the depiction in the 3-D model of the striker foot and sear, stating "can we show the enormous amount of unsafe MIM rollover on the face of the striker foot and sear? It was dramatic in the images we saw last month in MA."  Px018.  In response to Bagnell's stated "concern", High Impact created and shared an image with Bagnell which compared the 3-D model it had created to the underlying CT scan data that had been provided to High Impact.  Px018; Px009 (Image of Gun Model with Green Wireframe).  The image, labeled "V03," depicted an animated model of the P320 with a green

wireframe overlayed on certain components, including the sear face.  Px009.  According to High

Impact, the green wireframe (representing the CT scan data) is tightly fitted to the gray model,

showing that High Impact's initial 3-D model was depicting the gun in the way shown in the CT

scan data.  Px009; Px133 (High Impact Dep.) at 47:31-51:04.  In High Impact's initial model,

derived directly from the CT scan, the sear face is flat.  Px009; Trial Tr. (Miller Testimony) at

201:1-20.

After "V03" of the Animation was shared, High Impact testified that it had meetings with

Bagnell and Peter Villani, discussing the portrayal of these components.  Px133 (High Impact

Dep.) at 56:19-59:02.  Following one of these meetings, Bagnell shared an image of a lumpy

grease covered striker foot with High Impact.  *Id.*; Px015 (Mayes Striker Foot Shared with High

Impact); Px076 (Mayes Striker Foot); Trial Tr. (Miller Testimony) at 204:3-205:14.  The photo

of the lumpy striker foot came from an inspection of various pistols which took place in March

2021 at North Start Imaging in Marlborough, Massachusetts.  Trial Tr. (Toner Testimony) at

82:5-16, 84:6-12; Px076.  Bagnell and Villani were present at this inspection.  *Id*. at 82:17-21.

As described by Toner, the inspection of one of the guns, called the Mayes firearm, consisted of

a visual examination during which pictures of components were taken.  *Id*.  When first

examining the striker foot face of the Mayes firearm, there was a buildup of debris visible.  *Id*. at

84:19-85:6; Px076 (left image).  Toner described the buildup as a foreign substance in

combination with a lubricant, like oil or grease, which are commonly used in firearms.  *Id*. 85:2-

12.  During the examination, after seeing the debris on the striker foot face, the examiner ran a

Q-Tip over the face of the component and the debris all came off, leaving behind the flat striker

foot face.  Trial Tr. (Toner Testimony) at 85:18-86:4; Px076 (right image).  Bagnell and Villani

were both present to see the striker foot face being cleaned of the debris buildup.  Trial Tr.

(Toner Testimony) at 86:25-87:16.  In his testimony, Bagnell concedes that this appearance was grease.  Trial Tr. (Bagnell Testimony) at 354:21-355:7; Px134 (Bagnell Dep.) at 53:41-54:01.

Knowing that the lumpy appearance of the striker foot was simply debris that was easily wiped away with a Q-Tip, Bagnell still sent the image of the grease covered striker foot face to High Impact to serve as the basis for edits to the Animation.  Px133 (High Impact Dep.) at 56:19-59:35.  Bagnell then directed High Impact to make changes to the sear face in the Animation, which distorted the visual representation of this part in a way that deviated from reality but aligned with Bagnell's idea of "roll over."  *See* Px009 (Image of Gun Model with Green Wireframe); Px018 (Email between High Impact and Bagnell); Px133 (High Impact Dep.) at 59:09-59:35.  Going a step further in the misrepresentation, the grease-caused lumpy appearance was on a striker foot face, but at Bagnell's direction High Impact implemented the appearance on a completely different component (the sear face) than the one in the picture.  *See* Px092 (Striker Foot and Sear Comparison); *See* Appendix 1[5] at 2; Trial Tr. (Miller Testimony) at 204:3-205:14, 206:5-23.  Bagnell's directives to High Impact transformed what started as an accurate 3-D model into a false depiction of these critical parts, all with the aim of being able to show the alleged "mechanism of failure" Bagnell wanted.

At Bagnell's direction, High Impact implemented other changes and additions to the Animation, including the addition of an entire sequence, Px133 (High Impact Dep.) at 59:10-59:35, 1:06:22-1:06:22, purporting to show the striker foot moving up off of the sear, but which depended on the Animation (in a way obscured from viewers) merging two solid steel parts into

---

[5] **Appendix 1**, attached for the Court's convenience, is a compilation of key trial exhibits showing the misrepresentations in the Animation.

each other (a physical impossibility) and other distortions in order to falsely create enough room for the parts to move the way Bagnell wanted them to.  *Id*. at 1:07:49-1:08:11.

### D.  The P320 Animation on Bagnell's Website

High Impact finished the Animation in late July 2021.  Px133 (High Impact Dep.) at 1:09:26-1:11:09.  Upon its completion, Bagnell sought to publish the Animation on his website, but for technical reasons was unable to do so; he contacted High Impact and got technical advice from them that he would first have to put the Animation on an external site such as YouTube in order to place it on his website.  Px023 (Email Between Bagnell and High Impact); Px133 (High Impact Dep.) at 1:11:16-1:13:12.  On or about August 28, 2021, Bagnell posted the Animation on YouTube, enabling him to add a link to the Animation to his website and publish it there.  *See* Px134 (Bagnell Dep.) at 25:59-26:26, 30:54-31:20, 34:14-34:38.  Bagnell asserted a 2021 copyright in the Animation on his YouTube channel.  *See id.* at 33:29-34:13.  In text below the Animation graphic on YouTube, Bagnell thanked "High Impact in Colorado for developing this HD animation based on CT scans and microscopic photography" and included the Bagnell Firm's website address.  *Id.* at 34:53-35:22, 37:11-41.  Bagnell testified that the reason he described the Animation as "based on CT scans" was to convey that "the data [High Impact] were basing [it] on was real" with the motive of "get[ting] the word out to the public…"  *Id*. at 35:34-37:09.  According to the view count maintained by YouTube, as well as Bagnell's own estimate, the Animation had been viewed on Bagnell's YouTube page over 30,000 times prior to being taken down.  *See* Trial Tr. (Bagnell Testimony) at 351:21-352:1.

Before its removal pending the resolution of this lawsuit, the Animation appeared on the Bagnell Firm website on a dedicated page that a consumer could reach by clicking the "P320 Animation" tab on the website's main menu.  *See* Px134 (Bagnell Dep.) at 21:59-23:42.  Upon

clicking the "P320 Animation" tab, a consumer would find a web page with a graphic referencing the Animation at the center of the page, with a clickable "play" arrow icon that enabled a visitor to play the Animation directly from the web page.  *See id.*; Px029 (Animation on Website).  A consumer would see, as well, that Bagnell asserted a 2021 copyright in the Animation.  *See* Px134 (Bagnell Dep.) at 23:48-24:31; Px029.  The web page also included a clickable link so that a visitor could view the Animation on YouTube, where consumers could leave and respond to comments.  *See* Px029; Px134 (Bagnell Dep.) at 25:07-26:42.  Bagnell did not dispute that the reason for posting the Animation to YouTube was because he sought to publish the Animation on his website.  *See* Px134 (Bagnell Dep.) at 29:06-31:36; Px023 (Email Between Bagnell and High Impact); Px133 (High Impact Dep.) at 1:11:16-1:13:12.

In the few months that it was publicly available, the Animation created confusion among gun owners, potential owners, and the wider firearms community.  *See* Px031 (YouTube Comments); Px032 (YouTube Comments).  Indeed, several comments posted on YouTube by viewers of the Animation show that the false message was reaching consumers and causing harm.  *See, e.g.*, Px031; Px032.  One commenter wrote, "*This is the first CT scan I've seen like this. And it's amazing*," Px031, and another "*Should I stop carrying my P320?*"  Px031.  Another wrote, "*This is definitely plausible and [a] very well described video as to what could be the defective issue in Sigs Firearms.*"  Px032.  Another wrote, "*It seem[s] you nailed it on the head.*"  *Id*.  These comments indicate that viewers were being misled into thinking that what is depicted in the Animation was a "CT scan" and might be accurate, when in fact it is literally false.  *See* Px134 (Bagnell Dep.) at 45:06-45:21.

Bagnell is familiar with viewers' ability on the YouTube platform to leave a comment in response to something that is posted on YouTube.  *See id.* at 38:12-38:36.  Bagnell claimed that

12

he marked the Animation on his YouTube channel to "no comments," yet comments continued to appear.  *Id.*  Bagnell acknowledged that he spent time deleting comments himself.  *See* Px134 (Bagnell Dep.) at 40:49-41:03; Px031; Px032; Px033 (YouTube Comments).  Bagnell claims that he summarily deleted "all" comments.  *Id.* at 45:28-45:58.  Inconsistent with this claim, however, Bagnell did not "delete all comments."  *See* Px134 (Bagnell Dep.) at 47:15-47:30; Px032; Px033.  Instead, Bagnell deleted *particular* comments, including those raising questions about the accuracy of the Animation, while leaving behind at least one stating that the Animation was "plausible."  *See, e.g.*, Px032; Px033.

For example, one commenter wrote, "*I'm going to re-watch it now and look to see if I missed the firing pin safety block aspect.[6]  Don't think I did.  Did the earlier models not have one?  And the later models do?*"  *See* Px031.  Another wrote, "*Does this reflect the pre-upgrade or post-upgrade [fire control unit]?*"  *See* Px032.  Another wrote, "*Did they fix it with the upgrade or was this your findings after the upgrade?*"  *Id.*  Bagnell deleted all of these comments, which raised questions about the accuracy of the Animation, while leaving behind at least one comment that supported his false message: "*This is definitely plausible and [a] very well described video as to what could be the defective issue in Sigs Firearms.*"  *See* Px134 (Bagnell Dep.) at 46:36-48:30; *compare* Px032, *with* Px033.[7]

---

[6] Based on context, this reference to a "firing pin safety block" likely refers to the striker (i.e., firing pin) safety, a feature which has been present on the P320 since the firearm was first sold.

[7] Comparing Px032 with Px033 shows how, over time, Bagnell deleted some comments while leaving others.  In Px032, the total view count was 30,780 views.  In Px033, the total view count was slightly higher, at 31,446.  Additionally, Px032 shows a subscriber count of 170, while the subscriber count in Px033 is 177.  Finally, in Px032, the comment by D. Jackson is shown as posted "eight days ago", while the same D. Jackson comment in Px033 is shown as posted "ten days ago."  This indicates that Px033 is a screenshot of the YouTube comments at a point approximately two days later in time, that the screenshot in Px032.  This shows that, at some point in the two days between Px032 and Px033, Bagnell deleted the unfavorable comments but left the comment favorable to Bagnell.

### E. Critical Misrepresentations in the Animation

The opening frames of the Animation contain a prominent written message stating that SIG's P320 has a "mechanism of failure."  *See* Px001 (the Animation).  This conveys the message to viewers that what follows depicts that supposed "mechanism of failure."  The Animation then shows images of a CT scan of a P320.  *Id.* at 0:07.  This conveys the message to viewers that what follows is an accurate and exacting representation of the internal parts of the P320—a message that is false.  The Animation then morphs into fully animated images purporting to demonstrate the alleged mechanism of failure in action.  *Id.* at 0:11.  According to the Animation, "[n]ormal operation requires [a] trigger pull to discharge the firearm," *id.* at 2:07, but it is possible for the P320 to have a "defective discharge" with "no trigger pull," *id.* at 2:28. To support this false narrative, the Animation shows what purport to be images of internal components of the P320.  In reality, though, the images of P320 internal components on which the Animation's claims are based are misrepresentations, and the claims themselves are false. *See* Trial Tr. (Miller Testimony) at 243:4-24.

### i.  False Depiction of the Sear Face and Striker Foot

As SIG's expert, Robert Miller, testified, the Animation contains misrepresentations which—individually and together—make the Animation false.  *Id.* at 243:4-24.  First is the depiction of the sear face as lumpy and deformed, based on the use of a photograph of the face of a striker foot (not a sear) covered in grease (that could be easily wiped away with a Q-Tip).  *Id.* at 173:12-21, 204:3-205:14; 206:5-23; Px084 (Animation Sear).  In addition to visually examining the photographs and the actual physical components (strikers and sears), Miller used a drop indicator to carefully measure the flatness of an actual P320 sear face.  Trial Tr. (Miller Testimony) at 180:15-17.  A drop indicator is a measuring device which probes and measures

various points on the plane of the sear face.  *Id*. at 180:18-181:10.  Through this examination, Miller found that the difference between the lowest measurable point and the highest measurable point on the sear face was 0.0005 inches, indicating a *flat* surface.  Trial Tr. (Miller Testimony) at 180:11-182:20.  The Animation, on the other hand, appears to depict a lumpy and deformed surface.  *Id*; Px084; Px069; *See* Appendix 1 at 1.

Miller also undertook a visual comparison of the actual pre-upgrade P320 sear face and striker foot with the depictions in the Animation.  Trial Tr. (Miller Testimony) at 180:11-182:20; Px084; Px069; Px089; Px071; Appendix 1 at 1,3.  Miller observed no protrusions forward on the sear face or striker foot.  Trial Tr. (Miller Testimony) at 189:10-12; 192:22-25.  Additionally, Toner testified that the Animation's depiction of the striker foot did not look like the actual component because it was shorter in the Animation, among other discrepancies.  *Id*. (Toner Testimony) 67:9-22; Px117 (Striker Foot Comparison).  Importantly, Miller examined all materials provided by Bagnell, including Bagnell's affidavits, Villani's affidavits, Hick's affidavits, defendants proposed trial exhibits, and all case briefings and found that Bagnell did not provide any images that show a sear face or striker foot that looked like the one in the Animation.  Trial Tr. (Miller Testimony) at 206:24-8.  To the contrary, Miller compared the photo of the lumpy striker foot surface (grease easily wiped away with a Q-Tip) with the Animation's sear face, and he demonstrated how that photo (rotated 180 degrees and transposed onto the sear) was obviously the source of the contours in the Animation.  Trial Tr. (Miller Testimony) at 204:16-206:23, Px092 (Striker Foot and Sear Comparison); Appendix 1 at 2.  At trial, Defendants did not introduce any evidence and neither Bagnell nor Villani gave any substantive testimony that supported the Animation's representation of the components.  Miller

15

concluded, after his studies and observations, that the Animation falsely depicts the SIG P320 sear face.  *Id.* at 207:9-14.

Bagnell conceded that the photo he provided to High Impact showed grease, Trial Tr. (Bagnell Testimony) at 354:21-355:7, and Defendants did not meaningfully rebut the evidence that the contours of the grease were the source of the contours in the Animation.  Rather than defend the misrepresentation in the Animation, Defendants instead pivoted to claim that undefined "excess metal" is present on the sear face and striker foot regardless of the grease, without having performed any studies to support this assertion, and without providing any photographic evidence or actual components to support this assertion.  *See, e.g.*, D.E. # 162 at 4, 9-10.  At trial, the only basis offered by Defendants for this assertion is the unsupported "say-so" of Villani – no physical parts, and no measurements or testing.[8]  At the time the Animation was published in 2021, Villani had not measured or attempted to quantify any alleged irregularities in the surface of the sear or striker foot, and simply alleged that it was "visually obvious" there was a height difference.  Trial Tr. (Villani Testimony) at 339:2-15.  Villani's testimony on the alleged "obvious" irregularities was based solely on his purported examination of certain photographs. *Id.* at 308:2-309:2, 310:1-15, 323:12-14, 324:17-22.  However, as Miller explained, the particular features in the photographs which Villani alleges show excess metal, in fact only show highlighting and shadow, an artifact of the lighting and angles used in taking the microscopic photographs.  *Id.* at 269:21-271:11.  In fact, the P320 components introduced as evidence and shown to the court at trial all show flat and smooth sear and striker foot faces.  *See* Px135 (P320

---

[8] Defendants' reliance on Villani's "say-so" or *ipse dixit* to support this purported "opinion" is clearly inadequate.  *See Showers v. Pfizer, Inc. (In re Pfizer Inc. Sec. Litig.)*, 819 F.3d 642, 665 (2d Cir. 2016) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997))).

Parts).  Defendants offered nothing to support the Animation's depiction of these parts, and nothing even to support the generalized assertion of unspecified "irregularities" in the parts. Defendants had ample opportunities to support their claims with evidence or credible testimony but did not.

Defendants conceded at trial that the depiction of the sear face in the Animation is, indeed, based on the grease covered striker foot photograph—and Bagnell seemed to claim that this is what he intended to depict all along.  *See* Trial Tr. (Bagnell Testimony) at 354:22-355:7. Bagnell had never previously claimed that the Animation was intending to show grease (rather than an actual sear face), and the Animation itself does not indicate that in any way.  *See, e.g.* Px134 (Bagnell Dep.) at 53:02-54:20.  This last-minute change in Bagnell's story is not only completely incredible, but of course Defendants presented no testimony to explain why superimposing a grease-covered striker face on the sear to show lumps that are not really there is anything other than a materially false representation.

### ii.    False Depiction of the Slide's Upward Movement

The Animation falsely depicts the slide's ability to move up away from the frame, supposedly allowing the striker foot to bypass the sear and fire without a trigger pull.  *See* Trial Tr. (Miller Testimony) at 234:6-241:25.  As Miller explained, this is a physical impossibility.  *Id.* at 241:10-25.  Within the P320, the frame rails sit within the slide channel, two components made completely out of steel.  *Id.* at 235:13-236:17; Px132 (P320 CT Scan).  The Animation purported to show this occurring in an extended sequence.  Px01 (The Animation) at 4:44-4:57. In order to conduct an analysis of the Animation's depiction of this movement, Miller took a screenshot of the relevant frame of the Animation and adjusted the brightness and contrast of the image.  Trial Tr. (Miller Testimony) at 237:15-238:20.  This adjustment did not change what the

Animation was depicting, it simply lightened the dark colors obscuring what was going on in the Animation which allowed Miller to have better clarity of the image. *Id*. Miller was then able to observe that to depict upward movement, the Animation had the steel rail moving upward into and through the steel of the channel. Trial Tr. (Miller Testimony) at 240:5-241:1; Px096 (Animation Upward Movement Frame). As described at trial, Miller illustrated what was going on in exhibit Px096 to show the merging of the two steel parts in the Animation. Trial Tr. (Miller Testimony) at 239:8-20; Appendix 1 at 4. Miller added yellow lines to show the location of the slide channel, and a red box to show the location of the rail. *Id*. at 240:10-241:1. In a P320, the rail sits inside the slide channel, so an accurate depiction of these two parts would show the red box sitting between the two yellow lines. *Id*. However, in the Animation, that red box (the rail) moving into and through the bottom yellow line, thus depicting the steel rail merge into the slide channel by about half its height. *Id*. For this to occur in the real world, it would require metal to move through metal – an impossibility absent melting of the parts. Trial Tr. (Miller Testimony) at 241:2-9.

A close examination of Px096 shows the rail merging into the slide by half its width, and also shows the striker foot and sear in the background as the Animation portrays this alleged upward movement allowed the striker foot to walk up off the sear. Trial Tr. (Miller Testimony) at 242:1-19; Appendix 1 at 4. In this frame of the Animation, the striker foot has moved up just enough to be about to slip over the sear, but the only way to get this much upward movement required the Animation to have the rail and slide merge together in an impossible way. Trial Tr. (Miller Testimony) at 241:2-9. Without those two steel parts merging into each other, the striker foot would not have enough upward movement to be able to bypass the sear. Thus, this section of the Animation falsely depicts a striker foot walking up off the sear due to upward movement

of the striker.  *Id.* at 241:10-25.  Defendants presented no evidence to support this depiction in the Animation and did not even attempt to rebut Miller's analysis.

### iii.     False Depiction of the Striker Safety Notch Geometry and Height

Next, the Animation falsely depicts the P320's striker safety geometry.  *Id.* at 209:14-210:8.  Miller described his visual comparison of the striker safety notch as depicted in the Animation and as manufactured for a real P320, noting that the Animation: (1) omitted the angled nature of the safety notch's vertical wall and (2) omitted the undercut at the junction between the vertical wall and the horizontal plane of the safety notch.  *Id.*  These omissions are significant, as Miller testified, because the Animation uses these two misrepresentations in order to claim that the safety lock could slip over the safety notch to result in the gun firing without a trigger pull.  *Id.* at 210:9-211:1.  However, the Animation omits the physical geometry of the actual component that prevents this from occurring.  *Id.*

Miller additionally undertook an analysis of the height of the safety notch as depicted in the Animation.  *Id.* at 211:17-213:4.  By scaling side-by-side images of the Animation's safety notch and the actual component, Miller was able to determine that the Animation depicted a safety notch that is 50% shorter than the actual component.  *Id.*; Px125; Appendix 1 at 5.  The Animation also distorts the geometry of the safety notch (by depicting it as vertical instead of the angled geometry it actually has) to be able to create the claim that the lock could slide over and past the notch.  Trial Tr. (Miller Testimony) at 213:16-25.  Defendants presented no evidence showing a striker safety notch that looked like the one depicted in the Animation.  *Id.* at 214:10-15.

iv.    **False Depiction of the Striker Safety Lock**

Miller's review of the Animation also showed the Animation's use of distorted geometry of the striker safety lock and other safety geometry.  *Id.* at 220:18-221:25.  First, the Animation omits the striker safety spring, a component which maintains downward force on the striker safety.  *Id*. at 220:18-221:10; Px127; Appendix 1 at 6.  Second, the Animation distorts features of the striker safety lock that interact with the striker safety notch.  Aside from distorting the notch, as described above, the Animation also portrays the safety lock tab as rounded, deviating from the structured shape shown in the CT scan data.  Trial Tr. (Miller Testimony) at 220:18-221:10; Px129; Appendix 1 at 7.  The Animation claims that the safety lock can slip past the safety notch, causing the P320 to inadvertently fire without a trigger pull.  Trial Tr. (Miller Testimony) at 221:11-25.  However, after reviewing the actual components and the CT scan data, Miller concluded that to get to this claim, the Animation uses false depictions of all of these safety components.  *Id*.  Defendants presented no evidence showing any P320 striker safety lock or safety mechanism that looked like the one depicted in the Animation.  *Id.* at 222:10-15.

v.    **False Depiction of the Striker in Its Housing**

Miller also evaluated the depiction of the fitment between the striker and the striker housing and the supposedly "excessive" space shown in the Animation.  *Id.* at 223:4-224:5.  Miller's evaluation of this depiction included visual analysis of actual components, quantification of the alleged space shown in the Animation, and analysis of CT scan data.  *Id.* at 223:4-225:3; Px110; Px111; Appendix 1 at 8.  At trial, Miller explained how he had undertaken a quantification of the dimensions of the components shown in the Animation, and the purported space between them.  Px110(a); Appendix 1 at 9.  First, Miller imported that frame of the Animation depicting the striker in its housing into CAD software.  Trial Tr. (Miller Testimony)

at 226:25-227:13.  Using the CAD software, Miller was able to focus on the Outside Diameter of the striker, labeled as O.D., and the Inside Diameter of the striker housing, labeled as I.D., all as shown on Px110(a).  Trial Tr. (Miller Testimony) at 226:25-228:8; Appendix 1 at 9.  Miller measured an actual P320 striker and housing, then scaled the image from the Animation by applying the outside diameter of an actual striker housing to the Animation frame in the CAD software.  This process allowed the measurement of the interior diameter to be scaled to the size of the actual components, permitting an accurate comparison.  *Id*. 228:13-229:15.  Through his scaling and comparison of the space in the Animation versus the actual component, Miller found that the Animation depicted eleven times more space between the striker and the housing.  *Id.* at 226:25-229:23; Px110(a); Appendix 1 at 9 (Green writing).  Miller used a similar process to measure the difference in the amount of space between the housing channel and the striker foot.  Trial Tr. (Miller Testimony) at 230:15-231:6.  Here, Miller found that the Animation portrayed a spacing that was four times larger than what he measured in the actual components.  *Id.*; Px110(a); Appendix 1 at 9 (Blue writing).  Defendants offered nothing to rebut this analysis and provided no evidence showing a striker and housing fitment which looked like the one depicted in the Animation.  Trial Tr. (Miller Testimony) at 233:2-7.

### vi.   Summary of Misrepresentations

The Animation represents that the P320 has a mechanism of failure by which the striker foot walks up off the sear in order to cause the gun to fire without the trigger being pulled.  To get there, the Animation relies on a false depiction of the sear as lumpy and distorted, coupled with falsely enlarged space (11x larger) in the fitment of the striker in the striker housing and the false merging of two solid steel parts (in a part of the Animation obscured from viewers), along with significant distortions to the striker safety system and the striker safety lock geometry.  *Id.*

at 243:4-24. These misrepresentations work together to create the illusion that this alleged

failure mode can happen. *Id*. The misrepresentations and false depictions appear in about 80%

of the runtime of the Animation. *See* Px001 (Animation). The Animation is relying on

misrepresentations and distortions of the physical characteristics of these internal components to

achieve this failure mode, and therefore the Animation is depicting a false event. Trial Tr.

(Miller Testimony) at 243:4-24.

## ARGUMENT

### I.   Plaintiff Has Standing to Sue Defendants Under the Lanham Act

SIG has standing to sue Defendants under the Lanham Act because it "allege[s] an injury

to a commercial interest in reputation"—namely, that the Animation's false and distorted

depiction of the internal workings of the P320 have damaged or will damage SIG's reputation,

goodwill, and future business. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

118, 131 (2014) ("[T]o come within the zone of interests in a suit for false advertising under

§1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales.").

Defendants' suggestion that SIG falls outside of the zone of interests protected by the Lanham

Act because it and Defendants are not competitors is foreclosed by the plain language of the

Supreme Court's opinion in *Lexmark*, which states that "a rule categorically prohibiting all suits

by noncompetitors would read too much into the Act's reference to 'unfair competition'… [as

b]y the time the Lanham Act was adopted, the common-law tort of unfair competition was

understood not to be limited to actions between competitors." *Id.*

Indeed, nearly every court to address this issue has reinforced the principle articulated in

*Lexmark* that "a plaintiff need not show that a defendant was in commercial competition with

plaintiff to have standing under the Lanham Act." *Orange Lake Country Club, Inc. v. Reed Hein

& Assocs., LLC*, No. 6:17-cv-1542-Orl-31DCI, 2018 U.S. Dist. LEXIS 182131, at *24 (M.D.

Fla. Oct. 24, 2018); *see also, e.g.*, *Educ. Impact, Inc. v. Danielson*, No. 14-937 (FLW)(LHG), 2015 U.S. Dist. LEXIS 9467, at *37-38 (D.N.J. Jan. 28, 2015) ("[Defendant's] assertion that because [Defendant] is not in 'commercial competition with plaintiff' there can be no violation of the Lanham Act is incorrect."); *Diamond Resorts Int'l, Inc. v. Aaronson*, No. 6:17-cv-1394-Orl-37DCI, 2018 U.S. Dist. LEXIS 23574, at *6-7 (M.D. Fla. Jan. 26, 2018) ("The fallacy of [Defendants'] argument [that commercial competition is required] is apparent" in light of *Lexmark*); *Tobinick v. Novella*, 142 F. Supp. 3d 1275, 1279-80 (S.D. Fla. 2015) (same).

Courts in this district have reached the same conclusion, explaining that "[p]laintiff and defendant need not be competitors for a plaintiff to have standing" to bring a false advertising claim under the Lanham Act.  *Moreland v. Beso Lounge & Rest. LLC*, No. 3:19-cv-00958 (VLB), 2020 U.S. Dist. LEXIS 162009, at *10 (D. Conn. Sep. 4, 2020); *Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 292 (D. Conn. 2019) (same).  *Moreland v. Beso Lounge & Rest. LLC* provides an apt comparison.  There, professional models brought a Lanham Act claim for false advertising against a night club that had used and altered their images and disseminated them via social media to make it appear that they worked at the night club, which they did not. 2020 U.S. Dist. LEXIS 162009, at *3-5.  Applying *Lexmark*, Judge Bryant found that plaintiffs had adequately alleged reputational damage as a result of defendant's conduct and had therefore met their burden to allege standing.  *Id.* at *10-11.  There is no requirement that plaintiff and defendant be competitors, and the Court should not impose one here.

Defendants lean heavily on a small cluster of 2020 decisions from the District of Arizona. *See, e.g.*, *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, 2020 U.S. Dist. LEXIS 4214, at

*6-7 (D. Ariz. Jan 10, 2020).[9]  The interpretation of *Lexmark* applied there to require at least

indirect competition, however, contradicts the plain language of *Lexmark*, has not gained any

traction anywhere else, and has been explicitly criticized by other district courts.  *See Roof Maxx*

*Techs., LLC v. Rourk*, 2021 U.S. Dist. LEXIS 153487, at *30 n.2 (S.D. Oh. Aug. 16, 2021)

(explaining that *ThermoLife* "diverts from *Lexmark*'s holding" and that "this Court believes that

*ThermoLife* misread *Lexmark* and therefore disregards this non-binding authority").

Defendants' reliance on *POM Wonderful* is similarly misplaced.  In that case, the

Supreme Court merely noted that "competitors are within the class that may invoke the Lanham

Act because they may suffer an injury to a commercial interest in sales or business reputation

proximately caused by a defendant's misrepresentations" and defined the term "competitor" as

used in that opinion to "indicate all those within the class of persons and entities protected by the

Lanham Act."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014).  That case did

not purport to alter the "zone of interest" set forth in *Lexmark* by requiring some form of

competition between the plaintiff and the defendant.  *See id.*

## II.     Defendants' Animation Is False Advertising in Violation of the Lanham Act

To make out a claim for false advertising under Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a), a plaintiff must demonstrate that: (1) the challenged representation is

commercial advertising; (2) the representation in the challenged commercial advertising is false,

(3) the defendant misrepresented an inherent "quality or characteristic" of plaintiff's product, and

(4) the defendant placed the false or misleading statement in interstate commerce.  15 U.S.C. §

1125(a).

---

[9] The other District of Arizona cases on which Defendants rely include two other cases from
January 2020 involving the same plaintiff, ThermoLife International LLC, and a third case from
2020 which relies on the same rationale endorsed by the *ThermoLife* cases.

Where an advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertising's impact on the public. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255-56 (2d Cir. 2014) (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2010)). Depictions of products in animations are no less susceptible to a finding of literal falsity than claims expressed through words. *See, e.g., Schick Mfg. v. Gillette Co.*, 372 F. Supp. 2d 273, 285-86 (D. Conn. 2005); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 239 (2d Cir. 2001).

Here, the evidence presented by SIG at trial satisfied each of these elements.

### a. *The Animation Is Commercial Advertising*

Courts apply a three-part test to determine whether a representation constitutes "commercial advertising or promotion" under the Lanham Act. They consider whether the representation: (a) constitutes commercial speech, (b) was made with the intent of influencing potential customers to purchase the speaker's goods or services, and (c) is disseminated sufficiently to the relevant purchasing public. *See e.g., Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56-58 (2d Cir. 2002)). Here, the evidence presented by SIG at trial satisfied the test for commercial advertising.

As the U.S. Supreme Court has recognized for some time, it is "well established that attorney advertising is commercial speech." *Fla. Bar v. Went for It*, 515 U.S. 618, 623 (1995). Although the advertising at issue in *Went for It* involved direct mail solicitations to victims of accidents or disasters, the modes of attorney advertising since the Supreme Court's decision in that case have expanded in light of advances in technology. Now, of course, attorneys and law firms routinely market their services and expertise on websites and social media platforms, and

they rely far less on direct mailings and other outmoded forms of communication.  Accordingly,

many states, including Connecticut and Massachusetts (the two states in which Bagnell is

admitted to practice), recognize that law firm websites constitute attorney advertising.  *See*

Massachusetts Rule of Professional Conduct 7.2 Comment 3 (permitting lawyers to pay for

advertising, including the cost of website domain name registrations, and to compensate website

designers); Connecticut Rule of Professional Conduct 7.2(c)(1) and Commentary (permitting

lawyers to pay reasonable costs of advertisements, including the cost of website domain name

registrations); *see also Campfield v. Safelite Grp., Inc.*, 2016 U.S. Dist. LEXIS 197622, at *17-

18 (S.D. Ohio Sept. 30, 2016) ("Many courts have concluded that posting a statement on a

website constitutes 'commercial advertising or promotion' within the meaning of § 43(a).")

(finding that videos constituted commercial advertising, in part, because they were posted on

defendant's website).

Despite Bagnell's evasiveness when questioned about whether his website is attorney

advertising, *see, e.g.*, Px134 (Bagnell Dep.) at 15:30-16:27, 18:20-18:40, he admitted that his

website is a communication to potential clients about himself, his law practice, his capabilities,

his rates, and how to contact him.  *Id.* at 17:52-18:50, 19:22-19:57, 20:58-21:58.  That Bagnell

posted the Animation on his firm's website demonstrates an intention to use the Animation

commercially, *i.e.*, to demonstrate to potential clients his expertise as a litigator in gun accident

cases, in particular those alleging that a P320 fired without a trigger pull, and to attract potential

clients.  The Bagnell Firm's website places significant emphasis on Bagnell's experience in P320

litigation.  A consumer who visits the website and clicks "enter" on the Welcome page is taken

to the home page, which repeatedly highlights his work for plaintiffs in cases against SIG.

Px059 (2022 Bagnell Law Website Homepage); Px134 (Bagnell Dep.) at 19:22-19:57.  From the

26

home page, the consumer can navigate to pages including "client reviews," "cases," and "practice areas," all of which tout Bagnell's experience.  *See* Px059.  A consumer can also navigate to a page that invites the consumer to "contact" Bagnell and provides information about Bagnell's "rates."  *See* Px060 (2022 Bagnell Law Website Contact Page); Px134 (Bagnell Dep.) at 20:14-21:58.  Finally, as Bagnell admitted, he registers his website with the Connecticut Statewide Grievance Committee every year, indicating that his website is attorney advertising in need of regulation.  Px134 (Bagnell Dep.) at 16:31-16:37; *see also id.* at 19:48-19:54 ("I was trying to follow the basic format of a legal practice website.").  Thus, Bagnell's publication of the Animation on his website beginning in 2021 and continuing through its suspension in the context of this lawsuit, constitutes commercial advertising.

This conclusion is no different because Defendants also published the Animation on YouTube.  As an initial matter, Bagnell does not dispute that he posted the Animation on YouTube because this was what he was told he needed to do in order to add a link to the Animation to his website and publish it there.  *See* Px134 (Bagnell Dep.) at 29:06-31:36; Px023 (Email Between Bagnell and High Impact).  Regardless, Bagnell posting the Animation on YouTube (including a reference to the specific URL for Bagnell's website) only highlights his intention to use the Animation as a marketing tool.  Just like Defendants' website, which is accessible to anyone in the world with an Internet connection, YouTube is broadly accessible and is commonly used by lawyers and law firms to advertise their services.  In addition, YouTube has an active community of gun owners and enthusiasts and would likely reach more viewers than if published on the website alone.  The fact that Bagnell included his firm's website address under the Animation on YouTube underscores that he intended to use it commercially.

By providing the website address, Bagnell provided viewers with all the information they would need to learn about his expertise and contact him about potential legal representation.

Nor do Bagnell's claims that he may also have intended the Animation to have an informational or a social purpose—even if believed—alter the conclusion that the Animation is commercial advertising.  As the Supreme Court stressed in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67-68 (1983), "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues."

"Speech may be classified as commercial . . . even when, in addition to having a business purpose, it has an informational or a social purpose."  *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1235 (S.D.N.Y. 1991); *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 294 (S.D.N.Y. 2016).  A "hybrid" communication that combines commercial and non-commercial elements may be "commercial" where "(1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for the speech."  *Enigma Software*, 194 F. Supp. 3d at 294.

Whether on YouTube or the Bagnell Firm website, the context surrounding the Animation—which the viewing public would see first and last—clearly communicates that the Animation is presented to promote Bagnell and his firm.  Moreover, the fact that Bagnell posted the Animation on YouTube for the purpose of publishing it on his website—and only after he tried in vain to post it on his website alone—demonstrates that the Animation was published for business purposes—i.e., to promote Bagnell and his firm.

### b.  *The Animation Contains Many Literally False Material Misrepresentations*

A Lanham Act plaintiff establishes falsity by proving either that: (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers (i.e., impliedly false).  *See L. & J.G. Stickley, Inc. v. Cosser*, 255 F. App'x 541, 543 (2d Cir. 2007).  The fact that Defendants have falsely depicted SIG's P320 through an Animation makes those depictions no less susceptible to a finding of literal falsity than claims expressed through words.  *See, e.g., Schick Mfg.*, 372 F. Supp. 2d at 285-86 (finding animation literally false because it exaggerated extent to which defendant's vibrating razor raised hair up and away from skin prior to shaving); *S.C. Johnson*, 241 F.3d at 239 (upholding district court's finding that animation was literally false because it exaggerated extent to which competitor's "Slide Loc" plastic bag leaked water when filled and held upside down).  Indeed, this Court rejected such an argument in *Schick Manufacturing v. Gillette Co.*, concluding that: "Gillette's argument that the animated portion of its advertisement need not be exact is *wrong as a matter of law*.  Clearly, a cartoon will not exactly depict a real-life situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug.  However, *a party may not distort an inherent quality of its product in either graphics or animation*."  372 F. Supp. 2d at 285 (emphasis added).  That is exactly what Defendants have done here.  And Defendants' depictions are all the more literally false given the assertions in the Animation and its surrounding context that it is based on CT scan data and microscopic photography.

The Animation is replete with literally false statements.

*First*, the Animation falsely depicts malformed versions of the P320's sear face and striker foot—depicting the sear as lumpy and uneven, depicting both the sear and striker foot as having an "inset surface" and purported "rollover condition," and depicting a shortened striker

29

foot.  *See supra* Section E(i).  In reality, as Miller demonstrated during the hearing, the surfaces of both parts are flat with straight edges.  *See id.*

 **Second**, the Animation falsely depicts the slide's ability to move up away from the frame, allowing the striker foot to walk up off the sear and fire without a trigger pull.  *See supra* Section E(ii). As Miller explained, such movement is physically impossible and was accomplished in the Animation only by having two steel parts merge into each other in an obscured part of the Animation.  *See id.*

 **Third**, the Animation falsely depicts the height and geometry of the P320's striker safety notch.  *See supra* Section E(iii).  As Miller demonstrated, the Animation not only omits both the angled nature of the safety notch's vertical wall and the undercut at the junction between the vertical wall and the horizontal plane of the safety notch, but it also depicts a safety notch that is 50% shorter than the actual component.  *See id.*

 **Fourth**, the Animation falsely depicts the geometry of the P320's striker safety lock.  *See supra* Section E(iv).  Miller's review revealed that the Animation omits the striker safety spring, distorts features of the striker safety lock that interact with the striker safety notch, and falsely portrays the safety lock tab as rounded.  *See id.*

 **Fifth**, the Animation falsely depicts excessive space between the striker and its striker housing.  *See supra* Section E(v).  In fact, after performing visual analysis of actual components, quantifying the alleged space, and analyzing CT scan data, Miller found that the Animation depicted *eleven* times more space between the striker and the housing.  *See id.*

 As Miller testified, all of these misrepresentations in the Animation work together to make the claims of the Animation false:

> [O]verall, the animation is claiming [a] failure mode that … sudden impact or vibration leads to unintentional discharge.  And to get there, the animation is using

distortions to the sear face, … distortions to the fitment of the striker into the striker housing, … distortions to the safety geometry, and misrepresenting the physical movement of the slide[,] all working together to create the illusion that this failure mode can happen. … [W]hen we look at the falsities of how these different features are depicted in the animation and the fact that they are all falsely depicted to create that illusion, then it's my opinion that this animation falsely depicts how the actual product appears and how the actual product is manufactured and how the actual product behaves.

Trial Tr. (Miller Testimony) at 243:8-24.

### c. *The Animation's Material Misrepresentations Are of Inherent Qualities or Characteristics of the P320*

The evidence also establishes that Defendants' literally false representations relate to inherent qualities or characteristics of the P320 and are therefore material.  *See, e.g.*, *S.C. Johnson*, 241 F.3d at 238 (explaining that the requirement that defendants misrepresent an "inherent quality or characteristic" of the product "is essentially one of materiality, a term explicitly used in other circuits").  Specifically, each of the misrepresentations catalogued above is about the size, geometry, and dimensions of SIG's P320—*i.e.*, "inherent characteristics" of the firearm—and how they behave and interact.  The Animation uses those false statements and misrepresentations in service of a message that the P320 is inherently unsafe because of those specific alleged internal flaws.  These are precisely the types of claims that can be expected to impact a consumer's purchasing decision or opinion of SIG—a point that is underscored by the nature of the comments left on Bagnell's YouTube channel, *see, e.g.*, Px031 (*"Should I stop carrying my P320?"*).  *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016) ("This Court has defined materiality as 'likely to influence purchasing decisions,' a definition in harmony with other Circuits' use of the term.").  Here, the evidence presented by SIG at trial established that the misrepresentations of fact relate to inherent qualities or characteristics of the P320.

### d.  *The Animation Was Published in Interstate Commerce*

The Animation was published on the Internet, which constitutes interstate commerce.
*See, e.g.*, *Cousteau Soc'y, Inc. v. Cousteau*, 498 F. Supp. 3d 287, 311 (D. Conn. 2020) ("The internet has been 'routinely recognized by [the Second Circuit] as an instrumentality of interstate commerce.'") (citing *United States v. Cheng Le*, 902 F.3d 104, 112 (2d Cir. 2018)); *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (noting that a web site "is an avenue of interstate commerce"); *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1180 (D. Or. 2008) (statements made on website were advertisements in interstate commerce). Defendants do not dispute that the Animation was published in interstate commerce.

### e.  *Impact of Defendants' Deception*

Where—as here—the advertisement contains literally false representations, a plaintiff need not introduce evidence of consumer deception.  *See L. & J.G. Stickley, Inc.*, 255 F. App'x at 543.  As demonstrated above, the Animation is replete with literally false representations about internal components of the P320.  Thus, SIG need not offer evidence of consumer deception. And, to be clear, SIG is not required to prove that Defendants acted willfully.  However, the evidence presented by SIG at trial leaves no doubt as to Defendants' state of mind.

First, as described in detail above, *see supra* Section C, the distortions in the Animation were accomplished only because Bagnell directed High Impact to significantly deviate from the CT scan data that he provided to them.  Based on this CT scan data of an actual P320, High Impact created an electronic 3D model of the P320 that was faithful to the CT scan data. Subsequently, Bagnell instructed High Impact to *deviate* from that CT scan data, directing High Impact to make internal components of the P320 appear in distorted and false ways, and to appear to function in a way that is physically impossible, all as described above.

Second, Bagnell actively deleted comments that raised questions about the accuracy of the Animation, *see supra* Section D.  For example, in a comment that Bagnell has since deleted, a self-identified SIG customer said: *"I'm going to re-watch it now and look to see if I missed the firing pin safety block aspect.  Don't think I did.  Did the earlier models not have one?  And the later models do?"*  Px031 (YouTube Comments).  The customer then stated that *"if the early models had a firing pin block this video is misleading.  Cause if all else fails it will stop the pin."* *Id.*  These comments were subsequently deleted.  *Compare* Px031 *with* Px032 (YouTube Comments).  The P320 has all along had both a striker safety notch and safety lock (both misrepresented in the Animation).  In yet another comment that Bagnell deleted, a user wrote, *"Does this reflect the pre-upgrade or post-upgrade [fire control unit]?"*  Px032.

### III.     Plaintiff Is Entitled to a Permanent Injunction Against the Animation to Remedy the Lanham Act Violation

A permanent injunction is warranted where a plaintiff demonstrates (1) irreparable harm if the relief is not granted; (2) the absence of an adequate remedy at law, such as monetary damages; (3) that, considering the balance of hardships between plaintiff and defendants, injunctive relief is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See L. & J.G. Stickley, Inc.*, 255 F. App'x at 543 (applying standard in Lanham Act false advertising action); *Cornelio v. Connecticut*, No. 3:19-cv-1240 (JAM), 2023 U.S. Dist. LEXIS 163106, at *26-27 (D. Conn. Sept. 14, 2023).

As a result of a recent amendment to the Lanham Act, a plaintiff that demonstrates a Lanham Act violation is entitled to a statutory presumption of irreparable harm.  *See* 15 U.S.C. § 1116(a) (noting that a plaintiff seeking a permanent injunction "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection"); *Johnson v. Mi Rancho*, No. 3:19-cv-00862 (MPS), 2021 U.S. Dist. LEXIS 250995, at *23 (D.

Conn. Aug. 16, 2021) (applying presumption in false association case); *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2023 U.S. Dist. LEXIS 64630, at *7 (C.D. Cal. Apr. 12, 2023) (applying presumption in false advertising case); *Knature Co. v. Duc Heung Grp., Inc.*, 2021 U.S. Dist. LEXIS 168284, 2021 WL 3913194, at *5 (C.D. Cal. July 2, 2021) ("Plaintiffs are entitled to a rebuttable presumption of irreparable injury—and therefore no adequate remedies at law—when they prove a violation of the Lanham Act."); *see also Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 20-55933, 2021 U.S. App. LEXIS 30144, at *15 n.8 (9th Cir. Oct. 7, 2021) ("[U]nder the newly amended version of 15 U.S.C § 1116(a), it appears that [Plaintiff], if successful on its Lanham Act claims, might obtain permanent injunctive relief without affirmative proof that it suffered irreparable harm."); *cf. Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1326 (7th Cir. 2022) ("Unlike statutes such as the Lanham Act, see 15 U.S.C. § 1116(a), Title VII does not excuse a showing of irreparable harm.").  Because the evidence presented by SIG at trial overwhelmingly demonstrated a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), SIG is entitled to that statutory presumption of irreparable harm, satisfying this permanent injunction factor.  15 U.S.C. § 1116(a); *see Mi Rancho*, 2021 U.S. Dist. LEXIS 250995, at *23.

Defendants have not made any effort to rebut this presumption with evidence.  While Bagnell testified at the hearing that his "own research" suggests the Animation "had no impact whatsoever" on SIG's sales or their business, he presented absolutely no evidence to support this assertion.  Trial Tr. (Bagnell Testimony) at 355:8-19.  Bagnell's unsupported conjecture does not come close to rebutting the presumption of irreparable harm to which SIG is entitled.  Defendants appear to suggest that SIG is required to allege actual lost sales or revenue to make out its Lanham Act claim.  *See, e.g.*, D.E. # 162 at 17.  In the Second Circuit, however, the law is

unequivocal that a plaintiff like SIG, seeking an injunction under the Lanham Act, rather than money damages, need not present evidence of an actual loss or diversion of sales. *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir. 1981) ("[P]roof of diversion of sales is not required for an injunction to issue pursuant to § 43(a)."); *Johnson & Johnson*, 631 F.2d at 190-92 ("Sound policy reasons exist for not requiring proof of actual loss as a prerequisite to § 43(a) injunctive relief.  Failure to prove actual damages in an injunction suit, as distinguished from an action for damages, poses no likelihood of a windfall for the plaintiff.").

Even in the absence of the statutory presumption, "[t]he statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising."  *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980); *L. & J.G. Stickley, Inc.*, 255 F. App'x at 543.  Here, the evidence presented by SIG at trial established this "reasonable basis."

The Animation's false and distorted depiction of the internal workings of the P320 threatens SIG's reputation, goodwill, and future business.  It conveys the false message that the P320 has the specific internal defects discussed above and that those defects allow the striker to "walk off" the sear and fire without a trigger pull (which the Animation accomplishes by grossly exaggerating the internal space between parts and by merging two solid parts into each other, a physical impossibility).  It conveys the false message that the P320 contains substandard and poorly manufactured components that appear lumpy and malformed rather than flat with straight edge, or that are smaller or shaped differently in critical ways that appear to allow the purported failure depicted in the Animation.  These false representations harm SIG's reputation and goodwill.

What's more, Defendants published the Animation knowing it contained these falsifications, which have been proven by detailed expert testimony. *See supra* Section E.  At trial, Defendants admitted, at least in part, to falsely depicting the P320 in the Animation—by, for example, conceding that the depiction of the sear face is based on the grease covered striker foot photograph.  And Defendants failed to refute the other falsities, offering no competing analysis, demonstration, measurement, testing, or quantification of any kind, and—through the testimony of Villani—even admitting that they had none.  By intentionally fostering confusion, Defendants, through the Animation, would cause irreparable harm to SIG's brand, reputation, and goodwill.

Additionally, the wide availability of the Bagnell Firm Website and YouTube—both accessible to anyone in the world with an Internet connection—increases the likelihood of harm to SIG were the Animation to become available again.  *See* Px033 (displaying a view count of 31,455); Trial Tr. (Bagnell Testimony) at 351:21-352:1 (Bagnell estimating that the Animation had been viewed on his YouTube page around 35,000 or 37,000 times prior to being taken down); D.E. # 162 (Defendants noting that a version of the Animation had more than 80,000 views on another website).  In fact, a number of YouTube comments posted during the brief time before the Animation was taken down demonstrate that some irreparable harm has been experienced already.  For example, one user asked, *"Should I stop carrying my P320?"*  Px031. And in a comment showing that the Animation has the potential to affect an entire line of SIG products, not just the P320, another asked: *"was it only the P320 models specifically affected[?] Or the whole line that shares that [fire control unit] … like the M18 etc.[?]"*  *Id.*

IV.     **The Most Appropriate Lanham Act Remedy Here Is a Permanent Injunction As Set Forth in Plaintiff's Proposed Order, Attached As Exhibit A, Requiring Defendants to Permanently Refrain from Publishing the Animation**

A permanent injunction provides the most suitable remedy to ensure Defendants permanently cease the distribution of the Animation as advertising on the Bagnell Firm website, YouTube, or any other platform.

The balance of hardships between SIG and Defendants weighs in favor of the permanent injunctive relief SIG seeks.  This balance tips decidedly in SIG's favor, as SIG is entitled to a statutory presumption of irreparable harm to its reputation and customer goodwill in the event the Animation's false representations are published again.  By contrast, issuance of a permanent injunction will not harm Defendants.  Rather, they will remain free to advertise their services; they simply cannot do so using the false and misleading Animation.

Additionally, the public interest will be served by granting SIG's requested injunction, as it is in the public interest to remove false advertising from the marketplace.  *See Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 205 (N.D.N.Y. 2016) (finding public interest would be served by enjoining defendants from engaging in misleading advertising).  Indeed, "the public interest in truthful advertising . . . lies at the heart of the Lanham Act."  *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992).  Moreover, as discussed below, SIG's narrowly tailored requested injunction does not impinge on any First Amendment rights, as it targets false advertising, which is not entitled to First Amendment protection.  *See Alexander v. Cahill*, 598 F.3d 79, 90 (2d Cir. 2010).  Thus, an order requiring Defendants to permanently refrain from publishing any version of the Animation to the public in any advertising context would not adversely affect the public interest.  To the contrary, such an order is affirmatively in the public interest.

Finally, monetary damages are clearly inadequate to redress the presumptive irreparable harm to SIG, as they cannot adequately account for the intangible but significant harm to SIG's reputation and customer goodwill that the Animation would cause if made available again to the public. Accordingly, SIG does not seek damages in this case.

## V.   Issuance of Plaintiff's Narrowed Proposed Injunction Would Not Raise Any First Amendment Concerns

False advertising receives no First Amendment protection whatsoever. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 558-59 (1980); *Alexander*, 598 F.3d at 90 ("[Misleading] advertising is not entitled to First Amendment protection."); *Vidal Sassoon*, 661 F.2d at 276 n.8 ("Misleading commercial speech is beyond the protective reach of the First Amendment."); *Fleminger, Inc. v. United States HHS*, 854 F. Supp. 2d 192, 195 (D. Conn. 2012) ("As a threshold matter, the Court must determine whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment.") (internal quotation marks omitted).

Nor is the doctrine of prior restraint applicable in the context of commercial speech. *See Jay Norris, Inc. v. Fed. Trade Comm'n*, 598 F.2d 1244, 1252 (2d Cir. 1979) ("[F]or commercial speech … the doctrine of prior restraint may be inapplicable."); *Bad Frog Brewery v. N.Y. State Liquor Auth.*, No. 96-cv-1668 (FJS), 1996 U.S. Dist. LEXIS 18068, at *9 n.5 (N.D.N.Y. Dec. 5, 1996) ("The 'prior restraint' doctrine … is not applicable in the commercial speech context."). Defendants' reliance on *Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) is misplaced, as that case did not concern commercial speech, did not involve literally false descriptions of the inherent physical characteristics of a product, and the broad injunction at issue there lacked any contextual limitations.

Even if the Court were to engage in a prior restraints analysis, SIG's proposed injunction is sought after a full trial on the matter in which the literal falsities were definitively proven, and, in any event, is narrowly tailored.  SIG narrowed the proposed injunction in response to questions from the Court during the hearing, *see* Trial Tr. at 149:17-21; the narrowed proposed order enjoins Defendants from publishing the Animation in any advertising context.  Defendants will remain otherwise free to express their opinions about SIG's products or to use the Animation in the context of litigation.

## CONCLUSION

For the foregoing reasons, SIG Sauer respectfully requests that this Court find that Defendants' Animation violates the Lanham Act and issue a permanent injunction in the form of Plaintiff's Proposed Order, attached as **Exhibit A**, ordering the Bagnell defendants to permanently refrain from publishing any version of the Animation to the public in any advertising context, whether on the Bagnell Firm website or in any other form on any other platform, and whether on the Internet or in any other media.

Dated:  March 25, 2024

Respectfully submitted,

SIG Sauer, Inc.

By its attorneys,

*/s/ Anthony D. Mirenda*
Anthony D. Mirenda (*pro hac*)
E. Jacqueline Chavez (*pro hac*)
Caroline Holliday (*pro hac*)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone:  617-832-1000
Facsimile:  617-832-7000
adm@foleyhoag.com
jchavez@foleyhoag.com
cholliday@foleyhoag.com

James R. Smart (CT Bar ct20982)
Koch, Garg & Brown
1177 High Ridge Rd.
Stamford, CT 06905
Telephone: 203-461-1056
james@kgb-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, a copy of the foregoing was filed electronically.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Dated:  March 25, 2024                                          */s/ Anthony D. Mirenda*
                                                     Anthony D. Mirenda