**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SIG SAUER, INC.,
    *Plaintiff*,

v.                                                          No. 3:22-cv-00885 (VAB)

JEFFREY S. BAGNELL, ESQ., LLC, and
JEFFREY S. BAGNELL,
    *Defendants*.

**AMENDED RULING AND ORDER ON MOTION FOR A PERMANENT INJUNCTION**

Jeffrey Bagnell, an attorney, commissioned High Impact, a graphics company, to create an animation purporting to show how a P320 pistol could misfire absent a trigger pull ("uncommanded discharge" or the "Animation"). He later posted that Animation to YouTube and published it on his firm's website. Part of Mr. Bagnell's business involves representing plaintiffs who claim that they have been injured by uncommanded discharges from P320s.

Sig Sauer, Inc. ("Plaintiff"), the manufacturer of the P320, moved for permanent injunctive relief under the Lanham Act against Mr. Bagnell and his law firm, Jeffrey S. Bagnell, Esq., LLC (collectively "Bagnell" or the "Defendants"), alleging that the Animation constitutes false advertising by inaccurately portraying the firearm's internal components and safety features.

The issue in this case thus is not whether the P320 pistol can misfire or undergo uncommanded discharges, or whether that issue should properly be the subject of litigation elsewhere, or public commentary anywhere.[1]

---

[1] *See, e.g*, Obj. to Pl.'s Trial Mem at 4–6, ECF No. 162 ("Def. Obj. to Trial Mem."); Defs.' Post-H'rg Reply Br. at 3–5, ECF No. 177.

Instead, as the parties stipulated, the issues are: (1) whether the Animation constitutes false advertising under the Lanham Act, and (2) whether Sig Sauer is entitled to permanent injunctive relief barring publication of the version of the Animation presented in this case.[2] The Court held a two-day trial on the motion for a permanent injunction in February 2024.[3]

For the reasons stated below, Sig Sauer's motion for a permanent injunction is **GRANTED**.

Jeffrey S. Bagnell, Esq., LLC and Jeffrey S. Bagnell, and anyone acting on their behalf who receives actual notice of this Order, is hereby **ORDERED** to refrain permanently from using this version of the Animation for advertising purposes, whether on the Bagnell Firm website or in any other form on any other platform, and whether on the Internet or in any other media.

## I.      FINDINGS OF FACT AND CONCLUSIONS OF LAW

To make a successful claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must establish that (1) the challenged representation is commercial advertising; (2) the representation in the challenged commercial advertising is false; (3) the defendant misrepresented an "inherent quality or characteristic" of the product in

---

[2] *See* Joint Stipulation Re: the Issues Remaining in the Case, ECF No. 154.
[3] Following the trial, the presiding judge, the Honorable Jeffrey Alker Meyer untimely and unfortunately passed before a decision was rendered in this case. After Judge Meyer's death, this judge assumed responsibility for rendering this decision, and accepted from the parties following the case's transfer, numerous submissions from both sides in the months before its initial decision, Order Granting Mots. For Leave to File Additional Exs., ECF No. 197. *See, e.g.*, ECF Nos. 209, 212, 216, 223, 224. Thus, neither Judge Meyer nor this Court closed the record for purposes of issuing a ruling. Nonetheless, the Court herein certifies its "familiarity with the record," and has "determin[ed] that the case may be completed without prejudice to the parties." Fed. R. Civ. P 63. In fact, as noted above, this Court accepted filings from the parties following the case's transfer to it, and at no time before the Court's initial Ruling and Order did either party raise an issue as to the ability of this case to "be completed without prejudice to the parties." *Id.* The Court further notes that, in light of the motion for reconsideration filed by the Defendants, ECF No. 230, the Court took yet another review of the record to ensure that nothing had been overlooked and to determine whether any further proceedings were actually necessary. This Amended Ruling and Order thus additionally addresses, to the extent necessary, concerns raised about the style and substance of the Court's initial Ruling and Order.

question; and (4) the defendant placed the false or misleading statement in interstate commerce. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014); 15 U.S.C. § 1125(a).[4]

The plaintiff "has the burden of proof to present evidence in support of the allegations . . . and to prove those allegations by a preponderance of the evidence." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 232 (S.D.N.Y. 2013). And to meet this burden, "the trier of fact [has] to believe that the existence of a fact is more probable than its nonexistence." *Id.* (quoting *Metro. Stevedore Co. v. Rambo,* 521 U.S. 121, 137 n. 9 (1997)).

On this record, this burden has been met.

### A.  Commercial Advertising

A statement constitutes commercial advertising or promotion under the Lanham Act if it is "(1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) . . . disseminated sufficiently to the relevant purchasing public." *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 233 (2d Cir. 2023) (quoting *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004)).

First, it has been "well established that lawyer advertising is commercial speech." *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995). While *Went for It* related to direct mail solicitations, much attorney and law firm advertising has moved online. *See C=Holdings B.V.*, 992 F. Supp. 2d at 242–43 (S.D.N.Y. 2013) (finding published statements on the internet to be

---

[4] The Defendants argue that Sig Sauer lacks standing because its claim cannot fall within the Lanham Act's "zone of interests" since the Defendants and Sig Sauer are not in direct competition. *See* Def. Obj. to Trial Mem. at 11. The United States Supreme Court held in in *Lexmark Intern, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), however, that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. The Supreme Court further cautioned that it would be "a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition it can protect *only* the false-advertiser's direct competitors." *Lexmark*, 572 U.S. at 136 (emphasis in original); *see also Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 118–19 (2d Cir. 2023) (applying *Lexmark*'s "zone of interest" test for evaluating false advertising cases in the Second Circuit). Sig Sauer is not the Defendants' competitor, but it is plainly alleging "an injury to a commercial interest in reputation or sales." *Lexmark*, 572 at 132. This Court will therefore proceed directly to analyzing the merits of Sig Sauer's claim.

"obvious" commercial advertising). And many states—including Connecticut and Massachusetts, where Mr. Bagnell is admitted to practice—now regulate the manner by which attorneys advertise online. *See* Mass. R. Pro. Conduct 7.2 cmts. 1, 3; Conn. R. Pro. Conduct 7.2(c)(1) & comment. A video posted to YouTube and then to an attorney's website satisfies the first prong of the test.

Second, the animation was made for the purpose of influencing potential clients. The Defendants admitted that his website is a communication to potential clients about himself, his law practice, his rates, and how to contact him.[5] The law firm's website is registered with the Connecticut Statement Grievance Committee every year, which demonstrates an acknowledgement that this website is attorney advertising in need of regulation.[6] That website's home page repeatedly and prominently highlights the Defendants' work for plaintiffs in cases against SIG Sauer, as well as the press received and the television interviews done about that work.[7] On this record, based on these facts and admissions, the Animation was posted for the purpose of influencing consumers to purchase the Defendants' legal services.[8]

Third, the Animation was available to anyone with an internet connection.

The Defendants argue that the Animation cannot be classified as commercial speech because its publication did not have a solely economic purpose. Instead, they were purportedly

---

[5] Pl. Ex. 134 at 17:52-21:58 ("Bagnell Dep."); *see e.g.*, Tr. of Bagnell Dep. at 39:2–4, Ex. C, Pl. Mem. of L., ECF No. 158 ("I'm letting clients know that I have a good record, and I have some peer-reviews on it."); *id.* at 41: 21–23 ("I'm saying: If anyone has a legal inquiry, here is my information to contact."); *id.* at 42: 3–12 ("Q: And what was the purpose for your including the information there under 'Rates' on this 'Contact' page? A: Just so clients – potential clients – would have the information ahead of time. And, you know, in the past, I have offered contingency, hybrid, or straight hourly arrangements. So I'm just giving the clients – the potential clients – information.").

[6] Bagnell Dep. at 16:31-16:37.

[7] Pl. Ex. 59 (Bagnell Website Homepage).

[8] That Bagnell originally posted the animation to YouTube rather than his attorney website does not change this Court's conclusion. He does not dispute that he posted the video to YouTube first because he was told by High Impact to do so in order to cross-post it to his own website. Bagnell Dep. at 29:06-31:06; Pl. Ex. 23.

attempting to raise awareness about a public safety concern.[9] But "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983); *cf. N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 840 (2d Cir. 1994) ("[A]dvertising which links a product to a current debate is not thereby entitled to constitutional protection afforded noncommercial speech." (quoting *Bolger*, 463 U.S. at 68).

"[H]ybrid" communication with commercial and noncommercial purposes "may nonetheless be 'commercial' where (1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for the speech." *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 294 (S.D.N.Y. 2016). Because this Animation was an advertisement, it clearly refers to Sig Sauer's P320 product, and the Defendants do not contest that they had, at least, a partial economic motivation to commission and publish the Animation[10]—regardless of whether the Defendants had social and economic purposes for creating it—the Animation still constitutes commercial advertising under § 43(a). *See* 15 U.S.C. § 1125(a). And "[i]n light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible." *Bolger*, 463 U.S. at 65 (internal citations omitted).

### B. Falsity

"'Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers.'" *Merck Eprova AG*, 760 F.3d at 255 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001)). This Animation is literally false as a factual matter.

---

[9] Def. Obj. to Trial Mem. at 16.
[10] Def. Obj. to Trial Mem. at 16.

The P320 is a striker-fired pistol, meaning that a pull of the trigger initiates a sequence of internal components to move, culminating in the releasing of a compressed spring, which drives a pin forward to impact the cartridge, causing the gun to fire.[11] The Animation, which is approximately five minutes long, claims to show how vibrations or sudden movements could cause the P320 to fire absent a trigger pull.

It opens with a written message that the P320 contains a "mechanism of failure," suggesting that the following sequence is that mechanism.[12] The Animation then depicts a CT scan of a P320 before moving into fully animated renderings of the internal components of the firearm combined with text guidance. According to the Animation, "[n]ormal operation requires [a] trigger pull to discharge a firearm," but it is possible for the P320 to have a "defective discharge" with "no trigger pull."[13]

But Sig Sauer has demonstrated that it would not be possible for the P320 to have the "mechanism of failure" specifically depicted in the Animation, and identified five literally false statements within the video about specific components of the pistol.[14] *See Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273, 285–86 (D. Conn. 2005) (finding an animation to be literally false commercial speech under the Lanham Act); *S.C. Johnson*, 241 F.3d at 239 (same).

First, the Animation falsely depicts malformed versions of two P320 components: the sear and the striker foot. The Animation depicts the sear as lumpy and uneven and depicts both components has having "inset surfaces," which could lead to an unsafe "rollover condition."[15] In reality, as Sig Sauer's expert witness, Robert Miller, demonstrated at trial, both components are

---

[11] *See* Trial Tr. 28:10–29:2, ECF No. 173.
[12] Pl. Ex. 1 at 0:01-0:03 (animation).
[13] *Id.* at 2:07-2:28.
[14] In 2017, Sig Sauer implemented a voluntary upgrade program for the P320 pistol, the animation depicts the pre-upgrade version. Thus, the falsity analysis is based on a comparison between the animation and the pre-upgrade P320. *See* Def. Ex. 3; Trial Tr. 59:24-61:10, 143:2-10, ECF No. 173.
[15] Pl. Ex. 1 at 2:31-2:36.

flat with straight edges, making "rollover" impossible.[16] The difference is evident in

photographs: the Animation's depiction of the sear is below on the left while the actual P320 sear

is below on the right.





Pl. Ex. 84                                                Pl. Ex. 69

And the Animation's depiction of striker foot is below on the left while the actual P320

striker foot is below on the right.





Pl. Ex. 89                                                Pl. Ex. 71

According to High Impact's deposition, which was played during the first day of trial, the

company based initial versions of the Animation on photos and CT scan data of the P320 pistol

provided by the Defendants.[17] In an earlier model of the Animation, the sear surface was flat.[18]

---

[16] *See* Trial Tr. 203:14-207:14, ECF No. 174.
[17] Pl. Ex. 133 at 13:51-16:27 (Nick Maguire, 30(b)(6) representative designee of High Impact, Dep.).
[18] *See* Pl. Ex. 9; Trial Tr. 200:7-201:20, ECF No. 174.

After that version of the Animation was shared with Mr. Bagnell, High Impact met with Mr. Bagnell and Peter Villani to discuss the portrayal of these two components.[19]

Mr. Villani then shared a photo with High Impact of what appeared to be a lumpy striker foot to serve as the basis for its edits to the Animation.[20] But the photo was taken during an inspection of a number of P320 pistols in 2021, at which Mr. Bagnell and Mr. Villani were present, and this particular photo was of grease buildup on the striker foot of a particular firearm.[21]

During that inspection, the examiner ran a Q-Tip over that striker foot, cleaning off the grease and revealing the flat striker foot face beneath.[22] Mr. Bagnell and Mr. Villani both witnessed the Q-Tip cleanse, and Mr. Bagnell conceded at trial that the lumpy appearance of the striker foot in the photo he shared with High Impact was actually just grease.[23] In other words, Mr. Bagnell knew that the image was a distorted portrayal of the striker foot, yet he still used it to direct High Impact in creating the Animation.

Second, the Animation falsely depicts the slide's ability to move up away from the frame, allowing the striker foot to walk up off the sear and fire without a trigger pull. As Mr. Miller explained, such movement is not physically possible and was accomplished in the Animation only by having two steel parts—the slide and frame rail—merge into each other in an obscured part of the Animation.[24] Mr. Miller illustrated this inaccuracy in Sig Sauer's Exhibit 96, by adding yellow lines to a still from the Animation to show the location of the slide channel, and a red box to show the location of the rail.[25]

---

[19] Pl. Ex. 133 at 56:10-59:02.
[20] Pl. Ex. 133 at 56:16-59:35.
[21] Trial Tr. 82:5-85:12, ECF No. 173.
[22] *Id.* at 85:18-86:24); *see also* Pl. Ex. 76.
[23] Trial Tr. 86:25-87:16, ECF No. 173; Trial Tr. 354:11-355:7, ECF No. 174; *see also* Pl. Ex. 134 at 53:29-54:01.
[24] Trial Tr. 273:15-241:25, ECF No. 174.
[25] *Id.* at 240:10-241:1.



Pl. Ex. 96

As Mr. Miller pointed out, in an actual P320, the rail sits inside the slide channel, so an accurate depiction would have the red box sitting inside the two yellow lines.[26] Unless these two metal components were melted or broken, there would be no way for the slide to move through the rail as depicted in the Animation.[27] The Defendants presented no evidence to refute Miller's analysis on this issue nor did they otherwise support the Animation's depiction of the slide and rail.

Third, the Animation falsely depicts the striker's safety geometry.[28] There are two key differences between the striker's so-called safety notch depicted in the Animation and the actual P320 striker safety notch. The Animation falsely depicts the notch's vertical wall as straight rather than angled, and the Animation omits an undercut at the junction between the vertical wall and the horizontal plane of the safety notch.[29] The Animation's rendering of the striker safety notch is pictured below on the left and the actual safety notch is pictured below on the right.

---

[26] *Id.* at 240:10-241:1.
[27] *Id.* at 241:2-9.
[28] *Id.* at 209:14-210:8.
[29] *Id.*



Pl. Ex. 125

Mr. Miller testified that these two misrepresentations in the Animation are significant because they allow the Defendants to claim that the safety lock could slip over the safety notch to result in an uncommanded discharge.[30] But, as is clear from the photograph of the actual P320, the physical geometry of the components prevents this from occurring.[31] Mr. Miller also conducted comparative analysis of the Animation and CT data scans of a P320 from which he was able to conclude that the safety notch as depicted in the Animation is 50% shorter than the actual component.[32] The safety notch's smaller size combined with the Animation's distorted geometry added credibility to the otherwise inaccurate claim that the lock could slide past the notch.[33] The Defendants presented no evidence at trial that the striker safety notch resembled the one depicted in the Animation.[34]

Fourth, Mr. Miller's review of the Animation revealed a distortion of the striker safety lock that makes the lock appear less stable in the Animation than it is in reality.[35] The Animation depicts the safety lock as having a bulbous, rounded appearance and as fitting loosely against the

---

[30] *Id.* at 210:9-211:1; *see* Pl. Ex. 1 at 4:25-4:32.
[31] Trial Tr. 210:9-211:1, ECF No. 174.
[32] *See id.* at 211:17-213:4; Pl. Ex. 125.
[33] Trial Tr. 213:16-25, ECF No. 174.
[34] *See id.* at 214:10-15.
[35] *See id.* at 214:16-215:15, 218:3-222:9; Pl. Exs. 127, 129.

striker. In actuality, the striker safety lock has flat edges and is tightly fitted against the striker. The Animation's rounded and loose version of the striker lock is depicted below on top of an accurate rendering of the safety lock.



Pl. Ex. 129

Fifth, the Animation falsely represents the dimensions of the striker foot and striker housing by depicting "[e]xcessive space" between the two components.[36] The Animation notes that this "[e]xcessive space allows the striker pin to rotate."[37] Through his comparative analysis, Mr. Miller demonstrated that the Animation depicted eleven times more space between the striker foot and striker housing than exists in the P320.[38] The Animation's rendering of the striker foot and housing unit is pictured below on the left and a CT scan of those components in an actual P320 is picture below on the right.

---

[36] Trial Tr. 222:16-224:5, ECF No. 174.
[37] Pl. Ex. 1 at 3:57.
[38] Trial Tr. at 228:13-230:18, ECF No. 174.





Pl. Ex. 110                                    Pl. Ex. 111

Mr. Miller also analyzed the difference between the housing channel and the striker foot, where he found four times more space between the two components in the animation than in the CT scan data.[39]

In sum, the Animation contains five literally false statements that distort the firearm's components and safety features to support a claim that sudden impact or vibration leads to unintentional discharge.[40] The "mechanism of failure" depicted by the animation thus would not be possible given the P320's actual composition. *Cf. Schick Mfg., Inc.*, 372 F. Supp. 2d at 285–86 ("[A] party may not distort an inherent quality of its product in either graphics or animation. [Defendant] acknowledges that the magnitude of beard hair extension in the animation is false. The court finds, therefore, that any claims with respect to changes in angle and the animated portion of the [defendant's] current advertisement are literally false.").

For the same reasons as discussed above, even if "literally true," the Animation "is likely to deceive or confuse customers." *Merck Eprova AG*, 760 F.3d at 255 (citation and internal quotation marks omitted). Testimony from Mr. Peter Villani, the Defendants' own expert,

---

[39] Trial Tr. 226:25-231:5, ECF No. 174.
[40] *See id.* at 243:8-24.

12

underscores the source of likely customer confusion: the use of a pre-upgrade gun rather than a post-upgrade gun in the Animation, and the related decision not to depict in it features of the post-upgrade gun currently in use by Sig Sauer.[41] Put another way, while the Defendants focus on what, in their opinion, the Animation is intended to show, the Animation nonetheless leaves out parts of the gun, does not precisely depict spatial relationships within it, and "is likely to deceive or confuse consumers."

Accordingly, on this record, nothing in the Animation sufficiently helps consumers understand the distinction between their opinion of the gun as depicted in the Animation and the gun a consumer may be able to purchase, or already own. *See, e.g.*, Pl. Ex. 31 (quoting a consumer commenting on the Animation after it was posted YouTube: "Should I stop carrying my P320?").

### C. Materiality

In addition to proving falsity, Sig Sauer must prove that the Defendants misrepresented an "inherent quality or characteristic of the product." *S.C. Johnson & Son, Inc.*, 241 F.3d at 238. "This requirement is essentially one of materiality[.]" *Id.* The Second Circuit has defined materiality as "likely to influence purchasing decisions." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997). The five statements at issue here misrepresent the internal components of the P320 in an attempt to demonstrate that it is essentially unsafe for purchase. A firearm's safety to its bearer is plainly an "inherent quality or characteristic" and "likely to influence purchasers." There were also comments on the Animation when it was posted to YouTube that suggest consumers were influenced by it. *See, e.g.*, Pl. Ex. 31 ("Should I stop carrying my

---

[41] Trial Tr. 321: 10-322:4, ECF No. 174.

P320?"); Pl. Ex. 32 ("This is definitely plausible and very well described . . . BTW I own a Sig

M18 with a safety."); *cf. Apotex*, 823 F.3d at 68 ("[T]here is no record evidence that this

inaccuracy would dissuade consumers from purchasing [the product].").

### D.  Interstate Commerce

The internet has been routinely recognized as an instrumentality of interstate commerce.

*See United States v. Le*, 902 F.3d 104, 112 (2d Cir. 2018) (collecting cases); *see also Romeo &*

*Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08cv0442(DLC), 2016 WL 815205, at *7

(S.D.N.Y. Feb. 29, 2016) (recognizing the internet as an instrumentality of interstate commerce

for purposes of false advertising claims under the Lanham Act). Through placing the Animation

on YouTube and the Defendants' website, they plainly placed the statement in an instrumentality

of interstate commerce. Furthermore, the Defendants do not dispute that the fourth criterion is

satisfied.

## II.    REMEDY OF PERMENANT INJUNCTION

To obtain a permanent injunction, a plaintiff must satisfy a four-factor test, demonstrating

"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction." *Merck Eprova AG*, 920 F.

Supp. 2d at 432 (quoting *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). For the

reasons stated below, Sig Sauer has demonstrated that each factor of the test weighs in its favor.

### A.  Irreperable Harm

Under the Lanham Act, a plaintiff seeking a permanent injunction is "entitled to a

rebuttable presumption of irreparable harm upon a finding of a violation." 15 U.S.C. § 1116(a).

Since there was such a finding here, Sig Sauer is entitled to the presumption that it has cleared the "irreparable harm" hurdle. *See Johnson v. Mi Rancho, LLC*, No. 3:19-cv-00862 (MPS), 2021 WL 6498264, at *7 (D. Conn. 2021) ("Since the Court has found 'a violation' of § 1125(a), Plaintiffs enjoy a presumption of irreparable harm, satisfying the first permanent injunction factor.")

To rebut this presumption, the Defendants offered only that his "own research" suggests that the Animation "had no impact whatsoever" on SIG's business,[42] but declined to provide further detail on this research other than to state that "[t]he P320 is the best-selling striker fired gun on the market for 2022 and 2023."[43] But even if Sig Sauer was not entitled to the presumption of irreparable harm, it would not be required to provide proof of business loss. *See Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir. 1981) ("Although [the plaintiff] offered no evidence of actual sales loss directly traceable to the alleged misrepresentations, proof of diversion of sales is not required for an injunction to issue [under the Lanham Act]."); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980) ("The correct standard is whether it is likely that [the defendant's] advertising has caused or will cause a loss of [the plaintiff's] sales, not whether [the plaintiff] has come forward with specific evidence that [the defendant's] ads actually resulted in some definite loss of sales.").

Instead, Sig Sauer need only provide a "reasonable basis for the belief that . . . [it] is likely to be damaged as a result of the false advertising." *Johnson & Johnson*, 631 F.2d at 190. And Sig Sauer has, at least, provided a reasonable basis for believing that the "false and distorted depiction of the internal workings of the P320," which the Defendants made available to anyone

---

[42] Trial Tr. 355:8-19, ECF No. 174.
[43] *Id.* at 355:15-19.

with an internet connection, "threaten[ed] SIG's brand, reputation, and good will."[44] Indeed, the

Animation has been viewed as many as 37,000 times on YouTube over the seven-month period

before it was taken down, and at least 80,000 times on another website.[45]

As the Second Circuit noted long ago:

> Sound policy reasons exist for not requiring proof of actual loss as
> a prerequisite to . . . injunctive relief. Failure to prove actual
> damages in an injunction suit, as distinguished from an action for
> damages, poses no likelihood of a windfall for the plaintiff. The
> complaining competitor gains no more than that to which it is
> already entitled a market free of false advertising.

*Johnson & Johnson*, 631 F.2d at 192.

The significant number of views here supports the notion that Sig Sauer suffered

irreparable harm.

### B. Absence of Adequate Remedy at Law

Because of this Court's findings of a Lanham Act violation, and irreparable harm, a

permanent injunction barring the publication of this version of the Animation is the most suitable

remedy for Sig Sauer's injury. Allowing the Defendants to continue publishing this literally false

animation risks further injury to Sig Sauer's goodwill, brand, and reputation, not to mention its

business interests. Furthermore, monetary damages to Sig Sauer alone would be inadequate to

redress the irreparable harm, as it would be difficult to quantify the intangible harm to reputation

and consumers' goodwill that would result should the injunction be denied.

### C. Balance of Hardships

Absent a permanent injunction, Sig Sauer risks harm to its goodwill and reputation.

While the Defendants argues that this injunction would "threat[en] his very livelihood,"[46] the law

---

[44] Pl.'s Post-Trial Opening Br. at 35-36, ECF No. 176.
[45] Trial Tr. 351:21-352:1, ECF No. 174; Def. Obj. to Trial Mem. at 4.
[46] Def. Obj. to Trial Mem. at 21.

firm has a robust legal practice—including by representing clients against Sig Sauer—both before this Animation and since it has been removed from the internet.[47] As to any alleged First Amendment right issue, in particular, an alleged prior restraint on speech,[48] this case is in a different procedural posture from the context of a preliminary injunction, before an evidentiary hearing and this Court's factual findings above with respect to the Animation's falsity. *See, e.g.*, Br. of *Amici Curiae* ACLU, ACLU of Connecticut, and ACLU of New Hampshire in Opp'n to Pl.'s Renewed Mot. for Prelim. Inj. at 3, ECF No. 96 ("[A]lthough false or misleading commercial speech is unprotected by the First Amendment, SIG's preliminary injunction would restrain speech that has not been fully adjudicated to be false or misleading in any context.").

Indeed, "[c]ommercial speech that is false or misleading is afforded no First Amendment protection at all." *See Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (collecting cases); *cf. Gordon & Breach Sci. Publ'ers S.A. v. Am. Inst. Physics*, 859 F. Supp. 1521, 1544 (S.D.N.Y. 1994) ("[A]llegations of activities explicitly promotional in nature: distribution of survey results favoring defendants' products to an audience that represents the core consumer of those products. These activities clearly fall closer to [the Lanham Act's] reach than does mere publication of the articles. They may properly be described as commercial speech that a competitor employs for the express purpose of influencing consumers to buy [its] goods and services, or as speech proposing a commercial transaction." (citations and internal quotation marks omitted)).

---

[47] *See* Pl. Ex. 59 (Bagnell Website Homepage) (filed Feb. 13, 2024); *Bagnell | Law: P320*, Jeffrey S. Bagnell, Esq., LLC, https://www.bagnell-law.com/p320 (last visited Jan. 5, 2025) [https://perma.cc/3KZ5-S899]. The Court may take judicial notice of publicly available information on a website, assuming the authenticity of the website is not called into question. *See e.g., Force v. Facebook, Inc.*, 934 F.3d 53, 59-60 n.5 (2d Cir. 2019), *cert. denied*, *Force v. Facebook, Inc.*, 140 S.Ct. 2761 (Mem) (2020).
[48] Def. Obj. to Trial Mem. at 21-22.

17

Moreover, this permanent injunction merely prevents the Defendants from publishing this version of the Animation for advertising purposes. Such a narrow injunction does nothing to prevent the Defendants from continuing to practice law, represent plaintiffs against Sig Sauer, publicly express opinions about Sig Sauer or its products, or using even this version of the Animation in the context of other litigation.[49] Instead, the Defendants are (and will be) barred only from publishing this literally false animation about the P320, which, on this record, does not accurately explain how an uncommanded discharge could happen.[50] *Cf. S.C. Johnson & Son, Inc.*, 241 F.3d at 241 (upholding permanent injunction that limited its scope to the advertisements at issue and "other advertisements that similarly fail to accurately depict [the plaintiff's product]").

As a result, on this record, the balance of the hardships favors Sig Sauer, rather than the Defendants.

### D. Public Interest

Public interest underlies the Lanham Act's prohibition on false advertising. It is thus inherently in the public interest to permanently enjoin deceptive marketing, despite Defendants'

---

[49] To be clear, this Court takes no position whatsoever as to the admissibility of this version of the Animation in a court of law. That issue is one within the discretion of any court addressing this version of the Animation in the context of a specific case. *Cf. Weldon v. MTAG Servs., LLC*, No. 3:16-CV-783 (JCH), 2017 WL 776648, at *10 (D. Conn. Feb. 28, 2017) ("Federal courts in Connecticut routinely apply the state's litigation privilege to claims that challenge representations made in underlying state court litigation."); *Derisme v. Hunt Leibert Jacobson P.C.*, 880 F. Supp. 2d 311, 337 (D. Conn. 2012) ("It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy . . . The privilege applies also to statements made in pleadings or other documents prepared in connection with a court proceeding.").

[50] Significantly, nothing in this Ruling and Order can and should be construed as precluding the use of Animation depicting an uncommanded discharge of the P320, which can be adequately supported by the facts. *See Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975) ("The novel factual situation presented here dictates a narrow reading of this opinion."); *Am. Can Co. v. N.L.R.B.*, 535 F.2d 180, 188 n.13 (2d Cir. 1976) ("In view of our emphasis on the particular and unusual facts of this case, our decision should not be read that expansively."); *Cabreja-Rojas v. Reno*, 999 F. Supp. 493, 498 (S.D.N.Y. 1998) ("The Court emphasizes that this is a very narrow decision.").

argument to the contrary.[51] *See Ideavillage Products Corp. v. OhMyGod 1*, No. 18-CV-9999 (RA), 2020 WL 6747033, at *4 (S.D.N.Y. Nov. 17, 2020) ("A permanent injunction would also promote the public interest in freedom from deception in the marketing of consumer goods.**)**; *Adama Studios LLC v. Tang*, No. 23-cv-05842 (JMA) (ARL), 2024 WL 2816002, at *7 (E.D.N.Y. June 3, 2024) ("[T]he public interest is served by issuing injunctive relief because it would protect the public from deception, mistake, and confusion.").

Accordingly, the public interest is not disserved by issuing the below injunction.

## III.    CONCLUSION AND ORDER OF PERMANT INJUNCTION

For the reasons stated above, Sig Sauer's motion for a permanent injunction is **GRANTED**.

Jeffrey S. Bagnell, Esq., LLC and Jeffrey S. Bagnell, and anyone acting on their behalf, who receives actual notice of this Order, is hereby **ORDERED** to refrain permanently from using this version of the Animation for advertising purposes, whether on the Bagnell Firm website or in any other form on any other platform, and whether on the Internet or in any other media.

This permanent injunction shall not be construed to affect the ability of the Defendants to use any image, take any position, or make any argument to a court in any other litigation, as the Defendants' conduct in the course of other litigation is subject to the determinations of that other court.

The Clerk of Court is respectfully directed to enter judgment for the Plaintiff, and to close this case.

This Order shall remain in effect pending further order of this Court.

---

[51] Def. Obj. to Trial Mem. at 22-23.

**SO ORDERED** at New Haven, Connecticut, this 5th day of June, 2026.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE